1  **SUSAN MARTIN (AZ#014226)**
2  **JENNIFER KROLL (AZ#019859)**
   **MARTIN & BONNETT, P.L.L.C.**
3  1850 N. Central Ave. Suite 2010
   Phoenix, Arizona 85004
4  Telephone: (602) 240-6900
   smartin@martinbonnett.com
5  jkroll@martinbonnett.com

6  Attorneys for Plaintiff

7

8                    IN THE UNITED STATES DISTRICT COURT

9                             DISTRICT OF ARIZONA

10 _____
11 MARK SMILOVITS, Individually and on      :   **Civil Action No.:**
   Behalf of All Other Persons Similarly    :
12 Situated,                                 :
                                            :
13                              Plaintiff,   :   **JURY TRIAL DEMANDED**
                                            :
14            v.                             :
                                            :
15                                          :
                                            :
16 FIRST SOLAR, INC., MICHAEL J.            :
   AHEARN, ROBERT J. GILLETTE, MARK        :
17 R. WIDMAR, JENS MEYERHOFF, and          :
   JAMES ZHU,                               :
18                                          :
19                              Defendants.  :
   _____

20                      **CLASS ACTION COMPLAINT**

21        Plaintiff Mark Smilovits ("Plaintiff"), individually and on behalf of all other

22 persons similarly situated, by his undersigned attorneys, for his complaint against

23 defendants, alleges the following based upon personal knowledge as to himself and his

24 own acts, and information and belief as to all other matters, based upon, *inter alia*, the

25 investigation conducted by and through his attorneys, which included, among other

26 things, a review of the defendants' public documents, conference calls and

27 announcements made by defendants, United States Securities and Exchange Commission

28 ("SEC") filings, wire and press releases published by and regarding First Solar, Inc.

("First Solar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased First Solar securities between April 30, 2008 and February 28, 2012, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      First Solar designs and manufactures solar modules.  The Company uses a thin film semiconductor technology to manufacture electricity-producing solar modules.

3.      On February 29, 2012, the Company announced its financial results for the fourth quarter and year ended December 31, 2011.  Specifically, First Solar reported a decrease of $345 million in net sales for the fourth quarter, as compared to the previous quarter, "primarily due to the timing of revenue recognition in our systems business and lower for module-only sales."  In addition, the Company disclosed various charges including a charge of $164 million for warranty payments to replace equipment that caused premature power loss in certain panels.  The Company spent $125.8 million in the fourth quarter on warranty claims and has put aside $37.5 million to cover future claims.

4.       On these revelations, First Solar shares declined $4.10 per share or 11%, to close at $32.30 per share, on February 29, 2012.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) the full impact of certain manufacturing flaws on the Company's earnings; (2) that the Company was improperly

recognizing revenue concerning certain products in its systems business; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as First Solar's principal place of business is located within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.      Plaintiff as set forth in the attached certification purchased First Solar securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.      Defendant First Solar is a Delaware corporation, with its principal place of business located at 350 West Washington Street, Suite 600, Tempe, Arizona 85281.  First Solar's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "FSLR."

13.     Defendant Michael J. Ahearn ("Ahearn"), the founder of First Solar, has served as the Company's Chairman of the Board of Directors ("Board") since January 2011 and interim Chief Executive Officer ("CEO") since October 2011.   Defendant Ahearn served as CEO from August 2000 to September 2009 and Executive Chairman from October 2009 to December 2010.

14.     Robert J. Gillette ("Gillette") served as the Company's CEO and a director on the Board between October 1, 2009 and October 25, 2011.

15.     Defendant Mark R. Widmar ("Widmar") has served as the Company's Chief Financial Officer ("CFO") since April 2011 and Chief Accounting Officer since February 2012.

16.     Defendant Jens Meyerhoff ("Meyerhoff") served as the Company's CFO between May 2006 and December 31, 2010 and President of the Company's Utility Systems Business between July 2010 and September 30, 2011.

