1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   MICHAEL J. DOWD
    DANIEL S. DROSMAN
3   MARK SOLOMON
    JASON A. FORGE
4   655 West Broadway, Suite 1900
    San Diego, CA  92101
5   Telephone:  619/231-1058
    619/231-7423 (fax)
6   miked@rgrdlaw.com
    ddrosman@rgrdlaw.com
7   msolomon@rgrdlaw.com
    jforge@rgrdlaw.com
8
    Lead Counsel for Plaintiffs
9
    BONNETT FAIRBOURN FRIEDMAN
10     & BALINT, P.C.
    ANDREW S. FRIEDMAN (AZ005425)
11  KEVIN HANGER (AZ027346)
    2901 N. Central Avenue, Suite 1000
12  Phoenix, AZ  85012
    Telephone:  602/274-1100
13  602/274-1199 (fax)
    afriedman@bffb.com
14  khanger@bffb.com

15  Liaison Counsel for Plaintiffs

16  [Additional counsel appear on signature page.]

17              UNITED STATES DISTRICT COURT

18                  DISTRICT OF ARIZONA

19  MARK SMILOVITS, Individually and on      )   No. 2:12-cv-00555-DGC
    Behalf of All Others Similarly Situated,  )
20                                            )   CLASS ACTION
                             Plaintiff,       )
21                                            )   FIRST AMENDED COMPLAINT FOR
         vs.                                  )   VIOLATION OF THE FEDERAL
22                                            )   SECURITIES LAWS
    FIRST SOLAR, INC.; MICHAEL J.             )
23  AHEARN; ROBERT J. GILLETTE;               )
    MARK R. WIDMAR; JENS                      )
24  MEYERHOFF; JAMES ZHU; BRUCE               )
    SOHN; and DAVID EAGLESHAM,                )
25                                            )
                             Defendants.      )
26  _____)   DEMAND FOR JURY TRIAL

27

28

750217_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................... 1

II.   JURISDICTION AND VENUE ............................................... 2

III.  PARTIES ................................................................................... 2

IV.  DEFENDANTS' FRAUDULENT SCHEME ............................ 4

V.   CONFIDENTIAL WITNESSES ............................................. 17

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ............................................... 33

    A.    Sarbanes-Oxley ("SOX") Certifications ..................... 33

    B.    April 30, 2008-May 1, 2009 .......................................... 34

    C.    July 30, 2009-April 29, 2010 ........................................ 43

    D.    July 29, 2010-December 14, 2011 ................................. 52

VII.  DEFENDANTS ISSUED FALSE FINANCIALS AND VIOLATED GAAP ........................................................................................ 73

    A.    GAAP Violation: Understated Warranty Reserves ................................. 77

    B.    GAAP Violation: Excursion and Heat Degradation Disclosures ................ 87

    C.    GAAP Violations: Revenue Recognition and Related Disclosures ........... 92

VIII. ADDITIONAL EVIDENCE OF SCIENTER ....................................... 104

    A.    The Fraud Infected First Solar's Core Operations, Which Defendants Closely Monitored ........................................ 104

    B.    Defendants' Disclosures About Their Personal Involvement and Awareness ................................................ 106

    C.    Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised First Solar's Controls and Procedures ........ 116

    D.    Defendants Engaged in Massive and Suspicious Insider Trading ............ 116

    E.    Defendants Leave First Solar ......................................... 118

    F.    Defendants' Compensation Structure Incentivized Fraud ...................... 119

    G.    The Accounting Manipulations Were Extensive and Systematic in Nature ............................................... 119

IX.   LOSS CAUSATION ................................................................ 121

1

2                                                                                                    **Page**

3    X.      NO SAFE HARBOR ............................................................................ 129

4    XI.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD
             ON THE MARKET .............................................................................. 130
5
     XII.    CLASS ACTION ALLEGATIONS ................................................... 131
6
     XIII.   PRAYER FOR RELIEF ....................................................................... 133
7
     XIV.    JURY DEMAND ................................................................................... 133
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

750217_1

# I.     INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of First Solar, Inc. ("First Solar" or the "Company") between April 30, 2008 and February 28, 2012, inclusive (the "Class Period"), against First Solar and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      As multi-billion-dollar fraud schemes go, defendants' was fairly simple. Seizing on the opportunity presented by government subsidies and public enthusiasm for alternative energy, defendants spent years convincing investors that First Solar had a winning formula for reducing manufacturing costs so rapidly and dramatically as to make solar power competitive with fossil fuels.  They perpetuated their fraudulent self-portrayal by concealing and misrepresenting the nature and extent of major manufacturing and design defects in their solar modules.  Just weeks before the Class Period began, defendant Ahearn set the example he and the other defendants would follow for years.  In response to a direct question about whether their modules were having performance problems in the field, defendant Ahearn falsely responded, "[t]o our knowledge, we are not.  We have checked with a number of our customers and we have, as you know, pretty extensive internal quality controls and external field testing data, so we are not aware of anything, Eric."  Defendants proceeded down this path that Ahearn blazed through a series of false and misleading statements on earnings calls and in certified financial statements.

3.      Defendants have admitted that they concealed one of these manufacturing defects for over a year.  When growing customer complaints forced defendants to acknowledge this defect, defendants shifted tactics, characterizing it as a mere "excursion" that would cost under $30 million to remediate.  Less than two years later, defendants would admit that the true expenses for this so-called excursion were nearly 10 times greater than they had represented.  One of First Solar's former sales directors said that the $260 million "excursion" was overshadowed by the "3,000 pound boulder" of yet another concealed defect – the heat degradation defect.

4.     Long before the scheme's exposure, however, it was working.  It was working so well, defendants drove up First Solar's stock to a peak of over $310 per share.  Realizing that most of that price was attributable to the effectiveness, and ultimate hopelessness, of their scheme, defendants sold nearly a half-billion dollars of First Solar stock during the Class Period.  Defendant Ahearn alone sold 97% of his shares for over $427 million.  First Solar's investors were not so fortunate.  Soon after the sun had set on the Class Period, First Solar's stock had fallen from over $310 to under $30.

## II.     JURISDICTION AND VENUE

5.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

6.     Venue is proper in this district pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this district.

7.     First Solar is headquartered at 350 West Washington Street, Suite 600, Tempe, Arizona 85281.  Certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this district.

8.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III.     PARTIES

9.     Plaintiffs Mineworkers' Pension Scheme and British Coal Staff Superannuation Scheme purchased the publicly traded securities of First Solar during the Class Period and were damaged as the result of defendants' wrongdoing as alleged in this complaint.

10.     Defendant First Solar is engaged in the manufacture and sale of solar modules with an advanced thin film semiconductor technology, and it designs, constructs and sells photovoltaic ("PV") solar power systems.

750217_1

11.     Defendant Michael J. Ahearn ("Ahearn") founded First Solar.  Defendant Ahearn is, and at all relevant times was, the Company's Chairman of the Board.  On October 25, 2011, defendant Ahearn was appointed Interim Chief Executive Officer ("CEO") of the Company.  During the Class Period, Ahearn reaped $427 million in insider trading proceeds by selling roughly 3.2 million shares of his First Solar stock at artificially inflated prices.

12.     Defendant Robert J. Gillette ("Gillette") was, until his resignation on October 25, 2011, the Company's CEO.

13.     Defendant Mark R. Widmar ("Widmar") has served as the Company's Chief Financial Officer ("CFO") since April 2011.

14.     Defendant Jens Meyerhoff ("Meyerhoff") was, until December 2010, the Company's CFO.  During the Class Period, Meyerhoff reaped $17.97 million in insider trading proceeds by selling 116,772 shares of his First Solar stock at artificially inflated prices.

15.     Defendant James Zhu ("Zhu") was, until January 2012, the Company's Chief Accounting Officer.  From January 2011 through March 2011, Zhu served as the interim CFO and from June 2007 through October 2009, Zhu served as the Company's Vice President and Corporate Controller.  During the Class Period, Zhu reaped $1.172 million in insider trading proceeds by selling 7,884 shares of his First Solar stock at artificially inflated prices.

16.     Defendant Bruce Sohn ("Sohn") was, until April 30, 2011, the Company's President of Operations.  During the Class Period, Sohn reaped $12,390,248 in insider trading proceeds by selling 74,750 shares of his First Solar stock at artificially inflated prices.

17.     Defendant David Eaglesham ("Eaglesham") was the Chief Technology Officer at First Solar from November 2009 to May 2102.  From June 2006 to November 2009, defendant Englesham was the Company's Vice President of Technology.  During the Class

1  Period, Eaglesham reaped $9,645,827 in insider trading proceeds by selling 69,983 shares of

2  his First Solar stock at artificially inflated prices.

3      18.    The defendants named above in ¶¶11-17 are referred to herein as the

4  "Individual Defendants." The defendants named above in ¶¶10-17 are referred to herein as

5  the "defendants."

6      19.    The Individual Defendants, because of their positions with the Company,

7  possessed the power and authority to control the contents of First Solar's quarterly and

8  annual reports, press releases and presentations to securities analysts, money and portfolio

9  managers and institutional investors, *i.e.*, the market. They were provided with copies of the

10  Company's reports and press releases alleged herein to be misleading prior to or shortly after

11  their issuance and had the ability and opportunity to prevent their issuance or cause them to

12  be corrected. Because of their positions with the Company, and their access to material non-

13  public information, the Individual Defendants knew that the adverse facts specified herein

14  had not been disclosed to and were being concealed from the public and that the positive

15  representations being made were materially false and misleading. The Individual Defendants

16  are liable for the false statements pleaded herein.

17  **IV.    DEFENDANTS' FRAUDULENT SCHEME**

18      20.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose

19  adverse facts known to them about First Solar. Defendants' fraudulent scheme and course of

20  business that operated as a fraud or deceit on purchasers of First Solar publicly traded

21  securities was a success, as it: (i) deceived the investing public regarding First Solar's

22  prospects and business; (ii) artificially inflated the price of First Solar publicly traded

23  securities; (iii) permitted certain of the Individual Defendants to sell their First Solar stock at

24  artificially inflated prices; and (iv) caused plaintiffs and other members of the Class to

25  purchase First Solar publicly traded securities at artificially inflated prices.

26      21.    First Solar's business was based on a new approach to mass producing solar

27  cells using small amounts of cadmium and tellurium as its raw materials rather than

28  polysilicon. The Company's solar panels were less efficient than most traditional polysilicon

1   manufactured panels, and therefore, in order to compete with polysilicon modules, First
2   Solar was required to produce its panels at a much lower cost than its competitors.
3   Moreover, as late as June 2009, without subsidies, First Solar's modules were 5-10% more
4   expensive than conventional alternatives.  Therefore, it was essential for First Solar to
5   demonstrate to investors continued reductions in manufacturing costs without sacrificing
6   product performance and reliability.  Defendants used a metric called cost-per-watt[1] to
7   measure its reductions in manufacturing costs.  Therefore, the cost-per-watt metric was the
8   key gauge for investors in assessing First Solar's viability as an unsubsidized business.
9   Unable to achieve the required cost savings and efficiency, defendants engaged in a scheme
10  to defraud investors by knowingly manipulating the cost-per-watt metric.

11          22.     Defendants admitted that in order to "compete effectively," First Solar's
12  "modules . . . need[ed] to maintain a certain cost advantage per watt compared to crystalline
13  silicone-based modules."  Furthermore, a "failure to reduce cost per watt" would impair First
14  Solar's ability to enter into and compete in new markets.  In order to attract business, First
15  Solar had to make long-term guarantees that cost-per-watt would decline over time and
16  admitted that "failure to achieve these metrics could reduce . . . profitability or allow some
17  . . . customers to terminate their contracts."  The math was simple – either First Solar
18  lowered its costs to produce modules faster than it reduced its selling prices or the
19  Company's margins would erode, profitability would decline and the Company would
20  "default under certain of [its] Long Term Supply Contracts . . . ."[2]

---

[1]      Cost-per-watt is defined as: (total manufacturing costs) ÷ (total watts produced) in a given period.

[2]      These supply contracts involved the Company's largest customers and were therefore critical to First Solar's operations.

> "*These contracts . . . significantly affect our overall financial performance*."

> "*The loss of any of our large customers . . . could significantly reduce our net sales and adversely impact our operating results*."

750217_1

23.     In the first quarter of 2009, pressure increased even more to lower the cost-per-watt metric as long-term supply contracts were amended to "accelerate the decline in the sales price per watt" to induce additional sales.  In addition, in order to compete in the Company's core German market in 2009, First Solar "amended [its] Long Term Supply Contracts with certain of [its] customers to implement a program which extends a price rebate to . . . these customers for solar modules purchased" from First Solar.  This rebate constituted a further "reduction to the selling price" thereby further increasing pressure to lower cost-per-watt.

24.     The cost-per-watt was so critical that defendants' compensation was directly based on reducing the cost-per-watt metric.  For example:

> The 2010 annual bonus program was designed around eight performance metrics: (i) total module watts produced, (ii) module conversion efficiency, (iii) module manufacturing cost per watt at the end of the fourth quarter . . . .

25.     The most senior-level executives at First Solar devised and directed the cost-per-watt manipulation.  In early 2010, Confidential Witness ("CW")-6, a senior member of the Internal Audit Department received a non-anonymous whistleblower complaint via e-mail stating that the Vice President of Financial Planning and Analysis, Kurt Wood, had indicated to a group of his subordinates what the publicly reported cost-per-watt number was and directed attendees of the meeting, including the whistleblower, to do what was necessary to come up with that number.  CW-6 said Wood used the phase at the meeting, "Let's make this happen."  According to the whistleblower, Wood instructed the team to "do whatever you had to with your charts to make the numbers work."  According to CW-6, the whistleblower was knowledgeable about Wood's instructions regarding manipulating the cost-per-watt numbers because the whistleblower "was in the meeting" with Wood when he gave the directive and was a member of Wood's team.  A few days after receiving the Complaint, CW-6 alerted defendant Meyerhoff and, shortly after that, CW-6 met with defendant Meyerhoff to discuss the whistleblower's complaint regarding manipulations of the cost-per-watt metric.  However, First Solar took virtually no action in response to the whistleblower's complaint, telling Wood only that he should watch what he said in meetings.

26. CW-10, a member of First Solar's Financial Planning and Analysis Group, was responsible for calculating the cost-per-watt metric. CW-10 stated that s/he had concerns about the Company's cost-per-watt calculations, and commented that it could be "a whole different class action." Plaintiffs explained the nature and theory of the case to CW-10, and CW-10 stated that s/he believed s/he had information that would support plaintiffs' claims. CW-10 said s/he "could tell you an awful lot" about cost-per-watt issues, with which s/he had been directly involved, but s/he is "really nervous" about doing so because of the nondisclosure agreement s/he signed and therefore could not and would not speak further. CW-10 also received a letter from First Solar encouraging him/her not to speak to counsel for plaintiffs or their investigators. (Numerous additional witnesses reported receiving a similar letter). CW-10 calculated the metrics for cost-per-watt, but said that because of the non-disclosure agreement and letter s/he had received, s/he had better not say anything else.

27. In order to carry out their scheme, defendants understated First Solar's warranty expenses in violation of GAAP. By doing so, defendants artificially lowered their manufacturing costs, which in turn caused First Solar's cost-per-watt metric to be understated. Defendants were able to conceal and perpetuate their scheme because the Company included only the current period warranty expense (*i.e.*, only the amount of warranty on products sold in that period) in the cost-per-watt calculation. Defendants knew that any future warranty charges on defective products would have no impact on the cost-per-watt metric because those future warranty charges would apply to defective products sold in **prior** quarters. Thus, defendants would never be required to reflect those future warranty expenses in First Solar's cost-per-watt metric.

28. By the end of 2008, the Company had learned of customer complaints about what the Company would later refer to as the manufacturing excursion, a defect in its solar panels that caused premature power loss. According to CW-1, customers began complaining about this problem no later than the end of 2008. When customers complained about the early degradation in performance, First Solar argued that the modules were not completely failing to perform, they were performing differently than projected and this was why First

Solar referred to the situation as "a manufacturing excursion" as opposed to a manufacturing defect, which would imply a more severe performance shortcoming.  But regardless of how First Solar characterized the situation, the sharp degradation of the modules affected by the excursion differed from the performance of other First Solar modules and resulted in many very dissatisfied customers who were only concerned with the significant efficiency losses they were suffering.  First Solar's obligations to the dissatisfied customers arose out of specifications under which the modules were sold,[3] warranty obligations, and legal obligations in the countries where the problematic modules were installed, the need to maintain positive customer relationships and goodwill overall.  CW-1 said it was one of his customers that was the first (or among the first) to report problematic performance data. CW-1 brought this large German customer's concerns to the attention of "senior management" in quality and reliability, which resulted in a "rapid escalation" of the matter to the VP of Quality Mike Koralweski, who then brought it to the attention of his boss, defendant David Eaglesham.  CW-1 attended a meeting in Perrysburg, Ohio that included Eaglesham, Koralewski, Lou Trippell and four other quality and reliability personnel.  At that meeting, defendant Eaglesham encouraged a defensive response to customer complaints, rather than one that acknowledged the defect.

29.    Defendants concealed this problem from investors until July 2010, even though First Solar later admitted that it had "identified" and "addressed" the problem in June 2009. When First Solar belatedly disclosed the so-called manufacturing excursion in July 2010, defendants misrepresented its scope.  Throughout the remainder of the Class Period, First Solar falsely represented that: (i) the defect was limited to just 4% of the modules manufactured between June 2008 and June 2009; (ii) the problem was known, contained, and, to a growing extent, fixed; and (iii) its financial impact was limited.  In truth, the

_____

[3]      First Solar sold energy panels with a performance guarantee.  The modules would produce 90% of their power output rating during the first ten years following the installation and at least 80% of their power output rating during the following 15 years.

750217_1

1  problem was much bigger than the Company disclosed in August 2010 ($29.5 million). In
2  February 2012, the Company revealed the so-called excursion would cost more than $260
3  million.

4          30.      Reporter Sandra Enkhardt of Photovoltaik-Magazin in Germany conducted an
5  extensive investigation into First Solar's performance problems, including many interviews
6  of First Solar's customers and employees.   As Ms. Enkhardt explained, First Solar had
7  informed their retailers and installers during informational events that not just 4% but
8  actually 5-10% of the modules were affected, for some plants even up to 50%.  Many owners
9  of smaller plants were not informed about the recall until the fall of 2010, raising suspicions
10 that First Solar did not adequately inform all plant owners in order to keep the problem
11 buried so as to avoid a possible impact on its stock prices.  Ms. Enkhardt also learned as
12 early as 2011 that First Solar's remediation program included expenses for its customers'
13 lost profits, as required by European law.

14         31.      According to CW-2, a Process Development Engineer in First Solar's
15 Perrysburg, Ohio facility, First Solar "knew in 2007 that the projected failure rate [of the
16 Series II Modules] was going to be greater than 4%."  CW-2's tests showed a much shorter
17 life expectancy over the lifetime of some of the panels.  Modeling by First Solar employees
18 in the Root Cause Analysis Department confirmed CW-2's test results.  CW-2 presented
19 his/her findings in numerous meetings throughout 2007 and 2008, in which s/he predicted a
20 12% to 14% failure rate on the solar panels.  CW-2 said that Greg Helyer (Director of
21 Process Development Engineering), Kuntal Kumar (Manager of Process Development) and
22 other process development engineers attended these meetings.   CW-2 said that Mike
23 Koralewski (Vice President of Global Quality) was "informed in private meetings" of CW-
24 2's projected failure rates.  According to CW-2, "Helyer told me to ignore the results of my
25 own life-term test results and presentation."  When First Solar announced in mid-2010 that it
26 was anticipating a 4% failure rate of the panels, CW-2 believed that "the number was made
27 up."  According to CW-2, the engineering staff laughed when they saw that announcement:
28 "We knew it [the failure rate] was underestimated."

- 9 -

32.     According to an article in Solateur114 dated September 2011, First Solar also knew in 2009 that many of their modules were affected by severe defects causing low performance.[4] In 2011, an installer/project manager who had installed a FS 414KW plant in 2009 reported that this project had problems from the beginning.  The modules generated between 25% and 30% less yield than expected.  The information provided by CW-11 corroborates this decline.  The installation company subsequently sued the wholesaler, who, in the course of the lawsuit, stated that he had reported the modules with production defects to First Solar on their homepage.  He further stated that at this time First Solar must have had already lists with serial numbers of defective modules which he was supposed to receive (that never happened).

33.     On November 18, 2009, First Solar sent a letter to owners and operators of First Solar solar plants, stating that their internal quality assurance had raised some issues regarding a possible degradation and premature decline of performance in some of their modules.[5] First Solar asked the plant-owners to monitor the performance of their plants and in case there is a measurable excessive decline of performance, to contact their solar retailers to arrange for an exchange of the affected modules.

34.     First Solar faced an even greater product defect problem than the so-called manufacturing excursion – the premature degradation of modules in hot climates.  CW-1 characterized this problem as a "three thousand pound boulder" compared to the so-called excursion.  CW-1 stated that the heat degradation issue especially affected the large solar field power generating facilities that First Solar's Engineering Procurement and Construction division ("EPC") built and ultimately called into doubt the validity of First Solar's technology and its core strategy for the future.  That strategy – pitched by defendants as First

---

[4]     Solateur114 (September 2011), retrieved from http://www.photovoltaikforum.com/pv-module-f2/first-solar-produktionsmaengel-im-zeitraum-juni-08-t54910-s360.html at 37.

[5]     First Solar Germany (November 18, 2009) letter to all owners and operators of FS plants in German, retrieved from http://www.photovoltaikforum.com/pv-module-f2/first-solar-produktionsmaengel-im-zeitraum-juni-08-t54910-s40.html at 5.

750217_1

1   Solar's path to success – was to shift from strictly selling modules to undertaking complete

2   solar field power generating facilities – *i.e.*, the Company's EPC division.

3       35.     Because First Solar's modules work differently in different climates and First

4   Solar's business initially had been heavily concentrated in cool climates, First Solar had even

5   less field data available regarding the performance of the modules in hot climates than there

6   was from cool climates.  At best, First Solar only had about five years of field data for how

7   its modules performed, which was almost completely in relatively cool climates.  CW-1

8   stated that beyond five years, First Solar's engineers were "still only guessing" as to how the

9   modules would degrade.  What defendants did know, according to CW-1, was that in the first

10  three years of operation, modules in hot climates were "likely to fall below warranty levels"

11  of performance due to excessive degradation – an EPC plant in a hot climate would

12  experience a very sharp reduction in power generating ability almost immediately.

13  According to CW-1, almost as soon as a plant went into operation the plant operator would

14  be unable to generate the amount of electricity it had assumed in its models, and defective

15  panels had to be removed immediately and replaced by First Solar's warranty team.  Given

16  the heat degradation defect, CW-1 felt increasingly uncomfortable in representing the

17  performance of the First Solar modules to his customers.

18      36.     CW-1 reported that the directors of various groups and VPs in the warranty and

19  R&D groups knew about the heat degradation defect as early as 2009.  First Solar first

20  detected the defect at a plant First Solar itself had built and operated – the El Dorado plant in

21  Southern Nevada.   Other projects that had problems besides El Dorado included the

22  Cimarron project in New Mexico and a project in Blythe, California.  According to CW-1,

23  the warranty team was "proactively ripping out panels" because it was known the panels

24  would degrade and therefore would not perform according to First Solar's representations to

25  its customers.  CW-1 said there was definitely concern regarding the adequacy of the

26  warranty reserves once the heat degradation issue began to arise – in essence, the heat

27  degradation issue meant that First Solar's warranty costs were going "to skyrocket" and the

28  existing warranty reserve was "nowhere near where it should have been."   Personnel

750217_1

throughout First Solar were "deathly afraid of heat degradation."  According to CW-1, the performance guarantee for panels in the EPC plants was the same as the panels that First Solar sold to their third-party customers – *i.e.*, 10/25 years.

37.     CW-1 reported that because the EPC division was "a massive freight truck with so much momentum, it won't slow down because of a module problem."  Instead, a major objective of the EPC division was to meet delivery milestones of modules that would permit revenue to be realized on EPC projects no matter if those modules would have to be replaced immediately after the plant became operational.  CW-1 said the absolutely critical objective was to realize as much revenue up front as possible regardless of costs that might be incurred later on.

38.     Despite the fact that they knew of these massive product defects, defendants actually *decreased* the warranty reserve rate from 2.24% at 1Q08 to 1.11% at 4Q10 as shown in the chart below:



39.     The decrease in warranty rate was no accident.  Defendants knowingly and deliberately reduced First Solar's warranty reserve rate by booking a "change in estimate of

warranty liability" every quarter.  This advanced the scheme by enabling the defendants to improperly reduce manufacturing costs and therefore reduce First Solar's cost-per-watt. Remarkably, defendants reduced the Company's warranty reserve rate even while the cumulative number of modules installed in the field – and covered under warranty – was increasing significantly from the beginning of the Class Period as shown in the chart below:



40.     Throughout the Class Period, defendants assured investors that they had put the excursion problem behind them and in February 2011, specifically told investors that the claims process was "completed."  After the fact, defendants blamed their understatement of excursion-related expenses during the Class Period on the fact that the Company processed the majority of the claims in 4Q11 and therefore did not have insight into the full extent of the problem until that time.  This explanation, if true, is an admission that defendants could not reasonably estimate the excursion costs and were, therefore, required by GAAP to make the disclosures described below.  In addition, if true, this explanation is an admission that defendants had lied when they previously represented that the remediation process was almost complete, substantially complete, and complete.  This explanation, however, is incredible for several reasons.  First, defendants have already admitted that the cause of the problem was identified and the extent of the problem was quantified by 2Q09.  If the cause

750217_1

of the excursion and the quantity of affected modules were known by June 2009, then the timing of actually processing the claims should not have affected the estimate of total remediation costs.  Second, defendants said that product defects involving power output degradation, such as the so-called manufacturing excursion, mostly occur in the "early life cycle stage (typically the first 3-6 months)" after the solar modules are installed.  In fact, defendants represented that they have sufficient operating history to support this conclusion.  Therefore, it defies logic that defendants did not know about the totality of the excursion-related problems until 30 to 42 months after the modules were manufactured (from June 2008 – June 2009 until February 2012).  This is particularly true in light of defendants' repeated assurances, detailed below, that they had a lot of data from, and experience, in the field, and that they did want to bury their heads in the sand.  Finally, although defendants waited until 2012 to disclose 70% of the expenses related to the manufacturing excursion, they repeatedly reassured investors throughout the Class Period that they had accrued the full cost of the excursion:

> **July 29, 2010**: "We've been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, *complete*.  Some of these efforts go beyond our normal warranty coverage.  We accrued the estimated *full costs* of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail."

> **February 24, 2011**: "In Q4[2010] we *concluded* a claims process and based on our field data and execution today, we updated our *total* replacement cost estimate."

> **November 3, 2011**: "We have substantially *concluded* the remediation programs associated with the manufacturing excursion."

> **December 14, 2011**: "We have had on occasion issues and they are dealt with. We cover[ed] them.  *That has all been reflected in our financials*."

41.     Notwithstanding defendant Ahearn's representation a mere two weeks before the close of 4Q11 that *all* costs related to First Solar's defective products were reflected in First Solar's prior financials, the Company announced an *additional* $163.6 million charge for product defect costs incurred *in that same quarter* and announced another expected $*40-44* million for 1Q12.  The magnitude and proximity of the 265% increase leave no doubt that

- 14 -

1  defendants lied to investors when they previously told them that all costs had been reflected

2  in the prior financials.

3        42.    Maxim Group analyst Aaron Chew suggested that the "the ghost of the

4  manufacturing excursion" could haunt First Solar's financial statements.  He said that an

5  investor has to be skeptical about the Company's current estimate of an additional $44

6  million in warranty exposure after it just announced $164 million in warranty-related charges

7  this quarter, the largest single quarterly charge taken in 2011, of the total $253 million in

8  warranty items in the previous year.  "While FSLR claimed further exposure could amount

9  to $44m, we note that at the end of last year it was reportedly $0m," Chew said. "While the

10  level of warranty coverage is uncertain, given the 819 MW produced in 3Q08-2Q09 and

11  estimated replacement (module + labor) cost of $0.89/W, we estimate total nominal exposure

12  remaining of $528m."

13        43.    Throughout the Class Period, defendants perpetrated their fraud by regularly

14  shipping defective products and including the wattage of such products in First Solar's cost-

15  per-watt calculation.  Had defendants removed defective products as they should have, these

16  panels would not have been included as watts produced and First Solar's cost-per-watt

17  metric would have increased materially.

