Jordan Eth (CA SBN 121617) *(Admitted pro hac vice)*
Anna Erickson White (CA SBN 161385) *(Admitted pro hac vice)*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
(415) 268-7000
JEth@mofo.com
AWhite@mofo.com

Maureen Beyers, Arizona Attorney No. 017134
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000
mbeyers@omlaw.com

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>        Plaintiff,<br><br> vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>        Defendants. | Case No.   CV12-00555-PHX-DGC<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**(Oral Argument Requested)** |

sf-3189311

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

BACKGROUND ............................................................................................................... 2

ARGUMENT ..................................................................................................................... 4

I.    PLAINTIFFS MUST SATISFY EXACTING PLEADING
      REQUIREMENTS. ................................................................................................. 4

II.   PLAINTIFFS FAIL TO PLEAD A MATERIAL FRAUDULENT
      MISREPRESENTATION. ...................................................................................... 5

      A.    Plaintiffs Do Not Adequately Allege That The Cost-Per-Watt
            Metric Was False Or That Any Defendant Had Scienter. ............................ 6

      B.    Plaintiffs Fail To Plead Particularized Facts To Support Their
            Warranty Reserve Claims. ........................................................................... 7

      C.    Plaintiffs Fail To Support Their Revenue Recognition Claims
            With Particularized Facts. ........................................................................... 10

III.  PLAINTIFFS' ADDITIONAL SCIENTER ALLEGATIONS ALSO
      FAIL. ................................................................................................................... 11

      A.    The "Core Operations" Inference Does Not Apply. ................................. 11

      B.    Plaintiffs' Stock Sale And Compensation Allegations Do Not
            Establish A Strong Inference Of Scienter. ................................................. 13

      C.    Viewed Holistically, Plaintiffs' Theory Of Fraud Is Neither
            Cogent Nor Compelling. ............................................................................ 15

IV.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION. ....................................... 16

V.    THE SECTION 10(b) CLAIMS AGAINST CERTAIN
      DEFENDANTS FAIL FOR ADDITIONAL REASONS. .................................... 17

VI.   PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM. ............................. 17

CONCLUSION ............................................................................................................... 17

sf-3189311

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 Fed. Appx. 74 (9th Cir. 2007) ....... 10

*Curry v. Hansen Med. Inc.*,
    No. 09-5094, 2012 U.S. Dist. LEXIS 112449 (N.D. Cal. Aug. 10, 2012) ................. 17

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................................. 16

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ............................................................................. 12, 15

*In re Atmel Corp. Sec. Litig.*,
    No. 03-0558, 2004 U.S. Dist. LEXIS 27955 (N.D. Cal. Jan. 30, 2004) ..................... 11

*In re Downey Sec. Litig.*,
    No. 08-3261, 2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009) ...................... 5

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) ...................................................................................... 8

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................................... 15

*In re Int'l Rectifier Corp. Sec. Litig.*,
    No. 07-2544, 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008) .................... 17

*In re Nvidia Corp. Sec. Litig.*,
    No. 08-4260, 2010 U.S. Dist. LEXIS 114230 (N.D. Cal. Oct. 19, 2010) ......... 9, 12, 16

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003) ...................................................................................... 5

*In re Rigel Pharms., Inc. Sec. Litig.*,
    No. 10-17619, 2012 U.S. App. LEXIS 18743 (9th Cir. Sept. 6, 2012) ............... *passim*

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................................... 5, 14

*In re Silicon Storage Tech. Inc., Sec. Litig.*,
    No. 05-0295, 2006 U.S. Dist. LEXIS 14790 (N.D. Cal. Mar. 10, 2006) ................... 10

ii

*In re Vantive Corp. Sec. Litig.,*
    283 F.3d 1079 (9th Cir. 2002) .................................................. 4, 11, 13, 14

*Janus Capital Group, Inc. v. First Derivative Traders,*
    131 S. Ct. 2296 (2011) ................................................................... 17

*McCasland v. FormFactor, Inc.,*
    No. 07-5545, 2008 U.S. Dist. LEXIS 60544 (N.D. Cal. July 25, 2008) ...................... 5

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
    540 F.3d 1049 (9th Cir. 2008) .............................................*passim*

*Reese v. BP Exploration (Alaska) Inc.,*
    643 F.3d 681 (9th Cir. 2011) ...................................................... 17

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ........................................... 9, 13, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ............................................................. 2, 5, 6

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) .............................................*passim*

**STATUTES & RULES**

Private Securities Litigation Reform Act of 1995 .......................................... 1, 4

Fed. R. Civ. P.
    Rule 8 .......................................................................... 1
    Rule 9(b) ................................................................... 1, 4
    Rule 12(b)(6) ............................................................... 1

*All quotations and internal citations are omitted unless otherwise indicated.
.

