**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated, | No. CV-12-00555-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| First Solar, Inc., et al., | |
| Defendants. | |

On August 17, 2012, Mark Smilovits filed his First Amended Complaint ("the complaint") on behalf of himself and all other persons similarly situated against Defendant First Solar, Inc. ("the company" or "First Solar") and Individual Defendants Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham (collectively "Defendants").  Doc. 93.  Defendants filed a motion to dismiss.  Doc. 102.  The motion has been fully briefed.  Docs. 109, 113. Also before the court is Plaintiff's motion to limit confidentiality agreements between First Solar and several of its employees.  Doc. 99.  That motion has also been fully briefed.  Docs. 99-101, 106-07, 112.  For the reasons that follow the court will deny Defendants' motion to dismiss and deny Plaintiff's motion to limit confidentiality agreements without prejudice to the Court's resolving the issue at the case management conference.[1]

---

[1] The request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

**I.     Background.**

Defendant First Solar designs and manufactures solar panel modules.  Plaintiff represents a class of persons who purchased or otherwise acquired the publicly traded securities of First Solar between April 30, 2008 and February 28, 2012.  Doc. 93 ¶ 1.  The Individual Defendants are a select group of officers and directors of First Solar.  *Id.*

The complaint consists of two counts.  In count one, Plaintiff alleges that Defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 by disseminating and approving false or misleading statements during the class period. Doc. 93 ¶ 254.  In count two, Plaintiff alleges that Defendants violated Section 20(b) of the same Act because they qualify as control persons and failed to exercise control to stop violations of Section 10(b).

Plaintiff claims that Defendants manipulated First Solar's cost-per-watt ("CPW") metric to artificially inflate the company's stock price.[2]   Plaintiff also alleges that Defendants concealed a known defect or "excursion" in Defendants' manufacturing process and, once the excursion became known, hid the extent of the problem.  Plaintiff also claims that Defendant concealed a known defect in the design of Defendant's solar modules that led to an increased failure rate of the modules in hot climates ("heat degradation effect").

**II.     Legal Standards.**

     **1.     Pleading Standard.**

When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  To avoid a Rule 12(b)(6) dismissal, the complaint must plead enough facts to state a claim to relief that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This plausibility standard "is not akin to a 'probability requirement,'

---

[2] Cost-per-watt is defined by Plaintiff as: (total manufacturing costs) / (total watts produced) within a given period.  Doc. 93 at 8 n.1.

1   but it asks for more than a sheer possibility that a defendant has acted unlawfully."
2   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

3        "In alleging fraud or mistake, a party must state with particularity the
4   circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To allege fraud with
5   particularity, a [claimant] . . . must set forth an explanation as to why the statement or
6   omission complained of was false or misleading."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d
7   1541, 1548 (9th Cir. 1994).

8        Securities claims must also meet the heightened pleading requirements of the
9   Private Securities Litigation Reform Act ("PSLRA").   15 U.S.C. § 78u-4(b)(1-2);
10   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007).  When plaintiffs
11   allege misleading statements or omissions, the PSLRA requires that the complaint
12   "specify each statement alleged to have been misleading" and "the reason or reasons why
13   the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs must also "state
14   with particularity facts giving rise to a strong inference that the defendant acted with the
15   required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

16        **2.**    **Elements of 10b-5 Claim.**

17        To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: "(1) a
18   material misrepresentation or omission by the defendant; (2) scienter; (3) a connection
19   between the misrepresentation or omission and the purchase or sale of a security; (4)
20   reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss
21   causation."  *Janus Capital Group, Inc.*, 131 S. Ct. 2296, 2301, n.3 (2011); *see also Dura*
22   *Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

23   **III.**   **Discussion.**

24        Defendants argue that Plaintiff's complaint must be dismissed on three grounds.
25   Doc. 102 at 5-6.  First, they argue that Plaintiff has failed to plead the falsity of any of
26   First Solar's statements.  Second, they argue that Plaintiff has not pled facts sufficient to
27   establish a cogent theory of scienter.  Third, Defendants argue that Plaintiff has not pled
28   sufficient facts to establish loss causation.  The Court will address each argument in turn.

