# EXHIBIT A

James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Maureen Beyers, Arizona Attorney No. 017134
Joseph N. Roth, Arizona Attorney No. 025725
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000
MBeyers@omlaw.com
JRoth@omlaw.com

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, Individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>Defendants. | Case No.    CV12-00555-PHX-DGC<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' RESPONSE TO LEAD PLAINTIFF MINEWORKERS' PENSION SCHEME'S SECOND SET OF INTERROGATORIES** |

DEFENDANTS RESPONSE TO MINEWORKERS' 2ND SET OF INTERROGATORIES
Case No. CV12-00555-PHX-DGC
sf-3503993

PROPOUNDING PARTIES:     Lead Plaintiff Mineworkers' Pension Scheme

RESPONDING PARTIES:     Defendants First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham

SET NUMBER:     Two

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendants First Solar, Inc. ("First Solar"), Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham respond to Lead Plaintiff Mineworkers' Pension Scheme's Second Set of Interrogatories to Defendant First Solar, Inc. and the Individual Defendants, dated January 27, 2015, as follows:

**GENERAL OBJECTIONS**

1.      Defendants Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham (the "Individual Defendants") object to the extent Lead Plaintiff's interrogatories purport to have the Individual Defendants state facts known to, or identify documents that are in the possession, custody, or control of First Solar.  The Individual Defendants further object to the extent the interrogatories seek a response from the Individual Defendants about charges, estimates, and calculations made by First Solar.  Based on these objections, except as expressly stated in response to a particular interrogatory, the Individual Defendants will not respond to individual interrogatories, and the responses below are provided solely by First Solar.

2.      Defendants object to Instruction Nos. 1 and 3 to the extent that they conflict with, or purport to expand Defendants' discovery obligations beyond those imposed by, the Federal Rules of Civil Procedure and the Local Rules of this Court.

3.      Defendants object to Instruction No. 4 to the extent it purports to require information beyond what is required by Rule 26(b)(5) of the Federal Rules of Civil Procedure or any other applicable rule, law, or regulation.

4.    Defendants object to Definition No. 3 ("First Solar") as overbroad. Defendants interpret "First Solar" to mean First Solar and its current officers, directors, and employees.

5.    Defendants object to Definition No. 4 ("Identify" or "identifying") on the grounds that it is vague and ambiguous, as well as overly broad and unduly burdensome.

6.    Defendants object to Definition No. 6 ("Manufacturing Excursion") as vague and ambiguous.  In responding to Lead Plaintiff's interrogatories (and consistent with the statements in First Solar's Form 10-Q filed with the SEC on or about August 2, 2010), Defendants understand the term "Manufacturing Excursion" to refer to the manufacturing issue that occurred during the period from June 2008 to June 2009 and resulted in possible premature power loss in affected modules.

7.    Defendants object to Definition No. 8 ("You" and "your") as vague and ambiguous, in that it fails to distinguish between the different defendants, their actions, their states of mind, the information known to them, and/or the information reasonably available to them.

8.    Defendants object to each interrogatory to the extent a response would require Defendants to violate applicable German or European Union privacy law.

9.    Defendants object to each interrogatory to the extent it seeks information that is protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege, rule, or duty of confidentiality that precludes or limits the production or disclosure of privileged or confidential information.  Any disclosure of privileged information is inadvertent and shall not operate as a waiver.

10.    Defendants (including their expert witnesses) have not completed their review of the facts of this case or their preparation for trial.  Any response is based on information currently known to the responding defendant or defendants, and the responding defendant or defendants reserve the right to supplement, modify, and amend these responses and assert additional objections should they discover additional facts, documents, or other evidence at a later time.  The responding defendant or defendants

further reserve the right to make use of any subsequently discovered facts, documents, or other evidence at any hearing or at trial.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 3:

Identify all facts supporting each of the affirmative defenses in your Answer.

### RESPONSE TO INTERROGATORY NO. 3:

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, including its use of the phrase "[i]dentify all facts."  Defendants object to this interrogatory to the extent that it calls for legal conclusions.  Defendants further object on the ground that, with the exception of the Lead Plaintiffs, discovery has not taken place with respect to individual class members, and it would be premature to require Defendants to identify facts that support defenses with respect to the claims of absent class members.  In addition, Defendants have yet to decide which affirmative defenses they will present at trial, and on that basis Defendants object that this interrogatory is premature.

Subject to and without waiving any of its objections, Defendants (including First Solar and the Individual Defendants) respond as follows:

First Affirmative Defense:  Reliance on Others

Reliance on others could negate one or more essential elements of the plaintiffs' claims, including but not limited to scienter, but does not form a separate affirmative defense as to which defendants will bear the burden of proof at trial.  To the extent that reliance on others may be construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Second Affirmative Defense:  Intervening or Superseding Acts of Third Parties

Plaintiffs bear the burden of proving the elements of causation, reliance and damages.  Intervening or superseding acts of third parties do not form a separate affirmative defense, but could negate the elements of the plaintiffs' claims, including but

not limited to causation, damages and reliance.  To the extent that the intervening or superseding acts of third parties are construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Third Affirmative Defense:  Publically Available Information

Plaintiffs bear the burden of proving the elements of materiality, reliance, causation and damages.  While publically available information does not form a separate affirmative defense, evidence of publicly available information could rebut proof of some elements of the plaintiffs' claims, including but not limited to materiality, reliance, causation and damages.  To the extent that publically available information is construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Fourth Affirmative Defense:  Lack of Justifiable Reliance

Plaintiffs bear the burden of proving the element of reliance.  While lack of justifiable reliance does not form a separate affirmative defense, evidence of lack of justifiable reliance could rebut plaintiffs' proof of reliance.  To the extent that lack of justifiable reliance is construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Fifth Affirmative Defense:  Right to Rebut Presumption of Reliance

Plaintiffs bear the burden of proving the element of reliance.  Defendants' right to rebut the presumption of reliance does not form an affirmative defense.  Defendants reserve the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Sixth Affirmative Defense:  Assumption of Risk

Defendants asserted this affirmative defense to preserve their rights should the evidence establish that the named plaintiffs or any absent members of the class are barred,

in whole or in part, by the doctrine of assumption of risk.  Defendants are currently not aware of facts supporting an assumption of risk defense as to the named plaintiffs. Defendants have not had the opportunity to conduct discovery as to absent class members, and are currently unaware of facts supporting an assumption of risk defense as to absent class members.  Without claiming or undertaking any obligation to do so, Defendants reserve the right to amend this response in the event that they discover facts that support an assumption of risk defense as to one or more individual class members and/or to present such evidence at trial.

Seventh Affirmative Defense:  Other Factors Affecting Market Price

Plaintiffs bear the burden of proving the elements of causation and damages. While other factors affecting market price do not form an affirmative defense, evidence of such other factors could rebut plaintiffs' proof of causation, damages and reliance.  To the extent that other factors affecting market price are construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Eighth Affirmative Defense:  Failure to Mitigate Damages

Defendants asserted this affirmative defense to preserve their rights should the evidence establish that the named plaintiffs or any absent members of the class are barred, in whole or in part, by the doctrine of mitigation of damages.  Defendants are not currently aware of facts supporting a failure to mitigate damages defense as to the named plaintiffs.  Defendants have not had the opportunity to conduct discovery as to absent class members, and are currently unaware of facts supporting a failure to mitigate damages defense as to absent class members.  Without claiming or undertaking any obligation to do so, Defendants reserve the right to amend this response in the event that they discover facts that support a failure to mitigate damages defense as to one or more individual class members and/or to present such evidence at trial.

