James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, Arizona 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>                Defendants. | Case No.    CV12-00555-PHX-DGC<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Scheduled)**<br><br>Date:      June 25, 2015<br>Time:     2:00 p.m. |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iv

INTRODUCTION ................................................................................................................1

RELIEF REQUESTED .......................................................................................................4

I.     DEFENDANTS MOVE FOR ENTRY OF SUMMARY JUDGMENT ON ALL CLAIMS. ..................................................................................................4

II.    EACH DEFENDANT REQUESTS SEPARATE CONSIDERATION OF THE CLAIMS AND EVIDENCE AGAINST HIM OR IT...................................4

III.   DEFENDANTS ALSO REQUEST PARTIAL SUMMARY JUDGMENT AND FINDINGS PURSUANT TO RULE 56(a) and (g). .....................................5

FACTUAL BACKGROUND ..............................................................................................5

I.     PROCEDURAL HISTORY ....................................................................................5

II.    PLAINTIFFS' ALLEGATIONS.............................................................................6

III.   THE EVIDENCE IN THE RECORD ......................................................................7

       A.   An Overview of First Solar .........................................................................7

            1.   Organizational structure and key personnel......................................7

            2.   Operations and trends.......................................................................7

            3.   Calculation of relevant financial metrics .........................................9

                 a.   Accounting for module sales.................................................9

                 b.   Cost-per-Watt.....................................................................11

            4.   First Solar's external reporting cycle .............................................12

            5.   Processes and controls governing accounting and external reporting ..........................................................................................12

       B.   Class Period Developments Underlying the Allegations in the FAC ........17

            1.   The manufacturing excursion and LPM remediation .....................17

                 a.   Discovery of the manufacturing excursion ..........................17

                 b.   First Solar's commitment to remediate beyond warranty.............................................................................18

                 c.   First Solar's accrual for remediation expenses ....................18

            2.   Module performance in hot climates...............................................27

ARGUMENT...........................................................................................................................29

I.    THE EVIDENCE DOES NOT SUPPORT A FINDING OF LOSS
      CAUSATION. .................................................................................................30

      A.    First Solar's Disclosures Did Not Reveal Fraud. ......................................31

            1.    The October and December 2011 Press Releases did not reveal
                  fraud. ..............................................................................................31

            2.    The five Earnings Disclosures did not reveal fraud. .......................35

                  a.    The Earnings Disclosures did not reveal that First Solar
                        had violated GAAP when accruing for estimated future
                        expenses. ..............................................................................35

                  b.    The Earnings Disclosures did not reveal that First Solar
                        had improperly recognized revenue before it was
                        earned. ..................................................................................36

                  c.    The Earnings Disclosures did not reveal that First Solar
                        had fraudulently concealed the excursion or
                        misrepresented the status of the remediation. ......................36

                  d.    The Earnings Disclosures did not reveal that First Solar
                        had issued fraudulent statements and risk-factor
                        warnings regarding module and system performance. ........37

                  e.    The Earnings Disclosures did not reveal that First Solar
                        had fraudulently manipulated its reported CpW. .................37

      B.    Plaintiffs Also Cannot Prove That the Decline in First Solar's Stock
            Price Was Caused by a Revelation of Fraud. .............................................38

II.   THE EVIDENCE DOES NOT SUPPORT A FINDING THAT ANY
      DEFENDANT ENGAGED IN SECURITIES FRAUD. ....................................38

      A.    The Elements of a Section 10(b) Claim .....................................................39

      B.    Plaintiffs Cannot Establish Other Elements of Their Section 10(b)
            Claim. .........................................................................................................41

            1.    The evidence does not support Plaintiffs' accounting-fraud
                  allegations.......................................................................................41

                  a.    Plaintiffs cannot show that Defendants fraudulently
                        underaccrued for LPM remediation expenses.....................41

                  b.    Plaintiffs cannot show that Defendants fraudulently
                        accounted for the sale of modules into hot climates. ...........44

            2.    The evidence does not support Plaintiffs' allegation that
                  Defendants fraudulently concealed the excursion...........................45

            3.    The evidence does not support Plaintiffs' remaining
                  allegations regarding LPM remediation and hot-climate
                  disclosures. .....................................................................................47

a.      Warnings contained in the "Risk Factors" section of First Solar's Forms 10-K ................................................................. 48

b.      The percentage of modules affected by the excursion ......... 49

c.      Interim status reports .......................................................... 50

d.      Vague statements about quality and performance ............... 52

e.      Forward-looking statements ................................................ 53

f.      Dr. Eaglesham's discussion of module performance ........... 54

4.      The evidence does not support Plaintiffs' CpW claim. .................. 54

C.      Plaintiffs' Theory of Scienter is Implausible. ........................................... 56

1.      The bottom-up process by which the disclosures were prepared is inconsistent with fraud orchestrated from the top. ........ 57

2.      The absence of evidence that any Individual Defendant circumvented internal controls is inconsistent with scienter. ......... 57

3.      PwC's unfettered access and consistent endorsement of First Solar's accounting and controls is inconsistent with scienter. ........ 58

4.      There is no evidence of concerted fraudulent action among the Individual Defendants. .................................................................. 60

D.      The Individual Defendants' Transactions in First Solar Stock Do Not Support Inferences of Scienter. ................................................................. 61

1.      Michael Ahearn ................................................................................ 63

2.      Robert Gillette ................................................................................. 65

3.      Jens Meyerhoff ................................................................................ 66

4.      Mark Widmar ................................................................................... 66

5.      Bruce Sohn ...................................................................................... 67

6.      David Eaglesham ............................................................................. 67

7.      James Zhu ........................................................................................ 68

E.      The Evidence Does Not Support a Finding of Scienter Against First Solar ............................................................................................................ 68

III.      EACH DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 20(a) CLAIMS. ........................................................................... 69

CONCLUSION ............................................................................................................... 70

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Elec. Pension Fund v. Adecco, S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006)............................................................40, 42, 44

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)........................................................................................29

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................40

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..........................................................................46

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................29

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013)..............................................*passim*

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..........................................................39

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................... 1, 30, 31, 38

*Emp'rs Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ........................................................................54

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).................................................................................. 3, 41

*Glazer Capital Mgmt. v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ....................................................................39, 69

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000) ............................................................62, 69, 70

*In re Apple Inc. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ...............................................................*passim*

*In re Cirrus Logic Sec. Litig.*,
946 F. Supp. 1446 (N.D. Cal. 1996)................................................................59

*In re Convergent Tech. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ........................................................................ 40, 47

*In re Foundry Networks Secs. Litig.*,
No. C 00-4823 MMC,
2003 WL 23211577 (N.D. Cal. Feb. 14, 2003) ........................................................ 49

*In re Herbalife, Ltd. Sec. Litig.*,
No. CV 14-2850 DSF,
2015 WL 1245191 (C.D. Cal. Mar. 16, 2015)........................................................ 34

*In re Leapfrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ........................................................ 49

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ......................................................................*passim*

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ......................................................................*passim*

*In re PETCO Sec. Litig.*,
No. 05-CV-0823 H RBB,
2008 WL 8876554 (S.D. Cal. Apr. 29, 2008)........................................................*passim*

*In re REMEC Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)................................................................*passim*

*In re Rigel Pharm. Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ........................................................................ 56

*In re Sybase, Inc., Sec. Litig.*,
48 F. Supp. 2d 958 (N.D. Cal. 1999) ........................................................ 42

*In re Syntex Corp. Sec. Litig.*,
No. CIV. 92-20548 SW,
1993 WL 476646 (N.D. Cal. Sept. 1, 1993) ........................................................ 46, 48

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........................................................ 62, 63, 64

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ........................................................ 61

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ........................................................ 41, 63, 65

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011) ................................................................................... 39

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ......................................................................... 70

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...................................................................*passim*

*Mathews v. Centex Telemgmt., Inc.*,
    No. C-92-1837-CAL,
    1994 WL 269734 (N.D. Cal. June 8, 1994) ..............................................*passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011) ............................................................................. 41, 46

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................*passim*

*Oregon Pub. Emps.' Ret. Fund v. Apollo Group Inc.*,
    774 F.3d 598 (9th Cir. 2014) ............................................................ 31, 32, 33, 52

*Paracor Fin., Inc. v. GE Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ......................................................................... 69

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .................................................................*passim*

*Reese v. BP Exploration (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ......................................................................... 39

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..................................................................... 62, 63

*Schuster v. Symmetricon, Inc.*,
    No. C9420024RMW,
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ............................................... 57

*Stitt v. Williams*,
    919 F.2d 516 (9th Cir. 1990) ......................................................................... 30

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010) ......................................................................... 44

*Zeid v. Kimberley*,
    930 F. Supp. 431 (N.D. Cal. 1996)................................................................. 49

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................... 41

**STATUTES AND RULES**

15 U.S.C.
    § 78u-5(c) ............................................................................................................. 53, 54
    § 7262 ................................................................................................................... 14, 15

Sec. Exch. Act 1934
    § 10(b) ........................................................................................................... 4, 6, 30, 40
    § 20(a) ...................................................................................................................... 4, 6

Fed. R. Civ. P.
    Rule 30(b)(6) ................................................................................................................. 5
    Rule 56 ...................................................................................................................... 4, 5

SEC Rule
    Rule 10b-5 .................................................................................................................... 46
    Rule 10b5-1 ..................................................................................................... 65, 66, 68

Accounting Standards Codification
    ASC 250-10-20 ............................................................................................................. 35
    ASC 250-10-45-23 ....................................................................................................... 35
    ASC 450-20-25-2, 3 ..................................................................................................... 10
    ASC 450-20-50-2 ..................................................................................................... 10, 43
    ASC 460-10-25-5, 6 ..................................................................................................... 10
    ASC 460-10-50-7 ......................................................................................................... 43
    ASC 605-10-S99-1 ....................................................................................................... 10

**OTHER AUTHORITIES**

Council Implementing Regulation (EU) No. 1238/2013, 2013 O.J. (L325) ...................... 8

N. Metropolis, *The Beginning of the Monte Carlo Method*, Los Alamos Science
    Special Issue 1987, at 125-30.) ................................................................................. 22

A.Virtuani, et al., Overview of Temperature Coefficients of Different Thin-Film
    Photovoltaic Technologies, 25 Eur. Photovoltaic Solar Energy Conf. 4248
    (2010) ......................................................................................................................... 54

Couture, et al., A Policymaker's Guide to Feed-in-Tariff Policy Design ......................... 7

**INTRODUCTION**

First Solar, Inc. is one of the world's leading solar-power companies. From November 2006, when First Solar went public, to April 29, 2008, the day before the start of the Class Period, First Solar's stock rose from $25 to $276 a share. The autumn of 2008, however, brought a global financial crisis. Government austerity measures, particularly in Europe, ultimately led to widespread termination of the subsidies that had fueled the growth of solar power. And an influx of new Chinese manufacturers flooded the market with low-cost solar modules.

Unsurprisingly, these developments were accompanied by steep declines in stock prices throughout the industry. First Solar's stock price fell 89% from April 2008 to February 28, 2012, the last day of the Class Period. As reflected below, the price of its "peer group" declined by a similar amount:



(Flum Decl. ¶¶ 32-34.)

This lawsuit is an attempt to recover some of that decline through unsupported allegations of securities fraud. Section 10(b) is not a "downside insurance policy" for

investors. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-48 (2005). That is precisely, however, what Plaintiffs seek here.

Plaintiffs' case mainly concerns a manufacturing process change that First Solar engineers began implementing in June 2008. Unfortunately, that change resulted in occasional deviations from the Company's standard manufacturing control limits—referred to as a manufacturing excursion—which, in turn, caused a drop in the power output of some modules shortly after installation. The change was discontinued in June 2009, promptly after its discovery, but the job of remediating the excursion ultimately took longer and cost more than expected.

Plaintiffs also point to another technical issue, the fact that the performance of First Solar's modules—like all solar modules—was affected by climate. As First Solar shifted its focus toward regions with hotter climates, some modules installed there performed worse than expected—an issue that the Company's engineers addressed and remediated.

Despite the length of the class period (46 months) and the number of alleged materially misleading statements (167), Plaintiffs' claim boils down to an attack on First Solar's accounting and disclosure processes. In each quarter, First Solar accounted for any financial impact of the excursion and hot-climate issue in its financial statements in accordance with Generally Accepted Accounting Principles (GAAP). Anticipated costs were reasonably estimated and recorded as accrued liabilities, which were prepared following a bottom-up process by accountants in First Solar's finance group (who are not accused of wrongdoing) based on information supplied to them by First Solar's quality control engineers (who are also not accused of wrongdoing).

First Solar's financial statements and internal controls were reviewed, tested, and audited by PricewaterhouseCoopers (PwC), which was retained by, and reported directly to, the independent Audit Committee of First Solar's Board of Directors—chaired by a 30-year veteran of Deloitte. PwC had unfettered access to all First Solar employees and systems. Without exception, it reported to the First Solar Board of Directors, the Audit Committee, and the investing public that the Company's financial statements fairly

presented the financial position, operations, and cash flows of the Company, and that the Company maintained effective controls over its financial reporting.  There is no evidence that any Individual Defendant corrupted or circumvented these processes or controls.  In the absence of such evidence, Plaintiffs cannot meet their burden of proving either falsity or scienter—the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

Plaintiffs' theory—that in the face of these procedures and controls, the seven Individual Defendants fraudulently accounted for and downplayed the costs of the excursion and the hot-climate issue for four years in order to inflate First Solar's stock price—is implausible.  According to Plaintiffs, then-CEO Michael Ahearn and four other senior executives launched the fraud in April 2008 (long before either the excursion or hot-climate issue came to their attention).  Having allegedly concealed these issues from the public and PwC for eighteen months, they turned over the reins of the Company to a new CEO, Rob Gillette, a former Honeywell executive that none of the Individual Defendants had previously known.  Plaintiffs allege that Mr. Gillette continued the fraud for the next two years.  Three years into the alleged scheme, the Company hired yet another outsider, Mark Widmar, as the new CFO.  He, too, according to Plaintiffs, seamlessly joined the alleged fraud.  Meanwhile, despite allegedly perpetuating the fraud, Messrs. Gillette and Widmar purchased First Solar stock.

Unsurprisingly, other Individual Defendants sold First Solar stock during the four-year Class Period.  Nothing about these sales, however, supports Plaintiffs' fraud theory.  It is not suspicious for Company co-founder Michael Ahearn to sell his stake in the Company gradually over a period of years, or for executives, whose compensation is largely paid in stock, to seek to diversify their investments.  The sales are not coordinated with the alleged misrepresentations, and many of them occurred before the excursion or hot-climate issues were even identified.  In short, Plaintiffs cannot prove fraud.

Plaintiffs also cannot prove loss causation.  "Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the

fraudulent act or practice, and plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (affirming summary judgment on loss causation grounds).  None of Plaintiffs' seven alleged "corrective disclosures" revealed that any First Solar statement was fraudulent.  First Solar has never corrected or retracted its public statements or restated its financial results, and PwC has continued to stand behind its audits of the Company.  There has never been any finding— or even accusation by anyone except Plaintiffs—that any First Solar statement was fraudulent.

For these multiple, independent reasons, summary judgment should be granted.

## RELIEF REQUESTED

### I.    DEFENDANTS MOVE FOR ENTRY OF SUMMARY JUDGMENT ON ALL CLAIMS.

Pursuant to Federal Rule of Civil Procedure 56, all Defendants move for summary judgment on all claims on the following independent grounds:  (1) insufficient evidence of loss causation; (2) insufficient evidence that any statement challenged in the First Amended Complaint (FAC) was materially false or misleading when made; (3) insufficient evidence that any Defendant made any challenged statement with scienter; and (4) with respect to the Section 20(a) controlling-person claims, insufficient evidence of an underlying violation of Section 10(b) or of control and, additionally, the evidence establishes that each Individual Defendant acted in good faith.

### II.    EACH DEFENDANT REQUESTS SEPARATE CONSIDERATION OF THE CLAIMS AND EVIDENCE AGAINST HIM OR IT.

All Defendants seek entry of summary judgment on the grounds stated above. Additionally, each Defendant requests that, to the extent that the Court does not enter summary judgment on all claims, the Court address the sufficiency of the evidence with respect to each element of each claim against each Defendant separately.

## III.    DEFENDANTS ALSO REQUEST PARTIAL SUMMARY JUDGMENT AND FINDINGS PURSUANT TO RULE 56(a) AND (g).

Each Defendant requests that, to the extent the Court does not enter summary judgment in full, it enter partial summary judgment and make the following findings pursuant to Fed. R. Civ. P. 56(a) and (g):  (1) that any statement challenged in the FAC that Plaintiffs have not shown was materially false or misleading when made cannot be the basis for liability against any Defendant; and (2) that any alleged corrective disclosure that Plaintiffs have not shown revealed the fraudulent nature of any challenged statement cannot be the basis for liability against any Defendant.

Additionally, each Defendant requests that, with respect to any challenged statement remaining in the case, the Court find whether there is sufficient evidence (1) that the Defendant made the statement; and (2) that the Defendant acted with scienter when making the statement.

## FACTUAL BACKGROUND

## I.    PROCEDURAL HISTORY

Plaintiffs filed the FAC on August 17, 2012.  (Dkt. No. 93.)  The Court denied Defendants' motion to dismiss on December 17, 2012.  (Dkt. No. 114.)  On October 8, 2013, the Court certified a class of "persons who purchased or otherwise acquired the publicly traded securities of First Solar, Inc. between April 30, 2008 and February 28, 2012."  (Dkt. No. 171.)

On November 25, 2013, discovery commenced upon entry of a Case Management Order setting the dates for the close of discovery and briefing on summary judgment. (Dkt. No. 177.)  Fact discovery concluded on March 13, 2015.  First Solar produced approximately 2.5 million pages of documents.  Plaintiffs took twenty depositions, including each Individual Defendant, PwC, eleven current and former employees of First Solar, and twenty hours of Rule 30(b)(6) testimony.

