James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>    Plaintiff,<br><br> vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>    Defendants. | Case No.   CV12-00555-PHX-DGC<br><br><br>**DECLARATION OF MICHAEL J. AHEARN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, MICHAEL J. AHEARN, declare as follows:

1.     I am a defendant in this lawsuit.  I submit this Declaration in support of Defendants' motion for summary judgment.  I make this Declaration on personal knowledge.  If called as a witness, I would testify to the following facts:

**Founding First Solar**

2.     After graduating from law school at Arizona State University, I began my professional career working as a lawyer in Phoenix in 1982.  In 1996, I left the practice of law to join a venture capital firm, True North Partners, L.L.C. (later known as JWMA Partners, L.L.C.), with John Walton (the son of Sam Walton, the founder of Wal-Mart) and two other partners.  True North Partners' business was to invest in innovative early stage businesses with the potential to meet growing consumer demands and alleviate environmental pressures in sectors such as energy, water, and agriculture.  Our expectations, similar to other venture capital companies, were that some of these early stage investments would fail, others would be moderately successful, and some would develop into highly successful and impactful global businesses.  Typical of venture capital companies, we sought to eventually liquidate investments in the successful companies in order to redeploy funds back into early-stage businesses.  John Walton provided True North with its initial investment funding, and I acted as a general partner.

3.     In 1999, True North Partners founded First Solar.  True North Partners remained the majority shareholder of the Company until First Solar went public in November 2006.

4.     We founded First Solar in order to commercialize and scale up a thin film semiconductor technology with the potential to dramatically reduce the cost of photovoltaics (solar panels).  Our goal was to reduce solar energy costs to the point that solar energy could become a significant part of the global energy mix.

5.     Although First Solar had tremendous potential, many companies had tried unsuccessfully to commercialize similar thin film semiconductor technologies to produce low cost solar panels.  We were building the business from scratch and faced many

AHEARN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT     1
sf-3519719

technical, operational, and market challenges.  Ultimately it took approximately 6 years and over $100 million of investment for First Solar to succeed with its commercialization program.

**My Roles at First Solar**

6.     In August 2000, I became the interim Chief Executive Office ("CEO") of First Solar as well as Chairman of the Board of Directors.  I took on these roles, in addition to my regular duties at True North, to lead the development and commercialization of the technology.

7.     Between August 2000 and late 2004, First Solar developed into a highly capable organization and achieved its commercialization goals.  First Solar's progress coincided with favorable market developments, including a German market subsidy program launched in 2004 that greatly increased the market demand for solar energy, and a global shortage of silicon feedstock used by almost all solar module manufacturers except First Solar, which limited their production capacities and increased their costs.

8.     As a result of these favorable developments, John Walton and I agreed that I would continue to focus on the First Solar CEO role and help to expand First Solar for a few years.  We discussed a plan by which First Solar would eventually recruit another CEO, and True North would eventually liquidate some of its ownership in order to fund new investments in additional early stage businesses.

9.     In June 2005, as First Solar was expanding manufacturing capacity in Ohio, finalizing plans to build a new factory in Germany, and building up a global organization, John Walton was killed in an airplane crash.  This sudden, tragic event caused First Solar to complete an IPO in November 2006 in order to secure funding needed for its business expansion.  John's death, combined with the IPO, caused me to extend my time horizon for remaining in the First Solar CEO position for several years beyond what I had envisioned in my discussions with John.

**First Solar's Global Expansion**

10.     Between 2005 and 2009, First Solar grew rapidly in Germany and other European markets, built new factories in Ohio, Germany, and Malaysia, and became one of the largest and most successful solar manufacturers in the world.

11.     First Solar's headcount grew from approximately 220 employees at the end of 2004 to approximately 4,600 employees by the end of 2009, and continued to grow significantly thereafter.  The Company's geographic scope of operations expanded from Perrysburg, Ohio and Phoenix, Arizona to include multiple offices across Europe and Asia.  During this period, First Solar became the lowest manufacturing cost and most financially successful company in the solar industry by wide margins, and despite multiple increases in manufacturing capacity, had far more demand for its products than it could supply.

