James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>Defendants. | Case No.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF DAVID EAGLESHAM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

EAGLESHAM DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT
sf-3514787

I, DAVID EAGLESHAM, declare as follows:

1.     I am a defendant in the above-captioned action.  I submit this Declaration in support of defendants' motion for summary judgment.  If called as a witness, I would testify to the following facts:

**Education and Experience**

2.     I hold a BSc in chemical physics and a PhD in physics from the University of Bristol in Bristol, England.

3.     I served as First Solar's Vice President of Technology ("VP Technology") from May 2006 through November 2009.  As VP Technology, I reported to Bruce Sohn, First Solar's President, after he joined the company.

4.     I served as First Solar's Chief Technology Officer ("CTO") from November 2009 through May 2012.  As CTO, I reported to the CEO—Robert Gillette—from November 2009 through October 2011 and interim CEO Michael Ahearn from October 25, 2011, to May 2012.

5.     Before joining First Solar, I held various technology positions at other companies.  For example, from 2003 to 2006, I worked as a Director of Advanced Technologies at Applied Materials.  From 2002 to 2003, I worked as the Chief Technologist and Deputy Assistant Director of Chemistry and Materials Science at Lawrence Livermore National Laboratory.

6.     I am currently the CEO of Pellion Technologies, a next-generation battery technology company based in Cambridge, Massachusetts.

7.     As First Solar's VP Technology and CTO, my primary responsibility was to improve module efficiency through making improvements to the manufacturing process or to the cell structure.  During the time I held these positions, First Solar improved average module efficiency by 40% percent, from 9% to 12.6%.

**The Manufacturing Excursion**

8.     I first learned about what would come to be known as the LPM manufacturing excursion on or about May 29, 2009, when Mike Koralewski (Vice

President of Global Quality) briefed me on a customer complaint involving a small number of modules exhibiting greater-than-expected initial power loss.  We referred to these modules as low power modules, or "LPMs."

9.      After learning of the customer complaint, I led a task force, along with Mike Koralewski, to determine the root cause of these LPMs, and to propose a resolution.

10.     By the end of June 2009, the task force identified the root cause of these LPMs as a process change known as Fast Ramp 421, or "FR 421."

11.     FR 421 had been implemented by engineers in First Solar's Frankfurt-Oder, Germany plant in June 2008.  The process was shown to result in improved module efficiency and subsequently rolled out to the company's other manufacturing facilities.

12.     The task force discovered that FR 421 had the effect of producing a small subpopulation of modules that could experience field power loss of 15% or more from nameplate within the first several months of installation.

13.     The task force concluded that FR 421 had resulted in manufacturing conditions occasionally exceeding the company's standard control limits. We referred to such conditions as the LPM excursion.

14.     Upon determining the root cause of the LPM excursion, I directed all plants to implement process changes that ended the excursion.  These process changes were implemented at all plants worldwide by the end of June 2009.

15.     My primary role in addressing the LPM excursion was to lead the team that identified and mitigated its technical root cause.  As a result, after June 2009, my role was limited to serving as a technical advisor to the Quality team.

16.     I was not involved in the LPM remediation efforts, though I continued to provide technical advice.  This included providing technical expertise in drafting documents that explained the LPM excursion to customers and the independent engineers hired by customers and solar project investors.  My goal was to ensure that we provided accurate and useful information about the LPM excursion, while protecting our proprietary and confidential information.

17.    It was important that First Solar protect confidential information pertaining to its intellectual property.  Specifically, the solar industry was highly competitive at this time, and data about First Solar's technology and manufacturing processes were closely guarded secrets in light of the company's position as the lowest-cost solar manufacturer. In particular, there were several up-and-coming competitors who were actively attempting to replicate First Solar's manufacturing processes and device technology.  Therefore, I believed it was key to First Solar's continued success that proprietary information about our state-of-the-art processes not leak to competitors.

