James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>                    Plaintiff,<br><br>  vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>                    Defendants. | Case No.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF ROBERT J. GILLETTE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, Robert J. Gillette, declare as follows:

1.      I am a defendant in this lawsuit.  I submit this Declaration in support of defendants' motion for summary judgment.  If called as a witness, I would testify to the following facts:

**My Background**

2.      I attended Indiana University at Bloomington, where I received my Bachelor's degree in finance in 1982.  After graduating from Indiana University, I held various positions at Allstate, Owens Corning, and GE until 1996.

3.      In 1996, I left GE for Allied Signal (later known as Honeywell).  In 2001, I was named President and CEO of Honeywell Transportation Systems.  I served in this role until 2005, when I became president and chief executive officer of Honeywell Aerospace.

4.      I left Honeywell Aerospace in September 2009 to join First Solar.  I joined First Solar, as its CEO and a member of the Board of Directors, on October 1, 2009.  I did not know any of First Solar's executives before joining the company.

**My Time at First Solar**

5.      When I joined First Solar, I believed the company was in a position to solidify itself as an industry leader and continue the growth it had experienced since its IPO.  I believed that First Solar's cost advantages over its competitors situated it to capture additional market share in established subsidized markets and penetrate developing unsubsidized markets.

6.      To capitalize on these cost advantages, I led First Solar through a period of manufacturing expansion.  Along with Bruce Sohn (President, Operations) and the manufacturing team, I developed plans to build new manufacturing plants in Arizona and Vietnam.  I believed that continued expansion was the best way for First Solar to capitalize on its technical and manufacturing advantages.

7.      During my tenure as CEO, I emphasized long-term investment in our technology and Research and Development (R&D) teams.  I believed that improving our

technology would continue to reduce cost-per-watt and strengthen First Solar's position in the industry.

8.      Beginning in late 2010 and accelerating in early 2011, European markets, which had historically been the focus of First Solar's sales pipeline, began to face increased uncertainty due to general economic weakness and changes to solar energy subsidy programs.  Additionally, competitors, primarily from China, were flooding the market with low-cost modules.  Weakening European demand and growing supply from China combined to create difficult market conditions for First Solar and the solar industry as a whole.

9.      In response to these challenges, our business development team worked to develop new markets, primarily in North America and India, to increase First Solar's geographic diversification.

10.     I also led First Solar to diversify its business model.  I worked with Jens Meyerhoff to create First Solar's Utility Systems Business Group (USBG), focused on developing utility-scale solar projects to complement the company's traditional module-sales distribution channel.  By mid-2011, I believed that these efforts were starting to pay off and that these diversification efforts, along with First Solar's commitment to technological improvement, created a resilient business model that could survive a difficult time in the industry.

11.     On October 25, 2011, I was asked to leave the company.  I was replaced by Mike Ahearn, who returned as interim CEO.  I was told that the decision to reinstate Mr. Ahearn as interim CEO resulted from a change in corporate strategy.

**My Management Team at First Solar**

12.     The structure of my staff changed significantly throughout the Class Period. At different times during the Class Period, my direct reports included Bruce Sohn (President, Operations), Jens Meyerhoff (Chief Financial Officer and President, USBG), Mark Widmar (Chief Financial Officer), TK Kallenbach (EVP, Marketing and Product Management, and later President, Components Business Group), Mary Beth Gustafsson

GILLETTE DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    2
sf- 3512286

(EVP, General Counsel), David Eaglesham (Chief Technology Officer), Carol Campbell (EVP, Human Resources), Stephan Hansen (Managing Director, First Solar GMBH), and Maja Wessels (VP, Global Public Affairs).

13.     When I joined First Solar, I worked hard to get to know the management team and my direct reports.  Unlike many new CEOs, I hired only one person from my former staff at Honeywell, TK Kallenbach, because I believed in the strength of the existing management team at First Solar.

