James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>            Plaintiff,<br><br>  vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>            Defendants. | Case No.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF JENS MEYERHOFF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, JENS MEYERHOFF, declare as follows:

1.      I am a defendant in the above-captioned action.  I submit this Declaration in support of Defendants' motion for summary judgment.  I make this Declaration on personal knowledge, except as to items stated on information and belief.  Unless I state otherwise, all of my statements in this Declaration refer to the time period between April 30, 2008 (the beginning of the Class Period), and September 30, 2011 (when I left First Solar).  If called as a witness, I could testify to the following facts:

**Education and Experience**

2.      I hold a German Wirtschaftsinformatiker degree, which is the equivalent of a Finance and Information Technology degree, from Daimler Benz's Executive Training Program in Frankfurt, Germany.

3.      I am not an accountant and do not hold a CPA license or any equivalent certification.

4.      From approximately 1998 to May 2006, I worked as the CFO at three semiconductor companies:  Siliconix from 1998 to 2000, FormFactor from 2000 to 2004 (and as COO from 2004 to 2005), and Virage Logic from January to April 2006.

5.      I served as First Solar's CFO from May 2006 to December 2010, and as the President of First Solar's Utility Systems Business Group (USBG) from July 2010 to September 2011.  I served as both CFO and USBG President from July to December 2010.

6.      I am currently the CFO and Senior Vice President of Strategy of Tri Alpha Energy, a private energy research company headquartered in Foothill Ranch, CA.

**Roles at First Solar**

7.      In May 2006, Michael Ahearn hired me as First Solar's CFO.

8.      One of my initial duties as First Solar's CFO was to prepare the company for its November 2006 IPO and its future as a public company.  This preparation included the design of the internal controls systems related to the company's external reporting and compliance with the Sarbanes Oxley Act.  As part of this process, I led First Solar's

implementation of state-of-the-art controls systems.  Both before and during the class period, PricewaterhouseCoopers—First Solar's outside auditors—informed both me and the Audit Committee of the Board of Directors that First Solar's control environment and reporting were among the best that they had seen.  Additionally, Internal Audit regularly reviewed the company's compliance with internal controls and reported the results to the CEO, the Audit Committee, and to me while I was CFO.

9.     As CFO, I was responsible for overseeing First Solar's financial operations, including Financial Planning & Analysis (FP&A), Treasury, Accounting, Tax, and Investor Relations.  I led a team responsible for the preparation and presentation of First Solar's financial statements, its quarterly earnings releases, the financial reporting aspects of filings with the SEC, the company-wide monthly revenue forecasts, the financial metrics reported on quarterly conference calls, and First Solar's finance and accounting policies.

10.     As CFO, I also signed First Solar's quarterly and annual reports (Forms 10-Q and 10-K) filed with the SEC, and spoke with analysts and investors during First Solar's quarterly earnings conference calls and calls announcing First Solar's guidance.

11.     In the wake of the global financial crisis in the fall of 2008, I became increasingly focused on the finance, development, and sale of First Solar's large-scale solar projects.  This new focus was formalized in July 2010 when I was named President of the new USBG, which financed, designed, developed, constructed, and operated some of the world's largest photovoltaic plants.

12.     I served as both the President of the USBG and as CFO for six months as the company searched for a replacement full-time CFO.

13.     On January 1, 2011, James Zhu was named as First Solar's interim CFO, and I became the full-time President of the USBG.

14.     Along with assuming the role of President of the USBG in July 2010, I and the First Solar Board of Directors determined a plan under which I would oversee the development of the business group before my departure from the company.  I committed

to remain with First Solar through the completion of financing on First Solar's $10 billion project pipeline under my management. In September 2011, having spent five years at First Solar and seen the company through its IPO, the development of the USBG, First Solar's tremendous growth, and the completion of all project financing, I resigned from First Solar.

