James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>Defendants. | CASE NO.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF BRUCE SOHN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, BRUCE SOHN, declare:

1.      I am a defendant in the above-captioned action.  I submit this Declaration in support of defendants' motion for summary judgment.  The statements in this Declaration are based on facts that I personally know.  My statements in this Declaration refer to the time period between April 30, 2008, and April 30, 2011.  For the convenience of the Court, my Declaration includes topic headers that correspond to subjects that are relevant to my personal background and the arguments that are being asserted in defendants' summary judgment motion.  If I were called as a witness, I could testify to the following facts:

**Education and Experience**

2.      I hold a bachelor's degree in materials science and engineering.  I earned that degree from the Massachusetts Institute of Technology.

3.      From 1982 to 2007, I worked in several positions at Intel Corp.  My final role at Intel was as the General Manager of one of Intel's semiconductor fabrication facilities based in New Mexico.

4.      From July 2003 through June 2009, I served on First Solar's Board of Directors.  From March 2007 through April 30, 2011, I served as First Solar's President.

5.      After leaving First Solar, I was the CEO of Fluidic Energy from May 2011 to December 2011.  I then began consulting with MEGE Associates.  I am now the President of MEGE.  Since January 2013, I have also been serving as the President of QuantumScape.

6.      I have also served in other advisory roles.  In 2010, United States Commerce Secretary Gary Locke appointed me as the Chairman of the Manufacturing Council at the United States Department of Commerce.  In that role, I was a delegate to the United States Trade Mission to China.  From 2010 to 2011, I was a Clean Energy Ambassador at WWF International.  From 1998 to 2000, I served as a member of the Advisory Board at TCU Neeley MBA, where I was the Chair of the Technology Advisement Committee.

7.      I am not a certified public accountant and have had no formal training in accounting.

**Tenure at First Solar**

8.      In 2003, I was retained on a consulting basis by First Solar's Chief Executive Officer, Mike Ahearn, and Chief Operating Officer, Chip Hambro.  They invited me to visit and review First Solar's nascent manufacturing facilities.  They asked me to evaluate the technical aspects of the product, the manufacturing process, and the steps needed to fully commercialize First Solar's technology.  After that project, I continued to work as a consultant for First Solar, spending approximately one to two days per quarter on First Solar projects, though my primary employment during this time was with Intel.

9.      In 2003, First Solar board chairman and principal investor John Walton asked me to join the First Solar board of directors.  With approval from the Intel CEO, I agreed to join the First Solar board of directors.

10.      In 2007, Mr. Ahearn approached me and asked if I was interested in joining the executive team at First Solar.  I had not previously considered such a role.  I ultimately accepted the job because I was drawn to the technological challenges and opportunities of a new high-tech company.  I joined First Solar as its President.

11.      On April 29, 2009, First Solar announced a succession process to recruit a new CEO.  The other board members and I determined that, as both Mr. Ahearn and the to-be-hired CEO would be members of the board, I would not seek reelection to the board of directors so as to maintain the overall independence of the board.  My service on the First Solar board ended in June 2009, but I remained First Solar's President.

12.      I continued to serve as President until April 30, 2011.  In my capacity as President, I had overall responsibility for overseeing First Solar's global operations.

13.      While I served as President of First Solar, I reported to Mr. Ahearn until Robert Gillette was hired as CEO in October 2009.  At no time did I have any role, responsibility, or power to supervise or control Mike Ahearn, Robert Gillette, or the

company as a whole, which was ultimately managed by the board of directors. I had no role, responsibility, or power to supervise or control co-defendants in this case: Jens Meyerhoff, James Zhu, or Mark Widmar, who joined the company in the same month that I left First Solar. The only defendant in this action who reported to me was David Eaglesham.

**Involvement with the LPM Manufacturing Excursion**

14.    In May 2009, I first learned about a complaint from Juwi, one of First Solar's German customers, regarding lower-than-expected module performance. This was the first indication of a manufacturing issue, which later became known internally as the LPM manufacturing excursion. I believed that the term "excursion" aptly described the manufacturing incident because the term, when used in the semiconductor industry, refers to deviations from a process control, and connotes some randomness in the deviation from quality expectations.

