James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>              Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>              Defendants. | CASE NO.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF MARK R. WIDMAR IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, MARK R. WIDMAR, declare as follows:

1.      I am a defendant in this lawsuit.  I submit this Declaration in support of defendants' motion for summary judgment.  Unless I state otherwise, all of my statements in this Declaration refer to the time period between April 4, 2011 (when I joined First Solar) and February 28, 2012 (the end of the Class Period).  If called as a witness, I would testify to the following facts:

**Education and Experience**

2.      I hold a B.S. in Business Accounting and an M.B.A. in Finance from Indiana University.

3.      Between 1987 and 2006, I held various finance positions with Ernst & Young, Lucent Technologies, AlliedSignal, Bristol Myers Squibb, Dell, and NCR.

4.      From May 2006 to March 2011, I worked at Graftech International as Chief Financial Officer ("CFO") and as a President of Engineering Solutions.

**Role at First Solar**

5.      I joined First Solar as its CFO, at the invitation of the Board of Directors, on April 4, 2011, and I remain the CFO today.  I did not know any of First Solar's senior executives before joining the company.  During the Class Period, I reported first to CEO Robert Gillette, and then to Interim CEO Michael Ahearn.

6.      As CFO, I am responsible for overseeing First Solar's financial operations, including financial planning and analysis, treasury, accounting, and investor relations.  I lead a team responsible for the development of First Solar's finance and accounting policies, and the preparation and presentation of First Solar's financial statements, its quarterly earnings releases, the financial reporting aspects of filings with the SEC, the company-wide monthly revenue forecasts, and the financial metrics reported on quarterly conference calls.

7.      I also sign First Solar's quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K and speak during our quarterly earnings conference calls.

8.     On February 1, 2012, I became First Solar's Chief Accounting Officer ("CAO"). I still serve as First Solar's CAO today.

**My Involvement with the LPM Issue**

9.     I learned of the LPM issue shortly after joining First Solar in April 2011.

10.     At the time I joined the company, First Solar had been working with customers to remediate the LPM issue for more than a year and a half, and the company had in place established processes for estimating the effects of the remediation program on First Solar's financial statements.

11.     Soon after I joined the company, I met with the employees who were involved with the LPM issue to understand the remediation program and First Solar's accounting for it. Specifically, I met with or received reports from TK Kallenbach (President of the Components Business Group), Mike Koralewski (VP of Global Quality), James Zhu (Corporate Controller and CAO throughout 2011), and Bryan Schumaker (Assistant Corporate Controller). For example, I reviewed the monthly LPM status update that Mr. Kallenbach presented to the executive staff, which tracked operational and financial metrics related to the LPM issue. Based on my interactions with these individuals and my review of the presentations and reports they prepared, I believed that the LPM issue was well understood and that all metrics relating to the excursion and related remediation program were reported accurately.

12.     I also reviewed the disclosures contained in First Solar's SEC filings related to the LPM issue. It was my understanding that the information contained in these disclosures concerning the scope, duration, and effects of the excursion was developed in connection with First Solar's disclosure of the LPM issue in Q2 2010. During my discussions with Messrs. Kallenbach and Koralewski, I was told that these descriptions and the results of the underlying analyses, including the estimated affected population, had not changed since the Q2 2010 estimates. While I did not personally perform an independent analysis of the affected population of modules (I am not an engineer), I believed, based on my discussions with these individuals and my understanding of the

processes by which these estimates were developed and reviewed, that the information contained in First Solar's SEC filings on these subjects was accurate.

13.     Throughout the remainder of the Class Period, I continued to review periodic reports and presentations prepared by the team responsible for the remediation. For example, I reviewed Mr. Kallenbach's LPM status update presentations, which were distributed on a monthly basis.  As part of my review, I, or members of my team, routinely followed up with Mr. Kallenbach to better understand the analyses or resolve questions that I had.  I also received periodic reports and memoranda from my accounting team that tracked the costs associated with the LPM remediation program.  I discussed these reports and memoranda, and general issues related to First Solar's accounting for the LPM remediation program, with Mr. Zhu and Mr. Schumaker.  While I did not personally perform detailed accounting analyses of First Solar's accruals, I believed that the LPM issue was appropriately accounted for and all costs associated with the remediation program were reported accurately, based on my interactions with these individuals and my review of the presentations and reports they prepared.  Following my review each quarter, I did not believe there would be any material increase in the number of modules that would be needed to complete the LPM remediation, nor did I believe there would be a material increase in the LPM accrual.

