James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>　　　　　　　　　　　Defendants. | CASE NO.　　CV12-00555-PHX-DGC<br><br>**DECLARATION OF TK KALLENBACH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, TK KALLENBACH, declare as follows:

1.    I submit this Declaration in support of the Defendants' motion for summary judgment.  Unless I state otherwise, all of my statements in this Declaration refer to the time period between April 30, 2008, and February 28, 2012 (the "Class Period").  If called as a witness, I could testify to the following facts:

**My Background**

2.    I graduated from Arizona State University in 1981 with a Bachelor of Science degree in mechanical and aerospace engineering.  I received my MBA from Arizona State University in 1987.

3.    Between 1979 and 2009, I worked for Honeywell Aerospace.  I worked for divisions of the company that were acquired or changed names several times during this period, and were previously known as Garrett Turbine Engine Company and AlliedSignal.  My roles at Honeywell included Vice President (VP) of Engineering and Technology and VP of Marketing & Product Management.

**My Roles at First Solar**

4.    I joined First Solar on December 14, 2009, as Executive Vice President of Marketing and Product Management.  In this role, I was responsible for, among other things, developing market strategies, implementing product initiatives, and communicating with the media and industry trade press.  During this time, my team consisted of approximately 40-60 employees.

5.    In February 2011, I was promoted to the role of President of the Components Business Group.  In this role, I was responsible for First Solar's global components sales business, focusing on the sale of modules and other individual components (for example, mounting systems and trackers).  My reports included First Solar's product management, marketing communications, customer service, technical service, and business development teams.

6.    I left First Solar in December 2011 after the company went through an internal reorganization.

**Low Power Module ("LPM") Issue**

7.    I learned of the LPM issue (also referred to as the manufacturing excursion) shortly after I joined First Solar in December 2009.

8.    In approximately July 2010, I took over leadership and oversight of the LPM remediation program and started participating in the process of assessing First Solar's remediation estimates with Mike Koralewski (VP of Global Quality) and his team. Before this time, my involvement with the LPM remediation was limited to industry and trade press communications strategy issues and updates that I received as a member of the executive staff and Disclosure Committee.

9.    First Solar disclosed the LPM issue to investors in its Q2 2010 Form 10-Q and Q2 2010 earnings conference call.  I was tasked by Rob Gillette (who was the Chief Executive Officer at the time) with coordinating the development of the language used to describe the excursion.  To do this, I worked with the Disclosure Committee and knowledgeable engineering personnel, Mr. Koralewski, to accurately describe the issue and its effects on First Solar's business and financial statements.  Based on my participation in this process and my understanding of the underlying issues, I believed that First Solar's disclosures relating to the LPM issue, including the disclosure that the manufacturing excursion affected less than 4% of the total product manufactured during the period, were accurate and free from material misrepresentations.

10.    I continued to oversee and manage the LPM remediation program until I left the company in December 2011.  As part of this management role, I worked with the remediation team, primarily with Mr. Koralewski, to develop estimates of the total number of modules that would be replaced under the LPM remediation program. Mr. Koralewski and I provided these estimates to First Solar's Finance and Accounting groups, who used our estimates to calculate the total costs associated with the LPM remediation program.  I understood that the estimates we provided formed the basis for

the accruals that First Solar included in its financial statements and described in its quarterly filings with the SEC.  I believed that the numbers we provided were the best estimate of LPM remediation needs, based on the information available at the time.  The estimates were based on engineering and commercial judgments, made by Mr. Koralewski, me, and our teams, and I believed that the estimates constituted a fair and reasonable basis for calculating First Solar's accruals.

11.    At no time were my analyses of the LPM remediation program compromised by any improper instruction, direction, pressure, or influence from anyone at First Solar, including Messrs. Ahearn, Eaglesham, Gillette, Meyerhoff, Sohn, Widmar, or Zhu.

**Development of the Monte Carlo Model**

12.    In 4Q 2010, I worked with Mr. Koralewski and members of his team to develop a statistical model, based on a Monte Carlo analysis, to estimate the total number of modules that First Solar would need to replace under the LPM remediation program. Mr. Koralewski and I believed that, after more than a year of remediation work in the field, First Solar now had a large enough volume of data to support a statistical model to estimate total remediation needs associated with the LPM remediation program.

