James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>                           Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>                           Defendants. | CASE NO.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF MICHAEL KORALEWSKI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, MICHAEL KORALEWSKI, declare as follows:

1.      I am First Solar's Vice President of Site Operations and Plant Manager for the company's Perrysburg, Ohio factory.  I submit this Declaration in support of Defendants' motion for summary judgment.  I make this Declaration on personal knowledge.  Unless I state otherwise, all of my statements in this Declaration refer to the time period between April 30, 2008, and February 28, 2012 (the "Class Period").  All exhibit references in this Declaration are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.  If called as a witness, I could testify to the following facts:

**Education and Experience**

2.      I graduated from Case Western University in Cleveland, Ohio, in 1994 with a Bachelor of Science degree in Chemical Engineering.  In 2002, I earned an MBA degree from Bowling Green State University in Bowling Green, Ohio.

3.      I joined First Solar in 2006.  Prior to starting my current position as Vice President of Site Operations and Plant Manager in May 2011, I served as Vice President of Global Quality from mid-2008 to October 2011 and Director of Quality from 2006 until mid-2008.  In both of the latter positions, I was responsible for the overall quality and reliability systems of First Solar's manufacturing and Engineering, Procurement, and Construction ("EPC") business units.  Among other responsibilities, I was in charge of managing nonconforming product, including identifying, isolating, and correcting product that did not adhere to manufacturing specifications.  I was also charged with analyzing First Solar's warranty rates and the performance of First Solar's product in the field.

4.      From 2006 until approximately April 2011, I reported to Bruce Sohn, who was the President of First Solar.  Since April 2011, I have reported to Tymen DeJong, Senior Vice President of Manufacturing.

5.      Prior to joining First Solar, I held various quality and engineering roles at Dana Corporation, an automobile parts manufacturer.  Around the time I joined that

company in 1996, I received a quality engineer certification from the American Society of Quality. Broadly speaking, that certification requires demonstrated proficiency in the development and operation of quality control systems, diagnosis and correction of improper quality control practices, and prevention of unnecessary costs due to poor quality practices. I held that certification until approximately 2011, when I switched from First Solar's quality department into plant management.

**The Manufacturing Excursion**

6. In the course of my duties as Vice President of Global Quality, I was responsible for various estimates relating to the Low Power Modules ("LPMs"), which referred to modules that had been produced between June 2008 and June 2009 (the "excursion period") under specific manufacturing conditions and that could experience field power loss of 15% or more from nameplate within the first several months of installation. My responsibilities included, at various times, identifying the root cause of the manufacturing excursion; estimating the number of LPMs produced during the excursion; and estimating the total number of replacement modules that would ultimately be required under the LPM remediation program that First Solar instituted in 2009.

7. In executing my responsibilities as outlined above, I employed my best engineering judgment to produce what I believed at the time to be reasonable determinations and estimates on all these matters. I understood that these determinations and estimates were being used by First Solar and its management for both internal planning purposes and financial reporting and public disclosure purposes. I intended and believed that my determinations and estimates were the best available information for all these purposes. The determinations and estimates I made were entirely based upon honest engineering and scientific judgment and were never compromised by any instruction, direction, pressure, or influence from company management, including each of the named defendants in this action. The various determinations and estimates I made as well as my process for making them are set forth below.

**LPM Population Estimates**

8. Exhibit 59 is a true and correct copy of a June 2009 document that I and others created to track the LPM chronology through approximately June 5, 2009. It was prepared as part of our normal duties related to tracking warranty issues, and kept in the ordinary course of business. Starting in or around June 2009, I, in collaboration with others, undertook to estimate the number of LPMs. One of the purposes of these initial estimates was to allow First Solar to plan for and estimate the costs of ripping and replacing LPMs that had been installed in the field. Throughout the Class Period, we revised our estimates as appropriate based on the best data we had available to us at the time.

