James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, AZ 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>                              Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>                              Defendants. | CASE NO.   CV12-00555-PHX-DGC<br><br>**DECLARATION OF BRYAN SCHUMAKER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

SCHUMAKER DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT
sf-3520471

I, BRYAN SCHUMAKER, declare as follows:

1.     I submit this Declaration in support of the defendants' motion for summary judgment.  My declaration is based on facts that I personally know.  Unless I state otherwise, all of my statements in this declaration refer to the time period between April 30, 2008, and February 28, 2012, which I understand is the class period in this case.  For the convenience of the Court, my declaration includes topical headers that correspond to my background and the issues presented in defendants' summary judgment motion.  If called as a witness, I could testify to the following facts:

**Background**

2.     I hold a bachelor's degree in Accounting from the University of New Mexico.

3.     I am a certified public accountant (CPA).  I obtained my CPA license in 2001.  My Arizona license certificate number is 12004.

4.     Before joining First Solar, I had extensive accounting and auditing experience.  Between February 1999 and December 2000, I was a senior audit associate at a BDO Alliance firm, Semple and Cooper, LLP, where I had substantial auditing responsibilities.  From December 2000 through January 2003, I was a Supervising Senior at KPMG, where I engaged in process and analysis and development of controls over key accounting functions, prepared and reviewed annual reports and quarterly filings for publicly traded companies, and conducted audits.  From February 2003 through April 2008, I worked in several positions and ultimately as Vice President Corporate Controller for Swift Corporation, where my responsibilities included, among others, overseeing the monthly close, reviewing the accuracy of the consolidated financial statements, engaging in financial planning and analysis, including forecasting, for all segments of the business, serving as Chairman of the Disclosure Committee, presenting to the audit committee on a quarterly basis, budgeting, implementing internal controls and Sarbanes Oxley requirements, and developing an internal audit department.

5.    I am currently employed as a Vice President, Corporate Controller at First Solar.  I have held this position since January 2012.  From April 2008 to December 2011, I was the Assistant Corporate Controller at First Solar.  During the class period, my primary responsibilities at First Solar were to:

(a)    Manage corporate accounting operations and interface with segment and site-level controllers;

(b)    Ensure the timely and proper close of First Solar's worldwide consolidation process in accordance with Generally Accepted Accounting Principles, referred to in my declaration as GAAP;

(c)    Provide corporate oversight over the worldwide accounting processes, including inventory, warranty, special reserves, the general ledger, all relevant sub-ledgers, and consolidations;

(d)    Ensure compliance with corporate finance policies and the proper execution of controls established in First Solar's control documentation;

(e)    Assess and update the design and execution of First Solar's control environment;

(f)    Manage the coordination of the quarterly review and annual audit process with the external auditor; and

(g)    Assist the Corporate Controller with the preparation and review process associated with First Solar's filing of Forms 10-Q and 10-K with the Securities and Exchange Commission (the SEC).

**First Solar's Close Process**

6.    When I joined First Solar in April 2008, the company had a well-established process in place to consolidate, reconcile, and review its financial results.  This process was, and still is, referred to as the close process.  I have participated in or supervised First Solar's close process every month and every quarter since April 2008.  Based on that experience, I am knowledgeable about the close process.  In the following paragraphs, I briefly summarize the close process.

7. First Solar's multiple manufacturing facilities and operating segments each maintain separate accounting functions and accounting records. This means that transactions for these entities are recorded separately at each site. Throughout the class period, on a monthly basis, First Solar's finance and accounting teams performed a worldwide consolidation of the accounting records maintained by each of these entities. Accountants at each location performed general ledger, or GL, maintenance activity, evaluated the preparation, documentation, and support for First Solar's journal entries, and analyzed each account appearing on the GL. Local plant accountants reconciled all GL balance sheet accounts that had a beginning balance, ending balance, or account activity in the quarter.

8. Building on the work done by the Corporate Controller and local site and segment accountants, the controllers of these entities submitted financial data in a standardized template, referred to as a close deck. The close decks included income statement, balance sheet, inventory, and fixed assets for their respective entities. These close decks were reviewed and analyzed by me, the Director of Financial Planning and Analysis (FP&A) the Manager of Corporate Reconciliations, and the Director of SEC Reporting. As part of the review, we analyzed:

(a) Any material variations between the monthly income statements and forecasted income statements;

(b) Any material variations between the monthly balance sheet and prior balance sheets; and

(c) The accuracy and completeness of the trial balance and consolidation reports prepared by the plant and segment controllers.

9. The results of this close process were then presented to the Chief Financial Officer, or CFO, in what we called the CFO close deck. The CFO close deck presentation contained a review of key financial and operating metrics and significant transactions at both the corporate and site level. Members of the CFO's staff, including leaders of the FP&A, Tax, Treasury, and Controller's groups, attended this meeting, reviewed the

presentation with the CFO, highlighted remaining open items, and answered questions arising from the review.

