# Exhibit 21



**pwc**

**Memo**

To:             First Solar Audit Files

From:           PwC Phoenix Audit Team

Date:           February 2012

Subject:        Accruals Related to Module Performance


**Background**
In an effort to produce modules more efficiently, First Solar is continually looking at ways to make improvements to the Company's production process. One change that was made starting in 2008 was to install new ovens (used for the heating of the Cad Chorlide on the module) that would allow for heating at a higher temperature and thus allow for modules to spend less time in the oven and thus be produced more efficiently. Despite positive initial testing for the expected level of power production in the factory, it was later determined that this change resulted in modules that produced wider ranges of power output than intended. As a result there were certain modules that lower amounts of power less than their label. Because First Solar follows the "Copy Smart" process, the same manufacturing process was quickly implemented in all the Company's production facilities. This new process was in effect over the course of 13 months (June 2008 - June 2009) and affected the Perrysburg, Frankfurt-Oder and Malaysia plants (four lines in Malaysia only).


Because the Low Power Module (LPM) issue related a specific change in the production process, the company was able to trace the low power modules back to specific pieces of equipment used on the production lines. This was done by using actual return data and the bar code on each module. Management classified every day that an individual piece of the equipment was operating as one Cad Chloride day (CdCl2). In total there were 6,241 CdCl2 days when including all the production facilities and related pieces of equipment. Using this information, as well as a study of all LPM returns they have already received they determined the size of the potential LPM population.

**Low Power Module Accrual**
Management addressed letters to their ultimate customers (and provided the letters to First Solar's direct customers) beginning in 2009 to inform them that there was a manufacturing excursion and that they would replace the modules at no cost to their customers. The amount of the accrual was $6.5 million at December 31, 2009 due to the limited amount of watts expected to be included in the population.

During 2010, the Management accrued for the costs under the previous commitment as they became aware of additional information related to those commitments. The incremental amounts of expense recorded due to these commitments were $4.5 million, $23.1 million and $8.4 million in the first, second and fourth quarter of 2010. These expenses included power compensation charges. In each case management recorded a liability based on the amount of modules they committed to replace to customers or their best estimate, if the best estimate was higher than the contractually committed amount to be replaced. At the end of the year, management was using a Monte Carlo model to calculate their best estimate of the accrual since the binomial model allowed the Company to account for a significant number of variables that could impact the number of modules.

PWC0090290



**pwc**

During 2011, the Company continued this policy and recorded additional expense of $3.6 million, $46.9 million and $125.7 million during the second, third and fourth quarter respectively, including power compensation. The third quarter accrual represented an accrual for approximately 120 MW of modules which was considered management's best estimate and was above the contractually committed amount at that time. The liabilities through the third quarter were recorded net of fair market value of the modules that were to be returned. Management expected that the modules returned through the third quarter could be used in other projects, albeit at a lower sales value. Additionally, Management believed that any claims above 120 MW would be rejected, based on the rate of filling previous claims and the nature of the remaining potential claims. Accordingly, Management excluded an additional 85 MW from the liability calculation on this basis.

The current draft 10K includes a disclosure of the range of loss that could be possible for this liability and the current best estimate of $89.9 million was recorded in the financial statements. The low end of the range is based upon the current known legal commitment made and a communication of the modules to be replaced by First Solar. The high end of the range assumes a worst case scenario in which all claims will be fulfilled. Management has recorded a liability which represents the current best estimate of the liability as of December 31, 2011.

The change in range and best estimate from the third to fourth quarter is due to (i) additional testing that has occurred, (ii) the significant volumes of module testing that has been processed, (iii) Management's realization that additional claims would need to be fulfilled, and (iv) the change in the expected resale price of modules returned. The changes were not expected by Management in the third quarter nor was there a compelling basis at the time to believe that a larger accrual would be necessary based upon the information available. This was primarily driven by a significant increase in the number of claims that were processed and approved by management in Q4 2011. Much more information became known about the module performance once large numbers were returned and tested by First Solar.

The following procedures were performed over the LPM accrual throughout 2011:
- As of the third quarter 2011 testing was performed over the return data, the Monte Carlo model, assumptions in the model, claim data, validation of third party costs, and accuracy of the accrual.
- During the 4th quarter, the engagement team agreed the remediation size, and date of claims to source documents. Testing over the invoices paid to date.
- Validation of third party cost (ie. costs related to flashing and replacing the modules).
- Stress testing over cost for remediation assumptions
- Review of certain rejected claims and claims for which management has not concluded
- Inquired of First Solar operational leadership regarding the completeness of claims and to ensure there were no other written or oral commitments made as of December 31, 2011.

*Analysis of the Estimate*
In accordance with AU 342 we are responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. AU 342 also notes that one way for an auditor to evaluate the reasonableness of an estimate is to review and test the process used by management to develop the estimate. This was the approach taken by the audit team.

| a. Identify whether there are controls over the preparation | RTR-PEC-12 - Special Warranty |
|---|---|

2 of 5

Confidential Treatment Requested                                                          PWC0090291



pwc

| of accounting estimates and supporting data that may be useful in the evaluation. | Provision Review: Preparation of the memo and ensuring adequate justification exists to support the liability estimates is one of the key controls that identified indicators of an issue during meetings to determine what adjustments to the accrual estimate were needed atQ4 2011.  This process had been performed in prior periods but was not formally added as a key control until Q3 2011.<br><br>This control was effective for the year.<br><br>The engagement team did not a design deficiency related to claims reviewed by operating personnel after the balance sheet date but prior to the 10Q filing date.  This was considered a significant deficiency and substantive testing procedures was performed over the population.  This procedure was necessary in April, July and October.  However, this scenario could not occur in January and February of 2012 as the company halted all claim fulfillment therefore no such information existed. |
| | |
| b. Identify the sources of data and factors that management used in forming the assumptions, and consider whether such data and factors are relevant, reliable, and sufficient for the purpose based on information gathered in other audit tests. | As of Q4 2011, the sources of data management used for making their accrual were the actual system performance reports and communication, confirmation letters for module replacement, or customer replacement contracts.<br><br>Additionally, certain cost data were used as well.  To support these costs we examined information such as third party invoices for time and material costs.  The engagement team also reviewed data related to the timing of the returned modules. |
| | |
| c. Consider whether there are additional key factors or alternative assumptions about the factors. | In the fourth quarter, there were no alternative assumptions that would be valid.  All assumptions used are based upon actual data received from the customer and factory engineering data. |

3 of 5

Confidential Treatment Requested

PWC0090292



pwc

| | |
|---|---|
| d. Evaluate whether the assumptions are consistent with each other, the supporting data, relevant historical data, and industry data. | The key assumptions/factors in the calculated remediation amounts are site size, site remediation size, commitment date, remediation costs, module cost and others less significant information.  These amounts were agreed back to contractual documents, engineering site system analysis reports, and external cost information. |
| e. Analyze historical data used in developing the assumptions to assess whether the data is comparable and consistent with data of the period under audit, and consider whether such data is sufficiently reliable for the purpose. | We gained an understanding of the development and timeline of the low power module accrual.  Historically it was based off of actual return data and estimated through a Monte Carlo simulation.  As of Q4 2011 it is based on the actual commitments made and claims reviewed.  The extensive information available in the fourth quarter, including evidence that the Company was inadvertently remediating more than just LPM claims (i.e., hot climate, open circuit and others) made the Monte Carlo model less precise than a direct review of the available claims and trends. |
| f. Consider whether changes in the business or industry may cause other factors to become significant to the assumptions. | Since this estimate is related to a First Solar specific business issue no industry data can be applied.  However, all relevant company specific information has been used as described above. |
| g. Review available documentation of the assumptions used in developing the accounting estimates and inquire about any other plans, goals, and objectives of the entity, as well as consider their relationship to the assumptions. | We reviewed the contractual commitments, engineering reports, support for cost assumptions such as the cost to replace the modules and the refurbishment costs for returned modules and they are consistent with assumptions. |
| h. Consider using the work of a specialist regarding certain assumptions (section 336, Using the Work of a Specialist). | Not considered necessary. |
| i. Test the calculations used by management to translate the assumptions and key factors into the accounting estimate. | We tested the calculations of the clients model for mathematical accuracy, and also utilized internal audit in a direct assistance model for testing of certain components of the analysis. |

4 of 5

Confidential Treatment Requested

PWC0090293



**pwc**

|  |  |
|---|---|
|  |  |

## Conclusion

Based on the procedures performed, we believe that management's estimates are reasonable.

Appendix I - Client Memo:
 First Solar LPM Memo Understanding

5 of 5

Confidential Treatment Requested                                    PWC0090294

# Exhibit 22



# SAB 99 Memorandum

| | | | |
|---|---|---|---|
| Client Name: | First Solar | Date: | February 21, 2012 |

| | |
|---|---|
| Partner: | Adam D'Angelo |

| | |
|---|---|
| Quality Review Partner: | Tom McGuiness |

| | |
|---|---|
| Managers: | Garret Tripp, Karina Rivera |

| | |
|---|---|
| Office: | Phoenix |

## Management and Auditor Responsibilities

When errors in previously issued financial statements are identified, they must be assessed to determine whether the affected financial statements are materially misstated. It is management's responsibility to perform the analysis of the misstatements and document its conclusions in a written memo that summarizes all factors considered. Please refer to management's 'First Solar SAB 99 Analysis' separately provided. As the auditors, it is our responsibility to assess the judgments made by management.

## Background

First Solar ("Management" or "FSI") is a global leader in the manufacture of photovoltaic (PV) modules, and is the world's premier provider of PV solutions. First Solar offers an array of products and services for integrated solar solutions, from modules to complete turn-key PV power plants. First Solar manufactures thin film PV modules using an advanced semiconductor technology that offers enhanced suitability for affordable and efficient PV modules. First Solar offers turn-key PV power plants, whether in ground-mounted or in commercial and industrial rooftop applications. In certain regions, including the United States and Canada, First Solar provides utility customers and independent power producers (IPPs) with complete PV system solutions, including project development, financing, and asset sale, engineering, procurement and construction, as well as operations and maintenance for the life of the project.

## PwC Assessment of Management's Summary of Issue

Through inquiry, examination and audit procedures related to the issue described in the client's assessment, the engagement team notes management's summary of the issue is accurate, includes the relevant facts and circumstances and has the appropriate scope. In addition to the client's summary, the engagement team has identified additional points that are appropriate to highlight in relation to the facts and circumstances of this analysis.

Management addressed letters to their ultimate customers (and provided the letters to First Solar's direct customers) beginning in 2009 that there was a manufacturing excursion and that they would replace the modules at no cost to the customers. The amount of the accrual was considered minimal (approximately $7 million) due to the limited amount of watts expected to be included in the population. During 2010 and 2011 accrual balance related to these balances gradually increased as the company became aware of the difficulty of removing the modules and as they made additional commitments they made to satisfy customers. In each case management recorded a liability based the amount of modules they committed to replace, or their best estimate, if higher than the legally committed amount to be replaced.

During 2011, the company continued this policy of recording a liability and recorded additional liabilities of $3.5m and $33.9m (excluding hot climate and open circuit) during the second and third quarter respectively. The third quarter accrual represented an accrual for approximately 120 MW of modules which was considered management's best estimate and was approximately $8 million above the contractually committed amount at that time. The liabilities through the third quarter were recorded net of fair market value of the module that was to be returned. Management expected that the modules returned through the third quarter could be used in other projects, albeit at a lower sales value, and recorded the liability net of the value of the module to be

1

Confidential Treatment Requested

PWC0090507.001

returned. Additionally, Management believed that any claims above 120 MW would be rejected in light of (a) the historical rejection rate for claims, (b) the fact that the September 30, 2011 deadline for additional data had passed and (c) the Company still had not received data from a significant number of sites. Accordingly, Management excluded an additional 85 MW from the liability calculation on this basis.

As part of their yearend closing process, Management concluded that their best estimate of the liability needed to be increased and recorded an expense amount of $125 million due to the LPM issue. This was deemed an appropriate accrual in the 4th quarter and related to new information that became available in the fourth quarter. In the fourth quarter a majority of customers provided all the relevant information needed to complete the testing of sites and Management was able to process a significant amount of additional claims, and conclude on the remediation amount. We have performed audit procedures to validate this information. These conclusions have been further discussed in Management's LPM memo.

Due to the size of the fourth quarter accrual, management decided to look closely at the balance to ensure that none of the amount related to prior quarters. Management determined that a $4 million error in the second quarter related to module replacements that were communicated to customers (and related to the legal commitments initially established in 2009 after the balance sheet date. Since these balances related to items that were contractually committed as of the June 30, 2011 balance sheet date the amount should have been recorded at that time.

The Company concluded in the second quarter that they had overstated income approximately $4 million in the second quarter.

## PwC Materiality Assessment

The 2011 First Solar engagement annual overall materiality is $16.9 million (after the total LPM adjustment) based off of the profit before taxes. The initial overall materiality was over $30 million. However, the engagement team revised the materiality assessment downward to address the lower income as a result of significant fourth quarter charges.

## PwC Assessment of Management's Quantitative Effects on Prior Periods

### GAAP Analysis
The engagement team performed procedures on the GAAP analysis part of the assessment and agreed all financial statement information back to the appropriate 10Q filing without exception.

Q2 2011

| GAAP Results (in millions) | Q2 As Reported | Error | Q2 Corrected | Percent Change |
|---|---|---|---|---|
| Revenues | $        532.8 | $        – | $        532.8 | 0% |
| Cost of revenues | 338.8 | - | 338.8 | 0% |
| Gross profit | 194.0 | – | 194.0 | |
| Income (loss) before income taxes | 72.0 | (4.1) | 67.9 | -5.7% |
| Net income (loss) | $        61.1 | $    (3.5) | $        57.7 | -5.7% |
| | | | | |
| Impact to As Reported of Error | -5.7% | | | |
| | | | | |
| EPS: Diluted | $        0.70 | $    (0.04) | $        0.66 | -5.7% |

| GAAP Results (in millions) | Q2 As Reported | Error | Q2 Corrected | Percent Change |
|---|---|---|---|---|
| Accrued Expense | $   242,250.0 | $    4.1 | $   242,254.1 | 0.002% |
| Current Liabilities | 591,869.0 | 4.1 | 591,873.1 | 0.001% |
| Total Liabilities | 1,257,694.0 | 4.1 | 1,257,698.1 | 0.000% |
| Working Capital | $1,244,362.0 | $    4.1 | $1,244,366.1 | 0.000% |

Based on the Q2 2011 financial results and analysis of the error, Q2 net income was understated by 5.7%.

Q3 2011

Confidential Treatment Requested                    PWC0090507.002

| GAAP Results (in millions) | Q3 As Reported | | Error | | Q3 Corrected | | Percent Change |
|---|---|---|---|---|---|---|---|
| Revenues | $ | 1,005.8 | $ | - | $ | 1,005.8 | 0% |
| Cost of revenues | | 623.7 | | - | | 623.7 | 0% |
| Gross profit | | 382.1 | | - | | 382.1 | |
| Income (loss) before income taxes | | 222.8 | | 4.1 | | 226.8 | 1.8% |
| Net income (loss) | $ | 196.5 | $ | 3.6 | $ | 200.1 | 1.8% |
| Impact to As Reported of Error | | 2% | | | | | |
| EPS: Diluted | $ | 2.25 | $ | 0.04 | $ | 2.30 | 1.8% |

Based on the Q3 2011 financial results and analysis of the error, Q3 net income was overstated by 1.8%.

**Other Financial Statement Considerations**
Another important element of the quantitative assessment is the consideration of other financial statement areas impacted by the error.