17.     James Zhu ("Zhu") served as the Company's Chief Accounting Officer from November 2, 2009 through January 2012.  From January 2011 through March 2011, Defendant Zhu served as the interim CFO.  From June 2007 through October 2009, Defendant Zhu served as the Company's Vice President and Corporate Controller.

18.     The defendants referenced above in ¶¶ 13 - 17 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     First Solar manufactures photovoltaic ("PV") solar modules, and provides comprehensive PV solar systems.  By enabling clean, renewable electricity at competitive prices, First Solar provides an economically and environmentally viable alternative to peaking fossil-fuel electricity generation.   First Solar introduced the industry's first prefunded, comprehensive collection and recycling program for solar modules.  From raw material sourcing through end-of-life collection and recycling, First Solar is focused

on creating value-driven renewable energy solutions that protect and enhance the environment.

**Materially False and Misleading**
**Statements Issued During the Class Period**

20.     On April 30, 2008, the Company issued a press release announcing its financial results for the first quarter ended March 29, 2008.  For the quarter, the Company reported net income of $47 million, or $0.57 diluted earnings per share ("EPS") and revenue of $197 million, as compared to net income of $5 million, or $0.07 diluted EPS and revenue of $67 million, for the same period a year ago.

21.     On May 2, 2008, the Company filed a quarterly report for the period ended March 29, 2008 on Form 10-Q with the SEC, which was signed by Defendant Meyerhoff and reiterated the Company's quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that it disclosed any material changes to the Company's internal control over financial reporting.

22.     On July 30, 2008, the Company issued a press release announcing its financial results for the second quarter ended June 28, 2008.  For the quarter, the Company reported net income of $70 million, or $0.85 diluted EPS and revenue of $267 million, as compared to net income of $44 million, or $0.58 diluted EPS and revenue of $77 million, for the same period a year ago.

23.     On July 31, 2008, the Company filed a quarterly report for the period ended June 28, 2008 on Form 10-Q with the SEC, which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

24.     On October 16, 2008, the Company issued a press release announcing its financial results for the third quarter ended September 27, 2008.  For the quarter, the Company reported net income of $99 million, or $1.20 diluted EPS and revenue of $349 million, as compared to net income of $46 million, or $0.58 diluted EPS and revenue of $159 million, for the same period a year ago.

25.     On October 31, 2008, the Company filed a quarterly report for the period ended September 27, 2008 on Form 10-Q with the SEC, which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

26.     On February 24, 2009, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 27, 2008.  For the year, the Company reported net income of $348 million or $4.24 diluted EPS and revenue of $1.2 billion, as compared to net income of $158 million or $2.03 diluted EPS and revenue of $504 million, for the same period a year ago.  For the fourth quarter, the Company reported net income of $133 million or $1.61 diluted EPS and revenue of $434 million, as compared to net income of $63 million or $0.77 diluted EPS and revenue of $201 million, for the same period a year ago.

27.     On February 25, 2009, the Company filed an annual report for the period ended December 27, 2008 on Form 10-K with the SEC, which was signed by, among others, Defendants Ahearn and Meyerhoff, and reiterated the Company's previously announced financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

28. On April 29, 2009, the Company issued a press release announcing its financial results for the first quarter ended March 28, 2009. For the quarter, the Company reported net income of $165 million, or $1.99 diluted EPS and revenue of $418 million, as compared to net income of $47 million, or $0.57 diluted EPS and revenue of $197 million, for the same period a year ago.

29. On May 1, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on Form 10-Q with the SEC, which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

30. On July 30, 2009, the Company issued a press release announcing its financial results for the second quarter ended June 27, 2009. For the quarter, the Company reported net income of $181 million, or $2.11 diluted EPS and revenue of $526 million, as compared to net income of $70 million, or $0.85 diluted EPS and revenue of $267 million, for the same period a year ago.