18        44.    CW-3, a Production Team Lead at the Perrysburg, Ohio manufacturing facility,

19  described a litany of defects infecting the solar panels that were produced at the plant.  The

20  plant operated 24 hours a day, 7 days a week and was staffed by employees who worked 12-

21  hour shifts.  CW-3 estimated that of the panels produced in a given 12-hour shift, anywhere

22  from 20%-25% of the panels would have defects in them.  Of those defective panels, First

23  Solar shipped approximately 50% of them to customers.

24        45.    CW-3's statements are corroborated by CW-7 and CW-9. CW-7, a Production

25  Operator in the Perrysburg facility, responsible for examining the solar panels for quality

26  issues, stated that "there were lots of defects" in the panels.  CW-9, a Manufacturing

27  Technician and Team Lead at the Perrysburg plant, also reported that panels with known

28  quality problems were shipped to customers throughout the Class Period.  CW-9 said that

1   numerous panels at the Perrysburg plant were "out of spec," which meant the panels were

2   likely to perform poorly and/or fail, but the plant management would "let it [the problematic

3   panels] go." CW-9 estimated that 40% of the panels produced in a given shift ended up with

4   issues of one kind or another, but unless the panels were literally broken, they were typically

5   shipped to customers anyway.

6        46.    CW-3 and CW-9 both attributed First Solar's practice of regularly shipping

7   defective products to the incentives management received for meeting or beating production

8   goals. CW-3 stated that the presence of defects was deliberately overlooked by management

9   in order to meet production and shipping goals. As CW-3 explained, the management and

10  production supervisors at the Perrysburg plant received bonuses based on the volume of

11  panels that were shipped from the plant and therefore they "only cared about numbers and

12  not quality." Similarly, CW-9 explained that one reason that panels with known defects

13  were shipped was because First Solar's managerial and supervisory personnel at the

14  Perrysburg plant received large bonuses (as big as "five figures") for meeting production

15  goals even if this included shipping problematic solar panels.

16       47.    Defendants also manipulated the cost-per-watt metric by artificially increasing

17  the amount of watts used to calculate that metric through the use of a D-rate scam.

18  According to CW-1, when a panel was manufactured, it was theoretically capable of

19  producing a certain wattage level. But in reality, First Solar's panels did not perform to their

20  theoretical level. Therefore, a haircut to the wattage in the form a D-rating was applied to

21  the solar panel. Early on, First Solar applied a D-rating in the 12-15% range. CW-1 said

22  there was pressure from defendant Meyerhoff to stop selling the panels with such a large D-

23  rating – Meyerhoff described the high D-rating as "taping dollar bills on each panel."

24  Therefore, as time went on – and even though defendants uncovered increasingly severe

25  product defects – First Solar reduced the D-ratings to 6-8%, thereby artificially increasing

26  the number of watts used to calculate the cost-per-watt metric. The D-rating manipulation

27  also led to understated warranty expenses. First Solar warranted that its modules would

28  operate at 90% efficiency over their first 10 years of operation and 80% efficiency over the

1    next 15 years of operation.  The warranted performance was based on each panel's name-

2    plate wattage, which was net of D-rating.  Thus, by artificially lowering the D-rating and

3    consequently increasing the warranted wattage level, defendants dramatically increased their

4    warranty exposure – a calculation that was based largely on "guesswork" even without the

5    manipulation – but did not account for this increased exposure.

6       48.    At the same time defendants perpetuated the scheme described herein, they

7    took advantage of First Solar's inflated stock by dumping more than 3.5 million shares and

8    collecting more than $470 million.

9    **V.    CONFIDENTIAL WITNESSES**

10      49.    Several former First Solar employees have provided information demonstrating

11   that defendants' Class Period statements were false and misleading and that defendants knew

12   or recklessly disregarded the falsity of their statements.  The CWs include individuals

13   formerly employed at First Solar during the Class Period, whose accounts corroborate one

14   another and facts now admitted by First Solar.  The witnesses provided information on a

15   confidential basis and are particularly described by job description and responsibility, and

16   duration of employment, thereby providing sufficient detail to establish their reliability and

17   personal knowledge.  As set forth below, the information provided by the CWs supports a

18   strong inference that defendants acted with scienter.

19      50.    Confidential Witness No. 1 ("CW-1") was employed by First Solar from 2004

20   through mid-2011 and spent his entire career with First Solar at the Company's corporate

21   headquarters in Phoenix, Arizona.  Until late 2009, CW-1 was a senior manager in the

22   business development group and was responsible for securing supply commitments from

23   utility and utility affiliate developers in the western U.S.  CW-1 also identified opportunities

24   with major western U.S. utilities and negotiated multi-year framework agreements to secure

25   supply commitments and support utility retained/owned generation initiatives.  According to

26   CW-1, this position provided him with a strong technical understanding of First Solar's

27   products.  Toward the end of 2009, CW-1 was promoted to a senior position in the North

28   American sales group, where he was responsible for leading market penetration and segment

1   share capture efforts for North American Commercial, Government, Industrial, and

2   Residential market segments.  CW-1 remained in this position until he left the Company in

3   mid-2011, during which time CW-1 reported to T. K. Kallenbach, First Solar's President of

4   the Components Business Group.  In sales and as a product manager dealing directly with

5   customers meant that First Solar's quality and field test data were critically important to CW-

6   1.

7           (a)     Solar Module Degradation and Cost-per-Watt.  CW-1 explained that

8   module "stability" represents the amount of electricity a solar module will generate over a 10

9   and 25-year timeframe.  When a module is first produced it is "flash-tested" which

10  determines the module's efficiency in generating electricity.  After a certain period of time,

11  the module's efficiency is tested again.  The modules are apparently tested 10 days after they

12  are produced and again 27 days after they are produced.  The module is then rated depending

13  on the loss in power and this rating is used as a basis for establishing the performance

14  guarantee of the module.  In effect, based on the efficiency tests, First Solar will warrant that

15  the module will operate at 90% efficiency over its first 10 years of operation and 80%

16  efficiency over 25 years.  While there is inevitably a decline (or degradation) in the amount

17  of power that First Solar's modules will produce, the degradation – the "D-Rate" – does not

18  occur in a linear, steady manner, but instead occurs in a sometimes quite severe "stair-step"

19  fashion with quite a bit of degradation often occurring almost right away after a module goes

20  into operation.  The significantly greater degradation rates that fell below the averaged linear

21  degradation rates are key factors in both the warranty liability associated with the

22  manufacturing excursion and the premature degradation that occurs in hot climates.  CW-1

23  observed that a great deal of the estimates regarding degradation are basically "guesswork"

24  since no First Solar modules have been in operation for even 10 years, let alone 25 years.

25  The First Solar facility in Perrysburg, Ohio was where R&D work was conducted, and it was

26  there that the stability testing of the modules was conducted which determined how a given

27  type of module would be rated.  In essence, the Ohio R&D facility passed along to the

28  manufacturing plants the processes by which a given type of module was to be manufactured

- 18 -

1   and the plants complied with those processes.  The manufacturing plants did their own

2   testing but only to ensure that the modules had been produced according to the specifications

3   established by the facility in Ohio.  CW-1 explained that the higher the efficiency that can be

4   claimed for a module, the higher First Solar can price and sell the module.  According to

5   CW-1, when a panel was manufactured, it was theoretically capable of producing, for

6   example, 100 watts.  But in reality, First Solar's panels did not perform to their theoretical

7   level.  Therefore, based in part on post-production testing, First Solar would estimate the

8   percentage of this shortfall in the form of a D-rating of 15%.  First Solar's panels had tended

9   to have D-ratings in the 12-15% range, but as time went on, the D-ratings were decreased to

10  6-8%.  The warranty reserve was based on the name plate of each panel's D-rating.  CW-1

11  offered the following overview: First Solar made products for which it provided a best guess

12  that it would perform to a certain standard – say, 100 watts.  The D-rating was apparently a

13  minimum standard for the panel – a performance of, say, 85 watts.  CW-1 explained that

14  cost/watt was "absolutely" a key metric.  CW-1 said that cost-per-watt was determined as

15  follows: First Solar's CFO would determine the total costs incurred to make the panels, a

16  figure that would serve as a numerator.  The denominator would be the total watts that First

17  Solar had produced.  To improve the fraction, it would be necessary to drive down costs

18  and/or increase the watts.  In this regard, CW-1 said there was pressure from defendant

19  Meyerhoff to stop selling the panels with such a large D-rating – Meyerhoff described the

20  high D-rating as "taping dollar bills on each panel."

21          (b)     The Manufacturing Excursion and Efforts to Determine the Extent of

22  First Solar's Warranty Liability.  CW-1 said that the extrapolations regarding degradation

23  rates are based on test data, but there is only very limited historical data to actually support

24  the performance guarantees for 10 and 25 years since First Solar began selling its modules in

25  only 2005.  However, the modules behave very differently in the field compared to the test

26  climate.  As such, First Solar assigns a D-Rating to its modules based on the stability tests

27  but data can be reported by customers once the modules are deployed that differs from what

28  the linear D-rating indicates – as noted above, there often was a very sharp degradation right

1   away from when modules were first deployed.  According to CW-1, customers began

2   complaining about this problem no later than the end of 2008.  When customers complained

3   about the early degradation in performance, First Solar argued that the modules were not

4   completely failing to perform, they were performing differently than projected and this was

5   why First Solar referred to the situation as "a manufacturing excursion" as opposed to a

6   manufacturing defect, which would imply a more severe performance shortcoming.  But

7   regardless of how First Solar characterized the situation, the sharp degradation of the

8   modules affected by the excursion differed from the performance of other First Solar

9   modules and resulted in many very dissatisfied customers who were only concerned with the

10  significant efficiency losses they were suffering.  First Solar's obligations to satisfy the

11  dissatisfied customers were due to specified warranty obligations, as well as legal obligations

12  in the countries where the problematic modules were installed that were separate and apart

13  from the warranty terms, as well as the need to maintain positive customer relationships and

14  goodwill overall.  CW-1 said it was one of his customers that was the first (or among the

15  first) to report back problematic performance data.  CW-1 brought his customer's concerns

16  to the attention of "senior management" in quality and reliability which resulted in a "rapid

17  escalation" of the matter to the Vice President of Quality Mike Koralweski, who then

18  brought it to the attention of his boss, defendant Eaglesham.  CW-1 attended a meeting in

19  Perrysburg, Ohio that included Eaglesham, Mike Koralewski, Lou Trippell and four other

20  quality and reliability personnel.  According to CW-1, this meeting represented the first

21  internal acknowledgement that First Solar had a customer that was concerned with First

22  Solar's quality.  CW-1 said that the Company did not identify the cause of the problem for

23  six to nine months after CW-1's customer's complaint was brought to senior management's

24  attention.  (First Solar conceded during a conference call after the close of the market on July

25  29, 2010 that First Solar had identified the cause of the manufacturing excursion in June

26  2009.)  CW-1 knew about a number of these matters because, even though he was in the

27  business development group until late 2009, he was still called by German customers seeking

28  help from him in resolving their disputes with First Solar regarding defective modules.  CW-

- 20 -

1 also had numerous conversations with Tony Siebers (the individual in charge of First Solar's "global warranty"), from whom CW-1 learned that First Solar had received "thousands of claims" from customers by mid-2011.   According to CW-1, defendant Eaglesham was responsible for determining the overall "causality" of the manufacturing excursion, and defendant Sohn, who was in charge of operations, was responsible for resolving the actual manufacturing defect, once the nature of the defect was determined.  The commercial operations under T.K. Kallenbach dealt with customers and were responsible for driving sales, but also were responsible for responding to and figuring out how to resolve customer complaints and dissatisfaction.

(c)      Premature Module Degradation in Hot Climates.  CW-1 said that premature module degradation of modules in hot climates was an even more significant problem than the manufacturing excursion and characterized the premature heat degradation problem as a "3,000 pound boulder."  The heat degradation issue especially affected the large solar field power generating facilities that First Solar's EPC built.  He said the premature degradation problem in hot climates ultimately called into doubt the entire validity of First Solar's technology as well as the fundamental shift the Company had undertaken to get away from strictly selling modules to undertaking complete solar field power generating facilities – *i.e.*, the Company's EPC division.  Because First Solar's modules work differently in different climates and First Solar's business initially had been heavily concentrated in cool climates, First Solar had even less field data available regarding the performance of the modules in hot climates than there was from cool climates.  At best, First Solar only had about five years of field data for how its modules performed, which was almost completely in relatively cool climates.  Ultimately, First Solar engineers knew that the degradation was nonlinear, but beyond five years they were "still only guessing" as to how the modules would degrade.  Although the degradation was nonlinear, this was not how it was represented to customers.  CW-1 said that degradation is actually a function of both current and voltage and each degrade at different rates and under different conditions.  According to CW-1, an EPC plant in a hot climate would experience a very sharp reduction

- 21 -

1   in power generating ability almost immediately.  This meant that almost as soon as a plant

2   went into operation the plant operator would be unable to generate the amount of electricity

3   it had assumed in its models.  According to CW-1, First Solar's warranty teams removed and

4   replaced panels in hot climates to ensure the plants were achieving the represented power

5   generation.  CW-1 said that even with limited historical performance data it was definitely

6   known that in the first three years of operation, modules in hot climates were "likely to fall

7   below warranty levels" of performance due to excessive degradation.  Given this excessive

8   degradation, CW-1 felt increasingly uncomfortable in representing the performance of the

9   First Solar modules to his customers.  CW-1 explained that as of February 2011 (and prior),

10  personnel throughout First Solar were "deathly afraid of heat degradation."  The personnel

11  that CW-1 knew were aware of this burgeoning issue were directors of various groups and

12  vice presidents in the warranty and R&D groups.  CW-1 said that the First Solar warranty

13  team was aware of the heat degradation issue as early as 2009 because it was first detected at

14  a plant First Solar itself had built and operated – the El Dorado plant in Southern Nevada.

15  Other projects that had problems besides El Dorado included the Cimarron project in New

16  Mexico and a project in Blythe, California.  CW-1 noted that Tony Siebers was among those

17  who was well aware of the heat degradation problem and that Siebers had been involved in

18  trying to resolve heat degradation issues.  In essence, the heat degradation problem was so

19  bad that it was necessary to begin replacing panels almost immediately after a solar field

20  generating plant became operational.    According to CW-1, the warranty team was

21  "proactively ripping out panels" because it was known the panels would degrade and

22  therefore would not perform according to First Solar's representations to its customers.  The

23  problem was that while it might be known how many panels at a plant were likely to suffer

24  from the heat degradation, there was no way of knowing exactly where those panels were

25  located.  CW-1 said there was definitely concern regarding the adequacy of the warranty

26  reserves once the heat degradation issue began to arise – in essence, the heat degradation

27  issue meant that First Solar's warranty costs were going "to skyrocket" and the existing

28  warranty reserve was "nowhere near where it should have been."  According to CW-1, the

1    performance guarantee for panels in the EPC plants was the same as the panels that First

2    Solar sold to their third-party customers – *i.e.*, 25 years.  In emphasizing how the heat

3    degradation issue became increasingly critical, CW-1 said the EPC division was "a massive

4    freight truck with so much momentum it won't slow down because of a module problem."

5    Instead, a major objective of the EPC division was to meet delivery milestones of modules

6    that would permit revenue to be realized on EPC projects no matter if those modules would

7    have to be replaced immediately after the plant became operational.  CW-1 said that the

8    attitude of the engineering group building the plants regarding the use of modules subject to

9    heat degradation was "what we don't know won't hurt."  CW-1 explained that it was

10   absolutely critical that modules be shipped to the different EPC sites not only for revenue to

11   be realized, but also to avoid a build-up of finished goods inventory.  CW-1 said that First

12   Solar's emphasis on EPC deals was so that the Company could book as much revenue as

13   possible, even though the margins on those EPC deals were very inferior to the margins on

14   product sales.  CW-1 argued internally with members of the First Solar finance team,

15   including Kurt Wood, that First Solar would make far more money on a product sale – even

16   with a discount – than they would on an EPC deal.  But the finance team members told him

17   he was missing the point and that the EPC deals even though they had much lower margins

18   and ultimately made less money for First Solar after all the costs and expenses were realized

19   nonetheless permitted First Solar to report the maximum amount of upfront revenue which

20   was critical to "managing Wall Street" expectations.

21        51.    Confidential Witness No. 2 ("CW-2") was employed by First Solar as an

22   engineer with duties in production engineering in its Perrysburg, Ohio facility from 2005

23   until early 2011.  According to CW-2, First Solar "knew in 2007 that the projected failure

24   rate [of the Series II Modules] was going to be much greater than 4%."  CW-2 explained that

25   the ovens were not working properly and were overheating the panels during the annealing

26   process.  According to CW-2, "a layer of cad-sulfide would migrate into the cad-tulle layer"

27   during the manufacturing process due to overheating of the ovens.  CW-2 was responsible

28   for performing lifetime efficiency tests on the panels.  CW-2's tests showed a much shorter

life expectancy over the lifetime of some of the panels.  Modeling by First Solar employees in the Root Cause Analysis Department confirmed CW-2's test results.  CW-2 presented his findings in numerous meetings throughout 2007 and 2008, in which he predicted a 12% to 14% failure rate on the solar panels.  CW-2 said that Greg Helyer (Director of Process Development Engineering), Kuntal Kumar (Manager of Process Development) and other process development engineers attended these meetings.  CW-2 said that Mike Koralewski (Vice President of Global Quality) was "informed in private meetings" of CW-2's projected failure rates.  According to CW-2, "Helyer told me to ignore the results of my own life-term test results and presentation."  CW-2 explained that employees' bonuses were affected by the efficiency of the modules because the more efficient the modules, the more modules First Solar would sell and the more bonus compensation First Solar employees would receive.  When First Solar announced in mid-2010 that it was anticipating a 4% failure rate of the panels, CW-2 believed that "the number was made up."  According to CW-2, the engineering staff laughed when they saw that announcement: "We knew it [the failure rate] was underestimated."  According to CW-2, the Perrysburg warehouse started "filling up" with returned panels beginning in 2009.  When the modules were returned, he understood that First Solar would ship new ones to customers.

52.     Confidential Witness No. 3. ("CW-3") worked at First Solar as a Production Team Lead in First Solar's Perrysburg, Ohio facility from 2006 through mid-2009.  CW-3 was involved in different aspects of the manufacturing process for solar panels and was trained in all aspects of the production of solar panels.  As a Production Team Lead, CW-3 worked on one of the four main production "crews" that staffed the Perrysburg facility.  Each production shift worked a 12-hour shift – either 6:00 a.m. to 6:00 p.m. or 6:00 p.m. to 6:00 a.m.; CW-3 worked the evening shift, but sometimes worked overtime which meant that he worked on a daytime shift.  The crews had rotating days of work so that a crew would work Monday and Tuesday, be off Wednesday and Thursday, then work Friday, Saturday, and Sunday, and then be off on the ensuing Monday and Tuesday, and so forth.  Each crew worked 14 days a month.  CW-3 reported to Production Supervisor Eric Campbell.

Campbell reported to Plant Manager Todd Spangler; Spangler reported to COO Bruce Sohn. As a Production Team Lead, CW-3 worked on any of the roughly 50 or so distinct processes that were necessary to manufacture First Solar's modules – in this regard, CW-3 might work for, say, six months on "acid etching" but then be assigned for a week to work in boxing the final product.  Given the wide-ranging nature of CW-3's duties, CW-3 was able to observe practices – and problems – throughout numerous different manufacturing processes.  The plant in which CW-3 worked produced panels that were shipped to Germany, Spain, and "a lot" that went to Mexico and Arizona.  Once First Solar's German plant became operational, the Perrysburg plant no longer shipped panels to Germany because the German plant was intended to eliminate the shipping costs incurred from shipping products from the U.S. to Europe.  CW-3 said that the solar panels that were produced at the Perrysburg plant suffered from any number of defects, including low wattage, problems with glass, and sulphur spotting, to name just a few.  CW-3 said he was aware that First Solar produced some panels and shipped them to customers even though the panels did not perform to the standards that First Solar represented.  According to CW-3, management and production supervisors at the Perrysburg plant deliberately disregarded those problems in order to meet production and shipping goals.  CW-3 explained that every evening when he went to work, there was an employee meeting in which details regarding the numbers of panels shipped the prior shift were discussed, in addition to discussing the goals for the upcoming shift.  According to CW-3, the management and production supervisors at the Perrysburg plant received bonuses based on the volume of panels that were shipped from the plant and therefore they "only cared about numbers and not quality."  Time and again, CW-3 said he and other personnel identified defects with a panel arising during a given process – say acid etching.  The procedure was that when a module was determined to not meet the Quality Assurance ("QA") standards for that particular manufacturing process, to notify the production supervisor.  The production supervisor would instruct the employee to place the defective modules in a so-called "buck," which was a sturdy metal pallet that could hold upwards of 300 panels at a time.  The production supervisor would then call the QA employee assigned

1    to that shift – usually, Steve Bridges.  In many recurring instances, CW-3 said that Bridges

2    (as well as other QA managers) would say that the panels in the buck were okay and they

3    would therefore be released to continue on through the manufacturing process.  According to

4    CW-3, Bridges and the productions managers were literally – and arbitrarily – "changing it

5    [the quality criteria] on the fly" in order to make production numbers.  CW-3 elaborated on

6    the types of defects CW-3 had observed.  Besides observing numerous panels that suffered

7    from acid etching problems, sulphur spots, low wattage, there were also panels that were not

8    properly baked in the ovens.  As CW-3 explained, the panels were supposed to be placed in

9    ovens only after the appropriate temperature had been reached.  If an oven needed to be

10   brought up to the proper temperature, there was a "written criteria" that required 100 – 200

11   old "plates" (*i.e.*, panels) to be run through the oven first to bring it up to the correct

12   temperature.  The overall process to bring the ovens up to the correct temperature could take

13   90-120 minutes.  Many times, panels were put into the ovens without the proper heating

14   process being completed.  Other problems that routinely occurred, but were disregarded by

15   the QA managers, included pin-holes; other panels ended up with too much cadmium-

16   chloride spray on them, but others sometimes had too little.  Once it had been manufactured,

17   a finished panel was completely examined, to include being run through a series of so-called

18   "hi-pot" tests, which tested the wattage that each panel could generate.  The wattage for each

19   panel varied.  Depending on what the wattage for a panel happened to be, a barcode was

20   generated that indicated the wattage for that particular panel and then affixed to the panel.

21   Panels of similar wattage were put together – *i.e.*, panels of different wattages were not

22   supposed to be packaged together.  Finished panels were put into boxes that held 50 panels

23   of the same wattage at a time.  However, if a panel had an issue or defect that led it to fail the

24   final quality inspection, the entire box of 50 panels would be red-tagged.  The red-tag would

25   indicate that the box of 50 panels had a panel in it that suffered from a particular defect, say,

26   sulphur spotting.  At that point, CW-3 and other First Solar employees were directed by the

27   production supervisors to go through the box to find a panel with sulphur spots.  According

28   to CW-3, as soon as a single panel with sulphur spots was found, it was removed, but at that

750217_1

1   point the entire box was presumed to be free of any further defects.  For instance, if the panel

2   with sulphur spots had been found after looking at 10 panels, the remaining 40 panels would

3   not be inspected.  Furthermore, the personnel were directed to only look in the red-tagged

4   boxes for the first panel to come up that had sulphur spotting even though it was very likely

5   that the panels had other defects that were not delineated on the red-tag.  CW-3 said that he

6   oftentimes saw panels in the red-tagged boxes that had other kinds of defects.  However,

7   CW-3 emphasized that personnel were directed to only look for the defect specified in the

8   red tag and not look for anything else.  CW-3 admitted he and other personnel did not speak

9   up about the other defects that he routinely saw because "we were in fear for our jobs" if

10  they did since this would be viewed as challenging or contradicting their supervisors.

11  According to CW-3, the presence of defects was being deliberately overlooked.

12  Furthermore, CW-3 clarified that the final testing and inspection during the "boxing" phase

13  did not fully test the quality of the panels so that quality issues that had been waived through

14  earlier in the manufacturing process might still be significant, but not detected, during the

15  final inspection and testing.  CW-3 said that each production crew at the Perrysburg facility

16  produced 2000-3000 panels in a 12-hour shift.  CW-3 estimated that of the panels produced

17  in a given 12-hour shift, anywhere from 20%-25% of the panels would have defects in them

18  – these defects could occur anywhere throughout the multi-phase production process and/or

19  in the final boxing phase.  CW-3 estimates that 50% of the panels identified as having

20  defects in them, including many panels with sulphur spotting, ended up being shipped.

21         53.    Confidential Witness No. 4 ("CW-4") was employed by First Solar in the

22  Materials Group in Perrysburg and was responsible for procuring glass used by First Solar

23  from 2007 to early 2009, when CW-4 left First Solar.  CW-4 had detailed product knowledge

24  and expertise.  CW-4 said that CW-4 and other former employees of First Solar had received

25  letters from First Solar regarding the likelihood that First Solar would be sued by its

26  shareholders and requesting that former employees inform First Solar if they were contacted.

27  CW-4 said that senior management at First Solar, including former First Solar President

28  Bruce Sohn, were definitely aware that First Solar's modules would use the same glass that

750217_1

1   had proven problematic for Pittsburgh Glass, a manufacturer of glass panels that had

2   experienced premature sealant failures.  CW-4 knew this because CW-4 had been directly

3   involved in presenting this information to Sohn.  As part of that presentation, CW-4 said that

4   Roger O'Shaughnessy, who was the President of Cardinal Glass Industries, had authored a

5   paper that O'Shaughnessy presented to Sohn, Eaglesham, Koralewski, and CW-4 detailing

6   the problem, as well as a recommendation that the glass that First Solar procured from

7   Cardinal be treated with "a top coat of silicone" that would extend the life of the glass in the

8   panels.  O'Shaughnessy had written the paper and come up with the recommendation

9   because of his experience with the sealant failures.  The meeting with O'Shaughnessy, Sohn,

10  Eaglesham, Koralewski and CW-4 took place in Arizona, most likely in 2007.  Not only did

11  CW-4 participate in "regular weekly meetings" that included Sohn regarding First Solar's

12  glass supply, but CW-4 was knowledgeable regarding what was discussed in no small part

13  because CW-4 had been responsible for introducing O'Shaughnessy to First Solar in the first

14  place and it had been O'Shaughnessy who had also informed CW-4 about the bonding

15  problem and silicone top coating solution.  According to CW-4, Sohn basically referred the

16  matter to Eaglesham and Koralewski, who turned it over to the engineering group to

17  evaluate.  In spite of the information that O'Shaughnessy presented, the decision was made

18  to go forward with procuring the glass without the top-level of silicone that O'Shaughnessy

19  had recommended.  According to CW-4, First Solar management "did not want it" – *i.e.*, the

20  silicone top coat – even though they "knew they might have bonding failures."  Adding the

21  silicone would have increased First Solar's costs to produce the modules, but CW-4 noted

22  that the increased life span of the panels would have reduced First Solar's warranty costs.

23  CW-4 said that problems with the modules were not surprising because they were such new

24  products and "no one had 20 years of experience" to really know how the modules would

25  perform.

26          54.     Confidential Witness No. 5 ("CW-5") was employed by First Solar as a

27  Production Operator in Perrysburg, Ohio from 2006 to late 2009.  CW-5 said that First Solar

28  developed a new solar panel, which they began manufacturing in Perrysburg, Ohio in 2008.

1   CW-5 worked on the production of this panel during the time CW-5 was employed by First

2   Solar.  CW-5 observed that, while the older panels had many problems, the newer panels

3   produced in 2008 were even more problematic.  According to CW-5, the 2008 panels

4   suffered from power loss, which was discovered in the plant by QA.  CW-5 attended daily

5   meetings before beginning production.  During these meetings, the production team leaders

6   would identify and explain the problems that were occurring in the process of manufacturing

7   the panels.  During 2009, power loss seemed to be the main issue with these 2008 panels.

8       55.     Confidential Witness No. 6 ("CW-6") was employed by First Solar as a senior

9   member of its Internal Audit Department from 2006 until the spring of 2010.  As a senior

10  member of the Internal Audit Department, CW-6 was responsible for reviewing and acting

11  on internal whistleblower complaints.  According to CW-6, these complaints arrived via e-

12  mail or telephone.  In either January or February 2010, CW-6 received a non-anonymous

13  whistleblower complaint via e-mail stating that the Vice President of Financial Planning and

14  Analysis, Kurt Wood, had indicated to a group of his subordinates what the publicly reported

15  cost-per-watt  number  was  and  directed  attendees  of  the  meeting,  including  the

16  whistleblower, to do what was necessary to come up with that number.  CW-6 said Wood

17  used the phase at the meeting, "let's make this happen."  According to the whistleblower,

18  Wood instructed the team to "do whatever you had to with your charts to make the numbers

19  work."    According  to  CW-6,  the  whistleblower  was  knowledgeable  about  Wood's

20  instructions regarding manipulating the cost-per-watt numbers because the whistleblower

21  "was in the meeting" with Wood when he gave the directive and was a member of Wood's

22  team.  A few days after receiving the Complaint, CW-6 alerted defendant Meyerhoff and

23  shortly after that, CW-6 met with defendant Meyerhoff to discuss the whistleblower's

24  complaint regarding manipulations of the cost-per-watt metric.  CW-6 said that Kurt Wood –

25  the person who instructed his subordinates to manipulate the cost-per-watt metric – reported

26  directly to defendant Meyerhoff, First Solar's Audit Committee Chairman, Tom Presby, to

27  the whistleblower's complaint.  According to CW-6, First Solar took virtually no action in

28

750217_1

1    response to the whistleblower's complaint, telling Wood only that he should watch what he

2    said in meetings.