1   Defendants hereby move to dismiss Plaintiffs' First Amended Complaint (the

2   "FAC") pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), as well as the

3   Private Securities Litigation Reform Act of 1995 (the "PSLRA").

4   **MEMORANDUM OF POINTS AND AUTHORITIES**

5   From 2008 to the present, First Solar, Inc. and the entire solar industry faced

6   unprecedented and widely publicized challenges.  The United States economy

7   experienced its worst financial crisis since the Depression.  More importantly, the

8   European economy—the principal source of First Solar's revenues—collapsed.  As with

9   the rest of the solar industry, First Solar's stock plummeted, declining from over $300 in

10   2008 to under $30 this year.

11   Plaintiffs, however, claim that the decline in First Solar's stock price was caused

12   by a fraudulent scheme that went undetected for *four years*.  According to Plaintiffs, at

13   some unknown point in 2008 or 2009, First Solar and seven of its current and former

14   officers (the "Individual Defendants") knew the total costs that the Company would

15   ultimately incur in remediating a manufacturing deviation.  The Individual Defendants,

16   Plaintiffs allege, concealed these costs from everyone—including the Company's

17   independent auditors—until the Company disclosed the costs in February 2012.

18   The FAC falls far short of the stringent standards for pleading securities fraud

19   under the PSLRA and should be dismissed for three independent reasons.  First, the FAC

20   fails to plead the falsity of any of First Solar's statements.  Nowhere do Plaintiffs allege

21   contemporaneous statements or conditions inconsistent with any of the alleged

22   misstatements, and Plaintiffs' "confidential witnesses" ("CWs") say nothing about how

23   the Company prepared its financial statements.

24   Second, Plaintiffs' conclusory allegations do not plead in the required "great

25   detail" facts presenting a "cogent and compelling" inference of scienter.  The CWs do not

26   describe anything suggesting that any Individual Defendant knew information

27   contradicting the Company's public statements.  And Plaintiffs' claim that the seven

28   Individual Defendants engaged in this four-year scheme so that they could sell stock at

1

inflated prices makes no sense.  In fact, and omitted from Plaintiffs' 134-page complaint, two of the Individual Defendants—the Company's CEO and CFO—**bought** stock, undermining Plaintiffs' entire theory.  In any event, there is nothing suspicious about the stock sales by any of the Individual Defendants.

Third, Plaintiffs fail to plead facts sufficient to establish "loss causation."  There has never been any announcement by First Solar, PricewaterhouseCoopers LLP (First Solar's independent auditor), or anyone else suggesting the falsity of First Solar's financial statements.  Whatever caused the stock price to decline, it was not the market's learning of the falsity of First Solar's statements.

# BACKGROUND[1]

Based in Tempe, Arizona, First Solar, Inc. ("First Solar" or "the Company") is the world's largest thin-film photovoltaic (PV) solar manufacturer.  (Ex. 1 at 2.)[2]  The Company began production of commercial products in 2002, and became publicly traded on November 17, 2006.  (Ex. 1 at 32.)  Over five gigawatts, or five billion watts, of First Solar's modules are installed worldwide.

Between June 2008 and June 2009, a deviation, known as an "excursion," occurred in First Solar's manufacturing process, potentially resulting in early power loss in affected modules.  (¶ 107.)[3]  In November 2009, First Solar informed certain customers that it had identified "a *possible* degradation and premature decline of performance in some" of its modules.  (¶ 33 (emphasis added).)  First Solar requested the customers "to monitor the performance of their plants and in case there is a measureable excessive decline of performance, to contact their solar retailers to arrange for an exchange of the affected

---

[1] The factual information set out in this memorandum is based on the facts alleged in the FAC, the documents the FAC incorporates by reference, and other matters of which the Court may take judicial notice for the reasons stated in the accompanying Request for Judicial Notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[2] Citations to "Decl. ¶ __" and "Ex. __" refer to paragraphs and exhibits referenced in the declaration of Anna Erickson White in Support of Defendants' Motion to Dismiss.

[3] All "¶" references are to the FAC.  (Dkt. No. 93.)

2

1 modules." (*Id*.)

2   On July 29, 2010, the Company announced that the root cause of the excursion had

3 been identified and subsequently mitigated in June 2009. (¶ 107.) The Company further

4 disclosed that the excursion affected "less than 4% of the total product manufactured

5 within the period," and "*could* result in possible premature power loss in affected

6 modules." (*Id*. (emphasis added).) First Solar stated that it had been working with

7 customers to replace the affected modules and those "efforts [were] well underway and, in

8 some cases, complete." (*Id*.) First Solar announced that it had accrued $29.5 million to

9 date to cover the replacement of the anticipated affected module population.[4] (¶ 109.)

10   From 2010 forward, First Solar continued to reevaluate the costs associated with

11 this program. In each of its quarterly and annual public filings, the Company disclosed

12 the status of its remediation efforts, and provided up-to-date estimates regarding its

13 expected expenses in connection with its voluntary remediation program. (*E.g.*, ¶ 120.)

14   During 4Q11, after processing "thousands of claims" and based on "additional

15 information provided from the sites that [it had] already remediated," the Company

16 increased its estimate for costs associated with the excursion. (¶ 50; Ex. 1 at 39-40.)