1        **1.     False Statements.**

2        Plaintiff has alleged that Defendants made false statements with regard to First

3    Solar's CPW, warranty reserves, and revenue.  Defendants argue that Plaintiff has not

4    pled facts showing that the statements were false.

5        Plaintiff alleges that the CPW metric was central to First Solar's business plan.

6    Specifically, he cites to statements establishing that in order to survive without

7    government subsidies and compete with other solar panel producers, and eventually with

8    fossil fuels, First Solar had to "lower[] its costs to produce modules faster than it reduced

9    its selling prices."  Doc. 93 ¶ 22.  If it failed, Plaintiff alleges, First Solar's "margins

10   would erode, [and] profitability would decline."  *Id*.  Furthermore, without reducing

11   production costs, First Solar would likely default on several large contracts that were vital

12   to the company's overall performance.  *Id*.  Because of its importance, officers and

13   directors frequently represented CPW to the public as an indicator of First Solar's

14   success.  *See e.g.* Doc. 93 ¶¶ 66, 112, 119, 126, 132, 206

15       Plaintiff provides facts from a confidential witness ("CW-6") who is identified as

16   a senior member of the Internal Audit Department.  Doc. 93 ¶ 25.  CW-6 received a

17   complaint from an anonymous whistleblower who attended a meeting at which First

18   Solar's Vice President of Financial Planning and Analysis instructed attendees to "do

19   whatever is necessary" to achieve the CPW number reported publicly by First Solar's

20   management.  *Id*.  CW-6 stated that he reported the whistleblower's complaint, including

21   the events of this meeting regarding CPW manipulation, to Defendant Meyerhoff.  *Id*.

22   Plaintiff alleges that First Solar took virtually no action in response to this report, but

23   simply told the Vice President to watch what he said in meetings.  *Id*.

24       Plaintiff alleges that First Solar manipulated the D-rating of the panels it sold in an

25   attempt to increase the CPW.  *Id*. at 18-19.  The D-rating is a percentage reduction in watt

26   output assigned to each panel to account for the fact that panels do not produce watts at

27   their theoretical maximum efficiency.  *Id*.  Initially, First Solar's panels had a D-rating

28   from 12-15%, but according to another confidential witness there was "pressure from

1    defendant Meyerhoff to stop selling panels with such a large D-rating" and it was

2    eventually lowered to 6-8%. *Id*. ¶ 47. This was done despite the fact that Defendants

3    were uncovering "increasingly severe product defects." *Id.*

4              Plaintiff alleges, based on confidential witnesses and circumstantial evidence, that

5    Defendants became aware of a potential defect or "excursion" in its manufacturing

6    process that caused some panels to prematurely lose power. *Id*. ¶ 28. Plaintiff alleges

7    that Defendants learned of this problem in 2008 when customers began making

8    complaints. *Id.* Because of warranty guarantees, First Solar was obligated to address the

9    issue. *Id.* Plaintiff alleges that Defendants stated in a July 29, 2010 conference call that

10   First Solar had "identified" and "addressed" the problem by 2009 even though the

11   problem was not actually revealed to investors until July 2010. *Id.* When it was

12   revealed, Plaintiff contends that First Solar misrepresented the scope of the problem as

13   affecting only 4% of its modules. In fact, Plaintiff alleges, First Solar had known since

14   2007 that the problem would be greater, with some tests showing it would be as high as a

15   12-14% failure rate. *Id.* at ¶¶ 30-31. According to one confidential informant, First Solar

16   management instructed him or her to ignore these test results. *Id.* at ¶ 31. Plaintiff

17   alleges that the engineering staff laughed when they saw the company's had publicly

18   stated that there would be only a 4% failure rate. *Id.*

19             Moreover, until December 14, 2011, Defendants represented that the issues were

20   "dealt with" and "reflected in our financials," but several months after that last statement

21   First Solar announced an additional $163.6 million charge for product defect costs and an

22   expected $40-44 million charge for the upcoming quarter. *Id*. ¶¶ 40-41. Plaintiff

23   maintains that the degree to which these liabilities were understated and the proximity of

24   the statement to the alleged corrections provides additional evidence of concealment and

25   manipulation. *Id*.