Ninth Affirmative Defense:  Proportional Allocation of Fault

This defense is based on the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA") that relate to proportional liability, 15 U.S.C. § 78u-4(f)(2)(B). Because no liability has been found and no award has been entered against any Defendant, Defendants state that it is premature to require Defendants to state facts supporting this defense.  Without claiming or undertaking any obligation to do so, Defendants reserve the right to present facts related to apportionment in the event that a finding of liability is entered.

Tenth Affirmative Defense:  Speculative Damages

Plaintiffs bear the burden of proving the element of damages.  While the speculative nature of the plaintiffs' alleged damages does not form an affirmative defense, evidence of the speculative nature of plaintiffs' alleged damages could rebut plaintiffs' proof of damages.  To the extent the speculative nature of plaintiffs' alleged damages is construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Eleventh Affirmative Defense:  Safe Harbor

This defense is based upon the "Safe Harbor" provisions of the PSLRA, codified in relevant part at 15 U.S.C. § 78u-4 *et seq.*, which protect forward-looking statements such as many of the alleged misstatements and omissions identified in the plaintiffs' Complaint.  Plaintiffs bear the burden of overcoming the Safe Harbor provisions of the PSLRA in order to establish the elements of their claims at trial, including but not limited to materiality, reliance, and falsity.  While the Safe Harbor provisions of the PSLRA do not form an affirmative defense and do not impose a burden on Defendants, Defendants reserve the right to rebut any evidence presented by the plaintiffs at trial in an attempt to avoid the "Safe Harbor" provisions of the PSLRA.

In an abundance of caution, should any of the Safe Harbor provisions of the PSLRA be deemed to create an affirmative defense for which the Defendants bear the

primary burden, Defendants state that such a defense will be based on forward-looking and cautionary language referenced in, incorporated by, or appearing on the face of the documents or statements that the plaintiffs allege to contain false or misleading statements or omissions.

Twelfth Affirmative Defense:  Bespeaks Caution

This defense is based upon the "bespeaks caution" doctrine, which protects forward-looking statements such as many of the alleged misstatements and omissions identified in the plaintiffs' Complaint.  Plaintiffs bear the burden of overcoming the "bespeaks caution" doctrine in order to establish the elements of their claims at trial, including but not limited to materiality, reliance, and falsity.  While the "bespeaks caution" doctrine does not constitute an affirmative defense and does not impose a burden on Defendants, Defendants reserve the right to rebut any evidence presented by the plaintiffs at trial in an attempt to avoid the "bespeaks caution" doctrine.

In an abundance of caution, should the  "bespeaks caution" doctrine be deemed to create an affirmative defense for which the Defendants bear the primary burden, Defendants state that such a defense will be based on forward-looking and cautionary language referenced in, incorporated by, or appearing on the face of the documents or statements that the plaintiffs allege to contain false or misleading statements or omissions.

Thirteenth Affirmative Defense:  Materiality

Plaintiffs bear the burden of proving the element of materiality.  While the immaterial nature of the alleged false or misleading statements or omissions does not form an affirmative defense, evidence of the immaterial nature of all the challenged statements or omissions could rebut plaintiffs' proof of materiality.  To the extent that materiality is construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Fourteenth Affirmative Defense:  No Breach of Duty

Plaintiffs bear the burden of proving a breach of duty.  While the absence of a breach of duty does not form an affirmative defense, evidence that there was no such breach could rebut plaintiffs' proof as to other elements of their claims.  To the extent that no breach of duty is construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Fifteenth Affirmative Defense:  Statute of Limitations

Defendants asserted this affirmative defense to preserve their rights should the evidence establish that the named plaintiffs or any absent members of the class are barred, in whole or in part, by the applicable statute of limitations.  Defendants are not currently aware of facts supporting a statute of limitations defense as to the named plaintiffs.  Defendants have not had the opportunity to conduct discovery as to absent class members, and are currently unaware of facts supporting a statute of limitations defense as to absent class members.  Without claiming or undertaking any obligation to do so, Defendants reserve the right to amend this response in the event that they discover facts that support a statute of limitations defense as to one or more individual class members and/or to present such evidence at trial.

Sixteenth Affirmative Defense:  Lack of Impact on Market Price

Plaintiffs bear the burden of proving the elements of materiality, reliance, causation, and damages.  While the lack of impact on market price does not constitute an affirmative defense, evidence of a lack of impact on market price could rebut elements of the plaintiffs' claims, including but not limited to materiality, reliance, causation, and damages.  To the extent that the lack of impact on market price is construed as an affirmative defense, Defendants withdraw this defense, while reserving the right to rebut any evidence presented by the plaintiffs at trial in an attempt to establish the elements of the plaintiffs' claims.

Seventeenth Affirmative Defense:  Good Faith Under Section 20(a)

At all times, Defendants acted in good faith to comply with the securities laws. Defendants did not directly or indirectly induce or attempt to induce, encourage, or sanction any violations of the securities laws or other attempt to mislead or deceive investors in any way.   None of the Defendants had any knowledge of any violation of the securities laws, and none of Defendants believe that any statement made during the Class Period was materially misleading or deceptive in any way.  Each Defendant believed there to be—and actively sought to support—a robust and reliable process for gathering and providing accurate information about First Solar's business to the investing public.

Defendants reasonably believed that First Solar's business was conducted in an honest and competent manner.  That belief was based, among other things, on the competence, skill, and success of  First Solar's management team—including TK Kallenbach, Mike Koralewski, and other experienced professionals with backgrounds in engineering, finance, sales, operations and accounting, who successfully developed and oversaw business operations around the globe, established manufacturing systems with thousands of employees, and confronted, resolved, and managed complicated technological, logistical, and financial issues of various sorts.  Defendants regularly interacted with First Solar's team of executives, managers, accountants and operational personnel, and believed them to be knowledgeable, skilled, reliable, and trustworthy. Based on that experience, Defendants believed, in good faith, that the reports that they received about First Solar's operations and results were accurate.

First Solar's management team facilitated Defendants' own investigation of issues that arose during the Class Period.  Defendants sought out and relied on information from the persons described in this interrogatory response in performing their responsibilities during the Class Period, which provided them with reasonable grounds to believe that the statements challenged in this action were true and accurate at the time they were made. Sources of information that supported the Defendants' belief in the accuracy of these statements included the Defendants' own knowledge or judgment as informed by their

experience before joining and while working at First Solar. Defendants' belief in the accuracy of the statements now being challenged in this case was further supported by communications with others, including First Solar's officers and employees; First Solar's external auditors and accountants; customers; suppliers; vendors; government officials; industry analysts; stock analysts; and other market participants.

Defendants relied on personnel employed by First Solar with expertise in accounting, finance, disclosure, investor relations, engineering, technology, quality control, customer relations, government relations, logistics and reverse logistics, internal controls, and statistical modeling and analysis to gather, analyze, and verify the accuracy of the information that was disclosed to investors. Individuals from diverse fields were responsible for gathering, analyzing, verifying, and reporting the information that related to First Solar's day-to-day operations as well as its periodic figures and benchmarks. This included information concerning the LPM excursion and remediation, the hot climate issue, warranty accruals, revenue recognition, calculation and verification of Cost per Watt ("CpW"), and compliance with U.S. Generally Accepted Accounting Principles ("GAAP"). The results of these efforts were communicated to Defendants and others within the Company through various oral and written reports, presentations, forecasts, and budgets.