## II.   PLAINTIFFS' ALLEGATIONS

The FAC names as Defendants First Solar and seven Individual Defendants, who served in various positions during the Class Period.  The Individual Defendants and their tenures at the Company are set out in Attachment A.  Each Individual Defendant has executed a declaration in support of this motion setting forth facts relevant to his involvement in the events at issue.

Plaintiffs claim that each Defendant is liable for violations of Section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), and that each Individual Defendant is liable as a controlling person under Section 20(a) of the Exchange Act.

Plaintiffs allege that Defendants engaged in a fraudulent scheme to inflate the price of First Solar's stock by making false statements to the public in SEC filings, press releases, earnings calls, and at conferences.  The challenged statements are set out in Exhibit 1, organized chronologically; Exhibit 2, organized by attribution of statement to signer/speaker; and Exhibit 3, organized by subject matter.[1]  These statements fall into the following categories:

***Accounting for projected LPM remediation expenses:***  Plaintiffs allege that Defendants fraudulently underaccrued for expenses they expected First Solar to incur in the LPM remediation effort.

***Accounting for the sale of modules into hot climates:***  Plaintiffs allege that Defendants fraudulently recognized revenue on the sale of modules into hot climates and that First Solar's warranty accrual fraudulently failed to account for hot-climate-related warranty claims.

***Statements and omissions regarding the manufacturing excursion and the progress of the LPM remediation:***  Plaintiffs allege that Defendants fraudulently concealed the existence of the excursion and misrepresented the scope of the excursion and the progress of the LPM remediation.

---

[1] All exhibit references in this brief are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.

***Statements and risk factors regarding module and system performance:***
Plaintiffs identify various statements and risk-factor warnings regarding First Solar's modules and power systems that they contend were misleading in light of the excursion and hot-climate effects.

***Cost-per-Watt:***  Plaintiffs allege that Defendants fraudulently understated the manufacturing metric Cost-per-Watt (CpW) throughout the Class Period.

## III.    THE EVIDENCE IN THE RECORD

### A.    An Overview of First Solar

#### 1.    Organizational structure and key personnel

During the Class Period, First Solar was (as it remains today) a publicly held Company with over 100 million shares listed and traded on the NASDAQ stock exchange. First Solar's shareholder-elected Board of Directors delegated certain responsibilities to Board committees, including its Audit Committee, and appointed officers to manage the Company's operations pursuant to the Board's strategic direction.  The Company's organizational structure, its key officers, their positions, and their tenures are set out in Attachments A & B.

First Solar is headquartered in Tempe, Arizona.  Its primary manufacturing and research and development facility is in Perrysburg, Ohio.  During the Class Period, it also operated manufacturing facilities in Germany and Malaysia.

#### 2.    Operations and trends

From its inception, First Solar sold most of its modules in Europe to intermediaries, including distributors, system developers, system integrators, and independent power producers.  Europe was First Solar's primary market because many governments there offered feed-in-tariffs (FiTs)—an energy pricing system that assured relatively high prices for the sale of renewable energy into the power grid.  (*See generally*, Couture, et al., A Policymaker's Guide to Feed-in-Tariff Policy Design, http://www.nrel.gov/docs/fy10osti/44849.pdf, at v-x.)  The modules were generally

installed by third parties in large sites, some of which contained hundreds of thousands of modules.

Several trends had a significant impact on the solar industry during the Class Period. First, global module production increased greatly—from six gigawatts in 2008 to over twenty-four gigawatts in 2012—particularly as a result of large investments by the Chinese government. This supply increase, together with aggressive pricing by Chinese manufacturers, led to a steep decline in module prices. *See* Council Implementing Regulation (EU) No. 1238/2013, 2013 O.J. (L325), available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2013:325:0001:0065:EN:PDF, last accessed Mar. 27, 2015. (Ahearn Decl. ¶¶ 18-19.)

A second trend stemmed from the global financial crisis, which began in 2008. The impacts were particularly severe and long-lasting in Europe and had two related effects on First Solar: (1) a reduction in the construction of new solar power generation facilities, many of which were arranged and financed by banks; and (2) the ultimate reduction or elimination of FiTs by European governments. By the end of 2011, subsidy programs in France, Germany, Italy, and Spain had been dramatically cut back or were on the verge of being eliminated entirely. (Ahearn Decl. ¶¶ 12, 18-19.)

First Solar responded to these changes with two strategic adjustments. First, it shifted its primary focus from selling modules to building and operating complete solar power generation systems. In July 2010, the Company announced a new Utility Systems Business Group, headed by Individual Defendant Jens Meyerhoff, to provide a complete portfolio of services in the area of solar power generation systems, including design, engineering, development, construction, operation, maintenance, and financing. (Meyerhoff Decl. ¶ 11; Ex. 48 at 2.)

A second, related shift was away from Europe and toward markets where—because of more abundant sunlight and cheaper land—the economics of unsubsidized solar power were more viable. In 2009, First Solar reported that it sold 86% of its modules to

customers headquartered in Europe; by the end of 2011, it was 43%. (Ex. 46 at 10; Ex. 52 at 11.)

### 3.    Calculation of relevant financial metrics

The results of First Solar's operations were accounted for and analyzed by members of the Finance group. Finance, headed by the CFO, was divided into two parts: the Accounting group, led by the Chief Accounting Officer / Controller and the Financial Planning and Analysis (FP&A) group, led by the Vice President of FP&A. The Accounting group compiled the consolidated financial results of First Solar's operations quarterly pursuant to Generally Accepted Accounting Principles (GAAP). First Solar's financial statements were reviewed quarterly and audited annually by PwC. The FP&A group analyzed data for planning purposes and projected future results. (Meyerhoff Decl. ¶¶ 18, 30.)

### a.    Accounting for module sales

First Solar sold its modules pursuant to written terms, which warranted that First Solar's modules, if properly installed and maintained, would produce at least (1) 90% of their labeled power during the first ten years after their sale and (2) 80% of their labeled power during years eleven to twenty-five. (Ex. 63.) Due to measurement variability, the warranty included a measurement tolerance of 5%, meaning that First Solar was obligated to honor claims only if certified test results showed that the module was performing 5% or more below the threshold. (*See*, *e.g.*, Ex. 63.) In effect, therefore, First Solar's warranty obligations were triggered by modules testing at 85% or lower (15% power loss) within the first ten years, or 75% or lower (25% power loss) through year twenty-five. (Eaglesham Decl. ¶ 27.)

The warranty provided that if a customer identified an underperforming module and shipped it to a First Solar testing facility, and First Solar verified that the module was underperforming for reasons related to the module itself, then First Solar would ship a

replacement to the customer at First Solar's expense. (Ex. 63; Ex. 75 at 962.[2]) The warranty did not, however, provide that First Solar would monitor customers' facilities for underperforming modules, locate underperforming modules, or pay for the labor and other costs of removing underperforming modules and reinstalling replacements. (Schumaker Decl. ¶ 22.)

For most of the Class Period, First Solar additionally warranted that its modules would be free from defects in materials and workmanship for five years. (Ex. 63.) In late 2011, First Solar extended the workmanship warranty to cover the first ten years. (Koralewski Decl. ¶ 33.)

First Solar recognized revenue for selling modules, pursuant to Accounting Standards Codification (ASC) 605-10-S99-1,[3] and recorded its estimated future warranty costs as an accrued expense—often referred to as an "accrual" or a "reserve"—on its balance sheet pursuant to ASC 460-10-25-6.[4] (Schumaker Decl. ¶¶ 13-14.)

First Solar's Quality and Reliability teams estimated the Company's future failure and return rates for purposes of the power-output and workmanship warranties by analyzing historical test-site data and data from accelerated-life testing done on samples of modules during the manufacturing process. (Koralewski Decl. ¶ 34.) These engineers reported the results of their analyses periodically in white papers, which Michael Koralewski, the head of First Solar's Quality group, reviewed and approved. (Koralewski Decl. ¶ 35.) Mr. Koralewski reported the predicted return rates for both the power-output

---

[2] Pinpoint citations to Exhibits 56 through 86 refer to the final three digits of the Bates number appearing on the bottom right-hand corner of the document.

[3] According to ASC 605-10-S99-1, revenue shall be recognized when the following criteria are met: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectability is reasonably assured.

[4] Recording an accrued expense is appropriate when the following conditions are satisfied: (a) the company has determined that it is "probable" that it will pay the expense, ASC 450-20-25-3 and ASC 460-10-25-6; and (b) the amount of the expense can be reasonably estimated, ASC 450-20-25-2 and ASC 460-10-25-5.

and workmanship warranties to the FP&A and Accounting groups, which used the estimates to calculate First Solar's warranty accrual. (Schumaker Decl. ¶¶ 15-16.)

The Assistant Corporate Controller and his staff would regularly perform analyses of the warranty accrual, the underlying methodology, and its compliance with GAAP. (*Id.* ¶¶ 18-19.) The results of the analyses were included in warranty-rate memoranda, which were sent to PwC. Each of the Assistant Corporate Controller's reviews concluded that the warranty accrual was reasonable under GAAP. (Schumaker Decl. ¶ 19; Ex. 57 at 606; Ex. 73 at 579-580; Ex. 79 at 889.)

All key participants in the warranty accrual process—including the Assistant Corporate Controller and the Vice President of Global Quality—participated in First Solar's sub-certification process, described below in Section III.A.5. (Schumaker Decl. ¶ 62.) During the Class Period, all these individuals certified that they were not aware of any improper estimates or material misstatements. (*Id.* ¶¶ 61-62.)

First Solar's warranty accrual was reviewed by PwC every quarter and also examined as part of PwC's annual audits. PwC also consistently concluded that the Company's accrual methodology, accrual rate, and accrual amount were reasonable, and that the controls governing the accrual process were operating effectively. (D'Angelo Decl. ¶ 19.)

### b.    Cost-per-Watt

First Solar's FP&A group computed CpW, which the Company defined in its SEC filings as "the total manufacturing costs incurred during a period divided by the total watts produced during that period." (Ex. 45 at 29.)[5] The calculation methodology was identified in a white paper, and the calculation was reviewed by various members of the FP&A team to ensure accuracy. (Ex. 34 at 378:9-379:10; Ex. 58.)

---

[5] During the Class Period, First Solar has continuously improved its module design and manufacturing processes, resulting in a reduction in CpW from $1.14 at the start of the Class Period, to $0.75 at the end of it. (Ex. 1 at stmt. 1; Ex. 52 at 51.) In February 2009, First Solar became the first solar-module manufacturer to break the $1 CpW milestone. (Meyerhoff Decl. ¶ 58.)

Starting in 2010, PwC examined First Solar's reported CpW as part of its audit procedures. PwC consistently deemed First Solar's method for calculating CpW to be reasonable, and concluded that controls related to CpW were operating effectively. (Ex. 32; Ex. 33.)

### 4. First Solar's external reporting cycle

As a public company, First Solar communicated the results of its operations to the public in press releases and on forms pursuant to rules promulgated by the SEC. The Company followed the same procedure each quarter, generally making each of the following disclosures within a period of three business days:

*Earnings Releases:* First Solar issued a press release containing a balance sheet and statement of operations, which was filed with the SEC on a Form 8-K ("Earnings Release");

*Earnings Calls:* Following the Earnings Release, certain officers participated in a recorded "Earnings Call" with securities analysts, which was open to the public;

*Forms 10-Q / 10-K:* Within three business days of the Earnings Call, the Company filed a Form 10-Q (for the first three quarters) or a Form 10-K (for the full year).

### 5. Processes and controls governing accounting and external reporting

Throughout the Class Period, First Solar's SEC filings, Earnings Releases, and Earnings Call scripts were prepared by teams of employees in accordance with processes and subject to controls designed to ensure compliance with GAAP and all applicable laws and regulations. These processes were designed and implemented before the Class Period began. (Schumaker Decl. ¶¶ 6-12, 52-74.) The responsibility for executing these processes, and auditing compliance with them, was distributed among a large number of separate groups and persons, as described below.

*Preparation of the financial statements:* Each quarter, the Accounting group prepared drafts of a consolidated balance sheet, reflecting the Company's assets and

liabilities, and a consolidated statement of operations, reflecting the Company's revenues, expenses, and net income. (*Id*. ¶¶ 6-12.)

Within two weeks of the close of each quarter, the CFO, the Chief Accounting Officer / Controller, the Assistant Corporate Controller, the Plant Controllers, the VP of FP&A, and the Directors of FP&A attended a meeting called the CFO Close Review. All key financial metrics and accounting judgments were presented at this meeting in a slide deck, which formed the basis for discussion. (Meyerhoff Decl. ¶¶ 19-22; Widmar Decl. ¶¶ 15-18.)

Each of the metrics at issue in this case—revenue, accruals, and CpW—was separately presented for review in the Close Review decks. Any questions or concerns, including those regarding the appropriate application of GAAP or compliance with relevant SEC rules or regulations, were addressed at the CFO Close Review and resolved by the responsible teams. (Meyerhoff Decl. ¶¶ 21-22; Widmar Decl. ¶¶ 17-18.)

***Preparation of corporate disclosures:*** The procedures for preparing the Company's quarterly SEC filings and Earnings Releases began with a meeting of the Disclosure Committee, which took place within a few days of the quarter close and consisted of approximately fifteen to twenty executives, including the direct reports to the CEO and the heads of each corporate department. At this initial meeting, the Disclosure Committee members discussed developments during the quarter and whether changes in the disclosures from the prior quarter were warranted. (Schumaker Decl. ¶¶ 52-54.)

Following this meeting, the SEC Reporting group created an SEC financial filing template, based on the prior-period filing, which it would update. Following the CFO Close Review, the Controller's organization provided consolidated financial results to be input into the template and provided updates throughout the consolidation and reconciliation process. The SEC Reporting group obtained information for the other sections of the SEC Form 10-K/Q from the relevant department heads. (*Id*. ¶¶ 55-56.)

Once this information had been obtained, the Director of SEC Reporting circulated an initial draft of the filing to the various department heads and other subject-matter

experts, the Disclosure Committee, the General Counsel, and PwC. (*Id.* ¶¶ 63, 67.) These recipients reviewed the draft filing and submitted comments, which the SEC Reporting group reviewed and incorporated into a series of revised drafts that it re-circulated to the Disclosure Committee. (*Id.* ¶¶ 63-65.)

Concurrent with the preparation of the Form 10-K/Q, the SEC Reporting and Investor Relations groups collaborated to draft an Earnings Release containing the condensed consolidated financial statements. Based on the Earnings Release and draft Form 10-K/Q, the Investor Relations group prepared a draft script and slide presentation for the Earnings Call, including both prepared remarks and answers to potential questions. The draft Earnings Release was filtered through various levels of review including internal legal counsel, the Disclosure Committee, and the Audit Committee before publication. Substantive information in the Earnings Release and Earnings Call scripts tied back to the Form 10-K/Q. The written approval of the General Counsel was the final step in the approval process for the Earnings Release. (Schumaker Decl. ¶¶ 72-74.)

*Controls and reviews:* Throughout the Class Period, a team within the Controller's organization was charged with ensuring compliance with the Company's system of internal controls. The controls were designed to ensure that all financial statements and disclosures were prepared in accordance with GAAP and Section 404 of the Sarbanes-Oxley Act of 2002.[6] Each year, the Controller's organization and Internal Audit jointly prepared an assessment of the Company's internal controls over financial reporting, which was presented to the Audit Committee, as well as the CEO and CFO. (Schumaker Decl. ¶¶ 76-78.) As part of its annual audit, PwC audited, tested, and evaluated the design and operating effectiveness of First Solar's internal controls. (D'Angelo Decl. ¶ 7.)

---

[6] Section 404 of the Sarbanes-Oxley Act of 2002 was adopted to reduce the possibilities of corporate fraud by mandating stringent procedures for financial reporting. Toward this end, Section 404 requires publicly traded companies to establish internal controls and procedures for financial reporting that must be documented, tested, and maintained to ensure their effectiveness. 15 U.S.C. § 7262.

***The sub-certification process:*** A critical component of the internal controls was the requirement that all personnel substantially involved in the preparation of external disclosures execute an electronic sub-certification. (Schumaker Decl. ¶¶ 58-62.) Sub-certifications varied according to the certifier's position in the Company, with key participants affirming that they had properly performed their responsibilities and were not aware of any material misstatements, omissions, or misrepresentations in SEC filings or the supporting documentation. (Schumaker Decl. ¶¶ 60-61.) All employees at the director level and above, as well as other personnel with key roles in finance and accounting, submitted sub-certifications pursuant to this process.[7] At no time during the Class Period did First Solar ever file a Form 10-K/Q until it had received 100% feedback on all sub-certifications and resolved any material disagreements. (Schumaker Decl. ¶ 62.)

***Auditing:*** The Audit Committee of the Board oversaw the auditing of both First Solar's internal controls and its financial statements. Throughout the Class Period, the Audit Committee was chaired by J. Thomas Presby, a former Vice Chairman of Deloitte, who had thirty years of experience as an outside auditor of public companies. (Ex. 49 at 11.) All three Audit Committee members met the independence and financial expert standards for audit committee service under the listing standards of the NASDAQ Global Market, the requirements set forth in the Securities Exchange Act of 1934, and the requirements of all applicable SEC rules and regulations. *See* NASDAQ Listing Rule 5605(c)(2)(A) and (B); Sarbanes-Oxley Act Sections 301 and 407; SEC Regulation S-K Item 407(d). (Ex. 49 at 52.)

Internal Audit reviewed compliance with the Company's internal controls on a regular basis and reported the results of its reviews quarterly to the CEO, CFO, and Audit

---

[7] The levels of the organization—in ascending order of authority—were: (1) non-managerial associates, (2) managers, (3) directors, (4) vice presidents, (5) senior vice presidents, (6) higher-level executives—including certain senior vice presidents, presidents, the CFO and the CEO.

Committee.  (Meyerhoff Decl. ¶ 8.)  In addition, the design and effectiveness of these controls were independently tested and evaluated by PwC.  (D'Angelo Decl. ¶¶ 5, 7.)