12.     In late 2008, the solar industry, like nearly all industries, suffered from the effects of the financial sector meltdown.  The crisis caused banks and other financial institutions to abruptly stop financing renewable energy projects, jeopardizing many solar power projects being developed by First Solar and its customers.  The uncertainties surrounding the financial sector made politicians and regulators reluctant to commit to expanding renewable energy programs.  The general apprehensions of public investors during this period were also directed toward the solar industry, and First Solar's stock price dropped from approximately $269 per share at the beginning of 2008, to approximately $138 per share by the end of December 2008.

13.     First Solar's business strengthened considerably over the course of 2009. The U.S. Congress adopted legislation that enabled the U.S. Department of Treasury and the Department of Energy to provide liquidity to the project finance market, which enabled continued funding for solar power projects until the financial sector recovered and resumed active participation.  Policymakers in key markets, including Germany and California, decided to maintain or expand their markets for solar energy, and others regions adopted solar energy programs as a means of creating new jobs.  Interest rates

declined to low levels, which reduced the cost of solar energy and made it more attractive compared to conventional alternatives.  First Solar took advantage of these favorable developments by stabilizing its European business and significantly expanding its pipeline of California solar power projects, establishing itself as the world's leading turnkey provider of large, utility scale solar power plants.  First Solar was also able to leverage its position as an industry leader to establish important footholds in new markets, including China, India, and several new U.S. markets.

14.    Given its solid foundation and growth prospects by late 2009, I believed the time was right for me to step down as the First Solar CEO and return to the venture business.  In addition to holding leading positions in key markets and having a strong multi-year pipeline of business, First Solar had a solid team of executives, a loyal customer base, and a strong balance sheet.  I believed First Solar could grow several-fold over the coming years, and that the Company would benefit from having a CEO with extensive experience leading a significant global business of this size and magnitude.  At my request, the Board of Directors began searching for my replacement in 2009.  The Board ultimately hired Rob Gillette to replace me as CEO.  I was strongly in favor of hiring Mr. Gillette for the CEO role because of his experience running successful multibillion-dollar businesses at Honeywell.  I believed that his skill sets were well suited to the opportunities that we envisioned First Solar would face over the coming years.

**2010-2011**

15.    I stepped down from the CEO role on September 30, 2009, with the goal of starting up another venture capital company modeled after the original True North Partners.  I formed True North Venture Partners, L.P. in December 2010, along with several partners, to make early stage investments in transformative technologies in the energy, water, agriculture, and waste sectors.

16.    At the First Solar Board's request, and in order to assist Mr. Gillette's transition into the CEO role, I took the title of Executive Chairman of the Board and

AHEARN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                    4
sf-3519719

remained in this role until December 31, 2010, when my title changed to Chairman of the Board.

17.    In my role as Executive Chairman and Chairman, I had no responsibilities for the day-to-day business of First Solar, and I did not have an office at First Solar.  As Executive Chairman, in addition to my responsibilities as a Board member, I acted as an ambassador for First Solar, meeting occasionally with customers and government leaders to discuss issues related to First Solar and the solar industry.  I estimate that I averaged less than 10 hours per month working on my additional duties as Executive Chairman.

18.    Beginning in late 2010 and accelerating in 2011, the solar industry began to experience a shift away from the stable, growing industry that existed when I left the CEO role in 2009.  By the end of 2011, demand had fallen, traditional subsidy-driven markets in Europe were faltering, and competitors, principally from China, were flooding the market with solar modules at low prices.  As market supply persistently exceeded market demand, prices and profit margins continued to reduce across the industry, and growth rates for First Solar and other solar manufacturers stalled.

19.    These deteriorating industry fundamentals were driven by several inter-related root causes.  The traditional silicon-based technology for making solar modules became commoditized, reducing barriers to entry in the solar manufacturing business.  With ample, low cost capital available from both Chinese and U.S. sources, Chinese manufacturers were able to massively expand production capacity.  European countries that provided market subsidies to encourage solar energy adoption were flooded with supply, leading to unanticipated increases in the cost of subsidy programs that had been adopted by European governments.  These governments began to realize that with the solar module supply chain now commoditized, they could no longer afford to maintain large subsidized markets for solar power that were transparent and freely open to imported products.  As a result, they took steps to limit the size of their domestic markets and access to them by foreign companies.  Countries developing new solar energy markets of their own—such as China, India, and Japan—learned from the European

AHEARN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT    5
sf-3519719

experience and created market structures designed to make it difficult for exporting companies to sell into their domestic markets.