18.    First Solar also had important commercial reasons for keeping information about its modules' performance confidential.  It was my view that First Solar's competitors would use information that they learned about First Solar's modules to falsely portray it in a negative light.  The need for secrecy relating to First Solar's modules was heightened by the fact that there were a small number of independent technical advisors operating in the photovoltaic market globally, and those advisors worked for—and shared information with—some of First Solar's direct competitors.  Because information that was given to technical advisors could easily find its way to First Solar's competitors, the company was keenly aware of the need to protect proprietary and commercial information from the technical advisors.

**Module Degradation Characterization, Testing, and Labeling**

19.    First Solar forecast the output and lifetime performance of its modules using algorithms based on years of laboratory and real-world performance data.  This included laboratory data from First Solar's ongoing module testing program, which simulated more than 25 years of exposure in multiple climates and replicated International Electrotechnical Commission testing; real-time feedback from over 500,000 installed modules by 1Q2008; and historical performance data from (1) the Springerville Generation Site operated by Tucson Electric Power Co., (2)  multiple test arrays at the Arizona Public Service Solar Testing and Research site in Tempe, and (3) the National Renewable Energy Laboratory in Golden, Colorado.

20.    In addition, First Solar's modules were tested by independent laboratories, including Sandia National Laboratories, The Southeast Regional Experiment Station, The California Energy Commission, Fraunhofer ISE, TÜV Rheinland, The Institute of Solar Energy Technology, Institut für Physikalische Elektronik at the Universität Stuttgart, and PHOTON Laboratory.

21.    Based on this and other data, I knew that First Solar's modules, like those from all commercial photovoltaic module manufacturers, decline in power output over time. More specifically, First Solar's modules decline exponentially, meaning that they undergo an initial period of relatively rapid degradation (referred to as "stabilization") followed by much slower long-term degradation (referred to as "degradation").

22.    To account for the initial stabilization period, First Solar applied a "derate" of approximately -5.5% to all modules as they came off the production line. First Solar implemented the process of derating modules to account for the initial stabilization period before I joined the company in May 2006. This derate reduced the rated power output of a module from its actual tested value to its expected post-stabilization value. For example, if a module came off the production line and tested at 80 watts, it would be derated to 75 watts. The module would then be labeled as a 75 watt module, and both the sales price and the warranty would be based on the 75 watt label.

23.    Following the initial stabilization, the power output of modules in temperate climates were estimated to degrade at approximately -0.5% per year, and the power output of modules in hot climates were estimated to degrade at approximately -0.7% to -0.8% per year. I believe that throughout the class period, First Solar provided customers with these estimates for both temperate and hot climates—First Solar called these degradation estimates "degradation guidance."

24.    During the class period, I regularly met with Mike Koralewski to review the key metrics regarding First Solar's module technology.

25.    One of the key metrics I reviewed each quarter with Mr. Koralewski was the Performance Expectation Ratio ("PER"), which compared First Solar's model predictions

against actual power output at customer sites monitored by First Solar in a variety of climates. Degradation guidance was one input into the model. Because First Solar's model predictions closely mirrored those of our customers, the PER was a good measure of whether energy yield from sites built with First Solar modules matched our customers' expectations.

26. Throughout the class period, the PER metric showed that, on average, modules in all climates were performing at, or slightly above, the levels predicted by First Solar's model. In addition, in the few instances where a site was underperforming the model predictions, the underperformance was most likely due to statistical variations in the data or, as reported by the Quality team, due to construction or electrical issues with the site.

27. First Solar provided customers with a written warranty in connection with module sales. Under this warranty, modules that had been properly installed and maintained were warranted to produce 90% of their labeled power output for the first 10 years after sale, and 80% of their labeled power output for the eleventh through twenty-fifth years. Due to measurement variability, the warranty specified that First Solar was only obligated to replace modules that tested 5% or more under the warranted levels. Thus, First Solar's warranty obligations were triggered by modules testing at 85% or lower during the first ten years, or 75% or lower through the twenty-fifth year.