14.     I held one-on-one meetings or calls with each of my direct reports on a biweekly basis.  These interactions typically lasted approximately one hour.  I used these meetings and calls to receive updates to the business, financial, and technical developments that were happening within my direct reports' organizations.

15.     I held executive staff meetings, including all of my direct reports, approximately once a month.  These meetings allowed each of my direct reports to discuss and present on major developments, and encouraged an open dialogue about the business and any issues the company was facing.

**Involvement with the Low Power Module (LPM) Issue**

16.     I learned of the LPM issue shortly after I joined the company in October 2009.  At the time I joined First Solar, the engineering and manufacturing teams had already identified the root cause of the issue and prepared estimates of its size and scope.

17.     I attended meetings and received presentations and other communications discussing First Solar's engineering, quality, and accounting teams' efforts to identify the affected module population and the costs associated with the remediation of affected customer sites.  I also attended meetings and received communications regarding the best way to work through the technical product issues with our customers.

18.     I received updates from and relied on the technical expertise of experienced First Solar executives, including David Eaglesham, Bruce Sohn, and Mike Koralewski (VP, Global Quality), for data and analysis relating to the engineering evaluation of the manufacturing excursion and the work done to estimate the affected population.  While I

GILLETTE DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                    3
sf- 3512286

was not personally involved in developing the underlying data or estimates (I am not a physicist or engineer), my communications with these employees and the information I received supported my belief that the work being performed by the company's engineers relating to the manufacturing excursion was thorough and accurate.

19.    I received updates from and relied on the expertise of the CFO, CAO, and their staff for information relating to the financial and accounting treatment of the LPM remediation program and its financial effects.  Specifically, I relied on the financial and accounting expertise of experienced First Solar executives, including Jens Meyerhoff, James Zhu (CAO and Corporate Controller), and Bryan Schumaker (Assistant Corporate Controller), for information about the financial and technical accounting decisions relating to the excursion.  While I did not make these decisions or perform accounting analyses personally, I was confident in the accuracy of First Solar's accounting for the excursion based on the information I received, my interactions with these individuals, and my understanding of the processes by which First Solar's financial estimates and accruals were made.

20.    Beginning in August 2010, I began receiving LPM status update presentations from TK Kallenbach, who was then leading the LPM remediation program. Mr. Kallenbach sent these presentations to the executive staff on a periodic basis, often monthly, to give updates on remediation status, customer communications, and the financial implications of the remediation program.  I, along with the rest of the executive staff, reviewed these presentations and routinely asked questions of Mr. Kallenbach about the status of the remediation program.  Based on my review of these presentations, and my conversations with Mr. Kallenbach and members of his team, I believed that the company was making progress in resolving the LPM issue and that all metrics relating to the company's modules were reported accurately.

**First Solar's SEC Filings**

21.     As CEO, I signed First Solar's quarterly reports on Form 10-Q and annual reports on Form 10-K filed with the Securities and Exchange Commission (SEC).

22.     I understand that the plaintiffs in this case allege that statements contained in eight Forms 10-Q or 10-K that I signed contained misrepresentations. The specific statements are listed in Exhibit 2. In general, these statements concern: (a) general warranty and manufacturing excursion accrual amounts for the particular period; (b) risk disclosures; (c) the reported cost-per-watt metric for the particular period; and (d) First Solar's operational and module performance.

23.     I believed that the statements contained in these Forms 10-Q and 10-K were accurate and free from misrepresentations.

24.     When I joined the company in October 2009, First Solar had, and relied upon, an extensive set of processes for reviewing public statements made to investors and filing Forms 10-Q and 10-K with the SEC.

25.     After joining the company, I reviewed these processes and satisfied myself that they were thorough and reliable. I met with the teams responsible for providing information for SEC filings, and I discussed the controls and processes in place to ensure that information was being accurately reported. I also reviewed the regular reports that were produced by these groups and were fed into the disclosure process, such as CFO close presentations, technology roadmaps, and manufacturing reports. Based on my review of the controls in place and my interactions with the individuals involved, I believed that First Solar had an in-depth process in place for developing and reviewing its SEC filings and other public statements. I believed that the procedures in place were comparable in their strength and rigor to those of the much larger companies I had worked for in the past, and was impressed with the work that was done.