15.    From May 2006 to September 2009, I reported to CEO Michael Ahearn.

16.    From October 2009 through my departure from First Solar in September 2011, I reported to CEO Robert Gillette.

**First Solar's Processes for Preparing Its Financial Statements and SEC Filings**

17.    Since before the beginning of the class period, the company had in place an extensive set of processes for the preparation of its financial statements and quarterly and annual reports filed with the SEC. Based on my involvement in the design and implementation of these processes, feedback received from internal and outside auditors, and my involvement in these processes during over four years as the company's CFO, I believe that First Solar's processes and controls were thorough and reliable.

18.    Part of the control environment that I helped design was a division of responsibilities for the monthly and quarterly close process. The Accounting group, led by the Chief Accounting Officer/Controller, compiled the consolidated financial results of First Solar's operations pursuant to Generally Accepted Accounting Principles (GAAP). Separately, the FP&A analyzed data for planning purposed, projected future results, and validated current results against prior forecasts.

19.    On a monthly and quarterly basis, First Solar's Finance and Accounting groups performed a worldwide consolidation and reconciliation of the accounting functions maintained by the company's subsidiaries. This process was known as the "close process." As part of this process, the Controller's Organization, FP&A, and the SEC Reporting group performed rigorous analyses and reviews designed to ensure the accuracy of First Solar's balance sheet accounts and other financial metrics.

20.     The results of the close process were presented to me in the CFO Close Deck.  The CFO Close Deck was presented to me approximately two weeks after the end of the calendar month and quarter.  I set this schedule—which was longer than that at other companies I am familiar with—because I wanted to emphasize the importance of accuracy rather than speed.

21.     The CFO Close Deck compiled various financial and operational metrics, including revenue, gross margins, cost per watt, and average selling prices.  The Close Deck also contained a review of any significant events (which were regularly communicated to PwC as they occurred throughout the quarter) transactions, and estimates, and provided an overview of the major risks and opportunities facing the company in the current quarter.  The standard warranty accrual and LPM remediation accrual were also reviewed in this presentation each month.

22.     Every month and quarter, I reviewed the results of the close process and the CFO Close Deck with approximately ten members of my staff, including the leaders of FP&A, the Controller's Organization, the Tax Department, Treasury, and Internal Audit.  Among other things, the group discussed and reviewed the results of the close process, answered questions, and highlighted remaining open issues.  Any issues that remained open after the close meeting were resolved by the responsible members of First Solar's Finance and Accounting functions.

23.     The numbers included in First Solar's consolidated financial statements that appeared in the company's SEC filings and related earnings releases were the product of this quarterly close process.  While I did not personally prepare specific entries or perform the underlying analyses that formed the basis for the financial statements, based on my participation in the close process, my knowledge of the individuals involved in preparing and reviewing the results, and my understanding of the processes and analyses that take place as part of the close, I was confident that the financial results that appeared in First Solar's financial statements accurately reflected the financial condition of the

company in all material respects. First Solar, to my knowledge, has never restated any reported financials.

24. Building on the financial close process, the process for the preparation of First Solar's quarterly and annual reports filed with the SEC was coordinated by First Solar's Disclosure Committee. The Disclosure Committee consisted of approximately 15-20 senior employees and was made up of experts from across the organization, including technology, manufacturing, sales, finance, technical accounting, legal, and investor relations. The Disclosure Committee's role was to implement the internal control procedures relating to public disclosures, review the information flowing into the financial statements and SEC filings, and make balanced and informed decisions regarding First Solar's disclosures and SEC filings. I was a member of the Disclosure Committee through the 2Q 2011.

25. Review of individual disclosure items during Disclosure Committee meetings was led by the individuals responsible for the relevant functional areas within the business. As an example, for disclosure issues related to the LPM remediation program, Mr. Kallenbach, the executive in charge of the remediation program, Mr. Koralewski, the executive most knowledgeable about product quality issues, and Messrs. Schumaker and Zhu, the executives most knowledgeable about the associated financial and accounting issues, led discussion, answered questions, and reviewed the underlying data with the Disclosure Committee and with First Solar's SEC counsel to ensure that the Committee agreed that the disclosures contained in the SEC filings were accurate and appropriate.

26. While I was CFO, I personally read every quarterly and annual SEC filing in its entirety at least twice, and raised any issues identified with Mr. Zhu, Richard Mittermaier (First Solar's Director of Corporate Accounting,) and/or the Disclosure Committee or the relevant subject matter experts.