15.    Upon learning of Juwi's issue, I instructed two of my direct reports, Mike Koralewski, who was the Vice President of Quality, and David Eaglesham, the Vice President of Technology, to investigate. They led a task force—sometimes referred to as the LPM task force—to determine the root cause of the LPMs. At the time, it was important to me that they identify the root cause of the issue, so that we could resolve any quality issues. I have always placed a high priority on understanding and resolving quality issues of whatever origin.

16.    In June 2009, the LPM task force identified the root cause of the LPMs as a process change that altered the way we were manufacturing solar modules. Internally, we referred to the process change as Fast Ramp 421. The task force concluded that the Fast Ramp 421 process resulted in occasions where the manufacturing conditions exceeded the standard quality control limits in situations where oven temperatures were shifted towards the limit of the permitted temperature range. The Fast Ramp 421 process was discontinued by the end of June 2009. I believe the steps taken resolved any ongoing quality control issues.

SOHN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                                   3
sf-3518448

17. Based on the input from Mike Koralewski, David Eaglesham, and their respective teams of scientists and engineers, I believed that the manufacturing excursion affected only a small number of customer sites, and a relatively small percentage of modules that were manufactured between June 2008 and June 2009.

18. When I first learned of the manufacturing excursion in May 2009, First Solar had sold over 14 million modules for installation in customer sites between 2005 and April, 2009.

19. Soon after learning of the LPM excursion, I supported the decision to remediate LPMs by going above and beyond First Solar's standard warranty. First Solar's standard warranty provided that First Solar would repair or replace modules that were defective. The standard warranty did not, however, cover what we called "rip and replace" costs, which consisted of the costs of finding, testing, removing, and replacing LPMs at sites that were determined to be underperforming as a result of the manufacturing excursion. I believed that First Solar should go above and beyond the normal warranty to cover these reverse logistics costs. I thought that doing so would provide the best possible service to the customers whom we understood to be affected by the excursion. I believed that doing so would help solidify First Solar's position in the solar industry and demonstrate to the market that First Solar stood behind its product, which I thought could help differentiate First Solar from some competitors. I thought that the decision to go above and beyond warranty was an investment that would lead customers to realize that we valued their business.

20. Starting in July 2009, and continuing through the fall of 2009, First Solar reached out to potentially affected customers to alert them of the manufacturing excursion. By the end of November 2009, we had sent letters to our potentially affected customers. Our letters informed the customers that our internal quality control systems had identified a small percentage of modules that experienced premature power shortfall after installation. These letters asked customers to evaluate the output of their systems

and indicated that First Solar would replace modules at First Solar's expense if LPMs were identified following inspection and evaluation.

21.    Although I believed First Solar needed to take responsibility for the LPM excursion and resolve the problem to the utmost satisfaction of its potentially affected customers, I also believed that First Solar needed to make sure that it remediated the LPMs in a way that was not exploited by others.  I believed that there was a risk that competitors would try to use or extrapolate information about our manufacturing process to improve their own manufacturing processes.  I also believed that there was a risk that First Solar's competitors would try to disseminate incorrect, exaggerated, or distorted information about the LPM excursion to gain a competitive advantage, inviting an unjustified or irrelevant critique of First Solar or thin film technology generally.  In addition, I was concerned that customers might over-react to news or rumors regarding the excursion, not recognizing its relatively small size.

22.    In light of those concerns, First Solar developed a communications strategy regarding the LPM excursion.  First Solar's communication strategy was to provide consistent messaging for internal and external communications.  Under the strategy, our communication was to be rooted in facts.  Given the competitive nature of the solar industry at that time, I believed that it was in First Solar's best interests not to communicate proprietary and confidential information about the LPM excursion, including details about our technology, the manufacturing processes that First Solar used, and certain details about the effects of the LPM excursion.