**First Solar's Process for Preparing Its Financial Statements and SEC Filings**

14.     When I joined First Solar in April 2011, the company had in place an extensive set of processes for the preparation of its financial statements and quarterly and annual reports filed with the SEC.  Based on my review of these processes when I joined the company and my continued involvement in these processes over the last four years, I believe that First Solar's processes and controls were robust and reliable.

15.     On a monthly and quarterly basis, First Solar's finance and accounting groups performed a worldwide consolidation of the accounting functions maintained by the company's manufacturing facilities and operating segments, as well as reconciliations of balance sheet accounts.  This process was known as the "close process."  As part of this

process, the Controller's organization, Financial Planning and Analysis (FP&A), and the SEC Reporting group performed rigorous analyses and reviews designed to ensure the accuracy of First Solar's balance sheet accounts and other financial metrics.

16.    The results of the close process were presented to me in the "CFO Close Deck."  The CFO Close Deck was presented to me approximately two weeks after the end of the calendar month and quarter.

17.    The Close Deck compiled various financial and operational metrics, including revenue, gross margins, cost per watt, and average selling prices.  The report also contained a review of significant events, transactions, and estimates, and provided an overview of the major risks and opportunities facing the company in the current quarter. The standard warranty accrual and LPM remediation accrual were also reviewed in this presentation each month.

18.    Every month and quarter, I reviewed the results of the close process and the CFO Close Deck with members of the Finance organization, including the leaders of FP&A, the Controller's organization, the Tax group, and Internal Audit.  Among other things, the group discussed and reviewed the results of the close process, answered questions, and highlighted remaining open issues.  Any issues that remained open after the close meeting were resolved by the responsible members of First Solar's Finance and Accounting functions.

19.    The numbers included in First Solar's consolidated financial statements that appeared in the company's SEC filings and related earnings releases were the product of this quarterly close process.  While I did not personally prepare specific entries or perform the underlying analyses that formed the basis for the financial statements, based on my participation in the close process, my knowledge of the individuals involved in preparing and reviewing the results, and my understanding of the processes and analyses that were performed as part of the close, I believed that the financial results that appeared in First Solar's financial statements accurately reflected the financial condition of the company in all material respects.

20.     Building on the financial close process, the process for the preparation of First Solar's quarterly and annual reports filed with the SEC was coordinated by First Solar's Disclosure Committee.  When I joined the company in April 2011, the Disclosure Committee consisted of approximately 15-20 senior employees and was made up of experts from across the organization, including technology, manufacturing, sales, finance, accounting, legal, and investor relations.  First Solar established the Disclosure Committee to implement its internal control procedures for the assessment and review of financial disclosures, to review the information flowing into the financial statements and SEC filings, and to make recommendations regarding the company's disclosures and SEC filings.  I have been a member of the Disclosure Committee since I joined the company in April 2011.

21.     Review of individual disclosure items during Disclosure Committee meetings was led by the individuals responsible for the relevant functional areas within the business.  As an example, for disclosure issues related to the LPM remediation program, Mr. Kallenbach, the executive in charge of the remediation program, along with Messrs. Schumaker and Zhu, the executives most knowledgeable about the associated financial and accounting issues, led discussion, answered questions, and reviewed the underlying data with the Disclosure Committee to ensure that the Committee agreed that the disclosures contained in the SEC filings were accurate and appropriate.

22.     Pursuant to section 302 of the Sarbanes-Oxley Act (SOX), First Solar's CFO and CEO signed certifications that stated, in part, that, to the best of their knowledge, the financial statements fairly presented the company's financial condition; that they were responsible for establishing and maintaining disclosure controls and procedures; and that the disclosure controls and procedures were effective.  To support the CFO and CEO certifications required under SOX, First Solar also had in place an extensive sub-certification process.  The sub-certification process served as both a check on the accuracy of the SEC filings and an additional source of information for the Disclosure Committee.  At the time I joined the company, sub-certifications were sent out

to hundreds of employees every quarter.  Sub-certifications were distributed across the organization and included individuals responsible for, among other things, First Solar technology, sales, customer service, product management, marketing, finance, accounting, legal, manufacturing, and investor relations departments.

23.     The sub-certification process was designed to ensure, among other things, that the information contained in First Solar's SEC filings accurately reflected the financial condition of the business in all material respects, and that First Solar's internal controls were properly implemented and followed.  Sub-certifications were sent several weeks before the quarterly or annual filing, with a "refresh" sent again closer to the filing, to allow sufficient time to discuss or review any issues raised through the sub-certification process.

24.     I discussed the results of the sub-certification process with Mr. Zhu and/or Mr. Schumaker every quarter.  As part of our review of the sub-certification process, I confirmed that all material disagreements were cleared before signing my name to the CFO certification that accompanied First Solar's SEC filings.  I reviewed my own certification and the results of the sub-certification process with the CEO every quarter, and the CEO did not sign his certification until after I signed my certification.