13.    The Monte Carlo model took a different approach to estimating total remediation needs from our previous models.  Earlier models were based on a search for the population of modules affected by the manufacturing excursion, which Mr. Koralewski and his team estimated to be approximately 450,000 modules.  In contrast, the Monte Carlo model used a probabilistic approach, with conservative estimates of a "suspect population" of modules that could exhibit power loss of greater than 15% if every module produced between June 2008 and June 2009 was pulled from the field, returned to the factory, and measured without correction for dark soak.  This was not an estimate of the number of modules affected by the excursion, and the model did not attempt to distinguish between different technical causes of power loss, including those caused by improper customer maintenance or installation.  We continued to use the Monte

Carlo model as the primary basis for estimating total remediation need through the Q2 2011 close, and also used the model as a cross-check for purposes of developing the Q3 2011 estimate of remediation need.

**Q2 2011 Remediation Update**

14.    In early July 2011, I learned that First Solar had shipped more replacement modules under the LPM remediation program than the total number of replacement modules that had been estimated using the Monte Carlo model in Q2 2010 and Q2 2011. In response, I worked with Mike Koralewski and members of the remediation team in Europe to perform a review and analysis of the remediation program.

15.    As part of this review, we analyzed the status of all remaining open customer claims. We determined that, of the approximately five thousand total claims received, several thousand were still under consideration. Nearly 70% of these claimants, however, had not submitted the necessary supporting data (e.g., serial numbers or site power output data) to qualify for remediation. I believed that virtually all of these claims would be rejected. By July 2011, the last modules produced under excursion conditions would have been produced more than two years earlier. I understood that modules that were affected by the excursion experienced early power loss of at least 15% during the first few months of operation. Because of this, I believed that any issues relating to the manufacturing excursion would manifest themselves quickly after installation, and customers would, therefore, act quickly to submit the data needed to support their remediation claims. I believed that customers that had not submitted data up to this point were unlikely to be experiencing site-level power loss attributable to the manufacturing excursion.

16.    I also considered the remaining group of open claims that had supporting data (approximately 30% of those not yet fully analyzed or approved). I believed that the vast majority of these claims would be rejected, because I did not believe that these sites were experiencing power loss attributable to the manufacturing excursion. Throughout 2011, but becoming increasingly clear beginning in Q2 2011, First Solar's Global

KALLENBACH DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                    4
sf-3516626

Technical Service team (known as GTS) remediated customer sites that were experiencing power loss for reasons unrelated to the manufacturing excursion, including open circuit operation, improper cleaning, inverter and wiring issues, and other improper installation and maintenance procedures.  Because these issues were unrelated to the manufacturing excursion, they were not covered by First Solar's commitment to remediate modules affected by the excursion, should not have been remediated under the LPM remediation program, and should not have qualified for the enhanced remedy (rip and replace remediation) that was offered as part of that program.  In response, Mr. Koralewski and I worked with the remediation team to develop a new and improved process for the evaluation and approval of customer claims.  In addition to stricter thresholds for acceptance, the revised process required that sites of any significant size had to be approved by Mr. Koralewski or me.  In late July, I ordered GTS to stop shipping replacement modules, pending implementation of the new approval process and a reevaluation of sites that they had scheduled for remediation.

17.    In July 2011, Mr. Koralewski and his team reran our Monte Carlo model to incorporate updated module testing and remediation data from the field.  Based on the updated model, Mr. Koralewski estimated that approximately 92 megawatts (MW) of replacement modules would be needed to complete the remediation program, an increase of approximately 7 MW from the earlier Monte Carlo estimate.  I believed that the Monte Carlo model remained our best estimation tool at this time, and I did not believe that a significant amount of LPM remediation would be performed beyond the 92 MW estimated by the model.  I believed that the Monte Carlo model incorporated the best available objective data.  The fact that we had shipped approximately the same amount of replacement modules (92 MW) by the end of July was not inconsistent with this belief.  Rather, it reinforced my belief that we had remediated substantially all sites affected by the manufacturing excursion, and that any additional remediation requests from GTS would be unrelated to the manufacturing excursion and would not qualify for the LPM remediation program.

18.     As in previous quarters, I communicated my best estimate of the total number of modules that would be replaced under the LPM remediation program—approximately 92 MW— to the Finance and Accounting teams, including Mr. Schumaker, James Zhu (Chief Accounting Officer and Corporate Controller), and Mark Widmar (Chief Financial Officer).  I also discussed my estimate and underlying rationale with First Solar's outside auditors, PricewaterhouseCoopers (PwC).