9. Initially, based on our analysis of modules returned by customers and our manufacturing process, we developed a list of approximately 75,000 serial numbers of modules produced under specific manufacturing conditions on specific production line days that we had determined were associated with production of LPMs.

10. Though it represented our best estimate at the time, this approach was short-lived because we soon discovered modules in the field exhibiting 15% or more field power loss that were not on our initial population list. To cast a wider net, in Q3 2009, we developed a model that sought to predict the LPM population by extrapolating from a population of specific production line days during the excursion period. We revised and updated this model as we replaced and tested modules as part of the remediation process.

11. In Q3 2009, we estimated that there were 115,000 LPMs. This estimate increased to 154,000 modules in Q4 2009. These estimates represented my and First Solar's best estimates based upon reasonable scientific and engineering judgments.

12. With the benefit of more data from modules returned from the field, in or around March 2010, we re-estimated the number of LPMs likely produced during the June 2008 to June 2009 excursion period. Through statistical analysis, we were able to develop a correlation between the field power loss data from returned modules and "stability index" (STBi) data from tests that First Solar performed on a sample population

of modules at each of its plants on each of its production lines.  After determining the STBi value that correlated to field power loss of 15% or greater from nameplate, we were able to calculate a reasonable estimate of the percentage of LPMs produced during the excursion.  Based upon the statistical analyses we performed, we estimated that approximately 450,000 modules would likely exhibit the LPM defect in the field.  The 450,000 figure represented less than 4% of the total 11.8 million modules produced during the excursion period.

13.    As with my earlier estimates, the 450,000 estimate was used by First Solar for remediation planning and accounting purposes.  I reported my 450,000 estimate to First Solar's finance department.  I understand that accruals taken in the first and second quarters of 2010 were based upon a model in which the 450,000 estimate was an input.  That same model was the basis for internal planning necessary to the execution of the First Solar remediation program.

14.    I also knew that my 450,000 module estimate was the basis for the disclosure which First Solar included in its Q2 2010 10Q filing, specifically the statement that the June 2008–June 2009 manufacturing excursion had affected less than 4% of modules produced during that time period.  I believed that statement to be accurate and based upon reasonable engineering and scientific judgment.  I advised members of the Company's disclosure committee of my conclusion at the time.  Exhibit 70 is a true and correct copy of a July 29, 2010 email I sent to TK Kallenbach and Bruce Sohn to indicate my agreement with the less than 4% calculation.  Exhibit 68 is a true and correct copy of a July 29, 2010 email I received from Mr. Kallenbach, who also indicated his agreement with the less than 4% calculation.

15.    I am aware that First Solar's quarterly and annual filings for each of the successive five quarterly reporting periods from Q3 2010 through Q3 2011 repeated and included the statement that the manufacturing excursion affected less than 4% of the modules produced during the excursion period.  This statement was consistent with the data that I and First Solar had available during this period, including a growing body of

data on the observed and measured power loss of modules that were being returned under the Company's ongoing LPM remediation program.  During the Q3 2010 through Q3 2011 time period, I continued to monitor the statistical correlation between power loss on our returned module population and measured STBi during the excursion period, and monitored the total number of modules that were being returned from the field that exhibited the power loss characteristic of the LPM defect.  Based on all the data, I continued to believe throughout this time period that the 450,000 estimate from March 2010 remained accurate and that the "less than 4%" disclosure in First Solar's quarterly filings was therefore consistent with the available data and also accurate.  Exhibit 80 is a true and correct copy of a November 2, 2011 e-mail I sent to TK Kallenbach and James Zhu, among others, to confirm the accuracy of language in the Q3 2011 earnings call script, including the "less than 4%" statement.