10.    On a quarterly basis, First Solar's finance and accounting teams performed additional procedures designed to consolidate and reconcile the company's worldwide accounting functions maintained by the manufacturing facilities and operating segments, for purposes of preparing First Solar's publicly reported consolidated financial statements. On a quarterly basis, accountants at each location performed analyses of key financial metrics, including comparisons of:

      (a)    Current quarter profit and loss (P&L) vs. prior quarter P&L;

      (b)    Current quarter P&L vs. forecasted and budgeted P&L; and

      (c)    Current quarter balance sheet vs. prior balance sheet analysis

11.    The results of these analyses were presented to me, the Corporate Controller, the Director of FP&A, and the Director of SEC Reporting.  We verified that the results were accurate and complete.

12.    The final product of this close process following each quarter was used by the SEC Reporting team to prepare the consolidated financial statements that First Solar reported in its quarterly and annual filings on Forms 10-Q and 10-K with the SEC.

**<u>Revenue Recognition</u>**

13.    One of my responsibilities at First Solar has been to apply accounting rules with respect to revenue recognition for the sale of modules.  First Solar recognized the net sale price of its modules as revenue pursuant to GAAP, as set forth in Accounting Standards Codification 605-10-S99.  Exhibits[1] 56 and 61 include true and correct copies of First Solar's revenue recognition policy, as effective June 2008, and as updated December 2009, respectively.  The updated policy was effective for the remainder of the Class Period.

---

[1] All exhibit references in this Declaration are to the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment.

**Warranty Accrual**

14.     In each quarter of the class period, First Solar calculated its standard warranty accrual by estimating the expected future costs associated with satisfying its standard warranty obligation.  First Solar recorded its estimated future warranty costs as an accrued expense, pursuant to Accounting Standards Codification 460-10-25-6.  The accrued expenses were sometimes called an "accrual" or a "reserve" on First Solar's balance sheet.

15.     In estimating these future costs during the class period, the company followed a procedure established before the class period.  As part of this process, the quality department provided anticipated return rates for the two distinct components of the warranty: workmanship and power output.  These anticipated return rates were reviewed regularly by the quality department and presented to the finance department in a formal memorandum that was reviewed and approved by the Vice President of Global Quality.  Mike Koralewski served in that role for most of the class period.  While I did not personally prepare these estimates or perform the underlying analyses supporting the anticipated return rates, I believed—based on my meetings and conversations with Mike Koralewski and other members of the quality team, and my review of the information that they provided—that their estimates were reliable, thorough, accurate, and trustworthy.  For that reason, I relied on the return rate estimates when calculating warranty reserves.

16.     Accountants at each manufacturing site entered historical cost and the anticipated return rate provided by the quality department into a financial model to generate an accrual for the quarter.  The accountants then provided the result to the Corporate Controller's group.  In my role as Assistant Corporate Controller, I consolidated these accruals.

17.     The standard warranty accrual from the prior period was rolled forward and then updated to incorporate the current period estimate, subject to review, approval, and auditing processes.

18.    I personally reviewed the standard warranty accrual every quarter during the class period.  Based on my review, I believed that each quarter's accrual was prepared in accordance with GAAP and represented First Solar's best estimate of the total future costs associated with its standard warranty obligations.

19.    Additionally, in my role as Assistant Corporate Controller, I performed periodic detailed analyses and reconciliations of the standard warranty accrual, the underlying methodology, and its compliance with GAAP.  These analyses were documented in a warranty rate memorandum that was sent to, and discussed with, First Solar's independent auditors at PwC.  I prepared three of these analyses during the class period before the fourth quarter of 2011, and another as part of the fourth quarter of 2011 close process.  Exhibits 57, 73, 79, and 85 are true and correct copies of the warranty rate memoranda that I prepared on September 30, 2008, February 15, 2011, September 27, 2011, and February 24, 2012, in the ordinary course of my duties, respectively.

20.    At no time was I instructed or pressured to lower, manipulate, or improperly alter the standard warranty accrual.

**LPM Accrual**

21.    In approximately June 2009, I became aware of a quality issue that was described by First Solar's engineering and quality teams as a manufacturing excursion.  My understanding is that the engineering and quality teams determined that a small percentage of modules manufactured between June 2008 and June 2009 under specific manufacturing conditions could experience premature power loss of 15% or more within the first several months of installation.

22.    In November 2009, First Solar made commitments to its customers to identify and replace modules affected by the manufacturing excursion.  This commitment went above and beyond the contractual obligation arising from First Solar's standard warranty in that First Solar decided to remediate LPM modules by covering the costs associated with identifying, removing, and testing modules at customer sites, as well as

the costs of reinstallation of replacement modules. The standard warranty did not cover these costs, which we called "reverse logistics costs" or "rip and replace" expenses.

23. First Solar accrued for the expected future costs associated with reverse logistics services offered as part of the LPM remediation program. These costs were accrued separately from, and in excess of, First Solar's standard warranty obligation, because they went above and beyond the contractual obligations set forth in the terms and conditions of First Solar's standard warranty. For ease of reference in this declaration, I refer to this special accrual in excess of First Solar's standard warranty accrual, as the LPM accrual.