Balance Sheet
The engagement team agrees with management's conclusion for the impact of the error on the balance sheet as of Q2 and Q3 were not significant. As noted in the SUM (supplement to management analysis) the principle balance sheet account impacted is accounts payable. Please refer below for the balance sheet impact.

| GAAP Results (in millions) | Q2 As Reported | | Error | | Q2 Corrected | Percent Change |
|---|---|---|---|---|---|---|
| Accrued Expense | $ | 242,250.0 | $ | 4.1 | $ 242,254.1 | 0.002% |
| Current Liabilities | | 591,869.0 | | 4.1 | 591,873.1 | 0.001% |
| Total Liabilities | | 1,257,694.0 | | 4.1 | 1,257,698.1 | 0.000% |
| Working Capital | $1,244,362.0 | | $ | 4.1 | $1,244,366.1 | 0.000% |

Based on the Q2 2011 financial results and analysis of the error, Q2 total liabilities were understated by 0%.

| GAAP Results (in millions) | Q3 YTD As Reported | Error | Q3 YTD Corrected | Percent Change |
|---|---|---|---|---|
| Accrued Expense | 271,991.0 | 4.1 | 271,995.1 | 0.001% |
| Current Liabilities | 747,001.0 | 4.1 | 747,005.1 | 0.001% |
| Total Liabilities | 1,797,528.0 | 4.1 | 1,797,532.1 | 0.000% |
| Working Capital | $1,683,467.0 | $ 4.1 | $1,683,471.1 | 0.000% |

Based on the Q3 2011 financial results and analysis of the error, Q3 total liabilities were understated by 0%.

Statement of Cash Flow
As noted above, statement of cash flow is affected through operating activities as a change in the accounts payable balance. The change in the account payable balance would be offset by the decrease in the net income balance for the quarter. Therefore, there is no net impact on the consolidated statement of cash flows.

| Segment Results (in millions) | Q2 Component as reported | | Error | | Q2 Component Corrected | | Percent Change |
|---|---|---|---|---|---|---|---|
| Net sales | $ | 471.9 | $ | - | $ | 471.9 | 0% |
| Gross profit | | 189.9 | | - | | 189.9 | 0% |
| Income (loss) before income taxes | | 72.0 | | (4.10) | | 67.9 | -6% |
| Goodwill | | 393.4 | | - | | 393.4 | 0% |
| Total Assets | $ | 4,206.8 | $ | - | $ | 4,206.8 | 0% |

3

PWC0090507.003

| Segment Results (in millions) | Q3 Component as reported | Error | Q3 Component Corrected | Percent Change |
|---|---|---|---|---|
| Net sales | $ 612.7 | $ - | $ 612.7 | 0% |
| Gross profit | 253.7 | - | 253.7 | 0% |
| Income (loss) before income taxes | 222.8 | 4.10 | 226.9 | 2% |
| Goodwill | 393.4 | - | 393.4 | 0% |
| Total Assets | $ 4,506.0 | $ - | $ 4,506.0 | 0% |

## PwC Assessment of Management's Analysis of Qualitative Considerations

The engagement team has verified and performed procedures on all of the client's qualitative considerations in order to verify that information is accuracy and appropriate in context of a SAB 99 analysis. Please refer below for results of procedures performed.

| Consideration | Applies to this issue |
|---|---|
| **Consideration:** Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate.<br><br>**PwC Assessment:** The engagement team agrees that the information related to estimates at each quarter. However, the error relates to the failure to accrue for known approved claims that were known prior to the end of the second quarter. | Yes |
| **Consideration:** Whether the misstatement masks a change in earnings or other trends.<br><br>**PwC Assessment:** The engagement team agrees that the result of the error does not mask a change in earning or other trends. | No |
| **Consideration:** Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.<br><br>**PwC Assessment:** As noted in the quantitative analysis above, the Company's Q2 and Q3 Diluted EPS results do not affect its comparison to the Analysts' first call information (Q2 and Q3 were not met regardless). | No |
| **Consideration:** Whether the misstatement changes a loss into income or vice versa.<br><br>**PwC Assessment:** As noted above, the engagement team agrees that the error does not change the Q2, Q3 or Q4 from a loss into income or vice versa. | No |
| **Consideration:** Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrants' operations or profitability.<br><br>**PwC Assessment:** The engagement team notes that Component segment data is disclosed and this error has the same impact on the Component segment as it does the consolidated group. However, the information is also immaterial to the segment. | Yes |
| **Consideration:** Whether the misstatement affects the registrant's compliance with regulatory requirements.<br><br>**PwC Assessment:** The engagement team notes that this error does not affect compliance with regulatory requirements through review of committee meeting notes and through discussion with internal legal. | No |
| **Consideration:** Whether the misstatement affects the company's compliance with loan covenants or other contractual requirements.<br><br>**PwC Assessment:** The engagement team agrees that the Company's covenants and contracts with suppliers/customers are not affected by this error through review of the Company's debt covenants, significant contracts and through inquiry with management. | No |

4

Confidential Treatment Requested

PWC0090507.004

| Consideration | Applies to this issue |
|---|---|
| **Consideration:** Whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.<br><br>**PwC Assessment:** The engagement team noted that the bonus calculation is based on earnings but is calculated on the annual number and not the quarterly numbers. | No |
| **Consideration:** Whether the misstatement involves concealment of an unlawful transaction.<br><br>**PwC Assessment:** The engagement team agrees that through quarterly review procedures performed during the year and further discussions with management, there was no concealment of this error and it is not an unlawful transaction. | No |

## PwC Assessment of Management's Overall Conclusions

In addition to the procedures performed above, the engagement team has inquired with management to ensure the conclusions reached are verifiable, are appropriate and correlate in light with the facts and circumstances of the client's analysis. Please refer below for the engagement team's assessment of management's conclusions.

### Q2 2011 Conclusions
The engagement team agrees with management's conclusion that the error is not material to the Q2 2011 issued financial statement.

### Q3 2011 Conclusions
Given all quantitative and qualitative considerations by management (and supplemented by the engagement team), the engagement team agrees with management's conclusion that the error is not material to the Q3 2011 issued financial statement.

## PwC Assessment of Management's Internal Control Considerations

The identification of an error raises questions with respect to the design and/or operating effectiveness of related internal control over financial reporting. Although this error did not result in a material misstatement and was detected through management's control process in December 2011, the error was not identified in an appropriate time-frame. Therefore, there was a breakdown in the operating effectiveness of the existing control structure.

The internal control breakdown for this error related to clarity around legal commitments that became known subsequent to the balance sheet date.  Specifically, the client personnel that were signing letters agreeing to specific amounts of watts to be replaced did not inform the controller's organization of such letters subsequent to the balance sheet date but before the 10Q filing date. The total population of this specific item is included in this analysis.  Additionally, there were other claims that were being considered by the marketing for replacement that were not discussed with the controller organization.  This represents an additional $4 million of claims that could have been incorrect or a total potential misstatement of $8 million for the quarter that was not analyzed by the controllers organization. This $8 million is the largest the population of potential claims subsequent to the balance sheet date but prior to the 10Q filing date during the year.  The additional $4 million was not accrued because it related to claims for which the company did not complete its evaluation of the claim (and therefore believed to be covered by the Monte Carlo Model).  Such information was received in subsequent quarters and management then determined that no accrual was necessary.  Subsequent to the second quarter no claims were allowed to be processed without approval of others in the organization. This is significantly less than overall materiality at year end of $16.9 million but also much larger than our de minimis reporting to the audit committee.

Based upon this total potential exposure of $8 million, the engagement team agrees with management's conclusion and has determined that this monthly control is a <u>significant deficiency</u> as of December 2011.  A significant deficiency is a deficiency in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the

Confidential Treatment Requested

PWC0090507.005

Company's financial reporting. The deficiency did not reach the level of a material weakness because the error was discovered as part of its control environment and the previous period errors were not material. In other words, the mitigating and compensating controls caught the error prior to becoming a material misstatement. Specifically, the CFO review package and other year end controls caused management to discover the problem. These controls also would have ensured that a material error would have been detected even if the potential exposure on the design deficiency were higher than what was identified in this memo.

The engagement team leveraged PwC Audit 4712 (Evaluating Control Deficiencies against Interim Financial Statements) to assess the impact of internal controls over financial reporting to the interim financial statements.

Please refer to the SAD in the year-end work-papers that analyzes the severity of this control failure and subsequent remediation and testing.

## Other Considerations

The engagement team verified that management consulted internal counsel and the Audit Committee chairman prior to finalizing their conclusions. The verification was performed through inquiry and our audit committee communications,

The engagement team discussed this matter with Steve Kitson, Regional Risk Partner in reaching these conclusions.

Appendix I:
### First Solar SAB 99 Memo



Confidential Treatment Requested

PWC0090507.006

# Exhibit 23



**pwc**

| | | | |
|---|---|---|---|
| Client Name: | First Solar | Date: | March 6, 2012 |

Partner:  Adam D'Angelo

Quality Review Partner:  Tom McGuiness

Manager:  Garret Tripp

Office:  Phoenix

**Background**

This memo is being added to the external file to clarify communications at audit committee meetings that occurred during the last week of our audit for the 2011 audit.  The meetings occurred on February 21, 25 & 29, 2012,

**Additional Clarifying Documentation**
*February 21, 2012*
On February 21, 2012 First Solar held an audit committee meeting.  The meeting was attended by Adam D'Angelo, Garret Tripp and Al Augenstein.  At this meeting First Solar management presented the results of low power module transaction, and formally presented their SAB 99 analysis to the committee.  The audit committee approved the SAB 99 analysis prepared by management and considered the error in the interim second and third quarter financial statements immaterial.  Attached to this memo is the audit committee and board material presented on that day as well as the board meeting on February 22, 2012 where Mark Widmar presented the financial overview and David Brady presented a Treasury update.  The reason for this addition is clarify that the engagement team discussed the management SAB 99 analysis directly with the audit committee prior to the filing of the 10K.  Our conclusions related to this were documented in a critical matter.

Additionally, Adam D'Angelo discussed with the audit committee that PwC will be invoicing for amounts greater than the estimated amount noted in the engagement letter due to increased time incurred.  The final amount will be calculated and invoiced upon completion and filing of the audit.

*February 25, 2012*
On February 25, 2012 Adam D'Angelo and Garret Tripp attended the First Solar audit committee meeting.  In this meeting we discussed a presentation we prepared on the status of the 2011 audit, risk assessment update, and approval for funding to continue servicing the client through the April 2012 audit committee meeting.  We also communicated the significant deficiency in that presentation related to an adjustment for the low power module transaction.  This presentation was previously included in the audit file.

*February 29, 2012*
On February 29, 2012 Adam D'Angelo and Garret Tripp attended the First Solar teleconference audit committee meeting.  Management prepared and sent a SAB 99 analysis to management related to a tax error noted in the financial statements prior to filing the 10K.  In this meeting management presented their SAB 99 analysis related to a tax adjustment.  Adam D'Angelo discussed with the committee the procedures performed by PwC and that we would not object to the committees decision to waive posting the amount to the 2011 reported numbers.  This error was 2.5 million and was significantly less than our materiality but over the deminimis reporting amount and therefore was considered immaterial.  Additionally, since it was identified by management's internal processes it was not considered a control deficiency.  Our conclusions related to this was in a critical matter.

Discussions with Tom Presby

During the 6 weeks leading up to the 10k filing Adam D'Angelo had several conversations with Tom Presby concerning the status of the audit including discussions on LPM, Goodwill Impairment, the Vietnam plant and

Confidential Treatment Requested



Lower of cost or Market calculations.  Additionally, Adam D'Angelo and Garret Tripp were on a call with Tom Presby, Craig Kennedy and Paul Stebbins when the size of the LPM liability was initially known to discuss the risks and the path forward related to such liability.

# Exhibit 24

www.pwc.com

# *First Solar*
# Report to the Audit Committee of the Board of Directors
# Results of 2011 Integrated Audit

*February 24, 2012*



CONFIDENTIAL

FSLR00184276



J. Thomas Presby, Audit Committee Chair
Craig Kennedy
Paul Stebbins
First Solar, Inc.
350 West Washington Street
Suite 600
Tempe, Arizona 85281-1244

February 24, 2012

Dear Members of the Audit Committee:

We were pleased to have had the opportunity to meet with the Audit Committee (the "Committee") on February 21, 2012 to discuss various matters relating the year-end financial statements of the Company. We look forward to the teleconference scheduled for February 25, 2012 so that we can discuss the status of our audit procedures, key accounting matters and estimates, as well as other required communications. This document is intended to facilitate our discussion.

This report and the information that it contains are solely for the benefit and restricted use of the Committee and management and are not intended to be used or relied upon by any other party.

Please call Adam D'Angelo at (602) 364-8256 if you have any comments or questions concerning this report or if you would like to discuss the contents in more detail. We look forward to our discussions with the Committee.

Best Regards,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

*PricewaterhouseCoopers LLP, 1850 North Central Ave, Suite 700, Phoenix, AZ 85004-4563*
*T: (602) 364 8000, F: (602) 364 8001, www.pwc.com/us*

CONFIDENTIAL

FSLR00184277

First Solar  Report to the Audit Committee of the Board of Directors

# Contents

Status of the 2011 Annual Audit ........................................................................................................... 1

Fourth Quarter Significant Accounting Matters and Estimates ........................................................ 2

Out of Period Adjustment ..................................................................................................................... 6

Risk Assessment Update ........................................................................................................................ 8

Fee Update ............................................................................................................................................. 16

Appendix I

Required Communications .................................................................................................................. 19

Appendix II

Accounting, Auditing, and Regulatory Developments ..................................................................... 22

Evolving Developments ........................................................................................................................ 23

Appendix III

Management Representation Letter ................................................................................................... 30

Appendix IV

Management's Materiality Assessment ............................................................................................... 38

THIS REPORT AND THE INFORMATION THAT IT CONTAINS ARE SOLELY FOR THE BENEFIT AND RESTRICTED USE OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS AND ARE NOT INTENDED TO BE USED OR RELIED UPON BY ANY OTHER PARTY.

CONFIDENTIAL

First Solar   Report to the Audit Committee of the Board of Directors

## Status of the 2011 Annual Audit

### Status

Our year-end audit procedures are substantially complete and we expect to complete our remaining procedures by February 28, 2012. The Company's press release, Form 10-K and certain tax documentation are in final draft format and we are awaiting receipt of certain confirmations to finalize our audit.

### Materiality Update

At our April 26, 2011 audit committee meeting we communicated an estimated overall materiality of $36.5 million. Since the Company's expected earnings were much less than initially expected, we reassessed our materiality considerations. As a result, our overall materiality was reduced to approximately $17 million. Additionally, our deminimis amount for reporting to the audit committee was reduced from $2.4 million to $1 million. The materiality amount for balance sheet and income statement reclasses remained at $35 million.

### Controls Testing

Management has completed their evaluation of operating effectiveness for key controls, including their evaluation of deficiencies related to controls which were deemed ineffective as of December 31, 2011. There were 52 deficiencies noted during the year. All but 8 of the deficiencies were remediated as of December 31, 2011. Management has completed its annual assessment on internal controls over financial reporting and that assessment was provided to you at the February 21, 2012 meeting.

The remaining untested controls relate to management's certification of the Form 10-K, the final tie-out of the Form 10-K, and other controls that cannot be performed at this time.

1

CONFIDENTIAL

FSLR00184279

First Solar  Report to the Audit Committee of the Board of Directors

# Fourth Quarter Significant Accounting Matters and Estimates

## Low Power Module Accrual

As discussed in previous quarters, management determined the amount of low power modules ("LPM") to be replaced and believed they had appropriately recorded the balances. A summary of accruals and facts related to the modules are as follows:

- Management addressed letters to their ultimate customers (and provided the letters to First Solar's direct customers) beginning in 2009 to inform them that there was a manufacturing excursion and that they would replace the modules at no cost to the customers. The amount of the accrual was S6.5 million at December 31, 2009 due to the limited amount of watts expected to be included in the population.

- During 2010, the Management accrued for the costs under the previous commitment as they became aware of additional information related to those commitments. The incremental amounts of expense recorded due to these commitments were $4.5 million, $23.1 million and $8.4 million in the first, second and fourth quarter of 2010. These expenses included power compensation charges. In each case management recorded a liability based on the amount of modules they committed to replace to customers or their best estimate, if the best estimate was higher than the contractually committed amount to be replaced. At the end of the year, management was using a Monte Carlo model to calculate their best estimate of the accrual.