31. On August 3, 2009, the Company filed a quarterly report for the period ended June 27, 2009 on Form 10-Q with the SEC, which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

32. On October 28, 2009, the Company issued a press release announcing its financial results for the third quarter ended September 26, 2009. For the quarter, the Company reported net income of $153million, or $1.79 diluted EPS and revenue of $481

million, as compared to net income of $99 million, or $1.20 diluted EPS and revenue of $39 million, for the same period a year ago.

33.    On October 30, 2009, the Company filed a quarterly report for the period ended September 26, 2009 on Form 10-Q with the SEC, which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

34.    On February 18, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 26, 2009.  For the year, the Company reported net income of $640 million, or $7.53 diluted EPS and revenue of $2.1 billion, as compared to net income of $348 million or $4.24 diluted EPS and revenue of $1.2 billion, for the same period a year ago.  For the fourth quarter, the Company reported net income of $142 million, or $1.65 diluted EPS and revenue of $641 million, as compared to net income of $133 million or $1.61 diluted EPS and revenue of $434 million, for the same period a year ago.

35.    On February 22, 2010, the Company filed an annual report for the period ended December 26, 2009 on Form 10-K with the SEC, which was signed by, among others, Defendants Zhu, Ahearn, Gillette and Meyerhoff, and reiterated the Company's previously announced financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

36.    On April 28, 2010, the Company issued a press release announcing its financial results for the first quarter ended March 27, 2010.  For the quarter, the Company reported net income of $172 million, or $2.00 diluted EPS and revenue of $568 million,

as compared to net income of $165 million, or $1.99 diluted EPS and revenue of $418 million, for the same period a year ago.

37.     On April 29, 2010, the Company filed a quarterly report for the period ended March 27, 2010 on Form 10-Q with the SEC, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

38.     On July 29, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 26, 2010.  For the quarter, the Company reported net income of $159 million or $1.84 diluted EPS and revenue of $588 million, as compared to net income of $181 million, or $2.11 diluted EPS and revenue of $526 million, for the same period a year ago.

39.     Later in the day, the Company held a conference call with analysts. Defendant Gillette represented, in relevant part, the following:

> Finally in Q2, reflected costs associated with the modular replacement program.  During the period from June of 2008 to June of 2009, a manufacturing excursion affecting less than 4% of the total product manufactured within the period.  The excursion could result in possible premature power loss in affected modules.  The root cause was identified and subsequently mitigated in June of 2009.  Ongoing testing confirms the corrective actions are effective.  We have been working directly with impacted customers to replace the affected modules and these efforts are well under way, and in some cases complete.  Some of these efforts go beyond our normal warranted coverage.  We accrued the estimated full cost of these additional efforts in our Q2 results….

40.     During the conference call, Defendant Meyerhoff represented, in relevant part, the following:

> During the second quarter, we accrued $17.8 million in cost of sales for expected module replacement costs and our cost of goods sold.  In addition, we accrued $5.6 million of operating expenses associated with this process

excursion, bringing our total accrued expenses to $27.4 million at the end of the second quarter.

41.     On August 2, 2010, the Company filed a quarterly report for the period ended June 26, 2010 on Form 10-Q with the SEC, which was signed by Defendant Zhu and reiterated the Company's quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

42.     The 10-Q represented the following, in relevant part:

> During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we have accrued additional expenses of $17.8 million in the second quarter of 2010 and $29.5 million in total to date to cover the replacement of the anticipated affected module population in the field.

43.     On October 28, 2010, the Company issued a press release announcing its financial results for the third quarter ended September 25, 2010.  For the quarter, the Company reported net income of $177 million, or $2.04 diluted EPS and revenue of $798 million, as compared to net income of $153 million, or $1.79 diluted EPS and revenue of $481 million, for the same period a year ago.

44.     On November 1, 2010, the Company filed a quarterly report for the period ended September 25, 2010 on Form 10-Q with the SEC, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information

contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

45.    The 10-Q represented the following, in relevant part:

The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty.  During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. We did not incur any incremental costs during the third quarter of 2010.