3        56.    Confidential Witness No. 7 ("CW-7") was employed as a Production Operator

4    in First Solar's Perrysburg, Ohio manufacturing facility from 2006 to late 2009.  As a

5    Production Operator, CW-7 was responsible for examining the solar panels for quality

6    issues.  With respect to quality issues, CW-7 said that "there were lots of defects" in the

7    panels.  Sometimes there were coloration defects; others were called "voids."  CW-7

8    observed that if the defect – even a functional defect – was one which the customer would

9    not immediately detect visually, then First Solar would "definitely" ship it out anyway.

10   Sometime between March and September 2009, while inspecting plates during the last stages

11   of production, CW-7 noticed unusual spots on the plates.  CW-7 observed another problem

12   that arose at the end of 2007 or in early 2008.  CW-7 described this problem as an arcing

13   problem, meaning the exposed lead wire would arc away from the plate.

14       57.    Confidential Witness No. 8 ("CW-8") was employed by First Solar as a senior

15   member of the EPC group in First Solar's Bridgewater, New Jersey facility from late 2010

16   until late summer 2011.  CW-8 reported to the Director of Engineering, and both he and his

17   boss had contact with the Vice President of Engineering.  CW-8 was responsible for

18   managing and developing the structure of First Solar's business and was in charge of the

19   material management portion, the solar films, which CW-8 described as a "key element" of

20   the business.  CW-8 also attended quarterly conference calls with First Solar's senior

21   management, including the President and CEO of First Solar.  CW-8 said that the efficiency

22   of the solar panels was not what was claimed by the sales department.  CW-8 said: "In many

23   cases the module would not perform.  They [First Solar] ended up having to review the entire

24   project and install a number of new panels to compensate for those inefficiencies."  CW-8

25   said that the defects occurred, in part, because the Company "wanted to grow fast."

26   According to CW-8, "[m]any times [when] you want to speed up production and speed up

27   quantity, you get into to those situations.  You overlook details."  CW-8 noted that "[h]eat

28   degradation is always something that's been discussed with the panels, with the nature of the

1   product itself.  The problem is: when you sell [a panel] you don't have the history or the data

2   to say [how it will work] in 20 years."  CW-8 said that he was interviewed by the Securities

3   and Exchange Commission ("SEC") after he left First Solar and explained the SEC was

4   investigating First Solar.

5          58.    Confidential Witness No. 9 ("CW-9") was employed by First Solar in its

6   Perrysburg manufacturing facility from 2007 until mid-2012.  CW-9 had several roles during

7   his five-year employment at Fist Solar.  Prior to spring 2009, CW-9 was a manufacturing

8   technician.   As a manufacturing technician, CW-9 rotated amongst all of the different

9   production processes at the Perrysburg plant.  In the spring of 2009, CW-9 was assigned

10  specifically to the coating process; CW-9 was also a team lead.  CW-9 was knowledgeable

11  about the heat degradation problem impacting First Solar's panels.  According to CW-9,

12  First Solar had been selling panels reflecting high wattage ratings that underperformed

13  because they degraded so quickly.  CW-9 knew this because CW-9 had conversations with

14  engineering personnel at the Perrysburg plant who told CW-9 this.  In addition, CW-9 said

15  that panels with known quality problems were shipped to customers and this took place

16  throughout CW-9's employment at First Solar.  CW-9 explained that one reason that panels

17  with known defects were shipped was because First Solar's managerial and supervisory

18  personnel at the Perrysburg plant received large bonuses (as big as "five figures") for

19  meeting production goals even if this included shipping problematic solar panels.  CW-9 said

20  that numerous panels at the Perrysburg plant were "out of spec," which meant the panels

21  were likely to perform poorly and/or fail, but the plant management would "let it [the

22  problematic panels] go."  According to CW-9, the Perrysburg night shift produced around

23  2,600 solar panels each evening.  Of these 2,600 panels, he estimated that 40% ended up

24  with issues of one kind or another.  But according to CW-9, unless the panels were literally

25  broken, it was typically the case that problematic panels were shipped.  For example, CW-9

26  said that panels that did not have the correct film thickness were shipped to customer even

27  though it was known that a panel would degrade more quickly if the film was too thick or too

28  thin and therefore such panels should not have been shipped.  CW-9 said he had raised

1  concerns to his supervisors that shipping panels with problems and defects that were "out of

2  spec" was going to "nip the company" in the future, but CW-9 was basically told by Coater

3  Supervisor Jeremy Hollyer to "shut up."  Another manager named Dominique Mendoza also

4  told CW-9 to disregard when panels were out of spec.  CW-9 said by "turning a blind eye to

5  quality" to meet production goals so as to earn bonuses, the managers and supervisors at

6  First Solar's Perrysburg plant were essentially ensuring that "you will get bad panels in

7  boxes."  CW-9 said that the Perrysburg plant definitely received a large volume of returns.

8  Finally, CW-9 said that, at the end of a quarter, First Solar would ship panels out all at once.

9         59.    Confidential Witness No. 10 ("CW-10") was a member of the Financial

10 Planning and Analysis Group at First Solar between fall 2008 and summer 2011.  CW-10

11 was responsible for calculating the cost-per-watt metric.  CW-10 stated that s/he had

12 concerns about the Company's cost-per-watt calculations, and commented that it could be "a

13 whole different class action."  Plaintiffs explained the nature and theory of the case to CW-

14 10, and CW-10 stated that s/he believed s/he had information that would support plaintiffs'

15 claims.  CW-10 said s/he "could tell you an awful lot" about cost-per-watt issues, with which

16 s/he had been directly involved, but s/he is "really nervous" about doing so because of the

17 nondisclosure agreement s/he signed and the letter from First Solar s/he received and

18 therefore could not and would not speak further.  CW-10 also received a letter from First

19 Solar encouraging him/her not to speak to counsel for plaintiffs or their investigators.

20 (Numerous additional witnesses reported receiving a similar letter.)  CW-10 calculated the

21 metrics for cost-per-watt, but said that because of the non-disclosure agreement and letter

22 s/he had received, s/he had better not say anything else.

23        60.    Confidential Witness No. 11 ("CW-11") is a solar industry consultant.  CW-11

24 attended the Intersolar Industry Conference held in Munich, Germany in June 2010.  This is

25 a major European solar convention held on an annual basis.  At this conference, CW-11

26 spoke to several end users of First Solar's panels.  These end users told CW-11 that they had

27 been experiencing a very significant drop in power output very quickly following the initial

28 degradation that First Solar panels typically experience.  The power output of the First Solar

750217_1

1  panels is expected to degrade in the first three months of operation, after which the

2  performance should stabilize.  However, First Solar's panels were ***not*** stabilizing, but were

3  instead experiencing additional degradation of 20% to 30% below expected performance

4  levels.

**VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS
       ISSUED DURING THE CLASS PERIOD**

5

6

7        61.     Throughout the Class Period, defendants made numerous false and misleading

   representations in (a) press releases announcing quarterly financial and earnings results to the

8
   public, (b) follow-up conference calls with investors and analysts which were published to

9
   the market, and (c) quarterly and annual filings with the SEC on Forms 10-Q and 10-K

10
   signed and certified by defendants.

11

12 **A.    Sarbanes-Oxley ("SOX") Certifications**

13

14       62.     As set forth in §VIII.C, *infra*, although the Company's false financial results in

15 10-Q and 10-K violated numerous GAAP and SEC rules, these financial results were

16 reviewed, signed and certified under oath by the Company's CEO and CFO.   They

17 represented in each SEC Form 10-Q and 10-K that the results (1) "do not contain any untrue

18 statement of a material fact or omit to state a material fact necessary to make the statements

19
   made, in light of the circumstances under which such statements were made, not misleading"

20
   (2) "have been prepared in accordance with U.S. generally accepted accounting principles"

21
   and that (3) "information contained in such Report fairly presents, in all material respects,

22

23 the financial condition and results of operations of the Company."

24

25       63.     In addition, the Company expressly assured investors in each 10-Q and 10-K

26 that First Solar's CEO and CFO had "carried out an evaluation of the effectiveness of our

27 disclosure controls and procedures" and "[b]ased upon that evaluation . . . concluded that our

28

disclosure controls and procedures were effective as of the end of the period covered by this report."[6]

64.     Separately, First Solar's CEO and CFO signed sworn SOX certifications attached to each Form 10-Q and 10-K representing under oath that they:

(1) are responsible for establishing and maintaining disclosure controls and procedures . . . .;

(2) ***designed*** such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure*** that material information relating to the registrant . . . ***is made known to us*** by others . . . .;

(3) ***[e]valuated the effectiveness*** of the registrant's disclosure controls and procedures . . . .;

(4) "***[d]isclosed***" any change that has materially affected, or is "reasonably likely to materially affect, the registrant's internal control over financial reporting";

(5) ***disclosed . . . [a]ll significant deficiencies and material weaknesses*** in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ***ability to record, process, summarize and report financial information***; and

(6) disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**B.      April 30, 2008-May 1, 2009**

65.     On April 30, 2008, the Company issued a press release announcing its financial results for 1Q08.   The Company reported net income of $47 million, or $0.57 diluted

---

[6]     Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures. SEC Rule 13a-15(e), 17 C.F.R. §240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. §240.15d-5(e).

- 34 -

earnings per share ("EPS") for the first quarter of 2008, as compared to net income of $5 million, or $0.07 diluted EPS, for the same period in the prior year.

66.     On April 30, 2008 during the 1Q08 earnings conference call, defendant Ahearn falsely stated:

> Conversion efficiency was flat at an average of 10.6% for the quarter.  Cost per watt was $1.14.

67.     On May 2, 2008, First Solar filed its Form 10-Q with the SEC for 1Q08. Although defendants were aware of significant product performance problems, the 10-Q incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 29, 2007:

> Problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> \*     \*     \*

The 10-Q stated:

> **Product warranties**

> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

> Product warranty activity during the three months ended March 29, 2008 and March 31, 2007 was as follows (in thousands):

> \*     \*     \*

> Product warranty liability, end of period                    $9,261

68.     On July 30, 2008, the Company issued a press release announcing its financial results for 2Q08.  The Company reported net income of $70 million, or $0.85 diluted EPS for the second quarter of 2008, as compared to net income of $47 million, or $0.58 diluted EPS for the same period in the prior year.

- 35 -

69.     On July 30, 2008, during the 2Q08 earnings conference call, defendant Ahearn falsely stated: "cost per watt was $1.18."   During the same call, defendant Meyerhoff reiterated: "Cost per watt was $1.18."

70.     On July 31, 2008, First Solar filed its 10-Q with the SEC for 2Q08.  The 10-Q incorporated the following false statements from the Annual Report on Form 10-K for year ended December 29, 2007:

> Problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> *      *      *

> ***Product warranties***

> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

> Product warranty activity during the three and six months ended June 28, 2008 and June 30, 2007 was as follows (in thousands):

> *      *      *

Product warranty liability, end of period                $10,865

71.     On October 29, 2008, the Company issued a press release announcing its financial results for 3Q08.  The Company reported net income of $99 million, or $1.20 diluted EPS for the third quarter of 2008, as compared to net income of $46 million, or $0.58 diluted EPS for the same period in the prior year.

72.     On October 29, 2008, during the 3Q08 earnings conference call, defendant Ahearn stated:

> Cost per watt in the third quarter was $1.08 . . . .  We continue to solidify our position as the lowest cost manufacturer in the industry.

> *      *      *

750217_1

And finally, we are grounded in reality and we take a pragmatic approach to risk. ***We do not knowingly ignore uncertain events that could meaningful[ly] [] impact our business***, but rather attempt to identify them, convert them to opportunities, where possible, and mitigate them where appropriate. We've always tried to be transparent with our key stakeholders with regard to our views and approach to the business and its risk.

During the same call, defendant Meyerhoff reiterated: "Manufacturing costs per watt for the third quarter was $1.08."

73.     On October 31, 2008, First Solar filed its 10-Q with the SEC for 3Q08.  The 10-Q incorporated the following false statement from the 2007 10-K:

Problems with product quality or performance ***may*** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

\*       \*       \*

***Product warranties***

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

Product warranty activity during the three and nine months ended September 27, 2008 and September 29, 2007 was as follows (in thousands):

\*       \*       \*

Product warranty liability, end of period                    $9,858

74.     On February 24, 2009, the Company issued a press release announcing its financial results for 4Q08 and year ended December 27, 2008.  The Company reported net income of $133 million or $1.61 diluted EPS, and revenue of $434 million for the fourth quarter of 2008, as compared to net income of $63 million, or $0.77 diluted EPS, and revenue of $201 million, for the same period in the prior year.  The Company further reported net income of $348 million, or $4.24 diluted EPS, and revenue of $1.2 billion for

- 37 -

750217_1

the 2008 fiscal year, as compared to net income of $158 million, or $2.03 diluted EPS, and

revenue of $504 million, for the prior year.

75.     On February 24, 2009, during the 4Q08 earnings conference call, defendant

Ahearn stated:

> And finally, we reduced our manufacturing costs to $0.98 a watt in Q4.  That's down 9% quarter-over-quarter and 12% for the year.  Breaking that dollar per watt cost benchmark is a major industry milestone.  It is something the industry has been chasing for 20 years . . . .

76.     During that same call, defendant Meyerhoff reiterated the false cost-per-watt

information: "Manufacturing costs per watt for the fourth quarter were $0.98, down 9%

quarter-over-quarter and 12% for the year."  On that same call, defendant Ahearn continued:

"Well, so obviously getting below a dollar a watt is a significant milestone and we're really

pleased with the organization's ability to execute on that."

77.     Despite the fact that defendants were well aware of a massive heat degradation

problem for solar modules installed in the desert Southwest, Meyerhoff stated:

> What I can tell you, we obviously had revenue recognition for the El Dorado project that we brought on in Q4 that essentially came all through mostly in Q4.

78.     During the call, an analyst for Pacific Crest asked the following:

> And then, lastly, Bruce, just on that line calc, can you just verify there was no problems with the line this quarter? . . . *I just want to make sure there was no manufacturing problems* around, or that accounts for that line calc being down.

In response, defendant Sohn replied:

> [B]ut in terms of operational, the challenge is always is just bringing up the factory and developing the proficiency, recall as we bring a new factory online, like a KLM2 or KLM3, each of these factories is bringing on line capacity in the neighborhood of about 190 megawatts, 170 megawatts, or so, of total capacity.
>
> That is significant capacity and our expectation is to start-up matched from an efficiency perspective, matched from a yield perspective, *and matched, of course, from a quality and reliability perspective, and so we're very cautious*

- 38 -

750217_1

*and careful and have a high degree of expectation in terms of the way we operate the factories*.  As the proficiency of the workers develops, the run rate itself will also match.

79.    On February 25, 2009, First Solar filed its 10-K with the SEC for the fiscal year ended December 27, 2008.  The 2008 10-K included the following false statements:

We design and manufacture solar modules using a proprietary thin film semiconductor technology that has allowed us to reduce our average solar module manufacturing costs to among the lowest in the world.  In 2008, our average manufacturing costs were $1.08 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

*                *                *

Our thin film technology also has relatively **high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.

*                *                *

Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

*                *                *

While our power output warranty extends for twenty-five years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001.  Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules.  Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future.  For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations.  Any widespread product failures **may** damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

*                *                *

Our average manufacturing cost per watt has decreased from $2.94 during 2004 to $1.08 during 2008.

- 39 -

80.     On the March 2, 2009 conference call, despite the fact that defendants were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, defendant Meyerhoff falsely stated:

> I mean, if you think about the first system we did was the [] 10 megawatt ***El Dorado***.  That was less than five months.  And that was essentially our first pilot, right, ***where we drove a lot of learning.  So, that gives you a starting point of our capability*** that we believe we can ramp.

81.     On March 11, 2009, during the Merrill Lynch Cleantech Leaders Conference, defendant Meyerhoff stated: "First Solar announced a key milestone in the last quarter.  We are the ***first company to achieve sub-$1.00 per watt manufacturing cost***."

82.     On April 29, 2009, the Company issued a press release announcing its financial results for 1Q09.  The Company reported net income of $165 million, or $1.99 diluted EPS, and revenue of $418 million for the first quarter of 2009, as compared to net income of $47 million, or $0.57 diluted EPS, and revenue of $197 million, for the same period in the prior year.

83.     On April 29, 2009, during the 1Q09 earnings conference call, defendant Meyerhoff stated:

> [O]ur cost per watt produced for the first quarter was $0.93, down 5.1% sequentially as we continued to realize the benefit from increased production and low cost locations, higher line throughput and lower material costs.

84.     On May 1, 2009, First Solar filed its 10-Q with the SEC for 1Q09.  The 10-Q included the following false statements:

> We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93 in the three months ended March 28, 2009. . . .  Our cost competitiveness is based on our proprietary technology, which provides lower cost from a ***continuous highly automated industrial manufacturing process***, our scale and our ***operational excellence***. . . .  In 2008, we reduced our manufacturing cost per watt by 12%.

*       *       *

- 40 -

750217_1

The increase in MW volume of solar modules sold is attributable to the full production ramp of the first two plants at our Malaysian manufacturing center, commencement of product shipments at the third plant of our Malaysian manufacturing center and **continued improvements to our manufacturing process**.

\*        \*        \*

### Product warranties

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

Product warranty activity during the three months ended March 28, 2009 and March 29, 2008 was as follows (in thousands):

\*        \*        \*

Product warranty liability, end of period                    $13,557

85.    The 1Q09 Form 10-Q also incorporated the following false statement from the annual report on Form 10-K for year ended December 27, 2008:

Thin film technology has a short history and our thin film technology and solar modules may perform below expectations; problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

86.    By virtue of the facts alleged in §§IV, V, VII, and VIII, and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements above were misleading to investors.  Considered as a whole, defendants' representations misled investors by presenting a false and misleading picture of First Solar's results by, among other things, failing to disclose and actively concealing the excursion and heat degradation defects from investors.  In particular, defendants knew or recklessly disregarded that:

(a)    the April 30, 2008, July 30, 2008, October 29, 2008, February 24, 2009 and April 29, 2009 statements, referred to above, concerning the Company's reported net

- 41 -

1   income, earnings per share, and revenue were materially false and misleading as a result of

2   the Company's understatement of warranty reserves and improper recognition of revenue

3   (particularly for solar projects in the Southwestern U.S.), in violation of GAAP, as described

4   at §§IV, VII, and VIII.C., G.;

5          (b)     the April 30, 2008, July 30, 2008, October 29, 2008, February 24, 2009,

6   February 25, 2009, March 11, 2009, April 29, 2009 and May 1, 2009 statements, referred to

7   above, concerning the Company's reported cost-per-watt were materially false and

8   misleading because the cost-per-watt metric was understated and manipulated, as described

9   at §§IV, V, VII.A., and VIII.A.-F.;

10         (c)     the May 2, 2008, July 31, 2008, October 31, 2008, February 25, 2009

11  and May 1, 2009 statements, referred to above, concerning *potential* product quality and

12  performance problems that *could* lead to material product warranty costs were materially

13  false and misleading because significant product quality and performance problems were

14  *already* occurring, as described at §§IV, V, and VIII.A.-B.;

15         (d)     the October 29, 2008 statement, referred to above, regarding

16  "meaningful" "uncertain events" was materially false and misleading because defendants

17  were concealing product defects that adversely and materially impacted First Solar's

18  business, as described at §§IV, V, VII.C., and VIII.A.-B.;

19         (e)     the February 24, 2009 and March 2, 2009 statements, referred to above,

20  concerning a solar project in the Southwestern U.S. were materially false and misleading

21  because the statements concealed the severe heat degradation defect affecting modules

22  installed in hot climates, as described at §§IV, V, VII.C., and VIII.A.-B.;

23         (f)     the February 24, 2009, February 25, 2009 and May 1, 2009 statements,

24  referred to above, regarding the Company's successful manufacturing process, "operational

25  excellence," and product reliability were materially false and misleading because the

26  statements concealed pervasive product and manufacturing problems, including the

27  excursion and heat degradation defects, as described at §§IV, V, and VIII.A-B.; and

28

- 42 -

750217_1

(g)     the February 25, 2009 statement, referred to above, concerning module conversion efficiency was materially false and misleading because the statements concealed the fact that the module conversion efficiency was increased by manipulating the D-rating, as described at §§IV, V, and VIII.A.-B.

**C.     July 30, 2009-April 29, 2010**

87.     On July 30, 2009, the Company issued a press release announcing its financial results for 2Q09.  The Company reported net income of $181 million, or $2.11 diluted EPS, and revenue of $526 million for the second quarter of 2009, as compared to net income of $70 million, or $0.85 diluted EPS, and revenue of $267 million, for the same period in the prior year.

88.     On July 30, 2009, during the 2Q09 earnings conference call, defendant Ahearn made the following false statement:

> Our manufacturing costs came in at $0.87 per watt for the quarter.  That is down 6.5% quarter-over-quarter . . . .

89.     On the same call, despite the fact that defendants were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, Ahearn nevertheless made the following misleading statement: "In terms of California and the ***Southwest, nothing specific to report***."

90.     On the same call, defendant Meyerhoff reiterated the misleading cost-per-watt information: "Cost per watt produced for the second quarter was $0.87, down $0.6 or 6.5% sequentially . . . ."

91.     On August 3, 2009, First Solar filed its 10-Q with the SEC for 2Q09.  The 10-Q included the following false statements:

750217_1

1

***Product warranties***

2

We offer warranties on our products and record an estimate of the associated liability based on the following: number of solar modules under warranty at customer locations, historical experience with warranty claims, monitoring of field installation sites, in-house testing of our solar modules and estimated per-module replacement cost.

3

4

5

Product warranty activity during the three and six months ended June 27, 2009 and June 28, 2008 was as follows (in thousands):

6

\*        \*        \*

7

Product warranty liability, end of period              $17,413

8

9

Defendants also misrepresented its continued successful manufacturing cost reduction:

10

We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93 and $0.87 in the three months ended March 28, 2009 and June 27, 2009, respectively.

11

12

In particular, defendants emphasized the Company's "operational excellence."  Defendants

13

also falsely stated:

14

During the twelve months ended December 27, 2008 we reduced our manufacturing cost per watt by 12% from our cost per watt in the fourth quarter of fiscal 2007.  In the first six months of 2009, we further reduced our manufacturing cost per watt by 11% from our cost per watt in the fourth quarter of fiscal 2008.

15

16

17

Defendants falsely attributed increased sales volume to "continued improvements [in] our

18

manufacturing process."  Defendants continued:

19

In addition, we increased the average number of sellable watts per solar module by approximately 3% during the six months ended June 27, 2009 compared with the six months ended June 28, 2008.

20

21

Although defendants had identified massive defects with their solar modules, defendants

22

falsely represented that "there have been no material changes in the risk factors contained in

23

our Annual Report on Form 10-K" relating to product performance problems.  Instead,

24

defendants directed investors to the following false statement from the 2008 10-K:

25

Thin film technology has a short history and our thin film technology and solar modules ***may*** perform below expectations; problems with product quality or performance ***may cause*** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

26

27

28

92.     On October 28, 2009, the Company issued a press release announcing its financial results for 3Q09.  The Company reported net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million for the third quarter of 2009, as compared to net income of $99 million, or $1.20 diluted EPS, and revenue of $349 million, for the same period in the prior year.

93.     On October 28, 2009, during the 3Q09 earnings conference call, defendant Ahearn falsely stated:

> The most important takeaway for us is that **we remain on track** to the five year program we laid out at the Analyst Call in terms of manufacturing **cost per watt and conversion efficiency.  Things are progressing nicely**.

94.     During the same call, defendant Meyerhoff repeated the misleading cost-per-watt information:

> Cost per watt produced for the third quarter was $0.85, down $0.02 or 2.3% sequentially as we benefited from lower material costs, higher throughput and conversion efficiency . . . .

95.     On October 30, 2009, First Solar filed its 10-Q with the SEC for 3Q09.  The 10-Q included the following false statements:

> **Product warranties**
>
> We offer warranties on our products and record an estimate of the associated liability based on the following: number of solar modules under warranty at customer locations, historical experience with warranty claims, monitoring of field installation sites, in-house testing of our solar modules and estimated per-module replacement cost.
>
> Product warranty activity during the three and nine months ended September 26, 2009 and September 27, 2008 was as follows (in thousands):
>
>             *        *        *
>
> Product warranty liability, end of period                $20,582

Defendants also misrepresented its continued successful manufacturing cost reduction:

> We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93, $0.87 and

- 45 -

$0.85 in the three months ended March 28, 2009, June 27, 2009 and September 26, 2009, respectively.

In particular, defendants emphasized the Company's "*operational excellence*." Defendants also falsely stated:

> During the twelve months ended December 27, 2008, we reduced our manufacturing cost per watt by 12% from our cost per watt in the fourth quarter of fiscal 2007. In the first nine months of 2009, we further reduced our manufacturing cost per watt by 13% from our cost per watt in the fourth quarter of fiscal 2008.

Defendants falsely attributed increased sales volume to: "continued improvements [in] our global copy smart manufacturing process." Defendants continued:

> In addition, we increased the average number of sellable watts per solar module by approximately 3% during the three months ended September 26, 2009 compared with the three months ended September 27, 2008.

Although defendants had identified massive defects with their solar modules, defendants falsely represented that "there have been no material changes in the risk factors" relating to product performance problems. Instead, defendants directed investors to the following false statement from the 2008 10-K:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

96.     On December 2, 2009 at the Credit Suisse 2009 Annual Technology Conference, defendant Meyerhoff falsely stated: "*We're the lowest-cost producer in the industry*. Our cost-per-watt on a module level is at $0.85 of the third quarter."

97.     On February 18, 2010, the Company issued a press release announcing its financial results for 4Q09. The Company reported net income of $142 million, or $1.65 diluted EPS, and revenue of $641 million for the fourth quarter of 2009, as compared to net income of $133 million or $1.61 diluted EPS and revenue of $434 million, for the same period in the prior year. Additionally, the Company reported net income of $640 million, or $7.53 diluted EPS, and revenue of $2.1 billion for the 2009 fiscal year, as compared to net income of $348 million or $4.24 diluted EPS and revenue of $1.2 billion, for the prior year.

750217_1

98.     On February 18, 2010, during the 4Q09 earnings conference call, defendant Meyerhoff stated:

> Cost per watt produced for the fourth quarter was $0.84, down $0.01 and benefited from lower material costs, higher throughput and conversion efficiency . . . .

99.     On February 22, 2010, First Solar filed its 10-K with the SEC for the fiscal year ended December 26, 2009.  The 10-K included the following false statements:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $1.23 during 2007 to $0.87 during 2009. . . .  Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and permits a continuous highly automated industrial manufacturing process), our scale and our **operational excellence**.

> *        *        *

> Product warranties. . . .  When we recognize revenue for module sales, we accrue a liability for the estimated future costs of meeting our warranty obligations for those modules.  We make and revise this estimate based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

> *        *        *

> Product warranty liability, end of period                    $22,583

> *        *        *

> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In 2009, our total average manufacturing costs were $0.87 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although defendants had identified a manufacturing problem, they falsely touted their module manufacturing capability as "reliable" and directly linked their manufacturing capabilities with their future success:

> We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

- 47 -

Despite the known massive heat degradation defect, defendants falsely claimed:

> Our thin film technology also **has relatively high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.

Notwithstanding the problems relating to both the manufacture excursion and heat degradation defects had already occurred, defendants had not disclosed these problems to investors. Instead, defendants misrepresented that the problems "could" occur in the future:

> Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may cause** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> *        *        *

> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations, our manufacturing operations **could** be subject to process variations that **could** cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

100.    During the March 3, 2010, CLSA Asia USA Forum, defendant Meyerhoff stated:

> We obviously, given that we have the benefit of thin-film manufacturing, utilize significant lesser materials. All of these things resulted, by the end of the year, in an $0.83 per watt manufacturing cost, with a core cost of about $0.80, which far leads the industry as of today.

> *        *        *

> At the same point in time, our cost per watt on the module site scaled significantly. 2009 was a significant year as it relates to cost reduction. **We were able to lower our cost per watt by 19%**, year-over-year, achieving the $0.80 core cost by the fourth quarter of 2009.

101.    On April 28, 2010, the Company issued a press release announcing its financial results for 1Q10. The Company reported net income of $172 million, or $2.00 diluted EPS,

and revenue of $568 million for the first quarter of 2010, as compared to net income of $165 million, or $1.99 diluted EPS, and revenue of $418 million, for the same period in the prior year.

102.   During the April 28, 2010 1Q10 earnings conference call, defendant Gillette falsely stated: "our cost per watt was $0.81 a watt, which is down 13% year-over-year."  On the same call, defendant Meyerhoff reiterated the same false cost-per-watt information:

> Turning to cost per watt, cost per watt produced for the first quarter was $0.81, down $0.03 . . . .  Core manufacturing cost per watt was flat, at $0.80 per watt quarter-over-quarter.