17 Through its continued efforts, the Company had learned that "in light of the impracticality

18 of identifying and replacing individual affected models," it would instead be required to

19 "remove and replace several modules in the aggregate, including modules that might *not*

20 have been affected" by the excursion. (*Id*. at 39 (emphasis added).) Thus, on February

21 28, 2012, the Company announced that it had incurred an additional $125.8 million to

22 reflect an updated estimate of costs related to its remediation efforts. (Ex. 5 at 4.)

23   In 4Q11, the Company also announced a shift in its strategy in light of plummeting

24 demand from European countries, whereby the Company would focus on developing

25 countries, many of which are located in hot climates. (*E.g.*, Ex. 1 at 2, 19.) The

26 ―――――――――――――

27   [4] First Solar maintains a reserve to account for costs associated with potential
claims under its warranties. The excursion-related costs in excess of normal warranty
were accrued in a separate reserve. (¶ 149.)

28

3

1   Company's February 28 press release announced (i) lower-than-expected revenue and

2   earnings for 4Q11, (ii) reduced 2012 revenue guidance below analyst estimates, and (iii) a

3   $37.8 million charge to its warranty reserve to account for potentially increased failure

4   rates in hot climates (the alleged "heat degradation defect").  (Exs. 4, 6, 7.)  The Company

5   also announced pre-tax charges of $393 million related to goodwill impairment and $60

6   million related to restructuring activities.  (Ex. 4.)  The next day, First Solar's stock

7   declined 11%, from $36.40 to $32.30.  (¶ 238.)

8        Within two weeks, the Company was sued for securities fraud.  According to

9   Plaintiffs, the warranty charges announced on February 28 revealed a four-year fraud,

10  from April 30, 2008, to February 28, 2012 (the "Class Period"), orchestrated by First

11  Solar and the Individual Defendants to understate and misrepresent its warranty reserves,

12  and also to improperly recognize revenue.  (¶¶ 20-48.)  Plaintiffs claim that the "scheme"

13  was designed to manipulate a non-GAAP metric known as cost-per-watt and to permit the

14  Individual Defendants to sell stock at inflated prices.  (*Id.*)

### ARGUMENT

**I.   PLAINTIFFS MUST SATISFY EXACTING PLEADING REQUIREMENTS.**

17       To state a Section 10(b) claim, a plaintiff must allege facts sufficient to establish

18  (1) that the defendant made a material misrepresentation or omission; (2) that the

19  misrepresentation was made with scienter; (3) a connection with the purchase or sale of a

20  security; (4) transaction and loss causation; and (5) economic loss.  *Metzler Inv. GMBH v.*

21  *Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

22       Rule 9(b) and the PSLRA require a plaintiff to plead both falsity and scienter "with

23  particularity."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir.

24  2009).  "The purpose of this heightened pleading requirement was generally to eliminate

25  abusive securities litigation and particularly to put an end to the practice of pleading fraud

26  by hindsight."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002).

27       To plead falsity, Plaintiffs must "specify each statement alleged to have been

28  misleading [and] the reason or reasons why the statement is misleading."  *Metzler*,

4

540 F.3d at 1061.  In addition, Plaintiffs must allege "contemporaneous statements or conditions" that are "inconsistent" with the challenged statements so as to demonstrate that they were false when made.  *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003).  The "who, what, when, where, and how" of the alleged fraud must be pled with specificity.  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 998 (9th Cir. 1999).[5]

Plaintiffs also have the burden to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—scienter—when making the allegedly false or misleading statements.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  This means Plaintiffs must plead facts "in great detail," *Silicon Graphics*, 183 F.3d at 974, demonstrating that "defendants believed that they were making false or misleading statements," *In re Rigel Pharms., Inc. Sec. Litig.*, No. 10-17619, 2012 U.S. App. LEXIS 18743, at *39 (9th Cir. Sept. 6, 2012).  Plaintiffs' allegations must give rise to an inference of scienter that is both (1) "cogent" and (2) "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## II.    PLAINTIFFS FAIL TO PLEAD A MATERIAL FRAUDULENT MISREPRESENTATION.

Plaintiffs allege that First Solar issued false statements about the following: (1) cost-per-watt; (2) warranty reserves; and (3) revenue.  Plaintiffs have failed to show that any statements were false, let alone that any of the Defendants believed they were.

---

[5] The Complaint includes over 70 paragraphs of allegedly false and misleading statements.  (¶¶ 62-138.)  Rather than provide particularized facts explaining why each alleged misstatement is false, Plaintiffs refer to other sections of the FAC.  This tactic, known as "puzzle-pleading," improperly requires the Defendants and the Court to untangle the "impenetrable" mass of quoted public statements to determine what falsehoods Plaintiffs are actually alleging.  *McCasland v. FormFactor, Inc.*, No. 07-5545, 2008 U.S. Dist. LEXIS 60544, at *21 (N.D. Cal. July 25, 2008); *In re Downey Sec. Litig.*, No. 08-3261, 2009 U.S. Dist. LEXIS 83443, at *8-9 (C.D. Cal. Aug. 21, 2009) (dismissing complaint as "puzzle-style" pleading).