26             Plaintiff alleges that Defendants withheld information about the excursion because

27   they wanted to delay increasing warranty costs. *Id* ¶ 27. By delaying public disclosure

28   of additional costs that would eventually be incurred, First Solar could prevent those

losses from being reflected in the CPW metric, which takes into account warranty costs only for units currently produced.  *Id.*  Thus, Defendants could give the allusion of manufacturing quality panels at ever lower prices while knowing that the CPW did not include upcoming warranty expenses for known defects.  Because of the non-disclosures and understated extent of the problem, Plaintiff alleges that Defendant's frequent statements of the CPW were misleading under the circumstances in which they were given.  *Id.* ¶¶ 62-138.

Defendants contend that Plaintiff's argument amounts to nothing more than quibbling with First Solar's statistical methodology – a tactic the Ninth Circuit rejected in *In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 877-78 (9th Cir. 2012).  They also contend that instructing the Vice President to "watch what he says at meetings" was corrective action with respect to potential CPW manipulation and that Plaintiff does not claim that the CPW and D-ratings were unreasonable or false.  Finally, they argue that Plaintiff misunderstands CPW and that the non-disclosures they allege would not have affected the metric in any event.  Doc. 113 at 7-8.

The Court concludes that Plaintiff has pled facts which, if proven, would show deliberate attempts to manipulate CPW.  Active manipulation of an important and widely reported metric is more than a mere dispute over statistical methods.  Plaintiff has identified a witness who received a complaint about a meeting where CPW manipulation was discussed and reported that complaint directly to a Defendant.  Defendants do not deny that such a meeting occurred.  Plaintiff has also quoted other witnesses who allege personal knowledge of Defendants' awareness and concealment of the manufacturing excursion.  Plaintiff has made specific allegations related to manipulation of the D-rating and explained how and why such manipulation would deceive investors.  The Court must assume these facts to be true for purposes of the motion to dismiss, and finds that Plaintiff has pled enough facts to state a claim.

Plaintiff alleges that Defendants also made false statements by holding an inadequate warranty reserve and improperly recognizing revenue.  For example, Plaintiff

1  alleges that Defendants falsely represented that the claims process related to the
2  excursion was completed and accounted for in their financials when it was not.  Doc. 93
3  ¶ 40.  Defendants again counter that Plaintiff's allegations lack specificity.

4          Defendants seek dismissal of the entire complaint, not dismissal of specific
5  allegations in the complaint.  Because there is only one count in the complaint alleging
6  violations of Section 10(b), the Court need only find that some of the claims within that
7  count are sufficiently pled to deny the motion to dismiss.  The Court finds that allegations
8  of CPW manipulation, and the related allegations discussed above, are sufficiently pled
9  false statements.

10         Plaintiff has alleged no statements by Defendant Eaglesham relating to CPW.[3]
11 The only statement in the complaint attributed to Eaglesham is a presentation given at a
12 meeting of analysts and investors on June 24, 2009.  Doc. 93 ¶ 203.  The only arguably
13 misleading portion of that statement is Eaglesham's explanation that "our track of field
14 performance and our knowledge of field performance allows us to have fairly high
15 confidence that our product is delivering in the field[.]"  *Id.*  Other facts pled could
16 demonstrate the falsity of this statement, such as allegations by CW-1 that problematic
17 performance data related to the excursion was presented to Eaglesham no later than the
18 end of 2008.  *Id.* ¶ 28.  The complaint alleges that First Solar eventually conceded that it
19 had identified the cause of the manufacturing excursion by June 2009.  *Id.*  Plaintiff has
20 pled that Eaglesham was aware of a defect or excursion in the manufacturing process
21 when he said that he and First Solar had a "fairly high level of confidence that [their]
22 product is delivering in the field."  *Id.* ¶ 203.  The statement contained no disclosure
23 regarding the excursion.  Plaintiff has pled enough facts to survive a motion to dismiss.

24     **2.     Scienter.**

25         For Rule 10b-5 claims, the Supreme Court has defined scienter as the "intent to
26 deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12
27
28         [3] Each individual Defendant, with the exception of Eaglesham, referenced CPW in public statements.  *See e.g.* Doc. 93 ¶¶ 66, 112, 119, 126, 132, 206.