Defendants also relied on reviews, analyses, audits and reports by First Solar's independent auditors at PricewaterhouseCoopers ("PwC"), who examined First Solar's financial statements, internal controls and business operations. PwC reviewed and/or audited information related to First Solar's recognition of revenue, its accounting for warranty reserves, its LPM special reserve, its reported CpW, and the effectiveness of internal controls designed to ensure and verify the accuracy of First Solar's financial statements. Defendants understand that PwC had unfettered access to all First Solar personnel and to all systems that were necessary to conduct its work. Defendants cooperated fully with PwC in an open, transparent environment. Defendants understand that other First Solar personnel did the same. For each quarter and year of the Class

Period, PwC concluded that First Solar's financial statements were fairly stated and in conformity with GAAP, and that First Solar's internal controls were effective.

Defendants also relied on a disclosure process that was designed to prevent any materially misleading statements from being made. Cross-functional teams of subject matter experts gathered, analyzed, and verified the accuracy and materiality of information, including the information that was reported to investors in periodic SEC filings, quarterly earnings releases, and earnings call scripts, which were prepared, reviewed, and tied-out by the staff in the SEC Reporting Group at First Solar in collaboration and consultation with various individuals and groups within the Company.

As part of this disclosure process, all quarterly and annual SEC filings on Forms 10-Q and 10-K were vetted by a Disclosure Committee, which met at least three times per quarter. The Disclosure Committee consisted of top executives, department heads, and other subject matter experts. During the meetings, the Disclosure Committee would review, analyze, and comment on drafts of the SEC filings, bearing in mind various developments in First Solar's business during a given quarter. The Disclosure Committee provided an opportunity for a cross-functional group of knowledgeable and experienced executives and employees to raise any questions or concerns about the information disclosed in, or the accuracy of, First Solar's SEC filings.

Defendants also relied on a robust and verified system of internal controls that were designed to detect and prevent inaccuracy and fraudulent activity. Both First Solar's Internal Audit Department and PwC reviewed, tested, and confirmed the effectiveness of First Solar's internal controls on a regular basis. Both Internal Audit and PwC prepared reports that verified that these controls were operating effectively. By way of example, one of First Solar's internal controls required that all personnel involved in the preparation of external disclosures, or with knowledge of information relevant to the disclosures, were required to execute a sub-certification. This sub-certification affirmed that he or she was not aware of conditions that would constitute a violation of GAAP, or that would result in the disclosures being inaccurate or misleading in any way. During the Class Period, First

Solar never filed a 10-K or 10-Q with the SEC until it had received 100% feedback on all sub-certifications and cleared any material disagreements.  Throughout the Class Period, this and other verified systems of internal control did not detect any fraud.

Eighteenth Affirmative Defense:  Lack of Culpable Participation

Defendants state that this is a reformulation of the affirmative defense of "good faith," and incorporate by reference the facts set forth in support of the "good faith" defense.

Nineteenth Affirmative Defense:  Release

Defendants asserted this affirmative defense to preserve their rights should the evidence establish that the named plaintiffs or any absent members of the class released, settled, and/or entered into an accord and satisfaction of, or otherwise compromised their claims against Defendants.  Defendants are not currently aware of facts supporting a release defense as to the named plaintiffs.  Defendants have not had the opportunity to conduct discovery as to absent class members, and are currently unaware of facts supporting a release defense as to absent class members.  Without claiming or undertaking any obligation to do so, Defendants reserve the right to amend this response and reassert this defense in the event that they discover facts that support a release defense as to one or more individual class members and/or to present such evidence at trial.

Twentieth Affirmative Defense:  Res Judicata

Defendants asserted this affirmative defense to preserve their rights should the evidence establish that the named plaintiffs or any absent members of the class are barred, in whole or in part, by the doctrines of res judicata, collateral estoppel, claim preclusion and/or issue preclusion.  Defendants are not currently aware of facts supporting this defense as to the named plaintiffs.  Defendants have not had the opportunity to conduct discovery as to absent class members, and are currently unaware of facts supporting a res judicata defense as to absent class members.  Without claiming or undertaking any obligation to do so, Defendants reserve the right to amend this response and reassert this

defense in the event that they discover facts that support a res judicata defense as to one or more individual class members and/or to present such evidence at trial.

**INTERROGATORY NO. 4:**

Identify the total number of modules returned as part of the LPM remediation process.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "LPM remediation process" and "returned."  Defendants further object to this interrogatory as overbroad and unduly burdensome to the extent it seeks information for modules returned as part of the LPM process after 2011, and/or other information that is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving any of its objections, First Solar responds as follows:  the number of modules returned as part of the LPM remediation process through the end of the fourth quarter of 2011 was 1,121,405.

**INTERROGATORY NO. 5:**

Identify the total number of Refurbished Modules sold by you.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendants incorporate by reference each General Objection.  Defendants also object to this interrogatory because it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar responds as follows:  407,700.

**INTERROGATORY NO. 6:**

For Interrogatory No. 5, identify the following information: (a) the date of the sale; (b) the name of the customer; (c) the dollar amount of the sale; (d) the number and labeled wattage of modules sold; and (e) the total number of watts sold.

**RESPONSE TO INTERROGATORY NO. 6:**

Defendants incorporate by reference each General Objection and their objections to Interrogatory No. 5. Defendants further object to this interrogatory on the grounds that it is vague and ambiguous, including but not limited to its failure to specify a subject and its use of the phrases "the sale," "the customer,' "modules sold" and "watts sold." To the extent that this interrogatory seeks information about each refurbished module that First Solar has ever sold, Defendants object on the grounds that it is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving any of its objections, First Solar responds as follows:

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 10/4/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 10/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1250 | 62.5 | 78.1250 | 57031.25 | 10/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/12/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/14/2010 |
| First Solar Development (Canada) for Tilbury Solar | 950 | 67.5 | 64.1250 | 46811.25 | 10/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 200 | 67.5 | 13.5000 | 9855.00 | 10/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 70.0 | 105.0000 | 76650.00 | 10/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 800 | 70.0 | 56.0000 | 40880.00 | 10/14/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/4/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/4/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/4/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/4/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/4/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 72.5 | 108.7500 | 79387.50 | 10/12/2010 |
| First Solar Development (Canada) for Tilbury Solar | 700 | 72.5 | 50.7500 | 37047.50 | 10/14/2010 |
| First Solar Development (Canada) for Tilbury Solar | 50 | 75.0 | 3.7500 | 2737.50 | 10/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 600 | 70.0 | 42.0000 | 30660.00 | 10/21/2010 |
| First Solar Development (Canada) for Tilbury Solar | 550 | 67.5 | 37.1250 | 27101.25 | 10/21/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 10/7/2010 |
| First Solar Development (Canada) for Tilbury Solar | 200 | 65.0 | 13.0000 | 9490.00 | 9/30/2010 |
| First Solar Development (Canada) | 350 | 65.0 | 22.7500 | 16607.50 | 10/21/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| for Tilbury Solar | | | | | |
| First Solar Development (Canada) for Tilbury Solar | 500 | 65.0 | 32.5000 | 23725.00 | 10/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/18/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/21/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/21/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/21/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/22/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/25/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/26/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/26/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/27/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 10/27/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/28/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/29/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/29/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/29/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/29/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 10/29/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/2/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/3/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/3/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/4/2010 |
| First Solar Development (Canada) for Tilbury Solar | 350 | 65.0 | 22.7500 | 16607.50 | 11/3/2010 |
| First Solar Development (Canada) for Tilbury Solar | 50 | 67.5 | 3.3750 | 2463.75 | 11/3/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 65.0 | 97.5000 | 71175.00 | 11/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/5/2010 |
| First Solar Development (Canada) for Tilbury Solar | 500 | 65.0 | 32.5000 | 23725.00 | 11/8/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1000 | 67.5 | 67.5000 | 49275.00 | 11/8/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/8/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 67.5 | 101.2500 | 73912.50 | 11/9/2010 |
| First Solar Development (Canada) for Tilbury Solar | 600 | 67.5 | 40.5000 | 29565.00 | 11/12/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 11/10/2010 |
| First Solar Development (Canada) for Tilbury Solar | 450 | 65.0 | 29.2500 | 21352.50 | 11/10/2010 |
| First Solar Development (Canada) | 700 | 62.5 | 43.7500 | 31937.50 | 11/10/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| for Tilbury Solar | | | | | |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 11/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 11/11/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 11/12/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 62.5 | 93.7500 | 68437.50 | 11/12/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 70.0 | 105.0000 | 76650.00 | 11/12/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 70.0 | 105.0000 | 76650.00 | 11/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 800 | 70.0 | 56.0000 | 40880.00 | 11/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 200 | 72.5 | 14.5000 | 10585.00 | 11/15/2010 |
| First Solar Development (Canada) for Tilbury Solar | 1500 | 60.0 | 90.0000 | 65700.00 | 11/22/2010 |
| First Solar Development (Canada) for Tilbury Solar | 450 | 60.0 | 27.0000 | 19710.00 | 11/22/2010 |
| BELECTRIC Trading GmbH | 1800 | 65.0 | 117.0000 | 128700.00 | 9/8/2010 |
| BELECTRIC Trading GmbH | 800 | 65.0 | 52.0000 | 57200.00 | 9/10/2010 |
| BELECTRIC Trading GmbH | 1000 | 65.0 | 65.0000 | 71500.00 | 9/10/2010 |
| COLEXON Energy AG | 1800 | 67.5 | 121.5000 | 133650.00 | 9/10/2010 |
| COLEXON Energy AG | 1000 | 70.0 | 70.0000 | 77000.00 | 9/10/2010 |
| COLEXON Energy AG | 250 | 67.5 | 16.8750 | 18562.50 | 9/10/2010 |
| COLEXON Energy AG | 550 | 70.0 | 38.5000 | 42350.00 | 9/10/2010 |
| COLEXON Energy AG | 1200 | 67.5 | 81.0000 | 89100.00 | 9/10/2010 |
| COLEXON Energy AG | 600 | 67.5 | 40.5000 | 44550.00 | 9/10/2010 |
| COLEXON Energy AG | 1800 | 65.0 | 117.0000 | 128700.00 | 9/10/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 9/15/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 9/16/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 75.0 | 135.0000 | 148500.00 | 9/17/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 9/15/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 9/15/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 10/8/2010 |
| Assyce Fotovoltaica S.L. | 1750 | 75.0 | 131.2500 | 144375.00 | 10/7/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 10/6/2010 |
| Assyce Fotovoltaica S.L. | 500 | 62.5 | 31.2500 | 34375.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 450 | 60.0 | 27.0000 | 29700.00 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 50 | 75.0 | 3.7500 | 4125.00 | 10/7/2010 |
| COLEXON Energy AG | 1800 | 65.0 | 117.0000 | 128700.00 | 9/20/2010 |
| COLEXON Energy AG | 1800 | 65.0 | 117.0000 | 128700.00 | 9/21/2010 |
| COLEXON Energy AG | 1800 | 67.5 | 121.5000 | 133650.00 | 9/23/2010 |
| COLEXON Energy AG | 800 | 65.0 | 52.0000 | 57200.00 | 9/23/2010 |
| COLEXON Energy AG | 1000 | 67.5 | 67.5000 | 74250.00 | 9/23/2010 |
| COLEXON Energy AG | 1800 | 70.0 | 126.0000 | 138600.00 | 9/21/2010 |
| COLEXON Energy AG | 1800 | 67.5 | 121.5000 | 133650.00 | 9/21/2010 |
| BELECTRIC Trading GmbH | 1800 | 67.5 | 121.5000 | 133650.00 | 9/21/2010 |
| BELECTRIC Trading GmbH | 1800 | 65.0 | 117.0000 | 128700.00 | 9/22/2010 |
| BELECTRIC Trading GmbH | 1000 | 67.5 | 67.5000 | 74250.00 | 9/22/2010 |
| BELECTRIC Trading GmbH | 800 | 65.0 | 52.0000 | 57200.00 | 9/22/2010 |
| BELECTRIC Trading GmbH | 700 | 65.0 | 45.5000 | 50050.00 | 9/23/2010 |
| BELECTRIC Trading GmbH | 50 | 67.5 | 3.3750 | 3712.50 | 9/23/2010 |
| BELECTRIC Trading GmbH | 1050 | 65.0 | 68.2500 | 75075.00 | 9/23/2010 |
| BELECTRIC Trading GmbH | 1650 | 67.5 | 111.3750 | 122512.50 | 9/23/2010 |
| BELECTRIC Trading GmbH | 150 | 67.5 | 10.1250 | 11137.50 | 9/23/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/23/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/23/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/24/2010 |
| BELECTRIC Trading GmbH | 1000 | 65.0 | 65.0000 | 71500.00 | 9/23/2010 |
| BELECTRIC Trading | 1500 | 67.5 | 101.2500 | 111375.00 | 9/23/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| GmbH | | | | | |
| BELECTRIC Trading GmbH | 1500 | 67.5 | 101.2500 | 111375.00 | 9/24/2010 |
| BELECTRIC Trading GmbH | 500 | 67.5 | 33.7500 | 37125.00 | 9/23/2010 |
| BELECTRIC Trading GmbH | 600 | 67.5 | 40.5000 | 44550.00 | 9/24/2010 |
| COLEXON Energy AG | 300 | 65.0 | 19.5000 | 21450.00 | 9/24/2010 |
| COLEXON Energy AG | 50 | 67.5 | 3.3750 | 3712.50 | 9/24/2010 |
| COLEXON Energy AG | 100 | 70.0 | 7.0000 | 7700.00 | 9/24/2010 |
| COLEXON Energy AG | 800 | 70.0 | 56.0000 | 61600.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1550 | 60.0 | 93.0000 | 102300.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 250 | 62.5 | 15.6250 | 17187.50 | 9/24/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 67.5 | 101.2500 | 111375.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 67.5 | 101.2500 | 111375.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 67.5 | 101.2500 | 111375.00 | 9/25/2010 |
| BELECTRIC Trading GmbH | 1500 | 67.5 | 101.2500 | 111375.00 | 10/4/2010 |
| BELECTRIC Trading GmbH | 1500 | 70.0 | 105.0000 | 115500.00 | 10/4/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 100 | 60.0 | 6.0000 | 6600.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 50 | 62.5 | 3.1250 | 3437.50 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 1650 | 75.0 | 123.7500 | 136125.00 | 9/30/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Assyce Fotovoltaica S.L. | 1800 | 75.0 | 135.0000 | 148500.00 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 75.0 | 135.0000 | 148500.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 10/4/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 450 | 75.0 | 33.7500 | 37125.00 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 850 | 72.5 | 61.6250 | 67787.50 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 500 | 62.5 | 31.2500 | 34375.00 | 9/30/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 75.0 | 135.0000 | 148500.00 | 10/1/2010 |
| BELECTRIC Trading GmbH | 700 | 65.0 | 45.5000 | 50050.00 | 10/1/2010 |
| BELECTRIC Trading GmbH | 600 | 67.5 | 40.5000 | 44550.00 | 10/1/2010 |