Additionally, PwC performed independent audits of First Solar's financial statements throughout the Class Period.[8]  PwC had access to all First Solar personnel and systems and had designated office space onsite where multiple auditors worked for weeks at a time during PwC's audits and reviews.  (D'Angelo Decl. ¶ 10.)  PwC specifically reviewed and audited the warranty accrual, First Solar's revenue recognition policy, the accrual for LPM remediation expenses (LPM Remediation Accrual), and examined the CpW calculation and underlying controls.  (D'Angelo Decl. ¶¶ 14, 19-20; Exs. 10-24, 32, 33.)

Upon conclusion of its work, PwC communicated its findings directly to the Audit Committee in detailed reports, and also met separately with the Audit Committee outside the presence of management.  (D'Angelo Decl. ¶ 9.)  Additionally, PwC provided letters to the full Board of Directors, which were filed as part of First Solar's Form 10-K, setting out the results of its audit.  For each year of the Class Period, PwC's report contained the following conclusions:

- First Solar's financial statements "present fairly, in all material respects, the financial position of First Solar, Inc. and its subsidiaries at [year-end] and the results of their operations and their cash flows for each of the [preceding] three years . . . in conformity with accounting principles generally accepted in the United States of America"; and

- First Solar "has maintained, in all material respects, effective internal control over financial reporting as of [the end of the fiscal year]."

(D'Angelo Decl. ¶ 9; Exs. 5-8.)

After reviewing the filing with PwC and management, the Audit Committee deliberated and formally resolved to recommend that the full Board of Directors approve the filing of the Form 10-K/Q with the SEC.  (Schumaker Decl. ¶ 68.)

_____

[8] PwC's role as independent outside auditor was not to prepare First Solar's financial statements—that was the role of management as reflected in First Solar's management representation letters sent to PwC.  (Ex. 81.)  Rather, PwC's role was to test and verify First Solar's compliance with the governing accounting standards.

*Final Approval, Certification, and Filing:* For each quarter in the Class Period, the full Board of Directors formally resolved to authorize the filing of the Form 10-K/Q in substantially the form presented to it. The Chief Accounting Officer and Company representative then sign the Form 10-K/Q, and the CEO and CFO signed their SOx certifications. After all of these steps were complete, First Solar filed the Forms 10-K/Q with the SEC. (Meyerhoff Decl. ¶¶ 24-31; Widmar Decl. ¶¶ 20-26.)

**B.      Class Period Developments Underlying the Allegations in the FAC**

**1.      The manufacturing excursion and LPM remediation**

**a.      Discovery of the manufacturing excursion**

On March 20, 2009, a First Solar customer in Germany complained that certain of its sites were experiencing low power output. (Ex. 59.) In late June 2009, a First Solar task force led by Defendant David Eaglesham identified the root cause of the power loss as a manufacturing process change called "Fast Ramp 421" or "FR 421," which First Solar engineers had begun implementing one year earlier, in June 2008. (Eaglesham Decl. ¶¶ 10-11.) The task force concluded that FR 421 had resulted in manufacturing conditions sometimes exceeding the Company's standard control limits—what engineers call an "excursion." (Sohn Decl. ¶ 14.) The task force determined that a small subpopulation of modules manufactured during the excursion period under specific manufacturing conditions could experience field power loss of 15% or more within the first several months following installation.[9] (Eaglesham Decl. ¶ 12.) These modules were referred to as Low Power Modules or "LPMs."[10] The Company discontinued FR 421 at the end of June 2009. (Eaglesham Decl. ¶ 14.)

---

[9] First Solar chose to use a 15% or more field power loss threshold because that was the level necessary to trigger First Solar's warranty obligation. (Ex. 36 at 74:8-18.)

[10] Later in the Class Period, the term "LPM" came to refer to modules experiencing low power, without distinction as to root cause. (Koralewski Decl. ¶ 18; Ex. 35 at 23:6-17, 73:6-74:3.)

**b.    First Solar's commitment to remediate beyond warranty**

Within weeks of confirming that a manufacturing excursion had occurred, First Solar committed to remediate sites whose overall performance was affected by LPMs. As part of the remediation program, First Solar agreed to go beyond the terms of its warranty and pay for what it termed "rip and replace," meaning that the Company would remove and replace LPMs at sites that it determined were underperforming as a result of the excursion. (Meyerhoff Decl. ¶ 34.)

Beginning in July 2009 and continuing into the autumn, First Solar sent letters to its largest customers, distributors, and installers, advising them of the manufacturing excursion and of its offer to remediate affected sites. These communications included notice of a September 30, 2010 deadline for submitting remediation claims. (Koralewski Decl. ¶ 20.) First Solar also asked these entities to relay the remediation offer and the September 2010 claim deadline, which was later extended to November 2010, to their ultimate customers. (Koralewski Decl. ¶ 20.)

Through October 2010, First Solar received fewer than 400 claims. In the last thirty days before the deadline, more than 5,000 additional claims were submitted without any supporting data. These claims represented more than the total number of modules First Solar had manufactured during the entire excursion period. First Solar classified these unsupported claims as "preemptive," because it believed that they had little likelihood of being accepted for remediation. (Koralewski Decl. ¶¶ 25-26.)

**c.    First Solar's accrual for remediation expenses**

Beginning in Q2 2009 and continuing throughout the Class Period, Mr. Koralewski and his staff of engineers and scientists developed and revised models for estimating the number of modules that would be needed to complete the LPM remediation program. (Koralewski Decl. ¶ 21.) In July 2010, TK Kallenbach, President of the Component Business Group, assumed leadership of the LPM remediation program, and worked with Mr. Koralewski and his team to update the remediation estimates. (Kallenbach Decl. ¶ 8.) Mr. Koralewski provided these estimates to the FP&A group, which used them to estimate

the cost of the remediation.  (Schumaker Decl. ¶ 29.)  This cost estimate was then provided to the Assistant Controller, Mr. Schumaker, who reviewed it for reasonableness and used it as the basis for the LPM Remediation Accrual.  (*Id.* ¶¶ 30-31.)  Each key participant in this process, including Messrs. Koralewski, Schumaker, and Kallenbach, submitted sub-certifications during the Class Period stating that he was not aware of any undisclosed fraud, improper estimates, or material misstatements, misrepresentations, or omissions in First Solar's financial statements.  (Schumaker Decl. ¶¶ 61-62.)  PwC reviewed and audited the LPM Remediation Accrual from its inception in Q2 2009, and consistently found that the Company's accounting treatment and calculation of the accrual were reasonable.  (D'Angelo Decl. ¶¶ 14-15.)

*Q2 2009 through Q1 2010:* During Q2 2009, Mr. Koralewski's team estimated that 75,000 LPMs had been produced under manufacturing conditions associated with the excursion.  (Koralewski Decl. ¶ 9.)  That estimate was used to prepare the Q2 2009 LPM Remediation Accrual of $1.8 million.  (Schumaker Decl. ¶ 32.)  Because the estimated amount represented only 1% of First Solar's net income for the quarter, the Disclosure Committee concluded that the accrual was not quantitatively material.  And because the excursion was a one-time event that had been identified and remediated at the manufacturing facilities, the Disclosure Committee determined it was not qualitatively material either.  (Meyerhoff Decl. ¶¶ 36-37; Ex. 44 at 71:3-73:2.)[11]

During Q3 2009, Mr. Koralewski increased his LPM estimate, based on data from additional returns, to a total of 115,000 modules.  (Koralewski Decl. ¶ 11.) Mr. Schumaker and FP&A used Mr. Koralewski's revised estimate to increase the LPM Remediation Accrual by $2.2 million.  (Schumaker Decl. ¶ 33.)

Mr. Koralewski continued to update his estimate of the LPM population based on testing of additional returns during Q4 2009.  At year-end, the estimate increased to

---

[11] The estimated amount of the remediation expense remained immaterial for the following three quarters, representing 1.4%, 2.2%, and 2.6% of net income in Q3 2009, Q4 2009, and Q1 2010, respectively.  (Meyerhoff Decl. ¶¶ 37, 39.)

154,000 modules, which resulted in a $3.1 million increase in the LPM Remediation Accrual in Q4 2009. (Koralewski Decl. ¶ 11; Schumaker Decl. ¶ 34.)

By the end of Q1 2010, First Solar had compiled enough return data to establish a correlation between measured power loss and factory STBi[12] test data generated during the excursion. Using this correlation, Mr. Koralewski estimated that approximately 450,000 LPMs had been produced. (Koralewski Decl. ¶ 12.) The 450,000 LPM estimate was used to update the LPM Remediation Accrual by adding $4.5 million. (Schumaker Decl. ¶ 35.)

*Q2 2010 to Q3 2010:* First Solar first disclosed the manufacturing excursion in its Form 10-Q for Q2 2010 in connection with a $17.8 million increase in the LPM Remediation Accrual. (Ex. 47 at 38.)

Mr. Koralewski's estimate that 450,000 LPMs had been produced during the excursion did not change during Q2 2010, or for that matter through the end of the Class Period. (Koralewski Decl. ¶ 15.) What did change was the percentage of LPMs found in the total mix of modules being pulled from remediated sites, also known as the "hit rate." Based on experience remediating customer sites during the second quarter, First Solar engineers revised the projected hit rate downward to reflect the greater-than-anticipated difficulty of finding LPMs. (Koralewski Decl. ¶ 25; Ex. 67.)[13] A lower hit rate meant that more modules would need to be ripped and replaced, thereby increasing the estimated cost of the remediation as calculated by the FP&A group and confirmed by

---

[12] First Solar subjected a sample of modules to destructive testing to simulate performance following installation in the field. The results of these tests were referred to as the Stability Index (STBi).

[13] The manufacturing excursion affected only a small percentage of the 11.8 million modules manufactured during the excursion period. Because power output could not be determined by visual inspection, the only way to identify affected modules was to pull them from a site and return them to the factory for testing. First Solar accordingly developed a targeted approach to the remediation. For small rooftop sites, typically containing several hundred modules, First Solar ripped and replaced the entire site. For large free-field sites, which could contain hundreds of thousands of modules, First Solar ripped and replaced discrete portions of the site that were determined to be likely to contain modules affected by the manufacturing excursion. (Koralewski Decl. ¶ 22.)

Mr. Schumaker.  The $17.8 million represented approximately 11% of First Solar's reported net income for the quarter.  In light of this increase, First Solar broke out the LPM Remediation Accrual as a separate line item in its financial statements and described it in the text of its SEC filings.  (Meyerhoff Decl. ¶¶ 42-44; Ex. 47 at 38.)  PwC specifically analyzed the increase as part of its Q2 2010 review and concurred with First Solar's accounting treatment.[14]  (Ex. 14.)

Beginning in early July 2010, Mr. Kallenbach led a collaborative effort to develop appropriate disclosure language to describe the excursion.  (Kallenbach Decl. ¶ 9.) Following a review and approval process that included the Disclosure Committee, Audit Committee, Board of Directors, and key subject matter experts, First Solar included the following explanation in its Form 10-Q for Q2 2010:

> During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period.  The excursion could result in possible premature power loss in the affected modules.  The root cause was identified and subsequently mitigated in June 2009.  On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete.  Some of these efforts go beyond our normal warranty coverage. Accordingly, we have accrued additional expenses of $17.8 million in the second quarter of 2010 and $29.5 million in total to date to cover the replacement of the anticipated affected module population in the field.

(Ex. 1 stmt. 97; Ex. 47 at 13-14 and 42.)  The Company's representation that the excursion affected less than 4% of the modules produced from June 2008 to June 2009 accurately reflected Mr. Koralewski's 450,000 LPM estimate.[15]  (Ex. 70 at 329-330.) First Solar continued to include this language, with some minor modifications, in its SEC filings through Q3 2011.  (Exs. 1 stmts. 97, 111, 127, 139, 148, 163.)

---

[14] Also during Q2 2010, First Solar determined that it would provide compensation payments to certain customers for power they lost due to installation of LPMs. (Schumaker Decl. ¶ 36.)  This liability was reflected as an expense in First Solar's statement of operations.  (Ex. 47 at 13.)  PwC also specifically reviewed this accrual and determined it was reasonable.  (Ex. 14.)

[15] 450,000 LPMs divided by the 11.8 million modules produced during the excursion time period equals 3.8%.

First Solar's assessment of overall remediation requirements did not change during Q3 2010.  (Koralewski Decl. ¶ 25; Schumaker Decl. ¶ 37.)

*Q4 2010 to Q2 2011:*  As the remediation progressed into December 2010, Mr. Kallenbach and Mr. Koralewski concluded that, with more than a year of field experience and test results, First Solar now had enough data to support statistical analysis, using a Monte Carlo model, to estimate the remaining remediation needs.[16]  (Kallenbach Decl. ¶ 12; Koralewski Decl. ¶ 27.)  Unlike earlier models, which began with estimates of the total number of LPMs manufactured during the excursion period, the Monte Carlo model used a probabilistic approach based on factory measurements of the modules returned from sites targeted for remediation.  (Kallenbach Decl. ¶ 13; Koralewski Decl. ¶¶ 28-29.)

In Q4 2010, Mr. Koralewski used the Monte Carlo model to estimate that First Solar would need approximately 85 megawatts (MW)[17] of replacement modules to complete the remediation.  (Koralewski Decl. ¶ 30.)  Based on that estimate, the finance and accounting teams calculated an increase of $8.5 million to the LPM Remediation Accrual, which was incorporated in the financial statements in First Solar's Form 10-K on February 28, 2011.  (Schumaker Decl. ¶ 38; Ex. 48 at 45.)

First Solar provided the Monte Carlo model to PwC.  As part of PwC's work on the year-end audit, PwC specialists with expertise in valuation and modeling did independent calculations to replicate First Solar's Monte Carlo results.  (Ex. 15 at 258; Exs. 16-17; Ex. 35 at 60:13-61:15, 62:10-63:9.)  In addition, PwC's core audit team independently assessed the inputs and assumptions that were used to generate the model's output.

---

[16] A Monte Carlo model is a computational algorithm that relies on repeated random sampling to estimate the likelihood of various possible outcomes of a single event.  First developed at the Los Alamos National Laboratory by a nuclear physicist, it is now widely used in various branches of science and engineering.  (*See* N. Metropolis, *The Beginning of the Monte Carlo Method*, Los Alamos Science Special Issue 1987, at 125-30.)

[17] Based on average watts per module during the Class Period, one megawatt represented approximately 13,000 modules.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                                              22

(Ex. 35 at 62:10-24, 64:2-13, 71:9-72:25.)  Based on this work, PwC determined that "management's estimate [was] reasonable." (Ex. 15.)

At the conclusion of Q1 2011, Mr. Koralewski determined that the results of the remediation were consistent with the Monte Carlo estimate from December 2010. (Koralewski Decl. ¶ 30.)  As a result, the Company did not increase the LPM Remediation Accrual in Q1 2011.  (Schumaker Decl. ¶ 39.)

In early July 2011, Mr. Schumaker advised the executives in charge of the remediation process that First Solar had shipped more replacement modules than the December 2010 iteration of Monte Carlo had projected.  (*Id*. ¶ 40.)  Over the next several weeks, Mr. Kallenbach, assisted by Mr. Koralewski and others, assessed the status of the remediation.  (Kallenbach Decl. ¶¶ 14-17.)  As part of this process, the remediation team analyzed the status of all open customer claims.  (Ex. 76 at 104-106.)  Several thousand claims were still under review at the end of Q2 2011.  (*Id.*)  Nearly 70% of these claimants had not submitted any data showing performance issues at their sites.  Mr. Kallenbach therefore concluded that virtually all of these unsupported claims would be rejected. (Kallenbach Decl. ¶ 15.)  Mr. Kallenbach also concluded that the vast majority of the remaining 30% of open claims would be rejected on the ground that any performance issues at these sites were unrelated to the manufacturing excursion.  (Kallenbach Decl. ¶ 16.)

During July 2011, Mr. Koralewski and his team reran the Monte Carlo model to incorporate the results of module testing and remediation data from Q2 2011.  The updated model estimated that approximately 92 MW of replacement modules would be needed to complete the remediation—a 7 MW increase from the amount estimated during Q4 2010 and Q1 2011.  (Koralewski Decl. ¶ 30.)  Mr. Kallenbach reviewed the revised Monte Carlo estimate and compared it to the total number of modules shipped through the end of July, which was approximately 92 MW.  (Kallenbach Decl. ¶ 17.)  In Mr. Kallenbach's judgment, these results provided further confirmation that the Company had identified substantially all sites affected by the manufacturing excursion and that any

remaining open claims would likely be rejected. (Kallenbach Decl. ¶ 17.) Mr. Kallenbach communicated the new 92 MW estimate to Mr. Schumaker, who used it to increase the LPM Remediation Accrual by $3.6 million. (Schumaker Decl. ¶ 41; Kallenbach Decl. ¶ 18.)

Mr. Kallenbach also discussed his estimate with, and provided his underlying analysis to, PwC. (Kallenbach Decl. ¶ 18; Ex. 35 at 104:21-106:8, 107:20-108:18.) PwC reviewed the updated Monte Carlo model, First Solar's replacement module shipment data, and Mr. Kallenbach's analyses, and deemed the resulting accrual reasonable. (Ex. 18 at 2.)

*Q3 2011:* In Q3 2011, Mr. Kallenbach updated his estimate based on a site-by-site analysis that incorporated current module testing and customer-site data. As part of this analysis, the remediation team attempted to differentiate claims involving power loss caused by the manufacturing excursion from claims based on other root causes. (Kallenbach Decl. ¶ 19.) Contrary to Mr. Kallenbach's expectations, the site-based evaluation projected that a total of 120 MW would be needed to complete the remediation. (*Id.*) This review also identified another 17 MW of replacement modules for issues unrelated to the manufacturing excursion, for a total of 137 MW. (Kallenbach Decl. ¶ 19; Koralewski ¶ 30; Ex. 77 at 707-09.)