20.    These fundamental changes in market dynamics adversely affected First Solar along with the most of the solar industry, and required First Solar to shift its focus from established markets to pursuing a more entrepreneurial and global approach to identifying and creating new markets for its products.  In October 2011, the Board determined that First Solar would need a CEO with a more market-centric, entrepreneurial skill set to lead First Solar through the tumultuous period ahead, and decided to replace Mr. Gillette.  Mr. Gillette's termination had nothing to do with wrongdoing of any kind.

21.    At the Board's request, I agreed to return to the CEO role, on an interim basis, until Mr. Gillette's permanent successor was hired.  I remained Interim CEO until May 2012, when the Board hired Jim Hughes as CEO.  Mr. Hughes remains the CEO today.

22.    Late 2011 and early 2012 was a time of change and restructuring for First Solar.  Along with Mark Widmar (First Solar's CFO), I led First Solar through "Project Sunrise," a shift in strategic direction focused on developing new markets that were less reliant on government subsidies.  Project Sunrise entailed eliminating existing and planned production capacity that would not be needed for the foreseeable future, largely exiting our European operations which had been the mainstay of our business in prior years, expanding our utility scale solar power plant business to new geographies around the world where solar energy could meet important energy needs, strengthening our vertical integration in the power plant business beyond solar panels to the design and engineering of entire power plant systems, expanding our efforts to develop, finance, and operate large scale solar power plants, and reducing our corporate overhead.  Additionally, the industry developments in late 2011 and 2012 changed the dynamic with many of our major customers, and resulted in First Solar proposing commercial solutions for a number of large sites that had not previously been approved for LPM remediation.

Although some of these moves resulted in some large non-recurring charges, the moves were in our opinion necessary to overcome the industry-wide challenges we faced at the time.

**The LPM Excursion**

23.    In June 2009, while I was CEO, I first learned of a manufacturing excursion—that is, an unintended deviation from our standard manufacturing process— relating to some First Solar modules.

24.    During my remaining time as CEO from June 2009 to October 2009, I believed, based on all internal analyses and information provided to or requested by me, that the excursion and its related costs were modest both in terms of effect on First Solar's financial statements and the number of solar modules affected.

25.    During my first tenure as CEO, I attended meetings and received communications discussing First Solar's engineering, quality, and accounting teams' efforts to identify the root cause of the excursion and the costs associated with the excursion.  I also attended meetings and received communications regarding the best way to work through the technical product issues with our customers, while at the same time protecting our intellectual property and proprietary interests in our manufacturing trade secrets.

26.    I received updates from and relied on the technical expertise of experienced First Solar executives, including David Eaglesham (VP of Technology), Bruce Sohn (President of Operations), and Mike Koralewski (VP of Quality), for information relating to the technical engineering analysis of the manufacturing excursion, its root cause, and the work done to estimate the affected population.  These updates were typically presented at meetings of the executive staff in the form of PowerPoint presentations. While I did not personally prepare this information or conduct the underlying analyses, my communications with these employees, my years of experience working with them at First Solar, and my understanding of the processes they used to develop their estimates

AHEARN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                    7
sf-3519719

supported my belief that the work being performed by the Company's engineers to address the manufacturing excursion was thorough and accurate.

27.     To assess the financial effects of the issue, I received updates from and relied on the expertise of the Chief Financial Officer (CFO) and his staff for information relating to the financial and accounting treatment of the LPM remediation program. Specifically, I relied on the financial and accounting expertise of experienced First Solar executives, including Jens Meyerhoff (CFO), James Zhu (CAO and Corporate Controller), and Bryan Schumaker (Assistant Corporate Controller), for information about the technical accounting and finance decisions relating to the excursion.  While I did not personally make these decisions or perform the underlying accounting analyses, I believed that First Solar's accounting for the excursion was accurate based on my interactions with these individuals, my years of experience working with them at First Solar, and my understanding of the processes they used to develop their estimates.