**Hot Climate Stabilization**

28. Following the acquisition of Optisolar in May 2009, First Solar began developing its own large-scale photovoltaic plants in Canada and the United States through the company's Engineering, Procurement, and Construction ("EPC") division.

29. As a result, the company's finance and business development staff began to push for First Solar to consider changing its warranty offering from a step-structured module warranty to one based on annual power performance degradation at either the module or the system level. In assessing whether First Solar should change its warranty

offering and if so, under what terms, in early 2010, a team led by Adrianne Kimber in the Performance and Prediction group analyzed long-term degradation rates.

30.     On approximately April 2, 2010, Ms. Kimber's team completed work on a white paper regarding long-term degradation.  I received a copy of the white paper on or about that date.

31.     The white paper concluded that long-term degradation in temperate and warm climates matched First Solar's degradation guidance in those climates.

32.     The white paper also noted that some limited low-confidence data indicated that systems in hot climates may perform worse than degradation guidance for hot climates.

33.     At the time that I reviewed the white paper, I was not concerned that First Solar modules in hot climates performed worse than degradation guidance, let alone warranty expectations, for several reasons, including:

(a)     The white paper was mainly based on low-confidence data sets that were less than three years old.  As discussed above, I knew through years of research, however, that the company's modules followed a nonlinear functional form for degradation:  an initial rapid stabilization drop that then slowed down and leveled out after 2-3 years;

(b)     The best data that First Solar had at that time, its long-term test installations in the Arizona desert, were performing at or above expectations; and

(c)     I knew from the quarterly review I engaged in with Mr. Koralewski that, on average, monitored sites in hot climates were performing at or above performance expectation ratios.

(d)     As a result, the white paper drafted by Ms. Kimber's team did not change my view that First Solar's long-term degradation guidance of -0.7% to -0.8% per year in hot climates was correct.  In fact, at no time while I was First Solar's VP Technology or CTO did I believe that First Solar's degradation guidance for hot climates was incorrect.

EAGLESHAM DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT     6
sf-3514787

34.     Because it is always better to have more high-confidence data, I agreed with the recommendation in the white paper that First Solar should continue to investigate module and system degradation rates.  I authorized members of my engineering team to assist with the collection and analysis of this data as part of the work being conducted in conjunction with the Quality and Reliability and Product Management departments.

35.     On or about February 7, 2011, I was informed of new data that became available as part of the ongoing analysis of degradation rates.  This data, collected from a large site built and operated by First Solar in the Southern California desert, the Blythe site, was the first indication the company had that the initial stabilization for First Solar modules might be greater in magnitude than had been previously predicted.

36.     The Blythe site was constructed by First Solar at the same time as the Sarnia site in Ontario, Canada, which was performing as expected.  Because First Solar had constructed both sites using identical modules and other equipment, First Solar engineers hypothesized that the climate difference might be driving the difference in initial stabilization.

37.     Once I received this data, I sponsored a cross-functional team of engineers and scientists to further investigate and quantify the hot climate stabilization issue.

38.     By the beginning of the second quarter of 2011, the cross-functional team developed an improved method of analyzing the field data.  Based on this new analysis, the team concluded that (a) long-term degradation was likely temperature-independent and, therefore, hot climate degradation was lower than the guidance provided to our customers, but (b) the initial stabilization of First Solar modules in hot climates was greater than previously predicted.

39.     At this time, the vast majority of our modules were installed in temperate climates.  As a result, I directed my engineering team to work on mitigation strategies for future system installations and module sales to hot climate locations to ensure our customers would continue to see energy yields at or above expected levels.

40.     By the second quarter of 2011, my engineering team and the cross-functional stabilization team had developed both short-term and long-term plans to address future systems installations and module sales in hot climates.  These plans were presented to the entire executive staff and to the Board of Directors.  I also discussed the hot climate stabilization issue with PricewaterhouseCoopers (PwC)—First Solar's outside auditors.

41.     The short-term mitigation strategies included the development of a "smart derate" system, under which a smart derate equation determined the derate assigned to module sales in hot climates.