26.     I knew that the process was built around First Solar's Disclosure Committee. The Disclosure Committee consisted of approximately 15-20 senior employees and was made up of experts from across the organization. The Disclosure

GILLETTE DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                    5
sf- 3512286

Committee's role was to make balanced and informed decisions regarding First Solar's disclosures and SEC filings. The Disclosure Committee reported to me; I was not a member and did not attend their meetings.

27. I also knew that First Solar had an extensive financial close process that was performed by the financial planning and analysis (FP&A) and accounting teams. This process was designed to reconcile, consolidate, and report First Solar's financial results through the CFO's organization, for eventual inclusion in First Solar's SEC filings. As CEO, I reviewed the results of the close process with the CFO and members of his team every quarter. I used these reviews as an opportunity to clear any questions I had about the financial statements or First Solar's general financial condition. I did not, however, personally determine or calculate the specific financial estimates to include in the Forms 10-Q or 10-K or related earnings release conference calls. Specifically, I did not personally calculate product warranty or manufacturing excursion accruals or determine the cost-per-watt metric. These analyses were performed by First Solar's accountants and finance professionals, and I relied on the expertise of the CFO, CAO, Corporate Controller, and their staff to analyze and determine these accruals and metrics. Through my interactions with the CFO and his team, and the reports and other information I reviewed with them, I believed that the results of their analyses were truthful, thorough, and accurate.

28. First Solar also had an extensive and rigorous sub-certification process. While I was CEO, I knew that more than one hundred employees participated in the sub-certification process. The sub-certification process was designed to ensure that the information contained in First Solar's SEC filings accurately reflected the financial condition of the business in all material respects. As CEO, I met with the CFO to review the results of the sub-certification process every quarter. We met and performed this review before signing the SOX certifications filed in connection with First Solar's SEC filings. I also did not sign my SOX certification until after the CFO signed his own

certification. I viewed this as yet another assurance that the processes in place had been followed.

29. I also knew that First Solar's outside auditors, PricewaterhouseCoopers (PwC), performed quarterly reviews and annual audits of First Solar's financial statements. I met personally and in private with the auditors to discuss the results of these reviews and audits every quarter, generally before the Board of Directors and Audit Committee meetings. My meetings with PwC occurred on a regularly scheduled basis, at least once every quarter, and involved the PwC audit partner and, occasionally, other PwC accounting professionals. We used these meetings to discuss the component parts of PwC's reviews and audits of First Solar's financial statements, and to discuss any issues or questions that the auditors or I had. My discussions with PwC provided me with further assurance that the proper controls were in place and being followed.

30. The final step in the process was review of the SEC filings by the Audit Committee and Board of Directors. The SEC filings were presented to the Audit Committee and Board by members of the management team, led by the CFO and me. The Audit Committee reviewed the filings and asked questions of management to make sure that any issues or concerns were resolved prior to filing. After the Audit Committee was comfortable with the draft filings presented by management, the Audit Committee would make a recommendation to file to the full Board of Directors. The full Board then performed its own review before approving the SEC filings.

31. In addition to these processes, the work that I performed with my staff throughout the quarter gave me confidence that First Solar's SEC filings were accurate. The one-on-one biweekly calls and meetings that I held with my direct reports gave me confidence that I was being updated on the commercial, financial, and technical developments that were happening within my direct reports' organizations. I also held executive staff meetings, involving all of my direct reports, approximately once a month. These meetings allowed each of my direct reports to discuss and present on major developments, and encouraged an open dialogue about the business and any issues the

company was facing.  Because my direct reports included the executives responsible for, among other things, manufacturing, operations, human resources, sales, government relations, finance and accounting, legal, and marketing, I believed that these meetings gave me direct and valuable insight into all of the major developments occurring across the organization.  My interactions with my staff and the information and reports we reviewed during these meetings gave me confidence that each of the SEC filings I signed accurately reflected the condition of the company at the time they were issued.