27. Pursuant to section 302 of the Sarbanes Oxley Act (SOX), First Solar's CFO and CEO signed certifications that stated, in part, that, to the best of their

knowledge, the financial statements fairly presented the company's financial condition; that they were responsible for establishing and maintaining disclosure controls and procedures; and that the disclosure controls and procedures were effective. To support the CFO and CEO certifications required under SOX, First Solar also had in place an extensive sub-certification process. The sub-certification process serves as both a check on the accuracy of the SEC filings and an additional source of information for the Disclosure Committee. While I was CFO, sub-certifications were sent out to between several dozen and over 200 employees every quarter. Sub-certifications were distributed across the organization and included individuals responsible for, among other things, First Solar technology, sales, customer service, product management, marketing, finance, accounting, legal, manufacturing, and investor relations departments.

28. The sub-certification process was designed to ensure, among other things, that the information contained in First Solar's SEC filings accurately reflected the financial results and condition of the business in all material respects, and that First Solar's internal controls were properly followed and implemented. Sub-certifications were sent several weeks before the quarterly or annual filing, with a "refresh" sent again closer to the filing, to allow sufficient time to discuss or review any issues raised through the sub-certification process.

29. I discussed the results of the sub-certification process with Messrs. Zhu and Schumaker every quarter before signing my name to the CFO certification that accompanied First Solar's SEC filings. Based on these discussions and my understanding of the review process, I knew that SEC filings were not filed until all sub-certifications had been submitted and any material disagreements were cleared.

30. Parallel to First Solar's internal review processes, the company's external auditors, PricewaterhouseCoopers (PwC), performed quarterly reviews and annual audits of First Solar's financial statements. As is typical in public company audits, PwC's audit professionals had their own offices at First Solar's corporate headquarters in Tempe, Arizona. I, along with my staff, had free and open communication with PwC throughout

MEYERHOFF DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                6
sf-3477473

the audit and review process. Based on my interactions with the PwC team and my own staff, it was my understanding that PwC received all material information necessary for them to complete their work. I held multiple meetings with the PwC audit staff, led initially by Andreas Coumides, and then beginning in 2009, by Adam D'Angelo, on a quarterly basis to discuss the results of PwC's work and resolve any issues that the auditors identified. In addition, throughout my tenure as CFO, I directed my team to make sure that PwC received early notification of any complicated accounting issues ahead of PwC's quarter or year-end procedures.

31.    First Solar's financial statements and SEC filings were also reviewed by the Audit Committee of the Board of Directors. Every quarter, my team prepared a presentation for the Audit Committee that summarized the results of the close process, reviewed significant transactions and issues, and provided an overview of the financial condition of the company. Management, led by the CAO and General Counsel, also reviewed the draft SEC filings with the Audit Committee. Internal Audit also issued a report to the chair of the Audit Committee. As part of the Audit Committee's review, the management team was available to answer any questions and resolve any issues that the Audit Committee had with the current draft. After the Audit Committee was comfortable with the draft filings presented by management, the Audit Committee would make a recommendation to file to the full Board of Directors. The full Board then performed its own review and ultimately passed a resolution approving the SEC filings for filing.

32.    Based on my participation in this process, I was confident that no public statement made by First Solar, me, or any other member of management during the class period was false, inaccurate, or misleading. Specifically, I was confident that all of First Solar's reported quarterly and annual financial results were true, accurate, and not misleading; and that First Solar never misrepresented the state of its business, module performance, Cost per Watt (CpW), or accruals relating to the manufacturing excursion.

**Involvement with the LPM Manufacturing Excursion**

33.    I became aware of the LPM manufacturing excursion in June 2009 when Bruce Sohn, First Solar's President, briefed First Solar's executive staff, of which I was a member, of the issue.

34.    Upon learning of the manufacturing excursion, First Solar determined that it would go above and beyond the obligations of the company's standard warranty and remove and replace modules affected by the manufacturing excursion.