23.    At least before the end of the second quarter of 2010 on June 30, 2010, I believed that the LPM excursion and its remediation were relatively small issues in the context of First Solar's overall business operations, given the number of modules we had produced to date, given the expansion of our global capacity, given our technological strides, and in light of the demand for our modules.  I also believed the LPM excursion was contained, based on the efforts of our engineering, quality, and customer service teams.  I deferred to subject matter experts in legal and finance, including, among others,

Mr. Meyerhoff, our Chief Accounting Officer, James Zhu, and First Solar's independent auditors at PwC, to assess whether and when the costs of the LPM excursion were material to First Solar's financial results under applicable accounting rules.

24.    After the root cause of the LPM excursion was identified, the LPM task force spent hundreds of hours trying to estimate the scope of the excursion and the potential effects of the excursion. Gradually, the team came to realize that finding LPMs in the field would be challenging. Locating LPMs in the field, we learned, would necessitate on-site testing, which could only be done on blocks or strings of modules. Our teams determined that it was not feasible to easily, or cost-effectively locate individual LPMs in the field. As a result, to recover LPMs, First Solar generally had to remove and recover entire blocks or strings of modules, which included modules that were not LPMs. Over time, the quality and engineering departments developed and refined their models for estimating the number of modules that would need to be recovered to complete remediation of the LPMs. I was not personally involved in conducting those calculations. I relied upon the accuracy of the estimates that they provided to me and others.

25.    I was not personally involved in estimating or calculating the costs of remediating the LPM excursion. Based on information and reports that I received from, and discussions and meetings that I had with, experts in the finance department, I understood that First Solar reserved appropriate accruals to account for the anticipated costs of the remediation through its completion. I understood that a special reserve was established to cover the rip-and-replace costs of the LPM remediation, which are discussed above. I understood, by contrast, that the cost of replacement modules was covered by First Solar's standard warranty accrual. I deferred to the finance team to calculate and determine the appropriate accounting reserves in accordance with applicable accounting rules. Based on my years of experience working with the finance team, I found them thorough, trustworthy, reliable, and accurate. I also understood, based on reports that I received, and meetings that I had with others, that beginning in the second

quarter of 2009, the FP&A team subtracted watts earmarked for the remediation from the sellable watts calculation that was used for preparing First Solar's financial guidance.

26.    In the second quarter of 2010, the quality team lead by Mike Koralewski determined that the number of non-LPMs that would be needed to be recovered in connection with the remediation of modules affected by the excursion would be higher than previously anticipated.  I believe that, after those costs were calculated, a determination was reached by our accounting and finance professionals, that the costs were material with respect to our financial statements for that period.  That was one of the reasons that First Solar disclosed the LPM accrual in connection with our report of financial results for the second quarter ended June 30, 2010.  I deferred to the finance and legal teams with respect to the determination of the materiality of the costs and disclosure of those costs to First Solar's investors.

**First Solar's Cost-Per-Watt of Production**

27.    One of the metrics that First Solar used was cost-per-watt, which we abbreviated as CpW.  CpW measures the cost of manufacturing a watt of electricity during a given period, usually quarterly or annually.  CpW was used to measure our competitiveness with other energy producers, and was a way of measuring our progress on meeting our technology objectives.

28.    Throughout my tenure, First Solar steadily lowered its CpW.  For instance, First Solar's CpW was $1.59 in 2005, and, when I left First Solar in April 2011, First Solar's CpW had declined to $.75.  First Solar achieved its reduction in CpW over time by, among other things, increasing efficiency, increasing throughput, expanding production capacity, lowering material costs, and shifting a larger percentage of our production to geographies with lower operating costs, including lower labor costs.

29.    Although other companies in the solar industry measure their cost-per-watt, there is no standard definition of the metric, nor are there industry standards with respect to what costs are included in or excluded from the numerator of the calculation.  The determination is left to each solar manufacturer.  At First Solar, CpW represented the

SOHN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    7
sf-3518448

costs of module production divided by the total watts produced for sale during a given period. CpW was designed to capture the costs of a given period. First Solar's CpW measured spending related directly to producing modules during a given period. CpW did not capture costs unrelated to manufacturing. Nor did CpW include manufacturing costs from a different period other than the one being measured.