25.     Parallel to First Solar's internal review processes, the company's external auditors, PricewaterhouseCoopers (PwC), performed quarterly reviews and annual audits of First Solar's financial statements.  As is typical in large public company audits, PwC's audit professionals had their own offices at First Solar's corporate headquarters in Tempe, Arizona.  I, along with my staff, had free and open communication with PwC throughout the audit and review process.  Based on my interactions with the PwC team and my own staff, it was my understanding that PwC received all material information necessary for them to complete their work.  I held multiple meetings with the PwC audit staff, led by Adam D'Angelo, every quarter to discuss the results of PwC's work and resolve any issues that the auditors identified.

26.     First Solar's financial statements and SEC filings were also reviewed by the Audit Committee of the Board of Directors.  Every quarter, my team prepared a presentation for the Audit Committee that summarized the results of the close process, reviewed significant transactions and issues, and provided an overview of the financial condition of the company.  After review and recommendation by the Disclosure Committee, management provided a draft of the SEC filings to the Audit Committee, and a management team, led by the Corporate Controller and me, reviewed the draft with the Audit Committee.  As part of the Audit Committee's review, the management team was available to answer any questions and resolve any issues that the Audit Committee had with the current draft.  After the Audit Committee was comfortable with the draft filings presented by management, the Audit Committee would make a recommendation to file to the full Board of Directors.  The full Board then performed its own review and ultimately passed a resolution approving the SEC filings for filing.

27.     Based on my participation in this process, at no time did I believe, or was I ever informed, that any public statement made by First Solar, me, or any other member of management during the Class Period was false, inaccurate, or misleading.  Specifically, at no time did I believe, or was I ever informed, that any of First Solar's reported quarterly or annual financial results were false, inaccurate, or misleading, or that First Solar ever misrepresented the state of its business, module performance, cost per watt (CpW), or accruals relating to its standard warranty obligation or the manufacturing excursion.

**May 3, 2011 Conference Call**

28.     On May 3, 2011, First Solar issued its financial results for the first quarter of 2011.

29.     First Solar held a conference call on May 3, 2011, in connection with its release of the results.  On this call, I made a statement concerning First Solar's reported CpW.  I stated:  "Looking at our cost per watt, our module cost per watt in the first quarter was $0.75, flat with the prior quarter."  I understand that the plaintiffs in this case allege that this statement was false or misleading.

30. I believed that this statement was accurate and free from material misrepresentations at the time it was made.

31. My belief in the accuracy of this statement was based on my participation in the process described in ¶¶ 14-27 above. Specifically, the cost-per-watt figure was provided to me by my staff as part of the quarterly close review. The number was reviewed by my team as part of our quarterly close meetings. This review involved employees from the FP&A and Controller's group, including James Zhu (CAO), Bryan Schumaker (Assistant Corporate Controller), David Brady (VP, Treasury), Kurt Wood (VP, FP&A), Shrimo Maharaj (Director of Corporate FP&A), and Steve Ryan (Senior Manager, FP&A). Based on my participation in this review and my understanding of the processes used to calculate cost per watt, I believed that the number provided to me and disclosed to investors was accurate.

**May 3, 2011 Press Release and May 5, 2011 Form 10-Q**

32. On May 3, 2011, First Solar issued a press release announcing its first quarter earnings.

33. The financial results reported in the press release were also included in a Form 10-Q filed with the United States Securities and Exchange Commission (SEC) on May 5, 2011.

34. I understand that the plaintiffs in this case allege that statements contained in this Form 10-Q and the related press release contained misrepresentations. The specific statements are listed in Exhibit 2.[1] In general, these statements concern: (a) warranty and manufacturing excursion accrual amounts for the period; (b) risk disclosures; (c) the reported cost-per-watt metric for the particular period; and (d) statements about First Solar's operational and module performance.

---

[1] All exhibit references in this Declaration are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.

35.    I believed the information included in the Form 10-Q and related press release was accurate and free from material misrepresentations at the time those statements were made. My belief in the accuracy of those statements was based on my knowledge of, and participation in, the comprehensive process that First Solar used to prepare and review its financial disclosures. This process is described above in ¶¶ 14-27.

**August 4, 2011 Press Release and August 5, 2011 Form 10-Q**

36.    On August 4, 2011, First Solar issued a press release announcing our second quarter earnings. The financial results reported in the press release were also included in a Form 10-Q filed with the SEC on August 5, 2011.