**Q3 2011 Remediation Update**

19.     In Q3 2011, Mr. Koralewski and I performed an empirical site-based analysis, incorporating updated module testing and customer site data, to complete our review of GTS's remediation practices and the remaining open claims.  As part of this analysis, we attempted to differentiate claims involving power loss caused by the manufacturing excursion from claims based on power loss caused by other root causes.  I expected that this would confirm my belief that any additional remediation requests from GTS would be for issues unrelated to the manufacturing excursion and would therefore not be part of the commitment to our customers to go above and beyond the performance warranty.  Our site-based evaluation instead showed that First Solar would need to replace a total of 120 MW to complete the remediation associated with the manufacturing excursion.  We also discovered that a total of approximately 17 MW of remediation had already been completed or committed to for issues unrelated to the manufacturing excursion, bringing the total remediation need to 137 MW.  As a cross-check, Mr. Koralewski and his team reran our Monte Carlo model, incorporating new module testing data received during the third quarter.  The updated Monte Carlo model was consistent with our empirical model, estimating a total remediation need of approximately 133 MW.

20.     Like in previous quarters, I provided my updated best estimate to the Finance and Accounting teams, and it is my understanding that this analysis formed the basis for the Q3 2011 LPM remediation accrual.  I informed Messrs. Widmar, Zhu, and Bryan Schumaker (Assistant Corporate Controller) that I believed that the increase to the accrual in Q3 2011 was sufficient to conclude the LPM remediation program.

**First Solar's Disclosure Process**

21.    When I joined First Solar in December 2009, the company already had in place a comprehensive process for the preparation and review of its periodic disclosures and reports filed with the SEC.  In my role as EVP of Marketing and Product Management and later President of the Components Business Group, I participated in this process primarily through First Solar's Disclosure Committee and sub-certification process.

22.    First Solar's Disclosure Committee coordinated the preparation and review of the company's quarterly and annual filings with the SEC on Forms 10-Q and 10-K.  I was a member of the Disclosure Committee throughout my tenure at First Solar.  As a member of the Disclosure Committee, I reviewed drafts of the company's SEC filings and provided input to ensure the accuracy of the information included in First Solar's disclosures to investors.  Because of my role in managing the LPM remediation program, I often provided information to other Disclosure Committee members so that they could review the disclosures related to the excursion and LPM remediation program.  As one of the executives most knowledgeable about the issue, I viewed it as my responsibility to make sure that the excursion and related remediation program were described accurately and appropriately in the SEC filings and quarterly conference calls.  Based on my review of First Solar's disclosures each quarter, I believed that First Solar's disclosures relating to the excursion and LPM remediation program were accurate and free from material misrepresentations.

23.    I also provided sub-certifications as part of First Solar's sub-certification program.  The sub-certifications were designed to support the CEO and CFO certifications under Sarbanes-Oxley (SOX) and to ensure that First Solar's SEC filings accurately and appropriately discussed the condition of the business in all material respects.  Every quarter, I submitted sub-certifications attesting that I was unaware of any material inaccuracies in the company's financial statements.  After I took over leadership of the LPM remediation program in July 2010, I executed those sub-certifications with the

knowledge that the company's quarterly LPM accruals were based upon estimates of LPM remediation needs that I reviewed and approved. I intended those sub-certifications to communicate to First Solar management, specifically the CFO and CEO, that these estimates were accurate and reflected my best estimates and judgments, and those of the team.

24. In my role as EVP of Marketing and Product Management and later President of the Components Business Group, I also frequently communicated with PwC to provide information, including information related to the LPM issue, that the auditors needed to complete their quarterly reviews and annual audits of First Solar's financial statements. My communications with PwC were always open and honest, and I believe that I provided PwC with all material information that was necessary for them to complete their work.

**Stock Transactions**

25. I did not sell any shares of First Solar stock during the Class Period.

26. On February 26, 2010, I invested approximately $103,000 of my own money to purchase 1,000 shares of First Solar stock. On August 16, 2010, I invested approximately $123,000 of my own money to purchase 1,000 shares of First Solar stock. On August 22, 2011, I invested approximately $88,000 of my own money to purchase 1,000 shares of First Solar stock. In total, I purchased 3,000 shares for approximately $315,000 while I was employed at First Solar. I held these shares through the end of the Class Period.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of March 2015, in _____, CA _____ .

_____
TK KALLENBACH

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**