16.    During the Q2 2010 to Q3 2011 time period, I provided quarterly Sarbanes-Oxley subcertifications on which I truthfully communicated that I was unaware of any material inaccuracies in the company's public disclosure documents.  I made these subcertifications with full knowledge that the company's public filings included the "less than 4%" statement and the fact that that statement was based upon my professional and engineering judgment.  By making these subcertifications, I understood I was communicating my belief in the accuracy of the statement.  I specifically confirmed the accuracy of the "less than 4%" disclosure in a November 2, 2011 e-mail to James Zhu, Bryan Schumaker, and TK Kallenbach, among others.

17.    In February 2012, I again estimated the number of modules produced during the excursion period.  I did this principally by examining the statistical correlation between STBi and power loss measurements, now based on more than two years of field returns data.  My examination of the data again confirmed the basic correlation that was first observed in the spring of 2010.  Exhibit 83 is a true and correct copy of a February 20, 2012 email I sent to Timo Moeller, Klaus-Peter Fuss, and Thomas Kuster to provide my 450,000 module estimate for all quarters in 2011.

18.    I have sat for two full days of depositions in this case, running over 15 hours, in December 2014 and February 2015.  In those depositions, plaintiffs' counsel's questioning identified a variety of documents that he suggested contradict or call into question the reasonableness of my 450,000 module estimate and the engineering analyses I employed to reach it.  For instance, counsel showed me documents that include references to LPM counts higher than 450,000.  All such documents cited in my deposition used the "LPM" term to refer to a larger universe of modules than the population of LPMs manufactured during the excursion.  The "LPM" term and similar terms were used more broadly because in Q4 2010 we started using a statistical Monte Carlo model to estimate the total number of modules, including good modules, that First Solar would have to rip and replace to complete the remediation effort.  By design, this model, discussed further below, did not differentiate LPMs from modules that experienced power loss for other reasons.

19.    The questioning by plaintiffs' counsel also suggested various critiques of the analytical method and judgments I used in Q1 2010 to determine, and in subsequent quarters to confirm, my 450,000 module estimate.  None of counsel's questioning has caused me to change my judgment that 450,000 represents the best estimate of the number of actual LPM modules that First Solar produced during the excursion period.  None of counsel's questions change the fact that the 450,000 estimate represented my best estimate at all times between Q2 2010 and the end of 2011, as I confirmed to First Solar management throughout that time period.

**Customer Communications**

20.    Beginning in July 2009 and continuing into the autumn, First Solar sent letters to its largest customers, distributors, and installers, advising them of the manufacturing excursion and of its offer to remediate affected sites.  These communications included notice of a September 30, 2010 deadline for submitting remediation claims.  First Solar also asked these entities to relay the remediation offer

and the September 2010 claim deadline, which was later extended to November 2010, to their ultimate customers.

**Estimates of the Number of Modules Necessary to Remediate the LPM Defect That Supported First Solar's Accruals**

21. I was also responsible starting in Q2 2009 for providing First Solar management with estimates of the number of modules that would be required to remediate customer sites that had been adversely impacted by LPMs. As discussed above, in Q2 2009, we believed we could identify LPMs by serial numbers and replace only those modules. I provided the LPM population estimate to individuals in the finance department, who I understand used the figure to calculate the accrual booked in Q2 2009 to cover LPM remediation expenses.

22. After Q2 2009, we revised our assumptions about the total number of modules that we would have to replace in the field, beyond the actual LPMs. This was done, among other reasons, to reflect our experience remediating sites that contained modules produced during the manufacturing excursion. These new assumptions were reflected in algorithms that the company developed and applied at various times between Q3 2009 and Q3 2011 to estimate the ultimate number of modules required for remediation and the associated dollar accruals recorded in First Solar's financial statements. These algorithms incorporated our best engineering judgments and experience in the field, including:

a. Probability of performance calculations, which refer to the likelihood that a site had a sufficient concentration of LPMs to cause a detectable field performance issue and qualify for remediation.

b. Hit rate calculations, which refer to the percentage of returned modules that were LPMs. It was expected (and proved to be the case) that in order to actually remediate underperforming sites, it would be necessary to remove more than the LPMs. For small rooftop sites, which usually contained hundreds of modules, we determined that it was more efficient to replace all of the modules rather than

search for LPMs individually.  Similarly, for large free-field sites, which sometimes contained hundreds of thousands of modules, power losses were typically detected at the level of an inverter that would be fed by numerous "strings" of 10 or more modules.  Efforts to specifically identify the LPMs within those strings were not cost effective and therefore were generally not undertaken.