24. One of my responsibilities was to make sure that First Solar properly accounted for both the warranty and above-warranty costs of remediating the LPM manufacturing excursion, and to make sure that First Solar's accounting for those costs complied with GAAP.

25. The LPM accrual that First Solar recorded for the LPM remediation efforts was the product of a quarterly collaborative, bottom-up effort of the quality, product management, FP&A, and accounting teams.

26. The costs for replacement modules used in the LPM remediation process were covered by and reflected in First Solar's standard warranty accrual. First Solar accounted for the shipment of LPM replacement modules by recording a credit, or reduction, to inventory for the cost of the replacement modules, and recording a corresponding debit, or increase, to cost of sales on the income statement, which was then reclassified to the warranty expense, a component of cost of sales.

27. On a quarterly basis, I reviewed and evaluated First Solar's accounting for replacement modules shipped, modules expected to be shipped, modules that were returned from customer sites, and modules expected to be returned from customer sites, in connection with the LPM remediation, as discussed below. Based on my review, it was my belief and judgment that First Solar's accounting treatment was reasonable and correct under GAAP for every quarter.

28.     Beginning in the fourth quarter of 2009, modules returned from customer sites that tested within label specifications (+/-5% of label power output rating) were put back into inventory, valued at the lower of cost or market, LCM for short, with a corresponding credit, or reduction, to the warranty expense. This had the effect of offsetting the warranty expense of the associated replacement module. Before the fourth quarter of 2010, modules that tested with measured power loss between 5% and 20% were put back into inventory at zero value (these modules were referred to as "refurbished" or "refurbs"). Modules with a measured power loss greater than 20% were scrapped. In the fourth quarter of 2010, First Solar established a precedent for the sale of the refurbished modules, through the sale of approximately 20.7 megawatts of refurbished modules to customers for approximately $20.5 million. As a result, consistent with GAAP rules governing inventory, the company began to value the refurbished modules, based on an LCM analysis. Until the fourth quarter of 2011, First Solar's LCM analysis valued the refurbished modules and modules that tested within label specifications at the then current production cost, which was lower than the original cost to produce the refurbished modules. As of the fourth quarter of 2011, as a result of falling average selling prices and reduced demand, the LCM analysis required First Solar to value the refurbished modules and modules that tested within label specifications at their market price, which was then below the production cost. In my judgment, the fourth quarter 2011 valuation complied with GAAP. At my direction and as part of the fourth quarter of 2011 close process, members of my team prepared a memorandum documenting First Solar's fourth quarter of 2011 LCM analysis. It was First Solar's regular practice to prepare these types of memoranda to document and support accounting estimates and judgments. I reviewed the memorandum in my role as First Solar's Corporate Controller, and I relied on the information contained in the memorandum to perform my job responsibilities. I also provided a copy of the memorandum to PwC. Exhibit 84 is a true and correct copy of this memorandum, dated February 23, 2012.

29.     On a quarterly basis, beginning in the second quarter of 2009, Mike Koralewski and his team provided the finance and accounting teams with estimates of the total number of modules needed to be replaced as part of the LPM remediation program.  This estimate included both modules that were affected by the LPM manufacturing excursion and modules that were not affected by the LPM manufacturing excursion that were expected to be recovered in connection with the remediation efforts. Beginning in the second quarter of 2010, Mike Koralewski worked with TK Kallenbach, the Executive Vice President of Marketing and Product Management, who was then overseeing the LPM remediation efforts, to provide these estimates.  The estimates were presented in email communications or PowerPoint presentations.  Each quarter, I met with or had discussions with the quality and engineering teams to understand and test their estimates and assumptions.  Based on those conversations, meetings that I attended, and my review of the information that I requested or received, I believed that their assumptions and analyses were sound and that they reached reasonable conclusions to support their estimates.

30.     To calculate the dollar amount of the accrual to be recorded for the LPM remediation, I, along with members of the FP&A team, multiplied the number of modules needed to be replaced as part of the LPM remediation program by the per module cost of the LPM remediation program.  These cost assumptions were based on First Solar's historical and predicted costs for a variety of elements of the remediation process, including but not limited to labor, third party contractors, identification costs, box costs, material costs, and shipping costs.  I reviewed and assisted with the preparation of these assumptions on a quarterly basis.

31.     In each quarter, beginning with the first LPM accrual in the second quarter of 2009, I personally reviewed the LPM accrual and believed that the cost assumptions underlying the LPM accrual were First Solar's best estimates of the costs associated with concluding the LPM remediation program.  Based on my review, I determined and believed that each quarter's LPM accrual was prepared in accordance with GAAP.