- During 2011, the Company continued this policy and recorded additional expense of $3.6 million, $46.9 million and $125.7 million during the second, third and fourth quarter respectively, including power compensation. The third quarter accrual represented an accrual for approximately 120 MW of modules which was considered management's best estimate and was above the contractually committed amount at that time. The liabilities through the third quarter were recorded net of fair market value of the modules that were to be returned. Management expected that the modules returned through the third quarter could be used in other projects, albeit at a lower sales value. Additionally, Management believed that any claims above 120 MW would be rejected. Based on the rate of filling previous claims and the nature of the remaining potential claims. Accordingly, Management excluded an additional 85 MW from the liability calculation on this basis.

2

CONFIDENTIAL

FSLR00184280

- At December 31, 2011, Management will disclose a range of loss related to this liability. The low end of the range is based upon the current known legal commitment made and a communication of the modules to be replaced by First Solar. The high end of the range assumes a worst case scenario in which all claims will be fulfilled. Management has recorded a liability which represents the current best estimate of the liability as of December 31, 2011.

- The change in range and best estimate from the third to fourth quarter is due to (i) additional testing that has occurred, (ii) the significant volumes of module testing that has been processed, (iii) Management's realization that additional claims would need to be fulfilled, and (iv) the change in the expected resale price of modules returned. The changes were not expected by Management in the third quarter nor was there a compelling basis at the time to believe that a larger accrual would be necessary based upon the information available.

- The current draft 10K includes a disclosure of the range of loss that could be possible for this liability, the current best estimate of $89.9 million.

We have performed audit procedures over this estimated balance as part of our audit and have concluded that the estimated balance recorded and disclosure of the estimated range of loss is reasonable.

## Inventory Valuation

Due to the recent changes in the industry and a decline in the average selling price of modules, Management has performed an assessment of its inventory to ensure it is stated at its net realizable value. The primary inventory that has been written down relates to refurbished (i.e. retested and relabeled) modules received from the LPM, hot climate and other non-recurring warranty replacement activity. Management has proven the technological feasibility of using refurbished modules in recent projects but the Company also recognizes the price discount required to sell modules that are currently labeled (after de-rating) in the 60 watt to 70 watt range. The price discount is necessary due to higher balance of system costs associated with installing them. The estimated module resale price is approximately 55 cents per watt which is the current recorded carrying value.

We have reviewed the costs associated with selling these modules and we believe Management's estimate is reasonable at this time.

3

CONFIDENTIAL

FSLR00184281

First Solar   Report to the Audit Committee of the Board of Directors

## First Solar Advanced Technology (FSAT) Impairment

On December 13, 2011, the Company made the decision to cease their FSAT copper, indium, gallium, selenide (CIGS) process technology initiative.    The Santa Clara, CA facility was designed and built out to house a 50MW pilot manufacturing plant for this technology, with the net book value of assets being approximately $62 million.

Because the 50MW pilot plant within the FSAT facility has been abandoned an impairment loss was recorded by the amount the carrying amount exceeds its estimated fair value.  Since the specialized equipment had little alternative use it was assessed for fair value based on its estimated scrap value or 12 % of its original value.  An impairment loss of $50.3 million was recorded for the impairment of the equipment.  In addition First Solar had other associated charges related to outstanding purchase orders for CIGS related equipment and supplies of $2.6 million which were also written off.

We believe Management's conclusion is appropriate.

## Goodwill Impairment

As of December 31, 2011, the Company's market capitalization was significantly below the Company's book value.  As this is generally an indicator of a potential goodwill impairment, the Company engaged a reputable firm to perform a valuation of the Company's business units to evaluate whether goodwill was impaired.  As a result of the procedures performed, Management determined that the goodwill related to the components business was impaired and wrote off approximately $393 million of goodwill.

We are in the process of reviewing the assumptions related to the impairment analysis and will provide you an update on our work in this area at our meeting.

## Vietnam Facility

On December 6, 2011 Management discussed with the Board of Directors that they were evaluating the possibility of terminating construction of the Vietnam facility.  This discussion was primarily driven by the fact that there was a new strategic plan being developed for the company. The communication also indicated that the final determination has not been made by management and no decision was made by the Board in December 2011.  We reviewed the board presentation and discussed this topic with both management and the directors who were present at the meeting to confirm this understanding.

4

CONFIDENTIAL

FSLR00184282

First Solar   Report to the Audit Committee of the Board of Directors

The Vietnam facility is considered part of an asset grouping which includes other production lines. These facilities are assessed for impairment as a group unless a specific asset meets certain criteria for separate evaluation. Because the decision to abandon or sell the facility did not occur as of December 31, 2011, the Vietnam facility cannot be written off in 2011 apart from its asset grouping. Additionally, since the asset grouping had positive projected cash flows, there was no impairment of the asset group.

As a result, there was no write down of the Vietnam factory in 2011 despite the preliminary discussions in 2011. The Vietnam factory will be written off in 2012 when the criteria for impairment have been met. Management will disclose these decisions in the 10K and will indicate that a significant impairment should be expected in 2012.

We believe Management's conclusion is appropriate.

5

CONFIDENTIAL

FSLR00184283

First Solar    Report to the Audit Committee of the Board of Directors

## *Out of Period Adjustment*

### Second Quarter Error

Due to the size of the fourth quarter accrual related to LPM, Management decided to evaluate what caused their best estimate to change from the third to the fourth quarters of 2011, and to ensure that none of the amount recorded in the fourth quarter related to prior quarters. As part of this process Management determined that a $4 million error in the second quarter existed. Specifically, this related to module replacements that were communicated to customers after the June 30, 2011 balance sheet date but before the filing of the second quarter 10Q in July. Since these balances related to items that were contractually committed as of the June 30, 2011 (through the 2009 letters discussed above), the additional letters represent definitive evidence about that amount of a liability that existed as of June 30, 2011 and should have been recorded.

This error had the effect of overstating net income in the second quarter by $4 million and understating income in the third quarter by that same amount. This amount is immaterial to both the second quarter and the third quarter. Management's final SAB 99 analysis has been included in Exhibit IV to this presentation. We have reviewed the quantitative and qualitative items discussed in that memo and agree with Management's conclusions that the error is immaterial to the financial reporting of the Company.

### Significant Deficiency

The Company has a design deficiency relating to assessing facts connected to the LPM liability that become known subsequent to the balance sheet date but prior to the 10Q reporting date. Specifically, the client personnel that were signing letters agreeing to specific amounts of watts to be replaced did not inform the controllers organization of such letters subsequent to the balance sheet date but before the 10Q filing date. The total population of this specific item represents the $4 million error in the second quarter discussed above.

In addition to the error discussed above, there were other claims that were being considered by the operating personnel for replacement that were not discussed with the controller organization during the period subsequent to the balance sheet date and prior to filing the 10Q. This includes an incremental $4 million of claims that could have been incorrect or a total $8 million (after including the $4 million error) for the second quarter that was not analyzed by the controller organization. Subsequent to the second quarter no claims were allowed to be processed without approval of others in the organization. This is significantly less than overall materiality at year end of $17 million but also much larger than our de minimis reporting to the audit committee.

6

CONFIDENTIAL

FSLR00184284

Based upon this analysis we agree with Management's conclusion and have determined that this design deficiency is a significant deficiency as of December 2011. A significant deficiency is a deficiency in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the Company's financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

We believe the deficiency did not reach the level of a material weakness for a number of reasons, including the fact that the error was discovered through Management's control processes, the previous period errors were not material and the population of unanalyzed claims were immaterial. In other words, the mitigating and compensating controls caught the error prior to becoming a material misstatement.

7

CONFIDENTIAL

FSLR00184285

## *Risk Assessment Update*

### Overview

At your request we are providing this summary of our procedures related to the select risk areas identified in our first quarter audit committee report. Fiscal year 2011 has been a year that brought many changes within the industry as well as within the Company. First Solar experienced significant selling price declines from sales to their European customers as a result of the intense pricing competition with the foreign competitors. The Company's business model and risks have evolved through 2011 with a transition away from European feed in-tariffs towards large utility-scale systems. In addition the Company has dealt with certain product performance issues as well as increased inventories.

Management has taken specific to actions address these shifting risks and our audit procedures have also changed to address them.

In our April 26, 2011 meeting we discussed our view of the Company's risks and our planned audit procedures, and how we tailored our assessment of risk and planned procedures to focus on recurring audit risk areas such as:

- Revenue Recognition - Primarily System Business Contracts

- Fraudulent Financial Reporting

- Project Assets - Capitalization and Impairment Determinations

- Income Taxes - Transfer Pricing, Outside Basis Differences, Allocation

- Derivatives - Hedge Accounting and Fair Value Calculations

- Investments - Fair Value

- Key estimates such as Product Recycling and Reclamation Obligation, Product Warranties, Allowance for Doubtful Accounts, Rebate Program and Share-Based compensation

8

CONFIDENTIAL

FSLR00184286

First Solar  Report to the Audit Committee of the Board of Directors

During the fourth quarter, we added the impairment of goodwill to this list of risks. Our procedures related to that balance has been discussed above.

The following section highlights Management's and PwC's response to these financial reporting risks facing First Solar. In addition, we have highlighted procedures we have performed to address the risk of material misstatement in the financial statements resulting from these challenges.

## Revenue Recognition - System Business Contracts

| Risk Factors | ■ During the year First Solar has recorded $1.4 billion of revenue related to large sale solar projects primarily driven by the sale of the Agua Caliente, PNM (PNM Resources, Inc.) and other projects. The appropriate scope and the significant estimates associated with these contracts represent financial reporting risk. |
| --- | --- |
| | ■ Overstatement of revenue for periodic reporting particularly with revenue cut-off remains a risk to be addressed. |
| Management's Response | ■ All new contracts are reviewed by the management team and significant contracts include a review by members of the executive staff. |
| | ■ Generally, the accounting for contracts is understood when the contracts are signed and is monitored through contract completion and execution. |
| | ■ Management documents the facts and conclusions regarding each of these matters on a quarterly basis. |
| | ■ Management performed internal cut-off testing during the third quarter of 2011 and has re-designed their cut-off control making it more relevant to each location. |
| | ■ For all significant contracts, management typically discusses the accounting implication and its accounting conclusion with PwC before execution. |
| PwC's Response | ■ We read the contracts and tested details for each of the contracts discussed above. |
| | ■ We performed contract reviews and detail testing for over 90% of the systems business revenue. |
| | ■ We confirmed accounts receivable as well as performed cut off testing. |
| | ■ We performed credit worthiness procedures over certain primary customers. |

9

**CONFIDENTIAL**

**FSLR00184287**

## Fraudulent Financial Reporting

| Risk Factors | ■ There is always an assumed risk that periodic financial reporting is intentionally misleading or inaccurate.<br>■ We also consider if the assets of the Company could be fraudulently used or removed from the Company. |
|---|---|
| Management's Response | ■ First Solar maintains and demonstrates an ethical tone at the top, an active audit committee, formal policies related to the risk of fraud, and entity level controls, .<br>■ First Solar's 2011 bonus metrics is largely operating metrics rather than financial metrics. First Solar executives' compensation is not directly linked to EPS or its stock performance.<br>■ First Solar has a disclosure control committee to review the reasonableness of the financial statements and related disclosures. In addition, significant estimates and reserves are reviewed by senior management, are documented with adequate supporting facts, and are discussed with the Audit Committee.<br>■ First Solar also has a whistleblower hot line available.<br>■ None of the First Solar senior executives have direct access to the accounting system. |
| PwC's Response | ■ We met with senior management to perform fraud inquiries and understand management's perspective on the risk of fraud and the susceptibility of the Company's financial statements to material misstatement due to fraud.<br>■ We evaluated the Company's programs and controls that address identified risks of material misstatement caused by fraud including the review of journal entries, inquiries of management and performing disaggregated analytical procedures over revenue.<br>■ We met with Internal Audit and legal counsel to understand any whistleblower matters and other code of conduct violations.<br>■ We performed procedures over all significant management estimates in the financial statements.<br>■ We performed procedures over user rights and ability for company personal to make journal entries. |

10

CONFIDENTIAL

FSLR00184288

## Project Assets

| | |
|---|---|
| Risk Factors | ■ The Company continues to expand its ability to complete large scale utility solar projects. Project Assets had a balance $375 million at the end of 2011. We expect to see the project asset decrease over the next year as the sale of the Silver State North and St. Claire projects occurs.<br><br>■ The realizability of these projects is dependent on the ability to develop the land, obtain permits, sign power purchase agreements and ultimately sell the projects to third parties. There is a risk that project costs capitalized will not be written down in a timely manner if the projects are no longer viable. |
| Management's Response | ■ Management performs a quarterly analysis of all the projects and identifies any projects that are no longer economically feasible or no longer being pursued. This includes understanding the basis (at the macro and micro level) for concluding the assets are not impaired and documenting the status of the projects. For example, if a long term power purchase agreement is signed for specific project then the company has strong evidence that the project is on track and still viable.<br><br>■ Projects that are not considered viable are written off and the reasons for that are documented (primarily the Italian pipeline for 2011).<br><br>■ The Company has clearly defined risk based accounting policies, consistent with US GAAP, associated with when and what to capitalize as project costs.<br><br>■ Additionally, management has historically only begun significant expansion of a project after a power purchase agreement is signed. |
| PwC's Response | ■ We review management's reasons for asserting that the projects are reasonable and talk to the project managers about the status of the projects.<br><br>■ We also confirm that key documents exist supporting the realizability of significant project assets including bids on the projects, power purchase agreements and documents supporting the continued planned progress of the projects (environmental studies, etc). 95% of project asset balances are supported by either a sales contact or a power purchase agreement.<br><br>■ We perform inquires of management regarding the current portfolio of projects and development progress made. |

11

CONFIDENTIAL

FSLR00184289

First Solar  Report to the Audit Committee of the Board of Directors

## Income Taxes - Uncertain Tax Positions & Indefinitely Reinvested Earnings

| | |
|---|---|
| Risk Factors | ■ The Company has consistently had a low effective tax rate. This has been driven by the increased production and related profit being generated in Malaysia. Profit in Malaysia was $556 million and $445 million for 2010 and 2011, respectively. The Company has been granted a tax holiday for all income generated from the Malaysia plants from the Malaysia tax Authority for a fixed period of time |
| | ■ Since Malaysia has no tax treaty with the United States it is likely that the IRS will ask questions about the transfer pricing between the United States and Malaysia (i.e. the price charged for Malaysia to use the intellectual property developed in the US). To a lesser extent a similar business condition exists with other foreign countries. |
| | ■ During the year Management repatriated $300 million E&P from Germany. This puts pressure on management's ability to assert indefinite reinvestment overseas and, as a result, to not provide for taxes on foreign earnings. |
| Management's Response | ■ First Solar's finance organization has commissioned studies, analyzed relevant economic facts and documented their conclusions regarding transfer pricing in a comprehensive document. |
| | ■ Management has documented why they believe they can maintain the assertion that foreign earnings will remain permanently reinvested based on the cash flow projections for each jurisdiction. |
| PwC's Response | ■ We reviewed the transfer studies performed and related documentation prepared by the company. A PwC transfer pricing expert, who previously worked for the IRS, spent time with management in both the US and Malaysia to provide advice and gain a greater understanding of the company's specific circumstances. |
| | ■ We also reviewed and evaluated management's assumptions related to their assertion of permanently reinvesting undistributed earnings in the relevant foreign entities. This included an examination of cash flow projections by country. |