46.    On December 14, 2010, the Company issued a press release announcing financial guidance for 2011.  The Company stated, in relevant part, the following:

First Solar Inc. today announced 2011 financial guidance. In 2011, First Solar forecasts net sales in the range of $3.7 to $3.9 billion, up about 46% year over year compared to the midpoint of 2010 guidance provided on October 28, 2010. The net sales forecast is comprised of $2.8 to $2.9 billion of module sales and $0.9 to $1.0 billion of EPC/project development sales. EPS is forecasted to grow to between $8.75 to $9.50 per fully diluted share and consolidated operating income is $875 to $975 million. These forecasts include $80 - $85 million of manufacturing start-up expenses and $15-20 million of factory ramp costs associated with plant expansions. The Company plans to invest $1.0 to $1.1 billion of capital to nearly double production capacity by year-end 2012, to maintain existing capacity and to add infrastructure to support growth. First Solar expects to generate $1.0 - $1.1 billion of operating cash flow during 2011.

"First Solar revenue and profit is continuing to grow in 2011," said Rob Gillette, First Solar Chief Executive Officer. "We are benefiting from diversifying global partner demand and an increase in revenue from utility scale projects."

11

47.     On February 24, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010.  For the year, the Company reported net income of $664 million, or $7.68 diluted EPS and revenue of $2.6 billion, as compared to net income of $640 million, or $7.53 diluted EPS and revenue of $2 billion, for the same period a year ago.   For the fourth quarter, the Company reported net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, as compared to net income of $142 million, or $1.65 diluted EPS and revenue of $641 million, for the same period a year ago.

48.     On February 28, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by, among others, Defendants Zhu, Ahearn, and Gillette, and reiterated the Company's previously announced financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Gillette and Zhu, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

49.     The 10-K also represented the following, in relevant part:

> The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.

50.     On May 3, 2011, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2011.  For the quarter, the Company reported net income of $116 million, or $1.33 diluted EPS and revenue of $567 million, as compared to net income of $172 million, or $2.00 diluted EPS and revenue of $568 million, for the same period a year ago.

51.     On May 5, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Wdimar, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

52.     The 10-Q represented the following, in relevant part:

Cost of sales for the three months ended March 27, 2010 included $4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. No additional expense was accrued in the first quarter of 2011. $37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

53.     On August 4, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $61 million, or $0.70 diluted EPS and revenue of $533 million, as compared to net income of $159 million or $1.84 diluted EPS and revenue of $588 million, for the same period a year ago.

54.     On August 5, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Widmar, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

55.     The 10-Q represented the following, in relevant part:

> Cost of sales for the three months ended June 26, 2010 included $17.8 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. We accrued $41.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

56.     On October 26, 2011, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2011.  For the quarter, the Company reported net income of $196.5 million, or $2.25 diluted EPS and revenue of $1 billion, as compared to net income of $177 million, or $2.04 diluted EPS and revenue of $798 million, for the same period a year ago.

57.     On November 4, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to

SOX by Defendants Ahearn and Widmar, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

58.    The 10-Q represented the following, in relevant part:

> Cost of sales for the nine months ended September 25, 2010 included $22.4 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are in most cases complete or well underway for the remaining cases. These efforts go beyond our limited warranty obligation. We accrued $63.6 million in total-to-date manufacturing excursion expense to cover the replacement of the anticipated affected module population in the field. Such amounts include $25.6 million in expenses accrued during the nine months ended September 30, 2011, reflecting our most recent best estimates of the total replacement costs, based on our field data and execution-to-date of this excursion related module replacement program.