103.   On April 29, 2010, First Solar filed its 10-Q with the SEC for 1Q10.  The 10-Q included the following false statements:

**_Product warranties_**

> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

> Product warranty activity during the three months ended March 27, 2010 and March 28, 2009 was as follows (in thousands):

Product warranty liability, end of period                    $23,375

Defendants also misrepresented its continued successful cost reduction:

> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In the three months ended March 27, 2010, our total average manufacturing costs were $0.81 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although defendants had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable."

> We believe that combining our **_reliable_**, low cost module **_manufacturing capability_** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants also stated:

- 49 -

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.93 during the three months ended March 28, 2009 to $0.81 during the three months ended March 27, 2010. . . . Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and permits a continuous and highly automated industrial manufacturing process), our scale, and our *operational excellence*. . . . During the three months ended March 27, 2010, we reduced our manufacturing cost per watt by 13% from our cost per watt in the three months ended March 28, 2009.

104.    Notwithstanding the problems relating to both the manufacturing excursion and heat degradation defects had already occurred, defendants failed to disclose these problems to investors.  Instead, defendants misrepresented that the problems "may" or "could" occur in the future.  Defendants incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 26, 2009:

Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

*          *          *

While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001.  Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules.  Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future.  For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations.  Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

105.    By virtue of the facts alleged in §§IV, V, VII, and VIII, and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements above were misleading to investors.  Considered as a whole, defendants' representations misled investors by presenting a false and misleading picture of First Solar's results by, among other things, failing to disclose and actively concealing the excursion and

heat degradation defects from investors.   In particular, defendants knew or recklessly disregarded that:

(a)      the July 30, 2009, October 28, 2009, February 18, 2010 and April 28, 2010 statements, referred to above, concerning the Company's reported net income, earnings per share, and revenue were materially false and misleading as a result of the Company's understatement of warranty reserves and improper recognition of revenue (particularly for solar projects in the Southwestern U.S.), in violation of GAAP, as described at §§IV, VII, and VIII.C., G.;

(b)      the July 30, 2009, August 3, 2009, October 28, 2009, October 30, 2009, December 2, 2009, February 18, 2010, February 22, 2010, March 3, 2010, April 28, 2010 and April 29, 2010 statements, referred to above, concerning the Company's reported cost-per-watt were materially false and misleading because the cost-per-watt metric was understated and manipulated, as described at §§IV, V, VII.A., and VIII.A.-C., F.;

(c)      the August 3, 2009, October 30, 2009, February 22, 2010 and April 29, 2010 statements, referred to above, concerning *potential* product quality and performance problems that *could* lead to material product warranty costs were materially false and misleading because significant product quality and performance problems were *already* occurring, as described at §§IV, V, and VIII.A.-B.;

(d)      the February 22, 2010 statement, referred to above, regarding module performance in "high temperature environments" was materially false and misleading because the Company's solar panels were failing and experiencing high failure rates in high temperature climates (*i.e.*, heat degradation), as described at §§IV, V, VII.C., and VIII.A.-B.;

(e)      the July 30, 2009 statement, referred to above, concerning a solar project in the Southwestern U.S. was materially false and misleading because the statement concealed the severe heat degradation defect affecting modules installed in hot climates, as described at §§IV, V, VII.C., and VIII.A.-B.;

(f)      the August 3, 2009, October 30, 2009, February 22, 2010 and April 29, 2010 statements, referred to above, regarding the Company's successful manufacturing

- 51 -

process, "operational excellence," and product reliability were materially false and misleading because the statements concealed pervasive product and manufacturing problems, including the excursion and heat degradation defects, as described at §§IV, V, and VIII.A.-B.;

(g)     the August 3, 2009, October 30, 2009, February 22, 2010 and April 29, 2010 statements, referred to above, concerning product warranties were false and misleading because the Company's warranty reserve was materially understated, in violation of GAAP, as described at §§IV, VII.A.-B., and VIII.C., G.; and

(h)     the August 3, 2009 and October 29, 2009 statements, referred to above, concerning the module conversion efficiency were materially false and misleading because the statements concealed the fact that the module conversion efficiency was increased by manipulating the D-rating, as described at §§IV, V, and VIII.A.-B.

**D.     July 29, 2010-December 14, 2011**

106.   On July 29, 2010, the Company issued a press release announcing its financial results for 2Q10.  The Company reported net income of $159 million, or $1.84 diluted EPS, and revenue of $588 million for the second quarter of 2010, as compared to net income of $181 million, or $2.11 diluted EPS, and revenue of $526 million, for the same period in the prior year.

107.   On the July 29, 2010, 2Q10 earnings conference call, defendant Gillette stated:

> The cost per watt was $0.76, which is down 13% year over year, and down $0.05 from the first quarter of 2010.

> *              *              *

> And we drove the module costs down to a record low number . . . .

Although defendants disclosed the manufacturing excursion for the first time on the conference call, Gillette misrepresented the true nature and extent of the excursion:

> During the period from June of 2008 to June of 2009, a ***manufacturing excursion*** occurred, ***affecting less than 4% of the total product manufacturer*** within the period.  The excursion could result in possible premature power loss in affected modules.

> The **root cause was identified and subsequently mitigated** in June of 2009. Ongoing testing confirms the corrective actions are effective. We've been working directly with impacted customers to replace the affected modules and **these efforts are well underway, and in some cases, complete**.
>
> Some of these efforts go beyond our normal warranty coverage. We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail.

During the same call, defendant Gillette also concealed the heat degradation problem by touting the success of its solar projects in the Southwestern U.S., particularly the El Dorado site:

> Turning now to Copper Mountain, slide 8 shows 48 MW expansion of our original 10 MW installations at the El Dorado site for Sempra Generation. **El Dorado** is the first site we constructed in North America in late 2008. The expansion also **highlights the progress made in design and execution of utility-scaled solar plants**.
>
> Cimarron project in New Mexico for Southern Company is our first large-scale installation of the Series 3 product. The construction is underway and progressing well.

On the same call, defendant Meyerhoff repeated the false cost-per-watt information and continued to conceal the heat degradation problem:

> Net sales for the second quarter were $588 million, an increase of 12% year over year and a sequential increase of $20 million compared to the first quarter of 2010.
>
> The sequential increase of 3.5% was mainly driven by a higher percentage of system revenue recognition with a 48 MW Copper Mountain and 30 MW Cimarron project, partially offset by a decrease in module ASPs due to a lower blended foreign exchange rate and mix implications.
>
> *       *       *
>
> Module costs per watt produced for the second quarter was $0.76, down $0.05, benefiting from higher throughput rates, improvement in conversion efficiency . . . .

During this call, when specifically asked about the module problems, defendant Sohn stated:

> About 4% of the production during the timeframe from June 2008 to 2009 was affected, in the neighborhood of about 30 MW. And we've been working with our customers since that time frame and **expect to continue to do so for about the next six months or so**.

Another analyst on the same call specifically asked First Solar to "put a dollar amount on the module replacement program."  Gillette responded that the excursion problem had already been quantified and reserved for:

> So the cost of the program in total was about $23.4 million, $17.8 million in COGs and $5.6 million that we have reserved in this quarter. ***That reserve completes our current estimate*** of the cost of the program.

108.    On August 2, 2010, First Solar filed its 10-Q with the SEC for 2Q10.  The 10-Q included the following false statements:

> ***Product warranties***
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.
>
> Product warranty activity during the three and six months ended June 26, 2010 and June 27, 2009 was as follows (in thousands):
>
> Product warranty liability, end of period                    $23,862

109.    Defendants also misrepresented its continued successful cost reduction:

> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In the three months ended June 26, 2010, our total average manufacturing costs were $0.76 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although defendants had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

> We believe that combining our ***reliable***, low cost module ***manufacturing capability*** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants also stated:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.87 during the three months ended June 27, 2009 to $0.76 during the three months ended June 26, 2010.

- 54 -

1                                    *        *        *

2         Our cost competitiveness is based in large part on our proprietary technology
          (which enables **conversion efficiency improvements** and permits a continuous
3         and highly automated industrial manufacturing process), our scale, and our
          **operational excellence**.
4
                                     *        *        *
5
          During the three months ended June 26, 2010, we reduced our manufacturing
6         cost per watt by 13% from our cost per watt in the three months ended
          June 27, 2009.
7
                                     *        *        *
8
          The increase in the MW volume of solar modules sold was attributable to the
9         full production ramp of our four-plant Malaysian manufacturing center, full
          production ramp of our Perrysburg, Ohio expansion, **continued improvements**
10        to our manufacturing process, and growth in our systems business.   In
          addition, **we increased the average conversion efficiency of our modules by
11        approximately 3%** during the three months ended June 26, 2010 compared
          with the three months ended June 27, 2009.
12
   Defendants continued to conceal the true extent and nature of the excursion problem when
13
   they reported:
14
          During the period from June 2008 to June 2009, a manufacturing excursion
15        occurred affecting less than 4% of the total product manufactured within the
          period.  The excursion could result in possible premature power loss in the
16        affected modules.  The root cause was identified and subsequently mitigated in
          June 2009.  On-going testing confirms the corrective actions are effective.  We
17        have been working directly with impacted customers to replace the affected
          modules and these efforts are well underway and, in some cases, complete.
18        Some of these efforts go beyond our normal warranty coverage.  Accordingly,
          we have accrued additional expenses of $17.8 million in the second quarter of
19        2010 and $29.5 million in total to date to cover the replacement of the
          anticipated affected module population in the field.
20
          110.    Notwithstanding that defendants were already aware of both the manufacturing
21
   excursion and the heat degradation defects, they misrepresented that such problems "may" or
22
   "could" occur in the future.  Defendants incorporated the following false statement from the
23
   Annual Report on Form 10-K for the year ended December 26, 2009:
24
25        Thin film technology has a short history and our thin film technology
26        and solar modules **may** perform below expectations; problems with product
          quality or performance **may cause** us to incur warranty expenses, damage our
27        market reputation and prevent us from maintaining or increasing our market
          share.
28

750217_1

\*      \*      \*

While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations, our manufacturing operations **could** be subject to process variations that **could** cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

111.    On October 28, 2010, the Company issued a press release announcing its financial results for 3Q10. The Company reported net income of $177 million, or $2.04 diluted EPS, and revenue of $798 million, as compared to net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million, for the same period in the prior year.

112.    On October 28, 2010, during the 3Q10 earnings conference call, defendant Gillette stated:

Our manufacturing cost per watt was $0.77, which is down $0.08 or 10% year-over-year, and up $0.01 over Q2 of this year.

During the call, defendant Gillette continued to conceal the Company's heat degradation problem by touting the success of its solar projects in the Southwestern U.S.:

In terms of the market, we've **made progress in several areas** . . . and construction on both the 30 megawatt Cimarron and 48 megawatt Copper Mountain **facilities is progressing very well**. The 290 megawatt Agua Caliente project is fully permitted and initial construction has begun.

During the same call, defendant Meyerhoff also failed to disclose the heat degradation problem:

During the third quarter, we experienced strong demand led by growing sales in our [systems] business and by continued strength in our module business. Net sales for the third quarter were $797.9 million with sequential increase of $210 million or 36% compared to the second quarter of 2010. The **increase was primarily driven by** the completion of and revenue recognition for the 60 megawatt [AC] Sarnia phase two project and by continued percentage of completion recognition for the **Copper Mountain and Cimarron projects**, partially offset by a decrease in module average sale prices.

Defendant Meyerhoff also stated:

- 56 -

750217_1

1   Module cost per watt produced for the third quarter was $0.77 up $0.01
2   sequentially.

3   In response to an analyst question, defendant Sohn stated:

    We have good quality systems in place to ensure that the ***product that we're***
4   ***shipping is – to our standards***.

5   During the same call, defendant Sohn responded to another analyst question, minimizing the

6   extent of the excursion:

7   **Satya Kumar** - *Credit Suisse – Analyst*

8       Hi.  I was wondering if you could talk about the ***factors that were***
    ***driving the accrued expenses*** and, specifically, could you talk about whether
9   the warranty issues that you had last quarter, ***are there any additional***
    ***allocations you expect to make*** in the second half of the year compared to the
10  amount that you've already disclosed in Q2?  Thanks.

11  **Bruce Sohn** - *First Solar, Inc. – President*

12      As mentioned, the increase in cost was really a direct result of the
    improvements that we're putting into the factories, and we expect to see those
13  generate better efficiencies and performance and lower cost.  ***In terms of the***
    ***excursion that we mentioned last time, there were no additional costs***
14  ***incurred in Q3***.

15      113.    On November 1, 2010, First Solar filed its 10-Q with the SEC for 3Q10.  The

16  10-Q included the following false statements:

17  ***Product warranties***

18
19      We offer warranties on our products and record an estimate of the
    associated liability based on the number of solar modules under warranty, our
20  historical experience with warranty claims, our monitoring of field installation
    sites, our in-house testing of our solar modules, and our estimated per-module
    replacement cost.

21
22      Product warranty activity during the three and nine months ended
    September 25, 2010 and September 26, 2009 was as follows (in thousands):

23                              *       *       *

24  Product warranty liability, end of period                    $25,032

25      114.    Defendants also misrepresented its continued successful cost reduction:

26  [W]ith respect to our module manufacturing costs, our advanced technology
    has allowed us to reduce our average module manufacturing costs to the
27  lowest in the world, based on publicly available information.  In the three
    months ended September 25, 2010, our total average manufacturing costs were

28

- 57 -

$0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although defendants had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

> We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further . . . .

Defendants also stated:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.85 during the three months ended September 26, 2009 to $0.77 during the three months ended September 25, 2010.

> *       *       *

> Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

> *       *       *

> During the three months ended September 25, 2010, we reduced our manufacturing cost per watt by 9% from our cost per watt in the three months ended September 26, 2009.

> *       *       *

> Our increased line run rate was driven by an approximate **3% increase in the average conversion efficiency of solar modules** during the three months ended September 25, 2010 compared with the three months ended September 26, 2009.

Defendants continued to conceal the true nature and extent of the excursion problem when they reported:

> The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a **manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period**. The excursion could result in possible premature power loss in the affected modules. The root **cause** was **identified and subsequently mitigated in June 2009**. On-going testing confirms the **corrective actions are effective**. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these

- 58 -

efforts go beyond our normal warranty coverage.  Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field.  We did not incur any incremental costs during the third quarter of 2010.

115.    Notwithstanding that defendants were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 26, 2009:

Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

*        *        *

While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001.  Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules.  Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future.  For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations.  Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

116.    On December 8, 2010, at the Barclays Capital Global Technology Conference, defendant Gillette concealed the heat degradation defect while touting the success of its solar projects in the Southwestern U.S.:

So we hope to be able to look at *announcing a sale on Agua Caliente*, which where we get a lot of questions about [and other things].  It's a big site; it is a 290-megawatt AC, 340-megawatt DC, it is roughly 2,300 acres.  So it is a very, very large utility scale plant, and it will be the largest in the world by a factor of 3 to 4 by far.

117.    On December 14, 2010, First Solar issued a press release announcing its fiscal 2011 financial guidance.  The release stated in part:

"First Solar revenue and profit is continuing to grow in 2011," said Rob Gillette, First Solar Chief Executive Officer.  "We are *benefiting from*

- 59 -

diversifying global partner demand and an ***increase in revenue from utility scale projects***."

118.   On February 24, 2011, First Solar issued a press release announcing its 4Q10 and fiscal year-end 2010 financial results.  The Company reported net sales of $610 million and $1.80 diluted EPS for the quarter ending December 31, 2010.   Additionally, the Company reported net sales of $2,564 million and $7.68 diluted EPS for fiscal year 2010.

119.   On February 24, 2011 in the 4Q10 earnings conference call, defendant Gillette falsely stated:

> Our manufacturing cost per watt was $0.75, which is down $0.09, or 11% year-over-year, and down $0.02 compared to the third quarter.

In the same call, defendant Zhu repeated the false cost per watt information:

> Our module costs per watt in the fourth quarter was $0.75, down $0.02 from prior quarter.

During the call, defendant Zhu falsely reassured analysts that the claims process for the excursion problem was concluded:

> ***During the fourth quarter we reserved an additional $8.5 million for the module replacement program discussed with you in our second-quarter 2010 earnings call.  In Q4 we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate.***

120.   On February 28, 2011, First Solar filed its 10-K with the SEC for the fiscal year ended December 31, 2010.  The 10-K included the following false statements:

> [W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

> *           *           *

> Our thin-film technology also has relatively ***high energy performance in*** low light and ***high temperature environments*** compared with traditional crystalline silicon solar modules.

> *           *           *

> Thin-film technology has a short history, and our thin-film technology and solar modules and systems ***may*** perform below expectations; problems with product quality or performance ***may*** cause us to incur warranty expenses,

- 60 -

750217_1

damage our market reputation, and prevent us from maintaining or increasing our market share.

\*     \*     \*

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate, or experience power degradation in excess of expectations, and our manufacturing operations *could* be subject to process variations that could cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

\*     \*     \*

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

\*     \*     \*

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.87 during 2009 to $0.77 during 2010. . . . Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our *operational excellence*.

Although defendants had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our *reliable*, low cost module *manufacturing capability* coupled with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, . . . and [to] further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants also falsely stated:

1
2

***Product Warranties***. . . We accrue warranty costs when we recognize sales, using amounts estimated based on our historical experience with warranty claims, our monitoring of field installation sites, and in-house testing.

3

\*         \*         \*

4

Product warranty liability, end of period                    $27,894

5   Defendants continued to conceal the true nature and extent of the excursion problem when

6   they reported:

7
8
9
10
11
12
13
14
15

The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred ***affecting less than 4%*** of the total product manufactured within the period. The excursion ***could result*** in possible premature power loss in the affected modules. The root cause was ***identified and subsequently mitigated*** in June 2009. On-going testing confirms that the ***corrective actions taken are effective***. We have been working directly with impacted customers to replace the affected modules and these ***efforts are well underway and, in some cases, complete***. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.

16

\*         \*         \*

17
18
19
20
21
22
23
24
25

(1) The above-referenced $28.9 million of accrued nonrecurring expenses in excess of normal product warranty liability and related expenses as of December 31, 2010 consisted of the following, each related to the manufacturing excursion described below: (i) $25.3 million in estimated expenses for certain module replacement efforts voluntarily undertaken by us beyond the normal product warranty (presented in Item 7: "Results of Operations" under "Cost of sales"); and (ii) $3.6 million in estimated nonrecurring post-sale expenses (presented in Item 7: "Results of Operations" under "Selling, general and administrative"). During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage.

26

27

28

121. On May 3, 2011, First Solar issued a press release announcing its 1Q11 financial results. The Company reported net sales of $567 million and $1.33 diluted EPS for the quarter ending March 31, 2011.

122. On May 3, 2011 during the 1Q11 earnings conference call, defendant Gillette falsely stated:

> Core costs, which excludes the ramp penalty and stock-based compensation, was $0.73 per watt, down 9% year-over-year, in-line with our cost reduction roadmap.

On the same call, defendant Widmar repeated the false cost-per-watt information:

> Looking at our cost per watt, our module cost per watt in the first quarter was $0.75, flat with the prior quarter.

123. On May 5, 2011, First Solar filed its 10-Q with the SEC for 1Q11. The 10-Q included the following false statements:

### Product Warranties

> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.
>
> Product warranty activity during the three months ended March 31, 2011 and March 27, 2010 was as follows (in thousands):
>
> *        *        *
>
> Product warranty liability, beginning of period                    $32, 141
>
> *        *        *
>
> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended March 31, 2011, our total average manufacturing costs were $0.75 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although defendants had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

750217_1

We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from \$0.81 during the three months ended March 27, 2010 to \$0.75 during the three months ended March 31, 2011. . . .   Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

\*          \*          \*

Our net sales during the three months ended March 31, 2011 decreased slightly compared with the three months ended March 27, 2010, primarily due to a 14% decrease in our module average selling price, partially offset by an 11% increase in the volume of solar modules sold and a 5% increase in the average conversion efficiency of our solar modules.

\*          \*          \*

Cost of sales for the three months ended March 27, 2010 included \$4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty.  During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period.  The excursion could result in possible premature power loss in the affected modules.  The root cause was identified and subsequently mitigated in June 2009.  On-going testing confirms that the corrective actions taken have been effective.  We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete.  Some of these efforts go beyond our normal warranty coverage.  No additional expense was accrued in the first quarter of 2011.  \$37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

124.   Notwithstanding that defendants were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 31, 2010:

Thin film technology has a short history and our thin-film technology and solar modules **may** perform below expectations; problems with product

- 64 -

quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

\*        \*        \*

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001.  Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules.  Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future.  For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations.  Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

125.   On August 4, 2011, First Solar issued a press release announcing its 2Q11 financial results.  The Company reported net sales of $533 million and diluted EPS of $0.70 for the quarter ending June 30, 2011.

126.   On August 4, 2011, during the 2Q11 earnings conference call, defendant Gillette falsely stated:

Module manufacturing cost per watt was $0.75, which is flat quarter over quarter.

127.   On August 5, 2011 First Solar filed its 10-Q with the SEC for the quarterly period ended June 30, 2011.  The 10-Q included the following false statements:

***Product Warranties***

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three and six months ended June 30, 2011 and June 26, 2010 was as follows (in thousands):

\*        \*        \*

Product warranty liability, end of period                    $36,356

- 65 -

1                                    *        *        *

2        [W]ith respect to our module manufacturing costs, our advanced technology
         has allowed us to reduce our average module manufacturing costs to the
3        lowest in the world, based on publicly available information.  In the three
         months ended June 30, 2011, our total average manufacturing costs were
4        $0.75 per watt, which we believe is significantly less than those of traditional
         crystalline silicon solar module manufacturers.
5

6   Although defendants had identified a manufacturing problem, they falsely touted their

    manufacturing capability as "reliable":
7
8        We believe that combining our **reliable**, low-cost module
         **manufacturing capability** with our systems business enables us to more
9        rapidly reduce the price of solar electricity, accelerate the adoption of our
         technology in large scale systems, identify and break constraints to the
10       successful migration to sustainable solar markets, and further our mission to
         create enduring value by enabling a world powered by clean, affordable solar
11       electricity.

12  Defendants also stated:

13       We are the lowest cost PV module manufacturer in the solar industry, based
         on publicly available information, and our average manufacturing cost per
14       watt declined from $0.76 during the three months ended June 26, 2010 to
         $0.75 during the three months ended June 30, 2011. . . .   Our cost
15       competitiveness is based in large part on our proprietary technology (which
         enables conversion efficiency improvements and enables us to produce a
16       module in less than 2.5 hours using a continuous and highly automated
         industrial manufacturing process, as opposed to a batch process), our scale,
17       and our **operational excellence**.

18  Defendants also stated:

19       The increase in the MW volume of solar modules sold was attributable to the
         full ramp of our eight-line capacity expansion in our Malaysian manufacturing
20       center and a 5% increase in our annual line run rate due to **improvements in
         our module average conversion efficiency** and our line throughput at existing
21       manufacturing facilities.

22                                   *        *        *

23       Cost of sales for the three months ended June 26, 2010 included $17.8
         million related to an increase in estimated expenses for certain module
24       replacement efforts beyond normal warranty.  During the period from June
         2008 to June 2009, a manufacturing excursion occurred affecting less than 4%
25       of the total product manufactured within the period.  The excursion could
         result in possible premature power loss in the affected modules.  The root
26       cause was identified and subsequently mitigated in June 2009.  On-going
         testing confirms that the corrective actions taken have been effective.  We
27       have been working directly with impacted customers to replace the affected
         modules and these efforts are well underway and, in some cases, complete.
28       Some of these efforts go beyond our normal warranty coverage.  We accrued
         $41.5 million in total-to-date to cover the replacement of the anticipated

                                       - 66 -

affected module population in the field.  Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

128.   Notwithstanding that defendants were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 31, 2010:

> Thin film technology has a short history and our thin-film technology and solar modules **may** perform below expectations; problems with product quality or performance **may cause** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> *            *            *
>
> Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001.  Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules.  Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future.  For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations, our manufacturing operations **could** be subject to process variations that **could** cause affected modules to underperform compared to our expectations.  Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

129.   On September 6, 2011, the Company issued a press release falsely touting First Solar's "commitment to product quality and reliability."

> **First Solar, Inc.** today announced that it has extended its material and workmanship warranty from five to ten years.
>
> *            *            *
>
> The new warranty . . . **demonstrates the company's commitments to product quality and reliability**. . . .  "As one of the world's largest solar module manufacturers, we understand the need for a **low-risk product** that is backed by a comprehensive warranty," said Stephan Hansen,  managing director of First Solar GmbH.

750217_1

130.   On October 26, 2011, First Solar issued a press release announcing its third quarter 2011 financial results.  The Company reported net sales of $1,006 million and diluted EPS of $2.25 per share.

131.   On November 3, 2011, during the 3Q11 earnings conference call, defendant Ahearn stated:

> Today, much of this platform has been built with reduced module manufacturing costs per watt from $1.59 in 2005, which was our first full year of production, to $0.74 this past quarter.

132.   On the same call, defendant Widmar repeated the false cost-per-watt information:

> Module manufacturing costs per watt was $0.74, which is down $0.01 quarter over quarter as a result of higher conversion efficiency.

133.   Widmar continued to misrepresent the true extent of the excursion defect:

> Gross margin was 37.7%, up 1.1 percentage points from the prior quarter.  The increase was prior primarily due to higher ASPs, partially offset by increased manufacturing excursion accruals.  During the quarter, we incurred $22.1 million of additional costs related to the manufacturing excursion that occurred from June 2008 to June 2009. ***We have substantially concluded the remediation programs associated with this manufacturing excursion.***
>
> *     *     *
>
> The other was an $8.6 million for estimated post sales expenses related to the previously mentioned manufacturing excursion. . . .  It is important to note that we did not take these charges because our estimate of the percentage of modules with defects from the manufacturing excursion has changed.  ***It remains still less than 4% of the modules produced from June 2008 to June 2009***. . . .  Rather, these charges represent a higher than originally anticipated remediation cost and to support our value proposition and to increase customer satisfaction.

134.   On the same call, when asked about cost-per-watt, defendant Widmar stated:

> So when we do the math – and it's very predictable to do the math and understand the improvement and the benefits the ***efficiency gains have on the cost per watt, so we're very confident***.

135.   On November 4, 2011 First Solar filed its 10-Q with the SEC for the quarterly period ended September 30, 2011.  The 10-Q included the following false statements:

### Product Warranties

We offer a limited warranty on our products and record an estimate of the associated warranty obligation based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Normal product warranty activities during the three and nine months ended September 30, 2011 and September 25, 2010 was as follows (in thousands):

\*     \*     \*

Product warranty liability, end of period                                    $42,505

\*     \*     \*

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In the three months ended September 30, 2011, our total average manufacturing costs were $0.74 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although defendants had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable."

We believe that combining our **reliable**, low-cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, and our average manufacturing cost per watt declined from $0.77 during the three months ended September 25, 2010 to $0.74 during the three months ended September 30, 2011. . . .  Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

\*     \*     \*

The increase in the MW volume of solar modules sold was attributable to the full ramp of our new production lines in Malaysia and Germany and a 6% increase in our annual line run rate due to improvements in our module

- 69 -

average conversion efficiency and line throughput at our manufacturing facilities.

Defendants continued to conceal the true extent and nature of the excursion problem when they reported:

During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are in most cases complete or well underway for the remaining cases. These efforts go beyond our limited warranty obligation. We accrued $63.6 million in total-to-date manufacturing excursion expense to cover the replacement of the anticipated affected module population in the field. Such amounts include $22.1 million in expenses accrued during the three months ended September 30, 2011, reflecting our most recent best estimates of the total replacement costs, based on our field data and execution-to-date of this excursion related module replacement program.

136. Notwithstanding that defendants were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future. Defendants incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 31, 2010:

Thin film technology has a short history and our thin-film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

\*     \*     \*

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

750217_1

137.   On the December 14, 2011 Guidance Call, the following was stated:

**Timothy Arcuri** - *Citigroup – Analyst*

Hi, guys.  I had two things. First of all, a lot of the long-term cost reduction is based upon higher efficiencies.  And you've recently ***had some issues out in the field with some product that talking to some of your customers seems to be related to the higher efficiency product***.  So I'm wondering what the resolution and the risk around some of these issues – some of these power issues going on in the field are?  Number one, if you could help us with that risk?

\*   \*   \*

**Mike Ahearn** - *First Solar Inc. - Chairman and Interim CEO*

I would say on long-term field reliability, that is always a risk when you're changing processes and it has been from the time we went into production.  We have had on occasion issues and they are dealt with.  ***We cover them.  That has all been reflected in our financials***.

The [steady] issues that have been reported that I'm aware of relate to prior years productions.  And when we have field problems – when we have positive experience or negative, we take that back into the factory and improve processes but also improve our metrology and our accelerated reliability testing – our predictive ability.  And as a result, we are much better able today to measure and assess the long-term field performance of modules coming off the line than we were a year ago, two years ago, five years ago.

\*   \*   \*

So it's not about abandoning quality for – to try to drive efficiency or numbers.