**A.    Plaintiffs Do Not Adequately Allege That The Cost-Per-Watt Metric Was False Or That Any Defendant Had Scienter.**

According to Plaintiffs, Defendants "engaged in a scheme to defraud investors by knowingly manipulating the cost-per-watt metric," "the key gauge for investors in assessing First Solar's viability." (¶ 21.) Defendants did this, Plaintiffs say, by including "only the current period warranty expense *(i.e.*, only the amount of warranty on products sold in that period) in the cost-per-watt calculation." (¶ 27.) Thus, Defendants excluded warranty expenses related to products sold in prior quarters. (*Id.*) This meant that warranty costs related to the products affected by the 2008 to 2009 manufacturing excursion were not reflected in the cost-per-watt metric reported in later periods. (*Id.*)

None of this pleads falsity, as all Plaintiffs do is criticize First Solar's methodology for calculating cost-per-watt, not its disclosures. As Plaintiffs recognize, and as First Solar disclosed, cost-per-watt included only the total manufacturing cost incurred *during the current period*. (Ex. 2 at 30 and ¶ 205(b).)

The Ninth Circuit recently held that a plaintiff does not adequately allege falsity when it criticizes only the methodology used by defendants. *Rigel Pharms.*, 2012 U.S. App. LEXIS 18743, at *19. Allegations that defendants should have used a different methodology "concern two different judgments. . . . The allegations are not about false statements." *Id.* As in *Rigel*, because Plaintiffs do not allege that Defendants misrepresented the methodology they used, but instead "criticize[] only the . . . methodology employed," they do not adequately plead falsity with respect to their cost-per-watt claims. *Id.* at *23-24.

Plaintiffs also fall far short of pleading scienter because they fail to plead specific facts that any Individual Defendant knew or believed that the Company had disclosed false cost-per-watt figures. None of the CWs alleges that the cost-per-watt metric was inaccurate, let alone that any Defendant knew or believed that it was inaccurate. For example, CW-6, "a senior member" of the "Internal Audit Department," alleges that in January or February 2010, a "non-anonymous whistleblower" reported that a manager in

6

the Financial Planning & Analysis ("FP&A") group directed some unnamed persons to "do what was necessary to come up with" the publicly reported cost-per-watt number. (¶ 55.)  CW-6 claims that he met with Defendant Meyerhoff, and acknowledges that the Company took corrective action, "telling [the FP&A manager] that he should watch what he said in meetings."  (*Id.*)  CW-10, who claims to have been responsible "for calculating the cost-per-watt metric," alleges that "s/he had information that would support plaintiffs' claims," or a "different class action," but provides none of that purported information. (¶ 59.)

Finally, CW-1 suggests that First Solar's CFO "would determine the total costs incurred to make the panels" in calculating cost-per-watt and that "there was pressure from defendant Meyerhoff to stop selling panels with such a large D-rating" to "drive down costs and/or increase the watts."  (¶ 50.)  CW-1—a manager in sales and business development who had nothing to do with the cost-per-watt calculation and never claims to have personally interacted with Meyerhoff—does not even say that the adjustments to the alleged "D-rating" were unreasonable or that the cost-per-watt metric was ever inaccurate. Having failed to provide "specific descriptions of the precise means through which [the alleged fraud] occurred," much less "reliable personal knowledge of defendants' mental state," the CW allegations fail to support a fraud claim.  *Zucco*, 552 F.3d at 996, 998.

## B.    Plaintiffs Fail To Plead Particularized Facts To Support Their Warranty Reserve Claims.

Plaintiffs also allege that the warranty reserve was inadequate throughout the Class Period because the full extent of the manufacturing excursion and alleged "heat degradation defects" was known by Defendants no later than 2Q09.  (*E.g.*, ¶¶ 143-44.)

Under accounting rules, the Company was required to accrue warranty-related expenses if they were (1) "probable" and (2) "reasonably estimable."  (¶ 142.)  The determination of whether a loss is "probable" or "reasonably estimable" requires management to exercise judgment.  To plead fraud based on inadequate reserves, a complaint must allege, with particularity, facts that show that the initial setting of the

1   reserve was "the result of a falsehood," and not simply an estimate that turned out to be

2   wrong. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994).  Plaintiffs

3   have not made that showing here.

4       **First**, as to the excursion, Plaintiffs contend that the warranty reserve was

5   understated throughout the Class Period based on Defendants' "admission" that the cause

6   was known and the extent of the problem was quantified in 2Q09.  According to

7   Plaintiffs, at that point, "the timing of actually processing the claims should not have

8   affected the estimate of total remediation costs."  (¶ 40.)  But the fact that First Solar knew

9   how many modules were affected by the excursion does not mean that it knew the

10  ultimate cost of remedying the problem.  Replacing the particular defective modules is

11  only part of the equation, and, as it turned out, a small part.