(1976).  The Ninth Circuit requires that "intent to deceive" be alleged "in great detail, [by] facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  *Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  A court must first determine whether any single allegation is "sufficient to create a strong inference of scienter; [and] second, if no individual allegation is sufficient," the court must conduct "a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *N.M State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

Plaintiff bases his allegations of scienter on the testimony of the confidential witnesses, the "core operations inference," the proximity of at least one of the false statements to the updated financials reflecting the full scope of the loss, Defendants' insider stock sales during the class period, Defendants' basis for compensation, accounting irregularities, and Sarbanes-Oxley certifications.  Defendants respond that the confidential witnesses do not allege personal knowledge of Defendants' mental state, that the core operations inference does not apply, that Defendants' stock sales were not suspicious, and that the overall theory of fraud is not cogent or as compelling as the counter inference.

Plaintiff cites testimony of confidential witnesses to establish what they believe Defendants knew and when.  Plaintiff also cites Defendants' statements touting the allegedly manipulated CPW while failing to disclose either the reality of the manufacturing excursion or, at a minimum, its full extent. *See e.g.* Doc. 93 ¶¶ 66, 112, 119, 126, 132, 206.  Plaintiff similarly alleges that Defendants knew of, concealed, and downplayed the heat degradation effect.  *Id.* ¶¶ 36, 50, 58, 77, 80.  Where knowledge of the falsity of the statements is not directly tied to the testimony of a confidential witness, Plaintiff attempts to rely on the "core operations inference" that knowledge of matters

affecting the core operations of a company can be imputed to that company's high level executives. *See South Ferry LP, No. 2 v. Killinger* 542 F.3d 776, 782 (9th Cir. 2008). Because the allegedly manipulated CPW metric was so central to First Solar's business model, Plaintiff maintains that by virtue of their position in the company (in addition to other evidence) Defendants must have known about the non-disclosures that affected the stock price.

All of these things were done, claims Plaintiff, because Defendants intended to and did engage in stock sales at artificially inflated prices. Defendants counter that two defendants, Gillette and Widmar, actually purchased 11,000 shares of stock during the class period. Doc. 102 at 13. Plaintiff argues that the other five individual Defendants' sales are "suspicious because they sold nearly all of their shares and that was twice as high a percentage as their trading history, which was geared toward diversification," and those that bought stock simply "thought they could sustain the scheme longer than did others." Doc. 109 at 20. Furthermore, at least some of the trading seemed suspicious at the time it occurred, as Defendant Ahearn's sales prompted a question on a March 3, 2010 conference call about what Ahearn might know that investors did not. Doc. 93 ¶ 214. To that question, Defendant Meyerhoff responded that the timing was not good, but he "believed[d] [they] had put this behind [them]." *Id*. Plaintiff also notes that at least some of Defendants' compensation was based "directly on the cost-per-watt metric." *Id*. ¶ 24.

Defendants argue that the confidential witnesses' statements are insufficient to establish a strong inference of scienter and that the core operations inference should not apply because Plaintiff has not adequately alleged that the CPW metric was actually false. Doc 113 at 12-13. They argue that the stock sales look more drastic because of the length of the class period, that period sales were not disproportionate to pre-period sales, and that most of the stock was sold by Ahearn who served as Chairman but not as an officer for most of the class period. Doc. 102 at 17-18. With respect to compensation, Defendants contend that CPW was only a small part of the formula for determining

1  bonuses and bonuses were a small part of Defendants' compensation. *Id*. at 18-19. In
2  sum, Defendants argue that the counter inference that First Solar innocently
3  underestimated costs associated with its remediation efforts is more compelling that
4  Plaintiff's inference that information was deliberately withheld or distorted to inflate
5  stock prices. *Id*. at 19-20.

6      The Court finds that Plaintiff has pled enough specific facts to create an inference
7  of scienter "at least as compelling as any counter inference." *Tellabs*, 551 U.S. at 324.
8  While Defendants dispute the veracity of many of the allegations, factual disputes about
9  specific, plausible allegations are not sufficient to dismiss a claim. Factual allegations
10  and their reasonable inferences are accepted as true at the motion to dismiss stage.
11  Additionally, the Court need not decide the applicability of the "core operations
12  inference" because the testimony of the confidential witnesses, allegations regarding
13  Defendants' stock sales and compensation plans, and other circumstantial evidence is
14  sufficiently detailed to allege scienter for the single 10(b) count in the complaint.