| BELECTRIC Trading GmbH | 250 | 70.0 | 17.5000 | 19250.00 | 10/1/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 60.0 | 90.0000 | 99000.00 | 9/24/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 60.0 | 90.0000 | 99000.00 | 9/25/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 60.0 | 90.0000 | 99000.00 | 9/28/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 60.0 | 90.0000 | 99000.00 | 9/25/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 60.0 | 90.0000 | 99000.00 | 10/5/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 10/18/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 10/19/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 72.5 | 130.5000 | 143550.00 | 10/20/2010 |
| BELECTRIC Trading GmbH | 1500 | 65.0 | 97.5000 | 107250.00 | 10/20/2010 |
| BELECTRIC Trading GmbH | 700 | 67.5 | 47.2500 | 51975.00 | 10/20/2010 |
| BELECTRIC Trading GmbH | 600 | 70.0 | 42.0000 | 46200.00 | 10/20/2010 |
| BELECTRIC Trading GmbH | 1800 | 65.0 | 117.0000 | 128700.00 | 10/20/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| BELECTRIC Trading GmbH | 800 | 65.0 | 52.0000 | 57200.00 | 10/22/2010 |
| BELECTRIC Trading GmbH | 1000 | 67.5 | 67.5000 | 74250.00 | 10/22/2010 |
| BELECTRIC Trading GmbH | 700 | 65.0 | 45.5000 | 50050.00 | 10/26/2010 |
| BELECTRIC Trading GmbH | 1100 | 67.5 | 74.2500 | 81675.00 | 10/26/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 62.5 | 93.7500 | 103125.00 | 10/25/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 62.5 | 93.7500 | 103125.00 | 10/25/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 62.5 | 93.7500 | 103125.00 | 10/25/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 62.5 | 93.7500 | 103125.00 | 10/25/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 10/26/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 10/27/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 10/28/2010 |
| BELECTRIC Trading GmbH | 250 | 67.5 | 16.8750 | 18562.50 | 10/27/2010 |
| BELECTRIC Trading GmbH | 800 | 70.0 | 56.0000 | 61600.00 | 10/27/2010 |
| BELECTRIC Trading GmbH | 550 | 70.0 | 38.5000 | 42350.00 | 10/27/2010 |
| Assyce Fotovoltaica S.L. | 1350 | 62.5 | 84.3750 | 92812.50 | 10/27/2010 |
| Assyce Fotovoltaica S.L. | 450 | 62.5 | 28.1250 | 30937.50 | 10/27/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 10/29/2010 |
| BELECTRIC Trading GmbH | 1750 | 65.0 | 113.7500 | 125125.00 | 11/15/2010 |
| BELECTRIC Trading GmbH | 50 | 65.0 | 3.2500 | 3575.00 | 11/15/2010 |
| BELECTRIC Trading GmbH | 1800 | 67.5 | 121.5000 | 133650.00 | 11/15/2010 |
| BELECTRIC Trading GmbH | 100 | 70.0 | 7.0000 | 7700.00 | 11/16/2010 |
| BELECTRIC Trading GmbH | 1800 | 65.0 | 117.0000 | 128700.00 | 11/19/2010 |
| BELECTRIC Trading GmbH | 1800 | 67.5 | 121.5000 | 133650.00 | 11/17/2010 |
| BELECTRIC Trading GmbH | 1800 | 65.0 | 117.0000 | 128700.00 | 11/18/2010 |
| BELECTRIC Trading GmbH | 600 | 67.5 | 40.5000 | 44550.00 | 11/16/2010 |
| BELECTRIC Trading GmbH | 1100 | 65.0 | 71.5000 | 78650.00 | 11/16/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 11/16/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 11/17/2010 |
| BELECTRIC Trading GmbH | 100 | 67.5 | 6.7500 | 7425.00 | 11/17/2010 |
| BELECTRIC Trading GmbH | 200 | 70.0 | 14.0000 | 15400.00 | 11/17/2010 |
| BELECTRIC Trading GmbH | 300 | 67.5 | 20.2500 | 22275.00 | 11/22/2010 |
| BELECTRIC Trading GmbH | 50 | 70.0 | 3.5000 | 3850.00 | 11/22/2010 |
| BELECTRIC Trading GmbH | 550 | 67.5 | 37.1250 | 40837.50 | 11/25/2010 |
| BELECTRIC Trading GmbH | 800 | 70.0 | 56.0000 | 61600.00 | 11/22/2010 |
| BELECTRIC Trading GmbH | 950 | 67.5 | 64.1250 | 70537.50 | 11/29/2010 |
| BELECTRIC Trading GmbH | 350 | 70.0 | 24.5000 | 26950.00 | 11/29/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/6/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/7/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/8/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/10/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/9/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/10/2010 |
| Assyce Fotovoltaica S.L. | 1300 | 62.5 | 81.2500 | 89375.00 | 12/6/2010 |
| Assyce Fotovoltaica S.L. | 500 | 62.5 | 31.2500 | 34375.00 | 12/6/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/8/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/8/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/10/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/10/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/13/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/13/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 65.0 | 117.0000 | 128700.00 | 12/14/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 65.0 | 117.0000 | 128700.00 | 12/15/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Assyce Fotovoltaica S.L. | 1800 | 67.5 | 121.5000 | 133650.00 | 12/13/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 75.0 | 135.0000 | 148500.00 | 12/15/2010 |
| Assyce Fotovoltaica S.L. | 800 | 60.0 | 48.0000 | 52800.00 | 12/16/2010 |
| Assyce Fotovoltaica S.L. | 1000 | 72.5 | 72.5000 | 79750.00 | 12/16/2010 |
| Assyce Fotovoltaica S.L. | 50 | 65.0 | 3.2500 | 3575.00 | 12/16/2010 |
| Assyce Fotovoltaica S.L. | 1750 | 65.0 | 113.7500 | 125125.00 | 12/16/2010 |
| Assyce Fotovoltaica S.L. | 1400 | 65.0 | 91.0000 | 100100.00 | 12/16/2010 |
| Assyce Fotovoltaica S.L. | 400 | 62.5 | 25.0000 | 27500.00 | 12/16/2010 |
| Assyce Fotovoltaica S.L. | 300 | 67.5 | 20.2500 | 22275.00 | 12/17/2010 |
| Assyce Fotovoltaica S.L. | 500 | 60.0 | 30.0000 | 33000.00 | 12/17/2010 |
| Assyce Fotovoltaica S.L. | 100 | 62.5 | 6.2500 | 6875.00 | 12/17/2010 |
| Assyce Fotovoltaica S.L. | 600 | 67.5 | 40.5000 | 44550.00 | 12/17/2010 |
| Assyce Fotovoltaica S.L. | 300 | 70.0 | 21.0000 | 23100.00 | 12/17/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/20/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/20/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/21/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/21/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 62.5 | 112.5000 | 123750.00 | 12/27/2010 |
| Assyce Fotovoltaica S.L. | 1800 | 60.0 | 108.0000 | 118800.00 | 12/30/2010 |
| Assyce Fotovoltaica S.L. | 1650 | 65.0 | 107.2500 | 117975.00 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 150 | 65.0 | 9.7500 | 10725.00 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 1150 | 62.5 | 71.8750 | 79062.50 | 12/27/2010 |
| Assyce Fotovoltaica S.L. | 650 | 62.5 | 40.6250 | 44687.50 | 12/27/2010 |
| Assyce Fotovoltaica S.L. | 900 | 75.0 | 67.5000 | 74250.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 900 | 77.5 | 69.7500 | 76725.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 350 | 72.5 | 25.3750 | 27912.50 | 12/29/2010 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Assyce Fotovoltaica S.L. | 600 | 67.5 | 40.5000 | 44550.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 850 | 67.5 | 57.3750 | 63112.50 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 1500 | 62.5 | 93.7500 | 103125.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 100 | 60.0 | 6.0000 | 6600.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 900 | 62.5 | 56.2500 | 61875.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 250 | 65.0 | 16.2500 | 17875.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 50 | 70.0 | 3.5000 | 3850.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 100 | 65.0 | 6.5000 | 7150.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 100 | 72.5 | 7.2500 | 7975.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 450 | 65.0 | 29.2500 | 32175.00 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 150 | 67.5 | 10.1250 | 11137.50 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 100 | 70.0 | 7.0000 | 7700.00 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 150 | 67.5 | 10.1250 | 11137.50 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 150 | 70.0 | 10.5000 | 11550.00 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 100 | 75.0 | 7.5000 | 8250.00 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 150 | 72.5 | 10.8750 | 11962.50 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 250 | 77.5 | 19.3750 | 21312.50 | 12/28/2010 |
| Assyce Fotovoltaica S.L. | 50 | 65.0 | 3.2500 | 3575.00 | 12/27/2010 |
| Assyce Fotovoltaica S.L. | 550 | 62.5 | 34.3750 | 37812.50 | 12/27/2010 |
| Assyce Fotovoltaica S.L. | 1200 | 65.0 | 78.0000 | 85800.00 | 12/27/2010 |
| Assyce Fotovoltaica S.L. | 1000 | 60.0 | 60.0000 | 66000.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 500 | 62.5 | 31.2500 | 34375.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 300 | 62.5 | 18.7500 | 20625.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 1700 | 67.5 | 114.7500 | 126225.00 | 12/29/2010 |
| Assyce Fotovoltaica S.L. | 100 | 70.0 | 7.0000 | 7700.00 | 12/29/2010 |
| Phoenix Solar AG | 1800 | 62.5 | 112.5000 | 78750.00 | 7/22/2011 |
| Phoenix Solar AG | 1800 | 65.0 | 117.0000 | 81900.00 | 7/22/2011 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Phoenix Solar AG | 1800 | 67.5 | 121.5000 | 85050.00 | 7/22/2011 |
| Jörgen Klammer | 150 | 65.0 | 9.7500 | 3900.00 | 5/21/2012 |
| Miscelleaneous | 550 | 62.5 | 34.3750 | 7390.63 | 1/4/2013 |
| ADLER Solar Services GmbH | 6150 | 50.0 | 307.5000 | 137.15 | 6/28/2013 |
| ADLER Solar Services GmbH | 16250 | 50.0 | 812.5000 | 362.38 | 6/28/2013 |
| Adler Solar Trading GmbH | 50 | 75.0 | 3.7500 | 787.50 | 8/23/2013 |
| Adler Solar Trading GmbH | 50 | 77.5 | 3.8750 | 813.75 | 8/23/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/24/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/24/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/24/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/24/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/24/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/25/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/25/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/25/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/25/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/25/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/26/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/26/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/26/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/26/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/26/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/27/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/27/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 9/27/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/27/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/27/2013 |