As a cross check, Mr. Koralewski reran the Monte Carlo simulation, incorporating new module test data received during the third quarter. The updated Monte Carlo estimate of 133 MW was consistent with Mr. Kallenbach's updated estimate. (Kallenbach Decl. ¶ 19.)

As in previous quarters, Mr. Kallenbach shared with Mr. Schumaker and other members of the finance and accounting teams his updated best estimate of the total remediation need. (Kallenbach Decl. ¶ 20; Schumaker Decl. ¶ 42.) Mr. Kallenbach informed the finance and accounting teams that the new estimate of 120 MW would be sufficient to conclude the LPM remediation. (Kallenbach Decl. ¶ 20.) As part of the LPM accrual process for Q3 2011, Mr. Schumaker analyzed the cost associated with the

additional remediation. (Schumaker Decl. ¶ 42.) Based on this analysis, First Solar added $22.1 million to the LPM Remediation Accrual. It also accrued $16.2 million for remediation unrelated to the manufacturing excursion. (Ex. 50 at 43-44; Ex. 77 at 706-14.)[18]

Mr. Koralewski and Mr. Schumaker shared Mr. Kallenbach's new remediation estimate and the updated Monte Carlo analysis with PwC. PwC again reviewed the Company's analyses, evaluated and tested the assumptions, and deemed the adjustment reasonable. (Ex. 19; *see also* Ex. 20.)[19]

*Q4 2011:* Mr. Kallenbach left First Solar in December 2011 for reasons unrelated to the LPM remediation. (Ex. 38 at 78:6-25.) In his place, Tom Kuster, VP, Product Management and Customer Support, took over management of the LPM remediation. (Ex. 41 at 27:20-28:14.) Under Mr. Kuster's leadership, the team shifted its focus from finding and replacing individual LPMs, to offering "commercial solutions" to LPM-affected customers. (Ex. 41 at 55:18-56:17.) Thus, in lieu of ripping and replacing LPMs, the Company sometimes provided cash compensation or installed additional modules to return site-level power output to expected levels and/or compensate for lost power. This shift was, in part, a response to a significant change in the solar industry caused by reductions in European FiTs and actions by Chinese manufacturers to flood the market with low-cost modules, which gave customers increased leverage with suppliers. (Ahearn Decl. ¶¶ 18-19, 22; Ex. 41 at 54:14-55:22; Ex. 43 at 42:24-44:10.)

As a result of these changes and the new claim and module test data received during the quarter, Mr. Kuster's team performed a new analysis of the LPM remediation program. Because more than 90% of claims had now been processed, Mr. Kuster's team was able to develop site-by-site remediation estimates for all outstanding claims. (Ex. 86

---

[18] Based on new analysis performed by Mr. Kallenbach and his team during Q3 2011, the Company also accrued another $8.6 million for customer power compensation payments under the LPM program. (Schumaker Decl. ¶ 43; Ex. 50 at 45.)

[19] PwC also reviewed the analysis of customer power compensation payments and the resulting accrual, and concluded that they were reasonable. (Ex. 20 at .002.)

at 488.)  Based on this analysis, the Company increased the LPM Remediation Accrual by $23.9 million.  (*Id*. at 488-89.)[20]  The Company also announced a $70.1 million product warranty expense, reflecting an increase in the expected number of replacement modules needed and the lower market value of refurbished modules.  (*Id.* at 489.)[21]

Before the 2011 Form 10-K was filed, following standard procedures, Mr. Schumaker and Andrey Xavier (VP, Internal Audit) led an analysis of the timing and the amount of the increases to the LPM Remediation Accrual for prior quarters. (Schumaker Decl. ¶ 48.)  After performing a retrospective analysis of quarterly claim activity for Q2 through Q4 2011, the accounting and internal audit teams concluded that First Solar's accruals were materially accurate.  (Ex. 86 at 491.)  The results of this analysis were shared with PwC.  (*Id.* at 484.)[22]

As part of its annual audit of First Solar's financial statements, PwC tested the LPM Remediation Accrual.  (D'Angelo Decl. ¶ 15; Ex. 21; Ex. 24 at 280-81 & 284-85.) PwC "concluded that the estimated balance recorded and disclosure of the estimated range of loss [was] reasonable," and reported to the Audit Committee that the Q4 2011 "changes were not expected by Management in the third quarter nor was there a compelling basis at the time to believe that a larger accrual would be necessary based upon the information available at the time."  (Ex. 24 at 281; D'Angelo Decl. ¶ 15.)

---

[20] In addition, as part of the updated analysis, First Solar accrued $31.8 million for estimated lost power payments under the LPM program.  (Ex. 86 at 488.)

[21] As part of the remediation process, the Company put into inventory returned modules that could be resold, which were accounted for at the lower of cost or market. During the fourth quarter close, First Solar reevaluated the resale value of those modules. (Ex. 84 at 419-20.)  Mr. Schumaker's accounting team determined that, due to the market factors discussed above, the value of the refurbished modules had fallen approximately 37% since the third quarter.  (Ex. 84 at 419-20.)

[22] The accounting and internal audit teams identified a $4.07 million error relating to liabilities that were incorrectly recorded in Q3 2011 instead of Q2 2011, which the Company concluded was immaterial under the factors discussed in Staff Accounting Bulletin No. 99 (SAB 99).  (Ex. 24 at 316-27.)  The SAB 99 analysis was shared with PwC, which concurred with First Solar's assessment.  (Ex. 22; Ex. 24 at 284-85.)

## 2.    Module performance in hot climates

First Solar's modules—like those of other manufacturers—lose some of their capacity to convert sunlight into electricity over time.  Throughout the Class Period, First Solar understood—and advised its customers—that the rate of this degradation was slightly greater in hot climates than in temperate ones.  (Eaglesham Decl. ¶ 23.)  In April 2010, a team of First Solar scientists and engineers created a draft position paper that noted, among other things, that data from a small number of sites seemed to show that systems in hot climates might degrade faster than previously understood.  (Eaglesham Decl. ¶¶ 30-32; Ex. 64.)  These data, however, were inconsistent with other data from long-term test installations in the Arizona desert and other hot-climate sites that were performing at or above expectations.  (Eaglesham Decl. ¶ 33; Ex. 36 at 126:11-127:2, 129:23-132:5.)  Accordingly, in a May 2010 presentation distributed to Messrs. Gillette, Meyerhoff, and Sohn, the technical team concluded that the "analysis of validated sites does not support change to current guidance" given to customers about module degradation rates.  (Ex. 65 at 427.)

The technical team also recommended that First Solar continue to monitor sites to develop better data regarding degradation rates.  (Eaglesham Decl. ¶ 34; Ex. 36 at 157:13-158:6.)  On February 7, 2011, First Solar scientists reported to Dr. Eaglesham that the Company's Blythe plant, located in the southern California desert, was producing power at a lower level than its Sarnia plant, located in Ontario, Canada.  (Eaglesham Decl. ¶¶ 35-36.)  Dr. Eaglesham immediately tasked a new team to investigate the variance. (*Id.* ¶ 37.)  In March 2011, based on new data, First Solar scientists and engineers concluded that initial stabilization was more pronounced in hot climates than temperate climates.[23]  (*Id.* ¶ 38.)  The same team also concluded that, after this initial stabilization, module degradation was independent of temperature or climate.  (*Id.*)

---

[23] As with other thin-film modules, First Solar's modules undergo an initial period of relatively rapid degradation after installation (referred to as stabilization), followed by a much slower long-term degradation period.  (Eaglesham Decl. ¶ 21.)

Dr. Eaglesham then directed the team to develop hot-climate mitigation strategies. By the end of April 2011, the team had identified two short-term commercial solutions until a permanent technical solution could be implemented. First, the team proposed that a greater "derating" be applied to modules sold to third parties for installation in hot climates.[24] (Eaglesham Decl. ¶ 41; Ex. 74 at 530.) Second, for sites designed and built by First Solar, the team proposed installing additional modules to ensure site-level power output would remain at or above expectations after the initial stabilization period. (Eaglesham Decl. ¶ 42; Ex. 74 at 529.) The estimated financial impact of these proposals was fully incorporated into First Solar's updated financial guidance to investors issued on May 3, 2011. (Ex. 43 at 183:6-185:8.)

On April 26, 2011, Mr. Koralewski specifically concluded that First Solar's existing warranty accrual was adequate to cover projected warranty expenses for modules installed in hot-climate sites. (Koralewski Decl. ¶ 36; Ex. 75 at 968.) PwC, upon request of the Audit Committee, reviewed management's accrual estimates with respect to the hot-climate issue, including meeting with Dr. Eaglesham and other scientists and engineers on the task force. (D'Angelo Decl. ¶ 17; Ex. 27.) On April 29, PwC informed the Audit Committee that it had concluded that management's accrual estimate was reasonable, and that the hot-climate stabilization issue had been accounted for appropriately. (D'Angelo Decl. ¶ 17; Exs. 26-27.)

From June to September 2011, First Solar implemented its long-term solution—a new manufacturing process, known as the hot-climate process or "HCP," which improved module stability. (Eaglesham Decl. ¶ 43.) By the end of 2011, HCP and other process improvements had resolved the initial stabilization issue. (*Id*. ¶ 44.)

---

[24] From before the Class Period, First Solar applied a "derate" averaging approximately 5.5% to all modules as they came off the production line to account for the initial stabilization. (Eaglesham Decl. ¶ 22.) This derate reduced the nameplate power rating of a module from its actual tested value to its expected post-stabilization value. The nameplate power rating, sale price, and warranty accrual all were based on the derated value. (Eaglesham Decl. ¶ 22.)

As part of the Q4 2011 close, Messrs. Koralewski and Kuster, and Dr. Eaglesham, reviewed First Solar's projected warranty return rates. Based on their analysis, they concluded that it would be prudent to increase the general warranty accrual rate by one percentage point. (Koralewski Decl. ¶ 37; Ex. 82 at 347.) The warranty rate increase was informed by several factors, including new site-specific data developed during Q4 2011, changing customer behavior, and First Solar's increasing use of commercial solutions in lieu of its standard module-level warranty. (Koralewski Decl. ¶ 37; Ex. 85 at 771; Ex. 52 at 40.) Mr. Schumaker applied the recommended increase to new module sales and to the installed module base, resulting in a $37.8 million increase to the warranty accrual. (Ex. 85 at 772-74.) As part of its year-end audit, PwC reviewed the warranty accrual and the warranty accrual rate, and concurred that they were reasonable. (D'Angelo Decl. ¶ 18; Ex. 28.)

**ARGUMENT**

A Section 10(b) claim has six elements: "(1) a material misrepresentation or omission; (2) scienter (i.e., a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation . . . ; (5) economic loss; and (6) loss causation." *Loos v. Immersion Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014).[25] Plaintiffs bear the burden of proof on each element. *Oracle*, 627 F.3d at 387.

Where, as here, Plaintiffs bear the burden of proof, Defendants' burden on summary judgment is satisfied "by showing—that is pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (U.S. 1986). Plaintiffs then "must come forth with evidence from which a jury could reasonably render a verdict" in their favor. *Oracle*, 627 F.3d at 387. If the evidence is "not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). Where the factual

[25] Unless otherwise noted, all internal citations are omitted.

context makes the claim "implausible," as here, Plaintiffs "must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Stitt v. Williams*, 919 F.2d 516, 523 (9th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Plaintiffs cannot present evidence sufficient to support a judgment in their favor with respect to three elements of their Section 10(b) claim:  loss causation, material falsity, and scienter.  Plaintiffs cannot satisfy the loss causation element, because there is no evidence that the alleged fraud was revealed to the public.  Plaintiffs cannot satisfy the remaining elements, because the evidence is insufficient to support a reasonable judgment that Defendants engaged in fraud in the first place.

**I.     THE EVIDENCE DOES NOT SUPPORT A FINDING OF LOSS CAUSATION.**

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court held that, to prevail in a Section 10(b) fraud-on-the-market case, a plaintiff must prove not only that it purchased stock at a fraudulently inflated price—transaction causation—but also that it suffered a loss when the price of the stock fell in reaction to the fraud being revealed—loss causation. *Id*. at 345-46.  The Court rested its decision on the ground that the Private Securities Litigation Reform Act of 1995 "expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" *Id*. (quoting 15 U.S.C. § 78u-4(b)(4)).  The Court also explained that failure to enforce the element of loss causation would "transform a private securities action into a partial downside insurance policy," allowing speculators to reap the benefits of rising prices while shielding themselves from price declines. *Id*. at 345-48.

Following *Dura*, the Ninth Circuit has articulated a clear test for loss causation:  "Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and plaintiff suffers a loss as a result of the market's reaction." *Oracle*, 627 F.3d at 392 (affirming summary judgment on loss causation grounds).

Here, Plaintiffs cannot establish loss causation for two independent reasons. First, Plaintiffs cannot show that "the defendants' fraud was *revealed* to the market." *Loos*, 762 F.3d at 887 (emphasis in original). There has been no restatement of First Solar's financial results, no Wall Street Journal exposé, no Department of Justice indictment, no SEC enforcement action, and no withdrawal of PwC's unqualified opinions. Rather, Plaintiffs allege that the fraud was revealed by First Solar itself in press releases and Earnings Calls. Nothing in these earnings disclosures, however, retracts or corrects any of the challenged statements, or in any way reveals the falsity of the challenged statements. This failing alone entitles Defendants to summary judgment on all claims. *See Oracle*, 627 F.3d at 392; *Oregon Pub. Emps.' Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 608-610 (9th Cir. 2014); *Metzler Inv. GMBH v. Corinthian Colls.*, *Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).

Second, Defendants are also entitled to summary judgment on the independent ground that Plaintiffs cannot show that the (alleged) revelation of fraud caused a decline in First Solar's stock price. In other words, Plaintiffs have no evidence that, among "the tangle of factors affecting price," it was "a revelation of fraudulent activity rather than . . . changing market conditions, changing investor expectations, or other unrelated factors" that caused First Solar's stock price to decline. *Dura*, 544 U.S. at 343.

### A.   First Solar's Disclosures Did Not Reveal Fraud.

The seven disclosures Plaintiffs have identified as "corrective disclosures" are set out in a chart attached as Exhibit 4 in the Appendix of Exhibits. Two of these are press releases that do not mention anything about First Solar's financial performance. The other five are each routine quarterly Earnings Releases and accompanying Earnings Calls (Earnings Disclosures). None of the seven retracts or revises the challenged statements, (*see* Exs. 1-3), or in any way reveals them to have been fraudulent.

#### 1.   The October and December 2011 Press Releases did not reveal fraud.

The October 25, 2011 press release states (in its entirety):

> The Board of Directors of First Solar, Inc. (NASDAQ: FSLR) today asked its Chairman and Company founder, Mike Ahearn, to serve as interim Chief Executive Officer.  Ahearn has accepted.  Effective immediately, Rob Gillette is no longer serving as Chief Executive Officer, and the Board of Directors thanks him for his service to the Company.  The Board of Directors has formed a search committee and is initiating a search for a permanent Chief Executive Officer.

(Ex. 4.)  First Solar's stock price declined 25% the following day.  (FAC ¶ 230.)

This release does not address the subject matter of the challenged statements, let alone reveal those statements to have been fraudulent.  It cannot, therefore, establish loss causation.  *Loos*, 762 F.3d at 887-88.

Plaintiffs allege that Mr. Gillette's departure constitutes a corrective disclosure because it may have kindled speculation of fraud.  (FAC ¶ 230.)  Even if such speculation existed, it would not matter—on-point Ninth Circuit decisions hold that speculation is insufficient.  For example, in *Loos*, plaintiffs argued that the defendant company's announcement that its Audit Committee was conducting an independent investigation into accounting practices fueled market speculation concerning prior-period financial-accounting fraud.  The court rejected this argument, explaining:

> The announcement of an investigation does not "reveal" fraudulent practices to the market . . .  Any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred.  This type of speculation cannot form the basis of a viable loss causation theory.

*Loos*, 762 F.3d at 890.

Most recently, in *Oregon Public Employees v. Apollo*, the plaintiffs alleged that the defendants had inflated the stock price of their for-profit education business by fraudulently misrepresenting its recruitment methods.  Plaintiffs argued that loss causation occurred when the Department of Education "expressed a concern" over these methods.  The Ninth Circuit rejected this reasoning, explaining that "[a]n expression of concern . . . does not constitute a corrective disclosure and a public admission of Apollo's alleged fraud."  774 F.3d at 608.

Similarly, in *Metzler*, the stock price of for-profit education company Corinthian Colleges fell 45% after it announced disappointing financial results attributable in part to

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                            32

"higher than anticipated attrition." 540 F.3d at 1064. Plaintiffs argued that this phrase "was understood by the market as Corinthian's 'euphemism' for an admission that they had enrolled students who should not have been signed up at all." *Id.* The Ninth Circuit rejected this argument, explaining:

> So long as there is a drop in a stock price, a plaintiff will always be able to contend that the market "understood" a defendant's statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price.

*Id.* at 1064.

Like the disclosures in *Oregon Public Employees*, *Loos*, and *Metzler*, the October 25, 2011 press release did not reveal that any challenged statement was false when made. It does not, therefore, satisfy the requirement of loss causation.

For the same reason, the December 14, 2011 press release does not satisfy the requirements for loss causation. On December 14, 2011, First Solar lowered its estimated financial forecast for the remainder of 2011, forecast lower-than-expected financial results for 2012, announced a workforce reduction, and described how it was changing its business strategy to address new challenges in the marketplace. (Ex. 51 at exhibit 99.2.) The price of First Solar's stock declined by 27% in the two days following the release. (FAC ¶ 234.)

Again, these statements do not address the subject matter of the alleged misrepresentations. They certainly do not reveal the fraudulent nature of the challenged statements.

Plaintiffs allege that the reduced guidance was a corrective disclosure because it incorporated expenses that Defendants projected First Solar would incur in connection with LPM remediation and the hot-climate issue. (FAC ¶ 234.) The Ninth Circuit, however, has repeatedly rejected attempts to prove loss causation by arguing that the market reacted to financial results that were "impacted" by the fraudulent practices, rather than to disclosures revealing the fraudulent practices themselves.