28.     After leaving the CEO role in October 2009, I periodically received and reviewed presentations, in connection with quarterly Board meetings, about the financial and operational effects of the remediation program.  These presentations were prepared and presented by First Solar management.  I, along with the rest of the Board, discussed the issues, reviewed the data and analysis presented, and asked questions about the LPM remediation program with management.  Based on the analysis and information provided to or requested by me, I believed that management had a well-founded understanding of the operational and financial effects of the LPM remediation program.

29.     Along with my fellow board member, Tom Presby (Chair of the Audit Committee), I was delegated final authority by the Board to review the final language of First Solar's disclosure of the excursion in the Form 10-Q for the second quarter of 2010. My role, however, was limited to reviewing the disclosure language based on the data and accrual figures provided to me by First Solar's engineering and accounting teams.  I received the information from the executive leaders of these teams, including TK Kallenbach (EVP of Sales and Marketing), Mike Koralewski, Jens Meyerhoff, and James

AHEARN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                           8
sf-3519719

Zhu. Based on my review of the information presented to me, my interactions and discussions with these executives, and my understanding of the processes they used to develop their estimates, I believed that the disclosure language was accurate. I did not work on, direct, or change any of the underlying data or calculations.

30. When I returned to First Solar as Interim CEO in October 2011, I did not manage the day-to-day operations or analysis of the LPM remediation program. During this time, I received updates from experienced First Solar executives, including TK Kallenbach, Tom Kuster, and Mark Widmar, who led the teams responsible for the operational and financial analysis associated with the program. Based on my review of the information presented to me and my interactions with these individuals, I believed that the LPM remediation program was under control and fully accounted for.

**SEC Filings Signed as CEO**

31. I understand that Plaintiffs allege statements contained in six Forms 10-Q or 10-K that I signed as First Solar's CEO (filed on May 2, 2008; July 31, 2008; October 31, 2008; February 25, 2009; May 1, 2009; and August 3, 2009) contained misrepresentations. The specific statements are listed in Exhibit 2.[1] In general, these statements concern: (a) general warranty accrual amounts for the period; (b) risk disclosures; (c) the reported cost-per-watt metric for the particular period; and (d) statements about First Solar's operational and module performance.

32. I believed that the statements contained in these Forms 10-Q and 10-K were accurate and free from misrepresentations.

33. Throughout my time as CEO and as a Board member, I was personally aware that First Solar had and relied upon an extensive set of processes in connection with reviewing and publishing Forms 10-Q and 10-K with the SEC. First Solar's Forms 10-Q and 10-K went through an extensive review and fact checking process, involving at

---

[1] All exhibit references in this Declaration are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.

least six separate and independent layers of review: assessment and attestation of the company's financial disclosures by a Disclosure Committee, a multi-disciplinary committee created specifically to implement the internal control procedures; an extensive sub-certification process; a review and reconciliation of the financial statements by the finance department involving both the CAO and CFO; external review by outside auditor PwC and outside counsel; review and comment by the Audit Committee of the Board; and review and approval by the full Board of Directors.

34.    I knew that the process began with First Solar's Disclosure Committee, which was, and still is, a multi-disciplinary committee created specifically to implement the internal control procedures relating to First Solar's financial disclosures and compliance with the Sarbanes-Oxley Act. The Disclosure Committee was made up of employees from across the organization, including leaders of the finance, accounting, engineering, operations, sales, and manufacturing groups. The Disclosure Committee also solicited information from various parts of the business and worked with subject matter experts to ensure the accuracy of First Solar's SEC filings. I was not on the Disclosure Committee and do not recall ever attending their meetings.

35.    In addition to the executives on the Disclosure Committee, before the end of each reporting period, approximately 75-250 employees (depending on the time period) who provided information for the SEC filings were sent sub-certification requests. The sub-certification process was designed to ensure that the information contained in First Solar's SEC filings accurately reflected the financial condition of the business in all material respects. Employees typically responded to the sub-certification requests several weeks before the quarterly or annual filing, in order to allow for discussion and review of any issues raised through the process. I believe, based on my participation in this process, that at no time during the Class Period did First Solar file a Form 10-Q or 10-K with the SEC until it had received 100% feedback on all sub-certifications, clearing any material disagreements. As CEO, I met with the CFO to

discuss the results of the sub-certification process every quarter before signing my SOX certification that accompanied First Solar's SEC filings.