42.     An additional short-term mitigation strategy was to overbuild large sites constructed by the systems business.  Overbuilding a site consisted of installing additional modules such that the site would be expected to over-perform initially and in the later years of operation, while meeting expectations in all years.  This strategy had the benefit of increasing the overall lifetime energy output of a site, and therefore increasing its value to the end purchaser.

43.     As a long-term mitigation strategy, in the second and third quarters of 2011, an engineering team operating at my direction and led by Benyamin Buller developed and validated a new manufacturing process (the Hot Climate Process, or "HCP") that substantially improved the initial stabilization of First Solar modules in even the hottest climates.  This process was implemented at all First Solar factories by the end of the third quarter of 2011.

44.     By the end of 2011 HCP had successfully addressed much or all of the hot climate stabilization issue, such that the short-term strategies identified above were no longer needed.

45.    Attached as Exhibit 74 is a true and correct copy of a presentation I gave to First Solar's Board of Directors on or about April 27, 2011.[1] It was First Solar's regular practice to prepare presentations to the Board of Directors, and I participated in creating this presentation. These types of presentations were relied on by the Board of Directors and the company, so it was important that they be accurate. I have confirmed that this exhibit is a true and correct copy of the original document.

**First Solar's Reported Cost per Watt**

46.    I did not make decisions, or participate in the decision-making, about First Solar's reported cost per watt.

**First Solar's Accounting Decisions, Earnings Releases, and Public Statements**

47.    As CTO, I reviewed First Solar's Forms 10-Q and 10-K to ensure the accuracy of disclosures as they related to First Solar's module technology, and to ensure that proprietary information was not disclosed.

48.    As CTO, I sometimes attended disclosure committee meetings to provide input as to the accuracy of technical information discussed in filings, and to ensure that proprietary information was not disclosed.

49.    I do not recall providing any edits to a single Form 10-Q and 10-K as either the CTO or the VP of Technology.

50.    I did not participate in the drafting or preparation of First Solar's Forms 10-Q and 10-K.

51.    I did not make decisions about anything disclosed in First Solar's statements of operations, balance sheets, or any notes to those financial details, or First Solar's risk factors, non-technical press releases, or in conference calls with analysts.

52.    I never overruled or influenced the decisions of First Solar's accounting personnel, CEO, CFO, Audit Committee, Board of Directors, attorneys, or PwC.

---

[1] All exhibit references in this Declaration are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.

53.     I also did not participate in First Solar Quarterly Conference Calls.

54.     I never dictated the result of any accounting determination, or manipulated the inputs or methodology used.  I believed that all accounting determinations were consistent with First Solar's policies and procedures.

55.     Throughout my tenure at First Solar, I never knowingly or intentionally made any material misstatement or omission to the market.

56.     I never directed or induced anyone to make any public statements on behalf of or regarding First Solar which I knew to be false or misleading.

57.     To my knowledge, all information released to the public was done entirely in good faith, was supported by fact, and was true.

**June 24, 2009 Meeting with Analysts and Investors**

58.     On June 24, 2009, as VP of Technology, I presented slides at a meeting with analysts and investors, which I had done previously on occasion.[2]  A portion of my presentation included the following statements:

> So I wanted to just maybe take a slightly different slice through the same kind of space. So you look at what the different attributes of our technology buys you, and I think we generally begin with being a thin film company. If you tap most of the guys in my organization on the shoulder and you say, what kind of company are you? Most of them will say they are a thin-film PV first and a CdTe second. So we think of ourselves as a thin-film company.

> *The thin-film is—and I think we are the first of the thin-film companies to really get into scale here. I think we've achieved what thin-film has long promised to the PV industry, which is a much better level of integration in terms of the manufacturing and then a much more integrated device architecture as well. So I think those are the long-standing promises of thin-film and I think pretty much any thin-film technology carries a similar set of attributes to that.*

> A couple things that shake out of that—so thin-film carries an inherently low bill of materials so you don't have a big, thick piece of silicon that's tied to it. Having the integrated modules then is obviously closely coupled into delivering a low CapEx and a low labor cost. And so, again, pretty much any thin-film technology that

---

[2] Exhibit 60 is a true and accurate copy of the presentation I gave, in part, on June 24, 2009, entitled "Analyst/Investor Meeting, Westin Las Vegas."  I recall reviewing the presentation prior to June 24, 2009, and presenting it, in part, on or about June 24, 2009.

you are looking at out there is going to have some kind of capability for relatively low CapEx compared to the integrated chain through the whole crystalline silicon business.