32.     Only after all of these processes were complete—drafting and review by the Disclosure Committee; consolidation and reconciliation of the financial statements through the finance and accounting close process; sub-certification by key employees, including certification by the CFO; quarterly review or annual audit by PwC; review by the Audit Committee; and review by the Board of Directors—did I sign my SOX included in First Solar's SEC filings.

33.     It is my understanding that First Solar has never restated or been required to restate its financial statements issued during the Class Period.  It is also my understanding that PwC has never requested that First Solar restate its financial statements or identified a material weakness related to the financial statements issued by First Solar during the Class Period.

34.     At no time did I believe, or did anyone ever tell me, that any statement made by First Solar in an SEC filing issued during my tenure as CEO was false, inaccurate, or misleading.  Specifically, at no time did I believe, or did anyone ever tell me, that any of First Solar's reported quarterly or annual financial results were inaccurate or misleading, or that First Solar ever misrepresented the state of its business, module performance, cost-per-watt, or the accruals relating to its warranty obligations or the manufacturing excursion.

**Statements Made During Conference Calls**

35.     As CEO, I spoke during quarterly conference calls to discuss First Solar's financial results, performance, and guidance.

36.     I understand that the plaintiffs in this case allege that statements attributed to me in eleven of First Solar's conference calls with analysts and investors were misrepresentations.  The specific statements are listed in Exhibit 2.  In general, these statements concern: (a) the reported cost-per-watt metric; (b) First Solar's operational and module performance; (c) manufacturing excursion accruals; and (d) projects in hot climates.

37.     At the times I made those statements, I believed that every one of them was accurate and free from misrepresentations.

38.     The financial and operational metrics included in these statements were the product of the processes I discussed above in ¶¶ 25-34.  My belief in the accuracy of these statements is based on my knowledge of, and participation in, those processes.

39.     Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed during the earnings conference calls.  For example, on July 29, 2010, when I made the statement that the manufacturing excursion affected "less than 4% of the total product manufactured within the period" of June 2008 to June 2009, I knew that the accuracy of this statement had been verified by subject matter experts, including TK Kallenbach (EVP, Marketing and Product Management), Bruce Sohn (President, Operations), and Mike Koralewski (VP, Global Quality).  Indeed, as part of our review process, Mr. Kallenbach unequivocally represented to me that the excursion affected less than 4% of the total product manufactured during this period, emphasizing that the math was correct.

40.     Before the conference calls, it was also my practice to meet with the Investor Relations team and the CFO to review the conference call script and background materials, and otherwise prepare for the calls.  I used these meetings to review any developments or issues that needed to be addressed during the conference calls, and to discuss our approach to describing the data and metrics included in the conference call scripts and presentations.

41.     Additionally, during my personal review of the conference call scripts, I routinely asked questions of the executives responsible for the underlying information in the script until I was fully satisfied with its accuracy.

42.     At no time did I believe, or did anyone ever tell me, that any statement made by me, or any other member of First Solar management, during a conference call was false, inaccurate, or misleading.  Specifically, at no time did I believe, or did anyone ever tell me, that any of my statements relating to quarterly or annual financial results were false, inaccurate, or misleading, or that I ever misrepresented the state of First Solar's business, module performance, cost-per-watt, or the accruals relating to its warranty obligations or the manufacturing excursion.

**Stock Transactions**

43.     I did not sell any First Solar stock while I was CEO.

44.     On February 26, 2010, I purchased 10,000 shares of First Solar stock for approximately $1 million.

45.     I made this purchase because I believed in the company and its potential.  I believed that the company would succeed, primarily because it possessed the leading cost position in an immature and highly speculative industry.  I believed that First Solar's position in the industry would allow the company to continue to capture market share and cement its position as an industry leader.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of March in Memphis, TN.

Robert J. Gillette

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**