35.    Once the decision was made that First Solar would offer services in excess of the standard warranty, the CAO/VP Corporate Controller, James Zhu, immediately engaged with Mike Koralewski (VP of Global Quality) to analyze, determine, and accrue for all anticipated costs in excess of standard warranty obligations pursuant to First Solar's established controls and procedures.

36.    Based on data from First Solar's technical teams led by Mr. Koralewski, I understood that the manufacturing excursion affected a defined and relatively small number of modules manufactured from June 2008 to June 2009.  I also understood that the root cause had been identified and fixed at the manufacturing facilities.

37.    In connection with the Q2 2009 close, First Solar conducted an analysis of the financial impact of the manufacturing excursion and determined it to be immaterial on both a quantitative and a qualitative basis.  The accrual for that quarter was $1.8 million, or 1% of First Solar's $180 million net income for the quarter.

38.    As the LPM remediation continued and the Quality and Engineering departments developed more advanced models for estimating the number of modules which would be required to complete the LPM program, my staff—including Mr. Zhu and Kurt Wood, VP FP&A—continued analyzing and updating the anticipated costs of the remediation program and properly accruing for all of these costs pursuant to First Solar's established controls and procedures.  I did not personally conduct any analyses or calculations regarding the LPM accrual.

39. Pursuant to First Solar's standard controls and procedures, First Solar determined that additions to the LPM accrual were immaterial in Q3 2009 (1.4% of net income), Q4 2009 (2.1% of net income), and Q1 2010 (2.6% of net income).

40. I, along with Mr. Zhu and other senior members of my staff, regularly discussed the LPM accrual with PwC, which agreed that our accounting treatment of the LPM accrual was correct.

41. During the first year of the LPM remediation campaign, I had discussions with other First Solar employees and executives regarding the types of information that should be shared with customers and technical advisors. At that time, I was increasingly involved with the development and financing of large-scale solar projects, and I was often asked by customers and advisors for more information regarding the technical root cause of the manufacturing excursion. Sharing certain technical information regarding the manufacturing excursion, however, concerned the First Solar executives and employees who managed First Solar's intellectual property assets. Following many discussions on this issue, Mr. Sohn and Dr. David Eaglesham—the executives responsible for protecting intellectual property around First Solar's modules and production process—helped draft communications that satisfied both customers' and technical advisors' requests for information about the manufacturing excursion, but did not disclose details of our proprietary technology and manufacturing processes. I concurred with this approach.

42. In Q2 2010, First Solar's Quality department determined that the number of non-LPM modules that would be returned to First Solar in connection with the remediation of modules affected by the excursion would be higher than previously anticipated. Following receipt of the new numbers, my team again followed First Solar's established process to incorporate the updated numbers into First Solar's LPM accrual. As a result, First Solar added $17.8 million to the LPM accrual. This amount was approximately 11% of the net income First Solar reported for the quarter.

43.     In conjunction with the 2Q 2010 close, First Solar determined that the additions to the LPM accrual were material.  I and other First Solar employees then worked to draft appropriate disclosures in First Solar's Form 10-Q and in the earnings call script.

44.     First Solar determined, and I agreed, that the most important aspect of the manufacturing excursion was the impact of the beyond-warranty remediation costs, as reflected in the accruals, on First Solar's financial statements.  Because of this, First Solar disclosed both the quarterly and the cumulative cost of the LPM remediation accrual in its financial statements.  The company also provided additional background information in the Form 10-Q regarding the cause of additional accruals.  First Solar disclosed that less than 4% of the modules produced during the excursion timeframe were affected by the manufacturing excursion.  To calculate this figure, Mr. Koralewski provided an estimate of the total number of modules affected by the manufacturing excursion.

45.     While ongoing analyses continued, First Solar determined that no additions to the LPM accrual were required during the remainder of my time as CFO.

**Involvement with the Hot Climate Stabilization Issue**

46.     In March 2011, I was informed that new data showed a potential initial performance loss in hot climates that was in excess of what was previously predicted.

47.     In March 2011 when I heard about this data, I was the President of the USBG and was no longer serving as First Solar's CFO.  I was not responsible for or involved in accounting for the effects, if any, of the hot climate stabilization issue.