30.    I received periodic reports regarding First Solar's CpW from First Solar's financial planning and analysis group, known internally as the FP&A group. I believed that the individuals who prepared and provided me those reports were competent. I had no reason to doubt the accuracy of the CpW that they calculated. I never instructed anyone to manipulate the CpW. Nor did I work on, direct, or change the underlying data or calculations of CpW or direct anyone else to change them. I believe that First Solar truthfully and accurately reported its calculated CpW to investors in accordance with its established procedure. I never doubted the truthfulness and accuracy of First Solar's publicly reported CpW.

**Public Statements to Investors**

31.    At no time during my tenure at First Solar did I believe that any public statement made by First Solar, me, or any other member of management was false, inaccurate, or misleading. I believed then, and continue to believe now, that First Solar and I truthfully and accurately reported First Solar's quarterly and annual financial results, and that we never misrepresented information about First Solar's business, its performance, the quality of its products, the performance or characteristics of modules, CpW, accruals relating to the LPM excursion, information about its warranty policies, practices, or reserves, information about the LPM excursion and remediation efforts, or other subjects.

32.    My belief in the accuracy of all of the public statements made by First Solar and me was based, in significant part, on the comprehensive process that was in place to ensure the accuracy of external disclosures. During my tenure as President, I was a member of the Disclosure Committee, which played a principal role in reviewing, vetting,

and verifying quarterly and annual reports about First Solar that First Solar filed with the Securities and Exchange Commission, referred to in this Declaration as the SEC. The Disclosure Committee typically met three times per quarter to discuss First Solar's business and the drafts of periodic disclosures that would be filed with the SEC. First Solar's Disclosure Committee consisted of approximately twenty members from various parts of the company, all of whom had different perspectives and insights into the business. Some of the members of the Disclosure Committee, like me, reported directly to the CEO. Other members were heads of various corporate departments, including, among others, finance, accounting, quality, engineering, technology, legal, and investor relations. The Disclosure Committee had responsibility to review, understand, determine, and verify the information that was reported in First Solar's periodic SEC filings. The Disclosure Committee spent a significant amount of time every quarter discussing the accuracy and appropriateness of what was included.

33.    It was and remains my belief that the members of the Disclosure Committee took their roles seriously and fulfilled their responsibilities of presenting information, posing questions of others, and obtaining accurate reporting of information regarding First Solar's financial results and operations. All members of the Disclosure Committee had an opportunity to raise issues and ask questions of each other and reach out to others at First Solar to obtain information or answers responsive to questions raised during meetings of the Disclosure Committee. That extensive effort supported my belief in the accuracy of the periodic reports that First Solar filed with the SEC.

34.    I also believed and believe today that the public statements made by First Solar and me during my tenure as President were truthful and accurate in light of First Solar's sub-certification process. That process was designed to prevent First Solar from making any statements in periodic SEC filings that did not accurately reflect First Solar's true financial condition in all material respects. The sub-certification process required designated First Solar employees to affirm, before the end of a given reporting period, that they had properly performed their duties, and were not aware of any violations

of GAAP, and were unaware of any facts that would make First Solar's disclosures misleading. I am not aware of any occasion where a SEC filing was submitted without resolving any material issues or disagreements raised by me or other First Solar employees who were required to submit these sub-certifications.

35. I also believed that public statements made by First Solar and me during my tenure as President were truthful and accurate in light of verification of information contained in SEC filings that I knew was independently conducted by diligent staff in First Solar's SEC Reporting Department, in its investor relations group, and by First Solar's independent auditors at PricewaterhouseCoopers.