37.    I understand that the plaintiffs in this case allege that statements contained in this Form 10-Q and the related press release contained misrepresentations. The specific statements are listed in Exhibit 2. In general, these statements concern: (a) warranty and manufacturing excursion accrual amounts for the period; (b) risk disclosures; (c) the reported cost-per-watt metric for the particular period; and (d) statements about First Solar's operational and module performance.

38.    I believed the information included in the Form 10-Q and related press release was accurate and free from material misrepresentations at the time those statements were made. My belief in the accuracy of those statements was based on my knowledge of, and participation in, the comprehensive process that First Solar used to prepare and review its financial disclosures. This process is described above in ¶¶ 14-27.

39.    I knew that First Solar performed a review of the accruals related to the manufacturing excursion as part of this process. In connection with this review, I reviewed and discussed the status of the remediation program and the related costs with Messrs. Kallenbach, Zhu, and Schumaker. These individuals informed me that the accrual booked in the second quarter of 2011 represented the company's best estimate of the total costs associated with the LPM remediation program. Based on my discussions with Mr. Zhu, I also knew that Messrs. Kallenbach and Zhu had reviewed the accrual increase with PwC, and that PwC deemed the accrual adjustment reasonable. Based on these

discussions and my review of the information that these individuals provided to me, I believed that the accrual booked accurately reflected the company's best estimate of the total costs associated with the LPM remediation program.

**November 3, 2011 Conference Call**

40.    I also understand that the plaintiffs in this case allege that statements attributed to me during First Solar's November 3, 2011 conference call were false or misleading.  The specific statements are listed in Exhibit 2.  In general, these statements concern:  (a) the reported cost-per-watt metric; (b) First Solar's operational and module performance; (c) manufacturing excursion accruals; and (d) revenue recognition for projects in hot climates.

41.    At the time I made those statements, I believed that every one of them was accurate and free from material misrepresentations.  My belief in the accuracy of those statements was based on my knowledge of and participation in the process described in ¶¶ 14-27 above (the information discussed during conference calls was primarily derived from and tied to the SEC filings).

42.    Additionally, I knew that the Investor Relations team solicited data, distributed drafts, and verified the accuracy of script language with the relevant employees and internal experts responsible for the matters discussed during the conference calls.

43.    For example, I knew that Larry Polizzotto (VP, Investor Relations) had verified the script language discussing the manufacturing excursion with Messrs. Kallenbach and Koralewski, the executives most knowledgeable about the excursion and remediation program.  In fact, I was informed that Messrs. Kallenbach and Koralewski explicitly approved the very language plaintiffs claim was inaccurate (that First Solar had "substantially concluded" the remediation programs and that the population of affected modules remained "less than 4% of the modules produced from June 2008 to June 2009").

44.    Additionally, I, along with Marco Loures (VP, Internal Audit) and Mr. Zhu, reviewed an LPM status update presentation prepared by Mr. Kallenbach that verified that

the remediation program was substantially concluded.  The presentation showed that approximately 75% of the claims received had been deemed invalid; approximately 6% had been remediated; approximately 7% were scheduled to be remediated; and only approximately 11% still needed to be analyzed.  Exhibit 78 is a true and correct copy of this presentation.  The fact that approximately 89% of the claims had been conclusively analyzed further supported my belief that First Solar had "substantially concluded" the LPM remediation program.

**October 26, 2011 Press Release and November 4, 2011 Form 10-Q**

45.     On October 26, 2011, First Solar issued a press release announcing its third quarter earnings.  The financial results reported in the press release were also included in a Form 10-Q filed with the SEC on November 4, 2011.

46.     I understand that the plaintiffs in this case allege that statements contained in this Form 10-Q and the related press release contained misrepresentations.  The specific statements are listed in Exhibit 2.  In general, these statements concerned:  (a) warranty and manufacturing excursion accrual amounts for the period; (b) risk disclosures; (c) the reported cost-per-watt metric for the particular period; and (d) statements about First Solar's operational and module performance.

47.     I believed that the information included in this Form 10-Q and related press release was accurate and free from material misrepresentations at the time those statements were made.  My belief in the accuracy of those statements was based on my knowledge of, and participation in, the comprehensive process that First Solar used to prepare and review its financial disclosures.  This process is described above in ¶¶ 14-27.

48.     My belief in the accuracy of the statements related to the manufacturing excursion was further strengthened by the review process described in ¶¶ 43-44 above.

**Stock Transactions**

49.     I did not sell any First Solar stock during the Class Period.

WIDMAR DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    11
sf-3508477

50.    I invested approximately $91,750 of my own money to purchase 1,000 shares of First Solar stock on August 24, 2011, for approximately $91.75 per share.  I held these shares through the end of the Class Period.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of March, 2015 in Tempe, AZ.

_____
Mark R. Widmar

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**