23. Applying these principles, I prepared quarterly estimates, starting in Q3 2009 and continuing through Q3 2011, of the number of replacement modules the company would need to complete the LPM remediation program.  These estimates were based upon the best data available to the company in each quarter, were provided to management, and were updated on a regular basis.

24. Starting in Q3 2009 and continuing through Q3 2010, the company used an algorithm reflected in a basic spreadsheet to determine the number of modules that would be necessary to remediate the LPM defect.  I provided the basic inputs to that model, which was maintained by John Amonett, an employee in First Solar's finance department.  The input numbers that I provided—LPM population estimates, probability of performance, and hit rates—drove the output of the model.  Those inputs all reflected my best, honest engineering judgments.

25. As of Q2 2010, we had completed remediation of more than two dozen of the approximately 150 sites that had been claimed, but our remediation experience in the field reflected lower hit rates than we had anticipated in Q1 2010.  Exhibit 67 is a true and correct copy of a July 11, 2010 memorandum that my staff and I prepared to analyze our hit rate experience in the field.  We prepared this memorandum as part of our duties related to the LPM remediation program, and it was kept in the ordinary course of our business.  Based on this analysis, we revised the hit rate calculations in the model, which entirely drove the increased remediation estimate for Q2 2010.  We did not revise our remediation estimates in Q3 2010.

26. In the final weeks before the expiration of a November 30, 2010 deadline for customers to submit remediation claims, First Solar received over 5000 new claims,

most of which were not accompanied by supporting data. That compared to a total of less than 400 claims received through October 2010. I believed that the vast majority of these "preemptive" claims would be denied because (1) we had already undertaken significant remediation efforts; (2) in total the claims encompassed over 1.2 gigawatts of production, which represented more modules than we had manufactured in the excursion period; and (3) the absence of supporting data indicated that the customers had not identified any performance issue at the site.

27.    Starting in Q4 2010 and continuing through Q3 2011, the growing volume of data that we had collected from measurements of returned modules enabled us to employ a well-recognized statistical Monte Carlo model to accomplish this estimation task. I provided the inputs to the Monte Carlo model, which included suspect population estimates, probability of performance, and hit rates. As in the prior model, these inputs reflected my best engineering judgment applied to the most current data the company had available to it.

28.    The Monte Carlo simulation was designed to generate conservative estimates of the likely number of modules needed for remediation. Unlike my prior models, the Monte Carlo simulation was not designed to estimate the number of LPMs, which remained at 450,000, according to my and the company's best estimate.

29.    The Monte Carlo model instead started with a theoretical suspect population representing the number of modules that could exhibit power output of 15% or more below nameplate, if each of the approximately 11.8 million modules manufactured by First Solar between June 2008 and June 2009 was pulled from the field, returned to the factory, and measured without being preconditioned or otherwise corrected for dark soak. (Dark soak refers to a characteristic common to all First Solar modules whereby the power output of a module is reduced by approximately 5% when stored without exposure to sunlight. The module recovers its full output over a period of several weeks or more after installation and exposure to sunlight.) That approach was conservative, among other reasons, because it did not differentiate LPMs from modules

that experienced power loss for other reasons, including standard distribution inherent in First Solar's regular manufacturing process, improper installation and/or maintenance practices, and other root causes.

30.    Using the Monte Carlo model, we estimated in Q4 2010 that First Solar would need approximately 85 MW of replacement modules to complete the remediation program.  This remained our remediation estimate through Q1 2011.  We re-ran the model in Q2 2011 and Q3 2011 with updated data from the field, and increased our estimate to approximately 92 MW and 133 MW, respectively.