SCHUMAKER DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT
sf-3520471

9

32.    For the second quarter of 2009, the result of this process and calculation described above in paragraphs 29-31 was an estimated total remediation cost of $1.8 million, which was recorded as a liability, or accrual, and also was a component of First Solar's cost of sales that was reported in the company's Form 10-Q for the second quarter of 2009.   The LPM accrual reduced net income from $182 million to $180 million for the quarter.  Before the 10-Q was filed with the SEC, I reviewed the accrual balance and the underlying calculations.  I determined that they were reasonable and prepared in accordance with GAAP.  Based on information I received from, and discussions that I had with, Mike Koralewski and his team in connection with the second quarter 2009 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

33.    For the third quarter of 2009, the result of this process and calculation described above in paragraphs 29-31 was an estimated $2.2 million increase in the total LPM accrual.  This increase was recorded as a liability, or accrual, and was a component of First Solar's cost of sales, which was reported in First Solar's Form 10-Q for the third quarter of 2009.  Net income for the third quarter of 2009, by contrast, was $153 million. Before the 10-Q was filed with the SEC, I reviewed the accrual balance and the underlying calculations.  I determined that they were reasonable and prepared in accordance with GAAP.  Based on information I received from, and discussions that I had with, Mike Koralewski and his team in connection with the third quarter 2009 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

34.    For the fourth quarter of 2009, the result of this process and calculation described above in paragraphs 29-31 was an estimated $3.1 million increase in the total LPM accrual.  This increase was recorded as a liability, or accrual, and was a component of First Solar's cost of sales, which was reported in First Solar's Form 10-K for 2009.

The $3.1 million increase to the accrual compared to net income for the quarter of $141 million. Before the 10-K was filed with the SEC, I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski and his team in connection with the 2009 year-end close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

35.     For the first quarter of 2010, the result of this process and calculation described above in paragraphs 29-31 was an estimated $4.5 million increase in the total LPM accrual. This increase was recorded as a liability, or accrual, and was a component of First Solar's cost of sales, which was reported in First Solar's Form 10-Q for the first quarter of 2010. The $4.5 million increase to the LPM accrual for the quarter compared to net income of $172 million for the first quarter of 2010. Before the 10-Q was filed with the SEC, I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski and his team in connection with the first quarter 2010 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

36.     For the second quarter of 2010, the result of this process and calculation described above in paragraphs 29-31 was an estimated $17.8 million increase in the total LPM accrual. This increase was recorded as a liability, or accrual, and a component of First Solar's cost of sales, which was reported in First Solar's Form 10-Q for the second quarter of 2010. The accrual was also separately identified in the Results of Operations section of the 10-Q, and the footnotes to the financial statements. Additionally, in certain instances, First Solar provided certain customers with power compensation payments. These payments were made by First Solar to a customer based on the underperformance

of a site with modules from the LPM manufacturing excursion from the time the site was energized to the time the site was remediated. For the second quarter of 2010, First Solar accrued $5.6 million (in addition to the $17.8 million expense discussed above) relating to the estimated nonrecurring post-sale expenses related to this power compensation. The power compensation payment was classified as a sales, general, and administration expense (SG&A) based on a determination that the power compensation payments were settlements with customers treated as customer goodwill, and not linked to warranty obligations. Before the 10-Q was filed with the SEC, I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski, TK Kallenbach, and their teams in connection with the second quarter 2010 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

37.    For the third quarter of 2010, the result of this process and calculation described above in paragraphs 29-31 was First Solar's determination that no increase to the LPM accrual was necessary. Before the 10-Q was filed with the SEC, I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski, TK Kallenbach, and their teams in connection with the third quarter 2010 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

38.    In the fourth quarter of 2010, First Solar continued to analyze the LPM accrual according to the process discussed above in paragraphs 29-31. The only change to the process was that First Solar started using a Monte Carlo model to estimate the total remediation need associated with the LPM remediation program. I familiarized myself with the Monte Carlo method and understood that it used a standard statistical approach

for triangulating data. The specific Monte Carlo model that First Solar used was designed by Mike Koralewski, TK Kallenbach, and their teams. The result of the Monte Carlo model estimates that they generated was presented to the FP&A team and me for purposes of calculating the fourth quarter of 2010 LPM accrual. The Monte Carlo model estimated that approximately 85 megawatts, the equivalent of approximately 1.134 million modules, of remediation was necessary to complete the LPM remediation program. The finance and accounting teams applied updated cost assumptions to this number and determined that the LPM accrual needed to be increased by approximately $8.5 million. This amount was recorded as a liability and was a component of First Solar's cost of sales, which was reported in First Solar's Form 10-K for the first quarter of 2010. The accrual was also separately identified in the Results of Operations section of the 10-K, and in the footnotes to the financial statements. I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski, TK Kallenbach, and their teams in connection with the 2010 year-end close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

39. In the first quarter of 2011, as a result of the process described in paragraphs 29-31 and 38, I determined that no increase to the LPM accrual was necessary. I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski, TK Kallenbach, and their teams in connection with the first quarter 2011 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