12

**CONFIDENTIAL**

**FSLR00184290**

First Solar   Report to the Audit Committee of the Board of Directors

## Derivatives

| | |
|---|---|
| Risk Factors | ■ The company has foreign sales denominated in currencies other than the USD. In order to mitigate such risk First Solar enters into derivative contracts to hedge its cash flows. Total absolute fair value of the portfolio at the end of the fourth quarter 2011 is $108 million. |
| | ■ Based on the decline in the industry First Solar sales during the year were not enough to cover the amount of cash flow hedges for the same period. The ability to obtain hedge accounting is dependent on being able to forecast cash flow and that is difficult when sales are not realized as expected. |
| | ■ The derivatives are required to be recorded at fair value under current accounting guidance. Ensuring the appropriateness of the assumptions used in the calculation is essential. One such assumption is the default risk of the counter party. |
| | ■ Certain derivatives qualify for hedge accounting. At times, the requirements and application of hedge accounting can be complicated. The risk focus is around the process and adequate documentation to ensure hedge account has been correctly applied. |
| Management's Response | ■ First Solar has put the sales hedging program on indefinite hold. If First Solar determines in the future that the Euro exposure warrants re-implementing the hedging program, then First Solar will re-assess the process and targeted levels for sales hedging (i.e. only forecast 50% or less of sales volume). The Company continues to have foreign exchange forward contracts related to their Australian system projects as well as three interest rate swaps. |
| | ■ The policy covering the parameters for what derivative contracts are to be entered into is approved by the audit committee. |
| | ■ Because First Solar has a significant number of derivative contracts open at any point in time, they utilized a third party service provider to perform the fair value calculation of their derivative portfolio as well as ensure they are in compliance with the hedge accounting documentation requirements with regular effectiveness assessments. |
| PwC's Response | ■ We review the continued effectiveness of all derivatives accounted for as hedges. |
| | ■ To ensure the completeness and existence of all contracts we confirmed the terms of the derivative arrangements directly with the counterparties. We also evaluated the counterparties' ability to perform on the respective contracts. |

13

CONFIDENTIAL

FSLR00184291

First Solar  Report to the Audit Committee of the Board of Directors

| | ■ We independently tested the fair value of the derivative portfolio. |
|---|---|

## Investments

| Risk Factors | ■ First Solar currently has approximately $989 million of cash, cash equivalents, and marketable securities, of which $963 million is invested in fixed income securities ranging from corporate bonds to government bonds. The investment is classified as available-for-sale securities for accounting purposes. |
|---|---|
| | ■ The size of the investments and the volatility of the markets give rise to the risk that impaired investments are not identified timely. |
| | ■ The value of the investment portfolio needs to be at fair value. |
| | ■ Valuation assumptions are used to properly value the fixed income securities. |
| Management's Response | ■ First Solar continues to invest in highly-rated, highly-liquid investments and their portfolio is relatively low-risk. The investment policy is also discussed with the audit committee. |
| | ■ All of the available-for-sale marketable securities are reviewed regularly for performance and quarterly for impairment as valued by a reputable third party. |
| | ■ First Solar values their investments using quoted prices for securities with similar characteristics and other observable inputs. |
| PwC's Response | ■ To ensure the appropriateness of the fair value, we obtain independent prices for the securities and compare them to the price points used by First Solar. |
| | ■ For any new security we assess the investment instruments for proper valuation and disclosure. |
| | ■ We review the investment balances for indications of impairment. This is performed by such tests as reviewing the amount of unrealized losses for the portfolio, on a security by security basis. |

14

CONFIDENTIAL

FSLR00184292

## Key Accounting Estimates

| Risk Factors | ■ Due to the nature of their operations and the sustained level of manufacturing production, First Solar is required to make significant estimates of their recycling obligations, normal warranty, low power modules and inventory valuations. Several of these items have been discussed earlier in this document due to the changes noted in the fourth quarter.<br>■ There is an inherent risk that the accruals established are not appropriate based upon the level of judgment involved. |
|---|---|
| Management's Response | ■ Management examines the underlying historical facts and trends related to their estimates to prepare and support their accounting consideration. When historical trends are not available they may use more complicated binomial models and statistical analysis as is the case of the low power module accrual.<br>■ All of these estimates are reviewed by multiple layers of management with significant input from engineers, operations when necessary. |
| PwC's Response | ■ We reviewed the methodology for all the reserves noted above.<br>■ We analyzed the assumptions used in developing the estimates and, where applicable, stress tested or reperformed calculations prepared by Management. |

15

CONFIDENTIAL

FSLR00184293

First Solar   Report to the Audit Committee of the Board of Directors

## *Fee Update*

The following table summarizes our fee estimates approved by the Committee during the year and includes a status on fees as of December 31, 2011:

| Service description | Pre-Approved 2011 Fee | | Expected | Remaining | |
|---|---|---|---|---|---|
| **Audit services** | | | | | |
| Integrated audit | $ | 2,650,000 | $2,650,000 | $ | - |
| Expenses | | 100,000 | 100,000 | | - |
| Subtotal | | 2,750,000 | 2,750,000 | | - |
| Topaz stand alone audit | | 125,000 | 90,000 | | 35,000 |
| Statutory audits | | 210,000 | 200,000 | | 10,000 |
| Total audit services | | 3,085,000 | 3,040,000 | | 45,000 |
| **Audit related services** | | | | | |
| Assistance with SEC filings and comfort letter procedures | | 150,000 | - | | 150,000 |
| Procedures related to acquisitions and technical assistance with new transactions | | 250,000 | 55,000 | | 195,000 |
| SAP pre-implementation review - Phase I and II | | 200,000 | 98,000 | | 102,000 |
| Total audit related services | | 600,000 | 153,000 | | 447,000 |
| **Tax Services** | | | | | |
| Federal tax technical issues and tax compliance | | 150,000 | 94,000 | | 56,000 |
| International tax technical issues | | 150,000 | 115,000 | | 35,000 |
| Transfer pricing | | 150,000 | 117,000 | | 33,000 |
| Subtotal | | 450,000 | 326,000 | | 124,000 |
| **Other services** | | | | | |
| PwC Technology ADC and Comperio | | 5,000 | 2,700 | | 2,300 |
| Total services | $ | 4,140,000 | $3,521,700 | $ | 618,300 |

16

**CONFIDENTIAL**

**FSLR00184294**

We are requesting pre-approval for the following amounts by service category through the next audit committee meeting in April 2012 where we will present our annual service plan and request pre-approval for all other services. The categories below will be consistent will the specific categories approved by the audit committee at our April 2011 meeting. We expect this level of service will be necessary in addition to the remaining pre-approval amounts from the prior years.

| | |
|---|---|
| **Audit and statutory audits** | $ 650,000 |
| **Audit related** | 150,000 |
| **Tax Services** | |
| Federal tax technical issues and tax compliance | 75,000 |
| International tax technical issues | 75,000 |
| Transfer pricing | 75,000 |

17

**CONFIDENTIAL**

**FSLR00184295**



Appendix I

CONFIDENTIAL

FSLR00184296

## *Required Communications*

| Matter to be communicated | Auditor's response |
|---|---|
| Auditor's responsibility under generally accepted auditing standards | Included in our engagement letter presented to the Committee in April 26, 2011. |
| Significant accounting policies, including critical accounting policies and alternative treatments within generally accepted accounting principles, and the auditor's judgment about the quality of accounting policies | This is an ongoing communication that occurs throughout the year. |
| Management judgments and accounting estimates | This is an ongoing communication that occurs throughout the year. |
| Audit adjustments | No adjusted or unadjusted differences above $1 million for income statement affecting items or $35 million for items affecting balance sheet only was noted. |
| Potential effect on the financial statements of any significant risks and exposures | We are not aware of any significant risks or exposures that could materially affect the consolidated financial statements other than those communicated in this and other communications to the Committee this year. |
| Material uncertainties related to events and conditions that may cast doubt on the ability to continue as a going concern | We are not aware of any material uncertainties that cast doubt on the Company's ability to continue as a going concern. |
| Significant deficiencies and material weaknesses | This has been communicated elsewhere in this report. |
| Other information in documents containing audited/reviewed financial information | The auditor's responsibility with respect to information outside the financial statements is limited to reading the information for any material inconsistency with the audited financial statements. We will continue to read drafts of the Company's 10-K prior to filing and report any inconsistencies with our audit results to the Committee. |
| Disagreements with management | There were no disagreements with management. |

19

CONFIDENTIAL

FSLR00184297

First Solar   Report to the Audit Committee of the Board of Directors

## *Required Communications*
(continued)

| Matter to be communicated | Auditor's response |
|---|---|
| Consultation with other accountants | We are not aware of any consultations with other accounting firms regarding accounting matters in 2011. |
| Significant issues discussed, or subject to correspondence, with management prior to retention | No significant issues were discussed, or subject to correspondence, with management prior to retention. |
| Significant difficulties encountered during the quarterly review | We have previously discussed the significant efforts made with respect to the LPM accrual. |
| Fraud and illegal acts | No irregularities, fraud or illegal acts involving senior management, or that would cause a material misstatement of the financial statements, came to our attention as a result of our audit procedures. |
| Independence | We confirm that we are independent accountants with respect to the Company. We have previously communicated this to the Audit Committee in a letter dated April 26, 2011. No changes have occurred related to our independence since the date of that letter. |
| Other material written communications | The draft management representation letter has been included in Appendix III. See also management's SAB 99 memo in Appendix IV. |
| Other matters | No matters were noted other than those discussed elsewhere in this report. |

20

CONFIDENTIAL

FSLR00184298



Appendix II

CONFIDENTIAL

FSLR00184299

# *Accounting, Auditing, and Regulatory Developments*

## Significant Updates since September 30, 2011

From time to time, updates to recent developments in topics are announced after preparation of this document, but before publication. This section outlines recent developments for those topical areas. References to other firm publications are included in the Contents section above under "For More Information." Engagement teams should appropriately update and tailor any impacted areas.

- Private Company Standard Setting: In October 2011, the Financial Accounting Foundation (FAF) released for public comment a plan to establish a new council to improve the standard-setting process for private companies. The plan calls for the creation of a new Private Company Standards Improvement Council (the "council"), which would operate under the oversight of the FAF. The council would determine whether exceptions or modifications to U.S. GAAP should be considered for private companies. Any changes proposed by the council would be subject to ratification by the FASB.

- Consolidations: On November 3, 2011, the FASB issued a proposal to make targeted amendments to the consolidation model for variable interest entities and limited partnerships. The proposal would introduce a new requirement to assess whether the party with the power to direct the most significant activities of the entity is using that power in an agent or principal capacity. A party acting in an agency capacity would not consolidate the entity.

- Lease Accounting: The FASB and IASB made significant tentative decisions related to lessor accounting and transition guidance.

- Other Comprehensive Income Presentation: On November 8, 2011, the FASB issued a proposal to defer the new requirement to present reclassifications of other comprehensive income on the face of the income statement. Companies would still be required to adopt the other requirements contained in the new accounting standard for the presentation of comprehensive income.

- Investment Companies and Investment Properties: On October 21, 2011, the FASB issued a proposal to amend the criteria for defining an investment company under U.S. GAAP and address when an investment company would apply consolidation accounting. The proposal continues the current requirement for the parent of an investment company to retain the specialized accounting for the underlying portfolio investments in consolidation. Also on October 21, 2011, the FASB issued a proposed accounting standard for investment property entities, which could fundamentally change financial reporting for

22

many owners of and investors in rental real estate. The proposal could impact not only traditional real estate investors, including real estate investment trusts and real estate investment funds, but also nontraditional real estate/integral equipment owners, such as power plants, cell towers, and pipelines.

■ Revenue Recognition: On November 14, 2011, the FASB and IASB released for public comment a revised exposure draft of the proposed standard on revenue recognition. The revised exposure draft reflects the boards' redeliberations of issues addressed in a 2010 exposure draft. Comments are due March 13, 2012.

## Evolving Developments

### Loss Contingencies

In 2010, the SEC began to increase its scrutiny of disclosures of loss contingencies. This initiative follows recent activities by both the FASB and IASB to address certain areas in the accounting and disclosures for loss contingencies. The FASB has been deliberating possible changes to the disclosure requirements since 2008 and the IASB has been deliberating changes to the recognition, measurement and disclosure requirements under IFRS for many years.

Key Developments
■ The SEC staff has emphasized compliance with the existing standard through comment letters on registrants' public filings, speeches by the SEC staff, and the release of a "Dear CFO letter" in the fall of 2010. The SEC staff has stated that it would consider it unusual that a company could not reasonably estimate the amount of possible loss or a range of loss for at least some of the cases in a company's population of contingencies for which the likelihood of loss is reasonably possible. In addition, the SEC has raised concerns about the lack of adequate forewarning and emphasized that the recognition of a material expense for a loss contingency should generally not be the first disclosure regarding that contingency.

■ The FASB has proposed changes to the financial statement disclosures that are required for loss contingencies. The proposal was issued in response to the concerns voiced by certain investor groups that current disclosures in this area are insufficient and not timely. The proposed disclosures would generally be based on publicly available, factual information and the proposal would allow for aggregated disclosure of similar contingencies. Among the key changes from current GAAP being proposed are:

  — More extensive qualitative and quantitative disclosures, including a requirement to disclose the amounts accrued for contingencies

23

FSLR00184301

First Solar   Report to the Audit Committee of the Board of Directors

— A requirement to disclose certain asserted contingencies that are judged to have only a remote likelihood of loss if there is a potential severe impact to the business

■ The FASB received feedback that certain aspects of its proposal would require disclosure of information that could be prejudicial to a company's legal defense. While discussing this feedback, the board also questioned whether the perceived shortcomings in today's disclosure practices result from deficiencies in the existing standard or rather from inconsistent application of current guidance. Prior to concluding on whether an amendment to the existing standard is still needed, the FASB decided to evaluate whether disclosures of loss contingencies improve during the 2010 year-end financial reporting cycle, noting the SEC's focus in this area.

■ Based on the comment level activity with respect to the existing standard, it's clear that the SEC staff believes existing disclosures could be enhanced. In the meantime, the FASB has not yet indicated when the proposal would be back on its agenda. It is unlikely that we will see further movement on this project in 2011.

■ The IASB began redeliberating certain aspects of its proposal in late 2010, but has postponed further redeliberations until an as yet to be determined date.

### Why It's Important
■ The SEC initiatives and FASB proposal in this area have created a current reporting environment in which disclosures of loss contingencies are being scrutinized perhaps more than ever. A company should ensure that it has complied with all existing GAAP requirements and SEC staff views. Contemporaneous documentation of the disclosure decisions made by management should be made each financial reporting period.

■ Under the FASB's proposal, it is likely that a company will have to provide additional disclosures compared to current practice. The company may need to build additional time into its quarterly reporting process for preparing financial statements to ensure that a more robust assessment of its loss contingencies can be made.

### PwC's Point of View
■ We expect the SEC staff to continue its efforts to enhance compliance on the disclosures of loss contingencies throughout 2011. While these efforts were initially focused on the financial services industry, companies across other industries continue to receive comment letters in this area.

24

**CONFIDENTIAL**

**FSLR00184302**

First Solar   Report to the Audit Committee of the Board of Directors

- Given the constraints of the U.S. legal system, we believe that in the case of litigation contingencies, the objective of transparent disclosures must be balanced against the prejudicial impacts that can unfairly and adversely affect a company and its investors.  For this reason, we believe it is important that the board resolve the prejudicial concerns raised by preparers and lawyers prior to the issuance of a final standard.

- Once the prejudicial concerns are resolved, however, we anticipate that a final standard would provide incremental, but only marginal, improvement over the loss contingency disclosure requirements that exist today.  Accordingly, we believe this project is of lower priority relative to other projects on the board's agenda.

## Risks and Uncertainties

Key Developments

- The FASB has tentatively completed its exposure draft on improving disclosures about Risks and Uncertainties.  The objective of the proposal, which is the result of the FASB's work on its Going Concern project, is to provide guidance on management's responsibility to evaluate a reporting entity's ability to meet its obligations for the foreseeable future.  Although auditing literature requires auditors to assess whether there is substantial doubt about an entity's ability to operate as a going concern, there is currently no similar guidance in the accounting literature that directs management to make such an assessment.

- The proposal is expected to require robust disclosure about risks and uncertainties when management, applying commercially reasonable business judgment, believes those risks and uncertainties indicate that it is reasonably foreseeable that an entity may not be able to meet its obligations as they become due without making substantial changes to its operating or capital structure.  When assessing whether an entity has the ability to meet its obligations, management would be required to take into account available information about the foreseeable future, which is generally, but not limited to, 12 months from the end of the reporting period.