59.    The statements referenced in ¶¶ 20 - 58 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them: 1) the full impact of the manufacturing excursion on the Company's earnings; (2) the Company was improperly recognizing revenue concerning certain products in its systems business; (3) the Company lacked adequate internal and financial controls; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

60.    On February 28, 2012, after the market closed, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011.  For the fourth quarter, the Company reported a net loss of $413 million, or

($4.74) diluted EPS and revenue of $660 million, as compared to net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, for the same period a year ago. For the year, the Company reported a net loss of $39.5 million, or ($0.46) diluted EPS and revenue of $2.8 billion, as compared to net income of $664 million, or $7.68 diluted EPS and revenue of $2.6 billion for the same period a year ago. The Company also disclosed, in relevant part, the following:

> Fourth quarter 2011 net sales were $660 million, a decrease of $345 million from the third quarter of 2011, primarily due to the timing of revenue recognition in our systems business and lower volume for module-only sales….

> The fourth quarter of 2011 was impacted by pre-tax charges of $393 million (reducing EPS by $3.90) associated with a non-cash goodwill impairment for our components business, $164 million (reducing EPS by $1.67) related to warranty and cost in excess of normal warranty expense, and $60 million (reducing EPS by $0.43) related to restructuring activities, as announced in December 2011.

61.    Immediately, the media noted the staggering charge taken by the Company associated with replacing defective panels. *Bloomberg News* noted that in the fourth quarter, the warranty problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date. It also put aside $37.8 million to cover future claims." *The Wall Street Journal* reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty." Mark Bachman, an analyst at Avian Securities LLC noted that the "charges [are] about 10 times what they said they were going to be when they first reported the issue."

62.    On February 29, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Ahearn and Widmar, and reiterated the Company's previously announced financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Ahearn and Widmar, stating that the

financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

63.     The 10-K also represented the following, in relevant part:

2008-2009 Manufacturing Excursion

During the period from June 2008 to June 2009, a manufacturing excursion occurred whereby certain modules manufactured during that time period may experience premature power loss once installed in the field. The root cause of the manufacturing excursion was identified and addressed in June 2009. Beginning in 2009, we initiated a voluntary remediation program beyond our standard limited warranty pursuant to which we made commitments to customers with systems containing modules manufactured during the relevant period that we would cover certain costs of remediation efforts. These remediation efforts included module removal, replacement and logistical services and additional compensation payments to customers under certain circumstances. Our best estimate for costs of our voluntary remediation program, as of and in each fiscal period in question, has been based on evaluation and consideration of the then-currently available information, including the estimated number of affected modules in the field, historical experience related to our voluntary remediation efforts, customer-provided data related to potentially affected systems and the estimated costs of performing the logistical services covered under our remediation program.

*     *     *

In the fourth quarter of 2011, we accrued additional expenses in excess of standard product warranty liability relating to our voluntary remediation program. A principal driver behind such additional accrual was our greater understanding as of year-end, obtained through the processing of thousands of claims as described below, of the number of modules not affected in the manufacturing excursion that needed to be removed (and subsequently replaced) in order for us to be able to identify and remedy the number of modules actually affected by the manufacturing excursion….

In response to our communications to customers regarding our intent to undertake a voluntary remediation program, we received more than five thousand customer claims, which covered an installed base greater than our entire production output during the June 2008 - June 2009 timeframe. In our processing of these claims to date, we have determined that we will take remediation actions in accordance with our voluntary remediation program with respect to approximately 1,100 of such claims, approximately an additional 200 claims could, pending receipt of additional information, qualify for remediation, and the balance of approximately 4,000 claims

have been or will be rejected as they did not meet the criteria for participation in our voluntary remediation program (including claims containing insufficient data necessary to evaluate them). We have expensed $215.7 million total to-date for the estimated costs of remediating systems affected by modules manufactured during the relevant period, including $145.6 million for remediation expenses beyond our limited warranty obligations and $70.1 million in product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts….

64.     On this news, First Solar securities plummeted $4.10 per share or 11%, to close at $32.30 per share on February 29, 2012.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired First Solar securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, First Solar securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by First Solar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of First Solar;

- whether the Individual Defendants caused First Solar to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of First Solar securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- First Solar securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold First Solar securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of

securities.   Such scheme was intended to, and, throughout the Class Period, did:   (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of First Solar securities; and (iii) cause Plaintiff and other members of the Class to purchase First Solar securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

76.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for First Solar securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about First Solar's finances and business prospects.