138.   By virtue of the facts alleged in §§IV, V, VII, and VIII the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements above were misleading to investors.  Considered as a whole, defendants' representations misled investors by presenting a false and misleading picture of First Solar's results by, among other things, failing to disclose and actively concealing the excursion and heat degradation defects from investors.  In particular, defendants knew or recklessly disregarded that:

(a)   the July 29, 2010, October 28, 2010, February 24, 2011, May 3, 2011, August 4, 2011 and October 26, 2011 statements, referred to above, concerning the Company's reported net income, earnings per share, and revenue were materially false and misleading as a result of the Company's understatement of warranty reserves and improper

750217_1

1    recognition of revenue (particularly for solar projects in the Southwestern U.S.), in violation

2    of GAAP, as described at §§IV, VII, and VIII.C., G.;

3                    (b)      the July 29, 2010, August 2, 2010, October 28, 2010, November 1,

4    2010, February 24, 2011, February 28, 2011, May 3, 2011, May 5, 2011, August 4, 2011,

5    August 5, 2011, October 26, 2011, November 3, 2011 and November 4, 2011 statements,

6    referred to above, concerning the Company's reported cost-per-watt were materially false

7    and misleading because the cost-per-watt metric was understated and manipulated, as

8    described at §§IV, V, VII.A., and VIII.A.-C., F.;

9                    (c)      the August 2, 2010, November 1, 2010, February 28, 2011, May 5,

10   2011, August 5, 2011 and November 4, 2011 statements, referred to above, concerning

11   **potential** product quality and performance problems that **could** lead to material product

12   warranty costs were materially false and misleading because significant product quality and

13   performance problems were **already** occurring, as described at §§IV, V, and VIII.A.-B.;

14                   (d)      the February 28, 2011 and December 14, 2011 statements, referred to

15   above, regarding module performance in "high temperature environments" were materially

16   false and misleading because the Company's solar panels were failing and experiencing high

17   failure rates in high temperature climates (*i.e.*, heat degradation), as described at §§IV, V,

18   VII.C., and VIII.A.-B.;

19                   (e)      the July 29, 2010, October 28, 2010, November 1, 2010 and December

20   22, 2010 statements, referred to above, concerning a solar project in the Southwestern U.S.

21   were materially false and misleading because the statement concealed the severe heat

22   degradation defect affecting modules installed in hot climates, as described at §§IV, V,

23   VII.C., and VIII.A.-B.;

24                   (f)      the February 28, 2011, May 5, 2011, August 5, 2011, September 6, 2011

25   and November 4, 2011 statements, referred to above, regarding the Company's successful

26   manufacturing process, "operational excellence," and product reliability were materially

27   false and misleading because the statements concealed pervasive product defects and

28

750217_1

1  manufacturing problems, including the excursion and heat degradation defects, as described

2  at §§IV, V, and VIII.A.-B.;

3          (g)     the August 2, 2010, November 1, 2010, February 28, 2011, May 5, 2011

4  and November 4, 2011 statements, referred to above, concerning product warranties were

5  false and misleading because the Company's warranty reserve was materially understated, in

6  violation of GAAP, as described at §§IV, VII.A.-B., and VIII.C., G.;

7          (h)     the July 29, 2010, November 1, 2010, February 28, 2011, May 5, 2011,

8  August 2, 2011, August 5, 2011 and November 4, 2011 statements, referred to above,

9  concerning module conversion efficiency were materially false and misleading because the

10  statements concealed the fact that the module conversion efficiency was increased by

11  manipulating the D-rating, as described at §§IV, V, and VIII.A.-B.; and

12          (i)     the July 29, 2010, August 2, 2010, October 28, 2010, November 1,

13  2010, February 24, 2011, February 28, 2011, May 5, 2011, August 5, 2011, November 3,

14  2011, November 4, 2011 and December 14, 2011 statements, referred to above, regarding the

15  manufacturing excursion were materially false and misleading because the statements

16  concealed the true nature and extent of the excursion problem, as described at §§IV, V,

17  VII.B., and VIII.A.-C., G.  In particular, (i) the defective modules were *not* limited to "less

18  than 4%" (or roughly 348,500 modules) of the total products manufactured from June 2008

19  to June 2009, because, in fact, over 1.5 million modules were affected, (ii) the problem was

20  *not* mitigated in June 2009, because, in fact, the Company continued to produce and install

21  defective modules beyond June 2009, and (iii) the remediation efforts were *not* substantially

22  completed because, in fact, the Company had only recognized a fraction of the total

23  excursion-related costs.

24  **VII.    DEFENDANTS ISSUED FALSE FINANCIALS AND VIOLATED GAAP**

25          139.    In order to demonstrate continued revenue growth throughout the Class Period

26  and as an integral part of selling its solar modules, First Solar guaranteed its customers a 25-

27  year electrical output performance specifications for its solar modules.  First Solar sold each

28  module with a specification guaranteeing it *will produce* at least 90% of its power output

- 73 -

1   rating during the first 10 years following installation and at least 80% of its power output

2   rating during the following 15 years.  This performance specification was unproven and not

3   met at the time First Solar sold its modules.   As detailed herein, defendants and the

4   Company, in violation of GAAP, improperly accounted for and failed to disclose the true

5   costs associated with modules that failed to meet those specifications.  First Solar also

6   violated GAAP and SEC rules when it made materially false and misleading statements

7   regarding its revenues and the successful installation of their modules sold in hot climates.

8   Accordingly, First Solar reported materially false and misleading financial results in First

9   Solar's publicly issued financial statements and related earnings releases during the Class

10  Period.[7]  More specifically:

11          (a)     First Solar materially understated warranty reserves and related

12  liabilities, in violation of GAAP, for costs associated with the defective modules including

13  those related to the "excursion" and heat degradation defects;

14          (b)     First Solar failed to make required disclosures, in violation of GAAP,

15  regarding the extent of the costs the Company would ultimately incur as a result of the

16  product defects known by defendants;

17          (c)     First Solar failed to disclose and properly account for revenue, in

18  violation of GAAP,[8] where the stated 25-year performance specifications had not been

19  _____

20  [7]      First Solar's Class Period financial statements issued to the public and filed with the
    SEC include: SEC Form 10-Ks for full fiscal years ended December 27, 2008, December 26,
21  2009, December 31, 2010; SEC Form 10-Qs for periods ended March 29, 2008, June 28,
    2008, September 27, 2008, March 28, 2009, June 27, 2009, September 26, 2009, March 27,
22  2010, June 26, 2010, September 25, 2010, March 31, 2011, June 30, 2011, September 30,
23  2011.

24  [8]      GAAP are those principles recognized by the accounting profession as the
    conventions, rules, and procedures necessary to define accepted accounting practice at a
25  particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial
    statements filed with the SEC that are not prepared in compliance with GAAP are presumed
26  to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X
    requires that interim financial statements must also comply with GAAP, with the exception
27  that interim financial statements need not include disclosure that would be duplicative of
    disclosures accompanying annual disclosures, per 17 C.F.R. §210.10-01(a).  On June 30,
28  2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB*

demonstrated as achievable, particularly for solar modules placed in hot climates.   In accordance with ASC 605-10-S99, revenue is required to be deferred when the "seller **has not** previously demonstrated that the delivered product meets the seller's specifications"; and

        (d)     First Solar improperly failed to disclose in its financial statements and the Management's Discussion and Analysis section of its 10-Ks and 10-Qs the material effect on net sales for the known trend and uncertainties and known geographical concentration risk associated with the manufacturing excursion and heat degradation defects. (Reg. S-K Item 303, ASC 275/1.)

      140.   In each of its Class Period financial statements, First Solar was required under GAAP to record and disclose product warranty obligations for estimated future remediation costs associated with:

        (a)     First Solar's 5-year standard warranty;[9]

        (b)     First Solar's 25-year product performance guarantee;[10] and

        (c)     additional solar module performance problems covered by voluntary remediation actions.[11]

---

*Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162.*   FASB *Accounting Standards Codification* ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009. The ASC did not change existing U.S. GAAP.

[9]   "We provide a limited warranty against defects in materials and workmanship under normal use and service conditions for five years following delivery to the owners of our solar modules."

[10]   "We also warrant to the owners of our solar modules that solar modules installed in accordance with agreed-upon specifications will produce at least 90% of their power output rating during the first 10 years following their installation and at least 80% of their power output rating during the following 15 years.  In resolving claims under both the defects and power output warranties, we have the option of either repairing or replacing the covered solar module or, under the power output warranty, providing additional solar modules to remedy the power shortfall."

[11]   "From time to time we have taken remediation actions in respect of affected modules beyond our limited warranty . . . in which case we would incur additional expenses that are beyond our limited warranty."   As alleged herein, these remediation actions included the

141.   As a result of these long-term obligations, First Solar readily admitted "we bear the risk of extensive warranty claims long after we have sold our solar modules."  As alleged herein, this "risk" materialized into hundreds of millions of dollars of warranty claims and remediation costs by the end of the Class Period.  These costs were primarily associated with specific product performance problems that originated during the Class Period including a so-called manufacturing excursion and a heat degradation defect.  As alleged herein, these problems, which have affected over 2 million solar modules and caused First Solar to incur over $300 million in remediation expenses to date, were known by defendants but largely concealed from investors during the Class Period.  Defendants concealed the excursion and heat degradation from investors in each of the Company's Class Period financial statements by: (1) significantly understating First Solar's warranty reserves (and thus overstating its reported earnings and cost-per-watt metrics); (2) failing to make required disclosures regarding the extent of remediation costs the Company could ultimately incur; and (3) making other disclosures that minimized and misrepresented the scope of the problems.  As alleged in further detail below, defendants' concealment of the excursion and heat degradation defect involved material violations of GAAP which rendered the Company's publicly issued Class Period financial statements materially false and misleading.

---

"manufacturing excursion" as well as an additional product performance problem disclosed in November 2011 ("$16.2 million of accrued expenses in excess of normal product warranty liability and related expenses . . . for commitments made to certain customers to perform work including module replacement and related efforts primarily for modules that had been subjected to certain installation and maintenance procedures by our customers outside of our recommended procedures at the time of sale, resulting in underperformance of such modules").

- 76 -

750217_1

## A.     GAAP Violation: Understated Warranty Reserves

142.     ASC 460-10-25 *Guarantees* governs the accounting for warranty obligations incurred in connection with the sale of goods or services.  ASC 460 states that because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a loss contingency as defined under ASC 450.  In fact, "Obligations related to product warranties and product defects," which accurately describes First Solar's excursion and heat degradation defects during the Class Period, are among the specific examples of loss contingencies listed in ASC 450.  Under ASC 450, losses from warranty obligations shall be accrued if, based on available information at the date of an entity's financial statements, it is probable that customers will make claims under warranties relating to goods or services that have been sold and the amount of loss can be reasonably estimated.[12]

143.     Because of its 25-year performance guarantee, First Solar was required to maintain warranty reserves sufficient to cover estimated future remediation costs on every product it had sold since the inception of the Company in 2002.  While an accurate estimate of 25-year performance was not possible to calculate based on the Company's limited history, defendants deemed it reasonable to base the warranty reserves primarily on four factors: 1) historical claim experience (*i.e.*, defect rates); 2) the number of solar modules covered under warranty; 3) the cost to remediate a claim (*i.e.*, the current cost to replace a defective solar module with a new solar module); and 4) monitoring of module performance at field installation sites.  Defendants represented that they monitored these factors closely and adjusted the Company's warranty reserves as needed.  In the event that a specifically identified product defect was encountered, the historical claims experience (across all products ever sold by the Company) was clearly not indicative of future claims for the products affected by that particular defect.  Therefore, if the defect was significant, the

---

[12]     If the losses cannot be reasonably estimated, disclosure is required in the footnotes to the financial statements as described in detail below at §VII.B., herein.

1   Company was required to **increase** its warranty reserve to account for specific losses on the

2   affected products **in addition** to maintaining warranty reserves across all remaining products

3   at the historical defect rate.  For example, the modules affected by the excursion were clearly

4   expected to experience higher defect rates than what the Company had historically

5   experienced.  Therefore, defendants were required to increase their "estimate of the number

6   of solar modules that would require replacement" (one of the inputs to the warranty reserve

7   calculation).[13]  Applying the existing warranty reserve to a specific product defect problem,

8   such as the excursion, without increasing the reserve would leave the reserve coverage on all

9   remaining modules severely understated.[14]  For example, even if the excursion problem had

10  actually been limited to the modules originally identified by defendants (approximately 30

11  MW or 348,500 solar modules[15]), the cost of replacement would have been $23.1 million[16] –

12  an amount far exceeding the Company's total warranty reserve at 2Q09.  As a result, for a

13  specifically identified product defect, such as the excursion or the heat degradation defect,

14  the Company was required to set aside **additional** specific reserves to cover the future

15  remediation costs that were known to be above and beyond the Company's historical defect

16  rate.

17      144.  Defendants have readily admitted that the "manufacturing excursion was

18  identified June 2009" and, as alleged herein, the heat degradation defect was also known by

19  defendants by no later than 2Q09.  However, as alleged at §§IV and V even before the cause

---

21  [13]   "Should we change our estimate of the number of solar modules that would require
22  replacement and/or the replacement cost per solar module, we would account for that change
     in estimate in accordance with GAAP."  (Response to SEC Comment Letter filed August 9,
23  2006.)

24  [14]   As explained in §IV-V, First Solar had material product quality problems outside of
     the excursion and heat degradation defects.  Thus, the existing reserve was understated to
25  begin with and certainly was not sufficient to cover general product quality problems across
     all modules and specific problems such as the excursion and heat degradation.

26  [15]   Based on First Solar's average power rating per module of 76 watts during 2010.

27  [16]   Based on First Solar's average manufacturing cost-per-watt of $0.76 during 2Q10.

28

of the excursion was identified, the product performance problems had surfaced in the form of customer complaints and the Company was investigating the issue to determine the cause. In fact, according to CW-1, by no later than 4Q08, the Company was aware of the product performance issues that would later be referred to as the "manufacturing excursion." In addition, as explained at §V and throughout the Complaint, First Solar had material product quality problems outside of the excursion and heat degradation defects that existed as of the start of the Class Period. Therefore, under ASC 450, defendants were required to either increase its warranty reserves to account for these specific product problems, or if the losses could not be reasonably estimated, to disclose the specifics of the loss contingencies in the footnotes to the Company's financial statements (*see* §VII.B.). Defendants did neither. In fact, defendants did just the opposite and actually ***decreased*** the Company's reserve coverage[17] from 2.24% at 1Q08 to 1.11% at 4Q10 as shown in the chart below:



145. The decrease in warranty coverage was no accident. Defendants knowingly and deliberately decreased the reserve by booking a "change in estimate of warranty

---

[17]   Calculated based on cumulative MW sold since 2002.

liability" every quarter.  As described above, defendants represented to investors that First Solar's estimate (and the resulting accounting entry to change the estimate) was based on several factors including the total number of modules that had been installed in the field, any updated information as to the defect rate and performance of those modules, and the current manufacturing costs for modules requiring replacements.  While the manufacturing costs were declining, this decrease was more than offset by the other factors.  For example, the cumulative number of modules installed in the field and covered under warranty  was increasing significantly from the beginning of the Class Period as shown in the chart below:



146.   In addition, as described at §V the most updated information available to defendants regarding defect rates and product performance problems revealed massive problems and indicated defect rates at rates far exceeding the historical defect rate used by defendants in the original reserve calculation.  Thus, the only conceivable "change in warranty estimate" defendants could record was an increase.  However, as shown below, defendants continually recorded "changes in warranty estimate" that decreased the reserve:

| Period | "Warranty Change in Estimate" |
|--------|-------------------------------|
| 1Q08 | *increased by $100k* |
| 2Q08 | ***decreased by $207k*** |
| 3Q08 | ***decreased by $2,738k*** |
| 4Q08 | ***decreased by $548k*** |
| 1Q09 | ***decreased by $1,231k*** |
| 2Q09 | *increased by $104k* |
| 3Q09 | ***decreased by $112k*** |
| 4Q09 | ***decreased by $2,306k*** |

147.    The foregoing decreases contributed to the understatement of First Solar's warranty reserves.  As a result of the decreases to the warranty estimate,[18] resulted in the Company understating its warranty reserve, in violation of GAAP, from the start of the Class Period in 1Q08.[19]

148.    As shown in the chart below, the trend continued even as warranty claims began to spike in 4Q09 (presumably due to the excursion and heat degradation defects).  To put the warranty reserve coverage in context, the minimum effect of the excursion based on

_____

[18]    While the overall warranty reserve increased in dollar terms during these periods solely because the Company sold more products in that period, the reserve coverage declined on a percentage basis.  The warranty reserves did not keep pace with the total cumulative modules covered under warranty.

[19]    Between June 2009, the date at which defendants have admitted they knew about the excursion, and July 2010, when defendants disclosed the excursion for the first time, the Company continued to lower its warranty reserve coverage as follows:

| | 2Q09 | 3Q09 | 4Q09 | 1Q10 |
|--|------|------|------|------|
| **Warranty Coverage** (*warranty reserves/ total MW covered under warranty*) | *1.63%* | *1.61%* | *1.41%* | *1.35%* |

- 81 -

1    defendants initial (albeit false) estimates of the scope of the problem would have required an

2    increase in the reserve coverage to over 3.5% as of 2Q09 – **more than double** what the

3    Company actually had set aside.

4        149.    In 2Q10, the Company began reserving for excursion remediation costs in two

5    accounts: 1) its warranty reserve (as described above); and 2) an additional excursion

6    liability for costs associated with voluntary remediation efforts that were "**beyond . . .**

7    **normal warranty coverage**."[20]   However, a significant portion of the excursion remediation

8    remained outside the scope of First Solar's regular product warranty including the cost of

9    replacement modules.[21]   In 2Q10, when the excursion was disclosed for the first time,

10   defendants assured investors that the problem was limited to "less than 4% of the total

11   product manufactured between June 2008 and June 2009."  This amounted to 30 MW or

12   approximately 348,500 solar modules.[22]  However, First Solar later revealed, the number of

13   solar modules that required replacement as a result of the excursion was approximately 1.5

14   million – almost 4 times higher than what was originally represented by defendants.[23]  As a

15   result, the Company's warranty reserve was understated by over $90 million based on

16   excursion-related costs alone.  When the heat degradation defects and general product quality

17   problems are factored in, the Company's warranty reserve was unquestionably materially

18   _____

19   [20]    This account had no effect on the adequacy of the warranty reserve account referred
       to above because, as readily admitted by defendants, the reserves set aside in this separate
20     account were only for voluntary remediation costs beyond normal warranty costs.
       Nevertheless, including the additional excursion liabilities would not have impacted the
21     analysis of overall reserve adequacy because this account was also materially understated
       from its inception in 2Q10 until the end of the Class Period, as described herein.

22   [21]    The warranty costs associated with replacement modules have totaled over $100
       million or roughly 40% of the $267 million in total excursion expenses recorded by First
23     Solar to date.

24   [22]    Based on First Solar's average power rating of 76 watts per module during 2010.

25   [23]    This calculation is based on: (i) approximately $90 million in "product warranty
26     expense reflecting the net increase in the expected number of replacement modules required
       in connection with our remediation efforts" recorded in 4Q11 and 2Q12 and (ii) First Solar's
27     average power rating per module of 80 watts and average manufacturing cost per watt of
       $0.73 during 4Q11-1Q12.

28

750217_1

understated.   As shown in the chart below, the Company failed to increase its warranty reserve – *in fact, as shown below, the Company actually decreased its warranty coverage* – to account for costs associated with the excursion and heat degradation until the very end of the Class Period, when the Company was forced to record over $125 million in losses and increase its reserve coverage from just 1.3% to over 4.6% – a 250% increase.[24]



150.   Likewise, the Company's additional accrual for "voluntary" remediation costs that were "beyond . . . normal warranty coverage" were also materially understated from 2Q10 through the end of the Class Period.   As of 2Q10, defendants had set aside only $27.4 million in this account to cover all remaining "voluntary" remediation costs that were beyond the scope of First Solar's standard warranty.   As shown in the chart below, this figure represented just 16% of the actual remaining "voluntary" remediation costs the Company

---

[24]     In 4Q11, defendants admitted that they had failed to reserve for heat degradation during the Class Period when they recorded an almost $40 million "catch-up" adjustment to the Company's warranty reserves (and increased the Company's reserve coverage going forward) to account for the remediation costs associated heat degradation defects.

750217_1

would incur over the next 8 quarters.  As noted above, these remediation costs were not voluntary, they were required by law.  Furthermore, defendants understood that failing to make First Solar's customers whole would cause even more customer defection, leading to additional material lost revenue.  First Solar's accrual for "voluntary" remediation costs remained materially understated until 4Q11 when the Company increased its estimate of these costs to $145.7 million.



151.    Between the warranty reserve and the additional accrual for costs "beyond . . . normal warranty coverage" described above, defendants understated the Company's reported estimate of excursion-related costs by as much as 650% until 4Q11.[25]  If they were unable to reasonably estimate the excursion-related remediation costs, defendants were required under GAAP to make specific disclosures to warn investors about the true scope of the excursion problem.  As shown in the chart below, defendants' updated quarterly estimates of total excursion costs prior to 4Q11 were unreasonable on their face.  An estimate of costs that understates actual costs by 650% is not the level of reasonableness required under GAAP to disclose an estimate of a loss contingency without supplemental disclosures warning investors of possible additional losses.

---

[25]    Based on disclosed estimate of total excursion-related costs at 2Q10 compared to total actual total excursion-related costs through 2Q12 of $267.6 million.

750217_1



152.   After the fact, defendants have blamed their understatement of excursion-related cost estimates during the Class Period on the fact that the Company processed the majority of the claims in 4Q11 and therefore did not have insight into the full extent of the problem until that time.   Even if true, this explanation is an admission that defendants could not reasonably estimate the excursion costs and were therefore required, under GAAP, to make the disclosures described below.   In any event, defendants' explanation fails for several reasons.   First, defendants have already admitted that the cause of the problem was identified and the extent of the problem was quantified by 2Q09.   If the cause of the excursion and quantity of affected modules were known at that date, the timing of actually processing the claims would not have affected the estimate of total remediation costs.   Second, defendants have previously represented that product defects involving power output degradation, such as the excursion, mostly occur in the "early life cycle stage (*typically the first 3-6 months*)" after the solar modules are installed.[26]   In fact, defendants have represented that they have sufficient operating history to provide evidence of this behavior.   Therefore, it does not follow that defendants could not have known about the totality of the excursion-related problems until *30-42 months* after the modules were manufactured (June 2008-June 2009 until February 2012).   Finally, defendants repeatedly represented that they had processed claims throughout the Class Period and had finished processing claims before 4Q11:

---

[26]      First Solar response to SEC Comment Letter filed August 9, 2006.

**July 29, 2010**: "We've been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, **complete**.  Some of these efforts go beyond our normal warranty coverage.  We accrued the estimated **full costs** of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail."

**February 24, 2011**: "In Q4[2010] we **concluded** a claims process and based on our field data and execution today, we updated our **total** replacement cost estimate."

**November 3, 2011**: "We have substantially **concluded** the remediation programs associated with the manufacturing excursion."

**December 14, 2011**: "We have had on occasion issues and they are dealt with. We cover[ed] them.  **That has all been reflected in our financials**."

153.   The ongoing processing of excursion claims, shown graphically in the chart below, provided defendants with sufficient data to estimate the extent of the future remediation costs.



154.   Therefore, as set forth above, before 4Q11, defendants **either** knowingly understated the Company's warranty reserve and estimate of excursion-related costs **or** they knowingly lacked a basis to make reasonable estimate of such costs.  In the latter case, disclosing any amount of warranty reserve and estimate of excursion-related costs, without the additional required disclosures described below, resulted in materially false and misleading statements in each of First Solar's Class Period financial statements.[27]

_____

[27]     The requirement that a loss accrual can only be booked if the amount of loss can be reasonably estimated "is intended to prevent accrual in the financial statements of amounts **so uncertain as to impair the integrity of those statements**." ASC 450-20-25-2.

**B.      GAAP Violation: Excursion and Heat Degradation Disclosures**

155.    As described above, the excursion and heat degradation defects were loss contingencies specifically covered under ASC 450 ("***Obligations related to product warranties and product defects***").  Under ASC 450, First Solar was required to either set aside adequate reserves for these loss contingencies in its financial statements or, at a minimum, disclose the  nature and scope of the loss contingencies in the footnotes of its Class Period financial statements.  Because First Solar did not adequately reserve for the excursion or heat degradation in its Class Period financial statements, defendants were required by GAAP to disclose the nature and scope of these material loss contingencies in the footnotes of its Class Period financial statements.  By failing to do so, defendants violated GAAP.

156.    From the beginning of the Class Period through 1Q10, the manufacturing excursion was ***entirely*** concealed from investors in violation of ASC 450.  ASC 450 requires the disclosure of a loss contingency if "there is at least a reasonable possibility that a loss may have been incurred."[28]  ASC 450 provides that: "the disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."   There is no doubt that defendants knew about the significant product problems by the beginning of the Class Period.  There was more than a reasonable possibility that a loss had occurred.  As set forth in §V, CW-2 stated that First Solar "knew in 2007 that the projected failure rate [of the Series II modules] was going to be much greater than 4%.  Furthermore, defendants have admitted that the cause of the problem was identified and the extent of the problem was quantified by June 2009.  Based on these admissions, defendants knew, but failed to disclose there were at least hundreds of thousands of affected solar modules and the cost of replacement was at least tens of millions of dollars. In fact, before revealing the excursion to investors, First Solar had already started to incur

---

[28]      Pursuant to GAAP, "***reasonably possible***" means the chance of a loss occurring in the future is more than remote but less than likely.

1   material losses related to it.  By concealing the excursion from investors, defendants

2   knowingly violated GAAP.

3        157.    From 2Q10 through 3Q11, the Company disclosed minimal details regarding

4   the excursion and disclosed a reserve that was purportedly sufficient to cover all future

5   remediation costs.  Defendants' financial statement reflecting their misleading disclosure of

6   the excursion violated GAAP provisions ASC 450 and ASC 275.

7        158.    As described in detail above, defendants' reported estimates of excursion costs

8   were not reasonable prior to 4Q11.  Defendants either: (i) knowingly understated First

9   Solar's reported estimates; (ii) knowingly lacked a basis to make a reasonable estimate; or

10  (iii) at the very minimum, knew the Company's reported estimate was reasonably possible to

11  change in the near term.  In any case, defendants were required under GAAP to make

12  specific disclosures to provide investors with a clear description of the costs First Solar could

13  ultimately incur as a result of the excursion.

14       159.    The requirement that a loss accrual can only be booked if the amount of loss

15  can be reasonably estimated "is intended to prevent accrual in the financial statements of

16  amounts *so uncertain as to impair the integrity of those statements*."[29]  In fact "*[d]isclosure*

17  *is preferable to accrual when a reasonable estimate of loss cannot be made*."[30]  Therefore,

18  under ASC 450, if defendants could not make a reasonable estimate of the excursion-related

19  costs, disclosing any estimate of excursion-related costs, without the additional required

20  disclosures described below, resulted in materially false and misleading statements in each of

21  First Solar's Class Period financial statements.  As described below, defendants had

22  disclosure options under ASC 450.  Defendants did none of those things.

23       160.    Defendants also knew or were reckless in not knowing that it was at least

24  reasonably possible the estimate would change materially in the near term.  Defendants were

25  _____

26  [29]    ASC 450-20-25-2.

27  [30]    *Id*.

28

750217_1

required, under ASC 275, to disclose this material fact to investors.[31]  ASC 275 requires specific additional disclosures regarding estimates of loss contingencies[32] if information known to management prior to the issuance of the financial statements indicates that both of the following criteria are met:

- It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future events.

- The effect of the change would be material to the financial statements.

To supplement the disclosure requirements of ASC 450,[33] ASC 275 provides:

The disclosure shall indicate the nature of the uncertainty and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term.  If the estimate involves a loss contingency . . . the disclosure also shall include an estimate of the possible loss or range of loss, or state that such an estimate cannot be made.

_____

[31]     The disclosure  was material at all times during the Class Period.  ASC 275-10-50-11 states:

*Whether an estimate meets the criteria for disclosure under this Subtopic does not depend on the amount that has been reported in the financial statements, but rather on the materiality of the effect that using a different estimate would have had on the financial statements.  Simply because an estimate resulted in the recognition of a small financial statement amount, or no amount, does not mean that disclosure is not required under this Subtopic.*

[32]     First Solar's general disclosure regarding accounting estimates ("Critical Accounting Estimates" at 42 of its Class Period 10Ks do not satisfy the disclosure requirements under ASC 275.  ASC 275 requires a general statement regarding accounting estimates (ASC 275-10-50-4) and additional disclosures related to Certain Significant Estimates (ASC 275-10-50-6:15).