12      As First Solar learned more information, it continued to revise its estimates

13  upward.  During 4Q11, after processing "thousands of claims" and based on "additional

14  information provided from the sites that [it had] already remediated," the Company

15  realized that its original estimates were insufficient.  (Ex. 1 at 39-40.)  Through its

16  continued remediation efforts, the Company had learned that "in light of the impracticality

17  of identifying and replacing individual affected models," it would instead be required to

18  "remove and replace several modules in the aggregate, including modules that might *not*

19  have been affected" by the excursion.  (*Id*. at 39 (emphasis added).)  Accordingly, the

20  Company increased its estimate of the total remediation cost by $125.8 million.

21      In the alternative, Plaintiffs contend that First Solar lied when it said it "had put the

22  excursion problem behind them."  (¶ 40.)  But First Solar never suggested that the

23  remediation process was complete, as Plaintiffs suggest.  Rather, as it continued to

24  increase its reserves, First Solar repeatedly informed its investors that the reserves were

25  "*estimates*" based on "the replacement of the *anticipated* affected module population in

26  the field."  (*E.g.*, ¶ 123 (emphasis added).)

27      CW-1 and CW-2—the only CWs that purport to specifically address the

28  excursion—add nothing.  Neither is alleged to have been involved in First Solar's

8

accounting or financial reporting processes, and neither provides any facts concerning the process whereby First Solar set its reserves for any quarter. Lacking "firsthand knowledge of the workings" of the accounting or finance departments, the CW allegations are irrelevant. *Zucco*, 552 F.3d at 996. Not surprisingly, their allegations also lack the required particularity and plausibility to be reliable. *Id.* at 995. CW-2 claims that First Solar "knew in 2007 that the projected failure rate [of the Series II modules] was going to be much greater than 4%" (¶ 51), but does not explain how this relates to the excursion that occurred a year later. CW-1 alleges that customer complaints began no later than the end of 2008 (¶ 50), but does not allege how many customers complained or to whom, or how many modules were affected. *See In re Nvidia Corp. Sec. Litig.*, No. 08-4260, 2010 U.S. Dist. LEXIS 114230, at *25-26 (N.D. Cal. Oct. 19, 2010).

**Second**, as to heat degradation, none of the CWs allege that any Individual Defendant was aware of this issue before 4Q11, much less that losses related to it were probable or reasonably estimable in 2Q09. CW-8, who claims only that "[h]eat degradation is always something that's been discussed with the panels," did not even begin working at First Solar until "late 2010." (¶ 57.) According to CW-1, unnamed individuals on the "warranty team" were aware of the heat degradation issue "as early as 2009" (¶ 50), but he does not identify who that was or how many modules were affected. CW-1 claims that "personnel throughout First Solar" were "deathly afraid of heat degradation" in February *2011*, and that at some unspecified time "the heat degradation issue meant that First Solar's warranty costs were going to skyrocket." (¶ 50.) Even then, CW-1 does not describe who these "personnel" were, what "deathly afraid of" means, who told him that the reserve was not adequate, or what information that was based upon. These general claims of "corporate knowledge" are insufficient. *Zucco*, 552 F.3d at 998.[6]

---

[6] Plaintiffs also suggest that the warranty reserve was understated due to "general product quality problems." (¶ 149.) But the FAC simply points to a collection of vague statements by six CWs that some modules had various problems at different times over a five-year period. Such generalized allegations are insufficient. "Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001).

9

Plaintiffs also point to a chart allegedly showing that the "warranty coverage" rate decreased over time as further evidence that the reserve was understated during the Class Period. (¶¶ 38, 144, 149.)  Nowhere do they explain where this chart comes from, or how it was derived.  In addition, as Plaintiffs themselves admit, the "warranty coverage" rate naturally declined over time, as costs to produce a watt declined over time.  (¶ 145.)

Plaintiffs' alternative argument—that, "at a minimum," Defendants were required to "disclose the true nature and scope of these material loss contingencies" because they could not reasonably estimate the Company's exposure (¶ 155)—is equally unsupported. Plaintiffs have failed to identify any fact showing what information any of the Individual Defendants knew that prevented them from making a reasonable estimate.  The FAC alleges only that the amount ultimately accrued for the excursion "admit[s]" that the original estimates were unestimable.  (¶ 40.)  But this ignores the fact that, as the Company continued its remediation efforts, it learned that its full costs of remediation included removing and replacing modules "*that might not have been affected by the manufacturing excursion*."  (Ex. 1 at 39 (emphasis added).)  And, again, that an estimate later turns out to be inaccurate does not mean that it was unreasonable when made, as "even reasonable predictions turn out to be wrong." *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006), *aff'd*, 256 Fed. Appx. 74 (9th Cir. 2007).

Finally, that PwC gave First Solar clean audit opinions throughout the Class Period corroborates that the statements regarding warranty reserves were not false when made and that no Individual Defendant had any basis for believing so.  *See In re Silicon Storage Tech. Inc., Sec. Litig.*, No. 05-0295, 2006 U.S. Dist. LEXIS 14790, at *25 (N.D. Cal. Mar. 10, 2006).

## C.    Plaintiffs Fail To Support Their Revenue Recognition Claims With Particularized Facts.

Plaintiffs throw in a general allegation that First Solar improperly recognized revenue because it had "not previously demonstrated that its solar modules actually met" the warranted 10- and 15-year power outputs.  (*E.g.*, ¶ 164.)  Plaintiffs fail to meet even

10

1   the basic pleading requirements for a claim based on improper revenue recognition.