15      **3.      Loss Causation.**

16      Defendants argue that Plaintiff has not alleged loss causation because the stock
17  price went down as a result of the revelation of "bad news" rather than the revelation of
18  fraud. Doc. 102 at 20. Plaintiff argues that the precipitous drop in First Solar's stock
19  price was the direct result of revelations about the extent of the remediation costs
20  Defendants had concealed for years – in other words, that Defendants' fraudulent
21  concealment of true remediation costs ultimately caused the very losses suffered by
22  Plaintiff and the class. Doc. 93 ¶¶ 224, 227, 229, 230, 234. These allegations sufficiently
23  plead that Defendants' fraud caused the loss. *See In re Daou Sys., Inc.*, 411 F.3d 1006,
24  1026 (9th Cir. 2005) (holding that stock prices that dropped because of poor financial
25  statements were causally related to fraudulent accounting practices that allegedly inflated
26  earnings in previous financial statements). Plaintiff has pled loss causation.

27      **4.      Section 20(a) Claim.**

28      Section 20(a) allows for liability of control persons when someone within their

- 10 -

control violates another section of the Exchange Act.  Defendants move to dismiss the Section 20(a) claim because, they allege, Plaintiff has failed to plead a primary violation of Section 10(b).  They also claim that Plaintiff has not adequately pled facts showing that Defendants had control over the statements not directly attributed to them.

As explained above, Plaintiff has adequately pled a violation of Section 10(b).  Plaintiff has also pled that Defendants were high ranking executives at First Solar and that they often spoke on the company's behalf.  Plaintiff has provided detailed allegations of Defendants' involvement in the decision making processes that led to the allegedly fraudulent behavior.  At this stage in the litigation, these allegations are sufficient.  *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (quoting *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987)) ("day-to-day oversight of company operations and involvement in the financial statements at issue were sufficient to presume control over the transactions giving rise to the alleged securities violation"); *In re Adaptive broadband Sec. Litig.*, No. C 01-1092-SC  2002 WL (989478 (N.D. Cal. Apr. 2, 2002) ("The Court finds that the allegations that the Individual Defendants held the highest offices in the corporation, spoke frequently on its behalf, and made key decisions in how to present its financial results are sufficient to survive Defendants'' contention that the complaint lacks specificity as to control person liability.").

**IV.    Motion to Limit Confidentiality Agreements.**

After filing the complaint in this case, Plaintiff began attempts to interview former employees of First Solar to gather information related the CPW metric, defects and shortcomings in First Solar modules, and First Solar's accounting practices.  Doc 100 at 5.  Plaintiff learned from several former employees that First Solar had sent a letter to former employees advising that they may be contacted by "lawyers interested in suing First solar" who "may not identify themselves or their clients when they call and . . . may even leave the impression they are acting on behalf of First Solar, its shareholders of the government."  Doc. 101-1 at 2.  The letter asked the recipient to contact First Solar's in-house counsel if they were contacted and told them to "feel free" to contact in-house

counsel if they had any questions.  *Id*.  The letter also reminded the recipients that they were not obligated to speak to lawyers and that they were bound by the terms of a confidentiality agreement which prevented them from "disclos[ing] any confidential, proprietary, trade secret or privileged information regarding First Solar."  *Id.*  Finally, the letter warned that "even innocuous comments or ones you think may help First Solar can be taken out of context and used against First Solar."  *Id.*

Plaintiff found that some former employees were reluctant to provide information because they worried about violating the terms of their confidentiality agreements. Because of the employees' fear, Plaintiff asked First Solar to clarify the extent of the confidentiality agreements and permit former employees to talk about CPW, module defects, and accounting practices.  Doc. 100 at 6.  Plaintiff offered to stipulate to a protective order to ensure that such information did not become public.  *Id.*  When Defendants refused, Plaintiff filed this motion for an order limiting the confidentiality agreements.  *Id.*

Plaintiff contends that the agreements define "Confidential Information" more broadly "than what would be necessary to serve legitimate purposes, such as to protect trade secrets, forecasts, customer lists, technological developments, or any other sensitive aspect of First Solar's business."  Doc. 100 at 10.  Plaintiff argues that the enforcement of First Solar's confidentiality agreements to prevent former employees from disclosing information relating to violations of securities laws is against public policy.  *Id*. at 12-18.