| Customer Name | Qty. | Watt | KW | $ Net | Sales Date |
|---|---|---|---|---|---|
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/30/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/30/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/30/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/30/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/30/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 9/30/2013 |
| Belectric Australia Pty Ltd | 1800 | 57.5 | 103.5000 | 5796.00 | 10/2/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/2/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/2/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/2/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/2/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/3/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/3/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/3/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/3/2013 |
| Belectric Australia Pty Ltd | 1800 | 55.0 | 99.0000 | 5544.00 | 10/3/2013 |
| **Total** | **407,700** | | | **$21,002,115.91** | |

**INTERROGATORY NO. 7:**

For Interrogatory No. 6, state all facts and identify all documents that support your response.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants incorporate by reference each General Objection and their objections to Interrogatory Nos. 5 and 6. Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, including its use of the phrases "all facts" and "identify all documents." Defendants further object on the grounds that this interrogatory is vague and ambiguous because it seeks "all facts…that support" facts. Defendants

object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline.  Defendants object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar responds as follows:  The principal facts supporting First Solar's response are summarized in the table set forth in First Solar's response to Interrogatory No. 6.

**INTERROGATORY NO. 8:**

State all facts and identify all documents that support the statement in your Form 10-Q for the second quarter of 2010 that "[d]uring the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period."

**RESPONSE TO INTERROGATORY NO. 8:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, in its use of the phrases "[s]tate all facts," "identify all documents," and "support the statement."  Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline.  Defendants object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the Manufacturing Excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field

power loss of 15% or more from nameplate within the first several months of installation. The 450,000 figure represented less than 4% of the total 11.8 million modules produced during the excursion time period, based on First Solar's official production records.  In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The updated analyses confirmed the correlation on which he based his March 2010 estimate that approximately 450,000 modules were affected by the Manufacturing Excursion, as described above.

First Solar identifies the following principal documents that support this response, as well as the documents attached thereto:  FSLR00963321; FSLR02231329; FSLR02122084; FSLR01109252; FSLR00293953; FSLR00291678; FSLR00877494; FSLR02128316; FSLR00406446; FSLR02211872; FSLR00365085; FSLR02212550; FSLR00225480; FSLR02138846.

**INTERROGATORY NO. 9:**

State all facts and identify all documents that support the statement in your Form 10-K for 2010 that "[d]uring the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period."

**RESPONSE TO INTERROGATORY NO. 9:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, in its use of the phrases "[s]tate all facts," "identify all documents," and "support the statement."  Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline.  Defendants object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the Manufacturing Excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation.  The 450,000 figure represented less than 4% of the total 11,837,932 modules produced during the excursion time period, based on First Solar's official production records.  In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the

DEFENDANTS' RESPONSE TO MINEWORKERS' 2ND SET OF INTERROGATORIES                    30
Case No. CV12-00555-PHX-DGC
sf-3503993

Class Period. The updated analyses confirmed the correlation on which he based his March 2010 estimate that approximately 450,000 modules were affected by the Manufacturing Excursion, as described above.

First Solar identifies the following principal documents that support this response, as well as the documents attached thereto: FSLR00963321; FSLR02231329; FSLR02122084; FSLR01109252; FSLR00293953; FSLR00291678; FSLR00877494; FSLR02128316; FSLR00406446; FSLR02211872; FSLR00365085; FSLR02212550; FSLR00225480; FSLR02138846.

**INTERROGATORY NO. 10:**

State all facts and identify all documents that support the statement in your Form 10-Q for the third quarter of 2011 that "[d]uring the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period."

**RESPONSE TO INTERROGATORY NO. 10:**

Defendants incorporate by reference each General Objection. Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, in its use of the phrases "[s]tate all facts," "identify all documents," and "support the statement." Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline. Defendants object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the Manufacturing Excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field

DEFENDANTS' RESPONSE TO MINEWORKERS' 2ND SET OF INTERROGATORIES                    31
Case No. CV12-00555-PHX-DGC
sf-3503993

power loss of 15% or more from nameplate within the first several months of installation. The 450,000 figure represented less than 4% of the total 11,837,932 modules produced during the excursion time period, based on First Solar's official production records.  In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The updated analyses confirmed the correlation on which he based his March 2010 estimate that approximately 450,000 modules were affected by the Manufacturing Excursion, as described above.