On point is *Oracle*, where the company's stock price fell following its announcement of disappointing third-quarter financial results. Plaintiffs sued, alleging that the third-quarter shortfall resulted from defendants improperly accelerating recognition of third-quarter sales into the second quarter and from fraudulently concealed defects in a newly launched software suite. The Ninth Circuit affirmed summary judgment on the ground that the press release announcing Oracle's results did not reveal the alleged fraud. The court explained, "plaintiffs . . . assert that they should be able to prove loss causation by showing that the market reacted to the purported 'impact' of the alleged fraud—the earnings miss—rather than to [disclosure of] the fraudulent acts themselves. *We reject that assertion.*" *Oracle*, 627 F.3d at 392 (emphasis added).

The Ninth Circuit rejected the same "impact" argument in *Loos*. There, the plaintiffs alleged that defendant Immersion engaged in improper revenue recognition over several quarters to conceal fundamental weakness in its business. *Loos*, 762 F.3d at 887. Plaintiffs alleged that the impact of this fraud was revealed when the company reported lower revenue in the following quarters and, finally, announced that the audit committee of its board of directors was conducting an investigation into "certain previous revenue transactions." *Loos*, 762 F.3d at 885-86. Immediately following the announcement, Immersion's stock price fell over 23%. As it did in *Oracle*, the Ninth Circuit rejected the argument that investors suffered loss when the "impact" of defendants' fraud was revealed in the form of disappointing earnings, and explained that, to establish loss causation, "the market must have learned of and reacted to the company's fraudulent *practices* as opposed to the financial impact of those practices." *Id.* at 887-88 (emphasis in original); *see also In re Herbalife, Ltd. Sec. Litig.*, No. CV 14-2850 DSF (JCGx), 2015 WL 1245191, at *1 (C.D. Cal. Mar. 16, 2015) (plaintiffs must identify a corrective disclosure "revealing a previously unknown fraud").

The December 14, 2011 press release did not reveal any fraudulent practices. There is no reasonable basis, therefore, for a jury to conclude that the stock price decline following this release was caused by a revelation of fraud.

**2.      The five Earnings Disclosures did not reveal fraud.**

Plaintiffs also claim that the alleged fraud was revealed in five quarterly Earnings Disclosures, which provided investors with information concerning ongoing and projected future operations and financial results.  A review of the five categories of allegedly fraudulent statements and the content of these five Earnings Disclosures shows this argument to be without merit.

**a.      The Earnings Disclosures did not reveal that First Solar had violated GAAP when accruing for estimated future expenses.**

None of the Earnings Disclosures reveals that First Solar failed to follow GAAP when accruing for estimated future expenses.  Indeed, if First Solar had revealed GAAP violations, it would have been required to:  (1) publicly state that its prior financial statements were not prepared in accordance with GAAP and should not be relied upon; and (2) prepare and file new financial statements in accordance with GAAP.  *See, e.g.,* ASC 250-10-20; ASC 250-10-45-23, *et seq.*; Item 4.02 of Form 8-K.  First Solar has never done so or been called upon to do so.

Again, *Oracle* is directly on point.  There, plaintiffs alleged that defendants had fraudulently inflated second-quarter results by accelerating revenue from the third quarter into the second quarter.  The Ninth Circuit affirmed summary judgment for failure to prove loss causation, writing, "There is simply no evidence to support the conclusion that Oracle's stock price dropped as a result of the market's reaction to learning of fraudulently overstated Q201 earnings on March 1, 2001, as opposed to Oracle's poor financial health generally.  ***Oracle's Q201 earnings have never been revised downward.***" *Oracle*, 627 F.3d at 394 (emphasis added).

The same is true here:  First Solar's earnings have never been revised downward. Plaintiffs appear to be taking the position that when a company increases an accrual, it somehow reveals that the prior accrual was fraudulent or prepared in violation of GAAP. That is incorrect.  Far from revealing fraud, such increases are ***fully consistent with GAAP's requirement*** that accruals be adjusted quarterly to reflect current

understandings.[26]  (*See*, Argument § II.B.1.a, *infra.*)

Plaintiffs also contend that the "module replacement program" and "product problems" had a negative impact on net sales announced in February 2011 and May 2011 respectively, and that these disappointing sales numbers, in turn, caused loss.  (FAC ¶¶ 228, 229.)  Here again, Plaintiffs' argument is directly contradicted by the Ninth Circuit rule that "the market must have learned of and reacted to the company's fraudulent *practices* as opposed to the financial impact of those practices."  *Loos*, 762 F.3d at 888 (emphasis in original).

### b.   The Earnings Disclosures did not reveal that First Solar had improperly recognized revenue before it was earned.

A jury could not reasonably conclude that any of the five Earnings Disclosures revealed that First Solar had fraudulently recognized revenue on its sales of modules into hot climates.  First Solar has never restated its revenue.  And none of these Disclosures states that First Solar had incorrectly recorded revenue in the past.  Absent any such revelation, Plaintiffs cannot prove loss causation.  *See Oracle*, 627 F.3d at 394.

### c.   The Earnings Disclosures did not reveal that First Solar had fraudulently concealed the excursion or misrepresented the status of the remediation.

Plaintiffs claim that First Solar fraudulently concealed the full extent of the excursion and misrepresented the progress of the remediation effort.  (Ex. 3 at §§ 1, 3.)  None of the supposedly "corrective disclosures," however, revealed any prior statement on these subjects to have been fraudulent.  The July 29, 2010 release was the first time First Solar publicly disclosed the excursion.  Necessarily, therefore, it could not have revealed the falsity of earlier statements on the topic—*there had been none*.[27]  The

---

[26] For the same reasons, the five Earnings Disclosures did not reveal that First Solar had falsely characterized its accruals as its "updated best estimates of the total replacement costs" at the time (*e.g.,* FAC ¶ 127) or that First Solar had previously misrepresented the status of its remediation efforts.  (*E.g.,* FAC ¶¶ 40, 127.)

[27] As shown below, First Solar had no legal duty to disclose the excursion or remediation before it did.  (*See* Argument § II.B.2, *infra.*)

language of the later releases does not contradict—indeed, it repeats—the language of the July 29, 2010 release.  At no time did the alleged corrective disclosures ever reveal First Solar's statements concerning the excursion or the performance of its modules to have been false or fraudulent when made.

Plaintiffs also allege that First Solar misrepresented that "less than 4%" of modules produced between June 2008 and June 2009 were affected by the excursion.  There can be no loss causation with respect to this statement, however, because none of the Earnings Disclosures retracts the 4% figure or reveals that the 4% figure was incorrect.  (Ex. 1 stmts. 97, 111, 127, 139, 148, 163.)

Similarly, the February 2012 Earnings Disclosure also announced an increase in the warranty accrual based on the Company's shifting sales mix to hotter climates and new data, together with a reduction in projected financial performance and restructuring costs.  (Ex. 55.)  Nothing about this announcement revealed the falsity or fraudulent nature of prior statements.

            **d.**      **The Earnings Disclosures did not reveal that First Solar had issued fraudulent statements and risk-factor warnings regarding module and system performance.**

Plaintiffs have alleged that dozens of statements First Solar made about module and system quality—including cautionary risk factors—were rendered misleading by the excursion or climate effects.  (Ex. 3 at §§ 4, 5.)  The Earnings Disclosures do not retract, or reveal the falsity of, any of these statements.

            **e.**      **The Earnings Disclosures did not reveal that First Solar had fraudulently manipulated its reported CpW.**

Finally, Plaintiffs allege that First Solar manipulated its reported CpW.  The Earnings Disclosures, however, do not call into question the accuracy of any prior report of CpW.  Indeed, a December 14, 2011 presentation discussed in a public Earnings Call accompanying an alleged "corrective disclosure" *expressly reaffirmed* First Solar's previously disclosed CpW.  (Ex. 87 at 27.)

Thus, Plaintiffs cannot present evidence sufficient to support a reasonable finding

that the fraudulent nature of any challenged statement was revealed during the Class Period. On this ground, all Defendants are entitled to summary judgment on all claims.

**B.    Plaintiffs Also Cannot Prove That the Decline in First Solar's Stock Price Was Caused by a Revelation of Fraud.**

Even if Plaintiffs could somehow show that fraud was revealed to the marketplace—which they cannot do for the reasons stated above—that would not suffice to defeat summary judgment. Plaintiffs must, additionally, prove that, out of "the tangle of factors affecting price," *Dura*, 544 U.S. at 343, it was the revelation of fraud rather than other factors that caused the price of First Solar stock to decline; *i.e.*, the decline was caused by "a revelation of fraudulent activity **rather than** by changing market conditions, changing investor expectations, or other unrelated factors." *Loos*, 762 F.3d at 887 (emphasis added). Plaintiffs cannot meet that burden here.

As discussed above, the solar power industry in general, and First Solar in particular, went through dramatic changes during the period from July 2010 through February 2012.[28] Plaintiffs cannot present admissible evidence sufficient to establish that it was the effects of the 2008-2009 excursion and/or the hot-climate disclosures, rather than these changing market conditions, that caused the loss they complain of. For this additional, independent reason, all Defendants are entitled to summary judgment on loss causation grounds.

**II.    THE EVIDENCE DOES NOT SUPPORT A FINDING THAT ANY DEFENDANT ENGAGED IN SECURITIES FRAUD.**

As shown above, the absence of evidence that the alleged corrective disclosures revealed any fraud entitles Defendants to summary judgment. Defendants are also

[28] Among the tangle of factors affecting the market price were the end of FiTs, the global financial crisis, European government austerity programs, the precipitous decline in the price of silicon, and the massive influx of competition from China. Among the factors affecting First Solar specifically were the strategic shift from module sales toward the power-systems business and the shift in geographic focus away from Europe. (Factual Background, § III.A.2, *supra*.)

entitled to summary judgment on the ground that the evidence is insufficient to support a reasonable conclusion that there was any securities fraud in the first place.

### A.    The Elements of a Section 10(b) Claim

In addition to loss causation, Section 10(b) requires proof of four related elements: (1) that a defendant "made" a statement; (2) that the statement was false or misleading when made; (3) that the statement remediation was material; and (4) that the defendant made the statement with scienter.  *Oracle*, 627 F.3d at 387.

*The "maker" element:*  A person "makes" a statement within the meaning of Section 10(b) only when he holds "ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011); *see also Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011).  For purposes of this motion only, Defendants do not contest that the Individual Defendants who signed the SEC filings and spoke the challenged statements on Earnings Calls "made" those statements within the meaning of Section 10(b).[29]  The Individual Defendants, however, are not liable for statements made by others, whether they are defendants or not.  *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070-71 (N.D. Cal. 2012) (CEO and Chairman of Board did not have "ultimate authority" over statements made by others on earnings calls).  Nor may the knowledge of one corporate officer be grafted onto a statement made by another corporate officer for purposes of establishing scienter.  *See NVIDIA*, 768 F.3d at 1063; *Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 743-44 (9th Cir. 2008).

*Falsity:*  Plaintiffs' principal allegation of falsity is that Defendants improperly accrued for projected LPM remediation expenses and for the projected expense of satisfying warranty claims for modules installed in hot climates.  To establish that reserves

---

[29] First Solar's Board specifically retained ultimate authority over the content and filing of all SEC filings and Earnings Releases.  (Ex. 43 at 58:13-59:19, 68:14-19.)  The role of each Individual Defendant as an alleged signer or speaker of the Challenged Statements is set out in Exhibits 1-3.

or accruals were false or misleading within the meaning of Section 10(b), a plaintiff must prove that the accruals "were derived in a manner inconsistent with reasonable accounting practices." *Alaska Elec. Pension Fund v. Adecco, S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006), *aff'd*, 256 Fed. Appx. 74 (9th Cir. 2007); *Mathews v. Centex Telemgmt., Inc.*, No. C-92-1837-CAL, 1994 WL 269734, at *6 (N.D. Cal. June 8, 1994) (citing cases).  As *Mathews* explained, when addressing the analogous issue of setting reserves[30] for bad debt:

> Reserves for bad debts are essentially predictions about the future.  The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made.  Because reserves are meant to be estimates or predictions of collectability, they are fraudulent only "if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices."  . . .  If the defendants method of projection was reasonable, summary judgment is appropriate.  The jury need not be given the task of deciding whose proffered method is more reasonable.

*Id.*; *see also City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1117 (E.D. Wash. 2013) (dismissing allegations of "artificially low" loss reserves and explaining that, "[d]etermining the proper amount of reserves is an act laden with managerial judgment and discretion," and "setting reserves is an art, not a science").

*Materiality:*  To satisfy the materiality requirement, Plaintiffs must establish "a substantial likelihood" that the information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (affirming dismissal for lack of materiality).  "No matter how detailed or accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Intuitive Surgical*, 759 F.3d at 1061.  Section 10(b), therefore, allows companies considerable discretion in formulating their disclosures so as to avoid "bury[ing] the shareholders in an avalanche of trivial information." *In re Convergent Tech. Sec. Lit.*, 948 F.2d 507, 516

---

[30] As explained above in the Factual Background, section III.A.3.a, accrued liabilities are often referred to as either "accruals" or "reserves."

(9th Cir. 1991). "Moreover, it bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011).

*Scienter:* To establish scienter, Plaintiffs must prove that the Individual Defendant who "made" the misleading statement did so with an "intent to deceive, manipulate, or defraud" investors. *Ernst*, 425 U.S. at 193. "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (affirming summary judgment); *see also In re REMEC Sec. Litig.*, 702 F. Supp. 2d 1202, 1237 (S.D. Cal. 2010). Rather, to prove scienter, a plaintiff must show that "defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Deliberate recklessness is a "form of intentional or knowing misconduct." *Id.*[31]

### B. Plaintiffs Cannot Establish Other Elements of Their Section 10(b) Claim.

#### 1. The evidence does not support Plaintiffs' accounting-fraud allegations.

##### a. Plaintiffs cannot show that Defendants fraudulently underaccrued for LPM remediation expenses.

Plaintiffs' attacks on the LPM Remediation Accrual (*see* Ex. 3 at § 1) are without merit.[32] In light of the thorough and consistent process employed to prepare this accrual, Plaintiffs cannot prove either material falsity or scienter.

As described above (Factual Background, § III.B.1.c), the process for preparing the LPM Remediation Accrual included estimates of the number of replacement modules

---

[31] As discussed in note 38 below, forward-looking statements are subject to an "actual knowledge" scienter standard.

[32] The Company could not have accrued for remediation expenses before Q2 2009, when the excursion was first identified. The challenged financial statements issued during the first sixteen months of the Class Period—from the Q1 2008 Earnings Call in April 2008 until the Q2 2009 Form 10-Q filed in August 2009 (Ex. 1 stmts. 3-4, 8-9, 13, 15, 21, 29, 35)—could not have been materially false or misleading, on this ground.

needed, which were calculated by highly trained and experienced quality engineers. These estimates, together with related cost information, were communicated to FP&A personnel and the Assistant Corporate Controller, who then prepared and approved the accruals. The process was subject to internal controls, including the requirement that all key participants provide sub-certifications. PwC regularly performed reviews and audits of the accruals and the underlying methodology used to prepare them. PwC consistently confirmed that the accruals had been prepared using a reasonable process in compliance with GAAP and that the controls were free of any material weaknesses. (D'Angelo Decl. ¶¶ 12, 14-15.)

In light of this process, Plaintiffs cannot establish that the LPM Remediation Accrual was "derived in a manner inconsistent with reasonable accounting practices." *Alaska Elec.*, 434 F. Supp. 2d at 823. Under the authority set out above (Argument, § II.A), Plaintiffs cannot, therefore, prove the falsity of the accrual. Similarly, in *Oracle*, the defendants generated a sales forecast using a "bottom-up process" that began with projections from sales personnel and progressed through several layers of review. *Id*. at 388-89. Although the forecast ultimately proved inaccurate, the Ninth Circuit concluded that the bottom-up process "in and of itself refutes" any attempt to prove that the projections lacked a reasonable basis when made. On this ground, it affirmed summary judgment. *Id*. at 389; *see also In re Sybase, Inc., Sec. Litig.*, 48 F. Supp. 2d 958, 963 (N.D. Cal. 1999) (granting summary judgment and rejecting the plaintiffs' invitation to "second guess" Sybase's forecasting process). The same reasoning applies here.

The fact that the LPM Remediation Accrual increased as the remediation progressed is not evidence that the accrual was improperly set. "Because reserves are meant to be estimates or predictions," changes to reserves do not reveal or signal a prior-period GAAP violation. *Sybase*, 48 F. Supp. 2d at 963; *Mathews*, 1994 WL 269734, at *6 (same); *City of Roseville*, 963 F. Supp. 2d at 1117-18 (same).[33]

---

[33] Plaintiffs also allege that the accruals violated GAAP because First Solar did not disclose that it lacked a reasonable estimate or that its estimates were subject to change.

Additionally, Plaintiffs cannot establish scienter.  No Individual Defendant interfered in the process for setting the accruals, caused First Solar to record accruals different from those generated by the process, interfered with PwC's reviews or audits, or otherwise circumvented or corrupted the process for preparing accruals in any way.  In the absence of such evidence, Defendants are entitled to summary judgment on scienter grounds.

On point is *Mathews*, where plaintiffs alleged securities fraud after defendant Centex more than doubled its existing bad debt reserve at the end of the class period.  1994 WL 269734, at \*4.  The court granted summary judgment for defendants based on the absence of any evidence that the defendants had circumvented the existing reserve-setting process with the intent to deceive investors.  *Id.* at \*7.