36.    First Solar finance and accounting personnel also performed additional procedures during the preparation of financial statements, including a quarterly close process led by First Solar's CFO and CAO.  As CEO, I discussed the results of this close process, and First Solar's overall financial condition, with the CFO every quarter before signing any SEC filings.  I met with the CFO in person every quarter before the filing to discuss these issues and any other significant transactions or events that had occurred during the quarter.

37.    I was also well aware that First Solar's outside auditor, PricewaterhouseCoopers (PwC), reviewed First Solar's financial statements on a quarterly basis and performed an annual audit of the financial statements and controls.  As CEO and Chairman of the Board, I personally discussed the results of PwC's reviews and audits with the PwC audit partner every quarter.  These one-on-one meetings with the PwC partner provided me with another layer of comfort that the proper systems were in place and being followed.

38.    After the Disclosure Committee completed the initial drafting and fact-checking process, First Solar's Audit Committee met to discuss, review, and ultimately recommend the filing of each quarterly and annual filing.  This meeting included representatives of PwC.  The full First Solar Board met within one day after the Audit Committee meeting and, after reviewing the filing and the recommendation of the Audit Committee, approved the filing.

39.    As part of my own review of the financial information included in First Solar's Forms 10-Q and 10-K, I met with the CFO and members of his team to discuss and review key financial issues and metrics.  I met with the CFO every quarter to discuss, and ask questions about, the results of the close process and First Solar's overall financial condition.  As CEO, however, I did not actively participate in or control the day-to-day process of determining or calculating the specific financial estimates to include in the

Forms 10-Q or 10-K or the related earnings release conference calls.  Specifically, I did not actively participate in or control the process of determining First Solar's product warranty accruals or determining the cost-per-watt metric.  I relied on the skill and expertise of the CFO, CAO, Corporate Controller, and their staff to analyze and determine these accruals and metrics.  Based on the information I received, my interactions with these individuals, and my years of experience working with them at First Solar, I believed (and still believe) that the results of their analyses were truthful and accurate.

40.     Throughout each quarter I was CEO, I also held meetings with, and received updates from, my direct reports to gain an understanding of any major issues or events affecting the company.  For example, I held monthly CEO staff meetings that included my direct reports responsible for, among other things, manufacturing, operations, human resources, sales, government relations, finance and accounting, legal, and marketing.  Meetings such as these further confirmed my belief that the SEC filings I signed accurately reflected the condition of the Company at the time they were issued.

41.     As part of my review of First Solar's SEC filings and public disclosures, I also discussed major issues or events with my fellow Board members.  For example, I discussed issues relating to First Solar's technology and module performance with Jim Nolan, a Board member and one of the inventors of First Solar's technology.  Mr. Nolan had expertise in all aspects of the Company's technology and products, and had full access to the Company's technical and operational personnel and data.  As a part of his Board function, Mr. Nolan met regularly with the Company's technical and operating personnel, including "skip level" meetings that bypassed management and personnel, to review and analyze the technical and operating information reported by management, including information relating to LPM and other quality issues.  Mr. Nolan gave reports to the Board of Directors on a recurring basis with regard to his observations and conclusions.  Similarly, when I had questions about First Solar's financials, I reached out to Tom Presby, Chair of the Audit Committee, who is a former Global Deputy Chairman

and Chief Operating Officer of the audit and accounting firm, Deloitte.  These conversations further supported my belief that I fully understood the quarter's significant events and their impact on the business as a whole.

42.     My belief in the accuracy of the statements contained in First Solar's Forms 10-Q and 10-K was based on these extensive processes, my interactions with the people responsible for preparing the documents and underlying information, and the controls that First Solar had in place, before and during the Class Period, to prepare and issue the company's financial statements.

43.     First Solar has never restated or been required to restate its financial statements issued during the Class Period.  PwC has never requested that First Solar restate its financial statements or identified a material weakness related to the financial statements issued by First Solar during the Class Period.

44.     At no time did I believe, or was I ever told, that any public statement made by First Solar, myself, or any other member of management during the Class Period was false, inaccurate, or misleading.  Specifically, at no time did I believe, or was I ever told, that any of First Solar's reported quarterly or annual financial results were false, inaccurate, or misleading, or that First Solar ever misrepresented the state of its business, module performance, cost per watt, or accruals relating to its warranty obligations or the manufacturing excursion.