The device architecture—so the drawback of thin-film obviously is that you are carrying resistive losses. So the resistive losses associated with the transparent conducting oxide, so you actually give up a significant chunk of efficiency from the cell level integrating into the module.

The upside of that, however, is that in low light conditions that resistive loss is less of a penalty. So the upside of that is that in low light conditions, typically you will see the modules deliver better kilowatt hours per watt peak.

So then which of the pieces that are directly associated with CdTe? Alright, so CdTe has a couple of natural attributes of the material. So its band gap is 1.5 volts; it's—that 1.5 volts is well matched to a solar spectrum, so you wind up with a technology that has the capability of delivering high efficiency. You have a material which sublimes congruently, by which I mean, if you heat up CdTe to a condensate, what you get is CdTe in its compositional form. And there's actually almost no compounds in the—semiconductor compound in the periodic table that will do that.

So you have a unique capability of being able to quickly and easily produce a deposition system that will deposit a thin-film without a lot of complex control, without a lot of chemistry, without a lot of complexities around that.

So it's inherent to the nature of CdTe that CdTe delivers fast deposition, very fast deposition rates. It's going to hook you into a relatively low CapEx. And when we look at how we rack up against other thin-film technologies and when we assess other thin-film technologies that we are interested in getting into ourselves, one of the primary issues that you have to face is that it's very difficult to find other semiconductors that you can deposit anywhere near as fast. And that high-speed deposition takes you into much more extensive—high-speed deposition takes you into a lower CapEx. So it's a critical metric, again.

Last point is those binary compounds. And again, against other technologies, that makes it relatively simple to manufacture. So the complexity of the compound that you are trying to put down is relatively simple, so the opportunities to get it wrong and the need for control and particularly for expensive manufacturing, in situ manufacturing control systems, is much less.

So those are the attributes and how they link into the various attributes that we care about from a product standpoint and from a company mission standpoint, so the low bill of materials, the low capital cost, low labor cost, high efficiency, manufacturability and the high delivered energy per watt peak. And again, when we are looking at this as a company, a 100-year company, we are looking at this primarily in terms of these attributes and their ability to help the

EAGLESHAM DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                     11
sf-3514787

technology drive a kind of scale that we think the technology needs to go to in the long-term.

So does CdTe—I think one of the questions that we always try to address is what's our IP position in CdTe. I think the Company clearly has a lot invested in the technology, so we've spent a lot of money on this historically. I think, again, against our current expectations, our expectations are that the entire PV world is going to turn into a horse race. And so one of the questions that we are always asking is how are we positioned in the horserace, do we have the right ammunition, do we have the right components to drive our differentiation long-term going forward?

So the company is about 10 years old. So, if you go through the math there, you can figure out that anything that's truly a First Solar piece of intellectual property currently still has a long life to it in terms of the life of the patent. We have a pretty strong patent portfolio. The core patents around which the company is founded that involve the deposition technology, the high-rate deposition technology — that, again, is a key to our capital costs. Those patents remain in force, and they remain well protected.

We have a policy of working to protect ongoing improvements, so we have a selective policy of filing patents around the ongoing improvements. And I say that because, again, one of the catches with patents is, once it's out there, it's out there. And so we also — we do a fairly detailed analysis to understand what we want to patent versus what we want to hold as confidential information. And so a fair amount of the company's differentiation is actually held as a trade secret. It's unpublished, and we don't talk about it. And they very rarely let me get up on the stage in front of anybody.