48.     As the President of the USBG, part of my role included the development and sale of large-scale solar utility projects.  Financing, planning, permitting, and construction of these large-scale sites often takes several years to complete.  For example, one of the projects I worked on for First Solar was the 550 megawatt Desert Sunlight Solar Farm—one of the world's largest solar farms—in California's Mojave Desert. Planning on the Desert Sunlight project began in 2008, permitting occurred from 2009 to

2011, financing was completed in 2011, and construction continued from 2011 through February 2015.

**My Involvement with First Solar's Reported Cost per Watt**

49.    CpW is a metric used throughout the photovoltaic industry.  CpW is not a GAAP metric and does not have a standard definition.  At First Solar, CpW represented the cost of module production in a period divided by the total watts produced for sale in the period.  First Solar publicly defined CpW as a period manufacturing cost—that is, the in-period costs of producing one watt for sale.

50.    CpW is not the same as cost of sales reflected on the statement of operations.  As such, this period metric is not intended to include costs related to prior or future periods.

51.    As the CFO, my direct reports presented a PowerPoint presentation to me called the "CFO Close Deck" every month.  Part of this presentation was the CpW metric.  The CpW number contained in the CFO Close Deck resulted from the work of several employees in the FP&A organization.  I did not determine what the CpW number was, and I never instructed anyone in the FP&A organization to deviate from the standard methodology for calculating CpW.

52.    In late 2009 I was informed that a member of the FP&A team had raised concerns regarding some aspects of the CpW calculation in 3Q 2009.

53.    The Internal Audit department conducted an investigation of the concerns raised regarding the CpW calculation.  Internal Audit determined that the CpW calculations were appropriately supported by company records, and that the CpW calculations were correct.

54.    PwC also concluded that the CpW calculation for 3Q 2009 was correct.

55.    Beginning in 2010, PwC routinely audited the controls related to CpW.

56.    During my tenure as CFO, CpW was reported in First Solar's quarterly and annual reports.  CpW was also reported on quarterly and annual earnings conference calls and in presentations shown in conjunction with earnings conference calls.

57.    Attached as Exhibit 69 is a true and correct copy of the earnings conference call presentation shown on July 29, 2010, in conjunction with First Solar's earnings conference call for the second quarter of 2010.[1]  It was First Solar's regular practice to prepare presentations that were shown in conjunction with earnings conference calls, and during my time as CFO, I participated in creating these documents.  I participated in the creation of this presentation at or near the time of the events it records.  My team and I had a strong focus on making sure that the information contained in the earnings conference call presentations be accurate.  I have confirmed that the document attached as Exhibit 69 is a true and correct copy of the original document.

58.    In February 2009, First Solar became the first solar module manufacturer to break the $1 CpW milestone.

59.    Throughout my tenure at First Solar, I was confident that the CpW number was always calculated according to the established process and controls and that the reported number was correct.  First Solar to my knowledge has never restated CpW from any previous quarter.

**First Solar's Revenue Recognition Policies**

60.    Since before the class period, First Solar has followed policies for the recognition of revenue on module sales.  These policies were designed and implemented in compliance with GAAP as set forth in ASC 605, which sets out the criteria for recognition of revenue.

61.    First Solar's revenue recognition policies and procedures were reviewed and/or audited at least annually by both Internal Audit and PwC.  Throughout the quarter, new transactions would be immediately reviewed by PwC through a white paper process.  PwC's First Solar engagement team would also send details of some transactions to PwC's national office for peer review.

---

[1] All exhibit references in this Declaration are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.

62.     In April 2008, First Solar hired a new Director of Global Revenue and Compliance, Craig Fotheringham.  Mr. Fotheringham reported to the CAO, VP and Corporate Controller, Mr. Zhu, who in turn reported to me.  Mr. Fotheringham was an experienced expert in revenue recognition and treatment.

63.     Mr. Fotheringham's duties involved an ongoing review of First Solar's revenue recognition policies and procedures to ensure compliance with GAAP and SAB 104, as well as the development of revenue recognition policies for systems sales.