36. As First Solar's President, I occasionally spoke at meetings and during conference calls that First Solar hosted for analysts and investors. My prepared remarks on those occasions followed an extensive process whereby the information reported was crafted, reviewed, verified, and approved by others, including the CEO and the head of investor relations. In advance of investor calls and meetings, I would meet with other executives to discuss and review the issues and information that would be disclosed. During those meetings, I would pose questions of others and request information to familiarize myself with various matters, to get comfortable with anticipated points and issues for the meetings and calls. By doing that, I assured myself of the accuracy of the information being presented. I trusted and relied on the accuracy of the information that I was given and did not doubt its accuracy. I also knew that the investor relations team requested input, distributed drafts, and verified the accuracy of pre-scripted language with subject matter experts within the company, and coordinated with the SEC reporting team to verify facts. When I spoke spontaneously or in response to questions posed by stock analysts, I provided data, opinions, and predictions that I believed were accurate. My belief in the accuracy of my statements was also based on my experience, information, and reports that I had received from various groups and individuals at First Solar, meetings I attended, and the disclosure process that I discuss above. For these reasons, I

believed and continue to believe to this day that my statements to analysts or investors on conference calls and at meetings were truthful and accurate.

37.     I understand that Plaintiffs in this litigation allege that I misled investors when I made the following statement on First Solar's February 24, 2009 earnings call:

> [B]ut in terms of operational, the challenge is always [] just bringing up the factory and developing the proficiency, recall as we bring a new factory online, like a KLM2 or KLM3, each of these factories is bringing on line capacity in the neighborhood of about 190 megawatts, 170 megawatts, or so, of total capacity. That is significant capacity and our expectation is to start-up matched from an efficiency perspective, matched from a yield perspective, and matched, of course, from a quality and reliability perspective, and so we're very cautious and careful and have a high degree of expectation in terms of the way we operate the factories. As the proficiency of the workers develops, the run rate itself will also match.

38.     I believed and still believe today that my statement on the February 24, 2009 earnings call was true and accurate when made.  I believed that the statement was truthful and accurate in light of the disclosure process described in paragraphs 31-36 above.  I also believed in the accuracy of the statement based on information about our production lines, and my understanding of First Solar's Copy Smart Technology.  I made this statement months before learning of the LPM excursion, which has no connection to subjects that I was addressing on the February 24, 2009 earnings call.

**Form 10-K for Fiscal Year 2008 dated February 25, 2009**

39.     On February 24, 2009, First Solar issued a press release announcing earnings for the fourth quarter and fiscal year ended December 31, 2008.  I understand that Plaintiffs in this litigation allege that investors were misled by the following statement contained in that press release:

> Net income of $133 million or $1.61 diluted EPS, and revenue of $434 million for the fourth quarter of 2008, as compared to net income of $63 million, or $0.77 diluted EPS, and revenue of $201 million, for the same period in the prior year. The Company further reported net income of $348 million, or $4.24 diluted EPS, and revenue of $1.2 billion for the 2008 fiscal year, as compared to net

income of $158 million, or $2.03 diluted EPS, and revenue of $504 million, for the prior year.

40.     I did not write this press release.  The financial results reported in the press release were also included in a Form 10-K for the fiscal year ended December 31, 2008, which was filed with the United States Securities and Exchange Commission (SEC) on February 25, 2009.  In this declaration, I will refer to this 10-K as the 2008 10-K.

41.     Although I signed the 2008 10-K, I did not personally calculate or verify the reported financial results that were reported in the 10-K.  Instead, I relied on the accuracy, thoroughness, and judgment of the individuals in the finance department to compile, calculate, and present the reported financial results.  Based on my reliance on these individuals, I believed then and continue to believe today that the financial results disclosed in the 2008 10-K were true and accurate at the time reported.

42.     I understand that Plaintiffs in this litigation further allege that the 2008 10-K was misleading when it stated:  "Our thin film technology also has relatively high energy performance in low light and high temperature environments compared with traditional crystalline silicon solar modules."   I believed that this statement was truthful and accurate at the time it was made in February 2009.  I believed in the accuracy of the statement based on information that I received, from meetings I attended, and interactions that I had with First Solar's scientists and engineers.

43.     I understand that Plaintiffs in this litigation further allege that the 2008 10-K was misleading with its publication of the following risk factor warning:

> Thin film technology has a short history and our thin film technology and solar modules may perform below expectations; problems with product quality or performance may cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share. . . . While our power output warranty extends for twenty-five years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions could prove to be

> materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules could break, delaminate or experience power degradation in excess of expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which could have a material adverse effect on our financial results.