31.    In Q3 2011, in addition to running the updated Monte Carlo model, TK Kallenbach and I performed a bottom-up empirical analysis to estimate the total LPM remediation need based on site-specific data.  This involved differentiating claims based on LPM power loss from claims based on power loss caused by other root causes, including open circuit and initial stabilization issues.  This analysis formed the basis of the Q3 2011 LPM remediation accrual.

32.    Using the models and processes described above, I participated in the development of quarterly estimates of the number of modules needed for the LPM remediation program for each quarter from Q2 2009 through Q3 2011.  I understood at all times that these estimates formed the bases for LPM accruals that First Solar was including in its financial statements, and starting in Q2 2010, described in the discussion section of its quarterly filings.  The numbers that I provided to First Solar management each quarter represented my best estimate of the LPM remediation needs.  I believed at the time and continue to believe today that those numbers constituted a fair and reasonable basis upon which First Solar should base its accruals.

**Warranty Accruals**

33.    Throughout the Class Period, First Solar provided two standard warranties to customers that purchased modules: a workmanship warranty and a performance warranty.  Exhibit 63 is a true and correct copy of the warranty we provided to our customers.  With the exception of First Solar's extension of the workmanship warranty

from five years to ten years in or around September 2011, the terms of the warranties did not change throughout the Class Period.

34.    In my capacity as Vice President of Global Quality, I, along with my staff, conducted periodic reviews of historical performance, accelerated life test data, and returns data, and ran statistical analyses to determine expected failure and return rates under First Solar's workmanship and performance warranties.  We regularly performed these analyses.

35.    Through Q3 2011, we determined that the company's existing warranty accrual rates—1.32% for the workmanship warranty and 0.5% for the performance warranty—were reasonable and consistent with available performance and returns data. For each warranty, we regularly documented our analyses in white papers that were provided to individuals in the accounting department, including James Zhu and Bryan Schumaker, who I understand relied on the white papers to ensure the adequacy of the company's warranty accruals.

36.    In one such white paper, on or around April 26, 2011, my staff and I analyzed whether First Solar's existing performance warranty accrual rate was sufficient to absorb expected returns from recent hot climate installations.  We concluded at that time that the warranty accrual rate was adequate.  Exhibit 75 is a true and correct copy of the original white paper that documents this analysis.

37.    In early 2012, I worked with Dave Eaglesham and Tom Kuster to again evaluate the adequacy of the performance warranty accrual rate for modules installed in hot climates.  We ultimately determined that it would be prudent to increase the accrual rate by one percentage point—from 0.5% to 1.5%.  This increase was based on several considerations, including new hot climate data that the Company collected in response to a white paper prepared in the spring of 2010.  Following up on the issues raised in the white paper, we started a program in the summer of 2010 of swapping out modules from large, utility-scale sites that First Solar had recently commissioned in the desert Southwest.  Modules were removed from these sites on a regular basis and returned to the

factory for testing.  By the fourth quarter of 2011, we had collected enough data to allow us to create a new, statistically significant analysis of module performance in hot climates.  This new analysis was one of the factors that I relied on in approving the one percentage point increase to the performance warranty accrual rate.  Exhibit 82 is a true and correct copy of a January 24, 2012 memorandum titled "Failure Analysis and Rates of Return for Warranty," which documents the justification for increasing the performance warranty accrual rate by one percentage point.  I, together with Dr. Eaglesham and Mr. Kuster, reviewed and signed off on this memorandum in February 2012.

38.    Our warranty analyses were based entirely upon honest engineering and scientific judgment and were never compromised by any instruction, direction, pressure, or influence from company management, including each of the named defendants in this action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27 day of MARCH 2015    in WHITEHOUSE , OHIO .

_____
MICHAEL KORALEWSKI

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/*Rosemary Barajas*
**Rosemary Barajas**