40. In early July 2011, I received a report that indicated that First Solar had shipped more replacement modules as part of the LPM remediation program than the total

number that had been predicted by First Solar's Monte Carlo modeling in the first quarter of 2010. I raised this issue with TK Kallenbach, Mike Koralewski, and Corporate Controller James Zhu, among others. During the month of July, a working group led by TK Kallenbach, Mike Koralewski, James Zhu, and me developed an updated estimate of the total costs associated with the LPM remediation program. On approximately July 24, 2011, the working group prepared a memorandum, which was sent to PwC, summarizing First Solar's review. It was First Solar's regular practice to prepare status review memoranda and similar types of documentation to support First Solar's entries and accounting estimates. I participated in the creation and review of this document in my role as Assistant Corporate Controller, and I relied on the information contained in the memorandum to perform my job responsibilities. Exhibit 76 is a true and correct copy of this Q2 2011 memorandum.

41. Before First Solar filed its Form 10-Q for the second quarter of 2011, the working group determined—based on an updated estimate of total replacement modules that was provided by Mike Koralewski and TK Kallenbach—that the accrual needed to be increased. TK Kallenbach informed me in connection with the second quarter 2011 close that a total of 92 megawatts was needed to complete the LPM remediation, which was 7 megawatts more than was expected as of the end of the first quarter of 2011. Based on that information, I updated the calculations of the LPM accrual, increasing it by approximately $3.6 million. The increase to the LPM accrual was reported in First Solar's Form 10-Q for the second quarter of 2011 as a component of First Solar's cost of sales. The accrual was also separately identified in the Results of Operations section of the 10-Q, and the footnotes to the financial statements. Based on the work that the working group performed and my conversations with Mike Koralewski and TK Kallenbach, I believed that this was the best estimate of the total costs associated with the LPM remediation program and determined that the accrual was reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski, TK Kallenbach, and their teams in connection with the second

quarter 2011 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

42.     In early September 2011, TK Kallenbach informed Mark Widmar (the CFO), James Zhu and me that more modules would be needed to complete the LPM remediation program than were expected when we recorded the second quarter 2011 LPM accrual. Based on my discussions with TK Kallenbach in the previous quarter and the analyses that we performed during the second quarter 2011 close, I was surprised by this increase. It was my understanding that the increase was the result of an empirical analysis of the remaining open LPM remediation claims performed by Mike Koralewski and TK Kallenbach. TK Kallenbach informed Mark Widmar, James Zhu, and me that his updated estimate of 120 megawatts in total remediation needs would be sufficient to conclude the LPM remediation. Based on TK Kallenbach's update, I calculated and recorded an increase to the LPM accrual of approximately $22.1 million, which was a component of First Solar's cost of sales and was reported in First Solar's Form 10-Q for the third quarter of 2011. The accrual was also separately identified in the Results of Operations section of the 10-Q, and the footnotes to the financial statements.

43.     As part of TK Kallenbach's review of the third quarter of 2011 accrual, he also determined that additional power compensation payments would be made to customers. I reviewed TK Kallenbach's analysis and determined that an additional accrual of approximately $8.6 million was necessary. The power compensation charge was classified as an SG&A expense.

44.     TK Kallenbach also identified certain sites that were experiencing power loss caused by issues that were unrelated to the LPM manufacturing excursion but had been remediated as part of the LPM remediation program or would be remediated in the future. Based on the analysis performed by TK Kallenbach, I calculated that the cost in excess of warranty associated with the remediation of these sites was approximately $16.2 million. The accrual for these sites was reported in First Solar's Form 10-Q for the third

SCHUMAKER DECL. IN SUPPORT OF DEFS.' MOT. FOR SUMMARY JUDGMENT                                    15
sf-3520471

quarter of 2011. Before the 10-Q was filed with the SEC, I reviewed the accrual balance and the underlying calculations. I determined that they were reasonable and prepared in accordance with GAAP. Based on information I received from, and discussions that I had with, Mike Koralewski, TK Kallenbach, and their teams in connection with the third quarter 2011 close, I did not believe that it was reasonably possible that there would be any material increase in the number of modules that would be needed to complete the LPM remediation or any material increase in the LPM accrual.

45.     At the end of the fourth quarter of 2011, after TK Kallenbach left the company, Tom Kuster, the Vice President of Systems Development, assumed responsibility for overseeing LPM remediation efforts. I worked with Tom Kuster and depended on the analyses of his team to calculate the appropriate accrual for the fourth quarter of 2011.

46.     Under Tom Kuster's leadership, the remediation team focused on commercial solutions as an alternative to continuing the rip and replace efforts that the company had pursued since 2009. My understanding from attending meetings, having conversations, and reviewing reports and information from Tom Kuster and his team was that the commercial solutions were appropriate in light of changing market conditions in the fourth quarter of 2011, and in light of additional data that became available in the fourth quarter regarding performance at customer sites. Further, Tom Kuster's team conducted a site-by-site analysis to update the estimates for remediating the LPM modules in light of data that became available during the fourth quarter of 2011.