- The proposal will also provide guidance on when and how to prepare financial statements on the liquidation basis of accounting.

- Due to the potential interaction between the proposed standard, current auditing literature and disclosures required by the SEC, the board agreed to solicit the views of the PCAOB and the SEC prior to issuing an exposure draft for public comment.  At this time, the exposure draft is expected to be issued for public comment during the first half of 2012.

25

CONFIDENTIAL

FSLR00184303

## Why It's Important

■ The proposed standard is expected to require the following disclosures about risks and uncertainties when management concludes that it is reasonably foreseeable that an entity will not be able to meet its obligations as they become due without making substantial changes to its operating or capital structure:

 — Details of pertinent conditions and events giving rise to this conclusion, including when such conditions and events are anticipated to occur;

 — Management's evaluation of the significance of those conditions and events, the possible effects of those conditions and events and any mitigating factors;

 — Management's plans to mitigate the effects of the conditions and events, whether those plans can be effectively implemented, and the likelihood that such plans will be successful; and

 — Information about the recoverability or classification of recorded asset amounts or the amounts or classification of liabilities.

■ Substantial changes to an entity's operations or capital structure would include, but would not be limited to, a substantial disposition of assets outside the ordinary course of business, restructuring of debt, issuance of equity, or externally or internally forced revisions of its operations.

## Implications

■ While much of the information should be readily available, significant changes to the company's current annual and quarterly financial reporting procedures and controls may be necessary to properly gather and evaluate available information about risks and uncertainties for the foreseeable future.

26

CONFIDENTIAL

FSLR00184304



Appendix III

CONFIDENTIAL

FSLR00184305

## *Management Representation Letter*

PricewaterhouseCoopers LLP
Attention: Adam D'Angelo
1850 North Central Avenue
Suite 700
Phoenix, Arizona 85004

February 29, 2012

We are providing this letter in connection with your audits of (1) the consolidated financial statements of First Solar, Inc. (the "Company") as of December 31, 2011 and December 31, 2010 and for each of the three years in the period ended December 31, 2011 for the purpose of expressing an opinion as to whether such consolidated financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of First Solar, Inc. in conformity with accounting principles generally accepted in the United States of America; and (2) the Company's internal control over financial reporting as of December 31, 2011 for the purpose of expressing an opinion as to whether the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We confirm that we are responsible for the fair presentation in the consolidated financial statements of financial position, results of operations, and of cash flows in conformity with generally accepted accounting principles, including the appropriate selection and application of accounting policies, establishing and maintaining effective internal control over financial reporting, and performing an assessment of the effectiveness of internal control over financial reporting based on criteria established in Internal Control—Integrated Framework issued by the COSO.

Certain representations in this letter are described as being limited to those matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement. For the purpose of this letter we have defined materiality as items over 1 million.

We confirm, to the best of our knowledge and belief, as of February 29, 2012, the date of your report, the following representations made to you during your audit(s):

1.  The consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America (GAAP), and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Company is subject. We have prepared the Company's consolidated financial statements on the basis

**CONFIDENTIAL**

**FSLR00184306**

that the Company is able to continue as a going concern, including to meet its obligations in the ordinary course of business, and we are not aware of any significant information to the contrary.

2.  We have made available to you:

    a.  All financial records and related data.

    b.  Unconditional access to persons within the entity from whom you have requested audit evidence.

    c.  All minutes of the meetings of stockholders, directors, and audit or other committees of directors, and summaries of actions of recent meetings for which minutes have not yet been prepared. The most recent meetings held were on: February 21, 22 and 25 2012.

3.  We have appropriately reconciled our books and records (e.g., general ledger accounts) underlying the consolidated financial statements to their related supporting information (e.g., sub ledger or third-party data). All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements, as necessary. There were no material unreconciled differences or material general ledger suspense account items that should have been adjusted or reclassified to another account balance. There were no material general ledger suspense account items written off to a balance sheet account, which should have been written off to an income statement account and vice versa. All consolidating entries have been properly recorded. All intra-entity accounts have been eliminated or appropriately measured and considered for disclosure in the consolidated financial statements.

4.  There have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices.

5.  There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

6.  The effects of the out-of-period adjustments summarized in the accompanying schedule are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

7.  We have performed an evaluation and have made an assessment of the effectiveness of the Company's internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the COSO. We did not use any of the procedures you performed during your audits of internal control over financial reporting or the financial statements as part of the basis for our assessment of the effectiveness of internal control over financial reporting.

8.  We have concluded, as set forth in our assessment, that the Company has maintained effective internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the

**CONFIDENTIAL**

**FSLR00184307**

COSO as of December 31, 2011. We have disclosed to you all deficiencies in the design or operation of internal control over financial reporting (whether or not remediated) identified as part of our assessment of the effectiveness of internal control over financial reporting as of December 31, 2011. We believe that a design control deficiency related to the low power modules is a significant deficiency.

9.  We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

10. We have no knowledge of any fraud or suspected fraud affecting the Company involving:

    a.  Senior management,

    b.  Management or other employees who have significant roles in internal control over financial reporting, or

    c.  Others where the fraud could have a material effect on the consolidated financial statements.

11. We have no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, analysts, regulators, short sellers, or others.

    (As to items 9, 10 and 11, we understand the term "fraud" to mean those matters described in Statement on Auditing Standards No. 99.)

12. There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

13. The Company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

14. The following, if material, have been properly recorded or disclosed in the consolidated financial statements:

    a.  Relationships and transactions with related-parties, as described in Accounting Standards Codification (ASC) 850, *Related Party Disclosures*, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties.

    b.  Guarantees, whether written or oral, under which the Company is contingently liable.

    c.  Significant estimates and material concentrations known to management that are required to be disclosed in accordance with ASC 275, *Risks and Uncertainties*, and 275-10-50. (Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.)

CONFIDENTIAL

FSLR00184308

15. The Company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, except as disclosed in the consolidated financial statements.

16. The Company has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

17. Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for sales or other charges arising on or before the balance sheet dates and are not subject to discount except for normal cash discounts. Receivables classified as current do not include any material amounts which are collectible after one year. All receivables have been appropriately reduced to their estimated net realizable value.

18. Inventories recorded in the consolidated financial statements are stated at the lower of cost or market, cost being determined on the basis of FIFO, and due provision was made to reduce all slow-moving, obsolete, or unusable inventories to their estimated useful or scrap values. Inventory quantities at the balance sheet dates were determined from physical counts or from perpetual inventory records, which have been adjusted on the basis of physical inventories taken by competent employees at various times during the year. Liabilities for amounts unpaid are recorded for all items included in inventories at balance sheet dates and all quantities billed to customers at those dates are excluded from the inventory balances.

19. All liabilities of the Company of which we are aware are included in the consolidated financial statements at the balance sheet dates. There are no other liabilities or gain or loss contingencies that are required to be accrued or disclosed by ASC 450, *Contingencies,* and no unasserted claims or assessments that our legal counsel has advised us are probable of assertion and required to be disclosed in accordance with that Topic.

20. We are responsible for all significant estimates and judgments affecting the consolidated financial statements. Significant estimates and judgments and their underlying assumptions, methods, procedures and the source and reliability of supporting data are reasonable and based on applicable guidance, and are appropriately disclosed in the consolidated financial statements. The procedures and methods utilized in developing assumptions, estimates and judgments are appropriate and have been consistently applied in the periods presented.

21. The unaudited interim financial information has been prepared and presented in conformity with GAAP applicable to interim financial information and with Item 302(a) of Regulation S-K. The unaudited quarterly financial information for the year ended December 31, 2011 also has been prepared on a basis consistent with the corresponding interim periods for the year ended December 31, 2010 and, to the degree appropriate, with the consolidated financial statements for the years ended December 31, 2011 and December 31, 2010. The unaudited interim financial information for the three months ended December 31, 2011 and December 31, 2010

CONFIDENTIAL

FSLR00184309

does not include any material amount of year-end adjustments that have not been disclosed or any material amounts that should have been included in earlier interim periods of the respective fiscal years.

22. The Company does not have outstanding a past-due share of its accounting support fees collectible by the Public Company Accounting Oversight Board.

23. All cash and deposit accounts and all other properties and assets of the Company are included in the consolidated financial statements. Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, line of credit, collateral posted or similar arrangements have been properly disclosed in the consolidated financial statements.

24. Provisions have been made for losses to be sustained in the fulfillment of, or from the inability to fulfill, any sales commitments.

25. Provisions have been made for losses to be sustained as a result of purchase commitments for inventory quantities in excess of normal requirements or at prices in excess of prevailing market prices.

26. All borrowings and financial obligations of the Company have been disclosed to you and are properly recorded and disclosed in the consolidated financial statements.

27. We have evaluated the subjective acceleration clauses in our debt agreements and have concluded that the possibility of such clauses being exercised is remote.

28. The Company has not violated any covenants of its debt during any of the periods presented, and we disclosed to you all covenants and information related to how we determined compliance with the covenants.

29. We evaluated all contracts and financial instruments to determine whether they meet the definition of a derivative under ASC 815, *Derivatives and Hedging* (ASC 815).

30. We evaluated power purchase agreements, and such agreements qualify for the normal purchase exception as they meet the criteria in ASC 815-10-15-45 through 15-51.

31. We evaluated financial instruments and other contracts to determine whether the hybrid instrument contains embedded derivative instruments and have separated the embedded derivative from the host contract and accounted for it separately at fair value in accordance with ASC 815 and ASC 820, *Fair Value Measurements and Disclosures* (ASC 820), if the following criteria in ASC 815-15-25-1 and ASC 815-10-15-11 have been met: (i) the economic characteristics and risks of the embedded derivative are not clearly and closely related to the host contract, (ii) the hybrid instrument that includes the embedded and host contracts is not remeasured at

CONFIDENTIAL

fair value in accordance with ASC 820 and (iii) a separate instrument with the same terms as the embedded derivative instrument, would, under ASC 815, be a derivative instrument.

32. For all transactions to which hedge accounting is applied, we identified, designated and documented the relationship between the derivative instrument and the hedged item (or transaction). We have variable-rate debt that offers a choice of interest rate tenors at each reset date, and we have hedged that debt with an interest rate swap that does not include the same choice. We have not considered the option(s) in the debt that are not in the swap in assessing the effectiveness and measuring the ineffectiveness of the hedging relationship, as we will not exercise the option to select any interest rate tenor to be paid on the debt other than the one that is referenced in the swap.

33. For those forecasted transactions designated as hedged transactions in a cash flow hedge, we believe the forecasted transactions are probable.

34. There are no amounts in accumulated other comprehensive income related to hedge accounting that should be reclassified to earnings as a result of forecasted transactions becoming probable of not occurring, in accordance with ASC 815-30-40-4 and 40-5.

35. For any derivatives not currently designated in a hedge relationship (so called economic hedges), we recognized any cash settlements in the same income statement line that fair value changes were recorded.

36. We disclosed in the consolidated financial statements each significant concentration of credit risk arising from all financial instruments in accordance with ASC 825, *Financial Instruments* and ASC 815, *Derivatives and Hedging* (ASC 815), 815-10-65.

37. We consider the decline in value below cost of debt and equity securities classified as available-for-sale to be temporary. For all investments in an unrealized loss position for which other-than-temporary impairments have not been recognized, we included disclosures in the consolidated financial statements in accordance with ASC 320, *Investments - Debt and Equity Securities*. We are responsible for the fair value of estimates related to debt and equity securities, and determined the models, methods and assumptions used by pricing services are reasonable.

38. We evaluated, recorded and disclosed in the consolidated financial statements all contractual arrangements within the scope of ASC 840, *Leases* (ASC 840), including consideration of, but not limited to, whether: (1) arrangements which contain a lease are in accordance with ASC 840-10-15-6 though 15-9, *Arrangements that Qualify as Leases*, and (2) any purchase or renewal options are reasonably assured of exercise.

CONFIDENTIAL

FSLR00184311

39. We reviewed all arrangements that are being accounted for in accordance with ASC 605, *Revenue Recognition* (ASC 605), 605-35, *Construction-Type and Production-Type Contracts*, and confirm that the arrangements are within the scope of the statement.

40. We recognize revenue in accordance with SAB 104, *Revenue Recognition*. We disclosed to you all sales terms (whether written or oral), including all customer-acceptance provisions, rights of return or price adjustments and all warranty provisions. As part of evaluating the delivery criteria for revenue recognition, we specifically considered the impact of any continuing involvement.

41. We provided you with complete customer contract files (including all purchase orders, contracts, letter agreements, sales offers, shipping documents and other correspondence) for all customers for which you requested such documentation.

42. We identified the operating segments after consideration of the operating results regularly reviewed by the Chief Operating Decision Maker (consisting of senior executive staff), and disclosed in the consolidated financial statements all the relevant factors used to identify the reportable segments, including whether operating segments have been aggregated in accordance with ASC 280, *Segment Reporting* (ASC 280). The Chief Operating Decision Maker package has been included as an attachment to this letter.

43. We properly and consistently applied accounting policies for the provisions of ASC 718, *Compensation- Stock Compensation* (ASC 718), including requisite service period, attribution method, forfeiture rate assumption and the classification of awards as equity or a liability, and presented windfall tax benefits in the cash flow statement as financing inflows.

44. The listings provided to you of stock-based compensation awards granted, exercised, cancelled and forfeited during the reporting period are complete and accurate. We appropriately assessed the probability of vesting for awards with performance conditions and adjusted compensation cost in accordance with ASC 718.

45. The fair value of share-based awards was determined using an acceptable model and reasonable assumptions in accordance with ASC 718 and SAB 107, *Share-Based* Payment, as amended by Topic 14 (SAB 107 and SAB 110).

46. There has been no settlement of stock awards in cash, nor do we intend to settle future stock awards in cash.

47. We established a deferred tax asset valuation allowance in accordance with the provisions of ASC 740, *Income Taxes* (ASC 740). Based on the weight of the available evidence, the valuation allowance is adequate to reduce the total deferred tax asset to an amount that will, more-likely-than-not, be realized.

48. We disclosed in the consolidated financial statements and advised you of all significant tax positions for which it is reasonably possible the amount of unrecognized tax benefit will either increase or decrease in the next

CONFIDENTIAL

FSLR00184312

twelve months. We recognized changes in recognition and measurement of uncertain tax positions in the period to which they relate, including the interim period, and disclosed in the consolidated financial statements all individually significant changes in uncertain tax positions, even if the net amount of all such changes was insignificant. We recognized and measured all uncertain tax positions in accordance with ASC 740. We provided you access to all relevant information related to significant uncertain income tax positions that we have taken or expect to take, including all related opinions and analyses.

49. We provided you with all information related to significant income tax uncertainties of which we are aware. We also provided you with access to all opinions and analyses that relate to positions we have taken regarding significant uncertain income tax positions.

50. We appropriately reconciled the deferred tax assets and deferred tax liabilities recorded in the consolidated financial statements to their related supporting information. All related reconciling items considered to be material were identified and adjusted in the consolidated financial statements.

51. Assets and liabilities were measured both on a recurring and nonrecurring basis at fair value in accordance with ASC 820, *Fair Value Measurements and Disclosures* (ASC 820). The valuation was determined using an acceptable methodology applied on a consistent basis and taking into account reasonable assumptions, including highest and best use, nonperformance risk and credit and liquidity risk adjustments. We classified and disclosed financial assets and liabilities in the consolidated financial statements as Level 1, Level 2 and Level 3 in accordance with ASC 820, including a description of inputs and information used to develop valuation techniques as well as facts that required a change to such techniques.

52. We reviewed long-lived assets to be held and used for impairment in accordance with ASC 360, *Property, Plant, and Equipment* (ASC 360), 360-10-35, Subsequent Measurement, and determined no adjustment was necessary in Q4 2011 for the Vietnam factory, as the facility did not meet the held for sale criteria and was not considered abandoned.