77.   By virtue of their positions at First Solar, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of First Solar securities from their personal portfolios.

79.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.   As the

1   senior managers and/or directors of First Solar, the Individual Defendants had knowledge
2   of the details of First Solar's internal affairs.

3       80.     The Individual Defendants are liable both directly and indirectly for the
4   wrongs complained of herein.  Because of their positions of control and authority, the
5   Individual Defendants were able to and did, directly or indirectly, control the content of
6   the statements of First Solar.  As officers and/or directors of a publicly-held company, the
7   Individual Defendants had a duty to disseminate timely, accurate, and truthful
8   information with respect to First Solar's businesses, operations, future financial condition
9   and future prospects.  As a result of the dissemination of the aforementioned false and
10  misleading reports, releases and public statements, the market price of First Solar
11  securities was artificially inflated throughout the Class Period.  In ignorance of the
12  adverse facts concerning First Solar's business and financial condition which was
13  concealed by defendants, Plaintiff and the other members of the Class purchased First
14  Solar securities at artificially inflated prices and relied upon the price of the securities, the
15  integrity of the market for the securities and/or upon statements disseminated by
16  defendants, and were damaged thereby.

17      81.     During the Class Period, First Solar securities were traded on an active and
18  efficient market.  Plaintiff and the other members of the Class, relying on the materially
19  false and misleading statements described herein, which the defendants made, issued or
20  caused to be disseminated, or relying upon the integrity of the market, purchased shares
21  of First Solar securities at prices artificially inflated by defendants' wrongful conduct.
22  Had Plaintiff and the other members of the Class known the truth, they would not have
23  purchased said securities, or would not have purchased them at the inflated prices that
24  were paid.  At the time of the purchases by Plaintiff and the Class, the true value of First
25  Solar securities was substantially lower than the prices paid by Plaintiff and the other
26  members of the Class.  The market price of First Solar securities declined sharply upon
27  public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

28

82.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>COUNT II</u>

**(Violations of Section 20(a) of the
<u>Exchange Act Against The Individual Defendants)</u>**

84.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.    During the Class Period, the Individual Defendants participated in the operation and management of First Solar, and conducted and participated, directly and indirectly, in the conduct of First Solar's business affairs.   Because of their senior positions, they knew the adverse non-public information about First Solar's misstatement of income and expenses and false financial statements.

86.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to First Solar's financial condition and results of operations, and to correct promptly any public statements issued by First Solar which had become materially false or misleading.

87.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which First Solar disseminated in the marketplace during the Class Period concerning First Solar's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause First Solar to engage in the wrongful acts complained of herein.   The Individual Defendants

therefore, were "controlling persons" of First Solar within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of First Solar securities.

88.     Each of the Individual Defendants, therefore, acted as a controlling person of First Solar.  By reason of their senior management positions and/or being directors of First Solar, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, First Solar to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of First Solar and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by First Solar.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

1

## DEMAND FOR TRIAL BY JURY

2

3

Plaintiff hereby demands a trial by jury.

4

Dated: March 15, 2012

**MARTIN & BONNETT, PLLC**
s/Susan Martin
Susan Martin
Jennifer Kroll
1850 N. Central Ave. Suite 2010
Phoenix, AZ 85004
Telephone: (602) 240-6900
Facsimile: (602) 240-2345

5

6

7

8

9

**OF COUNSEL**

10

**POMERANTZ HAUDEK
GROSSMAN & GROSS, LLP**
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017-5516
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

11

12

13

14

15

**POMERANTZ HAUDEK
GROSSMAN & GROSS, LLP**
Patrick V. Dahlstrom
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

16

17

18

19

Peretz Bronstein
**BRONSTEIN, GEWITZ
& GROSSMAN, LLC**
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: 212-697-6484
Facsimile: 212-697-7296

20

21

22

23

24

*Attorneys for Plaintiff*

25

26

27

28