[33]     ASC 275-10-50-11: This Subtopic's disclosure requirements are separate from and do not change in any way the disclosure requirements or criteria of [ASC] Topic 450: rather, the disclosures required under this Subtopic supplement the disclosures required under that Topic as follows: If an estimate (including estimates that involve contingencies covered by Topic 450 meets the criteria for disclosure under paragraph 275-10-50-8 : . . this Subtopic requires disclosure of an indication that it is at least reasonably possible that a change in the estimate will occur in the near term; Topic 450 does not distinguish between near-term and long-term contingencies.

750217_1

1   Defendants failed to make any such disclosures until it was too late.  After it was too late to

2   warn investors, defendants for the first time made the disclosure required under ASC 275

3   regarding its estimate of excursion costs in its 2011 Form 10-K:

> We must also make an estimate for the cost of the remediation program described further in "2008-2009 Manufacturing Excursion."  ***Our estimates for the remediation program have changed, and may in the future change, significantly in light of our ongoing remediation efforts and our continued analysis of remaining claims***. . . .  In light of the additional data we gained from processed claims, as well as experience from our remediation efforts, ***our estimates have been subject to change***.

8   The purpose behind the disclosure requirements under ASC 450 and ASC 275 is to warn

9   investors about the extent of losses the Company faced as a result of the excursion.  Under

10  ASC 450 and ASC 275, defendants had acceptable disclosure options but did not comply

11  with any of them.  Instead, First Solar provided what it purported were reasonably certain

12  estimates of excursion-related remediation costs only to later reveal further losses throughout

13  the Class Period, including a massive $170 million loss in the 4th quarter of 2011.  As shown

14  in the chart below, the Company's disclosed estimate of excursion-related costs was subject

15  to almost quarterly increases – the exact set of circumstances requiring disclosure under ASC

16  450 and ASC 275.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    161.   To further bolster their false representations regarding the excursion costs,

16  defendants repeatedly emphasized that the remediation was well underway and that they had

17  encountered no additional problems or material loss exposures:

18      **July 29, 2010**: "We've been working directly with impacted customers to
19      replace the affected modules and these efforts are well underway and, in some
        cases, ***complete***.   Some of these efforts go beyond our normal warranty
20      coverage.   We accrued the estimated ***full costs*** of these additional efforts in
        our Q2 results, and Jens will discuss the financial impact in more detail."

21      **February 24, 2011**: "In Q4[2010] we ***concluded*** a claims process and based
22      on our field data and execution today, we updated our ***total*** replacement cost
        estimate."

23      **November 3, 2011**: "We have substantially ***concluded*** the remediation
24      programs associated with the manufacturing excursion."

25      **December 14, 2011**: "We have had on occasion issues and they are dealt with.
        We cover[ed] them.   ***That has all been reflected in our financials***."

26  By (1) making the above affirmative statements as to the scope of the problem and status of

27  the remediation efforts; (2) disclosing a grossly understated estimate of remediation costs

28

1    when a reasonable estimate could not even be made (in violation of ASC 450); (3) failing to

2    provide a range of additional possible losses; and (4) failing to make required disclosures

3    regarding the uncertainty surrounding the total extent of excursion-related costs the

4    Company would ultimately incur, defendants blatantly violated GAAP disclosure rules in

5    order to conceal the truth about the excursion from investors in each of its Class Period

6    financial statements.

7         162.    The heat degradation defect was also a loss contingency specifically covered

8    under ASC 450: "***Obligation related to product warranties and product defects***."   As

9    alleged in further detail at §IV, defendants knew the heat degradation defect was reasonably

10   likely to result in losses.  Under ASC 450, defendants were required to either accrue for the

11   losses at that time, or if the losses could not be reasonably estimated, to disclose the specifics

12   of the loss contingency in the footnotes to the Company's financial statements.  Throughout

13   the Class Period, defendants did neither.   Defendants failed to reserve for the heat

14   degradation losses.  In fact, in 4Q11, defendants admitted that they had failed to reserve for

15   heat degradation by recording an almost $40 million "catch-up" adjustment to the

16   Company's warranty rates reserves (and revising its warranty rate going forward) to account

17   for the heat degradation defect.  Because the Company did not reserve for these costs,

18   defendants were required under ASC 450 to disclose the heat degradation defect as a loss

19   contingency if there was at least a reasonable possibility that the Company would incur

20   losses.  As described herein, there was clearly a reasonable possibility of losses.  Therefore,

21   the Company was required to disclose: 1) the nature of the contingency associated with the

22   heat degradation defect; and 2)an estimate of the possible loss or range of loss or a statement

23   that such an estimate cannot be made.  (ASC 450-20-50-4).  However, in each of its Class

24   Period financial statements, defendants blatantly violated the GAAP disclosure rules to

25   conceal the truth about the heat degradation defect from investors.

26   **C.    GAAP Violations: Revenue Recognition and Related Disclosures**

27        163.    During the Class Period, First Solar sold every solar module with a guaranteed

28   specification "that solar modules installed in accordance with ***agreed-upon*** specifications

1  ***will produce*** at least 90% of their power output rating during the first 10 years following

2  their installation and at least 80% of their power output rating during the following 15

3  years." When First Solar went public in 2006, the Company represented to the SEC that this

4  performance guarantee was, in fact, a specification: "***The minimum average watt per***

5  ***module is a specification requirement*** . . . ."[34]  The 25-year performance specification,

6  according to CW-1, was a critical component in selling its solar modules.  If a solar module

7  did not meet its performance specification, it typically could not be repaired and was

8  therefore replaced.

9         164.   In accordance with revenue recognition rules promulgated by GAAP and the

10  SEC, First Solar was required to defer revenue if it had ***not*** previously demonstrated that its

11  solar modules actually met the stated 90% power output rating during the first 10 years and

12  at least 80% power output rating during the following 15 years.  Revenue recognition rules[35]

13  _____

14  [34]    First Solar's August 9, 2006 letter to the SEC.

15  [35]    The overarching concept for revenue recognition (ASC  605-10-25-1) states:

16     Paragraph 83(b) of FASB Concepts Statement No. 5, *Recognition and*
17     *Measurement in Financial Statements of Business Enterprises*, states that
       revenue is not recognized until earned.  That paragraph states that an entity's
18     revenue-earning activities involve delivering or producing goods, rendering
       services, or other activities that constitute its ongoing major or central
19     operations, ***and revenues are considered to have been earned when the entity***
       ***has substantially accomplished what it must do to be entitled to the benefits***
20     ***represented by the revenues***.

21     Additionally, ASC 60-10-S99-1 states:

22          (b)    Customer acceptance.

23     After delivery of a product or performance of a service, if uncertainty
       exists about customer acceptance, revenue should not be recognized
24     until acceptance occurs. . . .  Customer acceptance provisions may be
       included in a contract, among other reasons, to enforce a customer's
25     rights to (1) test the delivered product, (2) require the seller to perform
       additional services subsequent to delivery of an initial product or
26     performance of an initial service (*e.g.*, a seller is required to install or
       activate delivered equipment), or (3) identify other work necessary to
27     be done before accepting the product.  The staff presumes that such
       contractual customer acceptance provisions are substantive, bargained-
28     for terms of an arrangement.  Accordingly, when such contractual

- 93 -

regarding seller specified performance criteria (ASC 605-10-S99, SAB Topic 13.A.3b, question 1(c)) specifically state:

> Customer acceptance provisions generally allow the customer to cancel the arrangement when a seller delivers a product that the customer has not yet agreed to purchase or delivers a product that does not meet the specifications of the customer's order.  In those cases, revenue should not be recognized because a sale has not occurred.
>
> *          *          *
>
> (c) Acceptance provisions based on seller-specified objective criteria.  An example of such a provision is one that gives the customer a right of return or replacement if the delivered product is defective or fails to meet the vendor's published specifications for the product.  Such rights are generally identical to those granted to all others within the same class of customer and for which satisfaction can be generally assured without consideration of conditions specific to the customer.  Provided the seller has previously demonstrated that the product meets the specified criteria, the staff believes that these provisions are not different from general or specific warranties and should be accounted for as warranties in accordance with Statement 5 [Section 460-10-25].  In this case, the cost of potentially defective goods must be reliably estimable based on a demonstrated history of substantially similar transactions. . . . ***However, if the seller has not previously demonstrated that the delivered product meets the seller's specifications, the staff believes that revenue should be deferred until the specifications have been objectively achieved***.
>
> *          *          *
>
> If an arrangement includes customer acceptance criteria or specifications that cannot be effectively tested before delivery or installation at the customer's site, the staff believes that revenue recognition should be deferred until it can be demonstrated that the criteria are met.  (ASC 605-10-S99-1, SAB Topic 13.A.3b ques. 1 and 2)

165.    In violation of these revenue recognition rules even though defendants did not and could not reliably demonstrate that the 25-year performance specification was met at the time their solar modules were sold, First Solar recognized revenue on the insufficient basis that existing research and diligently monitoring and observing installed solar modules would purportedly allow them to evaluate and ***confirm***, on an ongoing basis, whether performance specifications were being met.  First Solar explained:

---

> customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

750217_1

*only a long period of time observing the actual performance of our solar modules in various field settings will confirm how they will actually perform over their estimated 25 year useful life* . . . . *We also monitor approximately 102,000 of our solar modules in use by end users, and can extrapolate future performance expectations from the observed performance of these modules*. . . . While thin film based modules do not have as extensive operating history over the estimated 25 year useful life, their electrical performance characteristics are generally well understood and researched. . . . Based on this research it is understood that the power degradation typically follows an asymptotic function, with *most degradation occurring in the early life cycle stage* (*typically the first 3-6 month*) before their performance stabilizes at their rated power.  (8/9/06 SEC Comment Letter.)

As CW-1 described, however, First Solar simply did not know how the panels would ultimately perform over their expected lifecycles.  As it turned out, First Solar's solar modules encountered at least two major premature performance problems during the Class Period – the so-called manufacturing excursion and the heat degradation defect.

166.    Either of these problems meant that First Solar could no longer reliably demonstrate that their guaranteed 25 year specifications would be met.  In accordance with GAAP, and consistent with what they had represented to the SEC when they went public in 2006, First Solar should have, at a minimum, deferred revenue recognition on modules sold in hot climates due to the degradation problem.

167.    The more widespread problem affecting First Solar's performance specifications was the heat degradation defect.  No later than 2009, First Solar was aware of the premature and severe power degradation in solar modules installed in hotter climates.  CW-1 explained that the heat degradation defect especially affected the large solar field power generating facilities that First Solar's EPC division built.  The heat degradation defect was first detected at the El Dorado plant located in Southern Nevada.[36]  According to CW-1, Tony Siebers, the Director of First Solar's Global Technical Service Operational Group, was certainly among those who was well aware of the heat degradation defect and that Siebers

---

[36]    First Solar had supplied the original modules for the new 10MW plant that was completed in December, 2008. First Solar had also handled engineering, procurement and construction as well as monitoring and plant maintenance.(http://www.pvtech.org/news/sempra_selects_first_solar_for_50mw_addition_to_el_dorado_plant_says_analys.). First Solar completed the plant in 4Q10.

1    had been involved in trying to resolve issues related to the heat degradation defects.  In

2    essence, the heat degradation defect was so bad that it was necessary to begin replacing

3    panels almost immediately after a solar field generating plant became operational.  As CW-1

4    put it, the warranty team was "proactively ripping out panels" because it was known that

5    panels would degrade and therefore would not perform according to First Solar's

6    representations to its customers.  According to CW-1, the El Dorado plant was just one of

7    many locations affected by defective solar panels.  By February 2011, CW-1 said that

8    personnel throughout First Solar were "deathly afraid of heat degradation."  Specifically,

9    CW-1 stated that Directors and Vice Presidents in the warranty and R&D groups were aware

10   of this critical defect.

11          168.    According to CW-1, there was even less field data available regarding the

12   performance of the modules in hot climates than there was from cool climates.[37]  At best,

13   CW-1 explained, First Solar only had about five years of field data for how its modules

14   performed and that was mostly in temperate climates.  CW-1 said that the *premature*

15   *degradation problem in hot climates ultimately called into doubt the entire validity of First*

16   *Solar's technology*.  CW-1 explained that First Solar engineers knew that the degradation

17   was nonlinear, but beyond five years they were "still only guessing" as to how the modules

18   would degrade.

19          169.    Thus, it was clear that First Solar  "*ha[d] not previously demonstrated that the*

20   *delivered product meets the seller's specifications*" and it was uncertain whether the

21   Company had delivered the product specified in the arrangement, as required by GAAP

22   (ASC 605-10-S99, SAB Topic 13.A.3b, question 1(c)).  GAAP therefore required revenue

23   on those units installed in hot climates, particularly in the U.S. desert Southwest, to be

24   deferred.  *Id*.  Additionally, the American Institute of Certified Public Accountants

25   _____

26   [37]    First Solar's inability to meet performance specifications was further exacerbated by

27   the fact that First Solar was changing many manufacturing processes as part of on overall
     goal to manufacture panels more quickly and cheaply (CW-1).

28

1    ("AICPA") issued a Practice Alert addressing this specific issue.  Practice Alert 95-1

2    "Revenue Recognition Issues" identifies as an example of unusual revenue recognition

3    practices: "***Sales with substantial uncertainty about seller's ability to comply with***

4    ***performance guarantees***."  Accordingly, First Solar violated GAAP and SEC rules by

5    recognizing, and failing to defer, revenue for solar modules installed in hot climates.

6        170.    Defendants also were required to disclose the heat degradation defect when it

7    was known.  SEC Regulation S-K Item 303, "Management's Discussion and Analysis"

8    requires a discussion of results of operations and other information necessary to an

9    understanding of a registrant's financial condition, changes in financial condition and results

10    of operations.  "This includes unusual or infrequent transactions, ***known*** trends or

11    ***uncertainties that have had, or might reasonably be expected to have, a favorable or***

12    ***unfavorable material effect on revenue, operating income or net income and the***

13    ***relationship between revenue and the costs of the revenue***."

14        171.    The SEC stated that the MD&A should "give investors an opportunity to look

15    at the registrant through the eyes of management by providing a historical and prospective

16    analysis of the registrant's financial condition and results of operations, with a particular

17    emphasis on the registrant's prospects for the future."  (SEC Financial Reporting Release

18    No. 36.)

19        172.    GAAP and SEC rules also require disclosure of vulnerabilities from

20    concentrations in particular geographical areas.  Specifically, First Solar was required to

21    disclose the vulnerability and risks associated with a particular geographic region if it was at

22    least reasonably possible that its sales, revenues, or income would be materially affected.

23        173.    An entity should disclose in the financial statements ***certain concentrations*** if,

24    based on information known to management before the financial statements are issued or are

25    available to be issued, all of the following criteria are met:

26          &bull;      The concentration exists at the date of the financial statements;

27          &bull;      The concentration makes the entity vulnerable to the risk of a near-term

28                  severe impact (*i.e.*, a significant financially disruptive effect on the

normal functioning of an entity).  A severe impact is a higher threshold than material; and

- ***It is at least reasonably possible that the events that could cause the severe impact will occur in the near term***.

The following concentrations require disclosure if they meet the above criteria:

- Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor;

- Concentrations in revenue from particular products, services, or fund-raising events;

- Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations; and

- ***Concentrations in*** the market or ***geographic area*** in which an entity conducts its operations.  (ASC 275-10-50.)

174.    In late 2008 and early 2009, First Solar began focusing on building and selling large scale solar systems in the desert Southwest.  Panel heat degradation, however, was severe in hotter geographical climates.  The problem was so severe that First Solar was "proactively ripping out panels" and began replacing panels almost immediately after a solar filed generating plant became operational.  Accordingly, First Solar was required by GAAP and SEC rules to disclose the vulnerability and potentially material impact on its sales, revenues, and income from operations in hotter climates like the desert Southwest.

175.    Defendants, however, said nothing about the massive heat degradation defects during the Class Period and never disclosed that heat degradation was having a severe impact on its solar power projects located in hot climates – particularly in the desert Southwest.

176.    Despite their knowledge during the Class Period of the massive heat degradation defect, defendants nevertheless continued to report the success and revenue generated from their large scale solar projects predominately located in the desert Southwest. The repeated false disclosures were vital in demonstrating to analysts that the Company was successfully accomplishing its goal of shifting its sales mix to large scale solar projects

750217_1

1    predominantly located in the desert Southwest.  As defendants began touting First Solar's

2    solar power system achievements in early 2009, they concealed the material fact that the

3    solar panels were experiencing heat degradation which would severely affect the Company's

4    operations.  Accordingly, during the Class Period and in violation of GAAP and SEC rules,

5    First Solar made the following material false and misleading statements and disclosures

6    regarding its net sales and performance of its solar systems built in hot climates –

7    predominantly located in the Southwestern U.S.

8         177.    On the **February 24, 2009** 4Q08 Earnings Conference Call, defendant

9    Meyerhoff told analysts: "What I can tell you, **we obviously had revenue recognition for the**

10   **El Dorado project** that we brought on in Q4 that essentially came all through mostly in Q4."

11   In 4Q08, First Solar recognized revenue on the El Dorado project – First Solar's first turnkey

12   installed system.

13        178.    On the **April 29, 2009** 1Q09 Earnings Conference Call, defendant Ahearn told

14   investors that First Solar was able to sign up "95 megawatts in the US under two projects

15   that we announced earlier.  The project with Sempra that we refer to as **Copper Mountain in**

16   **Nevada**; and then the Tri-State project in New Mexico."

17        179.    On **June 24, 2009**, First Solar held an analyst /investor meeting.  As  part of

18   that meeting, the Company gave a tour of the El Dorado site.  Bruce Sohn, President and

19   COO of First Solar, told investors the Company monitored climateal conditions at El Dorado

20   site in real-time.  He stated:

21        *The performance of an array is not only the performance of the modules*
          *themselves but, of course the environment and how that environment*
22        *interacts with the modules*.  We have a data analysis and acquisition system
          that records and *processes the information in a real-time manner.  This*
23        *allows us to keep – not only collect information on how the system is*
          *performing but it also allows us to analyze that performance and use it for*
24        *ongoing improvement at both the system level as well as at the module level*
          *itself*.  All of this folds up into a centralized monitoring system that's out in
25        New Jersey, providing full remote control capabilities of all of our plants,
          utilizes standard, programmable logical units and graphical user interface so
26        that we can understand what's going on.

27                                    *        *        *

28

750217_1

We think that was pretty impressive for our first power plant of this size [El Dorado]. *We've learned tremendously, learned a whole lot.* Throughout the entire time that we were constructing this, we were collecting data. That data has been turned over to the engineers and the statisticians, who have now combed over that and developed new ways for us to construct a facility like this faster and cheaper and still make them even larger.

180.     On *December 16, 2009* in its 2010 Guidance Webcast, defendant Gillette told analysts:

*This is all in Q4 of this year. Blythe, California sold to NRG Energy, and these are two significant utility scale investments and sites that we're very proud of and sold in Q4 of this year*.

181.     On *February 18, 2010*, during First Solar's 4Q09 Earnings Conference Call, defendant Meyerhoff reiterated the importance of the Blythe project for net sales: "Net sales for the fourth quarter were $641 million, an increase of $160 million compared to the third quarter of 2009. *The increase was driven by higher module production volumes, system revenue recognition for* the 20-megawatt AC Sarnia and *21-megawatt AC Blythe project*."

182.     On *March 3, 2010*, during the CLSA Asia USA Forum, defendant Meyerhoff explained the importance of the Southwest U.S. market: "Today you start to see, there's a pipeline in the U.S. that we're benefiting from that investment. So that benefit is demonstrated here. This slide essentially shows you *just for the southwest United States, predominantly the California market. There's about 8.6 gigawatt of PPA [signed] that are expected to be realized between 2010 and 2015*."

183.     On *July 29, 2010*, during its 2Q10 Earnings Conference Call, defendant Meyerhoff emphasized the importance of solar projects in the Southwestern U.S.: "Net sales for the second quarter were $588 million, *an increase of 12% year over year and a sequential increase of $20 million compared to the first quarter of 2010. The sequential increase of 3.5% was mainly driven by a higher percentage of system revenue recognition with a 48 MW Copper Mountain [El Dorado] and 30 MW Cimarron project*, partially offset by a decrease in module ASPs due to a lower blended foreign exchange rate and mix implications."

184.    On the same call, defendant Gillette stated: "Turning now to Copper Mountain, slide 8 shows 48 MW expansion of our original 10 MW installations at the El Dorado site for Sempra Generation.  El Dorado is the first site we constructed in North America in late 2008. The expansion also highlights the progress made in design and execution of utility-scaled solar plants.  Cimarron project in New Mexico for Southern Company is our first large-scale installation of the Series 3 product.  The construction is underway and progressing well."

185.    On **October 28, 2010**, during its 3Q10 Earnings Conference Call, defendant Meyerhoff repeated the importance and success of the solar projects in the desert Southwest: "Net sales for the third quarter were $797.9 million with sequential increase of $210 million or 36% compared to the second quarter of 2010.  ***The increase was primarily driven by the completion of and revenue recognition for*** the 60 megawatt [AC] Sarnia phase two project and by ***continued percentage of completion recognition for the Copper Mountain and Cimarron projects***, partially offset by a decrease in module average sale prices.  EPC revenue increased from 15% of total net sales in the second quarter to 28% in the third quarter."

186.    In a ***January 24, 2011***, press release, First Solar's Senior Vice President of Project Development, North America, Frank De Rosa said: "The Cimarron Solar Facility demonstrates First Solar's capabilities in utility scale projects."

187.    On ***February 24, 2011***, during its 4Q10 Earnings Conference Call, defendant Gillette touted the Company's success with projects in the Southwestern U.S.:

> ***We completed construction of both the 30-megawatt Cimarron and the 48-megawatt Copper Mountain projects.  We sold a 290-megawatt Agua Caliente project to NRG Energy***. . . .
>
> \*          \*          \*
>
> [W]e completed 138-megawatt AC of North American projects in 2010 – Sarnia, ***Copper Mountain and Cimarron. All three were completed early and under budget, built at a velocity two to three times faster than their predecessors.  Two of those projects are also record breakers***, with Sarnia now the larges operating PV plant in the world at 80 megawatts, and ***Copper is the largest in the United States at 58 megawatts***. . . . The strong performance demonstrates the improvements our EPC team has made in reducing cycle time and cost per watt through engineering design improvements and economies of scale.

188.    On **May 3, 2011**, during its 1Q11 Earnings Conference Call, defendant Gillette stated:

> Overall, **we are experiencing strong buyer demand for our utility scale systems projects due to our prudent systems' performance**, execution record and attractive financial profile.

189.    On **August 8, 2011**, during a Pacific Crest Securities Technology Leadership Forum Larry Polizzotto, First Solar's Vice President of Investor Relations emphasized how important the solar power utility scale systems were to the Company's revenue and success, particularly Agua Caliente, which is located in the desert Southwest in the U.S.:

> **If you look at our utility scale systems which in the second half of the year make up a significant portion of our revenues**, those projects actually have higher margins than what you find in the third-party market today and so therefore that should help lift margins in the second half of the year whereas – **in fact, its becoming an increasing part of our business next year as well**. We're going to go from 450 megawatts built in the utility scale this year to about a gigawatt in 2012 and that's a positive in terms of margins.
>
> *          *          *
>
> Basically Agua Caliente just closed last Friday . . . .  What that means is that per the contract agreement we have, we recognize an initial payment as a milestone for the closing.  We also will recognize a payment for the amount of work that's been done to date.

190.    On **November 3, 2011**, during its 3Q11 Earnings Conference Call, defendant Widmar, First Solar's CFO, explained the importance and success of hot-climate solar projects, including Agua Caliente:

> At **Agua Caliente, we closed the sale to NRG early in the third quarter** . . . .  We have now completed over 35% of the BOS [balance of the system] **and installed over 1.4 million modules in Agua Caliente**.
>
> *          *          *
>
> [N]et sales for the second quarter were just over $1 billion, up $533 million from last quarter.  **The increase was primarily due to a higher level of North American system business, which was highlighted by significant construction progress at Agua Caliente**.

191.    The foregoing statements and disclosures made during the Class Period were false and misleading because, as described herein, First Solar concealed its massive heat degradation defect while reassuring investors that large solar projects sold during the Class Period were generating revenue and represented the future growth of the Company.  In

- 102 -

750217_1

1    violation of GAAP and SEC rules, First Solar failed to disclose the negative impact on net

2    sales and operations that were related to the significant trends and uncertainties posed by the

3    heat degradation defect. Furthermore, First Solar was required under GAAP to defer revenue

4    on solar module sales on projects in hot climates due to the known heat degradation defects.

5        192. When First Solar reported its 4Q and year end 2011 financial results in

6    February 2012, the truth about the heat degradation defect was, for the first time, revealed to

7    analyst and investors. First Solar reported:

8       **Module Installation in Non-Temperate Climates**

9       We believe our PV modules are potentially subject to increased failure
10       rates in hot climates. This assumption is based on technical literature, data
that we have developed internally including through accelerated-life testing,
11       our analysis of modules returned under warranty, and our analysis of
performance data from systems that we monitor under O&M agreements.
12       ***Processes that are accelerated by higher ambient temperatures include stress
corrosion cracking in glass, polymer creepage and impurity diffusion
13       processes***. . . . First Solar has an extensive deployment history in temperate
climates, such as Europe. Our deployed volume into hot climates, such as the
14       southwestern United States, is mostly recent. ***We have increased our
warranty reserve by $37.8 million to reflect our exposure to this shift in the
15       mix of geographic regions where our modules are installed***. As we execute
on our Long Term Strategic Plan, we expect to install higher volumes in non-
16       temperate climates as part of our utility-scale offerings in Asia, the Middle
East, Africa, Australia and the southwestern United States. Accordingly, we
17       will continue to review our warranty reserve in the future to reflect actual
installations in such non-temperate climates and adjust such reserve as
18       appropriate. (2011 Annual Report)

19                 *     *     *

20       Finally, we recognized a $37.8 million charge to increase our warranty
accrual. ***We believe our PV modules are potentially subject to increase in
21       cellular rates in hot climates. As our geographic mix of sales has shifted to
hot climates, we have increased our warranty accrual. Our experience has
22       shown that our warranty rates for hot climates are slightly higher than the
return rates for temperate climates***. With this change, our standard warranty
23       accrual rate has been increased by one percentage point to account for the
potential returns, going forward. We will continue to review our warranty
24       accrual rate in the future and we'll adjust the rate as appropriate to reflect our
actual experience.

25                 *     *     *

26       **Chris Kettenmann** - *Miller Tabek – Analyst*

27       Hi, thank you for taking my question. Just wondering if you could tell us –
you mentioned that the hot climate affected panel performance. Wondering if

28

you could give us a quantitative idea of the level of degradation?   And geographically, where you saw most of the warranty claims come from?

**Mike Ahearn** - *First Solar, Inc - Chairman of the Board, Interim CEO*

At this point, ***we don't have a lot of data***.  We have enough – ***we know there's a natural physical acceleration of degradation modes in a hot climate***.  In fact, our accelerated reliability test exposes them to intense temperatures, so that's just the way they behave, from a physics point of view.  And we have enough to know – to feel that it is prudent to raise the rate until we get more data. But we're pretty early.  We just started really shifting the mix into hotter climates in the last couple of years.  So we'll have to continue to reevaluate it, as we see results – get more data.  But for now, we thought it was prudent to increase the rate by a point, because of the mix change and what we have seen, to date.  (2/28/2012 Conference Call)

193.    In addition, for the first time, defendants included a risk disclosure regarding the failure of solar panels installed in hot climates:

In addition, as we increase the number of installations in non-temperate climates, in accordance with our Long Term Strategic Plan, we may experience increased failure rates due to deployment into such hot climates.

194.    This was the first time First Solar acknowledged the heat degradation defect and the severe impact it had and was going to have on First Solar's operations in hotter climates.   First Solar's stock price was materially impacted upon the disclosure of yet another problem with the Company's solar modules.  As the Credit Suisse analyst, Satya Kumar, said: "The fact that First Solar is reporting performance issues in the field in the first few years and is accruing higher charges on an ongoing basis is worrying, as the hotter regions tend to make more sense for solar.  We are concerned this may not be the last time we hear of the warranty-related issues for First Solar."

## VIII.   ADDITIONAL EVIDENCE OF SCIENTER

### A.    The Fraud Infected First Solar's Core Operations, Which Defendants Closely Monitored

195.    The significance of the cost-per-watt metric to First Solar's operations cannot be overstated.   Defendants regularly acknowledged that First Solar's viability as an unsubsidized business depended on their ability to reduce significantly their cost-per-watt. That is why First Solar's current cost-per-watt was one of the first topics defendants addressed in virtually all of the earnings conference calls throughout the Class Period.

- 104 -

196.    As then-CEO defendant Gillette put it during a February 18, 2010 Earnings Conference Call,

> [R]eally fundamentally, our strategy has not changed from what was presented back in June of 2009.  This is a slide that Mike used to present the business and our focus on migrating from existing subsidy business and market places to transitioned markets.  Our goal and First Solar's goal overall remains to reach sustainable market economics where we can compete with and be positioned versus fossil fuel in the electricity market, and it will grow the market in general much more substantially than the subsidized markets that exist today.  Our technology and driving the costs down will enable us to compete, and we think grow the market overall.