2   Plaintiffs do not plead any facts regarding what considerations the Company took into

3   account in determining when and how to recognize revenue, who made these decisions,

4   and how or if they changed over time.  *In re Atmel Corp. Sec. Litig.*, No. 03-0558, 2004

5   U.S. Dist. LEXIS 27955, at *11 (N.D. Cal. Jan. 30, 2004).  Nor do Plaintiffs state the

6   "approximate amount by which revenues and earnings were overstated"—a "basic detail"

7   in revenue recognition allegations.  *Vantive*, 283 F.3d at 1091.  Plaintiffs include the

8   allegation from CW-1 that "First Solar simply did not know how the panels would

9   ultimately perform over their expected lifecycles."  (¶ 165.)  That one CW—who was

10  employed in the business development and sales groups—did not know how the panels

11  would perform says nothing about what others knew.  *Zucco*, 552 F.3d at 998.

12                                    *     *     *

13          As described above, Plaintiffs nowhere plead a single fact demonstrating scienter

14  for any of the three types of alleged misstatements.  The only potential source for such

15  allegations included in the FAC—the CWs—do not even come close.  Seven of the eleven

16  CWs (CW-2, CW-3, CW-5, CW-7, CW-9, CW-10, and CW-11) fail even to mention the

17  Individual Defendants, and thus contribute nothing.  Of the remaining four CWs, none

18  alleges that any Individual Defendant had information that contradicted any of the

19  Company's public statements.  Because the CWs fail to allege "personal knowledge of

20  defendants' mental state," these allegations cannot give rise to scienter.  *Zucco*, 552 F.3d

21  at 998.  *See also, e.g.*, *Rigel*, 2012 U.S. App. LEXIS 18743, at *39.  As discussed below,

22  none of Plaintiffs' remaining scienter allegations—individually or collectively—

23  contributes to an inference of scienter.

24  **III.    PLAINTIFFS' ADDITIONAL SCIENTER ALLEGATIONS ALSO FAIL.**

25          **A.    The "Core Operations" Inference Does Not Apply.**

26          Plaintiffs allege that Defendants must have known about the alleged misstatements

27  because they "infected First Solar's core operations."  (¶¶ 195-209.)  Allegations that

28  high-level officers "must have known" do not generally create an inference of scienter.

                                          11

*Zucco*, 552 F.3d at 1000-01.  There are two narrow exceptions to this rule:  1) where the complaint pleads "detailed and specific allegations about management's exposure to factual information within the company," or 2) where "the falsity is patently obvious—where the facts [are] prominent enough that it would be absurd to suggest that top management was unaware of them."  *Id.* at 1000-01.  Neither is present here.

Plaintiffs attempt to fit within the first *Zucco* exception by filling ten pages with block quotations attributed to the Individual Defendants regarding the significance of the cost-per-watt metric, warranty expenses, and the manufacturing excursion.  (¶¶ 201-209.)  That the Individual Defendants discussed the significance of certain metrics, or reported on accounting issues, does not establish knowledge of the alleged fraud.  Merely showing that "management had access to the purportedly manipulated quarterly accounting numbers, or that management analyzed the [misstated] numbers closely," is insufficient.  *Zucco*, 552 F.3d at 1000-01; *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008).[7]

The second exception does not apply because "[w]ithout sufficiently alleging actual falsity," Plaintiffs cannot establish that the falsity was "patently obvious."  *Nvidia*, 2010 U.S. Dist. LEXIS 114230, at *39.  Even if Plaintiffs had demonstrated falsity, though, they have alleged no particularized facts to demonstrate that it would be "absurd to suggest" that the Individual Defendants were unaware that judgment-based estimates, approved by First Solar's independent auditors, of the costs of a remediation plan involving thousands of customers and hundreds of thousands of modules were false.  *See, e.g.*, *Zucco*, 552 F.3d at 1001.

---

[7] Plaintiffs include a statement by Defendant Sohn during a June 2009 meeting about a "centralized monitoring system" in New Jersey.  (¶ 206(a).)  Plaintiffs say nothing about what information in this system would have revealed that First Solar's accounting or financial statements were incorrect.  *Metzler*, 540 F.3d at 1068.

**B.     Plaintiffs' Stock Sale And Compensation Allegations Do Not Establish A Strong Inference Of Scienter.**

Plaintiffs say that this four-year scheme was designed to permit Defendants to sell their stock at inflated prices. But "[i]nsider stock sales are not inherently suspicious." *Vantive*, 283 F.3d at 1092. Instead, to support an inference of scienter, a plaintiff "must allege 'unusual' or 'suspicious' stock sales." *Ronconi*, 253 F.3d at 435. Plaintiffs have failed to carry this burden for at least four reasons.