In *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002), a district court considering similar confidentiality agreements held that "[t]o the extent that those agreements preclude former employees from assisting in investigations of wrongdoing that have nothing to do with trade secrets or other confidential business information, they conflict with the public policy in favor of allowing even current employees to assist in securities fraud investigations."  *Id.* at 1137.  In this case, Plaintiff seeks to ask former employees of First Solar questions about subjects related to alleged violations of securities laws.

1    Defendants make three arguments in response to Plaintiff's motion.

2    First, citing *Kuriakose v. Federal Home Loan Mortgage Co.*, 674 F. Supp. 2d 483,

3    491 (S.D.N.Y. 2009), Defendants argue that Plaintiff lacks standing to challenge the

4    confidentiality agreements between First Solar and its former employees.  *Id.* at 492.

5    *Kuriakose* explained that a federal court's jurisdiction is constitutionally limited to "cases

6    and controversies" and that the standing doctrine "serves to identify those disputes which

7    are appropriately resolved through the judicial process."  *Id.* (quoting *Whitmore v.*

8    *Arkansas*, 495 U.S. 149 (1990)).  Thus, "the party invoking federal jurisdiction bears the

9    burden of satisfying" the three elements of standing set forth in *Lujan v. Defenders of*

10   *Wildlife*, 504 U.S. 555, 560 (1992).  *Id.*

11   Although the *Kuriakose* court's statement of standing law is accurate, the Court

12   cannot agree that it applies separately to Plaintiff's challenge to the confidentiality

13   agreements.  Plaintiff has satisfied the standing requirement of Article III by alleging that

14   he has been injured by the securities fraud of Defendants.  That allegation satisfies the

15   *Lujan* requirements of (1) injury in fact, (2) caused by Defendants, (3) that is likely to be

16   redressed by a favorable decision in this case.  *Id.*  The Court is aware of no law that

17   requires a plaintiff who has established such standing to show standing a second time

18   when disagreements arise in the litigation.  Standing applies to a case or controversy –

19   here, Plaintiff's securities fraud case.  Standing is not subdivided into separate hurdles

20   that must be cleared with respect to each succeeding issue that arises in the process of

21   resolving the case or controversy.  Thus, standing is no bar to Plaintiff's challenge to the

22   confidentiality agreements.   Although it is true that Plaintiff is not a party to the

23   confidentiality agreements, he alleges that those agreements are blocking access to

24   relevant information.  The Court views this as no different than any other instance where

25   one party claims that the other party is blocking access to relevant information.

26   Second, Defendants contend that Plaintiff's request violates Arizona Rule of

27   Professional Conduct 4.2, which prohibits a lawyer from communicating about the

28   subject of the representation with a person the lawyer knows to be represented by another

lawyer, unless the other lawyer has consented or the communication is authorized by law. But the confidentiality agreements are not based on Rule 4.2. They were not entered to regulate the ethics of lawyer conduct. Plaintiff's counsel will be obligated to abide by Rule 4.2 even if the agreements are modified. The rule therefore does not provide a basis for denying Plaintiff's request for modification.

Defendants likewise argue that *Lang v. Superior Court*, 826 P.2d 1228 (Ariz. Ct. App. 1992), prohibits ex parte communications with former employees whose acts or omissions gave rise to the litigation. *Lang* has been the law in Arizona for many years, and Plaintiff's counsel are obligated to abide by it. But the rule in *Lang*, like Rule 4.2, does not provide a basis for declining to modify the confidentiality agreements. The agreements are not based on *Lang*. If the agreements are overbroad and against public policy, they should not stand as a bar to Plaintiff's obtaining relevant information. The fact that other ethical rules might limit the information Plaintiff can obtain through ex parte communications does not mean that overbroad confidentiality agreements should remain in place. The *Lang* argument provides no basis for declining Plaintiff's request.