First Solar identifies the following principal documents that support this response, as well as the documents attached thereto:  FSLR00963321; FSLR02231329; FSLR02122084; FSLR01109252; FSLR00293953; FSLR00291678; FSLR00877494; FSLR02128316; FSLR00406446; FSLR02211872; FSLR00365085; FSLR02212550; FSLR00225480; FSLR02138846.

**INTERROGATORY NO. 11:**

State all facts and identify all documents that support the statement in your November 3, 2011 Earnings Conference Call that "[i]t is important to note that we did not take these charges because our estimate of the percentage of modules with defects from the manufacturing excursion has changed. It remains still less than 4% of the modules produced from June 2008 to June 2009."

**RESPONSE TO INTERROGATORY NO. 11:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, in its use of the phrases "[s]tate all facts," "identify all documents," and "support the statement."  Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline.  Defendants object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar and Mark Widmar respond as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the Manufacturing Excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. The 450,000 figure represented less than 4% of the total 11,837,932 modules produced during the excursion time period, based on First Solar's official production records.  In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the

Class Period. The updated analyses confirmed the correlation on which he based his March 2010 estimate that approximately 450,000 modules were affected by the Manufacturing Excursion, as described above.

Two First Solar executives with oversight responsibility for the LPM remediation—Mr. Kallenbach and Mr. Koralewski—reviewed and approved the statements that First Solar "did not take these charges because our estimate of the percentage of modules with defects from the manufacturing excursion has changed" and that the percentage of such modules "remains still less than 4% of the modules produced from June 2008 to June 2009," at the request of First Solar's Vice President of Investor Relations, Larry Polizzotto. Mr. Kallenbach responded by saying, "that is fine." Mr. Koralewski said "I agree with TK, it is fine."

First Solar identifies the following principal documents that support this response, as well as the documents attached thereto: FSLR00963321; FSLR02231329; FSLR02122084; FSLR01109252; FSLR00293953; FSLR00291678; FSLR00877494; FSLR02128316; FSLR00406446; FSLR02211872; FSLR00365085; FSLR02212550; FSLR00225480; FSLR02138846; FSLR01105822.

**INTERROGATORY NO. 12:**

State all facts and identify all documents that support the statement in your November 3, 2011 Earnings Conference Call that "[w]e have substantially concluded the remediation programs associated with this manufacturing excursion."

**RESPONSE TO INTERROGATORY NO. 12:**

Defendants incorporate by reference each General Objection. Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, including its use of the phrases "[s]tate all facts," "identify all documents," and "support the statement." Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline. Defendants

object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar and Mark Widmar respond as follows:

At the time of the November 3, 2011 Earnings Conference Call, First Solar had resolved 90% of the claims submitted as part of the effort to remediate the LPM manufacturing excursion. By October 25, 2011, First Solar had received 5,260 claims as part of the LPM remediation. Of these, First Solar determined that as of October 24, 2011, 335 (about 6%) of these claims were valid and would be remediated. Another 386 of the claims (about 7%) also were valid and had already been remediated or given compensation payments. The vast majority of the claims—4,011 claims (about 76%)—were invalid. This left only about 528 claims—or about 10% of the 5,260 claims—to be analyzed. As of October 25, 2011, First Solar had completed the analysis for about 90% of the claims submitted as part of the LPM remediation effort. On October 25, 2011, Mr. Kallenbach made a presentation to First Solar's Audit Committee showing this progress in concluding the LPM remediation program.

Two First Solar executives with oversight responsibility for the LPM remediation—Mr. Kallenbach and Mr. Koralewski—reviewed and approved the statement that the remediation program associated with the manufacturing excursion was "substantially concluded" at the request of First Solar's Vice President of Investor Relations, Larry Polizzotto. Mr. Kallenbach responded by saying, "that is fine." Mr. Koralewski said "I agree with TK, it is fine."

First Solar identifies the following principal documents that support this response, as well as the documents attached thereto: FSLR01079505; FSLR01077504; FSLR01088849; FSLR02213037; FSLR01105822; FSLR01078788; FSLR01275383; FSLR02157663; FSLR02157660; FSLR00253147; FSLR00253149; FSLR01465960; FSLR01171621.

**INTERROGATORY NO. 13:**

State all facts and identify all documents that support the statement in your December 14, 2011 Guidance Announcement Call that "[w]e have had on occasion issues and they are dealt with. We cover them. That has all been reflected in our financials."

**RESPONSE TO INTERROGATORY NO. 13:**

Defendants incorporate by reference each General Objection. Defendants further object to this interrogatory as vague and ambiguous, as well as unduly burdensome, including its use of the phrases "[s]tate all facts," "identify all documents," and "support the statement." Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline. Defendants object to this interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible information, particularly in that it seeks all facts and documents related to "issues" that are unrelated to this litigation and that have not been alleged in the Complaint. As the Court has ruled, the "LPM and the hot climate issue" are the only issues "specifically identified in the complaint." (Order of January 8, 2015.)

Subject to and without waiving any of its objections, First Solar and Michael Ahearn respond as follows:

First Solar has always reflected known significant issues related to module performance in its financial statements. These issues included, but were not limited to, issues related to mounting brackets, inverter mismatch, interlaminate seal issues, LPM, and cord plate issues, and other known failure modes, some of which occurred outside of the Class Period. First Solar accrued amounts to cover expected warranty costs associated with module issues, and these warranty accruals were reflected in First Solar's financial statements. Any known costs beyond First Solar's standard warranty obligation related to any issues with module performance were reflected in First Solar's financial statements to the extent that First Solar incurred any additional expenses in dealing with these issues.

The principal documents that support this statement include First Solar's quarterly and annual financial statements.

**INTERROGATORY NO. 14:**

As of the date that you filed the Form 10-Q for the first quarter 2010, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting."  Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  Mr.

Koralewski regularly reviewed updated analyses of the correlation between STBI and power loss during the class period. The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the class period.

**INTERROGATORY NO. 15:**

As of the date that you filed the Form 10-Q for the second quarter 2010, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 15:**

Defendants incorporate by reference each General Objection. Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting." Defendants object to the demand for "all fact supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information. Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period. To test the reasonableness of the

450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.

**INTERROGATORY NO. 16:**

As of the date that you filed the 2010 Form 10-K, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 16:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting."  Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the

stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period. To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak. Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period. The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.

**INTERROGATORY NO. 17:**

As of the date that you filed the Form 10-Q for the first quarter 2011, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 17:**

Defendants incorporate by reference each General Objection. Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting." Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information. Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global

Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak. Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.

**INTERROGATORY NO. 18:**

As of the date that you filed the Form 10-Q for the second quarter 2011, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 18:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting."  Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field

power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period. To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak. Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period. The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.

**INTERROGATORY NO. 19:**

As of the date that you filed the Form 10-Q for the third quarter 2011, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 19:**

Defendants incorporate by reference each General Objection. Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting." Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information. Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which

were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.

**INTERROGATORY NO. 20:**

As of the date that you filed the 2011 Form 10-K, state your estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 20:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting."  Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From March 2010 through the end of the Class Period, First Solar estimated that approximately 450,000 modules were affected by the manufacturing excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.

**INTERROGATORY NO. 21:**

State your current estimate of the total number of modules affected by the Manufacturing Excursion and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 21:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "affected by," and "all facts supporting."  Defendants object to the demand for "all facts supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possess a single definitive "estimate."