Similarly, in *City of Roseville*, the court dismissed plaintiff's claim for alleged understatement of loan loss reserves because plaintiff lacked contemporaneous information showing that the defendants' company's "reserves were deliberately manipulated to conceal adverse information."  963 F. Supp. 2d at 1118.  And the same reasoning led to summary judgment in *REMEC*, where defendants were accused of fraudulently failing to recognize losses related to goodwill impairment.  702 F. Supp. 2d at 1212-14.  The court rejected the argument that participation by the CEO and CFO in discussions regarding the accounting at issue created a triable issue of fact as to their scienter, finding that they both were entitled to rely on the judgment of the accountants

(FAC ¶¶ 155-62.)  The applicable GAAP sections provide for disclosure when an accrual cannot be reasonably estimated, or when available information indicates the reasonable possibility of a material change in the near term.  *See* ASC 450-20-50-2 and 460-10-50-7.  Plaintiffs' argument fails for two reasons.  First, as discussed, First Solar made and disclosed its reasonable estimates.  As confirmed by the Assistant Corporate Controller, they did not believe that it was reasonably possible that there would be a material increase in the number of modules needed to complete the remediation or any material increase in the LPM accrual.  (*See, e.g.*, Schumaker Decl. ¶¶ 41, 44; Widmar Decl. ¶ 13.)  Second, First Solar told investors that its estimates were subject to change.  In each Form 10-K filed during the Class Period, First Solar warned that its actual results may materially differ from the estimates.  (Exs. 45, 46, 48, 52.)  Moreover, the challenged accrual statements themselves made clear that they reflected the Company's "*expected* module replacement costs" given "the *anticipated* affected module population."  (Ex. 1 stmts. 93, 97, 111, 139 (emphasis added); *see also* FAC ¶ 105.)

who reported up to them. *Id.* at 1239-40, 1251.  The same is true here.

**b.      Plaintiffs cannot show that Defendants fraudulently accounted for the sale of modules into hot climates.**

Plaintiffs argue that Defendants fraudulently recognized revenue on the sale of modules into hot climates and that First Solar's warranty accrual was fraudulent because it did not account for the effects of hot climate on warranty expenses.  (*See* Ex. 3 at § 2.) These arguments are both unsound.

"[F]uture contingencies do not render . . . revenue recognition improper if the seller can reasonably estimate the effect of the contingencies and set aside reserves adequate to cover them." *United States v. Goyal*, 629 F.3d 912, 917 (9th Cir. 2010).  As discussed above (Factual Background, § III.A.3.a), First Solar followed a consistent, extensive, and audited process to project future warranty expenses.  The power-output warranty calculation was prepared based on technical analyses of historical data, including data from sites in hot climates and accelerated-life stability testing.  This calculation was reported regularly in a white paper that was approved by the head of Quality, Mr. Koralewski.  The accrual and underlying methodology were also reviewed by the Assistant Corporate Controller, who consistently found that the accrual had been prepared in accordance with GAAP.  PwC reviewed and audited the warranty accrual and underlying methodology.  Consistently throughout the Class Period, PwC found that the accrual methodology, rate, and amount were reasonable and that the controls were free of any material weaknesses.  (D'Angelo Decl. ¶ 19.)

As discussed above (Factual Background, § III.B.2), following the technical team's work in April 2011, Mr. Koralewski specifically considered the effect of the hot-climate stabilization issue when reviewing the adequacy of the warranty accrual.  PwC also independently considered these effects and informed the Audit Committee that management's estimates were reasonable and that the hot-climate stabilization issue had been properly accounted for.  (D'Angelo Decl. ¶¶ 17-18; Ex. 26; Ex. 27.)  PwC also audited First Solar's revenue recognition policy for sales of modules subject to warranty

obligations and determined that the policies were "in accordance with GAAP." (D'Angelo Decl. ¶ 20; Ex. 29 at 214-15.)  The fact that First Solar increased its warranty accrual rate in Q4 2011 based on new information is not evidence that the accrual in any prior period was false.  As discussed above (*see*, Argument § II.B.1.a, *supra*), courts consistently reject this improper inference of fraud by hindsight.

Thus, Plaintiffs cannot meet their burden to establish the absence of a reasonable process for estimating future warranty expenses, as required to prove that the accruals were false.  Plaintiffs also cannot present evidence that any Individual Defendant acted with scienter.  As with the LPM Remediation Accrual, the Individual Defendants did not calculate the warranty accrual; rather, that task was performed by highly trained professional engineers and accountants who were carrying out their assigned job responsibilities.  Their estimates were the result of statistical analyses of voluminous technical data.  Their processes and conclusions were reviewed and approved by PwC and the Audit Committee.  As discussed above with respect to the LPM accruals, on-point cases have repeatedly held that upper management's reliance on trained professionals for these matters is inconsistent with a finding of scienter.  *See, e.g.*, *REMEC*, 702 F. Supp. 2d at 1239-40, 1256-57.

**2.     The evidence does not support Plaintiffs' allegation that Defendants fraudulently concealed the excursion.**

Plaintiffs claim that Defendants fraudulently failed to disclose facts regarding the excursion and remediation until the July 29, 2010 Earnings Call.  This argument fails for three independent reasons:  (1) First Solar had no duty to disclose the excursion and remediation; (2) in light of First Solar's proper accounting for projected remediation expenses, any incremental information about the excursion and remediation was immaterial; and (3) the evidence is insufficient to support a finding of scienter.

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011).  "[F]or purposes of Section 10(b) and Rule 10b-5, material information

need not be disclosed unless omission of that information would cause other information that is disclosed to be misleading." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). As discussed below, none of the challenged statements made during this period was materially misleading; there was no duty, therefore, to disclose the excursion.

Additionally, as soon as First Solar committed to remediate the effects of the excursion in Q2 2009, it established an accrual for estimated costs. So long as a company accurately reports hard data, the securities laws do not require it to narrate the underlying details. *Intuitive Surgical*, 759 F.3d at 1061. In *Intuitive Surgical* the court rejected the plaintiffs' allegations that a defendant's Form 10-K materially misled investors by not providing information about known trends underlying the financial results. The Ninth Circuit explained that it has "expressly declined to require a rule of completeness for securities disclosures because no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." 759 F.3d at 1061; *accord Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Where a company has "provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock," the company does not commit fraud by withholding additional details. *In re Syntex Corp. Sec. Litig.*, No. CIV. 92-20548 SW, 1993 WL 476646, at *7 (N.D. Cal. Sept. 1, 1993).

Additionally, during the period before the July 2010 disclosure, First Solar's engineers and accountants estimated that LPM remediation expenses would be small in relation to the Company's net sales and income. Indeed, the total amount accrued between Q2 2009 and Q1 2010 was approximately 0.52% of net sales and 1.79% of net income during this period (Flum Decl. ¶ 27), amounts that are immaterial as a matter of law. *Mathews*, 1994 WL 269734, at *6-7 (citing cases for proposition "that allegedly fraudulent transactions which are under one or two percent of net operating revenues are immaterial"). These figures were also well below the 5% threshold for separate disclosure of other current liabilities contained in SEC Regulation S-X, Rule 5-02.20. The federal

securities laws do not require that companies include a narrative in their SEC filings to address amounts of this size; indeed, a contrary rule would force companies "to bury the shareholders in an avalanche of trivial information." *In re Convergent*, 948 F.2d at 516.

Finally, there is no evidence that any Individual Defendant made an affirmative decision to exclude reference to the excursion from First Solar's public filings with an intent to deceive investors. As discussed in Factual Background, § III.B.1 above, First Solar did not conceal the excursion or its financial impact. In fact, the Company included the estimated financial impact in its financial statements and guidance, and it sent letters to customers informing them of the excursion and offering to remedy its effects above and beyond its warranty obligations.[34] It makes no sense to infer that anyone at First Solar intended to mislead investors when the Company was proactively informing customers of the issue, offering remediation well beyond its warranty obligation, and filing financial statements that took projected expenses into account. Instructive on this point is *NVIDIA*, where the court rejected as "implausible" plaintiff's allegations that the defendant company intentionally concealed product defects, while, at the same time, adjusting its financial statements to account for such defects. 768 F.3d at 1056-58; *see also REMEC*, 702 F. Supp. 2d at 1246-47 (explaining that financial disclosures were inconsistent with an intent to deceive).

> **3.    The evidence does not support Plaintiffs' remaining allegations regarding LPM remediation and hot-climate disclosures.**

In addition to their accounting-fraud claims, Plaintiffs argue that Defendants defrauded investors by making statements downplaying the excursion, overstating the progress of the remediation, and/or implicitly exaggerating the quality of First Solar's modules (*see* Ex. 3 at §§ 3, 4). As explained below, a jury could not reasonably conclude that Defendants materially misled investors in this manner, much less that they did so with

---

[34] During much of the Class Period, when First Solar was capacity constrained, the use of modules in the LPM remediation reduced the number of modules available for sale and, thus, reduced revenue. First Solar took this effect fully into account when issuing revenue guidance throughout the Class Period. (Sohn Decl. ¶ 25; Ex. 42 at 134:16-21.)

scienter.[35]

The evidence does not support a finding of materiality or scienter with respect to any of these statements on the ground that First Solar's disclosure of hard, quantifiable information—its accruals and its revenue guidance—accounted for the financial impact of the LPM remediation and the hot-climate issues.  A jury could not reasonably conclude that details underlying this hard information—such as the number of LPMs created in 2008 and 2009, or whether or not the remediation was "well underway"—would have "significantly altered the total mix of information" available to investors.  *Intuitive Surgical*, 759 F.3d at 1061; *Syntex*, 1993 WL 476646, at *7.  Nor could a jury reasonably conclude that the very same executives who caused First Solar to disclose the hard, quantifiable information also intended to deceive investors by omitting underlying detail.  *NVIDIA*, 768 F.3d at 1056-58; *REMEC*, 702 F. Supp. 2d at 1246-47.  Each of these claims also fails for the additional reasons set out below.

> **a.      Warnings contained in the "Risk Factors" section of First Solar's Forms 10-K**

Plaintiffs claim that certain warnings included in the "Risk Factors" section of First Solar's Forms 10-K—cautioning that "solar modules may perform below expectations," "problems with product quality or performance may cause us to incur warranty expenses," and "product failures may damage our reputation" (*see* Ex. 3 at § 5)—were rendered misleading by failure to disclose the excursion and reduced conversion efficiency in hot climates.  Nothing about the excursion or hot-climate effects, however, rendered these warnings false or misleading.  Plaintiffs' argument here is really a disguised attempt to impose a duty to disclose, which does not exist.  (*See* Argument § II.B.2, *supra*.)

Accordingly, courts within this Circuit have held that, "warnings regarding

---

[35] Plaintiffs list eight other statements (Ex. 3 at § 7) that appear to lack a clear relationship to the issues in this case.  Plaintiffs did not challenge these statements as false or misleading in the FAC.  While they list these statements in their responses to Defendant Michael J. Ahearn's First Set of Interrogatories to Lead Plaintiffs, they do not explain why these statements are materially false or misleading or were made with scienter, as required to establish liability under Section 10(b).

potential adverse factors are not actionable as a matter of law"—regardless of whether the risks noted therein have already occurred. *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996); *see also In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048-49 (N.D. Cal. 2007) (risk factors "constitute defendants' cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results"); *In re Foundry Networks Secs. Litig.*, No. C 00-4823 MMC, 2003 WL 23211577, at *10 (N.D. Cal. Feb. 14, 2003) (same). In any event, the evidence does not support a reasonable conclusion that any Individual Defendant made any decision with respect to the Risk Factor warnings with scienter. On the contrary, these warnings were the product of the extensive and open process described above.

### b.     The percentage of modules affected by the excursion

Plaintiffs allege that First Solar falsely represented in Forms 10-K and 10-Q for Q2 2010 through Q3 2011 that the excursion affected "less than 4% of the total product manufactured within the period." (*See* Ex. 1 stmts. 87, 92, 97, 111, 127, 139, 148, 158, 163.) The evidence does not support a reasonable conclusion that this statement was materially false or misleading, or that it was made with scienter.

Before First Solar initially disclosed "less than 4%," the head of Global Quality, Mr. Koralewski, performed a statistical analysis. Mr. Koralewski's calculation, based on a correlation between STBi and field power loss, found approximately 450,000 LPM modules (Koralewski Decl. ¶ 12), which was approximately 3.8% of the total product manufactured during the excursion period. (Ex. 70 at 329-330.) Other technical and accounting personnel, including Messrs. Wood and Kallenbach, reviewed and concurred with this analysis. (*Id.*) In July 2010, Mr. Kallenbach wrote to Messrs. Gillette, Meyerhoff, and Sohn instructing that the disclosure language stating that the excursion affected less than 4% of the modules was appropriate and that "[t]he math is correct." (Ex. 68.)

Mr. Koralewski and others at First Solar continued to endorse this figure through

the Class Period.  (Koralewski Decl. ¶¶ 15-16.)  Indeed, on November 2, 2011, Messrs. Kallenbach and Koralewski again confirmed their conclusion when approving language used by Mr. Widmar during a conference call with analysts.  (Ex. 80.)

The evidence does not support a reasonable conclusion that the analysis underlying the less than 4% disclosure was incorrect.  It certainly does not support an inference of scienter on the part of the Individual Defendants, who did not perform the analysis themselves, but rather relied upon Messrs. Koralewski and Kallenbach to tell them that the "math is correct."  (Ex. 68.)  Messrs. Kallenbach and Koralewski were both highly trained and experienced engineers.  (Koralewski Decl. ¶¶ 2-3; Kallenbach Decl. ¶¶ 2-3.)  Mr. Koralewski had more than a decade of experience in quality assessment and control.  (Koralewski Decl. ¶ 5.)  The evidence does not support a reasonable finding, therefore, that any Individual Defendant knew or "must have known" that the calculations done by Messrs. Koralewski and Kallenbach were materially incorrect.  As in *Oracle* and *REMEC*, no reasonable juror could infer that any Individual Defendant acted with scienter.

### c.      Interim status reports

Plaintiffs challenge three categories of statements describing the status of the LPM remediation.  The evidence does not support a conclusion that any of these statements was false or made with scienter.

In filings for Q2 2010 through Q2 2011, First Solar disclosed that it was "working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete."  (Ex. 1 stmts. 97, 111, 127, 139, 148, 163.)  The evidence confirms that these statements were true.[36]  As early as June 2009, First Solar began to provide "rip and replace" services to customers.  By June 2010, First Solar had completed module replacement at more than two dozen of the approximately 150 sites that had been claimed at the time.  (Koralewski Decl. ¶ 25.)  Thus, by July 2010—the first

---

[36] The same is true with respect to Mr. Sohn's statement on July 29, 2010, that "we've been working with our customers" and "expect to continue to do so for about the next six months or so."  (Ex. 1 stmt. 87.)  Plaintiffs lack any evidence suggesting that Mr. Sohn expected otherwise, or lacked a reasonable basis for his belief.

time this challenged statement was made—First Solar's work with its customers was indeed "well underway and, in some cases, complete." (Ex. 1 stmt. 92.)

Second, on February 24, 2011, Mr. Zhu stated that "In Q4 [2010] we concluded a claims process . . . ." (Ex. 1 stmt. 122.) A jury could not reasonably conclude that this statement was false: First Solar established a November 2010 deadline for customers to submit excursion-related claims; that deadline had passed when Mr. Zhu spoke; thus, the claims-process piece of the remediation had indeed concluded. (Zhu Decl. ¶¶ 15-17.) Any possible ambiguity was cleared up in First Solar's contemporaneous answers to "Frequently Asked Questions" on its website, which stated: "November 30th 2010 marked the conclusion of the period during which customers could file extended-warranty claims related to the excursion modules. We are now in the process of validating and verifying those claims."[37] (Ex. 88.) Additionally, Mr. Kallenbach, who led First Solar's remediation work, reviewed and approved the accuracy of this statement before Mr. Zhu made it. (Ex. 66.) The FAQ and Mr. Kallenbach's approval foreclose any finding of scienter.

Third, on November 3, 2011, Mr. Widmar stated that "[w]e have substantially concluded the remediation programs associated with this manufacturing excursion." (Ex. 1 stmt. 158.) Again, discovery has confirmed the accuracy of this statement. A mid-October presentation informed Mr. Widmar that 75% of the submitted claims were invalid, 6% of the claims were remediated, 7% of the claims were approved, and 11% of the claims were to be analyzed. (Widmar Decl. ¶ 44; Ex. 78 at 384.) First Solar's internal information thus indicated that 89% of customers' excursion claims had been resolved.[38]

_____

[37]An archived website from February 28, 2011, containing First Solar's answers to "Frequently Asked Questions," explicitly noted that although the period during which customers could file warranty claims pertaining to the excursion had concluded, First Solar was still in the process of addressing those claims. (Ex. 88, available at https://web.archive.org/web/20110228175738/http://www.firstsolar.com/en/faq.php (last visited March 27, 2015).) The English version of First Solar's website contained this language as of February 4, 2011. (Sloan Decl. ¶ 10; Ex. 72.)

[38] For similar reasons, there is no evidence that a December 14, 2011 statement by Mr. Ahearn was false. (Ex. 1 stmt. 166.) On that date, an analyst asked about "the

Plaintiffs, therefore, cannot meet their burden of proof that Mr. Widmar's statement was materially false or made with scienter.

### d.    Vague statements about quality and performance

Plaintiffs challenge many general statements describing First Solar's operations, products, achievements, and business plans.  (Ex. 1 stmts. 22, 24, 36, 39-40, 57, 60, 69-71, 81-82, 98, 112, 128-130, 140, 149-150, 153, 164.)  Plaintiffs' reasoning seems to be that it was materially misleading for Defendants to say anything favorable about First Solar while the LPM remediation was proceeding and while the performance of First Solar's modules in hot climates was under review.[39]

"Investors do not rely on vague statements of optimism" like these.  *Oregon Pub. Emps.'*, 774 F.3d at 606.  Statements that First Solar displayed "operational excellence" (Ex. 1 stmts. 69, 82, 129, 150); had "reliable, low cost module manufacturing capability" (Ex. 1 stmts. 70, 81, 98, 112, 130, 140, 149, 164); was "very cautious and careful and ha[d] a high degree of expectation in terms of the way we operate the factories" (Ex. 1 stmt. 22); and had a warranty that "demonstrates the company's commitments to product quality and reliability" (Ex. 1 stmt. 153) are "optimistic, subjective assessment[s]" that cannot constitute material misrepresentations.  774 F.3d at 606.  They are "inherently subjective," cannot be proved true or false, and do not "induce the reliance of a reasonable investor."  *Id*. at 606-07.