**Statements Made During Conference Calls as CEO**

45.     As CEO, I spoke during earnings conference calls with analysts and investors to discuss First Solar's financial results, performance, and guidance.

46.     I understand the plaintiffs in this case to be alleging that statements attributed to me in six of First Solar's conference calls with analysts and investors (on April 30, 2008; July 30, 2008; October 29, 2008; February 24, 2009; April 29, 2009; and July 30, 2009) contained misrepresentations.  The specific statements are listed in Exhibit 2.  In general, these statements concern:  (a) the reported cost-per-watt metric; (b) First Solar's "pragmatic approach" to risk; and (c) projects in hot climates.

47.    At the times I made those statements, I believed that every one of them was true. I based this belief on my interactions with the people involved in the preparation of the information supporting the statements and the process described in ¶¶ 31-44 surrounding the preparation of each Form 10-Q and 10-K (the information presented during conference calls was primarily derived from and tied to First Solar's SEC filings). Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed during the conference calls.

48.    In addition to the work done by the Investor Relations team, I held several meetings with top First Solar executives each quarter to prepare for the upcoming earnings conference call. These meetings included executives responsible for First Solar's manufacturing, finance and accounting, and sales groups. As CEO, I also held a full executive staff meeting before the quarterly conference call to discuss and review the issues to be discussed during the call. During my personal review of the conference call scripts, I routinely asked questions of the executives responsible for the underlying information in the script until I was fully satisfied with the accuracy of all statements I was going to make during the conference call.

**SEC Filings Signed as a Board Member**

49.    I also understand that the plaintiffs in this case assert that statements contained in two Forms 10-K that I signed as a member of the Board of Directors (filed on February 22, 2010 and February 28, 2011) contained misrepresentations. The specific statements are listed in Exhibit 2. In general, these statements concern: (a) general warranty accrual amounts for the period; (b) the reported cost-per-watt metric for the particular period; (c) the manufacturing excursion accrual; (d) risk disclosures; and (e) statements about First Solar's operational and module performance.

50.    I believed that the statements contained in the February 2010 and February 2011 Forms 10-K were true and accurate, based on the processes described in ¶¶ 31-44

AHEARN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                                14
sf-3519719

and my interactions with the individuals responsible for preparing the statements and underlying information.

51.     In addition to First Solar's formal processes and controls, in my role as a Board member, I spoke to, and asked questions of, Tom Presby and the Audit Committee members, members of management, the auditor one on one, and our technology expert on the Board, Jim Nolan, before signing First Solar's Form 10-K.  These conversations further supported my belief in the accuracy of the SEC filings.

52.     As a member of the Board of Directors, I also received financial updates prepared by the CFO and his staff.  These updates provided information relating to key issues, metrics, and transactions relating to the previous quarter.  I, along with my fellow Board members, discussed these presentations with the CFO during our quarterly Board meetings to make sure that we understood and were comfortable with First Solar's financial condition.  I did not, however, actively participate in or control the day-to-day process of determining or calculating the specific financial estimates to include in the Forms 10-Q or 10-K or related earnings release conference calls.  Specifically, I did not actively participate in or control the process of determining First Solar's product warranty or manufacturing excursion accruals or the cost-per-watt metric.

**SEC Filings Signed as Interim CEO**

53.     I understand that the plaintiffs in this case allege that statements contained in one Form 10-Q that I signed as Interim CEO (filed on November 4, 2011) contained misrepresentations.  The specific statements are listed in Exhibit 2.  In general, these statements concern:  (a) general warranty accrual amounts for the particular period; (b) the reported cost-per-watt metric for the particular period; (c) the manufacturing excursion accrual; (d) risk disclosures; and (e) statements about First Solar's operational and module performance.

54.     I believed that the statements contained in the November 2011 Form 10-Q were true and accurate.  I based this belief on my interactions with the people responsible

for preparing these statements and underlying analyses, and the processes discussed in ¶¶ 31-44 above.