Okay, so quickly through the differentiation. So, when we look at other people, obviously First Solar has a big bull's-eye on it at this point. There's a lot of people are aware of what First Solar is doing; we are very visible. There's a lot of people are chasing after us. I think a lot of people are moving very aggressively to try to do everything that we've done in a very short period of time. I think it's important to recognize at this point that First Solar was — it didn't take First Solar 10 years to get to where we are because we are necessarily stupid. Right?

So I think that the opportunity for people to close the gap — there's clearly an opportunity for people to learn from what we've done and try to slipstream and drive a faster learning. But I think there's also issues around doing that, and I think you are seeing many companies face challenges now in terms of trying to move as fast as we've moved historically.

*Again, looking at the things that 10 years gives you, so 10 years gives you a lot of volume learning experience. You have a lot of experience in the field. You've had opportunities to develop your accelerated life tests and understand how those tie to the field performance. I think another attribute here that is really important to us, coming out of the growth of the EPC business, is we have — I feel I'm lucky as a*

*module technologist to have a direct line of sight to the installation business and the way that the EPC business has given us.*

*So we have an opportunity to actually understand, as opposed to trying to make estimates about what voltage or length of wires or other attributes, the way they are going to impact the business, we have the opportunity to try to really drill into that and understand that in a very detailed way. So again, we've got an opportunity to have a direct line of sight to those requirements.*

And again, I think we believe that we're positioned for ongoing efficiency improvements. And some of this is about scale. Right? So, again, we are a fairly large company. We're positioned at this point to be able to make pretty substantial investments in forward going technology. I think I've said, our expectation of the company is that this is going to turn into a technology horse race. So we are working aggressively to try to understand how to develop technologies on the assumption that this race in the end is going to be about us figuring out how to move faster than the other guys.

*So in the end, it's going to be a horse race. And we've got to figure out how to move faster than the guys coming behind us. And I think scale and our current financial position gives us an opportunity to be able to do that.*

*Okay, and this is talking to the sort of history of field information, I think this is a slide that most of you guys have probably seen before. This racks up against the BEW study, and I think this again — that this is making a relatively simple statement that our track of field performance and our knowledge of field performance allows us to have fairly high confidence that our product is delivering in the field and that we are able to extract the value that we expect to extract from the two attributes that I talked to. And this is the resistive loss gives you low light performance, and the band gap gives you high temperature performance.*

*And so those two attributes, again, remain a critical piece that our attributes are the cadmium telluride technology that we are able to see in the field.*

59.     I made this statement as part of an update to analysts and investors entitled Technology, Efficiency, and Competition.  My presentation begins on slide 81 (FSLR01659084) of the attached document.

60.     The purpose of my presentation was to provide an update on module technology and to provide details of specific areas in which First Solar's technology differed from that of its competitors.

61.     Two of the differentiators I highlighted in this presentation were attributes of First Solar modules known as "resistive loss" and "band gap."

62.     My statement that First Solar's "high confidence that our product is delivering in the field and that we are able to extract the value that we expect to extract from the two attributes that I talked to" is based on these two attributes (resistive loss and band gap). Neither of these attributes is related to the LPM excursion or the hot climate stabilization issue.

63.     My statements at the June 24, 2009 conference were true and correct based on field performance data and my knowledge of First Solar's module technology. For example, slide 87 of my presentation (FSLR01659090) shows that the benefits of resistive loss and band gap were being observed at Tucson Electric Power's Springerville Generation Station. In addition, as noted above, the PER metric, which I regularly reviewed, indicated that First Solar's modules were delivering at or above expectation in the field.

**Stock Sales**

64.     In accordance with First Solar's Insider Trading Policy, I pre-cleared all of my stock transactions, including implementing my 10b5-1 trading plans, with First Solar's office of the General Counsel before executing transactions.

65.     In connection with joining First Solar, in June 2006 I received a grant of stock options that vested approximately 3,627 shares monthly through June 1, 2011. My options were subject to an initial one-year waiting period during which I could not exercise any options.