64.     Mr. Fotheringham designed, implemented, and managed procedures for the recognition of revenue on systems sales.  Details regarding all revenue recognition for systems were audited by the Internal Audit department and shared with PwC.

65.     While I was CFO, First Solar never restated any financial statement or line item within a financial statement, including revenue, for any quarter or year.

66.     I am not aware of any disagreement between First Solar and the Internal Audit department or PwC regarding any issue, including the recognition of revenue.

**Quarterly and Annual Reports and Accompanying Press Releases**

67.     As CFO, I signed First Solar's Forms 10-Q and 10-K filed with the United States Securities and Exchange Commission (SEC).  The financial results from these filings were also included in press releases filed in the days before the filings.

68.     I understand that Plaintiffs in this lawsuit dispute the accuracy of statements contained in forms 10-Q or 10-K that I signed during the class period (dated May 2, 2008; July 31, 2008; October 31, 2008; February 25, 2009; May 1, 2009; August 3, 2009; October 30, 2009; February 22, 2010; April 29, 2010; August 2, 2010; and November 1, 2010).

69.     I was confident that all of the information contained in the Forms 10-Q and 10-K, as well as the press releases announcing financial results, was accurate and free from material misrepresentations at the time those statements were made.  My confidence in the accuracy of those statements was based on my knowledge of, and participation in, the comprehensive process that First Solar used to prepare and review its financial

disclosures, as described in ¶¶ 8-9 and 17-32 above. My confidence in the accuracy of the reported CpW was additionally based on the process described in ¶¶ 49-59 above. My confidence in the accuracy of the disclosures regarding the LPM manufacturing excursion was additionally based on the process described in ¶¶ 33-45 above.

**Earnings Conference Calls**

70.     As CFO, I spoke on conference calls in conjunction with the release of quarterly and annual financial results. I understand that Plaintiffs in this lawsuit allege that statements attributed to me in eleven of these conference calls were false or misleading. These calls occurred on April 30, 2008; July 30, 2008; October 29, 2008; February 24, 2009; April 29, 2009; July 30, 2009; October 28, 2009; February 18, 2010; April 28, 2010; July 29, 2010; and October 28, 2010.

71.     At the time I made the statements in earnings conference calls challenged by Plaintiffs, I was confident that every one of them was true. My confidence in the accuracy of these statements was based on my knowledge of and participation in the process described in ¶¶ 8-9 and 17-32 above (the information discussed during conference calls was primarily derived from and tied to the SEC filings). My confidence in the accuracy of the reported CpW was additionally based on the process described in ¶¶ 49-59 above. My confidence in the accuracy of statements regarding revenue recognition was additionally based on the process described in ¶¶ 60-66 above. My confidence in the accuracy of statements regarding the LPM manufacturing excursion was additionally based on the process described in ¶¶ 33-45 above. Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed during the conference calls.

**Participation in Conferences and on Conference Calls**

72.     As CFO, I participated in analyst and industry conferences, and spoke on industry conference calls. I understand that Plaintiffs in this lawsuit allege that statements attributed to me during these conferences and calls were false or misleading.

73. On March 11, 2009, I spoke at the Merrill Lynch Cleantech Leaders Conference. I understand that Plaintiffs in this lawsuit dispute the accuracy of statements I made at that conference regarding First Solar's CpW. At the time I made these statements, I was confident that they were true. My confidence in the accuracy of these statements was based on my knowledge of and participation in the process described in ¶¶ 8-9, ¶¶ 17-32, and ¶¶ 49-59 above. Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed at this conference.

74. On December 2, 2009, I participated in the Credit Suisse 2009 Annual Technology Conference. I understand that Plaintiffs in this lawsuit dispute the accuracy of statements I made at that conference regarding First Solar's CpW. At the time I made these statements, I was confident that they were true. My confidence in the accuracy of these statements was based on my knowledge of and participation in the process described in ¶¶ 8-9, ¶¶ 17-32, and ¶¶ 49-59 above. Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed at this conference.