44.    I believed that this risk factor warning was truthful and accurate at the time made in February 2009.  I believed, and continue to believe today, that there are inherent risks in manufacturing many products, including solar modules, and that the risks identified were real risks that First Solar faced.  In my opinion, this risk factor warning appropriately apprised investors of the potential risks of various product problems on our business.  At the time that this statement was made on February 25, 2009, I was not aware of any manufacturing or product problems or defects that were inconsistent with this statement.

45.    I understand that Plaintiffs in this litigation further allege that the following statement in the 2008 10-K was misleading:

> We design and manufacture solar modules using a proprietary thin film semiconductor technology that has allowed us to reduce our average solar module manufacturing costs to among the lowest in the world. In 2008, our average manufacturing costs were $1.08 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers. . . . Our average manufacturing cost per watt has decreased from $2.94 during 2004 to $1.08 during 2008.

46.    I believed that the foregoing statement was truthful and accurate at the time it was made based on my familiarity with and understanding of First Solar's manufacturing and technology, reports that I received, and meetings or conversations that I had with engineers and scientists about our manufacturing, as well as information about our CpW that I received from our FP&A group.  With respect to the statements in the

SOHN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    13
sf-3518448

2008 10-K, I believed they were truthful and accurate in light of the processes for preparing SEC filings discussed above in paragraphs 31-36.

**June 24, 2009 Meeting with Analysts and Investors**

47. I understand that Plaintiffs in this litigation further allege that I misled investors when I made the following statement during a June 24, 2009 meeting with analysts and investors:

> In 2007 we anticipated trying to get down to $1 a watt in the 2012 time frame, and we were going to do that by following this particular roadmap. The updated roadmap now has us spinning down to about $0.91 to $0.98 in 2014, all the while maintaining, again, the commitment to the original roadmap to hit those numbers by 2012. What's especially key, I think, to understand about the transition on these – the last slide in this slide, is we know a whole lot more about what balance of systems and balance of plant mean today than we did when we put this roadmap together a couple of years ago.

48. I understand that Plaintiffs in this litigation further allege that I misled investors at the meeting on June 24, 2009, when I said:

> I'll now transition in from the module side of the business and spend a little bit of time talking about the power plant side of the business and the costs associated with getting to utility scale systems. At the same time that we introduced the module roadmap, we also talked about the balance of systems cost reduction roadmap. We've always known, of course, that the point of this is not to sell glass. What really goes out the door in those boxes isn't a bunch of glass, it's a bunch of energy that needs to be produced. That's what we're trying to do with this business. And so, if we're going to do that, we need to really look at other portions of the cost structure and the balance of systems portion of that were a critical component.
>
> * * *
>
> That's a direct outcome of having done the work in acquiring [Turner] [R]enewable [E]nergy. It's a direct result of having constructed facilities like the El Dorado plant that you saw this morning. It's the direct result of our knowledge and information that we acquired through the acquisition of OptiSolar and the expertise that was inherent in that business. So our understanding of this roadmap and our appreciation of the costs that go into building

a power plant are much better understood today than they were back in those times, in those times.

\* \* \*

The performance of an array is not only the performance of the modules themselves but, of course the environment and how that environment interacts with the modules. We have a data analysis and acquisition system that records and processes the information in a real-time manner. This allows us to keep – not only collect information on how the system is performing but it also allows us to analyze that performance and use it for ongoing improvement at both the system level as well as at the module level itself. All of this folds up into a centralized monitoring system that's out in New Jersey, providing full remote control capabilities of all of our plants, utilizes standard, programmable logical units and graphical user interface so that we can understand what's going on.  We can share all that information, obviously, with the customers, and they've got various uses for it themselves and, as I said, use it for multilevel fault analysis and ongoing continuous improvement.

\* \* \*

We think that was pretty impressive for our first power plant of this size [El Dorado]. We've learned tremendously, learned a whole lot. Throughout the entire time that we were constructing this, we were collecting data. That data has been turned over to the engineers and the statisticians, who have now combed over that and developed new ways for us to construct a facility like this faster and cheaper and still make them even larger.