47.     As a result of the analyses performed by Tom Kuster and his team during the fourth quarter close, First Solar increased the LPM accrual by approximately $23.9 million, which was included in the reported cost of sales. In addition, First Solar incurred a $70.1 million product warranty expense, reflecting an increase in the expected number of replacement modules needed, and the lower market value for refurbished modules expected to be recovered as part of the LPM remediation program. First Solar also

increased its power compensation accrual by $31.8 million. The power compensation accrual for the fourth quarter of 2011 was again classified as an SG&A expense.

48.    Because of this increase to the accrual for the fourth quarter of 2011, as part of First Solar's standard procedures and at the request of the Chair of the Audit Committee, Tom Presby, my team, along with Internal Audit, performed an analysis of the increase, and investigated whether any out-of-period adjustments were necessary. Along with members of my team, I worked with the product management and customer service teams to analyze First Solar's previous quarter accruals and commitments made to customers under the LPM remediation program. After performing a retrospective analysis of quarterly claim activity, we concluded that First Solar's second quarter of 2011 and third quarter of 2011 LPM accruals were materially accurate. As part of this process, I documented First Solar's review in a memorandum that was shared with PwC. It was First Solar's regular practice to prepare this type of memorandum to document accounting estimates and judgments. I prepared this memorandum as part of my job responsibilities as First Solar's Corporate Controller, and I relied on the information contained in the memorandum to perform my responsibilities during the fourth quarter of 2011 close process. Exhibit 86 is a true and accurate copy of this memorandum dated February 28, 2012.

49.    As part of the above analysis, we determined that approximately $4.07 million of LPM related costs were improperly recorded in the third quarter of 2011, instead of the second quarter of 2011. My team performed an analysis and prepared a memorandum under SEC Staff Accounting Bulletin 99 (SAB 99) to determine if this error was material to First Solar's financial statements. After performing the quantitative and qualitative analyses of the error required by SAB 99, my team and I determined that the error was not material to First Solar's financial statements in the second quarter of 2011 or third quarter of 2011. First Solar's SAB 99 memorandum and analysis was shared with the Audit Committee and PwC. PwC reviewed First Solar's analysis and performed its own SAB 99 analysis, and agreed with management's conclusion that the error was not

material.

50. Based on the review that my team and I performed for the fourth quarter of 2011 before filing First Solar's 10-K with the SEC for 2011, I believed that First Solar's LPM accruals throughout the class period were materially accurate based on the information that was known at the time they were recorded.

**Cost-per-Watt**

51. Cost-per-watt, which is called CpW, was a metric that First Solar used to measure the cost of manufacturing a watt of electricity during a given period. The FP&A group was responsible for calculating, analyzing, and preparing reports and other information regarding CpW that were regularly distributed to various people at First Solar, including me. I relied on the accuracy of the information about CpW that I received from the FP&A team in performing my job and believed that it was accurate. Exhibits 62 and 71 are true and correct copies of CpW policy statements that were prepared by FP&A in or around February, 2010, and January, 2011, and received by me around the same time in the ordinary course of my duties.

**First Solar's Process for Preparing Public Statements**

52. As long as I have been employed by First Solar, we have adhered to a process for preparing the Forms 10-Q, 10-K, earnings press releases, and quarterly conference call presentations and scripts. The disclosure process has been coordinated by the Disclosure Committee. I am a member of the Disclosure Committee. During the class period, I was a member of the Disclosure Committee and participated in its regularly-scheduled meetings. Based on my membership on the Disclosure Committee, the responsibilities that I had serving on the Disclosure Committee, the meetings that I attended, and in light of documents I reviewed, I have an extensive understanding of the purpose, function, and practices of the Disclosure Committee, which I summarize below.

53. The Disclosure Committee is a multi-disciplinary committee created specifically to implement the internal control procedures for assessment and attestation of the company's disclosures in periodic SEC filings, and related earnings releases and

conference calls.  During the class period, the Disclosure Committee consisted of approximately fifteen to twenty members (depending on the period) and included senior employees from all of the key areas of the company.  The members of the Disclosure Committee included the CFO, each Executive Vice President, the General Counsel, the Vice President of Human Resources, the Corporate Controller, the Vice President of Investor Relations, the head of internal audit, the Chief Corporate Counsel, the Chief Executive Officer's direct reports, and other subject matter experts.

54.    For each quarter, the Disclosure Committee met three times.  The first Disclosure Committee meeting occurred within a few days of the close of the quarter.  During this meeting, Committee members discussed the quarter close, significant transactions, and significant events for potential inclusion in the filing.  The Disclosure Committee also received input from various corporate departments and business leaders about sections of the Management Discussion and Analysis, called the MD&A portion of the SEC filing, and notes to the financial statements.

55.    Following this initial meeting, the SEC Reporting group populated an SEC financial filing template, based on the prior-period filing that was updated with the current quarter's financial results.  The company's Accounting, FP&A, Legal, Tax, and Treasury groups sent information necessary for the preparation of the filings to the SEC Reporting Department.