53. We have recorded the accrual for the Low Power Modules and all other related warranty liabilities based upon our best estimate of the liability. This best estimate is within the range of loss disclosed in the financial statements.

We have provided all information related to our updated understanding of the low power module liability recorded this quarter and in previous quarters. We have disclosed to you all know claims, and have recorded our liability based on the contractual commitments known to us at year end. We are not aware of any other oral or written claims of which are not accounted for at year end.

CONFIDENTIAL

FSLR00184313

To the best of our knowledge and belief, there were no (1) events that have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned consolidated financial statements; and (2) changes in internal control over financial reporting or other factors that might significantly affect internal control over financial reporting, including any corrective actions taken by us with regard to significant deficiencies and material weaknesses, that have occurred subsequent to December 31, 2011 and through the date of this letter.

_____

Mike Ahearn
Chief Executive Officer

_____

Mark Widmar
Chief Financial Officer

_____

James Brown
President, Global Business Development

_____

Bryan Schumaker
Corporate Controller

CONFIDENTIAL

FSLR00184314

Appendix IV

CONFIDENTIAL

FSLR00184315



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

**To:**      Financial Reporting Files                                    **Date:** 2011 Dec 31

**From:**   Tyler Hillstead - Corporate Accounting

**Subject:** SAB 99 Assessment

---

### Overview:

As part of its 2010 Q2 Form 10-Q filing, First Solar, Inc. (FSI) and its subsidiaries reported a manufacturing excursion that occurred during the June 2008- June 2009 period.  The manufacturing excursion resulted in a limited number of Series II solar modules that may experience a premature power shortfall after installation in the field.

At June 30, 2011, FSI based its accrual estimate on the Monte Carlo analysis which was deemed to be the best methodology to estimate the accrual at that time due to the significant amount of uncertainty in the inputs.  As of June 30, 2011 there were 5,149 claims of which 2,963 needed to be analyzed.

In Q3 2011, FSI began to transition to consider an Empirical model and then fully transitioned to the Empirical model in Q4 11.  As part of the year end close FSI analyzed the empirical data that was now available to us at Q4 11 and applied that to the 2011 prior quarters.

Based on the information reviewed by the FSI Controller's organization in the fourth quarter, the period between the end of Q2 11 and the date on which FSI filed its Q2 11 Form 10-Q, FSI incurred liabilities of approximately $4.07 million pursuant to such communications.  Such liabilities were not reported in the Q2 11 interim financial statements, but were instead recorded in the Q3 11 interim financial statements (the "Q2 11 Misstatement").  FY 11 audited financial statements included in the FSI FY 11 Form 10-K (the "Q3 11 Misstatement" and together with the Q2 11 Misstatement collectively, the "Misstatements").

The purpose of this SAB 99 Assessment is to document FSI's conclusions regarding the timing of the liability recognition and the associated materiality of the Misstatements with respect to the interim financial statements for Q2 11.

---

### Background:

FSI has assessed the supporting communications between our Technical Customer Service ("Performance and Prediction") team and the Owners.  The general sequence and timeline of communications is as follows:

- November 2009 – *Initial communication with Owners and introduction of the manufacturing excursion.*  The initial communication states the following: "Your service provider will inspect your system to confirm if excursion modules are affecting the expected performance of your system and exchange any

---

Page 1 of 12

CONFIDENTIAL                                                                        FSLR00184316



**MEMORANDUM**

350 West Washington Street
Suite 600
Tempe, AZ 85281 USA

underperforming modules at First Solar's expense." This creates a legal obligation above our normal warranty obligation.

- September 2010 – *Subsequent communication with Owners regarding FSI's disclosure of the manufacturing excursion in the 2010 Q2 10-Q including Q&A,* which states:
  - "First Solar is taking voluntary actions beyond the standard warranty program;"
  - "Specific timing of module replacement is driven by arrangements with system owners and customers and occurs as practice after the identification of the affected modules;"
  - "First Solar will reimburse costs associated with affected modules, including costs associated with the disassembly/assembly of the identified modules;" and
  - "First Solar is covering costs associated with the excursion beyond its standard warranty program for claims filed with First Solar before November 30, 2010; beyond this date, customers may submit claims under the standard First Solar 25-year module warranty."

These communications created an obligation on behalf of FSI; however, further testing and internal assessment was still needed in order for FSI to be able to estimate the related liabilities.

Beginning in Q1 2009, and continuing through the present, FSI's Performance and Prediction team has been assessing the received claims related to the manufacturing excursion and determining the number of modules that need replacement on a claim-by-claim basis. FSI considers the liability for each such claim to be estimable after the Performance and Prediction team has tested the claim, generated the system check analysis report, and internally determined the specified quantity of modules to be replaced for smaller claims. Additionally, larger claims require (and required) review and approval from senior management prior to being able to estimate the quantity of modules to be replaced vs. only internal estimation and generation of the system check report. Please reference FSI Accounting files for additional memos and explanations regarding the liability recognition related to the special excursion.

Reviewing the trend or average "run-rate" of the claims processing that occurred between Q4 10 and Q4 11, the Performance and Prediction team processed ~27MWs worth of claims per quarter or 9MWs per month. FSI deems the 9MW trend to be its maximum exposure that could occur in any one period which equates to an obligation of $4.6M.

<u>July 2011</u>
As of the end of Q2 11, FSI had assessed 404 sites with claims totaling 93 MWs to be remediated. During the period between the end of Q2 11 and the date on which FSI filed its Q2 11 Form 10-Q, FSI had become aware of an additional 17.25MWs consisting of 102 claims to be remediated, which included several larger claims which required

**CONFIDENTIAL**

**FSLR00184317**



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

additional review and approval from senior management. These amounts were not considered in the second quarter financial closing process.

As part of the year end closing process, FSI analyzed the internal estimation dates and the approved replacement volume dates:

- 9.3MWs consisted of 12 larger claims that were reviewed and approved by senior management and communicated to the Owner(s) after the date on which FSI filed its Q2 11 Form 10-Q:
  - 4 claims totaling 1.8 MWs were approved and communicated in Q3 11(August and September);
  - 7 claims totaling 7.4MWs were approved and communicated in Q4 11; and
  - 1 claim totaling .6 MWs was approved and communicated in Q1 12

The extended time it took for larger site claims (~>150kw) to be approved is based on the following customer and weather driven factors:

1. Customer Specific Data Analysis – Analysis must be planned around inverter down-time, and calibration of site specific energy output monitoring systems. There is a large volume of data points required to finalize the system performance reports which requires extensive customer data points and analysis in order to determine the root cause. In addition, FSI sends a representative to support and review the analysis performed by the customer which takes resources, planning, and scheduling around weather patterns causing additional delays;
2. Weather – Depending on the time of year, weather can lead to additional delays in approval timelines. Decisive module performance analysis requires weather patterns with optimum irradiation (sunny days).

This information was not available as of the 10-Q filing date.

The 9.3MWs were not estimable as of the date on which FSI filed its Q2 11 Form 10-Q and are therefore excluded from this SAB 99 analysis. Also, they were not considered probable as of the 10-Q filing date. See the Appendix for details of the claims that make up the 9.3MWs.

The remaining balance should have been accrued in the second quarter and is an error. This represents 90 claims totaling 7.95MWs and equates to an obligation of $4.07M in the second quarter of 2011 that is applicable to this SAB99 analysis. This trend generally falls in line with the 9MWs processed and estimated on a monthly basis explained above.

### SAB 99 Assessment:

### Introduction:

We have conducted a quantitative and qualitative assessment of the Misstatements related to our manufacturing excursion remediation costs under our voluntary remediation program based on the guidance set forth in the Securities and Exchange Commission (the "SEC") Staff Accounting Bulletin 99, *Materiality* (August 12, 1999)

CONFIDENTIAL                                                                        FSLR00184318



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

("SAB 99) and have determined that the effects of such Misstatements on FSI's consolidated financial statements for the affected periods are not material.

According to SAB 99, the use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that - without considering all relevant circumstances - a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important. In its Concepts Statement 2, the FASB stated the essence of the concept of materiality as follows:

The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is a substantial likelihood that the fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality. Court decisions, Commission rules and enforcement actions, and accounting and auditing literature have all considered "qualitative" factors in various contexts.

The FASB has long emphasized that materiality cannot be reduced to a numerical formula. In its Concepts Statement 2, the FASB noted that some had urged it to promulgate quantitative materiality guides for use in a variety of situations. The FASB rejected such an approach as representing only a "minority view, stating - This SAB is not intended to change current law or guidance in the accounting literature regarding accounting estimates. See Accounting Principles Board Opinion 20, Accounting Changes 10, 11, 31-33 (July 1971).

- whether the misstatement masks a change in earnings or other trends

Page 4 of 12

CONFIDENTIAL

FSLR00184319



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
- whether the misstatement changes a loss into income or vice versa
- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability
- whether the misstatement affects the registrant's compliance with regulatory requirements
- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements
- whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation
- whether the misstatement involves concealment of an unlawful transaction.
- whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate

This is not an exhaustive list of the circumstances that may affect the materiality of a misstatement. Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself "too blunt an instrument to be depended on" in considering whether a fact is material. When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.

**Quantitative Considerations:**

The effect of the Misstatements is potentially quantitatively material. As an initial matter, the Misstatements have *no* effect on (i) the Statement of Cash Flows, or (ii) Debt Covenants, or (iii) Negligible impact in working capital ratios, in our consolidated financial statements included in our interim reports on Form 10-Q for the interim periods in 2011.

The quantitative impact of the Misstatements is reviewed below, for each of the impacted quarters.

CONFIDENTIAL

FSLR00184320



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

| Figures presented in Millions | Q2 11 | YTD Q2 11 | Q3 11 | YTD Q3 11 |
|---|---|---|---|---|
| **Pre-Tax Net Income** | $ 71.96 | $ 205.00 | $ 222.77 | $ 427.70 |
| **Misstatement** | $ (4.07) | $ (4.07) | $ - | $ - |
| **Prior Quarter Reversal** | $ - | $ - | $ 4.07 | $ 4.07 |
| **Adjusted Pre-Tax Net Income** | *$ 67.89* | *$ 200.93* | *$ 226.84* | *$ 431.77* |
| **Misstatement Percentage** | 5.7% | 2.0% | 1.8% | 1.0% |
| **After-Tax EPS Misstatement Impact** | $ 0.04 | $ 0.04 | $ 0.02 | $ 0.02 |
| **After-Tax EPS Misstatement Impact as % of EPS** | 5.7% | 2.0% | 0.8% | 0.4% |
| **Current Assets** | $1,836.23 | | $2,430.47 | |
| **Current Liabilities** | $ 591.87 | | $ 747.00 | |
| **Working Capital Ratio - Without Misstatement** | 3.10 | | 3.25 | |
| **Working Capital Ratio - With Misstatement** | 3.08 | | 3.25 | |

The table below sets forth the data related to the claims for which communications were sent to Owners in the period between July 1, 2011 and July 31, 2011:

**JULY:**

| Total MWs | Total Claims | Internally Estimated Liability as for July 2011 (Q2 Misstated Amount)* | EPS Impact (Pre Tax) | EPS Impact (After Tax) |
|---|---|---|---|---|
| 7.95 | 90 | $4.07M | $0.05 | $0.04 |

*Estimated expense not accrued as part of Q2 11 results that was incurred in the period between the end of Q2 11 and the date on which FSI filed its Q2 11 Form 10-Q.

## Qualitative Considerations:

SEC Staff Accounting Bulletin No. 114 states "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." Regarding quantitative measures, SAB 114 (and ASC 250-10-S99) "reminds registrants and the auditors of their financial statements that exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law." Further, it states "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Alternatively, SAB 114 (and ASC 250-10-S99) also provides some qualitative considerations when determining if an error is a material misstatement of the financial statements:

| SEC Consideration | FSI Response |
|---|---|
| Does the misstatement arise from an item capable of precise measurement or does it arise from an estimate and, if so, the degree of imprecision inherent in the estimate? | **No** – The estimate of the total modules to be replaced is inherently imprecise. However, the minimal accrual to be recorded should be based upon the contractually communicated obligation at period end after taking into consideration subsequent events through the period between June 30, 2011 and the date on which FSI filed its Q2 11 Form 10-Q. |
| Does the misstatement mask a change in earnings or other trends? | **No** – As FSI missed analyst expectations for Q2 11 and Q3 11 by a significant margin. The Misstatement did not mask a change in earnings. |

Page 6 of 12

**CONFIDENTIAL**

**FSLR00184321**

 **MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

| | |
|---|---|
| | During Q2 11, FSI recorded an incremental liability of $3.6M to its manufacturing excursion liability – showing a continued trend in excursion-related costs. In Q3 11, FSI recorded an additional liability of $47M related to the manufacturing excursion – a continuation of the prior trend. (see appendix and quantitative considerations for further details) |
| Does the misstatement hide a failure to meet analysts' consensus expectations for the quarter? | **No** – As described in the quantitative considerations and appendix, FSI missed analyst consensus expectations for Q2 11 and Q3 11. Whether the Misstatement had been recorded in the proper quarters or not, FSI would have missed such consensus expectations. |
| Does the misstatement change a quarterly loss into income or vice versa? | **No** – As described in the quantitative considerations and appendix, the Misstatement for Q2 11 or Q3 11 would not change the respectively quarterly net income into a loss or vice versa. |
| Does the misstatement relate to a segment or other portion of FSI's business that has been identified as playing a significant role in FSI's operations or profitability? | **Yes** – The Misstatement relate to FSI's Components segment, which played a significant role in FSI's operations and profitability during Q2 11, and Q3 11. However, had the Misstatement been correctly reported, income for the Components segment would have been decreased from $71.96M to $67.89M in Q2 11 and increased from $222.77M in Q3 11 to $224.33M in Q3 11. Note that the as reported income for the Components segment represented a 60% decrease in income from the same quarter in the prior year. With the Misstatement properly recorded, such decrease would have been equal to approximately 62.5% -- representing a 2.5% change from the reported income. |
| Does the misstatement affect FSI's ability to comply with regulatory requirements? | **No** – The Misstatement do not affect FSI's ability to comply with regulatory requirements. |
| Does the misstatement affect FSI's compliance with debt covenants or other contractual requirements? | <u>Debt Covenants</u><br>**No** – FSI has historically considered the manufacturing excursion charges as follows for respective debt facility covenants:<br><br><u>KLM debt facilities:</u> Manufacturing excursion charges are an extraordinary item that is excluded from the EBITDA calculation. The misstatements for Q2 11 or Q3 11 would not have changed FSI's assessment regarding its compliance with KLM debt facility covenants including subjective acceleration clauses.<br><br><u>Revolver:</u> Manufacturing excursion charges are an extraordinary and non-recurring item that is |

**CONFIDENTIAL**                                    **FSLR00184322**



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

| | |
|---|---|
| | excluded from the EBITDA calculation.  The misstatements for Q2 11 or Q3 11 would not have changed FSI's assessment regarding its compliance with the Revolver debt facility covenants including subjective acceleration clauses.<br><br>FFO debt facility: (same covenants and definitions as revolver).<br><br>Other contractual requirements<br>The Misstatements do not affect compliance with contractual requirements. |
| Does the misstatement have the effect of increasing management's compensation? | Bonus Plan<br>**No** - The 2011 FSI Bonus compensation plan is based on metrics relating to Operating Income, Watts Shipped, Average Selling Price, Levelized Cost of Energy, and Sales.  The Misstatements would have an impact on Operating Income, but the Misstatements would not have triggered the Operating Income metric in order for bonus compensation to be impacted.<br><br>Long-Term Incentive Stock Grants / Performance Equity Plan<br>**No** – The 2011 Performance Equity Plan (PEP) is based on metrics relating to EPS, Cost per Watt, and Sales Bookings (2011 & Future Years).  The Misstatements would have an impact on EPS, but the misstatement would not have triggered the threshold levels in order for bonus compensation to be impacted.  See quantitative considerations for more details. |
| Does the misstatement involve the concealment of an unlawful transaction? | **No** – The Misstatements do not involve the concealment of an unlawful transaction. |
| What would the volatility of the price of FSI's securities be in response to the disclosure of this misstatement? | FSI does not believe that the disclosure of the Misstatements in the Q2 11 or Q3 11 financials would introduce, or would have introduced, additional volatility to the FSLR stock price.  The FSLR stock price was already negatively impacted due to the misses in Q2 11 and Q3 11 of analyst consensus expectations.  Additionally, the cumulative amount of charge for the voluntary remediation program related to the manufacturing excursion was disclosed and the existence of the manufacturing excursion program was disclosed. |

## Conclusion

FSI has assessed the quantitative and qualitative factors related to the Misstatements and has concluded that the Misstatements are neither quantitatively nor qualitatively

CONFIDENTIAL

FSLR00184323



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

material to investors. Although the quantitative amount of the Q2 11 Misstatement as a percentage of operating income for that period was 5.7%, the dollar amount of the Q2 11 Misstatement is not considered to be significant to FSI as a whole. Even without the Q2 11 Misstatement, financial results for Q2 11 were unusually low due to overall industry excess supply and the peak timing of the economic crisis occurring in Europe, which resulted in a significant difference from FSI's guidance. The immaterial nature of the Q2 11 misstatement is emphasized by the increased Q3 11 operating income, which was three times the operating income of Q2 11. As a result, the $4.07M Q2 11 Misstatement was a moderate percentage of operating income in Q2 11. The qualitative factors overcome the quantitative size of such amounts, resulting in a conclusion that the Misstatements were not material to either Q2 11 or Q3 11.