197.    Similarly, defendant Meyerhoff recognized that, "[o]bviously, we're in the business of driving the cost for solar electricity down rapidly.  We're firm believers that we need to transition our industry as rapidly as possible, away from subsidy dependence."

198.    Because First Solar's cost-per-watt was far from the level necessary to compete with conventional sources of electricity without the benefit of subsidies, defendants and analysts were keenly aware of the need for First Solar to maintain a constant and rapid trend toward reducing their cost-per-watt.  As late as June 24, 2009, then-CEO defendant Ahearn recognized the tremendous gap that First Solar needed to close: "if you take out the subsidies and just look at solar generation costs, let's call it $0.30 to $0.60 a kilowatt hour.  It is basically what has prevailed 5 to 10 times the conventional alternative, if you're just looking at pure fossil fuel and economics."

199.    Defendants knew if they failed to maintain that constant and rapid trend toward reducing their cost-per-watt, their failure would not go unnoticed by analysts, such as during an August 4, 2011 Earnings Conference Call, during which the following exchange occurred between an analyst and then-CEO defendant Gillette:

> [Analyst question:]  Actually, I had two questions on cost per watt. First of all, I believe it's sort of like comparing apples and oranges when you look at the Chinese, how they report cost per watt and how you report cost per watt.  And I'm wondering if you can give us cost per watt calculated the same way that the Chinese do, i.e., stripping out freight and overhead costs.
>
> And then, secondly, I'm wondering if you look at cost per watt year-over-year, it hasn't really gone down, even if you strip out stock-based comp and you strip out the ramp costs.  It's down basically $0.01 even though the efficiency is up like 50 bips.  And so I'm wondering why that is and why that's going to change going forward.

- 105 -

750217_1

[Gillette:]  We usually don't talk about it, but from what I know in our analysis, what the competitors do is they exclude things like shipping, warranty, recycling, obviously, SBC, capacity ramp and insurance and other production costs and things like that.  So, ballpark, on a comparative basis if you looked at our cost per watt on the same basis, about $0.68, in that range, would be the equivalent comparison.

200.    Throughout the Class Period, all of First Solar's 10-Qs and 10-Ks assured the public that senior management remained informed, including personally and regularly evaluating the effectiveness of the Company's disclosure controls and procedures.

**B.    Defendants' Disclosures About Their Personal Involvement and Awareness**

201.    Throughout the Class Period, the Individual Defendants themselves confirmed their personal involvement and awareness of the details concerning the topics central to their scheme to defraud: cost-per-watt, warranty expenses, field performance, and so-called excursion-related expenses.

202.    Defendant Ahearn

(a)    February 13, 2008 Earnings Conference Call

[Analyst question:]  Hi.  There have been some rumors floating around.  Maybe you could address the issue of whether you are having any yield problems in the field.

[Defendant Ahearn] To our knowledge, we are not.  We have checked with a number of our customers and ***we have, as you know, pretty extensive internal quality controls and external field testing data***, so we are not aware of anything, Eric. I think based on the note you published late yesterday, I think you know more about it than we do frankly at this point as to where that rumor may have come from, but we don't have any information, no.

(b)    February 24, 2009 Earnings Conference Call

And finally, we reduced our manufacturing costs to $0.98 a watt in Q4.  That's down 9% quarter-over-quarter and 12% for the year.  Breaking that dollar per watt cost benchmark is a major industry milestone.  It is something the industry has been chasing for 20 years and I'd like to take a few minutes before we get back to the normal flow to put our accomplishments over the past few years in perspective.

(c)    April 29, 2009 Earnings Conference Call

Longer term, the question arises, could polycrystalline silicon costs reduce to the point that your competitive cost advantage is eroded? And that's something we want to be very sensitive to and not have our heads in the sand on.  Our approach on this is to compare a hypothetical best-case on polycrystalline silicon to our own cost reduction road map; and we have talked about our cost reduction road map previously, but basically it calls for a

manufacturing cost in the area of $0.65 a watt by 2012. There are a number of things we have to execute to get to that point. There are also levers driving this that we think continue beyond 2012 in terms of technology-driven conversion efficiency improvements, scale driven by very low variable costs, and productivity that continues to drive throughput.

(d)     December 14, 2011 Guidance Announcement Call

Turning to slide 21, transitioning away from the subsidies will put us on an entirely different trajectory from the rest of the industry. The business we're describing will be capable of strong consistent and profitable growth for decades. We are targeting markets that are underserved and growing on a macro basis at rates of 5% to 10% per annum and for which renewable energy can serve a disproportionate amount of load growth.

But we are not underestimating the difficulties achieving this transition. There are three major hurdles to overcome which I would like to briefly describe. First, we cannot even begin to have a serious discussion with policymakers, regulators and utilities about large-scale solar generation until we are prepared to price at unsubsidized levels at scale. We believe this translates to a levelized cost of electricity or LCOE of $100 to $140 a megawatt hour or $0.10 to $0.14 a kilowatt hour in most markets.

As Marc will discuss, achieving these LCOE levels without subsidies will require that First Solar reduce its manufacturing costs, increase module efficiencies, streamline operating expense and transition its business model to deliver superior returns at much lower gross margin than in the past.

*     *     *

In addition, we normalized our cost per watt to be consistent with the reporting of the top-tier crystalline competitors. Most of our competitors account for shipping and warranty costs in their operating expenses while we account for it in our cost of goods sold. Based on our analysis, the crystalline silicon cost parity per watt to our $0.52 is $0.57 by 2015. On a percentage reduction basis, the top-tier crystalline competitors would have to reduce their cost per watt by approximately 45% from the Q3 2011 reported cost.

[Analyst question:] Hi, guys. I had two things. First of all, a lot of the long-term cost reduction is based upon higher efficiencies. And you've recently had some issues out in the field with some product that talking to some of your customers seems to be related to the higher efficiency product. So I'm wondering what the resolution and the risk around some of these issues – some of these power issues going on in the field are? Number one, if you could help us with that risk?

And then secondly, I was wondering if you can give us what's the development cost that is on top of the core balance of system cost in your 2012 number? So you're taking that core number but there's a development number that goes on top of that and I'm wondering is about $0.30, $0.40, what is that number? Thanks.

[Defendant Ahearn] I would say on long-term field reliability, that is always a risk when you're changing processes and it has been from the time

we went into production.  We have had on occasion issues and they are dealt with.  We cover them.  That has all been reflected in our financials.

203.   Defendant Eaglesham

(a)   June 24, 2009 Analyst/Investor Meeting

The thin-film is – and I think we are the first of the thin-film companies to really get into scale here.  I think we've achieved what thin-film has long promised to the PV industry, which is a much better level of integration in terms of the manufacturing and then a much more integrated device architecture as well.  So I think those are the long-standing promises of thin-film and I think pretty much any thin-film technology carries a similar set of attributes to that.

Again, looking at the things that 10 years gives you, so 10 years gives you a lot of volume learning experience.  You have a lot of experience in the field.  You've had opportunities to develop your accelerated life tests and understand how those tie to the field performance.  I think another attribute here that is really important to us, coming out of the growth of the EPC business, is we have – I feel I'm lucky as a module technologist to have a direct line of sight to the installation business and the way that the EPC business has given us.

So we have an opportunity to actually understand, as opposed to trying to make estimates about what voltage or length of wires or other attributes, the way they are going to impact the business, we have the opportunity to try to really drill into that and understand that in a very detailed way.  So again, we've got an opportunity to have a direct line of sight to those requirements.

*       *       *

So in the end, it's going to be a horse race.  And we've got to figure out how to move faster than the guys coming behind us.  And I think scale and our current financial position gives us an opportunity to be able to do that.

Okay, and this is talking to the sort of history of field information, I think this is a slide that most of you guys have probably seen before.  This racks up against the BEW study, and I think this again – that this is making a relatively simple statement that our track of field performance and our knowledge of field performance allows us to have fairly high confidence that our product is delivering in the field and that we are able to extract the value that we expect to extract from the two attributes that I talked to.  And this is the resistive loss gives you low light performance, and the band gap gives you high temperature performance.

And so those two attributes, again, remain a critical piece that our attributes are the cadmium telluride technology that we are able to see in the field.

204.   Defendant Gillette

(a)   February 18, 2010 Earnings Conference Call

- 108 -

Module cost was down to $0.84 and was impacted by $0.02 roughly due to the Ohio startup and $0.02 due to SBC.  So our core costs for the year was down $0.03 – excuse me, for the quarter-to-quarter was down $0.03 to $0.80 a watt.

\*     \*     \*

Turning now to our strategy, really fundamentally, our strategy has not changed from what was presented back in June of 2009.  This is a slide that Mike used to present the business and our focus on migrating from existing subsidy business and market places to transitioned markets.  Our goal and First Solar's goal overall remains to reach sustainable market economics where we can compete with and be positioned versus fossil fuel in the electricity market, and it will grow the market in general much more substantially than the subsidized markets that exist today.  Our technology and driving the costs down will enable us to compete, and we think grow the market overall.

(b)     April 28, 2010 Earnings Conference Call

Conversion efficiency was 11.1%.  That's 0.2% of improvement year-over-year, and our cost per watt was $0.81 a watt, which is down 13% year-over-year.  We're on track with our Malaysian plants Five and Six expansion, with production to begin in the first half of 2011.

(c)     July 29, 2010 Earnings Conference Call

The cost per watt was $0.76, which is down 13% year over year, and down $0.05 from the first quarter of 2010.

\*     \*     \*

Finally in Q2, are reflected costs associated with a module replacement program.

During the period from June of 2008 to June of 2009, a manufacturing excursion occurred, affecting less than 4% of the total product manufacturer within the period.  The excursion could result in possible premature power loss in affected modules.

The root cause was identified and subsequently mitigated in June of 2009.  Ongoing testing confirms the corrective actions are effective.  We've been working directly with impacted customers to replace the affected modules and these efforts are well underway, and in some cases, complete.

Some of these efforts go beyond our normal warranty coverage.  We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail.

(d)     September 8, 2010 Citigroup Global Technology Conference

Well, I think it's – I mentioned LCOE, so for maybe a lot of the group is familiar with it, but levelized cost of electricity.  So we already – as a product if you compare us to some materials and they may have higher measured efficiency, what really matters is what happens when you put it in the field.  So we've got a lot of performance capability that benefits us, so we get higher energy yield off of our product, because of the way that it works.

- 109 -

1   And we're able to create yield in terms of power there.  I think our focus on
2   LCOE is to look at not just the cost of the module, but the total installed cost of the electricity and to make sure that we're doing our best to drive it down. Just a year ago, we talked about our cost being in the $1.40 type of range,
3   dollar cents on the BOS side of the equation.  And that we have long-term goals since the 2014 to achieve in the neighborhood of around a dollar.  I think
4   we've made significant progress towards that goal and have objectives to do that in the future, continue to drive that down.  And so when you combine that
5   with our cost curve that I showed you on the cost per watt on the module, we're headed towards our objectives to achieve that kind of level of parity
6   with some of the peak generating assets.

7       So it's not just the module, it's also how the module works and how you install it and how you execute it.  So having the ability to engineer and
8   develop the application and provide value to our customer creates a learning opportunity for us to think more about how we can grow in the future.
9
10      (e)     October 28, 2010 Earnings Conference Call

11  Our manufacturing cost per watt was $0.77, which is down $0.08 or 10% year-over-year, and up $0.01 over Q2 of this year.  During the quarter, we started to
12  qualify process changes to increase our module conversion efficiency.  It impacted our cost per watt by reducing yield and equipment up time.

13      (f)     August 4, 2011 Earnings Conference Call

14      [Analyst question:]  Actually, I had two questions on cost per watt. First of all, I believe it's sort of like comparing apples and oranges when you
15  look at the Chinese, how they report cost per watt and how we report cost per watt.  And I'm wondering if you can give us cost per watt calculated the same
16  way that the Chinese do, i.e., stripping out freight and overhead costs.

17      And then, secondly, I'm wondering if you look at cost per watt year-over-year, it hasn't really gone down, even if you strip out stock-based comp
18  and you strip out the ramp costs.  It's down basically $0.01 even though the efficiency is up like 50 bips.  And so I'm wondering why that is and why
19  that's going to change going forward.

20      We usually don't talk about it, but from what I know in our analysis, what the competitors do is they exclude things like shipping, warranty,
21  recycling, obviously, SBC, capacity ramp and insurance and other production costs and things like that.  So, ballpark, on a comparative basis if you looked
22  at our cost per watt on the same basis, about $0.68, in that range, would be the equivalent comparison.
23
24  205.    Defendant Meyerhoff

25      (a)     February 13, 2008 Earnings Conference Call

26  [A] lot of specificity on what those numbers will actually be.

27      [Analyst question:]  Okay.  Then – just a quick follow-up on that.  You said on the cost-per-watt goals, since you lowered your cost per watt by about
28  12% in 2007, should we think that to be a reasonable goal for 2008?

- 110 -

No, I think if you look at our roadmap in order to achieve the $1.25 to $1.00 pricing capability, right, in the outer years, which is in line with our grid parity goal of $0.08 to $0.10 per kilowatt power, that requires us to achieve cost per watt of about $0.65 to $0.70 and that is our long-term goal, so we believe we are on track for the roadmap.

(b)     April 30, 2008 Earnings Conference Call

Good morning, Michael.

[Analyst question:]  Quick question for you.  The $1.14, I want to make sure I understand, is that the cost per watt in COGS or your production cost?

That's our production – that's a production cost.  And so the way we calculate, you can't calculate it purely on a COGS basis because it includes the inventory component.

Got it.  Okay, and –

It's also manufacturing costs in the period divided it by total watts produced.

(c)     March 11, 2009 Cleantech Leaders Conference

We're not a company that tries to optimize near-term margin performance or profitability if that would create a tradeoff towards the long-term growth and throughput.

Obviously, we're in the business of driving the cost for solar electricity down rapidly.  We're firm believers that we need to transition our industry as rapidly as possible, away from subsidy dependence.  Generally subsidy programs do not necessarily create an efficiently functioning market and I think if we look at what we're just dealing with, with the fallout of mis-design or subsidy programs like we had in Spain, that created a lot of volatility in the market, I think  I think  would be one good example why our industry will be far better off once we migrate it away out of the subsidy environment.

(d)     April 29, 2009 – Earnings Conference Call

[Analyst question:]  Hi, couple of things.  First of all, Jens, can you tell us the megawatt shipment number and how many of those megawatts went into the systems business?

We actually – you may recall – I think Mike reported the megawatts produced.  We do not generally report any longer the megawatt ship number due to sensitivity around pricing, but the production was 219.5 megawatt.

Okay, then I guess, secondly, if you kind of normalize for some of the balance of system costs, right now you have kind of a 60 to $0.70 advantage versus kind of branded crystalline.  So I'm kind of wondering how you think longer term as to what the kind of cushion that you want to maintain for your pricing relative to branded crystal, and once you normalize for the balance of systems.  So are you willing to come down to $0.25? Is that kind of where you want to keep the cushion? How do you kind of think about that?

750217_1

I would say maybe Mike wants to chime in here.  I mean, I don't think there's such a magic formula where you just lock those in.  I think you gauge the end market, you gauge the sellthrough and essentially – we like – as you know, we're going to use our cost reduction road map.  We're firm believers in passing these cost reductions to some degree through into the market for multiple reasons.  Number one, it helps us to grow our business and to drive overall sellthrough.  It strengthens the overall channel in our channel partners, and we're a firm believer in demonstrating, especially to the government that have enabled feed-in tariffs, that PV can scale, and there's a logical and plausible task towards (inaudible) for this industry.

(e)     June 24, 2009 Analyst/Investor Meeting

Now, as I mentioned in summary on the underlying thing, our modules sale hasn't changed with respect to the accounting, right?  We account for it; we recognize the revenue upon shipment.  And this great turnkey system sale is generally a percentage of completion accounting.

(f)     December 16, 2009 Guidance Webcast

Well, I think so far right now, I think I'm not sure whether the industry has gotten to that level yet.  I think initially in Europe that is being offered, so the, the opportunity exists.  It's a question of whether it exists in a cost effective way.  I think right now, we're much more focused on with respect to how do you structure warranty, how do you structure service agreements around it, right, and then do you feel those up with a Company like us, right, where essentially feasibility has a very high probability when you strip the risk out.  Could you possibly reinsure?  That's one aspect.  I know some of our competitors that are less financeable in Europe have at least gone out and worked with insurance company to ensure some of the energy yield risk on those systems.  That is not a very cost effective way to do some of those things.  So whether we can get the whole bond reinsured or insurance back, I think we have to explore that.  We don't know yet.

(g)     February 18, 2010 Earnings Conference Call

As the industry moves into the transitional markets, access to low cost capital for large scale project finance becomes an imperative.  This is becoming an important competitive advantage.  We expect the rating agencies will focus on the quality of each project, down the line debt structures, service and warranty agreements and the balance sheets is backing them.  Strategic and equity investor consider the financial strength of the system developer to assure a multiyear project builds can be fulfilled.  25-year warranties are backed and operations and maintenance contracts are supported.

(h)     March 3, 2010 CLSA AsiaUSA Forum

This is the Lieberose project.  That project just completed a few months ago.  It just sold to an investor.  It's the second largest PV plant in the world and the largest in Germany today.

Again, this is a conversion site.  Through the construction of this PV plant, we essentially financed the clean up of a former militarysite, as it relates to ammunition, chemical warfare agents.

This project has become actually a poster child within the [EU] as it relates to sustainable PV development.

206.   Defendant Sohn

(a)   June 24, 2009 Analyst/Investor Meeting

I'll now transition in from the module side of the business and spend a little bit of time talking about the power plant side of the business and the costs associated with getting to utility scale systems.  At the same time that we introduced the module roadmap, we also talked about the balance of systems cost reduction roadmap.  We've always known, of course, that the point of this is not to sell glass.  What really goes out the door in those boxes isn't a bunch of glass, it's a bunch of energy that needs to be produced.  That's what we're trying to do with this business.  And so, if we're going to do that, we need to really look at other portions of the cost structure and the balance of systems portion of that were a critical component.

In 2007 we anticipated trying to get down to $1 a watt in the 2012 time frame, and we were going to do that by following this particular roadmap.  The updated roadmap now has us spinning down to about $0.91 to $0.98 in 2014, all the while maintaining, again, the commitment to the original roadmap to hit those numbers by 2012.  What's especially key, I think, to understand about the transition on these – the last slide in this slide, is we know a whole lot more about what balance of systems and balance of plant mean today than we did when we put this roadmap together a couple of years ago.

That's a direct outcome of having done the work in acquiring turnable renewable energy.  It's a direct result of having constructed facilities like the El Dorado plant that you saw this morning.   It's the direct result of our knowledge and information that we acquired through the acquisition of OptiSolar and the expertise that was inherent in that business.  So our understanding of this roadmap and our appreciation of the costs that go into building a power plant are much better understood today than they were back in those times, in those times.

\*      \*      \*

We have a data analysis and acquisition system that records and processes the information in a real-time manner.  This allows us to keep – not only collect information on how the system is performing, but it also allows us to analyze that performance and use it for ongoing improvement at both the system level as well as at the module level itself.

All of this folds up into a centralized monitoring system that's out in New Jersey, providing full remote control capabilities of all of our plants, utilizes standard, programmable logical units and graphical user interface so that we can understand what's going on.  We can share all that information, obviously, with the customers, and they've got various uses for it themselves and, as I said, use it for multilevel fault analysis and ongoing continuous improvement.

\*      \*      \*

- 113 -

750217_1

We think that was pretty impressive for our first power plant of this size. We've learned tremendously, learned a whole lot. Throughout the entire time that we were constructing this, we were collecting data. That data has been turned over to the engineers and the statisticians, who have now combed over that and developed new ways for us to construct a facility like this faster and cheaper and still make them even larger.

        (b)      July 29, 2010 Earnings Conference Call

Yes, this is Bruce. About 4% of the production during the timeframe from June 2008 to 2009 was affected, in the neighborhood of about 30 MW. And we've been working with our customers since that time frame and expect to continue to do so for about the next six months or so.

        (c)      October 28, 2010 Earnings Conference Call

[Analyst question:] Thanks. The question's on the higher cost per watt. Has all the equipment been updated so we won't see the cost go up penalty again? And is it possible that the Company could see an increase in the efficiency from these upgrades at some point next year? Thanks.

Yes, Steve, this is Bruce. As mentioned earlier, we've got a variety of improvements that are going into the factories and what was – might be easy on smaller scale is something that is more complex when we're dealing with 24 lines spread globally. We have good quality systems in place to ensure that the product that we're shipping is – to our standards. But in the implementation, it becomes somewhat of a challenge and affected us in terms of yields and our equipment up time to do the implementations. Nevertheless, we expect to continue to be on our cost per watt road map over the long term. We'll continue to implement changes over the – routinely, over time. But it takes a while for those things to propagate out.

[Analyst question:] Hi. I was wondering if you could talk about the factors that were driving the accrued expenses and, specifically, could you talk about whether the warranty issues that you had last quarter, are there any additional allocations you expect to make in the second half of the year compared to the amount that you've already disclosed in Q2? Thanks.

As mentioned, the increase in cost was really a direct result of the improvements that we're putting into the factories, and we expect to see those generate better efficiencies and performance and lower cost. In terms of the excursion that we mentioned last time, there were no additional costs incurred in Q3.

207.    Defendant Widmar

        (a)      November 3, 2011 Earnings Conference Call

Module manufacturing costs per watt was $0.74, which is down $0.01 quarter over quarter as a result of higher conversion efficiency. Core costs which excludes the ramp penalty and stock-based compensation was $0.73 per watt. We expect to drive our module costs down to the mid $0.60's by the end of 2012 as we accelerate our efficiency roadmap by implementing the technology from the record 17.3% sale highlighted in our Q2 earnings call.

750217_1

1          *     *     *

2          Gross margin was 37.7%, up 1.1 percentage points from the prior
3   quarter.The increase was prior primarily due to higher ASPs, partially offset
    by increased manufacturing excursion accruals.   During the quarter, we
4   incurred $22.1 million of additional costs related to the manufacturing
    excursion that occurred from June 2008 to June 2009.  We have substantially
5   concluded the remediation programs associated with this manufacturing
    excursion.

6   208.   Defendant Zhu

7          (a)     Defendant Gillette on defendant Zhu, during a December 14, 2010

8   earnings call: "As announced yesterday, James Zhu, our Chief Accounting Officer, will

9   serve as interim CFO until a new CFO is named.  James is extremely knowledgeable on our

10  systems and financials and I expect a very smooth transition."

11         (b)     Zhu, during 10Q4 Earnings Conference Call:

12         Our module costs per watt in the fourth quarter was $0.75, down $0.02
13  from prior quarter.  Our core manufacturing cost per watt also declined by
    $0.02 to $0.73.  This improvement was driven by our conversion efficiency
    improvement, the increase of line throughput and a material cost savings,
14  which was partially offset by annual equipment maintenance and upgrades,
    foreign exchange, and the ramp penalty.

15         *     *     *

16
17         This leads me to our updated guidance for 2011.  We have made several
    key assumptions underlining our guidance.  We maintain our spot exchange
    rate assumption of $1.30 per euro.  For the first quarter, we are fully hedged at
18  the rate of $1.32 per euro.  For the full year, about a 58% of our net sales and a
    72% of our expected net income are hedged at an average rate of $1.32 per
19  euro.  As of today, percent change in the dollar-euro spot rate would impact
    our revenue guidance for the year by about $6 million and our net income
20  guidance by about $3 million.

21  209.   Defendants Gillette/Meyerhoff

22         (a)     July 29, 2010 Earnings Conference Call

23         [Analyst question:]  Sure, congratulations, everybody, there on your
    results, and especially the improvements on the line run rate efficiency and
24  cost per watt.  First, Jens, can you just put a dollar amount on the module
    replacement program to go along with that 30 MW or so, so we don't need to
25  wait for the Q? And then, Bruce, I believe Steve O'Rourke asked you what
    your current balance of system costs was, but I never heard you actually give a
26  number.   Can you take another shot at answering that question from a
    quantitative point of view?

27

28

750217_1

Gillette

I'll actually answer both of them for you real quickly here, Mark.  So the cost of the program in total was about $23.4 million, $17.8 million in COGs and $5.6 million that we have reserved in this quarter.  That reserve completes our current estimate of the cost of the program.

In terms of the balance of systems costs, you're right.  I didn't get too specific on the exact number.  On the other hand, I – the trend is well en route to our goal of being under $1.00 a watt.  The progress is, as I mentioned earlier, is in really good shape.  I anticipate that we would probably beyond the more assertive side of hitting our goal, but as I said earlier, the challenge is to keep it there while inflationary pressures ensue.

Meyerhoff

Yes, so maybe just to add real quick, so the numbers Bruce gave you, right, were what we booked in Q2.  As we published our Q, you're going to see in our Footnote 8 around accrued liabilities that the total accrual stands at $27.4 million.

**C.     Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised First Solar's Controls and Procedures**

210.    Throughout the Class Period, defendants Ahearn, Gillette, Meyerhoff, Widmar, and Zhu repeatedly certified that they personally supervised and participated in the evaluation of First Solar's financial controls and procedure that the Company's financial disclosures fairly and accurately presented its financial condition.   Moreover, First Solar's many misleading 10-Q and 10-K reports were always followed by earnings calls during which all of the Individual Defendants described the favorable, but inaccurate, financial results (several examples of such calls are set forth above).

**D.     Defendants Engaged in Massive and Suspicious Insider Trading**

211.    The practically unprecedented levels of insider trading during the Class Period raises a strong inference that defendants knew that they were deceiving the public.  At the same time defendants engaged in their scheme to defraud investors by materially understating the Company's cost-per-watt metric, concealing the existence and extent of product defect problems and understating warranty costs, defendants suspiciously sold millions of First Solar shares for proceeds of over *$427 million*.  The sales are summarized in the following chart, and the detailed sales information is attached as Ex. A hereto:

750217_1

| | Insider | Shares Sold | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|
| **Subtotal** | 1. Ahearn<br>2. Meyerhoff<br>3. Eaglesham<br>4. Sohn<br>5. Zhu | 3,239,016<br>116,772<br>69,983<br>74,750<br>7,884 | $427,160,185<br>$17,977.601<br>$9,645,827<br>$12,390,248<br>$1,172,204 | 96.96%<br>79.69%<br>94.19%<br>74.56%<br>48.37% |
| **Grand Total** | – | 3,508,405 | $468,346,065 | 95.12% |

212.   Defendants sold their stock for as high as $311.14, and the lowest price at which *any* defendant sold First Solar shares was $96.74, whereas First Solar's stock price fell as low as $11.77 after the Class Period.

213.   During the Class Period, Ahearn sold over 3.2 million shares, or approximately *97%*, of his total First Solar stock holdings for proceeds of more than *$468 million*. Conspicuously, 92% (2.98 million shares) of Ahearn's sales occurred *after* the scope of the "manufacturing excursion" was, by Mr. Ahern's own admission, known to defendants but still concealed from investors.  Similarly, defendants Eaglesham (100%), Zhu (100%), Sohn (82.9%) and Meyerhoff's (78.5%) reported Class Period stock sales were heavily weighted to this time period.

214.   When pressed during a March 3, 2010 conference call, even defendant Meyerhoff admitted that the timing of Ahearn's February 2010 sales was suspicious: "Your chairman sold a bunch of stock last week.  What does he know that we don't know?" Meyerhoff responded:  "Was this the best timing to do this?  No, it probably wasn't the best timing to do this.  Were we entirely happy about the timing?  No, we were not.  I believe we put this behind us."  Notwithstanding the suspicious timing, defendant Meyerhoff denied that Ahearn was trading based on "any form of knowledge."   To the contrary, defendant Meyerhoff was well aware that defendant Ahearn *did* know something the public did not know.  In fact, he knew a lot.  He knew about defendants' scheme to defraud, including the fact that in early 2010, they were still concealing the quarter-billion-dollar so-called

750217_1

1   manufacturing excursion.  Notwithstanding his comments about the timing of Ahearn's

2   sales, Meyerhoff himself dumped 91,750 shares for $12.7 million in the ensuing months.

3        215.   Defendants' pre-Class Period sales reinforce the suspicious nature of their

4   Class Period trades, because all of the defendants' pre-Class Period sales were made either in

5   First Solar's IPO, secondary offering, or as part of stock sales plans.  The Company

6   specifically represented that the stock sales plans were specifically created to allow the

7   defendants "to achieve prudent and gradual **asset diversification** over time." By the

8   beginning of the Class Period, however, defendants already had diversified their portfolios.

9   But even after diversifying their portfolios – and while defendants' fraud was ongoing –

10   defendants proceeded to dump more than **95%** of their Class Period holdings for more than

11   **$468,000,000**, giving rise to a strong inference that defendants were in possession of

12   material, adverse nonpublic information concerning First Solar's financial condition.