First, Plaintiffs omit the fact that two Individual Defendants—Robert Gillette and Mark Widmar—actually purchased stock during the Class Period. Gillette, CEO of First Solar from October 2009 through October 2011, purchased 10,000 shares for $1.04 million in February 2010 and held those shares throughout his tenure with the Company. (Decl. ¶ 11, Ex. 9.) Similarly, Widmar, First Solar's CFO since April 2011, purchased shares on August 24, 2011. (Decl. ¶ 12, Ex. 10.) That the CEO and CFO—the officers with the most access to inside information—purchased, rather than sold, stock during the Class Period is fatal to Plaintiffs' allegations. *E.g.*, *Vantive*, 283 F.3d at 1094 (inference of scienter negated where trading of CEO—who "was presumably in the best position to know the 'true' facts"—"belies any intent to rid himself of a substantial portion of his holdings"); *Ronconi*, 253 F.3d at 436.

Second, Plaintiffs attempt to sweep in as many of the Individual Defendants' stock sales as possible by alleging a massive 200-week Class Period. But for the first eight months of the Class Period, Plaintiffs do not even attempt to demonstrate that any of the Individual Defendants knew about the excursion. Indeed, removing just the first three weeks of the 200-week Class Period—a time period predating even the beginning of the excursion—results in Ahearn having sold more stock in the 18 months leading up to the Class Period than he sold during the entire 46-month Class Period. (Decl. ¶ 14.) *See, e.g.*, *Vantive*, 283 F.3d at 1092 ("[T]he plaintiffs have selected an unusually long class period of sixty-three weeks . . . thereby making the stock sales appear more suspicious than they would be with a shorter class period.").

Third, the sales were consistent with pre-Class Period sales. Stock sales only give rise to an inference of scienter when they are "dramatically out of line with prior trading practices." *Metzler*, 540 F.3d at 1066-67. Only three of the Individual Defendants—Ahearn, Meyerhoff, and Sohn—were required to disclose stock transfers before the beginning of the Class Period. These three individuals sold, on average, significantly more shares per month in the pre-Class Period than during the Class Period: (1) Ahearn: 154,067 pre-Class Period and 70,413 during the Class Period; (2) Meyerhoff: 3,801 pre-Class Period and 2,539 during the Class Period; and (3) Sohn: 5,167 pre-Class Period and 1,625 during the Class Period.[8] (Decl. ¶¶ 15-17.)

Fourth, over 92 percent of the stock sales by all Individual Defendants during the Class Period were by Michael Ahearn. (*See* ¶ 211.) For the majority of the Class Period, Ahearn served as the Chairman of the Company, not CEO, and did not participate in earnings calls between November 2009 and October 2011. In fact, only 7.72 percent of Ahearn's stock sales occurred while he was CEO—and these occurred in the first three weeks of the 200-week class period. (Decl. ¶ 18.) That no false statements are attributed to Ahearn near the times that he was selling shares further negates any inference of scienter. *Silicon Graphics*, 183 F.3d at 988 ("stock sales do not give rise to a strong inference of deliberate recklessness" where seller "did not make any of the allegedly misleading statements"); *Vantive*, 283 F.3d at 1096.

Plaintiffs' allegation based upon Defendants' compensation fares no better. Plaintiffs suggest that the Defendants must have knowingly manipulated the cost-per-watt calculation because "defendants' compensation was directly based on reducing the cost-per-watt metric." (¶ 24.) But cost-per-watt was one of several metrics used to determine bonuses, and bonuses were only one small fraction of overall compensation, which also

---

[8] Plaintiffs allege that the timing of the sales is suspicious because the lowest price at which any Defendant sold stock was $96.74. Until August 2011, First Solar stock closed below $100 per share on two days—both near the beginning of the expansive Class Period. (Decl. ¶ 10.)

1   included base salary and long-term equity compensation.  (Decl. ¶ 19.)  In any event, "[i]f

2   simple allegations of pecuniary motive were enough to establish scienter, virtually every

3   company in the United States that experiences a downturn in stock price could be forced

4   to defend securities fraud actions."  *Zucco*, 552 F.3d at 1005.  *See also Rigel*, 2012 U.S.

5   App. LEXIS 18743, at *40.[9]

6       **C.    Viewed Holistically, Plaintiffs' Theory Of Fraud Is Neither Cogent Nor**

7       **Compelling.**

8       Plaintiffs present no explanation, much less a "cogent" and "compelling" one, for

9   how Defendants obtained clean audit opinions from PwC while misrepresenting First

10  Solar's financial statements over *a four year period*.  The absence of such an explanation

11  is "highly probative of an absence of scienter."  *In re Hansen Natural Corp. Sec. Litig.*,

12  527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007).  *See also Zucco*, 552 F.3d at 999.

13      Further, although Plaintiffs claim that the change in management that occurred

14  during the middle of the Class Period is a "strong indication" of scienter, this allegation

15  actually further undermines Plaintiffs' theory.  If Defendants Meyerhoff and Ahearn were

16  in the midst of a massive fraudulent scheme, switching the CEO and CFO would only

17  jeopardize, not advance, the scheme.  This is especially true given that neither Gillette nor

18  Widmar sold any stock during the Class Period, but instead purchased stock.

19      Plaintiffs allege that Defendants embarked on their fraud to artificially lower their

20  cost-per-watt metric.  (¶ 27.)  This makes no sense.  As discussed above, the cost-per-watt

21  metric did not include the excursion-related expenses.  Thus, the related warranty charges

22  would never have been included in the cost-per-watt metric.