Third, Defendants argue that their confidentiality agreement does not violate public policy. They assert that cases brought under the Reform Act are often dismissed at the pleading stage. Defendants cite several cases in which courts have discounted the testimony of confidential witnesses and dismissed complaints for failure to state a claim. Doc. 106 at 13-14; *see e.g. Higgenbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). For reasons stated above, however, the Court has declined Defendants' request to dismiss this action, and these cases do not address whether public policy favors or disfavors broad confidentiality agreements.

Defendants argue that the First Solar agreements protect legitimately confidential information and should not be limited. Specifically, they claim that Plaintiff has failed to show how "First Solar's wattage rating and details about First Solar's manufacturing process is not properly protected confidential information." Doc. 106 at 15-16. Plaintiff

1    agrees that confidentiality agreements may be enforceable with respect to confidential

2    information, but argues that the First Solar agreements prevent the disclosure of more

3    than just confidential information.  Doc. 112 at 10 (quoting *Static Control Components,*

4    *Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 549 (M.D.N.C. 2002)).

5        The Court concludes that it does not presently possess sufficient information to

6    enter an order on this issue.  On one hand, cases such as *JDS Uniphase* and *Chambers v.*

7    *Capital Cities/ABC*, 159 F.R.D. 441, 444 (S.D.N.Y. 1995), hold that there is a clear

8    public policy in favor of current and former employees voluntarily participating in

9    investigations of federal law violations.  *JDS Uniphase*, 238 F. Supp. 2d at 1137 ("To the

10    extent that those agreements preclude former employees from assisting in investigations

11    of wrongdoing that have nothing to do with trade secrets or other confidential business

12    information, they conflict with the public policy in favor of allowing even current

13    employees to assist in securities fraud investigations."); *Chambers*, 159 F.R.D. at 444

14    ("in some circumstances, agreements obtained by employers requiring employees to

15    remain silent about underlying events leading up to dispute, or concerning potentially

16    illegal practices when approached by others can be harmful to the public's ability rein in

17    improper behavior. . . Absent possible extraordinary circumstances not present here, it is

18    against public policy for parties to agree not to reveal, at least in the limited contexts of

19    depositions or pre-depositions interviews concerning litigation arising under federal law,

20    facts relating to alleged or potential violations of such law.").

21        On the other hand, it is distinctly possible that free and unfettered inquiry into the

22    broad subjects identified by Plaintiff – CPW, module defects, and accounting practices –

23    could result in the disclosure of genuinely confidential and proprietary information.  The

24    Court cannot conclude that these subjects are so free of confidential information that the

25    agreements should be modified to simply exclude them.

26        To resolve this issue, the Court will require further briefing and a hearing.  With

27    the motion to dismiss denied, the Court will schedule a case management conference for

28    **January 30, 2013 at 4:00 p.m.**  At least ten days before that conference, the parties shall

provide the Court with memoranda not to exceed ten pages.

Plaintiff's memorandum shall describe in more detail the employees he wishes to interview and the subjects he wishes to cover, and shall provide a proposal for how those inquiries can be made without compromising First Solar's legitimate interest in protecting confidential and proprietary information.  Plaintiff may provide a proposed protective order that would help accomplish this purpose.

First Solar shall provide more information, under seal if necessary, concerning the kinds of proprietary and confidential information that may be revealed if Plaintiff is permitted to inquire into the subjects he has identified.  First Solar shall provide a proposal for how that information can be protected while allowing Plaintiff to pursue the public policy of investigating alleged securities fraud.  First Solar may also propose a protective order that would help protect its interests.

The Court will review these memoranda and discuss them with the parties at the case management conference, after which it will enter an order resolving this issue. Plaintiff's motion for modification of the former employee confidentiality agreements will be denied without prejudice to the Court's resolving this issue at the case management conference.

**IT IS ORDERED:**

1.      Defendants' motion to dismiss (Doc. 102) is **denied.**

2.      Plaintiffs' motion to limit confidentiality agreements (Doc. 99) is **denied** without prejudice to the Court's resolving this issue at the case management conference.

3.      The Court will hold a case management conference on **January 30, 2013 at 4:00 p.m.**, and will issue a separate order regarding the case management issues to be discussed at the conference.

Dated this 17th day of December, 2012.

_David G. Campbell_

_____
David G. Campbell
United States District Judge

- 16 -