DEFENDANTS' RESPONSE TO MINEWORKERS' 2ND SET OF INTERROGATORIES          44
Case No. CV12-00555-PHX-DGC
sf-3503993

Subject to and without waiving any of its objections, First Solar responds as follows:

First Solar's current estimate is that approximately 450,000 modules were affected by the Manufacturing Excursion, which were understood to be modules that had been produced during the June 2008-June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation.  In or around March 2010, Michael Koralewski, First Solar's Vice President of Global Quality, and his engineering team derived the 450,000 module estimate based on a correlation between power loss measurements of modules returned by customers and the stability index (STBi) data of sampled modules from each of its manufacturing plants in the same June 2008-June 2009 excursion time period.  To test the reasonableness of the 450,000 module estimate, each quarter Mr. Koralewski tracked the number of returned modules that corresponded to 15% field power loss as corrected for dark soak.  The number of returned modules corresponding to 15% field power loss remained well below the 450,000 module estimate throughout the Class Period.  Mr. Koralewski regularly reviewed updated analyses of the correlation between STBi and power loss during the Class Period.  The updated analyses confirmed the correlation on which he based his March 2010 estimate that approximately 450,000 modules were affected by the Manufacturing Excursion, as described above.

**INTERROGATORY NO. 22:**

As of the date you filed the Form 10-Q for the second quarter of 2010, state your estimate of the total number of modules manufactured during the period from June 2008 to June 2009 and all facts supporting that estimate.

**RESPONSE TO INTERROGATORY NO. 22:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate" and "all facts supporting."  Defendants object to the demand for "all fact supporting that estimate" as overbroad, overly burdensome, and not reasonably calculated

to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From June 2008 to June 2009, First Solar manufactured 11,837,932 modules, based on First Solar's official production records.

**INTERROGATORY NO. 23:**

As of the date you filed the Form 10-Q for the third quarter of 2011, state your estimate of the total number of modules manufactured during the period from June 2008 to June 2009 and all facts supporting that estimate.

**RESPONSE TO INTERROGATORY NO. 23:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate" and "all facts supporting."  Defendants object to the demand for "all fact supporting that estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the stated time.

Subject to and without waiving any of its objections, First Solar responds as follows:

From June 2008 to June 2009, First Solar manufactured 11,837,932 modules, based on First Solar's official production records.

**INTERROGATORY NO. 24:**

If your responses to Interrogatory Nos. 22 and 23 are not identical, state every fact and identify all documents supporting the change in your estimate of the total number of modules manufactured during the period from June 2008 to June 2009.

**RESPONSE TO INTERROGATORY NO. 24:**

Defendants incorporate by reference each General Objection and their objections to Interrogatory Nos. 22 and 23.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "your estimate," "every fact," and "identify all documents."  Defendants object to the demand for "every fact" and "all documents supporting the change" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.  Defendants also object to this interrogatory on the grounds that it is argumentative in its assumption that First Solar or Defendants possessed a single definitive "estimate" at the referenced times.  Defendants object to this interrogatory to the extent that it seeks to identify documents that the plaintiffs never sought through a discovery request under Rule 34 of the Federal Rules of Civil Procedure before the discovery deadline.

Subject to and without waiving any of its objections, First Solar responds that this interrogatory requires no response.

**INTERROGATORY NO. 25:**

State your current estimate of the total number of modules affected by the Manufacturing Excursion returned to you and all facts supporting your estimate.

**RESPONSE TO INTERROGATORY NO. 25:**

Defendants incorporate by reference each General Objection.  Defendants further object to this interrogatory as vague and ambiguous, including its use of the phrases "affected by" and "all facts supporting."  Defendants object to the demand for "all fact supporting your estimate" as overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible information.

Subject to and without waiving any of its objections, First Solar responds as follows:

As part of the LPM remediation process, First Solar identified sites or portions of sites that it determined were likely to contain modules affected by the Manufacturing Excursion.  These modules were understood to have been produced during the June 2008-

June 2009 excursion period under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. For small sites that were determined to be underperforming and to contain modules manufactured during the Manufacturing Excursion, First Solar removed and replaced all modules installed at the site. These small sites were typically rooftop arrays. For large free field sites that were determined to be underperforming and to contain modules manufactured during the Manufacturing Excursion, First Solar removed and replaced discrete portions of the site that were determined to be likely to contain modules affected by the Manufacturing Excursion. This typically involved replacement of multiple "strings" of modules, consisting of 10-15 modules. The modules pulled as part of this process were returned to the factory where tests were done to measure their power output. Based on these measurements, First Solar determined which modules pulled from a site were performing within specification and which ones had experienced field power loss of 15% or more. This process began in the second half of 2009 and continued through the end of the Class Period. Most of the modules that were potentially affected by the Manufacturing Excursion were not removed from sites and returned to First Solar for testing until months or years after initial installation.

One of the hallmarks of a module affected by the Manufacturing Excursion was 15% or greater field power loss within the first several months after installation. When a year or more had elapsed between initial installation and the time a module was removed from a site and returned to First Solar for testing, as was the case for most the LPM remediation, First Solar was often unable to determine whether measured degradation was due to the Manufacturing Excursion or some other root cause, such as normal distribution inherent in First Solar's regular manufacturing process, improper installation, or improper maintenance. Because First Solar cannot reliably distinguish at this point in time between the population of returned modules that degraded due to the Manufacturing Excursion and the population of returned modules that degraded for other reasons, First Solar has no

current estimate of the total number of modules affected by the Manufacturing Excursion that were returned to First Solar through the date of these responses.


Dated: March 13, 2015                    By: s/ *Paul Flum*
                                             James P. Bennett
                                             Paul Flum
                                             Jordan Eth
                                             Judson E. Lobdell
                                             Anna Erickson White
                                             Philip T. Besirof
                                             Mark R.S. Foster
                                             MORRISON & FOERSTER LLP

                                             Maureen Beyers
                                             Joseph N. Roth
                                             OSBORN MALEDON, P.A.

                                              Attorneys for Defendants

## VERIFICATION

I, Betsy Engle, am authorized to make this verification for and on behalf of First Solar, Inc., and I make this verification for that reason. I have read the foregoing DEFENDANTS' RESPONSE TO LEAD PLAINTIFF MINEWORKERS' PENSION SCHEME'S SECOND SET OF INTERROGATORIES. I am informed and believe that the answers contained therein are correct based upon information provided to me by others.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2015, at Nashville, Tennessee.

By: _____

Betsy Engle

VERIFICATION TO DEFS' RESP. TO MPS'S 2ND SET OF INTERROGATORIES
CASE NO. CV 09-5473-RS
sf-3515564

**CERTIFICATE OF SERVICE**

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 425 Market Street, San Francisco, California  94105-2482.  I am not a party to the within cause, and I am over the age of eighteen years.

I further declare that on March 13, 2015, I served a copy of:

**DEFENDANTS' RESPONSE TO LEAD PLAINTIFF MINEWORKERS' PENSION SCHEME'S SECOND SET OF INTERROGATORIES**

☒    **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system to the e-mail address(es) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

Michael J. Dowd                              *Attorneys for Plaintiffs*
miked@rgrdlaw.com
Daniel S. Drosman
dand@rgrdlaw.com
Jason A. Forge
Jforge@rgrdlaw.com
Luke O. Brooks
lukeb@rgrdlaw.com
Mark Solomon
marks@rgrdlaw.com
Darren Robins
darrenr@rgrdlaw.com
Theresa Holindrake
tholindrake@rgrdlaw.com
Karen Cook
karenc@rgrdlaw.com
Andy Rudolph
andyr@rgrdlaw.com
Terry Koelbl
tkoelbl@rgrdlaw.com
Chris Stewart
cstewart@rgrdlaw.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed at San Francisco, California, this 13th day of March, 2015.

| Rosemary Barajas | *s/ Rosemary Barajas* |
|---|---|
| (typed) | (signature) |