In any event, Plaintiffs cannot demonstrate that the Individual Defendants who made these statements did not believe them to be true.  And, particularly in light of the hard information First Solar disclosed, Plaintiffs cannot show that any Individual

---

resolution and risk around. . . some of these power issues going on in the field."  Mr. Ahearn responded that "[w]e have had on occasion issues and they are dealt with.  We cover them.  That has all been reflected in our financials."  (*Id*.)  As discussed, they had been.

[39] Plaintiffs raised a slew of additional product issues, including Open Circuit, Cord Plate, and Solar Edge Tape, in their responses to Defendant Michael J. Ahearn's First Set of Interrogatories to Lead Plaintiffs.  The Court, however, confined the product issues to the excursion and hot climate.  (Dkt. No. 264.)

Defendant made any of these statements with an intent to materially mislead investors.[40]

### e.    Forward-looking statements

Fifteen of the statements Plaintiffs challenge (Ex. 1 stmts. 22, 26, 61, 65-66, 74, 87, 91, 100, 104-105, 114-116, 152) are not actionable for the additional reason that they are protected by the Safe Harbor provision of the Private Securities Litigation Reform Act of 1995.  15 U.S.C. § 78u-5(c ).  A forward-looking statement is any "statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Intuitive Surgical,* 759 F.3d at 1058.  The Safe Harbor provision applies if a forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* Statements at issue here—containing words such as "we expect," "we believe," "we think," "we anticipate" and "we hope"—are "forward-looking on their face." *Id.*  Each of these statements was accompanied by meaningful cautionary language.[41]  Such language at the beginning of each conference call meets the requirements of the Safe Harbor provision. *Id.* at 1059-60.  As a result, these statements are not actionable—whether or not the elements of Section 10(b) are met. *Id.*[42]

---

[40] Similarly, Plaintiffs lack any evidence suggesting that Mr. Ahearn's statement that "[w]e do not knowingly ignore uncertain events that could meaningful[ly] [] impact our business" on October 29, 2008, was false or misleading.  (Ex. 1 stmt. 14.)  It was said well before the excursion came to First Solar's attention and before any concerns regarding modules in hot climates arose.

[41] First Solar began each earnings conference call, for example, by explaining that the "forward-looking statements in this call are based on current information and expectations, are subject to uncertainties and changes in circumstances, and do not constitute guarantees of future performance. These statements involve a number of factors that could cause actual results to differ materially from these statements, including the risks as described in the company's most recent annual report on Form 10-K and other filings with the Securities and Exchange Commission."  (Ex. 1 stmts. 22, 65, 66, 87, 91, 104-105.)

[42] Additionally, to prove that makers of forward-looking statements acted with scienter, Plaintiffs must prove that they made them with "'actual knowledge . . . that the statement[s were] false or misleading' at the time made." *Emp'rs Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004)

**f.      Dr. Eaglesham's discussion of module performance**

Plaintiffs challenge a single statement that Dr. Eaglesham made at an analyst/investor conference on June 24, 2009.  (Ex. 1 stmt. 40.)  The Court previously held that the only "arguably misleading portion" of this statement was Dr. Eaglesham's alleged concealment of the LPM excursion when he stated that "field performance and our knowledge of field performance allows us to have fairly high confidence that our product is delivering in the field."[43]  (Dkt. No. 114 at 7.)

This statement was not false.  As Dr. Eaglesham has explained in his sworn declaration, and as is clear from the context of his remarks, Dr. Eaglesham was describing a proven scientific fact: cadmium telluride ("cad-tel") technology is less sensitive to temporary performance variations based on fluctuations in temperature and lighting than poly-silicon modules.  (A.Virtuani, et al., Overview of Temperature Coefficients of Different Thin-Film Photovoltaic Technologies, 25 Eur. Photovoltaic Solar Energy Conf. 4248 (2010); Eaglesham Decl. ¶¶ 60-63.) Dr. Eaglesham's statements bore no relationship to the LPM excursion or the hot-climate stabilization issue.  (Eaglesham Decl. ¶ 62.) Plaintiffs cannot, therefore, establish either falsity or scienter with regard to these statements.

**4.      The evidence does not support Plaintiffs' CpW claim.**

The evidence does not support Plaintiffs' claim that First Solar's reported CpW was false.  (Ex. 3 at § 6.)  And there is no evidence that any Individual Defendant knew or must have known it was false.

As discussed above (Factual Background, § III.A.3.b), CpW is a non-GAAP metric that was calculated by the FP&A group in conformity with a written procedure, audited by

_____

(quotation, ellipses, and brackets in original) (affirming grant of judgment on the pleadings for defendants dismissing claim based on forward-looking statements); 15 U.S.C. § 78u-5(c)(1)(B)(i); *see also Intuitive Surgical*, 759 F.3d at 1058 (affirming dismissal of claim based on forward-looking statements).

[43] At the time Dr. Eaglesham made this statement, the manufacturing excursion was understood to have affected only 75,000 of the 14 million modules First Solar had deployed to customer sites.  (Koralewski Decl. ¶ 9; Sohn Decl. ¶ 18.)

Internal Audit, and analyzed by PwC. The key FP&A personnel who reviewed the calculation of the CpW metric participated in the sub-certification process, specifically certifying that they were not aware of any improper estimates or material misstatements in First Solar's SEC filings. (*See* Factual Background § III.A.3.b, *supra*.)

In the FAC, Plaintiffs relied on CW10, later identified as Georgette Gillen, to support an accusation that First Solar's VP of FP&A, Kurt Wood (who is not a Defendant), improperly directed others to lower CpW by one penny—from $0.86 to $0.85—in the process of reporting Q309 results. (FAC ¶ 26.) But even Ms. Gillen has acknowledged that the CpW that First Solar publicly reported was consistent with First Solar's internal calculations, and that she herself populated the finalized CpW in First Solar's SEC filings. (Ex. 37 at 227:9-21.) The only other witness deposed on this issue, confirmed the accuracy of First Solar's reported CpW. (Ex. 34 at 381:13-24.) In any event, Ms. Gillen has made no accusations about any Individual Defendant nor is there any other evidence that any Individual Defendant participated in or was aware of any effort to manipulate CpW calculations.[44] (Ex. 37 at 222:16-22.)

Plaintiffs allege that First Solar "artificially lowered" CpW by underaccruing for the expected costs of the LPM remediation in violation of GAAP. First, as demonstrated above, there is no evidence that First Solar violated GAAP when accruing for expected LPM remediation expenses. Second, Plaintiffs' argument betrays a basic misunderstanding of how First Solar calculated CpW. As explained, and as disclosed (Ex. 45 at 29), the cost component of CpW included only the costs of manufacturing modules *in the current reporting period*. (Meyerhoff Decl. ¶¶ 49-50.) The LPM

---

[44] Moreover, Ms. Gillen's complaint was elevated to First Solar's Internal Audit, which commenced an investigation after consultation with the chair of First Solar's Audit Committee, the General Counsel, and the head of Human Resources. Internal Audit concluded that all of the questioned entries were reasonable, that the CpW calculation was appropriate, and that no employee manipulated the number. (Ex. 30.) The results of this investigation were shared with PwC, which concurred with management's conclusions that the CpW calculation was reasonable and that the challenged accounting entries were appropriate. (Ex. 31 at .002.) This response to Ms. Gillen further negates any inference of scienter.

remediation expenses, by contrast, were costs associated with modules produced months or years before—from June 2008 to June 2009. It would have been improper to include these costs in CpW for later periods.[45] (Ex. 62; *see also* Ex. 71.) Thus, when First Solar disclosed its excursion accrual in Q2 2010, it explicitly informed investors that CpW "[e]xcludes estimate of nonrecurring module replacement program described in second quarter 2010 10-Q." (Ex. 69 at 508.)[46]

Plaintiffs' CpW claim boils down to a complaint about the manner in which First Solar calculated CpW. But the Ninth Circuit has held that such "disagreements over statistical methodology" are insufficient to establish a material false statement. *In re Rigel Pharm. Inc. Sec. Litig.*, 697 F.3d 869, 878-79 (9th Cir. 2012). Under these circumstances Plaintiffs cannot meet their burden of proving falsity or scienter.

### C.    Plaintiffs' Theory of Scienter is Implausible.

The evidence does not support a reasonable conclusion that the challenged statements were materially false when made or that any Individual Defendant acted with scienter when making any challenged statement. This failure entitles Defendants to summary judgment, particularly in light of the fact that Plaintiffs' theory of scienter is implausible, including for the reasons set out below. *See Schuster v. Symmetricon, Inc.*, No. C9420024RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) (plaintiff must present "more persuasive evidence than would otherwise be necessary" where the claim is implausible), *aff'd*, *Schuster v. Symmetricon, Inc.,* 35 Fed. Appx. 705 (9th Cir. 2002).

---

[45] There is no evidence that CpW erroneously excluded the costs associated with the excursion for an additional, independent reason—those costs do not reflect the costs of manufacturing. Instead, they resulted from First Solar's decision to go beyond its normal warranty to create goodwill with its customers. (*See* Ex. 62.)

[46] Plaintiffs also allege that First Solar's reduction of the "derating" of certain modules resulted in a lower CpW. (FAC ¶ 47.) The record contains no evidence, however, that First Solar reduced derating for the purpose of reporting a lower CpW in any period.

### 1.    The bottom-up process by which the disclosures were prepared is inconsistent with fraud orchestrated from the top.

As shown above, the Individual Defendants did not calculate the accruals, estimates, and other metrics that were disclosed to investors; rather, these calculations were performed by trained professionals within the Company who were carrying out their previously assigned job responsibilities.  There is no evidence that any Individual Defendant dictated to any of these professionals how they should perform their calculations.  Nor is there any evidence that any Individual Defendant caused First Solar to report a result that was inconsistent with these calculations.

Courts have repeatedly held that this bottom-up fact pattern—where the challenged statements are prepared by professionals who report up to the defendants—"is inconsistent with a fraud orchestrated or deliberately ignored by the top officers of the corporation." *In re PETCO Corp. Sec. Litig*., No. 05-CV-0823 H RBB, 2008 WL 8876554, at *6 (S.D. Cal. Apr. 29, 2008); *accord REMEC*, 702 F. Supp. 2d at 1241-42 (granting summary judgment for lack of scienter where executive relied on "bottoms-up" procedures and "competence and expertise" of lower level employees).

### 2.    The absence of evidence that any Individual Defendant circumvented internal controls is inconsistent with scienter.

As shown above, First Solar had rigorous controls in place to ensure the accuracy of its disclosures, including its financial reporting.  The design of these controls was tested by First Solar's Internal Audit department and by PwC.  These independent auditors both reported directly to the fully independent Audit Committee that the controls were free of material weaknesses and provided reasonable assurance that First Solar's reporting was accurate.

These controls are significant for three related reasons.  First, the fact that the Individual Defendants implemented and maintained this system throughout the Class Period is inconsistent with the conclusion that they embarked, in April 2008, on a four-year-long fraud scheme.  It is implausible that officers seeking to deceive investors would

subject themselves and their allegedly fraudulent misrepresentations to scrutiny by a twenty-member Disclosure Committee, an independent Audit Committee chaired by a person with thirty years of experience auditing public companies, an independent Internal Audit department, and one of the world's most respected and sophisticated external auditing firms.

Second, the Individual Defendants were entitled to rely on these controls, including the multiple, independent, levels of review and the sub-certification process, to ferret out inaccuracies in the reporting process. The argument that some or all of the Individual Defendants "must have known" investors were being deceived by false disclosures fails in the face of the Company's control processes, which were designed so that, before any inaccurate statement could be published, it would be clearly identified as such. *See PETCO*, 2008 WL 8876554, at *.

Third, it would make no sense for the Individual Defendants to commit fraud in the face of these controls, at least absent any evidence that they planned and acted to circumvent or disable these controls in some way. Yet there is no evidence that any Individual Defendant—or anybody else—took any such evasive action.

### 3. PwC's unfettered access and consistent endorsement of First Solar's accounting and controls is inconsistent with scienter.

First Solar's independent outside auditor, PwC, played such an important role that it deserves special attention. As reflected in the audit workpapers, reports to the Audit Committee, and letters to the Board, PwC was deeply involved in every aspect of the financial reporting Plaintiffs have challenged. (*See*, Factual Background, § III.A.5, *supra*.) There is no evidence that any Individual Defendant ever sought to obstruct PwC's fully independent audits or conceal information from PwC or the Audit Committee in any way. On the contrary, Individual Defendants regularly engaged in discussions with PwC about First Solar's financial condition and the results of PwC's reviews and audits. (*E.g.*, Ahearn Decl. ¶¶ 37-38; Gillette Decl. ¶ 29; Meyerhoff Decl. ¶ 30; Widmar Decl. ¶ 25;

Zhu Decl. ¶ 10.)  Nor is there any evidence that PwC's independence was compromised in any way or that the PwC audit personnel were corrupt or incompetent.

A finding of scienter is inconsistent with the fact that "Defendants 'conferred with and relied in good faith on their outside auditor.'"  *Mathews*, 1994 WL 269734, at *7 (granting summary judgment).  "This conduct tends to negate an inference of scienter."  *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1463 and 1465 (N.D. Cal. 1996); *accord REMEC*, 702 F. Supp. 2d at 1254.

Indeed, no jury could reasonably conclude that the Individual Defendants hoped to deceive the investing public without first deceiving PwC.  Yet the record contains no such evidence.

This point is particularly strong here, where PwC has continued to endorse First Solar's accounting and control environment and never resigned or caused First Solar to restate its financial statements.  As explained in *City of Roseville*,

> Plaintiff does not contest that Sterling has never restated its financials, and that Sterling's independent auditors have always provided unqualified opinions.  And there have been no allegations of collusion between Sterling and its auditors.  To the extent Plaintiff relies on claims that Defendants manipulated Sterling's financials, the lack of a restatement weighs against a finding of scienter.

*City of Roseville*, 963 F. Supp. 2d at 1142 (citing cases).

Further, in addition to PwC's regular audits, Defendants affirmatively requested that both PwC and the VP of Internal Audit review the LPM remediation effort and analyze the associated accounting in early 2012 to determine whether the Company needed to restate its financials.  Both concluded that the Company's accounting was materially accurate in all periods.  (*See* Factual Background, § III.B.1.c, s*upra*.)  "[C]onducting a detailed investigation is inconsistent with an intent to deceive."  *PETCO*, 2008 WL 8876554, at *6.  Requesting reviews "shows, if anything, 'a pursuit of truth rather than reckless indifference to the truth.'"  *Id*. at *5 (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007)).

**4.      There is no evidence of concerted fraudulent action among the Individual Defendants.**

Another flaw in Plaintiffs' scienter theory is the absence of any coherent explanation for how the alleged conspiracy ever arose in April 2008, and how it came, over the course of four years, to involve seven different executives, who were each selected by an independent Board, joined, left or changed positions at various different times, and for the most part, had no prior connections with each other. (*See* Attachs. A & B.)

For example, how was it that a conspiracy to defraud among Messrs. Ahearn, Sohn, Meyerhoff, and Zhu arose in April 2008? The excursion had not even begun at that point. It would not become known to anyone inside First Solar for another eleven months, and no Individual Defendant learned of the issue for another two months after that. The increased effect of hot climate on initial module stabilization would not become known for another three years. What was this April 2008 conspiracy all about, and where is the evidence supporting its existence?

If the Individual Defendants really knew the cost of the remediation from the start, and if they were really so concerned with covering it up that they would engage in securities fraud, then why did they initiate the remediation in the first place? The remediation effort was certainly not required by the Company's warranty.

If Mr. Ahearn really were the ringleader, then why did he hand over the CEO role in September 2009 to an outsider appointed by an independent board not involved in the scheme? And why would Mr. Gillette leave his position as the head of a multi-billion dollar unit of Honeywell to join a scheme to inflate First Solar's stock price? Certainly it was not for personal financial gain—Mr. Gillette purchased rather than sold First Solar stock while serving as CEO. Similarly, Mr. Widmar joined First Solar at the invitation of the Board in April 2011—over three years after the alleged fraud began. (Widmar Decl. ¶ 5.) He had no prior relationship with any of the Individual Defendants. Why would Mr. Widmar join the Company in April 2011 and then, just weeks later, sign First Solar's

May 5, 2011 Form 10-Q with an intent to deceive investors? Again, it could not have been for personal financial gain because Mr. Widmar, too, purchased, rather than sold, at the allegedly inflated stock prices. (Widmar Decl. ¶ 50.)

In *REMEC*, the court explained that the fact that two individual defendants worked at REMEC at different times, with only a brief overlap in their tenures, "considerably weakens any inference that the two officers carried out a continuous scheme to conceal REMEC's true financial condition." 702 F. Supp. 2d at 1258. With no cogent explanation for why an independent Board would select a series of seven black-hearted executives, Plaintiffs' scienter allegations here are far less plausible than the allegations rejected as inadequate in *REMEC*.

### D. The Individual Defendants' Transactions in First Solar Stock Do Not Support Inferences of Scienter.

Plaintiffs have alleged that evidence of stock transactions by the Individual Defendants supports an inference of scienter. In fact, it does not.

Indeed, Plaintiffs' theory that First Solar executives conspired to inflate the Company's stock is undermined by the fact that three executives who are key to Plaintiffs' story—Mr. Kallenbach and Individual Defendants Gillette and Widmar—purchased stock on the open market at the allegedly inflated prices.

Mr. Kallenbach, the executive in charge of managing the LPM remediation work, purchased 1,000 shares of First Solar stock in February 2010, 1,000 shares in August 2010, and another 1,000 shares in August 2011, for approximately $315,000. (Kallenbach Decl. ¶ 26.)