55.    Before signing First Solar's Form 10-Q for 3Q 2011, I held meetings with, and received updates from, my direct reports to gain an understanding of any major issues or events that had occurred during the quarter.  For example, before the release of First Solar's 3Q 2011 earnings and Form 10-Q, I met with senior executives, including TK Kallenbach, Mark Widmar, and Jim Brown, to discuss the upcoming earnings release and major events of the quarter.  Meetings such as these confirmed my belief that the SEC filing that I signed accurately reflected the condition of the company at the time it was issued.

**Statements Made During Conference Calls as Interim CEO**

56.    I also understand that the plaintiffs in this case assert that statements attributed to me in two of First Solar's conference calls (on November 3, 2011 and December 14, 2011) contained misrepresentations.  The specific statements are listed in Exhibit 2.  In general, these statements concern:  (a) the reported cost-per-watt metric and (b) the manufacturing excursion accrual amount.

57.    At the times I made those statements, I believed that every one of them was true.  I based this belief on the processes outlined in ¶¶ 31-44 surrounding the preparation of each Form 10-Q and 10-K (both statements related to items disclosed in First Solar's financial statements and SEC filings) and my interactions with the individuals responsible for preparing the statements and the underlying information.

58.    Additionally, it was my understanding that First Solar's Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed during the conference calls.  To prepare for conference calls, I also met with the CFO and other executives to clear any questions I had about the prepared script and to discuss First Solar's financial outlook and major risks and opportunities.  For example, before the 3Q 2011 earnings conference call, I met with senior executives, including Mark Widmar,

TK Kallenbach, Jim Brown, and Ted Meyer, to discuss the conference call script and earnings release.  Similarly, before the December 14 guidance call, I met with Mark Widmar and members of the Investor Relations team to discuss our guidance models and conference call script.  These meetings confirmed my belief that the information we shared with investors was accurate.  As Interim CEO, I did not personally participate in or control the day-to-day process of determining or calculating the specific financial estimates to include in the Forms 10-Q or 10-K or the related earnings release or conference calls.  Specifically, I did not actively participate in or control the process of determining First Solar's reported cost-per-watt or manufacturing excursion accrual.

**Stock Transactions**

59.     At the time First Solar went public, I considered ways to divest my equity interest in the company and return to venture capital investing.  My plan was to sell all my stock holdings in First Solar over the course of a five-year period, beginning in November 2006 in First Solar's IPO.  I did not want to sell all of my shares at one time, because I believed that this would give the false impression that I did not believe in the future of the company.

60.     To minimize the impact of my sales on First Solar and its investors, I planned to sell roughly equal portions of my holdings in each year of my five-year plan. I planned on executing my sales during the first open trading window of each calendar year, as established by First Solar's Insider Trading Policy (First Solar's policy established two to three week "trading windows" that opened after the release of quarterly earnings; sales by senior executives outside of these windows were prohibited).

61.     I made many of my First Solar stock sales under Rule 10b5-1 plans.  I established these plans to sell a specified number of shares under specified conditions. Some of my plans set a minimum price at which to sell my stock.  Other of my plans sold shares at certain times at the then-market price.  I established these plans months before the actual dates of the sales.  In accordance with First Solar's Insider Trading Policy, I pre-cleared all of my stock transactions, including implementation of my 10b5-1 trading

plans, with First Solar's General Counsel before executing the transactions. I did not possess material non-public information at any time that I sold First Solar stock or entered into a Rule 10b5-1 plan.

62. I began selling my First Solar stock holdings on November 22, 2006— approximately 17 months before the Class Period began—as part of First Solar's IPO. When First Solar went public, I owned approximately 6.1 million shares of stock. As part of my five-year plan, I sold approximately 610,000 shares in the IPO (roughly 10% of my pre-IPO holdings) and an additional 1.4 million shares after the post-IPO lockup expired in May 2007 (roughly 23% of my pre-IPO holdings).

63. On November 30, 2007—before the start of the Class Period—I entered into a Rule 10b5-1 plan. This plan provided for the sale of one million shares.

64. Under this Rule 10b5-1 plan, I sold 750,000 shares of First Solar stock between February 19, 2008, and April 21, 2008 (before the start of the Class Period). These sales resulted in gross proceeds of approximately $177 million.

65. Between February 19 and February 21, 2008—before the start of the Class Period—my Family Foundation sold 23,500 shares of First Solar stock. These sales resulted in gross proceeds of approximately $5 million.