66.     Throughout my tenure at First Solar, I followed a long-term plan to sell my First Solar stock as it vested. I was uncomfortable having both my assets and my income tied up with a single company, particularly in a startup industry.

67.     As the VP of Technology, I made my First Solar stock sales during quarterly open trading windows through an E*TRADE account. I sought and obtained pre-clearance from the office of the General Counsel for my stock sales during this time.

68.     Once I became CTO, I exercised options and sold the resulting shares under Rule 10b5-1 plans. I did not enter into any of these plans while in possession of material

undisclosed information about First Solar.  After becoming CTO, approximately 97% of my sales were made under Rule 10b5-1 plans.

69.    All of my stock sales were consistent with my investment goal and were never influenced by any information that I had, but that the public and First Solar's investors did not.  My stock sales also were not motivated or influenced by specific movements in First Solar's stock price.  I did not seek advice on my stock sales from other First Solar executives, nor did I ask other executives to buy or sell stock.

**Quarterly Exercise and Sale of Vested Options**

70.    I began selling First Solar stock in the first open trading window after my one-year waiting period.  On August 3, 2007, I exercised all of my options on First Solar stock that had vested at that point and sold the stock received in the exercise.

71.    Once per quarter—during every available trading window—I similarly exercised all vested options and sold the stock received.  I engaged in these transactions on or about November 13, 2007, and February 19, 2008.

72.    My practice did not change during the class period.  I engaged in identical exercises and sales of all vested options on May 6, 2008; August 15-21, 2008; November 4-12, 2008; February 27, 2009; May 4, 2009; August 5, 2009; and October 30-November 3, 2009.

73.    In November 2009, I was promoted to Chief Technology Officer and began the process of formalizing a plan under section c of SEC Rule 10b5-1.  I was not able to finalize this plan during the brief open trading window after my promotion, so I was not able to exercise options or sell stock in February 2010.  I finalized a trading plan in the open trading window on February 26, 2010.

74.    The trading plan I entered into on February 26, 2010, covered all of my options that had vested or were scheduled to vest through April 2010.  On April 30, 2010, the plan administrator exercised 15,882 options and sold the shares received.  On May 18, 2010, the plan administrator exercised an additional 5,000 options covered by the plan and sold the shares received.  882 options covered by the plan were not exercised.

EAGLESHAM DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    15
sf-3514787

75.     In the May 2010 open trading window, I adopted a second trading plan that instructed the plan administrator to engage in a pattern of options exercise and sale identical to that which I had followed since I was first permitted to sell First Solar stock in August 2007.

76.     Under this plan, on August 2, 2010, the plan administrator exercised all options that had vested through that date and sold the stock received.  The plan administrator then exercised the remaining options from my November 2006 grant on a monthly basis as they vested.

77.     In total, I sold 216,761 shares of First Solar stock received pursuant to the exercise of options.  There was no variation in my strategy for the exercise of options or sale of stock before or during the class period.

**Sale of Vested Restricted Stock Units**

78.     While the vast majority of my compensation was in the form of stock options, as an executive officer I also participated in First Solar's long term equity incentive plan, under which I received an annual grant of Restricted Stock Units.  A portion of these RSUs vested annually in each of the four years following the grant.

79.     I sold a total of 3,878 shares from vested RSUs during the class period.  On March 4, 2011, I sold 1,944 shares from vested RSUs.  These sales were not made pursuant to a 10b5-1 plan and were my only sales not under such a plan during the class period while I was CTO.  When I made this sale, I was not in the possession of material non-public information.

80.     At the end of the class period, I continued to hold 4,316 vested RSUs.

**Sales Pattern Before and During the Class Period**

81.     In the nine months between the first open trading window following the one-year waiting period and the beginning of the class period, I sold a total of 72,547 shares, which was 100% of my holdings available for sale.

82.     During the 46-month class period, I sold a total of 148,092 shares, which was 97% of my holdings.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of ___March___ in ___Cambridge___, Massachusetts.

_____
DAVID EAGLESHAM

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**