75. On March 3, 2010, I participated in the CLSA Asia US Forum. I understand that Plaintiffs in this lawsuit dispute the accuracy of statements I made at that conference regarding First Solar's CpW and the pipeline of utility-scale solar projects in the United States. At the time I made these statements, I was confident that they were true. My confidence in the accuracy of these statements was based on my knowledge of and participation in the process described in ¶¶ 8-9, ¶¶ 17-32, and ¶¶ 49-59 above. Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed at this conference.

**Sales of First Solar Stock**

76.     As both the CFO and President of the USBG, I received the majority of my compensation in the form of long-term equity grants.  In connection with joining First Solar, I received a grant of 187,501 stock options.  Twenty percent of these options vested on May 22, 2007, with an additional 3,125 shares vesting each month until May 2011.  As CFO, I also received annual grants of restricted stock units (RSUs) based on my performance evaluations.  Generally, these RSUs vested over the four years following the grant, with 20% vesting on the first through third anniversaries of the grant and the balance vesting on the fourth anniversary.  When I became President of the USBG, I entered into an employment agreement under which I received a grant of 22,000 RSUs which vested on successful completion of various project development milestones.

77.     Throughout my tenure at First Solar, I followed a long-term plan to periodically sell my vested First Solar stock.  I sought to diversify my assets, as I was uncomfortable having both my assets and my income tied up with a single company in a startup industry.  To facilitate the sale of my First Solar stock, I set up trading plans under SEC rule 10b5-1 that instructed the plan administrator to sell stock under pre-set conditions.  Once these plans were in place, I had no personal involvement in the exercises of options or sales of shares of First Solar stock under the plans.  I was not in possession of any material non-public information when I entered into any of these trading plans.

78.     I was first able to sell First Solar stock in June 2007, approximately six months after First Solar's initial public offering.  My plan administrator exercised and sold all of my First Solar options that had vested at that point (37,500 shares).  In November 2007 my plan administrator once again sold all of my vested First Solar options (15,625).  Between December 2007 and April 2008, the administrator of my trading plan exercised and sold an additional 3,125 options as they vested each month.  In total, I sold 68,750 shares of First Solar stock between June 2007 and April 2008.

79.    Before the class period I had a total of 73,750 shares available for sale, including vested options and 5,000 shares acquired through open market purchases. My sales before the class period began equaled 93.2% of my holdings.

80.    After the class period began, my strategy did not change. In May, June, July, and August of 2008, the administrator of my trading plan exercised all of my vested First Solar options and sold the stock received—3,125 shares—each month.

81.    On August 29, 2008, and May 12, 2009, I entered into revised 10b5-1 plans; however, due to the decline in First Solar's stock price caused by the global financial collapse, the plan administrator did not sell any shares under these plans. I was not in possession of any material non-public information regarding First Solar when I entered into these plans.

82.    On May 1, 2009—a month before I first learned of the LPM manufacturing excursion—I engaged in my only stock sale during my time at First Solar that was not part of a 10b5-1 plan. I was not in possession of any material non-public information when I engaged in this transaction.

83.    In the open trading windows on February 25, 2010, May 27, 2010, and August 31, 2010, I entered into additional 10b5-1 trading plans. I was not in possession of any material non-public information when I entered into any of these plans. Under these plans, between April 30, 2010, and February 1, 2011, the plan administrator sold a total of 91,750 shares of First Solar stock, consisting of 83,750 vested options and 8,000 vested RSUs.

84.    Before engaging in any stock transactions or entering into 10b5-1 plans, I always sought—and obtained—pre-clearance from First Solar's office of the General Counsel pursuant to First Solar's Insider Trading policy.

85.    While I was employed at First Solar during the class period, I sold a total of 119,250 shares of First Solar stock. During this period, I had a total of 161,519 shares of First Solar stock available to sell. My sales while I was employed by First Solar during the class period equaled 73.8% of my class period holdings.

86.    87.42% of the stock that I sold during the class period while I worked at First Solar was sold pursuant to a valid 10b5-1 plan.

87.    When I left First Solar on September 30, 2011, I still had 12,501 vested options and 10,296 vested RSUs.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25 day of _____March_____ in ___2015___ , Fountain Hills.

_____
JENS MEYERHOFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**