49.    I believed and continue to believe today that my statements on June 24, 2009, were truthful and accurate in light of the processes for preparing for investor conferences and calls that I discuss in paragraphs 31-36 above.  I also believed that these statements were truthful and accurate when made in June 2009, based on my familiarity with and understanding of our manufacturing processes technology, reports that I received, meetings I attended, and conversations that I had with engineers and scientists, about our manufacturing, as well as information about our CpW that I received from and discussed with our FP&A group.

SOHN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    15
sf-3518448

**July 29, 2010 Earnings Conference Call**

50.    I understand that Plaintiffs in this litigation allege that I misled investors during a conference call with analysts held on July 29, 2010, when I stated:  "About 4% of the production during the timeframe from June 2008 to 2009 was affected, in the neighborhood of about 30 MW," by the LPM excursion.

51.    I believed and believe today that the foregoing statement was truthful and accurate at the time it was made.  I believed the statement was truthful and accurate in light of information provided to me by Mike Koralewski, and based on my personal verification efforts.  Specifically, in June 2010, Mike Koralewski reported that he had estimated that the number of LPMs manufactured during the excursion between June 2008 and June 2009 was 450,000 modules.  I reviewed his analysis and believed he had reached reasonable conclusions based on sound assumptions and analyses.  I reviewed our production records and determined that First Solar produced approximately 11.8 million modules from June 2008 through June 2009.  On July 28, 2010, I divided the 11.8 million modules produced during the period by the 450,000 LPMs, to calculate that approximately 3.9% of the modules produced during that period were LPMs.  The 450,000 modules equaled approximately 30 megawatts of power.

52.    I understand that Plaintiffs in this litigation allege that I misled investors during the same conference call with analysts held on July 29, 2010, when I stated that "[a]nd we've been working with our customers since that time frame and expect to continue to do so for about the next six months or so."  I believed that this statement was truthful and accurate when made in July 2010, based on conversations that I had with the individuals leading First Solar's remediation efforts, including TK Kallenbach and Mike Koralewski, among others.  I also believed that my statements on July 29, 2010, were truthful and accurate in light of the processes for preparing for investor conferences and calls that I discuss in paragraphs 31-36 above.

53.    I further understand that Plaintiffs in this litigation allege that First Solar's statements during the Class Period were misleading because of issues related to module

performance in hot climates. Exhibit 65 is a true and correct copy of a presentation that was distributed to Robert Gillette, Jens Meyerhoff, me, and others during the time period leading up to the July 29, 2010 earnings conference call. It reflects my understanding at the time that any performance differences between warm and cool environments did not support a change to our guidance.

**October 28, 2010 Earnings Conference Call**

54.    I understand that Plaintiffs in this litigation allege that I misled investors when I made the following statement during a call with investors and analysts on October 28, 2010:

> As mentioned, the increase in cost was really a direct result of the improvements that we're putting into the factories, and we expect to see those generate better efficiencies and performance and lower cost. In terms of the excursion that we mentioned last time, there were no additional costs incurred in Q3.

55.    I understand that Plaintiffs in this litigation also allege that I misled investors when I made the following statement during the October 28, 2010 conference call with analysts and investors:

> As mentioned earlier, we've got a variety of improvements that are going into the factories and what was – might be easy on smaller scale is something that is more complex when we're dealing with 24 lines spread globally. We have good quality systems in place to ensure that the product that we're shipping is – to our standards. But in the implementation, it becomes somewhat of a challenge and affected us in terms of yields and our equipment up time to do the implementations. Nevertheless, we expect to continue to be on our cost per watt road map over the long term. We'll continue to implement changes over the – routinely, over time. But it takes a while for those things to propagate out.