56.    For most of the class period, the members of the SEC Reporting group that were primarily responsible for the preparation of the first drafts of the Forms 10-Q and 10-K, and for incorporating subsequent comments and revisions suggested by others, were April Brady, an SEC Reporting Analyst, and Richard Mittermaier, the Director of SEC Reporting.

57.    Pursuant to Section 302 of the Sarbanes-Oxley Act, SOX for short, First Solar's CEO and CFO signed certifications that stated, in part, that, to the best of their knowledge, the financial statements fairly presented the company's financial

condition; that they were responsible for establishing and maintaining disclosure controls and procedures; and that the disclosure controls and procedures were effective.

58.     To support these certifications, First Solar had in place an extensive sub-certification process that was designed to ensure the accuracy of the company's SEC filings.  I supervised the SOX and SEC Reporting teams that were responsible for administering this process at various points during the class period, and participated in the process throughout the class period.  Based on experiences in having that responsibility, including reports that I reviewed, meetings I attended, and discussions that I had, I am familiar with how First Solar administered, processed, and handled sub-certifications and discuss that process below.

59.     At the end of the quarter, the SOX team electronically circulated sub-certification requests to all employees with titles of director and above, as well as individuals who provided material information for the filings.  The SOX team required responses from all individuals within a week after the close of the quarter, and then also required a "refresh" response a week before the filing of a 10-Q or 10-K with the SEC.

60.     The sub-certifications were customized, to an extent.  The sub-certifications that were sent to an employee reflected that employee's role within the company.  For example, an associate in the finance group would receive sub-certification requests concerning, among other things, the "iron curtain" analysis of balance sheet accounts, while an associate in the human resources group would receive sub-certification requests concerning, among other things, compensation policies and procedures.

61.     Among other things, participants that provided material information to the SEC filing certified that:

       (a)     First Solar's controls were followed and properly implemented;

       (b)     They were not aware of any undisclosed fraud; and

       (c)     They were not aware of any material misstatements, errors, or omissions in the draft SEC filings.

62.    Before the filing of a 10-Q or 10-K with the SEC, the SOX team and I reviewed the sub-certification responses and worked with the responding employees to address "disagree" responses (if there were any).  As part of this process, a member of the SOX team contacted each employee who filed a "disagree" response in their sub-certifications.  The SOX team member discussed the reasons for the "disagree" response, and any substantive concerns or issues that the employee had, and developed a plan to implement the appropriate changes or raise the issue to the responsible individuals.  The key individuals who participated in the standard warranty and LPM accrual processes, including TK Kallenbach, Mike Koralewski, plant controllers, and me, participated in the sub-certification process.  At no time during the class period did First Solar ever file a Form 10-Q or 10-K with the SEC before receiving 100% feedback on all sub-certifications and clearing any material disagreements.  The Corporate Controller (who was James Zhu for most of the class period until I succeeded him in that role in January 2012) and I discussed the results of the sub-certification process with the CFO every quarter before the CFO and CEO signed their SOX certifications.

63.    Within two weeks after the quarter end, the SEC Reporting group prepared the first draft of the Form 10-Q (and 10-K at year-end), based on information provided by the various departments.  The draft incorporated the latest consolidation of First Solar's financial statements, which were the result of the financial close process described above in paragraphs 6-12.  The consolidated financials were sent to the SEC Reporting group by the Consolidation Manager, a member of the controller's organization.  The SEC Reporting group's initial draft was circulated internally to the CFO, the General Counsel, the Corporate Controller, and other members of the Disclosure Committee.

64.    In the third week after the end of a quarter, the Disclosure Committee met for a second time to review the current draft of the filings.  At this meeting, members of the Disclosure Committee discussed the current draft, proposed edits, asked questions, and reviewed the filing for accuracy.

65. Every quarter, the SEC Reporting group completed the disclosure checklist, which was supplied by PwC, to ensure that all applicable items were accurately and appropriately addressed.  The SEC Reporting group also worked with Disclosure Committee members to incorporate any comments and revisions received to date, and then circulated a third draft of the filing to the Board, the Audit Committee, and to the Disclosure Committee.

66. Parallel to First Solar's internal processes, PwC performed quarterly reviews and annual audits of First Solar's financial statements.  As is typical in large public company audits, PwC's audit professionals had their own office space at First Solar's corporate headquarters in Tempe, Arizona.  I, along with my team, worked closely with PwC throughout the quarter to make sure that they received all material information necessary for them to complete its work.  Based on my interactions with the PwC team and my own staff, I believe that First Solar maintained free and open communication with PwC throughout the audit and review process, and that PwC had unfettered access to the employees, documents, and systems that were necessary to do its work.

67. Each quarter, PwC received drafts of First Solar's financial statements and SEC filings throughout the quarter close process.  I, along with the SEC Reporting group, worked with PwC to address and resolve any questions that PwC had and to incorporate the audit team's comments into the filings.  PwC also reviewed the draft filings with the Audit Committee during the quarterly Audit Committee meeting.