CONFIDENTIAL

FSLR00184324



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

## Appendix

### Analyst Consensus Details – Q2 11

|  | **FSLR Results / Guidance** | **Consensus on day of release** |
|---|---|---|
| **2q11 – Qtrly EPS** | $0.70 | $0.92 |
| **2q11 - Qtrly Revenue** | $533 million | $590 million |
| **2q11 – 2011 EPS** | $9-$9.50 | $9.33 |
| **2q11 – 2011 Revenue** | $3.6-$3.7 billion | $3.76 billion |

### 10-Q – Q2 11

FIRST SOLAR, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share amounts)
(Unaudited)

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2011 | June 26, 2010 | June 30, 2011 | June 26, 2010 |
| Net sales | $ 532,774 | $ 587,854 | $ 1,100,067 | $ 1,155,815 |
| Cost of sales | 337,976 | 303,660 | 645,604 | 589,585 |
| Gross profit | 194,798 | 284,194 | 454,463 | 566,230 |
| Operating expenses: | | | | |
| Research and development | 33,102 | 22,836 | 64,453 | 45,724 |
| Selling, general and administrative | 86,872 | 78,597 | 173,872 | 145,461 |
| Production start-up | 10,294 | 2,288 | 22,225 | 3,431 |
| Total operating expenses | 130,268 | 103,721 | 260,550 | 194,616 |
| Operating income | 64,530 | 180,473 | 193,913 | 371,614 |
| Foreign currency gain (loss) | 1,659 | (2,625) | 2,609 | (3,321) |
| Interest income | 3,417 | 3,035 | 6,440 | 8,683 |
| Interest expense, net | — | (6) | — | (6) |
| Other income (expense), net | 2,351 | (439) | 2,002 | (1,173) |
| Income before income taxes | 71,957 | 180,438 | 204,964 | 375,797 |
| Income tax expense | 10,819 | 21,395 | 27,858 | 44,409 |
| Net income | $ 61,138 | $ 159,043 | $ 177,106 | $ 331,388 |
| Net income per share: | | | | |
| Basic | $ 0.71 | $ 1.87 | $ 2.07 | $ 3.91 |
| Diluted | $ 0.70 | $ 1.84 | $ 2.03 | $ 3.84 |
| Weighted-average number of shares used in per share calculations: | | | | |
| Basic | 86,164 | 84,852 | 85,746 | 84,679 |
| Diluted | 87,126 | 86,401 | 87,092 | 86,247 |

CONFIDENTIAL

FSLR00184325



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

## Analyst Consensus Details – Q3 11

|  | **FSLR Results / Guidance** | **Consensus on day of release** |
|---|---|---|
| **3q11 – Qtrly EPS** | $2.25 | $2.67 |
| **3q11 - Qtrly Revenue** | $1.01 billion | $1.02 billion |
| **3q11 – 2011 EPS** | $6.50-$7.50 | $8.62 |
| **3q11 – 2011 Revenue** | $3-$3.3 billion | $3.6 billion |

## 10-Q – Q3 11

FIRST SOLAR, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share amounts)
(Unaudited)

|  | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | September 30, 2011 | September 25, 2010 | September 30, 2011 | September 25, 2010 |
| Net sales | $ 1,005,788 | $ 797,899 | $ 2,105,855 | $ 1,953,714 |
| Cost of sales | 626,624 | 476,007 | 1,272,228 | 1,065,592 |
| Gross profit | 379,164 | 321,892 | 833,627 | 888,122 |
| Operating expenses: | | | | |
| Research and development | 38,164 | 21,472 | 102,617 | 67,196 |
| Selling, general and administrative | 112,743 | 84,961 | 286,615 | 230,422 |
| Production start-up | 5,514 | 3,821 | 27,739 | 7,252 |
| Total operating expenses | 156,421 | 110,254 | 416,971 | 304,870 |
| Operating income | 222,743 | 211,638 | 416,656 | 583,252 |
| Foreign currency (loss) gain | (1,857) | (1,001) | 752 | (4,322) |
| Interest income | 3,225 | 2,658 | 9,665 | 11,341 |
| Interest expense, net | — | — | — | (6) |
| Other (expense) income, net | (1,346) | (380) | 656 | (1,553) |
| Income before income taxes | 222,765 | 212,915 | 427,729 | 588,712 |
| Income tax expense | 26,251 | 36,046 | 54,109 | 80,455 |
| Net income | $ 196,514 | $ 176,869 | $ 373,620 | $ 508,257 |
| Net income per share: | | | | |
| Basic | $ 2.28 | $ 2.08 | $ 4.35 | $ 5.99 |
| Diluted | $ 2.25 | $ 2.04 | $ 4.29 | $ 5.88 |
| Weighted-average number of shares used in per share calculations: | | | | |
| Basic | 86,338 | 85,072 | 85,946 | 84,810 |
| Diluted | 87,151 | 86,610 | 87,114 | 86,368 |

CONFIDENTIAL

FSLR00184326



**MEMORANDUM**

350 West Washington Street
Suite 600
Tempe, AZ 85281 USA

### July 2011 Appendix:

| Registration | Name of Site | Customer | Size of Site | Approved Volume (kWs) | Volume Approved Date | P&P System Check Report Creation Date |
|---|---|---|---|---|---|---|
| FR 92 10032302213 | Quantum Energie Pierrelatte | Séchilienne Sidec | 6970.475 | 2760.00 | 10/20/2011 | 7/27/2011 |
| DE 82 09070609005 | Solarpark Türkenfeld (BA 1) | Phoenix Solar AG | 3024 | 1706.25 | 11/23/2011 | 7/18/2011 |
| IT 73 09080301383 | SOL SALENTO 2 | Conergy AG | 996.3 | 814.05 | 11/29/2011 | 7/21/2011 |
| DE 86 09092409111 | Energiequelle GmbH u. Co. PVA Hollenbach Ingelhausen KG | Gehrlicher Solar AG | 3732 | 768.35 | 11/8/2011 | 7/18/2011 |
| DE 92 09071407355 | Solarpark Thannhausen | Ecostream | 1518.75 | 641.25 | 8/10/2011 | 7/18/2011 |
| IT 73 09110412163 | SOLSALENTO 1 (UNO) | Conergy AG | 996.3 | 638.55 | 11/29/2011 | 7/21/2011 |
| DE 89 10022608455 | Helmeringen II | Gehrlicher Solar AG | 9419.22 | 565.38 | 12/20/2011 | 7/7/2011 |
| DE 06 09101509242 | Husemann & Rochell GbR | COLEXON Energy AG | 625.8975 | 544.90 | 9/2/2011 | 7/27/2011 |
| DE 86 09112504205 | P1101 Freiflächenanlage Niederarnbach | juwi solar GmbH | 2322 | 464.50 | 8/18/2011 | 7/21/2011 |
| DE 73 10020302552 | Handelshof Wendlingen | Conergy AG | 237.8 | 186.76 | 9/15/2011 | 7/22/2011 |
| ES 30 10062507221 | Planta Solar Nemesis III | Phoenix Solar AG | 275.5 | 138.75 | 11/23/2011 | 7/19/2011 |
| DE 88 08082714205 | Reithalle Wolfegg | Phoenix Solar AG | 56.84 | 56.84 | 2/8/2012 | 7/13/2011 |
| | | | 30175.1 | **9285.6** | | |

Reviewed by:

_____
      /s/ Bryan Schumaker
Bryan Schumaker, Corporate Controller

Date:

_____
      February 21, 2012

CONFIDENTIAL

FSLR00184327

© 2012 PricewaterhouseCoopers LLP. All rights reserved. In this document, "PwC" refers to PricewaterhouseCoopers LLP, a Delaware limited liability partnership, which is a member firm of PricewaterhouseCoopers International Limited, each member firm of which is a separate legal entity. This document is for general information purposes only, and should not be used as a substitute for consultation with professional advisors.

CONFIDENTIAL

Exhibit 25



# Memo

To: First Solar 2012 File

From: Karina Rivera, Adam D'Angelo

Date: January 19, 2013

Subject: Class action complaint for violation of the federal securities laws

## Class Action Lawsuit

On March 15, 2012, a class action lawsuit titled Smilovits v. First Solar, Inc., et al. , Case No. 2:12-cv-00555-DGC, was filed in the United States District Court for the District of Arizona ( "Arizona District Court") against the Company and certain of the Company's current and former directors and officers. The complaint was filed on behalf of purchasers of the Company's securities between April 30, 2008, and February 28, 2012 (a time over which First Solar's stock price and the industry as a whole declined significantly). The complaint generally alleges that the defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by making false and misleading statements regarding the Company's financial performance and prospects. More specifically the complaint claims that First Solar executives perpetuated a fraudulent scheme by concealing and misrepresenting the nature and extent of major manufacturing and design defects in their solar modules. The action includes claims for damages, and an award of costs and expenses to the putative class, including attorneys' fees.

On July 23, 2012, the Arizona District Court issued an order appointing as lead plaintiffs in the class action the Mineworkers' Pension Scheme and British Coal Staff Superannuation Scheme (collectively "Pension Schemes").

## LPM Background

In an effort to produce modules more efficiently, First Solar has been continually looking at ways to make improvements to the Company's production process. One change that was made starting in 2008 was to install new ovens (used for the heating of the Cad Chloride on the module) that would allow for heating at a higher temperature, allow for modules to spend less time in the oven and thus be produced more efficiently. Despite positive initial testing for the expected level of power production in the factory, it was later determined that this change resulted in modules that produced wider ranges of power output than intended. As a result there were certain modules that produced less power than their label.  This new process was in effect over the course of 13 months (June 2008 - June 2009) and affected the Perrysburg, Frankfurt-Oder and Malaysia plants (four lines in Malaysia only).

Management stated that they were not aware of the problem with the modules until in 2009. From this point forward, management began performing a quarterly estimate of the number of low power modules ("LPM") to be replaced and the reverse logistics cost associated with those modules to ensure that the warranty reserve was properly stated at each quarter end.

Beginning in 2009 management began to inform their ultimate customers (and provided the letters to First Solar's direct customers) that there was a manufacturing excursion and that they would replace the modules at no cost to their customers which was beyond the standard warranty provisions because the customer would ordinarily need to identify, rip out and send the module to first solar before a new module would be shipped. In order to qualify for a replacement a claim would need to be filed by the customer and reviewed and approved by First Solar. All claims had to be submitted by November 30, 2010 to be eligible for the program. Based on the information they had at the time,

Confidential Treatment Requested



management recorded a $6.5 million accrual at December 31, 2009 due to the limited amount of watts expected to be included in the population.

During 2010, management received/became aware of additional claims/information related to commitments and made additional accruals. This accrual included an estimated amount of power compensation to cover the loss of power due to these underperforming modules. At the end of 2010, management was using a Monte Carlo model to calculate their best estimate of the accrual. The Monte Carlo model used the following key assumptions/estimates: 1) the suspect population, 2) the hit rate, and 3) the probability of a performance issue. The incremental amounts of expense recorded in 2010 due to these commitments were $4.5 million, $23.1 million and $8.4 million in the first, second and fourth quarter, respectively.

During 2011, the Company continued this policy and recorded additional expense of $3.6 million, $46.9 million and $125.7 million during the second, third and fourth quarter respectively, including power compensation. The third quarter accrual represented an accrual for approximately 120 MW of modules which was considered management's best estimate. The liabilities through the third quarter were recorded net of fair market value of the modules that were to be returned. Management believed that any claims above 120 MW would be rejected, based on the rate of filling previous claims and the nature of the remaining potential claims. Accordingly, Management excluded an additional 85 MW from the liability calculation on this basis. The changes in Q4 ranges and best estimates were due to (i) additional testing that had occurred, (ii) increases in the volumes of module testing that have been processed, and (iii) management's realization that some claims that were previously considered unlikely to be fulfilled would likely be fulfilled.

Robust disclosure was included in the 2011 10K related to this issue and estimate.

In 2011, as part of the fourth quarter testing the engagement team became aware of approximately $8 million of commitments that were committed to by Management (letters stating First Solar will perform remediation activity above and beyond the normal warranty) that were not accrued for in the second quarter. The engagement team communicated that a significant deficiency related to their warranty liability existed at that time.

## Class Action Lawsuit Allegations

The complaint alleges that members of the management team failed to timely disclose the nature of certain equipment problems they identified and fraudulently under recorded- warranty related costs resulting from product defects that should have been taken in earlier periods. Below are the key allegations with financial impact.

- Product defects – Despite the fact that they knew of these product defects, defendants actually decreased the warranty reserve from 2.24% at 1Q08 to 1.11% at 4Q10. The Company did not make the required disclosures.

- Hot climate degradation – In addition to the manufacturing excursion there were also heat degradation issues which should have resulted in loss contingencies. The Company did not adequately disclose this information.

- Revenue recognition – The solar modules had not previously demonstrated that they met the seller's performance specifications therefore they should have deferred revenue for that product. The Company failed to disclose the material effect on net sales.

- Cost per watt – The vice president of FP&A pressured his subordinates to incorrectly calculate the publicly reported cost-per-watt number.

Confidential Treatment Requested



**pwc**

**<u>PwC Procedures</u>**

**_Discussions with Internal counsel_**

Discussions were held by the members of the engagement team and Mary Beth Gustafson (General Counsel) on several occasions, including April 26, 2012, July 25, 2012, October 25, 2012, and January 11, 2013, to obtain updates on the case. Based on these discussions, internal counsel believes that the allegations are without merit and they do not believe they have any probable loss at this time relating to the claim.

**_Discussion with External counsel - Morrison Foerster_**



Redacted

**_Discussions with the Audit Committee_**

Prior to the lawsuit as part of the 2011 year-end financial close, the audit committee hired Gibson Dunn to perform an independent analysis of the work that management and internal audit had done over LPM. Per discussions between Adam D'Angelo and Tom Presby, Audit Committee Chair, the results of the investigation satisfied the Audit Committee. Tom also indicated that he was comfortable with the company's defences and did not believe an accrual would be warranted at this time.

**_Auditing Considerations of the Allegations_**

Refer below for a discussion of each respective item.