13        216.   Defendants' pre-Class Period sales and their Class Period sales are compared

14   in the chart below:

| Defendant | Pre-Class Period Shares Sold | Pre-Class Period Proceeds | Class Period Shares Sold | Class Period Proceeds |
|---|---|---|---|---|
| Ahearn | 2,773,204 | $312,608,874 | 3,239,016 | $427,160,184 |
| Meyerhoff | 68,416 | $8,929,869 | 116,772 | $17,977,601 |
| Eaglesham* | -- | -- | 69,983 | $9,645,827 |
| Sohn | 93,000 | $19,060,720 | 74,750 | $12,390,248 |
| Zhu | -- | -- | 7,884 | $1,172,204 |
| TOTALS | 2,934,620 | 340,599,463 | 3,508,405 | $468,346,065 |

22   *Pre-Class period sales, if any, are not publicly available.

23   **E.    Defendants Leave First Solar**

24        217.   Another strong indication of defendants' knowing participation in the scheme

25   to defraud is the virtual game of hot potato that played out among First Solar's executives

26   beginning in December 2010, as First Solar was spiraling toward the inevitable revelation of

27   their scheme:  First Solar changed CEOs (for the second time in less than three years), had

1    three different CFOs, the President of its Components Business Group departed, the
2    President of Operations (defendant Sohn) departed, as did its Chief Accounting Officer,
3    defendant Zhu.  In fact, First Solar announced defendant Zhu's departure the very same day,
4    December 14, 2011, that defendant Ahearn falsely assured investors that the expenses related
5    to the so-called excursion and other field problems had "all been reflected in our financials."
6    And less than three months after First Solar's fraudulent scheme was revealed, it changed
7    CEOs yet again, replacing defendant Ahearn with James Hughes, and defendant Eaglesham
8    resigned.  Of the seven Individual Defendants, only one (Widmar) has retained the position
9    held with First Solar in 2011.

10   **F.    Defendants' Compensation Structure Incentivized Fraud**

11          218.   In addition to the incentive to manipulate First Solar's cost-per-watt to
12   maintain the false impression of its steady progress toward viability, defendants had a direct
13   incentive to manipulate First Solar's cost-per-watt as part of their scheme to defraud because
14   the first three of the eight factors of defendant's bonus program were tied to cost-per-watt
15   directly:  (1) total watts produced; (2) module conversion efficiency; and (3) year-end cost-
16   per-watt.

17   **G.    The Accounting Manipulations Were Extensive and Systematic in Nature**

18          219.   Despite defendants' certifications, the extensive and systematic accounting
19   manipulations described at §VII were simply too pervasive to have escaped the attention of
20   First Solar's multiple CEOs and CFOs during the Class Period.   The accounting
21   manipulations described herein contain at least the following indicators of knowledge, or
22   recklessness disregard by defendants:

23          (a)    ***The types of accounting violations*** – as detailed herein, the improper
24   accounting employed by defendants did not occur as a result of good faith differences in
25   accounting judgments, or interpretations of complicated, vague, or arcane accounting rules.
26   The accounting rules for calculating warranty reserves (ASC 450 and ASC 460) and
27   recognizing revenue subject to performance specifications (ASC 605) are based on
28   fundamental GAAP concepts that were known and understood by defendants.  In addition,

- 119 -

1  the disclosure of material loss contingencies such as the excursion and heat degradation

2  problem are also based on basic accounting rules – namely ASC 450 and ASC 275.  As

3  described at §VII, defendants violated GAAP by failing to warn investors about the financial

4  statement impact of these product problems.

5        (b)    ***The duration over which the improper accounting was perpetrated*** –

6  as more fully detailed herein, these accounting manipulations were not a case of an honest

7  mistake or oversight during a single quarter or even a single year.  In fact, defendants' failure

8  to record sufficient warranty reserves, properly defer revenue on modules installed in hotter

9  climates, or adequately disclose material loss contingencies continued for 15 quarters before

10  the Company finally revealed massive losses in 4Q11.  As described at §VIII.C., defendants

11  reviewed and certified the accuracy of the financial statements in each of these quarters.

12        (c)    ***The magnitude or size of the accounting errors*** – defendants'

13  understatement of warranty reserves and overstatement of revenue was material.  As

14  described at §VII.A., defendants' estimate of excursion-related costs was understated by as

15  much as 650% until 4Q11.  In addition, the failure to disclose the excursion or heat

16  degradation problems, in violation of ASC 450 and ASC 275, allowed defendants to conceal

17  hundreds of millions of dollars of module replacement costs.  Meanwhile, defendants were

18  recording and touting material amounts of revenue for solar systems built in the

19  Southwestern U.S.  The magnitude of these accounting manipulations was unlikely to escape

20  the attention of defendants.

21        (d)    ***The effect of the accounting violations*** – as described herein, it is more

22  than sheer coincidence that ***all*** of defendants accounting violations resulted in

23  ***overstatements*** of earnings and revenue and ***understatement*** of cost per watt in ***all*** 15

24  quarters during the Class Period.

25        (e)    ***Defendants were on notice*** – with respect to properly accounting for

26  warranty reserves, defendants were on notice from the start of the Class Period.  In a Form

27  10-K filed prior to the Class Period, the Company was forced to restate its financial

28  statements and forced to admit that it had a material weakness in internal controls due, in

750217_1

part, to the fact that defendants "***did not maintain effective controls to properly accrue for warranty obligations***."[38]   Additionally, prior to the Class Period, the SEC sent Ahearn a comment letter that questioned the Company's revenue recognition practice.  The Company represented to the SEC that the Company "monitor[ed] solar modules in use by end users, and can extrapolate future performance expectations."

## IX.   LOSS CAUSATION

220.   During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market that artificially inflated the price of First Solar's publicly traded securities.  Defendants misled investors about First Solar's financial health and performance and its prospects for future financial success by: (i) improperly recognizing revenue before it was earned; (ii) concealing the full extent and nature of First Solar's manufacturing flaws and product defects and its impact on First

---

[38]   "A material weakness" is defined by the PCAOB as "a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."
      "As of December 31, 2005, we did not maintain effective controls over the preparation, review and presentation and disclosure of our consolidated financial statements due to a lack of personnel with experience in financial reporting and control procedures necessary for SEC registrants.  This failure caused several significant deficiencies, four of which had a large enough impact on our operating results to individually constitute material weaknesses."
      "These material weaknesses were: (i) we did not maintain effective controls to ensure that the appropriate labor and overhead expenses were included in the cost of our inventory and that intercompany profits in inventory were completely and accurately eliminated as part of the consolidation process; (ii) we did not maintain effective controls to ensure the complete and accurate capitalization of interest in connection with our property, plant and equipment additions; ***(iii) we did not maintain effective controls to properly accrue for warranty obligations;***  and (iv) we did not maintain effective controls to properly record the formation of First Solar US Manufacturing, LLC in 1999 and the subsequent liquidation of minority membership units in 2003."
      "These control deficiencies resulted in the restatement of our consolidated financial statements for 2004 and audit adjustments to our 2005 consolidated financial statements and to the consolidated financial statements of each interim period in 2005.  These control deficiencies could result in more than a remote likelihood that a material misstatement to our annual or interim financial statements would not be prevented or detected.  Accordingly, we have concluded that each of these control deficiencies constitutes a material weakness."

1   Solar's earnings; (iii) materially understating First Solar's warranty costs and reserves; and

2   (iv) falsely touting First Solar's cost-per-watt.

3       221.   Later, when the defendants' prior misrepresentations and fraudulent conduct

4   were absorbed by the market, the price of First Solar publicly traded securities fell

5   significantly, as the prior artificial inflation came out of the price over time.  As a result of

6   their purchases of First Solar publicly traded securities during the Class Period, plaintiffs and

7   other members of the Class suffered economic loss, *i.e.*, damages, under the federal

8   securities laws.

9       222.   Although defendants have admitted that they knew of the full nature and extent

10  of First Solar's massive module defect problems and, in fact, had resolved the problem by no

11  later than June 2009, they concealed the problem – and all associated charges and costs –

12  from investors for more than a year.  It was not until July 29, 2010, that First Solar first

13  disclosed any information about its product defect problems.  Even then defendants

14  continued to mislead investors about the scope of the product problems.

15      223.   On July 29, 2010, the Company issued a press release announcing its false and

16  misleading financial results for the second quarter ended June 26, 2010.  The Company

17  reported net income of $159 million or $1.84 diluted EPS, beating analysts' consensus EPS

18  expectations for the second straight quarter.  Later in the day, the Company held a

19  conference call with analysts.  On the call, defendant Gillette disclosed that "during the

20  period from June of 2008 to June of 2009, a manufacturing excursion occurred, affecting less

21  than 4% of the total product manufacture[d] within the period.  The excursion could result in

22  possible premature power loss in affected modules."  Gillette also admitted on the call that

23  First Solar had been aware of the problem for more than a year, stating "[t]he root cause was

24  identified and subsequently mitigated in June of 2009."  Gillette also represented that First

25  Solar's 2Q10 results "reflected costs associated with a modular replacement program."

26  Defendant Meyerhoff offered specifics on those costs, representing that First Solar "accrued

27  $17.8 million in cost of sales, but expected module replacement costs in our cost of goods

28

750217_1

1 sold" and "$5.6 million of operating expenses associated with this process excursion,

2 bringing our total accrued expenses to $27.4 million at the end of the second quarter."

3     224.    As a result of these disclosures, First Solar's stock price declined on this news

4 by $10.05, or 7.42%, as compared to a 3.53% decline in the peer group identified in First

5 Solar's SEC filings.[39]  Commentators linked this decline to investors' concern about the

6 product problems and management failures to disclose the "manufacturing excursion" for

7 more than a year.  Notably, First Solar's stock price decline occurred on the news of the

8 product defect problems despite the fact that the Company beat analysts' earnings

9 expectations.  By way of comparison, when First Solar beat analyst expectations in the prior

10 quarter, the Company's stock price rose by 17.75%.

11     225.    First Solar's stock price remained artificially inflated, however, because

12 defendants affirmatively misrepresented the scope of First Solar's product defect problems

13 and continued to conceal the full nature and extent of their fraud.  Defendants falsely assured

14 investors and analysts that the charge was a one-time issue and all of the problems had been

15 resolved in 2009.  Gillette assured investors that "[o]ngoing testing confirms the corrective

16 actions are effective."  Gillette also misleadingly told investors that efforts to replace the

17 defective modules were "well underway, and in some cases, complete" and that the

18 "estimated full costs of these additional efforts" had been accrued in First Solar's results.

19 Defendants also minimized this problem as a "manufacturing excursion" even though they

20 knew that First Solar also faced a heat-degradation defect that was a massive "3,000 pound

21 boulder."

22     226.    Following the July 29, 2010 partial disclosure, defendants continued to conceal

23 material information from investors, artificially propping up First Solar's stock price.  As

24

25   [39]     The "peer group" referred to herein is from the "Stock Price Performance Graph"

26 section of First Solar's December 31, 2011, Form 10-K at 33 and consisted of the following companies: Canadian Solar, Inc ("CSIQ"); Hanwha Solarone Co. ("HSOL"); Sunpower

27 Corp. ("SPWR"); Suntech Power Holdings ("STP"); Trina Solar LTD ("TSL"); and Yingli Green Energy Holding Co. ("YGE").

28

1    described in more detail herein, throughout the remainder of the Class Period defendants

2    misrepresented the scope of First Solar's product defect problems and their impact on the

3    Company's operations and results.  In each of First Solar's 10-Q and 10-K filings for 3Q10,

4    FY10, 1Q11, 2Q11, and 3Q11, defendants continued to understate the full extent of the

5    manufacturing excursion and its impact on the Company's earnings.  In each of those filings,

6    defendants falsely represented that the problems affected "less than 4% of the total product"

7    manufactured between June 2008 to June 2009 and understated the actual costs and financial

8    impact of the massive product problems.  Nevertheless, First Solar continued to report

9    additional expenses associated with the "manufacturing excursion" and declining financial

10   results, which fueled investor doubt about the viability of First Solar's business model and

11   defendants' statements concerning the quality of products and the scope of excursion-related

12   expenses.  First Solar's stock price remained inflated, however, because defendants

13   continued to present false and misleading financial results to investors and conceal the true

14   nature and extent of First Solar's massive product problems and its impact on the Company's

15   financials.

16         227.    After the market closed on October 28, 2010, First Solar held a conference call

17   to announce its 3Q10 results.  The following day, when the Company's stock price declined

18   by 8.91%, as compared to a 3.71% decline in the peer group, removing some of the artificial

19   inflation caused by defendants' fraud and causing plaintiffs to suffer losses.  First Solar's

20   stock price remained inflated, however, because defendants continued to present false and

21   misleading financial results to investors and conceal the true nature and extent of First

22   Solar's massive product problems and its impact on the Company's financials.

23         228.    During the Company's February 24, 2011 conference call to announce First

24   Solar's financial results for 4Q10 and FY10, defendant Gillette admitted that First Solar's

25   4Q10 net sales were "impacted by our decision to divert some volumes to expedite the

26   module replacement program."  Defendants also disclosed that "[d]uring the fourth quarter

27   we reserved an additional $8.5 million for the module replacement program."  Based on this

28   news, First Solar's stock price declined more than 10% over the next two trading days –

750217_1

5.44% on February 25, 2011 and another 5.35% on February 28, 2011, as compared to declines of 3.15% and 4.83% in the peer group, removing some of the artificial inflation caused by defendants' fraud and causing plaintiffs to suffer losses.  On the same conference call, defendant Zhu falsely assured investors that First Solar's warranty costs were limited and based on a reasonable method: "In Q4 we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate."  Thus, although the February 28, 2011 disclosures resulted in negative impact on First Solar's stock price resulting from First Solar's concealed problems, they were still misleading as defendants continued to conceal adverse facts from the market, and falsely assure investors that the problems were under control, maintaining artificial inflation in First Solar's stock price.

229.   On May 3, 2011, defendants announced First Solar's false and misleading 1Q11 financial results.  Net sales declined 7%, compared to the fourth quarter of 2010.  The decrease was caused at least in part by decreased demand resulting from First Solar's concealed product problems.  As a result of this news, First Solar's stock price declined 6.20%, as compared to a peer group decline of 2.62%, removing some of the artificial inflation caused by defendants' fraud and causing plaintiffs to suffer losses.  First Solar's stock price remained inflated, however, because defendants continued to present false and misleading financial results to investors and conceal the true nature and extent of First Solar's massive product problems and its impact on the Company's financials.

230.   On October 25, 2011, First Solar issued a press release announcing that it had replaced CEO Gillette with defendant Ahearn on an interim basis.  Press reports indicated that Gillette was ousted by the board of directors.  Investors, suspecting fraud or major operational problems, fled from First Solar's stock, causing it to decline 25.33% on trading volumes of more than 23 million shares, as compared to a 7.19% decline for the peer group, removing some of the artificial inflation caused by defendants' fraud and causing plaintiffs to suffer losses.  First Solar's stock price remained inflated, however, because defendants continued to present false and misleading financial results to investors and conceal the true

1  nature and extent of First Solar's massive product problems and its impact on the Company's

2  financials.  As Ahearn later admitted: "I know there's been a lot of speculation about

3  whether there was some type of fraud or legal action or government investigation or major

4  operational problem behind the move . . . ."

5      231.    On October 25, 2011, a Morgan Stanley analyst wrote: "***Impact on our views***:

6  We believe that Robert Gillette's unexpected departure is likely a troubling sign of things to

7  come. . . .  We believe the uncertainty regarding the departure and the abrupt nature of the

8  announcement ***will lead to negative speculation regarding the Company's fundamentals***."

9  The same day, a JP Morgan analyst wrote: "[W]e believe the news (along with timing of

10  announcement) is likely to raise a lot of investor questions about the health of overall

11  industry as well as near/longer term profitability outlook of the company."  A Credit Suisse

12  analyst also called the news "quite concerning" and wrote: "we have never quite seen a CEO

13  departure announced in this manner in our universe."

14      232.    After the market closed on November 4, 2011, defendants held a conference

15  call to discuss First Solar's false and misleading 3Q11 financial results for expenses related

16  to the manufacturing excursion.  The Company took another charge of $30.4 million.  As a

17  result, the next day, First Solar's stock price declined 3.73%, as compared to a peer group

18  decline of 1.47%.  First Solar's stock price remained inflated, however, because defendants

19  continued to present false and misleading financial results to investors and conceal the true

20  nature and extent of First Solar's massive product problems and its impact on the Company's

21  financials.  For example, defendants still falsely maintained that the excursions impacted less

22  than 4% of the modules produced from June 2008 to June 2009.  Defendant Widmar also

23  falsely represented that First Solar had "***substantially concluded the remediation programs***

24  ***associated with this manufacturing excursion***."

25      233.    On December 14, 2011, First Solar issued a press release announcing its

26  updated fiscal 2011 financial guidance.  The Company again slashed its 2011 guidance,

27  forecasting net sales in the range of $2.8 to $2.9 billion, diluted EPS of $5.75 to $6.00 and

28  operating income of $575 to $600 million.  Additionally, the Company provided

750217_1

1   disappointing fiscal 2012 forecasts with net sales in the range of $3.7 to $4.0 billion, $3.75 to

2   $4.25 diluted EPS, and consolidated operating income in the range of $425 to $450 million

3   for fiscal 2012.

4         234.   The Company's reduced guidance was attributable to massive charges for

5   defective products that the Company would be forced to incur.  As a result, First Solar stock

6   dropped $9.12 per share to close at $33.45 per share on December 14, 2011, a one-day

7   decline of 21% on volume of over 17 million shares, as compared to an 8% decline for the

8   peer group.  The stock price continued to decline the next day by another 6%, as compared to

9   the peer group which increased slightly.  These declines removed artificial inflation from

10   First Solar's stock price, causing plaintiffs' losses.  First Solar's stock price remained

11   inflated, however, because defendants continued to present false and misleading financial

12   results to investors and conceal the true nature and extent of First Solar's massive product

13   problems and its impact on the Company's financials.  For example, on the conference call,

14   defendant Ahearn falsely represented to investors all costs related to defective products were

15   already reflected in their financials.

16         235.   On February 28, 2012, defendants announced a net loss of $413 million, or

17   ($4.74) diluted EPS for 4Q11 and revenue of $660 million, as compared to net income of

18   $156 million, or $1.80 diluted EPS and revenue of $609 million, for the same period the year

19   before.  For the year 2011, defendants reported a net loss of $39.5 million, or ($0.46) diluted

20   EPS and revenue of $2.8 billion, as compared to net income of $664 million, or $7.68 diluted

21   EPS and revenue of $2.6 billion for the same period the year before.  The Company also

22   disclosed, in relevant part, the following:

23         Fourth quarter 2011 net sales were $660 million, a decrease of $345 million

24         from the third quarter of 2011, primarily due to the timing of revenue
            recognition in our systems business and lower volume for module-only sales

25         . . . .

26         The fourth quarter of 2011 was impacted by pre-tax charges of $393 million
            (reducing EPS by $3.90) associated with a non-cash goodwill impairment for

27         our components business, $164 million (reducing EPS by $1.67) related to
            warranty and cost in excess of normal warranty expense, and $60 million

28         (reducing EPS by $0.43) related to restructuring activities, as announced in
            December 2011.

750217_1

236.   On February 28, 2012, defendants also announced a $37.8 million charge related to heat degradation and expected higher defect rates related to this problem going forward.  The company significantly increased the total cost of excursion-related expenses to $255.7 million to $259.7 million.

237.   The media and analysts noted the staggering charge taken by the Company associated with replacing defective panels.  *Bloomberg News* noted that in the fourth quarter, the problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date.  It also put aside $37.8 million to cover future claims." *The Wall Street Journal* reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty."  Mark Bachman, an analyst at Avian Securities LLC, noted that the "charges [are] about *10 times* what they said they were going to be when they first reported the issue."  In his February 29, 2012 report titled "A quarter billion dollar warranty problem," Credit Suisse analyst Satya Kumar emphasized that "[t]he $253mm in cumulative warranty and related charges now raises a significant question mark on the reliability and field performance of FSLR's panels – product quality in our view is THE MOST SIGNIFICANT metric for a solar companies' long-term survivability."  (Emphasis in original.)

238.   On February 29, 2012, First Solar's stock price fell to $32.30 per share, down 90% from the Class Period high of $311.44, and a single-day decline of 11.26%, as compared to a 5.05% decline for the peer group.

239.   Analysts continued to register their belief that First Solar's business model was threatened by the product defects.  On March 2, 2011, a Credit Suisse analyst wrote: "We find it a bit disturbing that there were 5000 separate claims, reflecting a large body of dissatisfied customer base with FSLR. . . .  This is an important area to watch – to ensure there have not been issues with panels made after June' 09."  The analyst also discussed the heat degradation defect: "Hot climate issue – a new issue for investors.  FSLR noted that based on available technical literature, internal data, analysis of module returns – its panels are subject to higher failure rates in hot climates.  FSLR also noted this is due to 'stress

750217_1

1   corrosion cracking in glass, polymer creep and impurity diffusion.'  FSLR also noted that the

2   hot climate applies to South West US where some of its projects lie, as well as several

3   regions identified in its long term strategic plan as focal areas.  This hot climate issue is a

4   new factor for investors and possibly for FSLR customer-investor partners."

5        240.   First Solar's stock price continued to fall on high trading volumes in the days

6   and weeks following defendants' announcement, as the market absorbed the news and

7   continued to scrutinize the timeliness and completeness of defendants' disclosures, dropping

8   to $25.80 by March 7, 2012 (a five-day drop of 20%).  Ultimately, First Solar's stock price

9   fell as low as $11.77 on June 1, 2012.

10        241.   Each disclosure of adverse facts which removed inflation from First Solar's

11   stock price was connected to defendants' false statements and omissions and fraudulent

12   conduct alleged herein.

13        242.   On April 11, 2012, an S&P analyst emphasized why the heat degradation

14   defect was so devastating to First Solar's future prospects:  "We see high risk of field

15   performance issues for its modules given plans to shift its geographic exposure to warmer

16   climates and data illustrating degradation of panels in extreme heat."

17   **X.**   **NO SAFE HARBOR**

18        243.   First Solar's verbal "Safe Harbor" warnings accompanying its oral forward-

19   looking statements ("FLS") issued during the Class Period were ineffective to shield those

20   statements from liability.

21        244.   The defendants are also liable for any false or misleading FLS pleaded

22   because, at the time each FLS was made, the speaker knew the FLS was false or misleading

23   and the FLS was authorized and/or approved by an executive officer of First Solar who knew

24   that the FLS was false.  None of the historic or present tense statements made by defendants

25   were assumptions underlying or relating to any plan, projection or statement of future

26   economic performance, as they were not stated to be such assumptions underlying or relating

27   to any projection or statement of future economic performance when made, nor were any of

28

750217_1

the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

245.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    plaintiffs and other members of the class purchased First Solar stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

246.    At all relevant times, the market for First Solar stock traded in an efficient market for the following reasons, among others:

(a)    since well before the Class Period, First Solar's stock has been listed and actively traded on the NASDAQ National Market, a highly efficient and automated market;

(b)    as a regulated issuer, First Solar filed periodic public reports with the SEC; and

(c)    First Solar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

750217_1

## XII.   CLASS ACTION ALLEGATIONS

247.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired First Solar publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

248.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  First Solar has over 86.4 million shares of stock outstanding, owned by hundreds if not thousands of persons.

249.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   whether the 1934 Act was violated by defendants;

(b)   whether defendants omitted and/or misrepresented material facts;

(c)   whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)   whether the prices of First Solar publicly traded securities were artificially inflated; and

(f)   the extent of damage sustained by Class members and the appropriate measure of damages.

250.   Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

251.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

252.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

253.    Plaintiffs incorporate ¶¶1-252 by reference.

254.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

255.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of First Solar publicly traded securities during the Class Period.

256.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for First Solar publicly traded securities.  Plaintiffs and the Class would not have purchased First Solar publicly traded securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

750217_1

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

257.    Plaintiffs incorporate ¶¶1-256 by reference.

258.    The Individual Defendants acted as controlling persons of First Solar within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of First Solar stock, the Individual Defendants had the power and authority to cause First Solar to engage in the wrongful conduct complained of herein.  First Solar controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**XIII.  PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiffs and the members of the Class damages, including interest;

C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**XIV.  JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  August 17, 2012                ROBBINS GELLER RUDMAN
                                                        & DOWD LLP
                                                    MICHAEL J. DOWD
                                                    DANIEL S. DROSMAN
                                                    MARK SOLOMON
                                                    JASON A. FORGE


                                                    _____s/DANIEL S. DROSMAN_____
                                                            DANIEL S. DROSMAN

                                                    655 West Broadway, Suite 1900
                                                    San Diego, CA  92101
                                                    Telephone:  619/231-1058
                                                    619/231-7423 (fax)

- 133 -

750217_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN (AZ005425)
KEVIN HANGER (AZ027346)
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

Liaison Counsel for Plaintiffs

1

CERTIFICATE OF SERVICE

2       I hereby certify that on August 17, 2012, I authorized the electronic filing of the

3 foregoing with the Clerk of the Court using the CM/ECF system which will send notification

4 of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List,

5 and I hereby certify that I caused to be mailed the foregoing document or paper via the

6 United States Postal Service to the non-CM/ECF participants indicated on the attached

7 Manual Notice List.

8       I certify under penalty of perjury under the laws of the United States of America that

9 the foregoing is true and correct.  Executed on August 17, 2012.

10
                                    s/ DANIEL S. DROSMAN
11                                  DANIEL S. DROSMAN

12                                  ROBBINS GELLER RUDMAN
                                         & DOWD LLP
13                                  655 West Broadway, Suite 1900
                                    San Diego, CA  92101-3301
14                                  Telephone:  619/231-1058
                                    619/231-7423 (fax)
15
                                    E-mail: ddrosman@rgrdlaw.com
16

17

18

19

20

21

22

23

24

25

26

27

28

750217_1

# Mailing Information for a Case 2:12-cv-00555-DGC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George C Aguilar**
  gaguilar@robbinsumeda.com,notice@robbinsumeda.com

- **Kathryn B Allen**
  kallen@kmllp.com

- **Stephen Richard Basser**
  sbasser@barrack.com

- **Maureen Beyers**
  mbeyers@omlaw.com,ljensen@omlaw.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com

- **Luke Brooks**
  lukeb@rgrdlaw.com

- **Jeremy James Christian**
  jjc@tblaw.com,sab@tblaw.com

- **Keith Michael Cochran**
  kcochran@cfsblaw.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com,mzehel@pomlaw.com

- **Jonathan Adam Dessaules**
  jdessaules@dessauleslaw.com,hpeters@dessauleslaw.com

- **Michael J Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel S Drosman**
  dand@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Jordan Eth**
  jeth@mofo.com,adavis@mofo.com,nurbina@mofo.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeffrey Dale Gardner**
  gardner@sackstierney.com,suellen.douglas@sackstierney.com

- **Richard W Gonnello**
  rgonnello@faruqilaw.com

- **Bryan Jens Gottfredson**

Bryan.Gottfredson@sackstierney.com,jennelle.deatley@sackstierney.com,karen.sorensen@sackstierney.com

- **Salvatore Jo Graziano**
  salvatore@blbglaw.com,errol.hall@blbglaw.com

- **Joseph P Guglielmo**
  jguglielmo@scott-scott.com

- **Kevin Richard Hanger**
  khanger@bffb.com,rcreech@bffb.com

- **Craig Kennedy**
  mbeyers@omlaw.com

- **Jennifer Lynn Kroll**
  jkroll@martinbonnett.com

- **Jeffrey S Leonard**
  jeffrey.leonard@sackstierney.com,wendy.peterson@sackstierney.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Peter S Linden**
  plinden@kmllp.com

- **Susan Joan Martin**
  smartin@martinbonnett.com,tmahabir@martinbonnett.com,mblawfirm@aol.com

- **Michael Craig McKay**
  mmckay@schneiderwallace.com,efilings@schneiderwallace.com,egallegos@schneiderwallace.com

- **Gregory Michael Monaco**
  gmonaco@mackazlaw.com

- **Danielle S Myers**
  danim@rgrdlaw.com

- **Patrick Powers**
  patrick@powerstaylor.com,sarah@powerstaylor.com

- **Ira Michael Press**
  ipress@kmllp.com

- **Jay N Razzouk**
  jrazzouk@robbinsumeda.com

- **Brian J Robbins**
  brobbins@robbinsumeda.com,notice@robbinsumeda.com,rsalazar@robbinsumeda.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Hart Lawrence Robinovitch**
  AZDocketing@zimmreed.com,stacy.bethea@zimmreed.com

- **David R Scott**
  drscott@scott-scott.com,efile@scott-scott.com

- **Mark Solomon**
  marks@rgrdlaw.com

- **Michael Sweeney**
  mbeyers@omlaw.com

- **Edward M Varga , III**
  evarga@kmllp.com

- **Samuel M Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Daxton Reese Watson**
  dwatson@mackazlaw.com,bcorpora@mackazlaw.com

- **Anna Erickson White**
  awhite@mofo.com,tvanvoris@mofo.com,avickery@mofo.com

- **Garrett Webster Wotkyns**
  gwotkyns@schneiderwallace.com,efilings@schneiderwallace.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)