23      The competing, and far more plausible, explanation is that First Solar

24  underestimated the costs that would be associated with its voluntary remediation efforts,

25  and that, when those costs became "probable" and "estimable" under appropriate

26  ───────────────

27      [9] Plaintiffs' suggestion that certain of the Individual Defendants admitted
    knowledge of the alleged fraud by signing SOX certifications has been repeatedly rejected
    by the Ninth Circuit.  *E.g., Glazer*, 549 F.3d at 747 (collecting cases).

28

1   accounting rules, the Company timely disclosed them to the market.  "The statement, 'the

2   storm is passing and it will be sunny tomorrow,' when it in fact continues to snow the next

3   day, may be bad forecasting, but it is not necessarily a lie.  Without more, it does not raise

4   a strong inference of intentional or deliberately reckless falsity or deception."  *Ronconi*,

5   253 F.3d at 433.

6   **IV.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.**

7        Plaintiffs also fail to plead loss causation, *i.e.*, the "causal connection between the

8   material misrepresentation and the loss."  *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342

9   (2005).  To plead loss causation, the FAC "must allege that the practices that the plaintiff

10  contends are fraudulent were revealed to the market and caused the resulting losses."

11  *Metzler*, 540 F.3d at 1063.  It is not sufficient merely to allege that a stock price dropped

12  following the revelation of bad news.

13       There was no disclosure of "the practices that the plaintiff contends are fraudulent"

14  here.  The information disclosed was that First Solar had increased its reserve and taken

15  additional expenses—not that First Solar had failed to follow GAAP when setting reserves

16  in earlier periods.  First Solar has never withdrawn or restated its financial statements and

17  there has never been any announcement by First Solar, PwC, the SEC, or any other source

18  suggesting that the financial statements were not prepared in accordance with GAAP.

19  Plaintiffs' allegations are, therefore, inadequate under *Metzler*.  *See also Nvidia*, 2010

20  U.S. Dist. LEXIS 114230, at *44.[10]  This is especially true here, given Plaintiffs' failure to

21  account for the "far more plausible reason[s] for the resulting drop in [First Solar's] stock

22  price—[that] the company failed to hit" expectations and the broader decline in the solar

23  industry.  *Metzler*, 540 F.3d at 1065.

24

25

26  _____

27       [10] Plaintiffs cite to analyst reports referencing the warranty and heat degradation issues.  (¶¶ 237, 239.)  These reports undermine Plaintiffs' loss causation allegations

28  because the reports also do not call into question First Solar's accounting.

sf-3189311

**V.     THE SECTION 10(b) CLAIMS AGAINST CERTAIN DEFENDANTS FAIL FOR ADDITIONAL REASONS.**

A person "makes" a statement only by actually speaking it, or by having "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). *See also Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 694 n.8 (9th Cir. 2011).

There is no allegation that Eaglesham made or had ultimate authority over the challenged statements. Thus, the claims against him should be dismissed in their entirety. *Id.* Plaintiffs also have pled no particularized facts demonstrating that Sohn had "ultimate authority" over any statements other than those signed by or specifically attributed to him. *Curry v. Hansen Med. Inc.*, No. 09-5094, 2012 U.S. Dist. LEXIS 112449, at *13 (N.D. Cal. Aug. 10, 2012). The same is true for Ahearn between October 1, 2009, and October 25, 2011, when he was not CEO.

**VI.    PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM.**

Section 20(a) allows recovery against persons who exercised control over primary violators of Section 10(b). *Zucco*, 552 F.3d at 990. Plaintiffs have failed to plead a primary violation of Section 10(b). The Section 20(a) claim thus fails. *Id.*

Plaintiffs' Section 20(a) claim fails for the additional reason that Plaintiffs do not allege any particularized facts showing that any Individual Defendant exercised actual power or control over the other Defendants or the statements that are not attributed to them. *See In re Int'l Rectifier Corp. Sec. Litig.*, No. 07-2544, 2008 U.S. Dist. LEXIS 44872, at *69 (C.D. Cal. May 23, 2008). This omission is especially glaring given that several of the Individual Defendants were at the Company only for a portion of the Class Period and/or held positions unrelated to financial reporting (*e.g.*, Chief Technology Officer).

<b>CONCLUSION</b>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the FAC without leave to amend.

17

Dated:  September 14, 2012

By: s/ Anna Erickson White

Jordan Eth
Anna Erickson White
MORRISON & FOERSTER LLP
425 Market Street, 32nd Floor
San Francisco, California 94105-2482

OSBORN MALEDON, P.A.
Maureen Beyers
2929 N. Central Ave.
Phoenix, AZ 85012

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn,
Robert J. Gillette, Mark R. Widmar,
Jens Meyerhoff, James Zhu, Bruce Sohn,
and David Eaglesham

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2012, I electronically transmitted the

attached document to the Clerk's Office using the CM/ECF System for filing and

transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/Magdalena Blackmer
Magdalena Blackmer

sf-3189311