Mr. Gillette purchased 10,000 shares on February 26, 2010, just days after he allegedly inflated First Solar's stock price by making allegedly false statements on February 18. (FAC ¶¶ 97, 99, 204; Gillette Decl. ¶¶ 44-45.) Likewise, Mr. Widmar bought 1,000 shares for $91,750 in August 2011. (Widmar Decl. ¶ 50.) According to Plaintiffs, Mr. Widmar had made sixteen false statements with the intent to inflate First

Solar's stock price before this purchase. (Ex. 1 stmts. 132, 135, 136, 137, 138, 139, 140, 141, 144, 145, 146, 147, 148, 149, 150, 151.)

These purchases are "wholly inconsistent with fraudulent intent." *City of Roseville*, 963 F. Supp. 2d at 1141; *accord In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1178 (C.D. Cal. 2007). It is highly implausible that these executives would participate in a fraudulent stock-price-inflation scheme that (1) provided them with no financial reward; and (2) actually caused them to suffer personal financial loss. *See Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001); *Mathews*, 1994 WL 269734, at *8.

The implausibility of Plaintiffs' fraud theory cannot be remedied merely by carving these individuals out. For example, Mr. Kallenbach was the First Solar officer who estimated remediation expenses and verified the metrics behind many of First Solar's disclosures. (*Supra*, Factual Background, § III.B.1.c.) Mr. Kallenbach's multiple purchases of First Solar stock in 2010 and 2011 make an allegation that he was part of a plan to inflate First Solar's stock price absurd on its face. But if his estimates were honest, then how was it that the accruals, which were indisputably derived from those estimates with no interference from the Individual Defendants, were fraudulent? It makes no sense to argue that they were.

While other Defendants sold stock, those sales do not salvage Plaintiffs' theory. "Insider stock sales are not inherently suspicious." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002). Executives commonly receive compensation in the form of stock options or company shares, which are designed to align the incentives of the executives and the shareholders they serve. An executive may sell that stock for any number of reasons, including "to fund major family expenses, diversify his portfolio, or arrange his estate plan." *Ronconi*, 253 F.3d at 435. Indeed, sales by insiders are not even admissible evidence absent a foundational showing of a suspicious pattern. *Howard v. Everex Sys.*, 228 F.3d 1057, 1066-67 (9th Cir. 2000).

For purposes of a Section 10(b) disclosure case, a sale by an insider "is suspicious

only when it is 'dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information.*"[47]  *Ronconi*, 253 F.3d at 435 (emphasis in original); *see also Vantive*, 283 F.3d at 1092.  A "consistent pattern of selling stock for several years" before the class period negates an inference of scienter with respect to stock sold consistent with this pattern during the class period.  *Mathews*, 1994 WL 269734, at *8.

Further, "wholly innocent explanations for stock sales . . . are sufficient to defeat any inference of bad faith."  *In re Apple Inc. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).  Stock sales made pursuant to pre-established 10b5-1 trading plans "rebut an inference of scienter."  *Metzler*, 540 F.3d at 1067 n.11; *see also Worlds of Wonder*, 35 F.3d at 1428 (stock sales made pursuant to a "predetermined plan in accordance with SEC Rule 144" negate inference of scienter).

The Individual Defendants' transactions do not support any inference of scienter.  All of the Individual Defendants' transactions, including purchases and sales of stock, were pre-cleared in accordance with the Company's insider trading policy.  (Ahearn Decl. ¶ 61; Eaglesham Decl. ¶¶ 64, 67; Meyerhoff Decl. ¶ 84; Zhu Decl. ¶ 25.)  And the patterns of their transactions are inconsistent with a concerted effort to defraud investors.

### 1.   Michael Ahearn

Mr. Ahearn co-founded First Solar in 1999, and became its CEO in 2000.  His long-term plan was to build First Solar into a leader in the solar industry and then to transition the management of First Solar to others, so that he could return to developing and investing in start-ups in the renewable energy and related fields.  (Ahearn Decl. ¶¶ 14-15.)

---

[47]Plaintiffs argue that Defendants engaged in "insider trading" on "material non-public information."  (Ex. 89 at 53:27-54:23.)  But Plaintiffs do not assert a claim for insider trading under Exchange Act § 20A, which provides for a private right of action for insider trading claims.  Of course, there have been no government insider trading claims brought against any of the Individual Defendants.

When First Solar went public in 2006, Mr. Ahearn considered how best to divest his equity in the Company. He decided that rather than selling all of his shares at once, it would be prudent to plan an orderly sale over a long period—five years. (*Id*. ¶ 59.) Mr. Ahearn's sales under this five-year plan began in the November 2006 IPO, when he sold 610,000 shares, representing 10% of his holdings. (*Id*. ¶ 62.) In 2007, he sold approximately 1.4 million shares, roughly 23% of his pre-IPO holdings. (*Id*.) The next year, between February and April 2008, Mr. Ahearn and his family foundation sold an additional 773,500 shares, roughly 13% of his pre-IPO holdings. (*Id*. ¶¶ 64-65.) Thus, in the seventeen months *before* the start of the Class Period, Mr. Ahearn sold approximately 2.8 million shares, roughly 45% of his pre-IPO holdings. (*Id*. ¶ 66.)

In May 2008, just after the Class Period began, Mr. Ahearn sold an additional 250,000 shares (roughly 4% of his pre-IPO holdings). (Ahearn Decl. ¶ 67.) In 2009, given worldwide economic uncertainty, including in the solar industry, Mr. Ahearn decided to defer selling under his plan. (*Id*. ¶ 69.) In 2010, Mr. Ahearn resumed sales under his 5-year plan, selling 1.5 million shares (roughly 25% of his pre-IPO holdings). (*Id*. ¶ 70.) The next year, in 2011, Mr. Ahearn again sold approximately 1.5 million shares (roughly 25% of his pre-IPO holdings). (*Id*. ¶¶ 72-77.)

Nothing about Mr. Ahearn's stock sales is suspicious. Mr. Ahearn sold approximately 45% of his pre-IPO holdings before the Class Period began. (Ahearn Decl. ¶ 66.) Excluding just the first three weeks of the Class Period—a period pre-dating both the excursion and the hot-climate issue—Mr. Ahearn *sold more stock* in the eighteen months *before* the Class Period than in the forty-five-month class period.[48] (Ahearn Decl. ¶¶ 66-67.) With respect to the entire Class Period, he sold only slightly more during those forty-six months than during the much shorter eighteen-month period preceding it. (Ahearn Decl. ¶ 66.) The Class Period sales are consistent with his trading

---

[48]Plaintiffs selected an "unusually long" class period to sweep in as many stock sales as possible, including Mr. Ahearn's May 2008 sales. *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1092 (describing a class period of merely fifteen months as "unusually long").

history. *Mathews*, 1994 WL 269734, at *8. They are not "dramatically" out of line with it. *Apple*, 886 F.2d at 1117-18.

In addition, the timing of Mr. Ahearn's sales shows that they were not calculated to maximize the personal benefit from undisclosed information. Mr. Ahearn learned about the excursion in June 2009. (Ahearn Decl. ¶ 23.) He did not sell until eight months later, and in the meantime, he had relinquished management of the Company to his Board-appointed successor, Mr. Gillette. He also did not sell stock on the eve of adverse news. *See Apple*, 886 F.2d at 1117-18 (collecting cases finding bad faith when insider sales were "at times calculated to maximize personal benefit" within two days to three weeks before disclosure of significant adverse news).

Further, only 8% of Mr. Ahearn's Class Period sales occurred while he was CEO. Those were the sales in May 2008—before the excursion even began—and were made pursuant to a valid Rule 10b5-1 plan that was entered into in November 2007, five months before the Class Period began. (Ahearn Decl. ¶¶ 63 & 67.) Mr. Ahearn's remaining sales occurred when he was a director, and ***not involved in management of the business***. (*Id.* at 68.) The court in *PETCO* held that, similar sales by a former CEO and chairman of the board were not indicative of scienter because, "he no longer engaged in day-to-day oversight of PETCO's business operations." 2008 WL 8876554, at *3.[49] For these reasons, Mr. Ahearn's sales do not support any inference of scienter.

### 2.    Robert Gillette

Robert Gillette joined First Solar at the invitation of the Board after the alleged fraudulent scheme had been in place for well over a year. The record contains no evidence that he left his prior position with the intent to enter into a securities fraud

---

[49] Under Ninth Circuit law, "[s]ales according to predetermined plans 'may rebut [] an inference of scienter.'" *Metzler*, 540 F.3d at 1067 n.11 (alteration in original) (quoting *Worlds of Wonder*, 35 F.3d at 1427-28). All but one set of Mr. Ahearn's sales during this time period occurred under valid Rule 10b5-1 plans. (Ahearn Decl. ¶ 71.) The one set of sales that did not occur under a Rule 10b5-1 plan occurred in February 2010. (*Id.* ¶¶ 59-78.) There is no evidence that Mr. Ahearn had access to any information showing any Company disclosure was false or misleading at this time (or at any other time).

scheme with a group of strangers.  There is also no evidence that he learned of and joined the alleged fraudulent scheme after becoming CEO.  The fact that Mr. Gillette *purchased and did not sell* First Solar stock at any time while working at First Solar negates any inference of scienter.  He did not personally benefit from—and indeed was harmed by— any alleged fraud.

### 3.    Jens Meyerhoff

Mr. Meyerhoff's sales do not evidence scienter, because they occurred pursuant to a long-term diversification plan.  He sought to diversify his assets to ensure that they would not be concentrated in the stock of the Company that was also the source of his income.  *See Apple*, 886 F.2d at 1117.  (Meyerhoff Decl. ¶ 77.)

Mr. Meyerhoff was first able to sell First Solar stock in June 2007, at which point he sold all his vested shares.  (*Id.* ¶ 78.)  Over the next eleven months, until April 2008, he sold a total of 68,750 shares of stock, roughly 93% of his holdings at the time.  (*Id.* ¶¶ 78-79.)  During the forty-one months of the Class Period that he was employed at First Solar, Mr. Meyerhoff sold 119,250 shares, roughly 74% of his holdings.  (*Id.* ¶ 85.)  Thus, his Class Period sales were consistent with his trading history.  *See Apple*, 886 F.2d at 1117-18; *Mathews*, 1994 WL 269734, at *8.

Moreover, Mr. Meyerhoff's sales were not made at suspicious times. Mr. Meyerhoff learned about the excursion in June 2009, but he did not sell until ten months later.  Similarly, he first learned of the hot-climate issue in March 2011, but he did not sell any stock after that time while he was still employed at First Solar.  Indeed, his last sale while he worked at First Solar was in February 2011.

Finally, approximately 87% of the shares sold by Mr. Meyerhoff during the Class Period while he worked at First Solar were pursuant to Rule 10b5-1 plans.  The only exception was a sale occurring on May 1, 2009—more than a month before he first learned of the excursion.  (Meyerhoff Decl. ¶¶ 82, 86.)

### 4.    Mark Widmar

Plaintiffs' fraud theory is also incoherent as applied to Mr. Widmar, who, as

discussed above, purchased and did not sell First Solar stock during the Class Period. (Widmar Decl. ¶¶ 49-50.) He was, therefore, harmed and not benefited by the alleged fraud, which negates any inference that the alleged fraud existed in the first place. Also negating an inference of scienter on the part of Mr. Widmar is the fact that he joined First Solar at the invitation of the Board—which is not accused of fraud—after the alleged fraudulent scheme had been in place for three years.

### 5.    Bruce Sohn

Mr. Sohn sold First Solar stock both before and during the Class Period in a pattern not probative of scienter. His sale of 93,000 shares during the seventeen-months before the Class Period exceeded his sale of 74,750 shares during the thirty-six-months from the start of the Class Period through his departure from First Solar. (Sohn Decl. ¶¶ 62-63.)

Mr. Sohn's sales during the Class Period while he worked at First Solar were thus not "dramatically out of line with prior trading practices" (except that they were substantially reduced). Additionally, eight of Mr. Sohn's ten sales of First Solar stock during the Class Period—covering 67% of the shares he sold—were pursuant to pre-arranged 10b5-1 stock trading plans. (*Id.* ¶ 60.)

Finally, none of Mr. Sohn's sales of First Solar stock during the Class Period while he worked at First Solar occurred at suspicious times. Mr. Sohn sold 12,750 shares in August 2008—nine months before he learned of customer complaints of low power modules—and he did not sell stock again until August 2010, a month after the excursion was disclosed to the public. (*Id.* ¶¶ 64-65.)

### 6.    David Eaglesham

Dr. Eaglesham's transactions in First Solar stock are also not probative of scienter. First, his sales followed a consistent pattern throughout his tenure at First Solar: he exercised options as soon as they vested and sold the resulting stock to minimize concentration of his assets in the stock of his employer. *See Apple*, 886 F.2d at 1117; (Eaglesham Decl. ¶ 66; Ex. 36 at 99:6-101:5, 104:7-23). All of the options that

Dr. Eaglesham exercised and sold during the Class Period vested either during the Class Period or in the quarter immediately preceding it. (Eaglesham Decl. ¶¶ 70-77.)

Second, Dr. Eaglesham's sales during the Class Period were consistent with his pre Class Period sales. In the nine months before the Class Period began, Dr. Eaglesham sold 100% of his holdings. (Eaglesham Decl. ¶ 81.) He did almost exactly the same thing during the forty-six-month Class Period, selling 97% of his holdings. (*Id*. ¶ 82.)

Third, throughout the Class Period, Dr. Eaglesham also received restricted stock units (RSUs) under First Solar's long-term incentive plan. Dr. Eaglesham held more of these RSUs at the end of the Class Period than he sold during the entire forty-six month Class Period: He held 4,316 vested shares at the end of the Class Period, as compared to the 3,878 shares that he sold during the Class Period. (*Id*. ¶¶ 78-80.)

Fourth, only one of Dr. Eaglesham's sales while he was CTO occurred outside of a Rule 10b5-1 plan. This lone transaction involved the sale of vested RSUs, and accounted for only 3% of his sales while he was CTO during the Class Period. (*Id*. ¶ 79.) The remainder of Dr. Eaglesham's stock sales during the Class Period while he was CTO occurred pursuant to Rule 10b5-1 plans. (*Id*.)

### 7.   James Zhu

Mr. Zhu made just three stock transactions during the Class Period. The pattern of these sales negates an inference of scienter. Mr. Zhu's lone sale not under a Rule 10b5-1 plan occurred in November 2009—three months ***before*** the first of his challenged statements allegedly designed to inflate the stock price. (Zhu Decl. ¶¶ 20-21.) Moreover, this early sale was small—only 500 shares. (*Id*. ¶ 21.) The other sales—94% of the stock he sold during the Class Period—were made pursuant to valid Rule 10b5-1 plans. (*Id*. ¶¶ 22-25.)

### E.   The Evidence Does Not Support a Finding of Scienter Against First Solar.

To establish that a corporate entity made a false statement with scienter, a plaintiff must prove the following: (1) that the statement was made by a duly authorized corporate

officer; and (2) that the officer made the statement with scienter. *See NVIDIA*, 768 F.3d at 1063; *Glazer*, 549 F.3d at 743-44 (9th Cir. 2008). As shown above, Plaintiffs cannot make these showings.[50] First Solar is, therefore, entitled to summary judgment on scienter grounds.

### III.   EACH DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 20(a) CLAIMS.

Summary judgment should be entered for each Defendant on the Section 20(a) controlling-person claims on three grounds. First, as discussed above, Plaintiffs cannot establish an underlying Section 10(b) violation, a prerequisite to a Section 20(a) claim. *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163-64 (9th Cir. 1996).

Second, Plaintiffs cannot establish that any Individual Defendant exercised actual power or control over the primary violator.[51] Proof of control requires, at a minimum, proof of an Individual Defendant's authority to control First Solar's disclosures, beyond the disclosures that he signed or spoke. *Howard*, 228 F.3d at 1067.

The Individual Defendants' positions as officers or directors do not themselves prove that they exercised control within the meaning of Section 20(a). *See Paracor*, 96 F.3d at 1163-64. Rather, Plaintiffs must prove that each Individual Defendant exercised actual control over corporate actions—here the preparation and approval of the

---

[50] The Ninth Circuit has considered—but not decided—whether or not it is theoretically possible to plead corporate scienter without identifying an individual officer with scienter by name. *See NVIDIA*, 768 F.3d at 1063; *Glazer*, 549 F.3d at 743-44. This pleading doctrine has no application to summary judgment. In any event, it could only apply under extraordinary circumstances, as outlined in this hypothetical:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Id*. This case presents no such scenario.

[51] Plaintiffs also allege that First Solar is liable as a "controlling person" under Section 20(a) because it allegedly controlled the Individual Defendants and all of the Company's employees. (FAC ¶ 258.) But Plaintiffs do not allege that any employees, other than the Individual Defendants, committed fraud. And Plaintiffs do not explain how the Company "controlled" any of the Individual Defendants.

allegedly false disclosures. *Id.* As discussed above (Factual Background, § III.A.5), First Solar's Board retained final authority over the issuance of all the challenged statements. With the exception of the statements the Individual Defendants themselves signed or said, therefore, Plaintiffs cannot establish the required element of control; thus, the controlling-person claims fail as to each of them.

Third, the evidence shows that each Individual Defendant acted in good faith, providing a complete defense to Section 20(a) liability. "[A] defendant 'may assert a good faith defense by proving the absence of scienter and a failure to directly or indirectly induce the violations at issue.'" *PETCO*, 2008 WL 8876554, at *14. Each of the Individual Defendants has submitted a declaration establishing his lack of scienter and his "effective lack of participation" in the alleged fraud. *Howard*, 228 F.3d at 1065. This evidence established good faith under Section 20(a), further entitling each Individual Defendant to summary judgment on this claim. *See, e.g.*, *Kaplan v. Rose*, 49 F.3d 1363, 1383 (9th Cir. 1994).

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment for Defendants and/or grant all other relief requested above.

Dated: March 27, 2015

By: s/ *Jordan Eth*
Jordan Eth
MORRISON & FOERSTER LLP

OSBORN MALEDON, P.A.
Maureen Beyers

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**