66. By the start of the Class Period, I had sold a total of 2,773,204 shares of First Solar stock, or roughly 45% of my pre-IPO holdings. These sales resulted in total gross proceeds of approximately $313 million. In contrast, during the 46-month Class Period, I sold a total of 3,239,016 shares, or roughly 53% of my pre-IPO holdings. I sold an average of approximately 163,000 First Solar shares per month before the Class Period, but an average of approximately 70,000 First Solar shares per month during the Class Period.

67. Pursuant to my November 30, 2007 Rule 10b5-1 plan, I sold an additional 250,000 of my First Solar shares on May 15 and 16, 2008. These sales resulted in gross proceeds of approximately $77.3 million. These sales brought my total sales in 2008 to 1.02 million shares (roughly 17% of my pre-IPO holdings).

68.     I served as CEO of First Solar at the time of these sales.  No other sales of my First Solar stock during the Class Period occurred during my tenure as CEO of First Solar.  The vast majority of sales of my First Solar stock during the Class Period— 92%—occurred after I left the CEO role.  While I remained a member of First Solar's Board of Directors, I had no involvement in the day-to-day management of the company during this time.

69.     With the financial crisis in late 2008, I decided to defer selling shares in the first quarter of 2009.  I made this decision because I did not want to add any additional instability to First Solar's stock during a time of global market insecurity.  Although the financial sector began to stabilize later in 2009, I wanted to adhere to the principle of selling my shares during the first open window of each calendar year.  As a result, I decided not to sell any shares in 2009 and instead to sell the remaining 3 million shares in equal amounts of 1.5 million shares during the first open trading windows in each of 2010 and 2011.

70.     In the first quarter of 2010, I continued with my original plan of selling my remaining holdings.  I made the decision, consistent with my practice in 2007 and 2008, and excepting 2009 based on the financial crisis, to begin my sales during the first available trading window in the year, which was in February 2010 after First Solar released its earnings for FY 2009.  Between February 22 and 26, 2010, I sold 1,500,000 First Solar shares (roughly 25% of my pre-IPO holdings) at an average price per share of $108.30, for gross proceeds of approximately $162.4 million.

71.     I did not sell these shares under a Rule 10b5-1 plan because, unexpectedly to me, First Solar's trading window during the previous quarter (Q4 2009) was closed early.  First Solar's policy at the time required that 10b5-1 plans be made, at the latest, during the open trading window immediately preceding the scheduled sales under the plan.  Because the window had closed unexpectedly during the previous quarter, I was unable to enter into a 10b5-1 plan at that time.  My decision to sell stock was wholly

unrelated to the manufacturing excursion or the LPM remediation program. I did not possess material non-public information when I executed these sales.

72.    During 2011, I divided my planned sale into two pieces (rather than just a single sale) in response to investor reaction to my February 2010 sales. Specifically, after discussions with investors and First Solar management, I decided to split my 2011 sales to mitigate any pricing pressure on First Solar's stock that my sales might cause.

73.    On November 25, 2010, I entered into a Rule 10b5-1 plan. This plan provided for the sale of 800,000 shares at open market price over the first four weeks after the first open trading day in 2011, as established under First Solar's Insider Trading Policy.

74.    Under this plan, 800,000 of my First Solar shares were sold on my behalf between February 28 and March 25, 2011. These sales resulted in gross proceeds of approximately $118.8 million.

75.    On May 26, 2011, I entered into a Rule 10b5-1 plan. This plan provided for the sale of 629,016 shares at open market price beginning on the first open trading day established by First Solar's Insider Trading Policy after First Solar's release of earnings for the second quarter of 2011.

76.    Under this plan, 629,016 First Solar shares were sold on my behalf between August 8 and August 10, 2011. My family foundation also sold 60,000 shares at this time. These sales resulted in total gross proceeds of $68.73 million ($5.93 million of that related solely to the family foundation's shares).

77.    I sold a total of approximately 1.49 million shares in 2011, representing approximately 25% of my pre-IPO holdings.

78.    All my stock sales were consistent with my investment goals outlined above, and were never influenced by any information I had that the public, and specifically First Solar's investors, did not. My stock sales were also not motivated or influenced by specific movements in First Solar's stock price.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of March in Phoenix, Arizona.

_____

MICHAEL J. AHEARN

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**