56.    I believed and continue to believe today that my statements on October 28, 2010, were truthful and accurate. I believed that these statements were truthful and accurate when made on October 28, 2010, in light of the extensive processes described in paragraphs 31-36 above. Further, I believed that the statements were truthful and accurate given investments that we had made in our factories before October 28, 2010. For

SOHN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT    17
sf-3518448

example, we were adding production lines in our Malaysian facility at that time, and were improving our line run rates. In light of those developments and other factors, I believed First Solar would generate better efficiencies and produce modules at lower cost. In fact, in the fourth quarter of 2010, CpW declined $.02, or 2.7% quarter-over-quarter, from $.77 in the third quarter of 2010 to $.75 in the fourth quarter of 2010. And, as I pointed out above in paragraph 28, First Solar had a track record of steadily lowering its CpW during my tenure at First Solar. I believed that we had good and reliable quality-control systems in place on October 28, 2010, which was over a year after the LPM manufacturing excursion ended, based on information reported to me in meetings, based on communications that I had with Mike Koralewski and members of his team, and based, in part, on lessons that we learned from the LPM excursion. I also believed in the accuracy of my statements on October 28, 2010, because I was informed during an E-Staff meeting that there were no additional costs incurred in the third quarter of 2009 for the LPM excursion.

**Sales of My Holdings in First Solar Stock**

57.    As both a member of the board of directors and First Solar's President, I received a portion of my compensation in the form of long-term equity. I also purchased First Solar stock on the open market.

(a)    In 2005, I received a grant of 72,750 options in connection with my service as a member of First Solar's board of directors. These options were fully vested by November 26, 2007.

(b)    On March 21, 2007, I received a grant of 150,000 options in connection with my appointment as First Solar's President: 20% of these options vested on March 21, 2008, while the remaining 80% of these options vested monthly for the following 48 months. As of the date of my departure from First Solar, 122,500 options from this grant had vested.

58.    As a First Solar employee, I periodically received grants of restricted stock units, called RSUs for short. Typically, these RSUs vested over a four-year period, with

20% of the shares vesting on the first, second, and third anniversaries of the grant, and the final 40% of the shares vesting on the fourth anniversary of the grant.

59.     During the class period in this case—which I understand spans from April 30, 2008, to February 28, 2012—53,182 of my RSUs vested.  Other than shares withheld by the company to pay taxes on these shares, I did not sell any vested RSUs between the beginning of the class period and my departure from First Solar.

60.     Throughout my tenure at First Solar, I followed a long-term plan to periodically exercise and sell my First Solar stock options in order to diversify my assets.  Towards that end, I periodically entered into plans under SEC Rule 10b5-1, which authorized the plan administrator to sell a predetermined number of my First Solar shares without my involvement in, or consent to, particular sales on particular dates.  Approximately 67% of my stock sales during the Class Period were made under these plans, which made it easier for me to execute trades of my First Solar stock.  At the time that I established the plans, I could not predict future events that might affect First Solar's stock price.  I did not enter into any of these plans while in possession of any material undisclosed information about First Solar.

61.     My stock sales were consistent with my investment goals outlined above, and were never influenced by any material information I had, but that the public and First Solar's investors did not.  My stock sales were also not motivated or influenced by specific movements in First Solar's stock price.  I did not seek advice on my stock sales from other First Solar executives, nor did I ask other executives to buy or sell stock.

62.     I began selling my First Solar stock in 2007.  I first sold some of my First Solar stock holdings on August 15, 2007—almost nine months before the class period began.  In the next nine months—before the start of the class period—I sold a total of 93,000 shares of First Solar.

63.     In contrast, during the 46-month class period, I sold a total of 74,750 shares. I thus sold an average of approximately 10,333 First Solar shares per month before the class period, but an average of 1,625 First Solar shares per month during the class period.

SOHN DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                    19
sf-3518448

64.    My first sale of First Solar stock during the class period was on August 28, 2008, when I sold 12,750 of my First Solar shares.  I made this sale about nine months before I learned about the LPM manufacturing excursion.

65.    On August 28, 2010—a month after the LPM manufacturing excursion was disclosed to the public—I exercised 12,000 options on First Solar stock and sold the shares received.

66.    The following day, I entered into a Rule 10b5-1 plan.  This plan provided for the exercise of 50,000 options for First Solar stock.  Between November 1, 2010, and February 2, 2011, the plan administrator exercised 50,000 options for First Solar stock and sold the shares received.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26 day of March 2015, in San Jose, California.

_____
BRUCE SOHN

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**