68. Also, as part of the quarterly Audit Committee meeting, management representatives, led by the CFO and Controller, reviewed the draft SEC filings with the Audit Committee.  As part of this review, the management team was available to answer questions and resolve issues raised by the Audit Committee.  After the Audit Committee was satisfied with the draft filings presented by management, the Audit Committee would make a recommendation that the full Board approve the filing.  The full Board then performed its own review and adopted a resolution granting formal approval of the filing.

69.     One day before filing with the SEC, the Disclosure Committee met for a third time to re-review the document.  Further substantive edits were discussed with the CFO for approval, and redlines highlighting the changes were sent to the Audit Committee and full Board of Directors.

70.     Before the final document was filed with the SEC, all financial data within the SEC filings was tied out and cross-referenced to supporting documentation by a member of the SEC Reporting team.  The tie-out procedures were compiled in a quarterly tie-out binder, which contained the documentation supporting the financial information presented in the SEC filings.  After all review comments were taken into consideration and related updates completed, the final filing was placed into the standardized form provided by the SEC.

71.     Only after all of these steps were completed were the final Forms 10-Q and 10-K filed with the SEC.

72.     Building on these quarter-end processes, First Solar also prepared a press release announcing the earnings results (also filed with the SEC as a Form 8-K) and a presentation, a script, and responses to potential questions for the earnings conference call (during which the company discussed its financial results through prepared remarks and answered analysts' questions).  The financial metrics and information contained in the press releases and earnings call scripts and presentations were pulled from and tied to the SEC filings by personnel in the SEC Reporting and FP&A groups.

73.     The first draft of the earnings press release was prepared by the head of Investor Relations, and the SEC Reporting team.  Each release was filtered through various levels of review, including legal counsel, the Disclosure Committee, and the Audit Committee, before publication.  The written approval of the General Counsel of First Solar was the final step in the approval process for the earnings releases.

74.     The earnings conference call scripts and presentations were prepared by the Investor Relations (IR) team.  The financial metrics and information used in the scripts and presentations were pulled from and tied to the SEC filings.  The scripts and

presentations were also circulated to senior executives, subject matter experts, and business leaders across the organization for their review and fact-checking, and tied out by the FP&A and SEC Reporting teams.

75.     Based on my participation in this extensive process and my knowledge of the underlying facts at issue in this case, at no time did I believe that any public statement made by First Solar or any member of management during the class period was untruthful, inaccurate, or misleading.  At no time did I believe that any of First Solar's reported quarterly or annual financial results were inaccurate or misleading, or that First Solar ever misrepresented the state of its business, module performance, cost per watt, or accruals relating to its standard warranty obligation or the LPM manufacturing excursion.

**Internal Controls**

76.     In my roles as Assistant Corporate Controller and Corporate Controller, I have had responsibility for overseeing First Solar's compliance with various internal controls that were designed to prevent fraud and ensure accurate financial reporting. Section 404 of SOX requires that management assess the effectiveness of the company's internal controls over financial reporting at the end of each fiscal year.  Pursuant to this requirement, First Solar performed a detailed review of the effectiveness of the company's internal controls over financial reporting each year during the class period.  The annual review was summarized in a memorandum that was shared with the Audit Committee, PwC, as well as First Solar's CEO and CFO.  The memorandum was prepared by the controller's organization and internal audit.  In my role as Assistant Corporate Controller, and later Corporate Controller, I helped prepare and review this memorandum each year during the class period.

77.     As part of this review, internal auditors within First Solar's internal audit group evaluated the design of the internal control environment.  The internal audit team also tested the operating effectiveness of the controls.  I attended meetings where internal audit presented the results of its tests.  I also received reports where internal audit reported its findings on the control environment.  In addition, I had extensive discussions with the

internal audit team members about their analyses, testing, and findings.  As long as I have been at First Solar, internal audit has never identified a material weakness in First Solar's internal controls.

78.    Concurrent with First Solar's review of its internal controls, PwC performed its own, independent audit of the company's controls.  I had numerous discussions and meetings with PwC's audit team during each of their audits of First Solar's internal controls.  In those interactions, I learned about PwC's objectives, process, tests, analyses, reasoning, and conclusions.  PwC's audit was designed to analyze and test the effectiveness of the company's internal controls over financial reporting.  I reviewed the results of PwC's reviews of First Solar's internal controls with the PwC audit team every year.  As long as I have been at First Solar, PwC has never identified a material weakness in First Solar's internal controls, and PwC has issued an unqualified, or clean, audit opinion on First Solar's controls every year since I joined First Solar.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27th day of March, 2015, in Tempe, Arizona.

BRYAN SCHUMAKER

Schumaker Decl. in Support of Defs.' Mot. for Summary Judgment
sf-3520471

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


                                        s/*Rosemary Barajas*
                                        **Rosemary Barajas**