**_Warranty Rate – Product defects including LPM and hot climate_**

Allegations - _Despite the fact that they knew of these massive product defects, defendants actually decreased the warranty reserve from 2.24% at 1Q08 to 1.11% at 4Q10. In addition to the manufacturing excursion there were also heat degradation issues which should have resulted in loss contingencies. The Company did not make the required disclosures._

First Solar provides a limited warranty against defects in materials and workmanship under normal use and service conditions for 10 years following delivery to the owners of their solar modules. They also typically warrant to the owners of their solar modules that solar modules installed in accordance with agreed-upon specifications will produce at least 90% of their labelled power output rating during the first 10 years following their installation and at least 80% of their labelled power output rating during the following 15 years. In resolving claims under both the defects and

Confidential Treatment Requested



power output warranties, First Solar has the option of either repairing or replacing the covered solar module or, under the power output warranty, providing additional solar modules to remedy the power shortfall. They also have the option to make a payment for the then current market price for solar modules to resolve claims.

First Solar accrues the module warranty liability upon shipment of the modules based on the estimated future costs of meeting their limited warranty obligations. They make and revise these estimates based primarily on the number of solar modules under warranty, historical experience with warranty claims, monitoring of field installation sites, internal testing of and the expected future performance of their solar modules and BoS components, and estimated per-module replacement cost. Prior to Q4 2011, management had performed an assessment of the warranty rate based on actual return data excluding low power modules (LPM) since LPM was treated as a separate accrual.

To test warranty expense, the PwC engagement team obtained an understanding of management's estimate, tested the assumptions (historical return rate, etc.) and recalculated it (modules sold * estimated rate of return * estimated replacement cost).

To test LPM, the engagement team obtained an understanding of management's calculation, recalculated information, reperformed the Monte Carlo simulation, tested claims data, tested costs, and stress tested the inputs. Additionally, the engagement team tested the power compensation accrual by review of management's communication of such commitments to their customers. This is discussed further below in the year by year walk.

The warranty rate was reduced from 2.14% (0.5% power and 1.64% defect) to 1.82% (0.5% power and 1.32% defect) in Q3 of 2008, and it remained at this level until Q4 of 2011 at which point it was raised to 2.82% (1.32% defect and 1.5% power). The downward change occurred before management became aware of the problem in 2009 and was revised upward when Management became aware of the full extent of the problems from the manufacturing excursion in 2011. These changes and our testing procedures over the warranty rate are discussed further below. Note that prior to Q4 2011 management had performed an assessment of the warranty accrual and had determined that no change was needed as the current rate was sufficient to cover all the known performance issues. The rate in these periods was based on actual return data excluding LPM. As mentioned above, LPM was treated as a special onetime event that should not impact the warranty rate. This was because the population affected by LPM issue related to a specific change in the production process where the Company was able to trace the low power modules back to specific pieces of equipment used on the production lines and was able to isolate the potential modules affected to 6,241 CdCl2 days of production (the number of days a single line was in operation). Since this population was addressed separately, the warranty rate was not increased but accruals related to the LPM modules where recorded separately.

2008
During the 3rd quarter of 2008 the First Solar quality department updated the statistical analysis that is used to estimate and project the warranty return rate. As a result, the defect rate was reduced from 1.64% to 1.32%. The primary driver of this return rate reduction was due to the quality department's continuous improvement to increased product reliability to date. Because of the increasing amount of mature data that was available they decided to break out monthly "vintages" for purposes of analyzing the data. In the prior analyses annual "vintages" were used as that represented the most reliable populations. The quality department indicated that they believed this breakdown of the data would allow for more data points to be analyzed and would help them better perform root cause analyses. In order to assess the accuracy of the estimated return rate, the PwC team reperformed management's calculation of the rate using the same raw data. To test the reliability of the data we performed an Accept Reject test and traced selected returns to RMA (Returned Material Authorization forms). Using the rates, the PwC team independently recomputed the warranty reserve calculation within an immaterial amount of the balance by multiplying modules sold * estimated rate of return * estimated replacement cost. The PwC team determined that the process for computing the defect return rate was considered accurate.

2009
During Q2 2009, FSI received notification from their customers, that some of their modules were not meeting minimum requirements. At that time FSI performed an analysis and determined that the company had adjusted their

Confidential Treatment Requested



temperatures for one of the batches which resulted in modules which produced lower watts per module than their label. At that time, the belief was that this only affected one batch of approximately 98K modules.

During Q3 2009, FSI started to refine their process of determining which modules needed to be replaced and how it would be done. It was determined that it would be easier to take back a table of modules within an array (i.e. a string of modules) instead of determining which modules on the array were low power modules. As a result, FSI recorded an additional accrual of $2.2M. The primary driver for the increase in the accrual was that FSI planned to disassemble a table instead of individual modules as had been originally planned; this would increase their labor costs and packaging costs. In addition, FSI would be testing all of these modules at their FFO manufacturing plant to determine which modules were low power, and which were still operating effectively and could be sold or replaced to the original table.

During Q4 2009, FSI continued to monitor the situation. No additional information became available that lead FSI to question the adequacy of the current accrual. As such, no changes were made in Q4.

During each of these quarters, the engagement team held discussions with management to assess the known facts and circumstances. Based on these discussions, the company was using the best available information to calculate the estimated liability. We also obtained a copy of the accrual calculation and reviewed it for reasonableness and mathematical accuracy. Additionally, we reviewed all known warranty related items to ensure that the warranty reserve was large enough to capture these items.

2010
As mentioned above, customers were originally instructed to submit their claims to FSI by November 30, 2010. Throughout 2010 FSI received a substantial amount of data through this claim process and work performed in the field. At the end of 2010, management was using a Monte Carlo model to calculate their best estimate of the accrual. The Monte Carlo model used the following key assumptions/estimates: 1) the suspect population, 2) the hit rate, and 3) the probability of a performance issue. These assumptions are based on historical data and best estimates. To test management's estimate the engagement team obtained an understanding of management's calculation, recalculated information, reperformed the Monte Carlo simulation, tested claims data, tested costs, and stress tested the inputs. Additionally, the engagement team tested the power compensation accrual by review management's communication of such commitments to their customers.

2011
In 2011, FSI processed/received a significant amount of site specific related claim support from their customers which allowed them to gain more transparency in the total exposure of potential warranty claims. As more claims where processed, there was stabilization in the total population of claims, stabilization of the rejection rate of the claims and a more reliable historical experience that could be applied to future expectations. This lead to changes in their assumptions and as a result of this FSI recorded an additional LPM accrual. The primary components of the accrual including the cost of modules, reverse logistics costs, estimate of valid claims and power compensation costs were tested by the engagement team.

2012
Based on the work performed to date over the claims received to date, we are not aware of necessary increases to the accrual. Additionally, we are not aware of any new issues/claims that are not already accrued for in the warranty accrual rate of 2.82%.

Warranty rate including hot climate
In Q4 2011 First Solar changed its warranty rate to 2.82% (1.32% defect and 1.5% power). All Product Defects such as SET, Hot Climate, LPM, Open Circuit, were evaluated by the engagement team. Procedures, including documenting an understanding of the issue, gathering necessary support (such as legal documents, quotes, contracts, customer communications, management analysis, legal analysis), recalculating amounts, stress testing assumptions, review of the timing and location of project construction / shipment of modules, and performing inquiry with employees, management, internal and external council as deemed appropriate. Further substantive procedures were performed on an annual basis as necessary. Based on these procedures, we gained comfort over the completeness, accuracy, and

Confidential Treatment Requested



timing of the accrual of these related items. Furthermore, this information was considered when reviewing the appropriateness of the warranty rate as discussed above. Based on all of these procedures, we are not aware of any defects that should have resulted in material loss contingencies in periods before they were actually accrued.

Low Power Modules
As noted previously, prior to Q4 2011 management had performed an assessment of the warranty rate based on actual return data excluding low power modules (LPM) since LPM was treated as a separate accrual. The stability (performance variance of the module difference from the labelled production) was later found to have greater variability in very hot climates (up to this point in time most of the modules were sold into the more temperate climate in Europe). Additionally, prior to 2012 FSI had typically installed modules in temperate climates which did not result in any indication of performance issues.

During 2011 a First Solar was having an increase in the number of installations in non-temperate climates, including hot climates such as the southwest US, in accordance with their Long Term Strategic Plan and contracted pipeline. With respect to such increased installations, FSI has increased their warranty reserve on a prospective basis. They expected to install higher volumes in non-temperate climates as part of their utility-scale offerings in Asia, the Middle East, Africa, Australia and the south western United States.

The Company recorded a significant liability for LPM apart from the warranty accrual. It appears the plaintiffs are including LPM in their warranty claim. It seems that they believe the LPM charges in the fourth quarter of 2011 should have been recorded earlier. However, as discussed above, we believe management recorded a liability based upon the facts they were aware in the third quarter of 2011. The final large accrual related to this was recorded in the fourth quarter of 2011 and the reasons for why it was recorded at that time were disclosed in the 10K for that year.

Additional Warranty Testing
In Q4 2011, the engagement team reviewed the available information and independently calculated the return rate for the remaining warranty modules (excluding the LPM). The engagement team believed that the remaining warranty modules will experience return rates that is somewhere in between the LPM return rates and the original return rates for the following reasons:

- The Company has identified that their modules do experience power loss in hotter climates and for STBi problems (which would make them have some of the characteristics of LPM).
- They have remediated the manufacturing excursion (and accounted for the true LPM separately) and therefore the remaining modules should also have return rates that are similar to that of their historical return rates after separating LPM.

The average of these two historical return rates is 2.46%. We then inputted this rate into the FS normal warranty model and compared output to the warranty accrual developed by management of 2.82% and noted that the balance was only $9.2 million lower. Given the complexity of the model used by management as compared to our independent calculation we believe the estimate prepared by management was reasonable. The engagement team also understood and reviewed the detailed calculation prepared by management at that time.

**Revenue Recognition**

Allegation - *The solar modules had not previously demonstrated that they met the seller's performance specifications therefore they should have deferred revenue for that product. The Company failed to disclose the material effect on net sales.*

Revenue is recorded based upon the expected power output of a module. The allegation is implying that warranty liability (including LPM) was so large that the company could not have been confident enough to recognize revenue when they did.

Confidential Treatment Requested

PWC0148447.006



Except for the management excursion that is the topic of this memo First Solar had a history of selling modules that produced power within a predictable power output range, had limited warranty claims to the contrary and was paid for by their customers over a relatively short period. Revenue recognized on modules sold to 3rd parties is appropriately recognized when the modules are shipped based upon the historical wattage output of their modules and testing performed at the factory prior to shipment (most modules actually produced above the listed label price). Also, the vast majority of the modules perform to specification.

The size of the LPM accrual related in large part to the generous manner in how First Solar decided to remedy their excursion problems not the modules themselves. The Company provided module replacements that when far beyond their normal warranty accrual (which requires the buyer to identify warrantied modules and to ship them to First Solar). First Solar eventually agreed to test, remove, replace and ship the old modules and that went far beyond the original module warranty of just providing a replacement module. Accordingly, the cost of the LPM accrual does not correlate to a problem with revenue recognition since the company was often agreeing to replace modules that were in good condition (because it was easier to replace a whole array) and because the customers were receiving benefits beyond the normal warranty accrual (no need for the customer to find the modules and return them at the customers cost)

### *Cost Per Watt*

Allegation - *The vice president of FP&A pressured his subordinates to do what was necessary to come up with the publicly reported cost-per-watt number.*

On October 31, 2009 Adam D'Angelo received an email from Tom Presby, First Solar Audit Committee Chair, detailing allegations of manipulation of the manufacturing cost per watt ("CPW") calculation by the First Solar FP&A group. The concerns were raised by an employee of the Ohio facility and related to how certain costs were excluded from the costs per watt calculation that is disclosed by First Solar publically (not a GAAP measure but derived from financial information). The allegations were initially brought to the attention of First Solar's internal audit group. Adam and Tom discussed the email on that same day.

CPW is a calculation that is monitored by the industry and investors since it indicates the manufacturing costs of producing a watt of solar energy, a key indicator of the affordability of solar energy. There is no uniform calculation of the metric in the industry and many companies include different costs in the calculation. CPW influences the year end GAAP financial statements since it is a factor in the final determination of the bonus calculation at year end. The specific item that was the focus of the allegation had the effect of rounding the CPW calculation for the third quarter by a cent.

During the week of November 2, 2009 First Solar internal audit performed an investigation of the allegations. Specifically, they performed the following: (i) substantively tested the cost per watt schedules calculated by FP&A (ii) analyzed a list of manual journal entries at the Ohio factory for the month of October, and (iii) obtained an understanding of the bonus calculation and how the cost per watt effected the third quarter bonus calculation. In summary, internal audit concluded that all the entries were reasonable and that the CPW calculation was appropriate. Additionally, Internal Audit noted that regardless of whether the entries were made the CPW calculation would be between $0.87 and $0.83 per watt which results in the same bonus payout at year end. Therefore, there would be no effect on the management bonus accrual for the third quarter.

Upon discussing the topic with Tom Presby, Mary Beth Gustafsson, First Solar Vice President and General Counsel, engaged an external law firm McDermott Will & Emery LLP (MWE) to perform further inquiries. Peter Kreinndler, counsel from MWE, ⌐ Redacted ¬





Redacted

The conclusions reached by Internal Audit and Outside Counsel were discussed on November 5, 2009 with the First Solar Audit Committee.

Based upon the review of the procedures performed by Internal Audit and the results communicated to PwC by legal counsel we concurred with management's conclusions that (i) the costs per watt calculation was reasonable, ii) the changes made were appropriate and (iii) the financial statements (including the bonus calculation) would not have been altered as a result of rounding the cost per watt calculation to 85 cents. This matter was discussed with Steve Kitson, Regional Risk Management Partner at the time and documented in a significant matter.

Since this time, the engagement team has performed quarterly procedures over the CpW including checking it for consistency with prior periods and a tie out to the trial balance. Additionally, we have monitored the results of the whistleblower hotline and have not been made aware of any similar allegations. Based on these quarterly and year end procedures, nothing has been brought to our attention that would question the results of this 2009 investigation as discussed above.

**Conclusions**
Based on our discussions/inquiries with internal counsel, external counsel, management and the audit committee, and our review of the class action lawsuit, we did not become aware of any facts and circumstances that would make us question the sufficiency of the audit work performed by the audit team. This memo has been shared with Steve Kitson, Regional Risk Management Partner.

Steve Kitson – Approval

Confidential Treatment Requested





Re: Two Final Memos and One New One

Steve Kitson    to: Adam D'Angelo                                    01/23/2013 01:23 PM

cc: Garret Tripp, Karina Rivera                                     Show Details

History:    This message has been replied to.

Adam - I am fine with changes to two prior memos, see my comments in the attached related to cfra, feel free to call if you would like to discuss. Steve

Adam D'Angelo        Steve - Attached below are the memos to discuss. The first one is new and the last two include the c...  01/23/2013 08:14 AM

From:       Adam D'Angelo/US/ABAS/PwC
To:         Steve Kitson/US/ABAS/PwC@Americas-US
Cc:         Garret Tripp/US/ABAS/PwC@Americas-US, Karina Rivers/US/ABAS/PwC@Americas-US
Date:       01/23/2013 08:14 AM
Subject:    Two Final Memos and One New One

Steve -

Attached below are the memos to discuss. The first one is new and the last two include the changes you suggested. Please let me know when you can discuss. We will set up a call with Guy and Renata once you indicate you are ok with the changes to the final memo.

Thanks for you help.
Adam

Last memo we promised related to the CFRA analyst report. This is the first time you are seeing it.

[doc icon]
CFRA Report 2012 updated for AD's comments - 1.22.13.docx

Your changes the memo regarding our decision not to extend procedures related to going concern have been included and tracked for changes.

[doc icon]
Indications of Substantial Doubt - w. Kitson Changes.docx

Your changes to the class action lawsuit memo have been included and tracked for changes.

[doc icon]
Class action lawsuit memo updated for AD's comments - 1.22.13.docx

Adam D'Angelo
PwC | Partner
Office: 646 471 1652 | Mobile: 646 236 8848 | Fax: 313 636 2161
Email: adam.d.angelo@us.pwc.com
PricewaterhouseCoopers LLP
300 Madison Avenue, New York, NY 10017
http://www.pwc.com/us

Confidential Treatment Requested

PWC0148447.009