# Exhibit 26

To identify possible actions that may affect interim financial information, perform the following, as appropriate:

Refer to PwC US Audit 12071.

| Procedures to be performed, guidance and templates link | Work completed and links, including responses to matters arising |
|---|---|
| a) Read the available minutes of meetings of shareholders, directors, and appropriate committees. Inquire about matters dealt with at meetings for which minutes are not available. Identify matters that may affect the interim financial information, including those matters that may affect the organizational and/or legal structure of the Company, which may have potential implications to the consolidation of the Company's financial statements. | See the summary of meeting minutes documented below this section, the linked package includes the meeting minutes from the February 2011 meeting. |
| b) Consider reading the reports rendered by internal auditors since the most recent annual audit or quarterly review. | Please refer to *Update understanding of internal controls and review 302 certification |
| c) Read any principal new borrowing agreements and contracts. | None noted. |
| d) Read any significant new sales (e.g., for revenue recognition issues, etc.) or purchase (e.g., for commitment issues, etc.) agreements. | Although there have been changes made to the sales framework in recent prior periods, no significant changes were noted in Q1 2011. Refer to *Perform inquiries regarding significant and complex matters for discussions with management. |
| e) Read any significant equity related agreements (e.g., preferred stock, equity options, etc.) to identify classification, beneficial conversion feature, valuation, option accounting and other issues related to such equity. | Refer to *Perform inquiries regarding significant and complex matters for work performed on equity transactions. |
| f) Read any other pertinent client documentation, including press release(s). | Refer to Summary of Press Releases. |
| g) If applicable, consider reviewing the Company's web site for pertinent financial and disclosure information. | In conjunction with our press releases review noted above in procedure f), the engagement team reviewed the company's web site for pertinent financial and disclosure information. There were no matters of significance that we noted which were not disclosed in the financial statements. |

Use the information obtained above to identify and provide a basis for inquiry about any significant matters that come to your attention.

## Summary of Board Minutes

See the link for the complete pack.  Board Package Final

**April 26, 2011**

Project Development Risk Committee 8:00am – 11:00am

Audit Committee Meeting 11:30am – 1:30pm

Compensation Committee Meeting 2:00pm – 3:30pm

Nominating and Governance Committee Meeting 3:30pm – 4:00pm

Board Dinner 5:00pm – 8:00pm

**April 27, 2010**

Board Meeting 7:00am – 2:00pm


***Project Development Risk Committee Meeting:***

**Meeting Agenda:**

1) Call to Order

2) Approval of Prior Minutes

3) Review of Transaction

4) Update on Scope of Authority

5) Project Portfolio Review


***Audit Committee Meeting:***

**Meeting Agenda:**

1) Administrative Matters

    A - approval of prior minutes

2) Company Q1 11 Financial Review

    A - Significant events and transactions

    B - Balance sheet flux

    C - Related Party Transactions

    D - Debt Covenant Report

    E - New Pronouncements

Confidential Treatment Requested

  F - Ray Tracker Acquisition Update

3) Review of PwC Interim Review

4) Recommendation to Board regarding Q1 Financials

  A - Review Draft Press Release

  B - Review Draft 10Q

  C - Resolution

5) Internal Audit Status - 2011 Audit Plan

  A - Goals

  B - IA 2011 Budget

  C - 2011 Audit Plan

  D - Internal Audit Team Metrics

6) PwC 2011 Service Plan

  A - Audit Plan

  B - Commitment Letter

  C - Audit Fee Discussion and Pre-Approval Requests

  D - Quality Assurance Review (QAR) Results

7) ERM Update

8) Compliance Report

Adam D'Angelo and Garret Tripp attended the audit committee meeting.

**Compensation Committee Meeting:**

**Meeting Agenda:**

1) Call to Order

2) Approval of Prior Minutes

3) Non-Standard Grants

4) Bruce Sohn Agreement

5) Compensation Philosophy Interview Process Update

6) Committee Charter Review

**Nominating and Governance Committee Meeting:**

Confidential Treatment Requested

**Meeting Agenda:**

1) Administrative Matters

2) Discuss Candidates for the board

3) Review Master Agenda


*Board Meeting:*

**Meeting Agenda:**

1) Administrative Matters          7:00am - 7:15am

a) Approve Prior Minutes

b) Approve AES Transaction

2) Organizational Update          7:15am - 8:00am

3) Committee Reports          8:00am - 8:45am

4) Financial Review          8:45am - 9:00am

5) Business and Market Update      9:45am - 11:45am

6) Plant Replication          11:15am - 11:45am

7) Long Term Plan Update          11:45am - 12:00pm

8) Lunch          12:00pm - 1:00pm

9) Technology Update          12:30pm - 1:00pm

10) Executive Session          1:00pm - 2:00pm

# Audit Committee Meeting
# April 29, 2011

During the audit committee meeting on April 26, 2011 the First Solar press release was not ready for review. This was due to First Solar finalizing their updated guidance ensuring they consider any impact from the "hot-climate stabilization" issue. Based on current test arrays and the output results from projects currently in high heat environments First Solar has identified that their modules have a faster degradation than modules in non-hot-climate environments. This analysis was presented to board; see slides 119-127 of the 'Board Presentation 042711' file within the Board Package Final link. Based on this finding First Solar has determined that they need to re-allocate approximately 20mw of modules to the projects currently in the high-heat environments. This reallocation of modules negatively impacts their earnings, as these are fewer modules that could have been sold to external customers, thus reducing earnings.

As documented in the step  PwC Audit Committee Report (04/26/11) the audit committee requested that PwC review certain facts surrounding the stabilization issue that was described to the in the full board. During our meeting with First Solar management and David Eaglesham the linked file was discussed - Stabilization Summary Memo. As shown in the memo First Solar has projected the results of the stabilization issue based on data from their current test

                    PWC0075311

facilities and already completed projects (Cimarron, Blythe, Copper Mountain and El Dorado), all in high-heat environments.  As the results show there is no projected issue with Cimarron and a short period of time by Blythe is expected to perform below the warranty level (years 8-10, expected module impact to be 7,000 modules - less than $1m).  We also discussed any potential Q1 2011 impact.  For all projects First Solar is outside the time period for where liquidated damages could apply, and there is currently no increased warranty exposure.  Also, First Solar has not committed to any of these customers that they will replace modules.  In conclusion, there is not Q1 2011 financial impact, and reason for the primary driver to the analysis is for First Solar to remediate the issue before their footprint grows in the high-heat environments (currently they only have 10% of their modules in high-heat but this will increase closer to 90% over the next five years).

Confidential Treatment Requested

PWC0075312

Exhibit 27

| Engagement: | First Solar Q1 2011 |
|---|---|
| Period End Date: | 31.03.2011 |
| Audit Unit: | First Solar Q1 2011 - HQ |
| EGA Title: | PwC Audit Committee Report (04/26/11) |
| Ref No: | 191010-6900 |

Within the Audit Committee Meeting for the 2011 first quarter as of 04/26/11 we presented the results of our Q1 review 2011. See therefore: Audit Committee Report Q1 2011 . Additionally, the audit committee requested that PWC review certain facts surrounding the stabilization issue that was described in the full board meeting subsequent to the April 26 audit committee meeting, held on April 29, 2011. The engagement team met with key members of the engineering team including David Eaglesham, Chief Technology Officer, to understand the process used to obtain the engineering data that supported management's conclusions that no adjustment to the financial statements in the first quarter was necessary at this time. Upon review by the engagement team, Adam D'Angelo verbally communicated to the audit committee on April 29th via conference call that management's conclusion on this matter was deemed reasonable for the quarter. When the audit committee requested input regarding management change in projections for the year Adam D'Angelo stated that we do not comment on forecasted results. For a further discussion see *Read client documents.

Furthermore we presented our approach for the integrated audit as of 2011 including an upfront risk assessment, our audit timeline, estimated fees, the independence confirmation, the commitment and the engagement letter. See therefore: Audit Committee Report - Audit Plan 2011 .

The Audit Plan was discussed and the engagement letter was signed: Engagement Letter .

Confidential Treatment Requested

Exhibit 28



**pwc**

**Memo**

To:            First Solar Audit Files

From:          PwC Phoenix Audit Team

Date:          October 2011

Subject:       Warranty Rate Change

**Background**

First Solar Inc. ("FSI") provides a limited warranty for defects in materials and workmanship under normal use and service conditions for five years following delivery to the owner of their solar modules. FSI also warrant to the owner of their solar modules that solar modules installed in accordance with agreed-upon specifications will produce at least 90% of their initial power output rating during the first 10 years following their installation and at least 80% of their initial power output rating during the following 15 years. FSI's warranties are transferable from the original purchaser to a subsequent purchaser.  First Solar offers the following warranty for module sales:

- A 5-Year Limited Workmanship Warranty on all Series-2 modules sold and all Series 3 modules sold prior to October 1, 2011 which are governed by our standard Warranty Terms and Conditions.
- A 10-Year Limited Workmanship Warranty on all Series-3 modules sold on or post October 1, 2011 which are governed by our standard Warranty Terms and Conditions.
- A 25-Year Limited Power Output Warranty on all Series of module products which are governed by our standard Warranty Terms and Conditions.  Modules installed in accordance with agreed-upon specifications will produce at least 90% of their initial power output rating during the first 10 years following their installation and at least 80% of their initial power output rating during the following 15 years.

FSI accrues their warranty liability when the sale of the module is recognized as revenue.  Their limited warranty obligation only includes the cost of the module, End of Life Liability and shipping cost to and from the customer.  The contractual warranty obligation does not include any expense associated with the removal or reinstallation of the product since it is specifically excluded from the Module Warranty Terms and Conditions.

The accrual is based on the following factors:
- Estimated number of modules that will be replaced under our warranty obligation.  This amount is based on our historical experience of warranty claims
- Monitoring of field installation sites
- In-house testing data
- Estimated per-module replacement cost at 100% overhead

Management's warranty rate through quarter three was 1.82% (1.32% Defect and Workmanship; .5% Power).  The defect rate is based on actual returns of modules.  The return data is plotted to determine an approximate trend line (defect rate by number of months in service).  Using the calculation from that trend line, FSI estimates the number of units that will be returned for being defective.

Confidential Treatment Requested



The 0.5% power rate is based on regression analysis that was performed using historical data gathered from the 3rd Party APS Star Center.  APS tests as many different solar PV panels as they can. In this way they can be sure of the technology's reliability and exactly how efficient it is.  As First Solar's oldest solar modules covered by the warranty have only been in use since 2004, there is limited historical data for returns of this nature.  Thus, management believed the 25 year power output rating return rate of 0.5% is the company's best estimate.

In Q4 2011, as part of the warranty return rate analysis, FSI modified the warranty return rate to 2.82% (1.32% Defect and Workmanship; 1.5% Power).   The rate change was retroactive and prospective.

### Change in Power Warranty Rate

In prior quarters, including Q3 2011, management had performed an assessment of the warranty accrual and had determined that no change was needed as the current rate was sufficient to cover all the known performance issues, including LPM.  The rate in these periods was based on actual return data excluding LPM.  The performance variance of the Fist Solar modules is also referred to as "Stability" or STBi.  This is the performance variance of the module difference from the labelled production.

### Rationale for Change in Rate

In Q4 2011, FSI processed/received a significant amount of claim data received from their customers.  As a result of this FSI recorded an additional LPM accrual, but also there were able to gain more transparency in the total exposure of potential warranty claims.  The chart below depicts the STBi timeline as well has the carved out LPM accrual areas.



Everything in the white box titled LPM has been accrued for as part of the overall LPM accrual. The items in the pink up to the red line are still exposure modules for the Company, of which could potentially be warranty modules.  In addition to this FSI had rejected approximately 4,000 LPM claims as they did not meet the defined parameters of the excursion plan.   And the LPM excursion has educated their customers to extract commercial leverage from variations in the performance of the modules and how they perform at a string level.  In many cases they have established monitoring techniques to identify module variations within sites, and assume that the best modules in the site are at label, thus these claims could have increased warranty module claims related to them.  Also, some of

2 of 4

Confidential Treatment Requested



FSI's customers have begun to raise concerns of underperforming sites. Although the site is above the Power Warranty level, it is below the expected performance rate.

*Rationale for Prospective Rate Change*
Additionally, prior to 2012 FSI has typically installed modules in temperate climates which masked some of the STBi issues noted above. Based on the facts discussed above an adjustment to the warranty rate is reasonable.

FSI's oldest solar modules manufactured during the qualification of their pilot production line have only been in use since 2001. Because of the limited operating history of their solar modules, they have been required to make assumptions regarding the durability and reliability of their solar modules. Their assumptions could prove to be different from the actual performance of the solar modules, causing FSI to incur substantial expense to repair or replace defective solar modules in the future. For example, the glass-on-glass solar modules could break, delaminate, or experience power degradation in excess of expectations, and their manufacturing operations could be subject to process variations that could cause affected modules to underperform compared to their expectations. These risks could be amplified as FSI implements design and process changes in connection with their efforts to accelerate module conversion efficiency improvement and manufacturing production throughput as part of their Long Term Strategic Plan.

In addition, FSI is increasing the number of installations in non-temperate climates, in accordance with their Long Term Strategic Plan and contracted pipeline. FS has been installing increasing larger volumes of panels into hot climates (i.e. south western US). With respect to such increased installations, FSI has increased their warranty reserve on a prospective basis. They expect to install higher volumes in non-temperate climates as part of their utility-scale offerings in Asia, the Middle East, Africa, Australia and the south western United States.



*PwC Independent Calculation*
The engagement team reviewed the available information and independently calculated the return rate for the remaining warranty modules (which excludes the LPM modules which is part of a separate memo). The engagement team believes that the remaining warranty modules will experience return

3 of 4


pwc

rates that is somewhere in between the LPM return rates and the original return rates for the following reasons:

- The Company has identified that their modules do experience power loss in hotter climates and for STBi problems (which would make them have some of the characteristics of LPM).
- They have remediated the manufacturing excursion (and accounted for the true LPM separately) and therefore the remaining modules should also have return rates that are similar to that of their historical return rates after separating LPM.

The average of these two historical return rates is 2.46%. We then inputted this rate into the FS normal warranty model and compared output to the warranty accrual developed by management of 2.82% an noted that the balance was only $9.2 million lower. Given the complexity of the model used by management as compared to our independent calculation we believe the estimate prepared by management is reasonable. See the EGA for our independent calculation --->    Warranty Calculation and Stress Test


**Conclusion**
Based on the procedures performed, we believe that management's adjustment of the warranty rate to 2.82% is reasonable.

4 of 4

Exhibit 29

| Procedures | Results of procedures performed, including links to attachments or other EGAs |
|---|---|
| An understanding of the entity's revenue streams should be documented with the understanding of likely sources of misstatement. Analyze, as described below, the company's accounting policies with respect to each significant revenue stream identified. Also consider the need for substantive audit evidence over relevant assertions in accordance with our audit plan. | For an understanding of the Company's revenue streams refer to the following link: <br><br> 2011 First Solar Revenue Assessment & Approach |
| Perform the following with regard to the company's revenue recognition policies: | The work below only assesses the Company's revenue recognition policy for the components' revenue stream only. |
| a)  Update understanding and evaluate the company's accounting policies for recognizing and recording revenue including how the company assesses evidence of an arrangement, collectability, delivery, and whether the fee is able to be reliably measured (i.e. is fixed and determinable). | a) The Company recognizes revenue under ASC 605-15 (SAB 104).  In their policy they assess the following criteria: <br><br> 1.  Persuasive evidence of a revenue arrangement exists. <br><br> 2.  Delivery has occurred or services have been rendered. <br><br> 3.  FSI's price to the customer is fixed or determinable. <br><br> 4.  Collectability of the amounts due associated with the revenue arrangement is reasonably assured. <br><br> Based on our review of their policy, we noted |

Confidential Treatment Requested

PWC0109214

| | |
|---|---|
| | that it is in accordance with GAAP.  Refer to the memo attached below for additional details.<br><br>Components Revenue Recognition Policy |
| b)   For judgmental areas within the client's policies, assess reasonableness of judgments and obtain supporting documentation, as appropriate. | b) Based on our understanding of the Company, the components revenue stream does not require significant judgements. |
| c)    Determine whether the policy is in accordance with generally accepted accounting principles, consistent with prior years, and reasonable in light of the industry. | c) Done. Per review of the policy, we noted it was in accordance with GAAP, consistent with prior years, and reasonable in light of the industry. |
| Refer to SAB 104 and ASC 605, *Revenue Recognition* (ASC 605), specifically the following accounting considerations that may be relevant to your engagement: | |
| ASC 605-25, *Multiple Element Arrangements,* | N/A as transactions under ASC 605-25 are not common for the Company. |
| ASC 605-50, *Customer Payments and Incentives,* | Addressed in management's memo in a) above.  Additionally, when this program was initially introduced in late 2009, the engagement team consulted on the proper presentation concurring with First Solar's position of taking the rebate as a reduction to revenue with the offset going to accounts receivable.   Sales rebate - 2009 memo |
| ASC 605-35, *Construction-Type and Production-Type* | The Company does not recognize revenue |

Confidential Treatment Requested

| | |
|---|---|
| *Contracts,* | under ASC 605-35 for its components' revenue stream, but does under the system's revenue stream.  For understanding of that policy refer to the following EGA:  <u>Evaluate and test accounting policy - Revenue</u> . |
| ASC 985, *Software,* ASC 985-605, *Revenue Recognition, and* |  N/A as transactions under ASC 985 are not common for the Company. |
| ASC 605-15-25-1 through 25-4, *Sales of Product when Rights of Return Exists* | Addressed in management's memo in a) above. |
| d)   If any of the following factors or conditions are found to exist, test, to an extent based on materiality and inherent risk, that proper policies/practices for accounting for revenue recognition are being followed: | d) Refer to documentation below. |
| Issues requiring special consideration: | |
| i)   A change in the company's revenue recognition policies. | i) No changes noted. |
| ii)  Sales terms do not comply with the company's normal policies. | ii) None noted. |
| iii) Existence of longer than expected payment terms or installment receivables. | iii) None noted.  We review AR balances and payment terms as part of the following EGA:  <u>Assess Allowance for Doubtful Accounts</u> . |
| iv) Significant sales or volume of sales that are recorded at or near the end of the reporting period. | iv) To address this risk, we perform cut-off testing and review of the credit memos issues after year end.  Refer to the following EGA: |

Confidential Treatment Requested

PWC0109216

|  | Test sales/accounts receivable cutoff |
|---|---|
| v)  Unusual volume of sales to distributors/ re-sellers (i.e., "channel stuffing"). | v) Refer to procedures performed in iv) above. |
| vi) Sales are billed to customers prior to the delivery of goods and held by the seller ("bill and hold" or "ship-in-place" sales). | vi)  Historically, the company has not had a high volume of bill and hold transactions.  In Q2 2011, it has a bill and hold related to Reliance for which they went through a SAB Topic A analysis.  Refer to management and PwC's memo's below.<br><br>Management's Reliance Memo<br><br>PwC Reliance Memo |
| vii) The use of non-standard contracts or contract clauses. | vii) Contracts are reviewed as part of the test of details testing performed at the following EGA:  Test sales/revenue transactions (components) |
| viii) The use of letters of authorization in lieu of signed contracts or agreements. | viii) Refer to vii) above. |
| ix) Transactions with related parties. | ix) N/A as this is not common for the Company.  However, related party transactions are reviewed at the following EGA:  *Related party transactions - completion |
| x)  Barter transactions. | x) N/A as this is not common for the Company. |

Confidential Treatment Requested

| | |
|---|---|
| xi) The existence of "side-agreements." | xi) Refer to vii) above.  Additionally, inquiry is performed of management and we have controls comfort over the contracts process. |
| xii) The impact of right of return. | xii) Addressed in management's memo in a) above. |
| Situations potentially indicative of accounting errors: | |
| xiii) Sales in which evidence indicates the customer's obligation to pay for the merchandise depends on: receipt of financing from another (third) party; resale to another (third) party (i.e., sale to distributor, consignment sale); and/or fulfillment by the seller of material unsatisfied conditions. | xiii - xxiii) These factors will be considered when performing our testing over revenue. Note that this will be done over several EGAs. |
| xiv) Sales of merchandise that are shipped in advance of the scheduled shipment date without evidence of the customer's agreement or consent. | |
| xv) Pre-invoicing of goods that are in the process of being assembled or invoicing prior to, or in the absence of, actual shipments. | |
| xvi) Shipments are made after the end of the period (i.e., books kept open to record revenue for products shipped after the period end). | |
| xvii) Sales are not based on actual (firm) orders to buy. | |
| xviii) Shipments are made on canceled or duplicate orders. | |

Confidential Treatment Requested

PWC0109218

| | |
|---|---|
| xix) Shipments are made to a warehouse or other intermediary location without the instruction of the customer. | |
| xx) Shipments that are sent to and held by freight forwarders pending return to the company for required customer modifications. | |
| xxi) Altered dates on contracts or shipping documents. | |
| xxii) Significant or unusual returns. | |
| xxiii) Write-offs of accounts receivable balances for customers in same period in which revenue is recorded. | |
| Also consider the need for substantive audit evidence over relevant assertions in accordance with our audit plan. | |
| If the entity has customer incentive programs, consider performing additional procedures in the appropriate EGA. | |

Confidential Treatment Requested

PWC0109219

Exhibit 30

To: PwC, External Auditors

From:  Scott Erickson, Senior Manager – First Solar Internal Audit

Date: 12/29/2009

RE: First Solar CpW accounting-related allegations

Internal Audit (IA) performed audit procedures on the Company's (First Solar) Cost-per-Watt calculation as a result of allegations received between October 19, 2009 and October 29, 2009. This memo will only focus on IA's response to the CpW calculation allegations and the procedures IA performed in response to the CpW accounting-related allegations.   The allegations are paraphrased as follows:

1.   During the week of October 12, 2009, the Company decided to book a charge of approximately $2.2 million to warranty accrual to account for certain costs incurred by the Company in replacing and reinstalling low power modules ("LPM").  This was the second charge the company incurred regarding these LPMs.  A similar charge to warranty accrual, in the amount of $1.8 million, was booked in Q2 2009.  This $1.8 million charge was included in the Q2 cost of production and, consequently, was included in the Company's Q2 2009 CpW calculation.

On or about October 19, 2009, it was determined that, unlike the $1.8 million charge in Q2 2009, the $2.2 million charge to warranty accrual would not be included in the cost of production for Q3 2009 because the LPMs were produced in periods prior to Q3 2009.  This also meant that the $2.2 million charge to warranty accrual would not be included in the Company's Q3 2009 CpW calculation.  A First Solar associate from the finance group questioned whether the $2.2 million charge was properly excluded from the CpW calculation for Q3 2009. This led to the first investigation conducted by Internal Audit into FP&A's calculation of Q3 2009 CpW.  As discussed in more detail below, IA concluded that the exclusion of the $2.2 million charge was appropriate and Internal Audit's investigation into Q3 2009 CpW was considered closed.

2.   On October 29, 2009, subsequent to the closure of the first investigation, the person who alleged that the $2.2 million charge was improperly excluded, further alleged that the schedules prepared by FP&A to support the calculation of CpW which were provided to IA in the first investigation were different than those previously utilized by the FP&A group to calculate CpW.  In addition, the complainant alleged that certain costs were reclassified in connection with the Q3 financial close which favorably impacted Q3 CpW and the complainant questioned the appropriateness of these reclassifications.  Specifically, the reclassification involved two journal entries described as:

-CONFIDENTIAL-

Confidential Treatment Requested                                                    PWC0052623

a. Movement of Panels with Quality Issues to Start Up Costs for the Oliver Plant (New PBG Plant) - A journal entry was made to move the expenses related to panels with quality issues that were produced in the Oliver plant shortly after production began from inventory expense to Start Up Costs for the new plant (Inventory expense is included in the CpW calculation, and Start Up Costs are not).

b. Adjusting the WIP Inventory Accrual – The work in progress accrual was modified during Q3 to allow for additional ETA (R&D) modules to be included in the period. Since ETA modules are removed from the cost per watt calculation, this adjustment reduced the overall cost per watt for Q3.

IA developed the following audit program in response to these allegations.

| | Task | Auditor | Status |
|---|---|---|---|
| 1 | Obtain CpW schedules generated and provided by Management. Perform the following: | Rich Innes | Done |
| (a) | Test mathematical accuracy of the schedules (including rounding accuracy, etc.) | Rich Innes | Done |
| (b) | Compare quarterly calculations for inconsistencies in approach | Rich Innes | Done |
| (c) | Identify quarterly adjustments included in the CpW calculation and agree to supporting documentation. Determine appropriateness of adjustments. | Rich Innes | Done |
| (d) | Reconcile COGS information used in the CpW schedules to GAAP COGS. Determine appropriateness of reconciling items. | Rich Innes | Done |
| 2 | Obtain the population of manual JEs made prior to and after Q3's period-end closing. Perform the following: | Chris Youngston, Brian Castro Vidot | Done |
| (a) | Identify JEs of interest (JE description, approver, etc.) | Chris Youngston, Brian Castro Vidot | Done |
| (b) | Obtain an understanding of the rational for the JE, period over period consistency, impact on financial statement line items (limited to reclasses, etc.) requester and approver, etc. Consider impact on CpW calculation. | Chris Youngston, Brian Castro Vidot | Done |
| 3 | Obtain an understanding of the 2009 Bonus CpW metric. Determine the following: | Brian Castro Vidot | Done |
| (a) | The 2009 CpW target for 1x, 1.5, 2x, etc., payout thresholds | Brian Castro Vidot | Done |
| (b) | Determine whether a 1 cent change in CpW for a given quarter would impact the overall Bonus Accrual recorded in Q1, Q2, and Q3. | Brian Castro Vidot | Done |
| 4 | Obtain personnel records for selected individuals and perform the following: | Brian Castro Vidot | Done |
| (a) | Review for evidence of poor performance reviews, disgruntled behavior, etc. | Brian Castro Vidot | Done |
| 5 | Discuss the CpW calculation with Director of FP&A and obtain the following representations: | Fadel/ Scott | N/A |
| (a) | Whether FP&A utilized different methods of calculating CpW in prior quarters. Explain as needed. | Fadel/ Scott | N/A |
| (b) | Whether FP&A considered/ utilized different adjustments in prior quarters that would have produced different CpW results. Explain as needed. | Fadel/ Scott | N/A |
| (c) | Whether FP&A/ Management recorded any accounting entries (Manual JEs) with the intent of adjusting CpW in prior quarters. Explain as needed. | Fadel/ Scott | N/A |

The audit tasks were assigned and completed in PBG and TMP by respective senior auditors. In summary:

(1) Rich Innes, Senior Auditor, tied the Q1-09, Q2-09, and Q3-09 CpW schedules received from Steve Ryan, FP&A, to supporting accounting records. Refer to the Excel attachments for supporting workpapers. The CpW schedules provided are consistent from quarter to quarter, starting with the general ledger information (as currently mapped to GAAP production costs), adjusting for one-time Management adjustments for CpW, to arrive at final CpW production figures supporting the CpW figure.

➢ The GAAP based G/L information presented was agreed to First Solar's accounting records, and was reconciled to the production costs utilized in the CpW calculation.

-CONFIDENTIAL-

Confidential Treatment Requested

PWC0052624

The only reconciling items related to absorption costs. The appropriateness of adjusting for the absorption costs in the CpW calculation was corroborated with Richard Thompson, Senior Inventory Analyst. Refer to attachments for the reconciliations.

➢ Three one-time Management adjustments were made to CpW: A $12M adjustment made in Q1-09 and Q2-09 relating to Turnow, a $700k adjustment in Q2 relating to an EPC-related warranty issue, and a $2.2M adjustment in Q3 relating to the incremental LP warranty charge. These adjustments appear reasonable based on explanations and support reviewed with Steve Ryan, FP&A.

[See Aura library "Cost Per Watt - IA Embedded Files]

(2) Chris Youngston, Senior Auditor, obtained a download of all manual journal entries recorded at PBG from 1/1/2009 through 10/31/2009. The JE descriptions and accounts were reviewed and further narrowed down to approximately 20 JEs that appeared to relate to inventory and production cost reclassification entries recorded in September/October 2009, as referenced in the allegation. Chris Youngston approached the individual who made the allegation and asked that the exact JEs be identified. The individual identified the following two JEs (referred to herein as A and B):

[See Aura library "Cost Per Watt - IA Embedded Files]

➢ Journal Entry A – In summary, some issues with new equipment installed at the Oliver Plant at PBG (the plant extension) resulted in the production of faulty modules in late August 2009. This is referred to as the 'Static Load' issue, which caused a number of nonconforming modules to be produced between August 10, 2009 and August 26, 2009. To account for the estimated faulty modules associated with this production problem at the end of Q3, the inventory reserve expense and accrual accounts were increased by approximately $676k. The inventory reserve expense as recorded would have increased production costs for the quarter. However, the $676k charge was subsequently reclassed from production expense to Start-up costs. Start-up costs do not impact production costs as they role-up to R&D on the P&L. A series of reversing entries occurred subsequent to the accrual entries, and the actual static load issue was eventually determined to approximate $600k. Mark Villani, PBG Controller, emailed Jim Koedam, Manufacturing Director, and Kuntal Kumar, Director of Manufacturing Engineering, seeking an explanation of the production issue and whether the issue would be more appropriately recorded as Start-up costs. The reclassification to Start-up costs appears to be reasonable at quarter-end based on the nature of the problem described by the manufacturing engineers.

➢ Journal Entry B – Represents a $481k reclassification entry from manufacturing expense to R&D-related expense. The reclassification occurs within the same ledger account; the expense was transferred between cost-centers. The cost centers are mapped to different P&L line-items (e.g., COGS, R&D, etc.). Upon

-CONFIDENTIAL-

Confidential Treatment Requested

further examination, IA determined that this entry is part of a recurring series of entries recorded monthly to reclassify estimated R&D/ETA modules from manufacturing costs to R&D.   Accordingly, JE support for each month was obtained to support the monthly entries.   Refer to the attached file for support.

- o   Due to the 4-4-5 calendar schedule, the last month of a given quarter is prone to having additional R&D reclassification (due to the additional days included) relative to the other months in the quarter.
- o   As production quotas are met, Engineering may run additional R&D/ETA modules through the production line which causes variability in the month-to-month reclassification amount.
- o   From Jan-09 through Aug-09, the JE was based on an estimate of modules that needed to be reclassed from manufacturing to R&D.  However, in September a decision was made to attempt to capture the actual number of modules requiring reclassification.  In making this change, 3 journal entries resulted in September netting to a $1.7M reclassification from manufacturing expense to R&D:

  - ▪   $1.5M reclassification which would have represented the normal-recurring method of recording the estimated reclassification accrual.
  - ▪   $360k reduction to the originally recorded $1.5M to adjust the $1.5M estimate closer to actual.
  - ▪   $481k addition to the reclassification entry, due to an incorrect number of days being utilized in the calculation originally performed to support the $360k adjustment and an attempt to capture the actual figures for each month in the quarter (e.g., July, August, and September).

Additionally, the calculation supporting the reclassification entry was prepared by Kevin Willis (FA Manager) prior to September 2009.  In September 2009, the calculation was taken over by Zach Dalton, FP&A Manager, based in PBG.   The change in roles, together with the 4-4-5 calendar, appears to have also contributed to confusion around the calculation which further contributed to the $481k second true-up adjustment recorded.   This journal entry reflects a change in accrual estimation methodologies and appears to be acceptable under accounting rules governing changes to accounting estimates.

(3) Brian Castro Vidot, Senior Auditor, obtained the supporting bonus accrual documentation from Georgette Gillen, FP&A.  Georgette is responsible for the CpW component of the bonus accrual.  Refer to the attachment for the Bonus Plan matrix and CpW component. The 2009 Bonus Plan includes a CpW component, weighted at 20% of the overall bonus. Quarterly Plan components are evaluated the bonus accrual is adjusted based on the forecasted bonus payout in Q1-2010.  While the bonus accrual is adjusted each quarter, the final bonus payout is based on actual Q4-2009 metrics.  The CpW component, combined with the other Plan components, influences the overall bonus payout.

-CONFIDENTIAL-

Confidential Treatment Requested

PWC0052626

Per the Plan matrix, CpW results are bucketized, with each bucket resulting in 1.0x bonus payout, 1.5x bonus payout, and so forth. The Plan indicates that achieving ≤$0.85 CpW will result in a 1.5x bonus payout for the CpW component. Achieving ≤$0.87 CpW results in a 1.0x payout, while achieving ≤$0.83 CpW results in 2.0x payout. Each shift in the CpW bucket results in an approximate $2M change in the bonus accrual. Accordingly, a 1-2 cent change in the CpW calculation does not have a material impact on the Company's financial statements.

[See Aura library "Cost Per Watt - IA Embedded Files]

(4) Brian Castro Vidot, Senior Auditor, pulled a sample of additional HR files (as a follow-up to an HR audit he had been conducting) and included the individual of interest in his selection. He discovered that the individual of interest had an incomplete file. Scott Erickson emailed Carol Campbell and asked if she had pulled this individual's file (Carol had been aware that IA would be requesting this information) and she indicated that she had pulled the file that morning and that it included nothing of interest. Scott Erickson informed Fadel Shukry of this and the decision was made to not perform any additional procedures for this step.

(5) The intent of this step was to address the existence of the other versions of the CpW calculation maintained by FP&A up through the point where IA requested support for the CpW calculations. Redacted

Redacted

Based on IA's review of the CpW schedules provided by FP&A, the CpW calculations are supported with company accounting records. The one-time Management adjustments included in the CpW calculation also appear reasonable based on the understanding obtained by IA through discussion with and support received from Management. The schedules provided by FP&A supporting the CpW calculations rely on the underlying integrity of the Company's accounting records, including the key controls governing financial reporting.

Regarding the accounting-related allegations in the second allegation, our review of the two JEs in question seem to indicate that, based on discussion with and support received from Management, the entries are supportable and represent valid reclassifications and changes in accrual estimates which are acceptable under accounting rules governing accruals/ estimates.

With respect to the bonus accrual, a 1-2 cent change in the CpW component of the bonus accrual would not have a material impact on the Company's Q3 financial statements.

-CONFIDENTIAL-

Confidential Treatment Requested

PWC0052627

Exhibit 31

# PRICEWATERHOUSECOOPERS ⓟ

# Memo

To: / Location:         First Solar Audit Files

From:                  First Solar Audit Team

Date:                  January 2010

Subject:               Cost per Watt Allegations and Review

### Background

On October 31, 2009 Adam D'Angelo received an email from Tom Presby, First Solar Audit Committee Chair, detailing allegations of manipulation of the manufacturing cost per watt ("CPW") calculation by the First Solar FP&A group. The concerns were raised by an employee of the Ohio facility and related to how certain costs were excluded from the costs per watt calculation that is disclosed by First Solar publically (but not a GAAP measure)  The allegations were initially brought to the attention of First Solar's internal audit group. Adam and Tom discussed the email on that same day.

CPW is a calculation that is monitored by the industry and investors since it indicates the manufacturing costs of producing a watt of solar energy, a key indicator of the affordability of solar energy. There is no uniform calculation of the metric in the industry and many companies include different costs in the calculation. CPW influences the year end GAAP financial statements since it is a factor in the final determination of the bonus calculation at year end. The specific item that was the focus of the allegation had the effect of rounding the CPW calculation for the third quarter by a cent. It did not affect the third quarter bonus calculation.

The CPW reported by the Company over the past quarters have been steadily declining and the effect of one cent would not change to overall declining trend. The reductions have been made possible by advances in the technology, manufacturing process, and supply chain. Below is a summary of the CPW reduction and outlook.

| Cost Per Watt Road Map | | | | | | | | | | 2010 - 2014 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 | | | 2014 |
| $ 1.23 | $ 1.14 | $ 1.18 | $ 1.08 | $ 0.98 | $ 0.93 | $ 0.87 | $ 0.85 | $ 0.85 | | → | $0.52-$0.63 |
| % Reduction | -8% | 3% | -9% | -10% | -5% | -7% | -2% | 0% | | | |

### Investigation

#### Internal Audit

During the week of November 2, 2009 First Solar internal audit performed an investigation of the allegations. Specifically, they performed the following: (i) substantively tested the cost per watt schedules calculated by FP&A (ii) analyzed a list of manual journal entries at the Ohio factory for the month of October, and (iii) obtained an understanding of the bonus calculation and how the cost per watt effected the third quarter bonus calculation. Their audit procedures and conclusions are documented in a memo titled "Internal Audit Procedures_First Solar CPW accounting-related allegations" attached as an appendix to the memo. In summary, internal audit concluded that all the entries were reasonable and that the CPW calculation was appropriate. Additionally, Internal Audit noted that regardless of whether the entries were made the CPW calculation would be between $0.87 and $0.83 per watt which results in the same bonus payout at year end. Therefore, there would be no effect on the bonus accrual for the third quarter.

As noted in the internal audit memo, the allegations are associated with expenses related to low power modules (LPM) or modules that were found to produce less than the labeled yield amounts. During Q2 2009, First Solar received notification from their customers, that some of their modules were not meeting minimum yield requirements. Based on our discussion with First Solar, the Company had adjusted their temperatures for one of the production batches which resulted in modules which were process lower watts per module. There were approximately 98K modules that were LPM based on the change in the temperatures while being produced. In Q2 we performed an analysis of the warranty accrual and determined that the current accrual was sufficient to absorb the module charges

Confidential Treatment Requested                                    PWC0051670.001

PRICEWATERHOUSECOOPERS

for the LPM modules.  To maintain a positive customer relationship First Solar also agreed to remove the LPM's at no cost to the customer, and this additional charge of $1.8M in Q2 2009 was recorded as non-warranty accrual and expense (to account for the labor, shipping, etc. charges that will be incurred).  In Q3 2009 First Solar determined they needed to record an additional $2.2M of charges based on more accurate information related to the costs of reclaiming the LPM's.  The LPM's in question were actually produced in 2008 and not 2009 quarters for which the manufacturing costs per watt was being calculated.  As a result of this information and the fact that warranty expense has never been included in the CPW calculation it appears reasonable to exclude the LPM's expense from the 2009 CPW calculation.

While First Solar accounted for the Q2 2009 expense of $1.8M in the CPW and excluded the $2.2M Q3 2009 expense.  Management did not believe that either of them should have been included in the CPW calculation as they didn't relate to the manufacturing process.  Neither had an impact on the bonus calculation because regardless of whether the entries were made the CPW calculation would be between $0.87 cents and $0.83 cents per watt expected as of the end of the year.

Discussed in the analysis of "JE A" in the IA memo they note that a $676K charge was reclassed from production expense to start-up expense related to the Project Oliver expansion.  Considering the nature of the entry and timing of when it was posted it is appropriate that the amounts were classified as start-up expenses (Project Oliver cleared the start-up phase on August 11, 2009).

*Outside Legal Counsel*
Upon discussing the topic with Tom Presby, Mary Beth Gustafsson, First Solar Vice President and General Counsel, engaged an external law firm McDermott Will & Emery LLP (MWE) to perform further inquiries.  Peter Kreinndler, counsel from MWE, Redacted
Redacted



Redacted

The conclusions reached by Internal Audit and Outside Counsel were discussed on November 5, 2009 with the First Solar Audit Committee.

**Conclusion**
Based upon the review of the procedures performed by Internal Audit and the results communicated to PwC by legal counsel we concur with management's conclusions that (i) the costs per watt calculation was reasonable ii) the changes made were appropriate and (iii) the financial statements (including the bonus calculation) would not have been altered as a result of rounding the cost per watt calculation to 85 cents.  This matter has been discussed with Steve Kitson, Regional Risk Management Partner.

***Appendix***
Internal Audit Report:
Cost Per Watt - IA Memo
Cost Per Watt - IA Embedded Files

MWE Report:
Cost Per Watt - MWE Report

Steve Kitson Sign off:
RMP CPW and SEC Letter Sign Off

Confidential Treatment Requested

# Exhibit 32

## Substantive Analytical Procedures Template

Spell Check

Delete analytic

| Client Name | First Solar, Inc |
| Testing As of Date | 12/31/10 |
| Performance Materiality | For planning materiality, |

| Name of substantive analytical procedure | Type and objective<br><br>Applicable Assertions<br>Level of Evidence<br>Type of Analytic | 1. Develop and document expectation<br><br>Document your expectation and the basis on which it was developed | Document how you assessed the reliability of the data used to develop the expectation | 2. Define a significant difference or threshold<br><br>Document your threshold, which is generally not more than performance materiality | 3. Compute differences | 4. Investigate and corroborate significant differences<br><br>Investigate differences exceeding the threshold, corroborate entire difference from expectation and document conclusion |
|---|---|---|---|---|---|---|
| **Cost Per Watt** | [dropdown]<br>[dropdown] | The expectation is that the cost per watt will continually decrease at the same percentage on a quarterly basis. Using the prior 5 quarters % change in cost per watt, I expect the cost per watt for Q4'10 to be $0.754. | The information used in this analytic was taken from prior quarter cost per watt spreasheets. These are critical spreasheets subject to testing under PEC-02 which PwC independently testing and found to be opperating effectively throughout the year. I also reviewed this critical spreasheets for consistency between quarters. Refer to the CpW background for more information. | Refer to the 'CpW Calc' tab for calculation of the threshold. | Refer to 'CpW Calc' tab for detailed substantive analytics calculation | There were no differences that exceeded our predetermined threshold. |
| This is the calculated cost per watt produced | A low level of evidence is deemed appropriate based on the controls comfort (PEC-02), and realiability of the data used. | | | ☑ The threshold is appropriate considering performance materiality, disaggregation and desired level of precision and evidence | | ☑ For all differences exceeding the threshold, the entire difference from the expectation has been investigated and corroborating evidence has been obtained and documented |

PWC0066727

Basic Cost per Watt (CpW) has always been calculated as Cost of Production divided by Finished Good Equivalent Watts Produced. FGE is equal to WIP plus Finished Goods. A module half way thru the line is equivalent to half a fully completed module, or .5 FGE's. Refer to the picture below for an example calculation of FGE.

| | Dec | Std $ | Complete | FGE Qty | | |
|---|---|---|---|---|---|---|
| FS100 | 19,759 | $ 32.82 | 45% | 8,797 | | 8,797 = 19,759 x 44.52% |
| FS200 | 8,742 | $ 33.69 | 46% | 3,995 | | |
| FS300 | 11,216 | $ 34.87 | 47% | 5,305 | | |
| FS400 | 26,326 | $ 72.36 | 98% | 25,839 | | |
| FG | 110,971 | $ 73.72 | 100% | 110,971 | | |
| Unit EOH | 177,014 | | | 154,907 | | |
| FGE EOH | 154,907 | | | | | |

**Standard Cost by WIP level.**

**% of FG module: 45% = $32.82/ $73.72**

To gain comfort over the cost per watt I inspected the calculation to ensure that it has been applied consistently from 2009 through every quarter in 2010. The calculation has remained consistent with both the prior year and between all four quarters in 2010. To determine the calculation has remained the same I followed the calculation through the spreadsheet noting that the same information was being used for each calculation and that the spreadsheet was calculating the information correctly. In addition, I noted that the spreadsheet has changed in format with the conversion to SAP, however I ensured the calculation remained the same. Cost per watt is a critical spreadsheet that is produced on a quarterly basis and is subject to control RTR-PEC-02 which we independently tested and deemed to be operating effectively w/o/e. To gain further assurance over the cost per watt I performed a reasonableness substantive analytic. Refer to the link below:

**CpW Background**

PWC0066727

**Threshold**

399,295,743  **A**

13,275,000  **B**

0.033  **C**

**A**    FGE Watts produced in Q4 per the Q4 CpW critical spreadsheet

**B**    Half of TMP performance materiality. This is deemed appropriate as watts are produced at all three plants (PBG,FFO,KLM). Note that this amount is below the individual performance materiality for PBG and thus is sufficient enough to capture any differences that could be material on a consolidated basis.

**C**    The threshold will be a difference of + or - $.033 between the expected and the actual cost per watt.

**Expectation**

$0.7541  **A**

**A**    This amount was calculated within the COS Calc tab at the following link:        COS Calc

**Difference**

$0.754

$0.750

$0.004  amount is below threshold and as such no further investigation is deemed necessary

PWC000066727

# Exhibit 33

## Substantive Analytical Procedures Template

| | |
|---|---|
| Client Name | First Solar, Inc |
| Coverage Date(s) | 12/31/2011 |
| Performance Materiality | 9,000,000 |

### ANALYTIC INFORMATION

| | |
|---|---|
| **Name of substantive analytical procedures** | Cost Per Watt |
| **Relevant account balance(s)** | All accounts that roll up into CpW/COS |

| **Level of Evidence and Type of Analytic** | Document rationale if the desired level of evidence selected differs from Gather Evidence view in Aura. | This is not meant to be a substantive analytic. |
|---|---|---|
| Low evidence ▼ | | |
| Reasonableness test ▼ | | |

### STEP 1: DETERMINE SUITABILITY, ASSESS RELIABILITY OF UNDERLYING DATA AND DEVELOP AN INDEPENDENT EXPECTATION

| Document your consideration of suitability when it is not otherwise readily determinable | Suitability needs to be determined on the basis of the relevant assertions. | Note that this is not a substantive analytic. The procedures performed in this EGA are suitable to obtain a low level of assurance as it relates to the assertions listed within the aura wizard of this ega. |
|---|---|---|
| Document your independent expectation and the basis on which it was developed | The precision of the expectation is a principal factor contributing to the level of evidence obtained from a substantive analytical procedure. The nature and source of data used to establish the expectation can significantly impact the level of precision of the expectation. | Based on historical data, I noted that the company has been able to steadily decrease cost per Kwt. As such, I expect this trend to continue through Q4 2011. Note that this historical data was obtained from the quarterly CpW spreadsheets which were agreed to their respective 10Q/10K's. These spreadsheets are also considered critical spreadsheets and are subject to key control PEC-02. I reviewed this spreadsheets for mathematical accuracy and consistency with prior periods. Prior year figures were subject to prior audits, and prior quarters were subject to quarterly review procedures. Additionally major types of costs that flow into CpW were audited throughout this database. |
| Document your assessment of the reliability of the data used to develop the expectation | The reliability of the data used to develop the expectation needs to be appropriate for the desired level of evidence for this analytical procedure. | Note that this historical data was obtained from the quarterly CpW spreadsheets which were agreed to their respective 10Q/10K's. These spreadsheets are also considered critical spreadsheets and are subject to key control PEC-02. I reviewed this spreadsheets for mathematical accuracy and consistency with prior periods. Prior year figures were subject to prior audits, and prior quarters were subject to quarterly review procedures. Additionally major types of costs that flow into CpW were audited throughout this database. |

### STEP 2: DEFINE A SIGNIFICANT DIFFERENCE OR THRESHOLD

| Document your threshold(s) and the factors considered | The primary factors considered when defining a threshold are:<br>- Overall and performance materiality<br>- Level of disaggregation<br>- Desired level of evidence<br><br>Thresholds generally would be set lower than performance materiality to reflect the level of disaggregation. | Based on the level of disaggregation of the data, the desired level of evidence (low), and the predictability of the accounts included in our analytics, we established a threshold for investigation of $4M. This threshold is appropriate, as it is below our FY2011 component planning materiality but above our de minimis SUM level. |
|---|---|---|

### STEP 3: COMPUTE DIFFERENCES

| Compute differences between expected and actual results | The computation of differences should be performed after developing the expectation and defining the threshold. | Refer to the COS Expectation tab for calculation of the difference. |
|---|---|---|

### STEP 4: INVESTIGATE SIGNIFICANT DIFFERENCES AND CORROBORATE WITH EVIDENCE

| Investigate differences exceeding the threshold, obtain sufficient corroborative evidence, and document results | For all differences exceeding the threshold, was the entire difference from the expectation investigated and not just the amount above the threshold? ☑ Yes<br><br>Has sufficient corroborative evidence been obtained and documented? ☑ Yes<br><br>Provide information regarding the results of work or cross-reference to detailed testing. (Document to the right) | There were no differences from our expectations requiring an investigation or explanation. |
|---|---|---|
| Document conclusion | ☑ Desired level of evidence has been achieved<br>☐ Further work is required. (Document to right) | Note that this is not a substantive analytic and the procedures performed in this step are deemed appropriate to achieve a low level of assurance. |

**Analytic Template**

PWC0089659

Basic Cost per Watt (CpW) has always been calculated as Cost of Production divided by Finished Good Equivalent Watts Produced. FGE is equal to WIP plus Finished Goods. A module half way thru the line is equivalent to half a fully completed module, or .5 FGE's. Refer to the picture below for an example calculation of FGE.

|  | Dec | Std $ | Complete | FGE Qty |
|---|---|---|---|---|
| FS100 | 19,759 | $ 32.82 | 45% | 8,797 |
| FS200 | 8,742 | $ 33.69 | 46% | 3,995 |
| FS300 | 11,216 | $ 34.87 | 47% | 5,305 |
| FS400 | 26,326 | $ 72.36 | 98% | 25,839 |
| FG | 110,971 | $ 73.72 | 100% | 110,971 |
| Unit EOH | 177,014 |  |  | 154,907 |
| FGE EOH | 154,907 |  |  |  |

**8,797 = 19,759 x 44.52%**

**Standard Cost by WIP level.**

**% of FG module: 45% = $32.82/ $73.72**

To gain comfort over the cost per watt, I verified that the calculation was applied consistently with that of prior quarters in 2011; consistency with quarters prior to Q1'11 was tested during the 2010 year-end audit and the Q1'11 quarterly review. To determine the calculation remained the same, I followed the calculation through the spreadsheet noting that the same costs were being used for each calculation and that the spreadsheet was calculating the information correctly. Cost per watt is a critical spreadsheet that is produced on a quarterly basis and is subject to control RTR-PEC-02 which is independently tested throughout the year. To gain further assurance over the cost per watt I performed a reasonableness analytic, and documented an understaning of the costs that go into CpW. Refer to the work performed within this EGA.

**CpW Background**

PWC0089659

**Threshold**

|  |  |
|---:|:---|
| 542,771,207 | **A** |
| 4,000,000 | **B** |
| 0.0074 | **C** |

**A** FGE Watts produced in Q4'11 per the Q4 CpW critical spreadsheet
**B** Q4'11 materiality used for analytics
**C** The threshold will be a difference of +/- $.0074 between the expected and the actual cost per watt.

**Expectation**

| $0.721 | **D** |
|---:|:---|

**D** This amount was calculated within the 'COS Expectation' tab at the below link:
COS Expectation

**Difference**

|  |  |
|---:|:---|
| $0.721 | Expectation |
| $0.722 | Actual CpW |
| $0.001 | Difference between expectation and actual |
| $0.007 | Threshold |
| -$0.007 | **E** |

| Kwts sold in Q4'11 | 202,852 | **F** |
|:---|---:|:---|
| Q4'11 Cost per Kwt | 0.722 | **G** |
| Q4'11 expected COS | $146,459 | in millions |

**E** Our established threshold of +/- $0.0074 was not exceeded. Thus the CpW is deemed reasonable.
**F** Tested at the following links    Disaggregated Revenue Analytics            Test sales/revenue transactions (components)
**G** Based on the work performed within this workbook the CpW is deemed reasonable.

**PWC0089659**

# Exhibit 34

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually
and on behalf of all other
persons similarly situated,

        Plaintiffs,

                        Case No.

vs.                     CV12-00555-PHX-DGC

First Solar, Michael J.
Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens
Meyerhoff, James Zhu, Bruce
Sohn and David Eaglesham,

        Defendants.

_____/

CONFIDENTIAL

PURSUANT TO PROTECTIVE ORDER

VIDEO DEPOSITION OF:

JOHN AMONETT

Toledo, Ohio

Friday, December 12, 2014

Reported By:

ANNE E. VOSBURGH, CSR-6804, RPR, CRR

Reference No. 87450

Confidential - Pursuant to Protective Order

Page 2

December 12, 2014

9:19 a.m.

Deposition of JOHN AMONETT, held on the 12th of December, 2014, commencing at 9:19 a.m. at the Radisson, Cedar Boardroom, 3100 Glendale Avenue, Toledo, Ohio, before Anne E. Vosburgh, Certified Shorthand Reporter, Registered Professional Reporter, Realtime Reporter

- oOo -

Confidential - Pursuant to Protective Order

Page 8

JOHN AMONETT

P R O C E E D I N G S

THE VIDEOGRAPHER:  Today's date is December 12th, 2014, at approximately 9:19, and we are on the record.

Will the court reporter please swear in the witness.

J O H N  A M O N E T T, called as a witness, having been duly sworn to testify truthfully, was examined as follows.

MR. DROSMAN:  Why don't we go off the record for a second.

THE VIDEOGRAPHER:  We're off the record at 9:20 a.m.

(Brief break in proceedings.)

THE VIDEOGRAPHER:  We are back on the record at 9:20.

MR. DROSMAN:  The witness has been sworn in; is that correct?

Confidential - Pursuant to Protective Order

JOHN AMONETT

MR. FOSTER:  Let me rephrase that question.

BY MR. FOSTER:

Q    Is CPW a number that is automatically generated by a computer system without any human input?

A    No.

Q    Can you explain how the company goes about actually calculating the CPW?

A    Yes.  So the calculation -- I can speak to how the company calculated cost per watt when I worked in the finance functions there.

The -- you know, we had financial models that would compute what we -- what we estimated it to be.  But especially when it related to actual results, we had to review the content of what happened during a particular period to determine whether something had happened that was not contemplated in the initial estimate of cost per watt.  But that fell into the realm of how the company defined it.

So we would look at the business

Confidential - Pursuant to Protective Order

JOHN AMONETT

circumstances that happened in a particular month -- or in a particular quarter, rather, and make -- human beings would make an assessment as to whether the cost per watt calculation that was generated from our spreadsheet models was appropriate as was, or whether an adjustment needed to be made to it and would document the substance of any adjustment.

BY MR. FOSTER:

Q   Did First Solar include any costs related to the LPM excursion in its cost per watt?

A   Not to my knowledge.  Not to my recollection, no.

Q   How about during time periods in which LPM modules were manufactured?

A   Yeah.  The -- so I'll go back to the -- what the cost per watt was intended to be in the first place.

It was intended to be a measure of what it cost the company to manufacture a watt of electricity generating capacity at a moment in time.

Confidential - Pursuant to Protective Order

JOHN AMONETT

So as I sit here today, I don't have doubts about the accuracy about it.

Q    You testified earlier about reviewing First Solar's SCC filings or certain portions of them.

Do you remember that testimony?

A    Yes, I do.

Q    Did that review include any review of CPW in those SCC filings or investor disclosures?

A    Yes.

Q    Did you ever have any doubt about the accuracy of the disclosures that the company made about CPW in its SCC filings or other investor communications?

A    None that I recall, no.

Q    Did anybody at First Solar ever pressure you to personally change the CPW number at any time?

A    Not that I recall, no.

Q    Did anyone ever pressure you to manipulate the CPW number at any time?

A    No.

Q    Do you know if anybody at the

Confidential - Pursuant to Protective Order

Page 393

JOHN AMONETT

A   As far as I -- so the numbers that were discussed in MD&A certainly would have been evaluated through that lens, as far as I'm aware.

Q   I'm just asking, is the MD&A subject to US GAAP?

MR. FOSTER:  Foundation, speculation.

THE WITNESS:  So I don't know.

BY MR. DROSMAN:

Q   You don't know one way or the other, correct?

A   Yeah.  That's an element of -- it's a specific question about the requirements of GAAP that I, not being a CPA, can't answer specifically.

MR. DROSMAN:  No further questions.

MR. FOSTER:  I have no further questions.

(Continued on next page to include jurat)

Confidential - Pursuant to Protective Order

JOHN AMONETT

THE VIDEOGRAPHER:  We are off the record at 6:20 p.m.

_____

JOHN AMONETT

Subscribed and sworn to before me this _____ day of _____.

Confidential - Pursuant to Protective Order

Page 395

CERTIFICATE

I, ANNE E. VOSBURGH, Certified Shorthand Reporter,

No. 6804, Realtime Reporter, do certify that there

came before me the above-mentioned witness, who was

by me duly sworn to testify truthfully concerning

the matters in controversy in this cause; who was

thereupon examined under oath and said examination

reduced to writing by me; and that this is a true

record of the testimony given by the witness.

I further certify that I am not a relative or

employee of counsel/attorney for any of the parties,

nor a relative or employee of such parties, nor am I

financially interested in the outcome of the action.

_____

ANNE E. VOSBURGH, CSR-6804, RPR, CRR

CERTIFIED SHORTHAND REPORTER

Dated: December 15, 2014

# Exhibit 35

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mark Smilovits, Individually    )
and on Behalf of All Other      )
Persons Similarly Situated,     )
                                )
                Plaintiffs,     )
                                )
            vs.                 ) Case No.
                                ) 2:12-cv-00555-DGC
First Solar, Michael J. Ahearn,)
Robert J. Gillette, Mark R.     )
Widmar, Jens Meyerhoff, James   )
Zhu, Bruce Sohn, and David      )
Eaglesham,                      )
                                )
                Defendants.     )
------------------------------)

VIDEOTAPED

DEPOSITION OF ADAM D'ANGELO

New York, New York

Friday, January 30, 2015

Reported by:

FRANCIS X. FREDERICK, CSR, RPR, RMR

JOB NO. 89592

January 30, 2015

9:00 a.m.

Videotaped deposition of ADAM D'ANGELO, held at the offices of Morrison & Foerster LLP, 250 West 55th Street, New York, New York, pursuant to Federal Rule of Civil Procedure 30(b)(6), before Francis X. Frederick, a Certified Shorthand Reporter, Registered Merit Reporter and Notary Public of the States of New York and New Jersey.

                    A. D'ANGELO

        PricewaterhouseCoopers representing the

        witness.

                THE VIDEOGRAPHER:  Will the court

        reporter please swear in the witness.

                * * *

A D A M   D ' A N G E L O,   called as a

        witness, having been duly sworn by a

        Notary Public, was examined and

        testified as follows:

EXAMINATION BY

MR. ALVARADO:

        Q.    Good morning, Mr. D'Angelo.

        A.    Good morning.

        Q.    Would you please state your full

name for the record.

        A.    Adam D'Angelo.

        Q.    Can you please provide us with

your current home and business addresses.

        A.    My home address is 521 Pelham

Manor Road in Pelham, New York.  My business

address is 300 Madison Avenue in New York.

        Q.    You're currently employed by

PricewaterhouseCoopers; is that right?

        A.    I'm a partner at

A. D'ANGELO

services related to each module defect..."
and then there are a number of subparts.

Do you see that?

A.    Yes.

Q.    And what is your understanding of
the module defects that are at issue in this
case?

A.    Well, there was a manufacturing
excursion that was sometime -- sometimes
referred to as LPM.  Sometimes LPM brought in
some other items.  So there could refer to
stabilization modules.  It could refer to low
power modules.  It could refer to, you know,
various different types of problems.  But
generally they were modules that produced
lower than the labeled power.

Q.    Any other module defects that
you're aware of that relate to this
litigation?

A.    No.

Q.    Are you aware --

A.    I may be aware of the defect from
the hardware, but I don't know -- if you tell
me which defects you're referring to I could

A. D'ANGELO

e-mail that would -- with our general type of addresses.  E-mail addresses.

Q.    Nothing on here leads you to believe that this is not a true copy, right?

A.    Yeah.  Nothing leads me to believe it's not a true copy.

Q.    And the e-mail concerns topics that relate to First Solar's review of -- I'm sorry -- relates to PwC's review of First Solar's Monte Carlo model, correct?

A.    Correct.

Q.    And you understood that First Solar at this point in time had begun using a Monte Carlo model to estimate the number of modules required to ship as part of the remediation process?

A.    Correct.

Q.    There's an e-mail from an individual by the name of Dat T. Do in the TS Calculation -- or TS department at PricewaterhouseCoopers, correct?

A.    Right.

Q.    And Mr. Do is the person who Mr. Tripp asked to take a look at the Monte Carlo

A. D'ANGELO

and run a shadow version of the Monte Carlo, correct?

A.    So Dat Do was assisting Ray Rath, yes.  So, yes.  The TS Group was asked to basically perform a calculation, shadow calculation, a Monte Carlo model.

Q.    And why was the TS Group asked to perform a shadow calculation?

A.    They have expertise with valuation and modeling.  And so management did do a Monte Carlo model, but it was very hard to audit the software package.  So we decided to do our own calculation using similar inputs to see what we would end up with.

Q.    And Mr. Dat Do indicates:  "You asked us to perform a shadow calculation of a Monte Carlo simulation prepared by management."

Management, that refers to the First Solar management.

A.    First Solar.

Q.    Correct?

A.    Yes.  First Solar management.

Q.    And if you can just try to wait

A. D'ANGELO

for me to finish the question just because it makes it hard on him.

A.   Right.

Q.   He goes on:  "Our efforts would assist the audit team in its assessment of the reasonableness of management's calculation."

Do you see that?

A.   Yes.

Q.   And PwC asked Mr. Do to perform a shadow Monte Carlo to assess the reasonableness of management's calculations as it related to the number of modules required in the LPM remediation process, correct?

A.   They basically reperformed the calculation.  They did not assess the inputs of the -- into the model.  We did the input assessment.  The core audit team, meaning Garrett and Bo and myself.

This was about redoing the model. You know, because these are -- Monte Carlo is a binomial model, we didn't want to rely on -- for our audit work, on purely management's model.  So we wanted to do our own.

Q.   And the reason you were doing your

A. D'ANGELO

own shadow model is to assess the reasonableness of management's calculation as it relates to the number of modules required to remediate the LPM excursion, correct?

A.    Part of our -- yes.  Part of our calc -- part of the reason we did this is to -- this is part of the work we did to assess the reasonableness of that calculation.

Q.    It goes on:  "All input assumptions were provided to us by the audit engagement team and those assumptions can all be found in slides 8 through 14 of the Powerpoint attachment.  TS did not assess any of the inputs or the form of methodology used by management.  We simply performed an agreed upon input."

Do you see that?

A.    Yes.

Q.    And this is what you were just referring to, that TS did not assess --

A.    Correct.

Q.    -- the inputs to the model, simply took the inputs and ran with them.

A.    Dat and Ray, that's right.

Page 64

A. D'ANGELO

Q.    And did anyone at PwC assess the inputs of the Monte Carlo model and determine that they were reasonable?

A.    We -- I have to figure out exactly what period that was, but we did do some sensitivity analysis around the assumptions and we did do -- get an understanding of the assumptions from management.

Q.    PwC performed sensitivity analyses to the Monte Carlo assumptions received from management, correct?

A.    Correct.

Q.    If you could turn to the next page of this document.  This is the output attachment that Mr. Do refers to, correct?

A.    Appears so, yes.

Q.    And do you see that it indicates the equation is modules equals total suspect population times probability of performance issue and then divided by hit rate?

A.    Which page are you looking at? I'm sorry.

Q.    The page ending -619.

A.    Sorry.

A. D'ANGELO

his shadow model?

A.    Correct.

Q.    And the audit team ran sensitivity analyses on these assumptions; is that right?

A.    We did.  I don't know which year we did it in at the time, but I'd have to go back and look.  At some point we did.

Q.    What exactly did PwC do when it ran sensitivity analyses on the assumptions?

A.    Well, we basically tried to figure out if some of the inputs changed, how much would it affect the financial statements and how sensitive the estimate was to the inputs changing.  We knew at the time that we were making estimates we did not have perfect foresight.  And so we were trying to figure out, well, how far off could this amount be.

Q.    That analysis consisted of taking the assumptions from management and either increasing or decreasing the assumption one way or the other to see what effect that would have on the results --

A.    Correct.  And that's in the work papers.

Page 72

A. D'ANGELO

Q.    Taking a look at, for example, at the page ending -629, there's a -- there are assumptions for hit rate.

Do you see that?

A.    Um-hum.

Q.    And what if anything did PwC to confirm that the hit rates being assumed by management were supportable?

A.    The -- and I don't have the work paper number off the top of my head where it is, but we did talk to them to get an understanding what they were getting back to date.  So they were looking at the modules that were coming back and what their historical hit rate has been, meaning that when I get ten modules back were two of them not performing up to expectations or five of them or eight of them.  And that was the hit rate.  So that -- we talked to them about what they believed their hit rate was based upon what is actually coming back.

Q.    So you asked management for return --

A.    Um-hum.

A. D'ANGELO

Q.     -- results to confirm that the hit rates they were using were appropriate?

A.     We discussed the return results with them.

Q.     How did you factor in the fact that First Solar was getting low-performing modules back outside of LPM?

A.     It's a complicated question because based upon the representations and the work we did, First Solar was discovering that they had other items other than the manufacturing excursion, which I assume is what you mean by LPM.

Q.     Yes.

A.     Okay.  So LPM became a term that was used in many different contexts.  In some cases LPM meant any low-power performing module.  And in some cases LPM was just the excursion modules.

As time went on, management informed us that that LPM bucket had other things in it.  And so that's why I can't directly answer the question as phrased.  But there were multiple items that management

A. D'ANGELO

became aware of over time and informed us about.

Q. The hit rate would have been -- for just LPM, would have been lower if you were excluding the things that were coming back as low power but not truly LPM; is that right?

MR. FLUM: Objection. Vague. Incomplete hypothetical.

A. I can't -- it's hard for me to say what would have been like back then. But I would believe that certain of these items that came back as part of the hit rate are not just the excursion, based on the facts we know now.

At the time -- I got to figure out what point in time this was -- but at the time I'm not sure what management knew or what we knew.

Q. Some of the return modules that were being used to calculate the hit rate were, in fact, low power for reasons other than the LPM excursion, correct?

A. Eventually we realized that.

Q. And when did PwC learn that -- let

A. D'ANGELO

June 30th, 2011, there were a total of 5,149 claims.  Of these 2,956 have yet to be reviewed.  The most significant component of this volume is due to lack of compelling data from the customer that indicates a true site level LPM issue."

Do you see that?

A.    Yes.

Q.    And on the next page do you see there's a chart that identifies the remaining claims -- the claims that have been shipped and the claims that remain?

A.    Yes.

Q.    And then under the chart it indicates:  "In order to properly determine if an amount of modules are required to finalize LPM, the final details on these sites are required," right?

A.    Yes.

Q.    And you understand that at this point in time, 2Q '11, First Solar had not determined whether more modules would be required to remediate the LPM excursion, right?

A. D'ANGELO

MR. FLUM:  Objection, vague.

A.    I remember discussions I had with management about why they did not believe the additional claims would result in an accrual.

Q.    You recall discussions with management about why the remaining 2,956 claims would not result in any additional LPM accrual?

A.    I remember discussions with -- as of the second quarter that -- there was a lot of -- the data they were getting back was incomplete.  I think they set a deadline at some point.  So they were getting a lot of information that was not valid, meaning that the information was incomplete, wasn't available in a format they wanted.  They couldn't provide serial numbers so people were just giving forms in.  And they believed that those claims would ultimately not need to be honored.

Q.    Management indicated to you that the remaining --

A.    I'm sorry.  The claims would not be valid, yeah.

A. D'ANGELO

Q.    Management indicated to you that the remaining 2,956 claims would not be valid?

A.    They did not believe they would be fulfilling those claims based on the information they had at that time.  They believed it was quite poor, the documentation they were getting.

Q.    And did PwC test any of the remaining claims to determine whether any of them may be valid?

A.    We were doing the review at the time.  So the testing was much less significant than in an audit.

Q.    So was there any testing performed on the remaining 2,956?

A.    As of the --

Q.    Let me finish the question.

A.    Oh.

Q.    Was there any testing performed at 2Q '10 as part of PwC's review on the remaining 2,956 LPM claims?

MR. FLUM:  Your question referred to Q2 '10.  Is that what you intended?

Q.    Let me rephrase.

A. D'ANGELO

Was there any testing performed at 2Q '11 as part of PwC's review on the remaining 2,956 LPM claims?

A.    I don't believe we tested the second quarter -- we didn't audit the second quarter balances.  Our testing procedures are in the context of an audit and are performed as of the balance sheet date, which would be the year-end balance sheet date.  So we did do inquiries and had discussions.  But the amounts of testing if any is limited as of the second quarter.

Q.    PwC didn't test any of the outstanding claims at 2Q '11, right?

A.    No.  No.  We -- primarily our procedures would have been limited to inquiry, understanding, but the testing is generally done as of year-end.

Q.    And through PwC's inquiry, PwC understood from management that the remaining claims would not result in any valid claims; is that right?

A.    Yes.  I remember talking to TK about that.  With James.

A. D'ANGELO

Q.    Mr. Kallenbach and Mr. Zhu indicated to you that of the remaining 2,956 claims --

A.    Well, they didn't say of the remaining claims.  What they said was, you know, that because of the poor information that they were getting, they didn't believe -- TK did not believe there would be more paid out under those claims.

Q.    And you relied on Mr. Kallenbach's representation that the remaining claims would not be valid --

A.    I relied on his --

Q.    Hold on.

      -- at 2Q '11; is that right?

A.    Yeah.  We relied on those representations among other things.

Q.    Did Mr. Kallenbach ever tell you that First Solar, in fact, at 2Q '11 had not completed its analysis of the remaining claims and didn't know whether additional accrual was required at 2Q '11?

      MR. FLUM:  Objection.  No

      foundation.

A. D'ANGELO

I would say they were -- believed they were going to reject the vast majority of them.

MR. ALVARADO:  We can take a break.

THE VIDEOGRAPHER:  The time is 11:12 a.m.  We're going off the record.

(Recess taken.)

(Deposition Exhibit 259, letter dated November 3, 2011 bearing production numbers PWC0017339 through PWC0017344, marked for identification as of this date.)

THE VIDEOGRAPHER:  The time is 11:24 a.m.  We're back on the record. Video number three.

BY MR. ALVARADO:

Q.   Welcome back, Mr. D'Angelo.  You understand you're still under oath?

A.   Yes.

Q.   I've handed you Exhibit 259 for identification.  Exhibit 259 is a letter bearing Bates stamp PWC0017339 through PWC0017344.

A. D'ANGELO

A.    Um-hum.  I see it.

Q.    Exhibit 259 is the management representation letter to PwC for the third quarter of 2011, correct?

A.    Yes.

Q.    And the letter is dated November 3rd, 2011.  PwC received this in the ordinary course of its work for First Solar in connection with its review of 3Q '11, right?

A.    Yes.

Q.    And this appears to be a true and accurate copy of the letter you received from First Solar --

A.    Yes.

Q.    -- around this date?

A.    Um-hum.

Q.    If you could turn your attention to the page ending -340.

A.    Okay.

Q.    Do you see that there's a -- there are two paragraphs, 9 and 10, that relate to specific items that were discussed and reviewed for the third quarter of 2011, correct?

Page 258

A. D'ANGELO

THE VIDEOGRAPHER:  The time is 3:29.  We're off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 3:31 p.m.  We're back on the record.

MR. FLUM:  Defendants have no questions.

MR. SENGER:  I have no questions as well, but we would request the opportunity to read and sign the transcript.

(Continued on next page to include jurat.)

Page 259

A.  D'ANGELO

THE VIDEOGRAPHER:  The time is 3:31 p.m.  We're going off the record.

(Time Noted:    3:30 p.m.)

_____

ADAM D'ANGELO

Subscribed and sworn to before me this ___ day of _____, 2015.

_____

C E R T I F I C A T E

STATE OF NEW YORK     )

                      : ss.

COUNTY OF NEW YORK    )

          I, FRANCIS X. FREDERICK, a

     Notary Public within and for the State

     of New York, do hereby certify:

          That ADAM D'ANGELO, the witness

     whose deposition is hereinbefore set

     forth, was duly sworn by me and that

     such deposition is a true record of

     the testimony given by the witness.

          I further certify that I am not

     related to any of the parties to this

     action by blood or marriage, and that

     I am in no way interested in the

     outcome of this matter.

          IN WITNESS WHEREOF, I have

     hereunto set my hand this 2nd day of

     February, 2015.



                    _____

                    FRANCIS X. FREDERICK

Exhibit 36

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually          )

and on behalf of all other       )

persons similarly situated,      )    Case No.

      Plaintiffs,               ) 2:12-cv-00555-DGC

v.                               )

First Solar, Michael J.          )

Ahearn, Robert J. Gillette,      )

Mark R. Widmar, Jens             )

Meyerhoff, James Zhu, Bruce      )

Sohn, and David Eaglesham,       )

      Defendants.               )

_____

VIDEOTAPED DEPOSITION OF DAVID EAGLESHAM

Boston, Massachusetts

Wednesday, January 21, 2015

Reported by:  Dana Welch, CSR, RPR, CRR, CBC, CCP

Job No.  87651

Page 2

Wednesday, January 21, 2015

9:11 a.m.

Video deposition of DAVID EAGLESHAM, held at the offices of Choate Hall & Stewart LLP, Two International Place, Boston, Massachusetts before Dana Welch, Certified Shorthand Reporter, and Registered Professional Reporter of the Commonwealth of Massachusetts.

EAGLESHAM

MR. WEBB:  Robert Cortez Webb, Morrison and Foerster, for defendants.

THE WITNESS:  David Eaglesham.

DAVID EAGLESHAM, sworn

BY MR. BROOKS:

Q.  Could you state your full name for the record, please?

A.  David James Eaglesham.

Q.  And what's your current business address?

A.  Pellion Technologies, 625 Mount Auburn Street, Cambridge, Massachusetts.

Q.  And what's your current residential address?

A.  8 Cutler Farm Road, Lexington, Massachusetts.

Q.  You may have already had an opportunity to go over some of these issues with your counsel but I'd like to go over some of the ground rules covering the deposition here today, okay?

A.  Okay.

Q.  Do you understand that you're giving testimony here and that even though we're in an informal setting in a conference room, you're

EAGLESHAM

Q.   And was the percentage used for a warrantable module falling out of 10 percent or 15 percent?

MS. WHITE:   Vague and ambiguous.

A.   So can you clarify?

Q.   Sure.

We're talking about -- well, you testified earlier that you considered modules to be warrantable if they had fallen outside of their warranty.  Does that mean a power loss of more than 10 percent or a power loss of more than 15 percent?

A.   So it depends, to some extent, on how it's measured, but the quick answer is the contract -- the contractual warranty allowed for 5 percent measurement error, meaning that -- that you don't trigger warranty until the module is at 85 percent of rated power.

Q.   Turning back to Exhibit 192, Mr. Sohn indicates that there were a series of key decisions that were made, and the first is, "If the customer desires, we will replace any module with a serial number that is on the list of excursionary material, whether customer measures it or not."  Do you see that?

EAGLESHAM

Q.  Do you see that you made several trades on October 30th, 2009, the same date of the document we were just looking at, Exhibit 107?

A.  Yes.

Q.  And do you see that on October 30th, you traded approximately 10,800 shares?

A.  Yes.

Q.  You didn't buy those shares yourself, did you?

A.  They were stock options.

Q.  So they were stock options granted to you by the company and you exercised and sold them, correct?

A.  Yeah.  Actually, I think my wife exercised these trades, but I'd have to check.  But usually my wife would be exercising the trades.

Q.  Why do you say that?

A.  That was -- that was just the way we did it.  She usually exercises the trades because I was usually really busy when the market was open.

Q.  You were aware of the trades, correct?

A.  I was -- um -- so -- so we had a plan where we basically looked at diversification of our overall portfolio and we sold as we vested.

EAGLESHAM

Q.   You sold -- can you explain what you mean by that?

A.   So as stock options vested, we sold them.

Q.   Immediately as they vested?

A.   In -- as soon as they were vested in a given quarter.  So there's a narrow trading window in a given quarter where we can trade.  So vesting, I think, was -- vested -- there's a vesting schedule, which I think is initially annually and then monthly thereafter.  And so in a given quarter, there would be a succession of vesting events in a given quarter, and then there's a trading window that opens.  And the window was typically only a few days, and we would trade during the trading window.

Q.   So you were not someone who received vested stock options and held the First Solar shares.  Your strategy was to trade them at the first available opportunity; is that correct?

A.   Yes.

Q.   And did you continue --

MR. BROOKS:  Withdrawn.

Q.   When did you implement that strategy?

A.   Pretty much from the beginning.  So I

Page 101

EAGLESHAM

think there were a handful of exceptions where there were specific reasons that was not able to happen, but where possible, we basically executed to sell all vested options as they vested.

Q.  At this point in time in October of 2009, had First Solar publicly disclosed to investors anything about the excursion that we've been talking about today?

MS. WHITE:  Objection, lacks foundation, vague and ambiguous.

A.  So -- so, I don't recall when the disclosures were made to investors, so I don't recall in detail.

Q.  You certainly were aware at this point in time, that there was this excursion issue, correct? We've seen it in the documents.

A.  Yeah, so at this point in time, there's -- there's a known issue and there's a model.  And the detailed model shows that the excursion lies within our current warranty accrual.

Q.  And you were deeply familiar with the model, correct?

MS. WHITE:  Objection, vague and ambiguous.

EAGLESHAM

was responsible for technical input, so he would come to the technology organization for technical input, such as this -- this model.

Q.  What is -- what was the basis --

MR. BROOKS:  Withdrawn.

Q.  Did you know at the time in 2009 that, as you say, the model showed that the excursion lay within the current warranty?

A.  I don't recall precisely.

Q.  That's not something you focused on before you made your trades, correct?

MS. WHITE:  Objection, vague and ambiguous.

A.  So -- so, again, the trades -- the trades were part of an ongoing plan that we had that was basically a diversification, so -- so we talked about how we wanted to do this, my wife and I.  We talked about how we wanted to do this and we made the decision we would just sell as they vested on an ongoing basis, and we didn't, I think, at any point depart from that except when there was some practical issue that prevented us from doing it.

MR. BROOKS:  Why don't we take a break.

THE VIDEOGRAPHER:  Here ends tape number

EAGLESHAM

MR. BROOKS:  Withdrawn.

Q.  When the .8 number or prediction was put in place, how long had the Tucson Electric Power Springerville site been up and running?

A.  I don't recall, but a long time, a long, long time.

Q.  Were there more than one Tucson Electric Power site, or was there only one?

A.  Yes, I think so, yes.

Q.  How was the data from the other Tucson Electric Power sites considered in developing the predicted degradation rate in hot climates?

MS. WHITE:  Objection, lacks foundation, vague and ambiguous.

A.  So there's -- there's -- I think there's only one site of that vintage.  So Tucson Electric Power is a company, so we did many arrays with them.  There's a Springerville site, which was one of our first installations, and so it's in -- it's in the Arizona desert.  It's ultra hot.  And it's been there for a very long period of time.  And that Springerville site was the one where we had the longest history.  So I think there were other Tucson Electric Power installations, but the

EAGLESHAM

Springerville site was the one that we used.

Q. Was that .8 prediction derived while you were at First Solar or before you came to First Solar?

A. I don't recall. I was not involved deriving that number.

Q. That was performance and prediction --

MR. BROOKS: Withdrawn.

Q. Who was involved in deriving that number?

A. I don't know.

Q. Who had ultimate approval over the prediction numbers?

MS. WHITE: Objection, lacks foundation, vague and ambiguous.

A. So -- so -- so I'm not -- I'm actually not clear. I don't know.

Q. The prediction numbers were given to First Solar customers as guidance for expected performance, correct?

MS. WHITE: Lacks foundation.

A. I was not close to what was provided to customers. I was --

Q. You don't know one way or another?

COURT REPORTER: I'm sorry. I didn't hear

EAGLESHAM

climates.

MR. BROOKS: And 0.5 percent for temperate climates, correct?

THE WITNESS: And I said yes.

BY MR. BROOKS:

Q. So then the last bullet point under what we don't know reads, "High confidence level of energy prediction model due to uncertainties in actual performance data used to," quote, "calibrate the model." Do you see that?

A. I see that.

Q. At this point in time, did you have a high confidence in the energy prediction model for First Solar's modules?

A. Yes, I would say so.

Q. What was the energy prediction model?

A. So we used a variant of PVSyst.

Q. What was the purpose of the energy prediction model?

A. It was to calculate energy yield from a site based on the climate.

Q. Was the energy prediction model used as part of the analysis to establish the power degradation rate over time?

EAGLESHAM

MS. WHITE:  Lacks foundation, vague and ambiguous.

A.   The energy prediction model was used in that performance expectation ratio calculation and so the model has everything in that we know.  So it has the weather, it has the module efficiency, it has the degradation terms, so basically everything that we know goes into the model, is used to calculate energy.

And then with the quality organization -- so when we do field assessments, then with the quality organization, Mike Koralewski and I would sit down and as part of our quality review on an ongoing basis, we would review performance expectation ratios for sites and compare the expected energy from a site that's predicted with the actual energy that went down the wires, so the actual energy that came out of that site.

Q.   Now, do you also disagree that the --

MR. BROOKS:  Withdrawn.

Q.   Mr. Trippel indicates in this presentation that there were uncertainties in performance data used to calibrate that model and for this reason, there was not a high confidence in predicting

EAGLESHAM

energy output.  Do you agree or disagree that there were uncertainties in the actual performance data used to calibrate the model?

A.  So if you will suffer me a little, I will agree and disagree.  So let me do the disagree first.  So when we reviewed performance expectation ratios, we routinely saw customer sites running at about 101 percent, meaning when I go through my whole prediction and I say how much electricity can a customer sell to the grid based on what I'm telling the customer including the .5 percent or whatever, I go through that whole calculation and then I say how much -- so that's what they're expecting to sell to the grid and then how much are they actually selling to the grid.  The amount they're actually selling to the grid translates into 101 percent of what they should be expecting.

So as both the technology organization and the quality organization, we look at that 101 percent and we say this is good.  So the customer is getting the value that the customer anticipates getting, a check, that's good.  The customer is getting a little bit more check, also good, but not too much more, we're not giving away

EAGLESHAM

too much value, right?  So 101 percent feels like a good number and that was the number that we typically saw for a lot of sites, that's the I think we have a good number.

Q.  Okay.  Where do you agree?

A.  So where do I agree?  That number varied a lot.  So it bounced around from site to site and we would see sites where the meters were not -- the solar meters were not well maintained, the data would suddenly go to zero, the inverters would crash.

We had -- the famous picture that Mike has where customers complained that their yield had gone down and there were goats walking on the modules, so goats climbing on top of the modules and the footprints all over the modules.  So there were many issues with that data.

And what Lou is requesting here, which I think I supported, is more data would give us higher confidence and more data is clearly better.

Q.  Okay.  Let's turn to the next page.  This slide is titled "FS Commercial Field Performance Summary" and the second bullet point says, "Today" --

EAGLESHAM

data.

Q.   At this point, you were seeing other indications from the field that modules in hot climates weren't performing as well as anticipated, weren't you?

MS. WHITE:  Objection, lacks foundation, vague and ambiguous.

A.   I am -- I don't -- I'm not sure of the timing, but I don't recall seeing any data set other than this one that flagged hot climates on this time frame.

Q.   What action, if any, did you take in response to this draft or the final version of this paper?

A.   So -- so this -- this paper, there's a set of requests and recommendations in this paper, and the recommendations in this paper are all focused on obtaining better data so that the data will become actionable.  So -- so there's a list of recommendations under future work that's in the back of this document.  My recollection is that all those recommendations were funded, supported, and executed on.  And so we expanded the Arizona star site.  We began an expanded sampling process.  I

EAGLESHAM

believe this is the time frame in which we began

testing in Florida.  So there's a range of

recommendations in here that are focused on

obtaining more data and those recommendations were

-- were pursued.

Q.  Did you inform Ms. Kimber that her

conclusions were incorrect because of the linear

fit?

MS. WHITE:  Objection, vague and

ambiguous.

A.  So -- so I don't recall the discussion in

detail, but I will tell you that there was a robust

discussion around forcing a linear fit to what is

clearly a nonlinear data set.  And so it was

something that was discussed in a very, again,

robust fashion, where the various people came in

with opinions about whether you should or should

not be forcing linear data through -- a linear

functional form to a nonlinear data set.

Q.  How did the data set that was used to

derive the conclusions in this paper differ from

the data set that was derived -- that was used to

derive the .8 that First Solar was guiding its

customers with?

Page 283

EAGLESHAM

You wasted seven hours on a lot of other questions badgering the witness and so we're done.

MR. BROOKS:  I never badgered the witness once.  If you want to walk away from the deposition as it's ongoing, you'll have to live with the consequences.

MS. WHITE:  The deposition is over.  It's been seven hours.  Dave?

THE VIDEOGRAPHER:  Here ends today's deposition.  Off the record, 6:01 p.m.

(Whereupon, this deposition was concluded at 6:01 p.m.)

                    _____

                    DAVID EAGLESHAM

        Subscribed and sworn to before me

  this _____ day of _____, 2015.

                    _____

Page 284

CERTIFICATE

Commonwealth of Massachusetts

Suffolk, ss.


        I, Dana Welch, Registered Professional
Reporter, Certified Realtime Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, do hereby certify that David
Eaglesham, the witness whose deposition is
hereinbefore set forth, was duly sworn by me and
that such deposition is a true record of the
testimony given by the witness.

        I further certify that I am neither related
to nor employed by any of the parties in or counsel
to this action, nor am I financially interested in
the outcome of this action.

        In witness whereof, I have hereunto set my
hand and seal this 22nd day of January, 2015.


                    _____

                    Dana Welch

                    Notary Public

                    My commission expires:

                    October 6, 2017

# Exhibit 37

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually          )
and on behalf of all other       )
persons similarly situated,      )
                                 ) Case No.
          Plaintiffs,            ) CV12-00555-PHX-
                                 ) DGC
     vs.                         )
                                 )
First Solar, Michael J.          )
Ahearn, Robert J. Gillette,      )
Mark R. Widmar, Jens             )
Meyerhoff, James Zhu, Bruce      )
Sohn, and David Eaglesham,       )
                                 )
          Defendants.            )
_____  )

VIDEO DEPOSITION OF

Georgette Gillen

San Diego, California

Thursday, August 7, 2014

Reported by:

LISA MOSKOWITZ, CSR 10816, RPR, CLR

JOB NO. 82792

Page 2

August 7, 2014

9:04 a.m.

                  Video deposition of GEORGETTE
GILLEN, held at the offices of Robbins
Geller Rudman & Dowd LLP, 655 West
Broadway, Suite 1900, San Diego, California,
before Lisa Moskowitz, Certified Shorthand
Reporter and Registered Professional
Reporter of the State of California.

representing the witness Georgette Gillen.

MR. ETH:  Jordan Eth representing the defendants First Solar and the individual defendants.

MR. FOSTER:  Mark Foster representing all defendants.

MR. WEBB:  Robert Webb representing all defendants.

MR. STEWART:  Chris Stewart for plaintiffs.

MR. RUDOLPH:  Andrew Rudolph for plaintiffs.

MR. FORGE:  Jason Forge for plaintiffs.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please swear in the witness.

GEORGETTE GILLEN,
        called as a witness, having been
        duly sworn, was examined and
        testified as follows:
///
///

a black-and-white kind of objective assessment, or was it more subjective?

A.   It was more subjective.  We were developing a methodology.

Q.   Were there other aspects of the CpW calculation that were susceptible to subjective determinations?

MR. ETH:  Objection.  Vague.

A.   Yes.

BY MR. FORGE:

Q.   In this instance talking hypothetical, these aspects of the CpW determination that were subject to subjective determination, does that mean they were also subject to potential manipulation?

MR. ETH:  Objection.  Vague, foundation.

THE WITNESS:  Yes.

BY MR. FORGE:

Q.   If you could, please take a look at what we'll mark as Exhibit 7.

(Exhibit No. 7 was marked for identification.)

///

BY MR. FORGE:

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's the cost per watt calculation documentation.

Q.   If you look, the third heading is "Responsibility and Uses," and the second sentence in there reads, "Cost per watt is a key performance indicator of First Solar and provides a clear measure of cost competitiveness and manufacturing execution performance."

Was that a theme that was familiar to you at First Solar?

A.   Yes.

Q.   Do you recall anybody ever expressing disagreement with that perspective?

A.   Never.

Q.   Moving up to the preceding paragraph, the one -- the heading "Scope," it says, "This document defines First Solar's standard methodology for calculating cost per watt produced (CWP) and associated

off the record.  We are off the record at 3:30 p.m.

(Recess taken from 3:30 p.m. to 3:43 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 3:43 p.m.

BY MR. ETH:

Q.   Ms. Gillen, I have just a few more questions for you.

A.   Fantastic.

Q.   There's an issue about something I had said earlier and whether the court reporter got it right; so I just wanted to clear that up.

A.   Sure.

Q.   I had asked you with respect to each of the individual defendants, I listed them by name, Ahearn, Eaglesham, Gillette, Widmar, Meyerhoff, Sohn, and Zhu whether you had substantive discussions with any of them.  I think your answer was no?

A.   That's correct.

MR. ETH:  There was an issue about whether I said substantive or subsequent; so that's why I wanted to

Q.   Do you see that it was forwarded on to PwC?

A.   I do.

Q.   Are you aware that PwC knew about the First Solar's treatment of cost per watt?

A.   As I stated, I don't recall being involved with PwC directly.

Q.   The numbers that get reflected in SEC filings for cost per watt, were they consistent with the numbers that First Solar calculated internally?

MR. FORGE:  Object as to form.

THE WITNESS:  If you're referring to the MDNA, and I was sent that on a regular quarterly basis to populate with the cost per watt that was finalized as part of the job; so yes.  To the extent I filled in that MDNA, I filled it in with what was the finalized cost per watt for that period.

BY MR. ETH:

Q.   Do you recall when you first heard about this lawsuit being filed?

A.   I do.

A.   Yes.

Q.   Ms. Gillen, did you listen to conference calls that the company had with its investors?

A.   Some of them, yes.

Q.   Isn't it true that during those conference calls, the company referred to the exclusion of LPM costs from cost per watt calculations?

A.   I couldn't say.

MR. ETH:  Okay.  All right.  I think you're free to go.

THE WITNESS:  Thank you.

MR. FORGE:  Thank you for your time.

THE WITNESS:  Thank you.

(Continued on next page to include jurat)

Page 250

THE VIDEOGRAPHER:  This concludes

media No. 3 of 3 in the deposition of

Georgette M. Gillen.  We are off the

record at 4:16 p.m.

(Time noted:  4:16 p.m.)

_____

GEORGETTE GILLEN

Subscribed and sworn to before me

this        day of            , 2014.

_____
(Notary Public)

My Commission expires: _____

Page 251

                    C E R T I F I C A T E

STATE OF CALIFORNIA:


        I, LISA MOSKOWITZ, CSR, RPR, CLR,

shorthand reporter, do hereby certify:

        That the witness whose deposition is

hereinbefore set forth was duly sworn, and

that such deposition is a true record of the

testimony given by such witness.

        I further certify that I am not related

to any of the parties to this action by

blood or marriage, and that I am in no way

interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set

my hand this 12th day of August, 2014.




        _____

        LISA MOSKOWITZ, CSR, RPR, CLR

        Shorthand Reporter

# Exhibit 38

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Mark Smilovits, Individually and on )
behalf of all other persons          )
similarly situated,                  )
                                     )
            Plaintiff,               )
                                     )
vs.                                  ) No. CV12-00555-PHX-DGC
                                     )
First Solar, In,  Michael J. Ahearn,)
Robert J. Gillette, Mark R. Widmar,  )
Jens Meyerhoff, James Zhu, Bruce     )
Sohn, and David Eaglesham,           )
                                     )
            Defendants.              )
                                     )

VIDEOTAPED DEPOSITION OF TERRY LEE KALLENBACH

Phoenix, Arizona
March 2, 2015
9:18 a.m.

REPORTED BY: Kristy A. Ceton, RPR
AZ Certified Court Reporter No. 50200
Job No. 90113

TSG Reporting - Worldwide - 877-702-9580

Page 6

TERRY LEE KALLENBACH

with David Wiener of Morrison & Foerster.  We are representing defendants and the witness.

Before you get started, Mr. Drosman, I want to request an opportunity to read and sign on behalf of the witness.  And could I also -- it looks like your realtime is working and mine isn't.  Can I just swap these two out?

THE VIDEOGRAPHER:  Madam reporter, would you please swear in the witness.

TERRY LEE KALLENBACH, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DROSMAN:

Q.   Could you please state your full name for the record, sir?

A.   TL Kallenbach.

Q.   And what's your full legal name?

A.   Full legal name is Terry Lee Kallenbach.

Q.   And you go by TK; is that correct?

A.   Typically.

Q.   Could you give us your current business

Page 78

TERRY LEE KALLENBACH

share in -- in the calls with investors.

Q.   You had no other understanding about Mr. Gillette's firing, correct?

A.   No, I did not.

Q.   Okay.  And shortly after Mr. Gillette left, you left the company; is that right?

A.   That's correct.

Q.   Did you leave voluntarily or involuntarily?

A.   I would say it wasn't involuntary.  It was a mutual decision on both parties.

Q.   Okay.  You wanted to leave the company; is that right?

A.   I would say that my job changed right after Rob left the company.  I had an employment agreement which included my job responsibilities.  A large part of those responsibilities were transferred to another member of the E-staff, specifically the business management piece.  As part of my -- my employment contract, my job had changed so much that we looked for some other opportunities.

But the role that was left for me was not one that I really wanted to continue with.  So I would say it was a mutual decision.

Page 391

TERRY LEE KALLENBACH

ostensibly started in Q2 and Q3 of 2011.

Q.   And these non-LPM issues that you read about here, were they covered by the LPM reserve?

MR. FLUM:  Objection.  Foundation.

THE WITNESS:  I would say no.  Some of these were customer-related events.  The customer had installed it improperly, not to our technical guidance, and so those would definitely not be covered by either our performance warranty nor the LPM special accrual.

MR. DROSMAN:  Move to strike as nonresponsive everything after "no."

I have no further questions at this time.

MR. FLUM:  All right.  I have no questions.

THE VIDEOGRAPHER:  This concludes today's recording of the deposition of TK Kallenbach.  This is the end of media No. 5, and there are a total of five media in this recording.  We are now off the record.  The time is 7:08 p.m.

(The proceedings concluded at 7:08 p.m.)

Page 392

TERRY LEE KALLENBACH

I, TERRY LEE KALLENBACH, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct,

EXECUTED this _____ day of _____, 20__, at _____, _____,

(City)                          (State)

_____ I have made changes to my deposition.

_____ I have NOT made changes to my deposition.

_____
TERRY LEE KALLENBACH

Page 393

TERRY LEE KALLENBACH

ERRATA SHEET FOR THE TRANSCRIPT OF
Case Name: Smilovits v. First Solar
Dep Date:  3/2/2015
Deponent:  Terry Lee Kallenbach


                         CORRECTIONS:

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____

Page_____Line_____ Reason_____
NOW READS:_____
SHOULD READ:_____


                    _____
                    TERRY LEE KALLENBACH

Page 394

TERRY LEE KALLENBACH

CERTIFICATE


            I, Kristy A. Ceton, Certified Court

Reporter for the State of Arizona, certify:

            That the foregoing proceedings were taken

by me; that I am authorized to administer an oath;

that the witness, before testifying, was duly sworn

by me to testify to the whole truth; that the

questions propounded by counsel and the answers of

the witness were taken down by me in shorthand and

thereafter reduced to print by computer-aided

transcription under my direction; that review and

signature was requested; that the foregoing pages are

a full, true, and accurate transcript of all

proceedings and testimony had upon the taking of said

proceedings, all to the best of my skill and ability.

            I FURTHER CERTIFY that I am in no way

related to nor employed by any of the parties hereto

nor am I in any way interested in the outcome hereof.

            DATED this 3rd day of March, 2015.



                    _____
                    Kristy A. Ceton
                    Certified Court Reporter No. 50200
                    For the State of Arizona

Exhibit 39

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, individually
and on behalf of all other
Persons similarly situated,

                                   Case No.
         Plaintiffs,               CV12-00555-PHX-
                                   DGC

  vs.

First Solar, Inc.; Michael J.
Ahearn; Robert J. Gillette;
Mark R. Widmar; Jens
Meyerhoff; James Zhu; Bruce
Sohn; and David Eaglesham,
         Defendants.
-----------------------------------

VIDEOTAPED DEPOSITION OF ADRIANNE KIMBER
San Francisco, California
Tuesday, November 25, 2014

REPORTED BY:
CYNTHIA MANNING, CSR No. 7645, CLR, CCRR
JOB NO. 86087

November 25, 2014

9:02 a.m.

Videotaped deposition of ADRIANNE KIMBER, held at Morrison & Foerster, 425 Market Street, San Francisco, California, before Cynthia Manning, Certified Shorthand Reporter No. 7645, Certified LiveNote Reporter, California Certified Realtime Reporter.

APPEARANCES:


On Behalf of Plaintiffs:

    ROBBINS GELLER RUDMAN & DOWD

    By:  LUKE BROOKS, ESQ.

        ANDREW RUDOLPH, CPA, CFE

    One Montgomery Street

    San Francisco, CA 94104



On Behalf of Defendants and the Deponent:

    MORRISON & FOERSTER

    BY:  PAUL FLUM, ESQ.

        NICHOLAS ALAN ROETHLISBERGER, ESQ.

    425 Market Street

    San Francisco, CA 94105



Videographer:  Sean McGrath

SAN FRANCISCO, CALIFORNIA;

TUESDAY, NOVEMBER 25, 2014; 9:02 A.M.

THE VIDEOGRAPHER:  Good morning.

This is the start of Disc Number 1 of the videotaped deposition of Adrianne Kimber in the matter Mark Smilovits, et al., versus First Solar, et al., in the United States District Court for the District of Arizona.  Case Number CV12-00555-PHX-DGC.

This deposition is being held at 425 Market Street, San Francisco, California, on November 25th, 2014, at approximately 9:02 a.m.

My name is Sean McGrath from TSG Reporting, Incorporated, and I'm the legal video specialist.

The court reporter is Cynthia Manning, in association with TSG Reporting.

Will counsel please introduce yourselves starting with the questioning attorney?

MR. BROOKS:  Luck Brooks, from Robbins Geller Rudman & Dowd, for the plaintiffs.

MR. RUDOLPH:  Andy Rudolph for the plaintiffs.

MR. FLUM:  Paul Flum, Morrison & Foerster, for defendants and the witness.

MR. ROETHLISBERGER:  Nicholas Roethlisberger for defendants.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and we can proceed.

ADRIANNE KIMBER,

having first been duly sworn, testified as follows:

EXAMINATION

BY MR. BROOKS:

Q.  Good morning.

A.  Morning.

Q.  Have you ever been deposed before?

A.  No.

Q.  Okay.  Could you state your full name for the record, please?

A.  Adrianne Ryan Curtner Kimber.

Q.  And what's your current business address?

A.  663 Glenside Drive, Lafayette, California.

Q.  Is that also your home address?

A.  It is.

Q.  You may have gone over some ground rules with your counsel, but let me just go over some of these so we have a full understanding.

Gillette about the degradation issues that were in the position paper?

A.   I don't think so.

Q.   What about Mr. Sohn?

A.   I just didn't have very much contact with them personally, so I can't recall.

(Deposition Exhibit 32 was marked for identification)

THE WITNESS:   Thanks.

BY MR. BROOKS:

Q.   Exhibit 32 is FSLR00281771 through 794.

This is another series of e-mails with a draft of the Degradation Position Paper attached; correct?

A.   That is correct.

Q.   And the date of the draft is April 2nd, 2010; right?

A.   Correct.

Q.   And this one reflects the authors.  As you mentioned, the draft you looked at in preparation for your deposition also reflects; correct?

A.   That's correct.

Q.   And so the authors of the paper were you, Mr. Sorensen, Mr. Trippel, Mr. Gloeckler --

A.   Close enough.

Q.   -- Mr. Ward, Mr. Schulz, Mr. Koralewski
Mr. Klammer, Mr. Brown, and Mr. Brutsaert; correct?

A.   That's correct.

Q.   I have a few questions about this document.
They relate mostly to changes between the prior
draft and this draft.

A.   Okay.

Q.   So why don't I point you to those changes
and if you need to read for context, go ahead and do
that.

A.   Okay.

Q.   Okay.  The first is on the page ending 74.

A.   Okay.

Q.   And here there is a discussion of the
sensitivity of the market value of the product to
the expected degradation rate that we discussed
before.

A.   Mm-hmm.

Q.   And the number has changed from 4.2 cents
to 3.5 cents per watt.

Do you see that?

A.   I see that.

Q.   Why was that change made?

A.   I don't remember.

Q.   That was made after your meeting with

A.   That's the power rating that the module would receive on the sticker, the amount of power that was sold to the customer.

Q.   That's the post derate power?

A.   The post derate power.

Q.   And toward the bottom there is a sentence that says:

"Using a representative project finance model and starting with our base case guidance of .7 per year degradation, the linear 1.5 scenario decreases product market value by 28 cents/Wdc."

What's the "28 cents/Wdc?

A.   28 cents per watt.

Q.   And the exponential 12-year scenario decreases product market value by 17 cents per watt; correct?

A.   That's what it says.

Q.   And the exponential five-year scenario decreases product market value by 7 cents per watt; correct?

A.   That's what it says.

MR. BROOKS:  Okay.

MR. FLUM:  All right.  We're done.

THE WITNESS:  Awesome.

THE VIDEOGRAPHER:  This marks the end of Volume I, Disc 4 and concludes the deposition of Adrianne Kimber.  The time is 6:08 p.m. and we're off the record.

(Time noted:  6:08 p.m.)

Page 253

DECLARATION UNDER PENALTY OF PERJURY

I, ADRIANNE KIMBER, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on November 25, 2014; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this          day of
2014, at                         , California.

_____

ADRIANNE KIMBER

Page 254

STATE OF CALIFORNIA   )

        :ss

COUNTY OF SAN MATEO   )

        I, CYNTHIA MANNING, a Certified Shorthand Reporter of the State of California, do hereby certify:

        That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

        I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

        IN WITNESS WHEREOF, I have subscribed my name this 28th day of November, 2014.


_____

        CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

# Exhibit 40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually
and on behalf of all other
persons similarly situated,

      Plaintiffs,

              Case No.
vs.          CV12-00555-PHX-DGC

First Solar, Michael J.
Ahearn, Robert J. Gillettfe,
Mark R. Widmar, Jens
Meyerhoff, James Zhu, Bruce
Sohn and David Eaglesham,
      Defendants.
_____/

VIDEO DEPOSITION OF:

MIKE KORALEWSKI

Toledo, Ohio

Wednesday, December 17, 2014

Reported By:
ANNE E. VOSBURGH, CSR-6804, RPR, CRR
Reference No. 87452

December 17, 2014

9:16 a.m.

Deposition of MIKE KORALEWSKI, held on the 17th of December, 2014, commencing at 9:16 a.m. at the Radisson Hotel, Cedar Boardroom, 3100 Glendale Avenue, Toledo, Ohio, before Anne E. Vosburgh, Certified Shorthand Reporter, Registered Professional Reporter, Realtime Reporter

- oOo -

Page 10

M I C H A E L   K O R A L E W S K I,

    called as a witness, having been

    duly sworn to testify truthfully,

    was examined as follows.


                MR. FLUM:  Before you start with

           your examination, I just want to state

           on the record that we request the

           opportunity to read and sign the

           transcript.


        EXAMINATION

         BY MR. DROSMAN:

             Q    Could you please state your full

        name for the record, sir.

             A    Michael Steve Koralewski.

             Q    Could you give us your full business

        and residence address for the record.

             A    My current business address is

        28101 Cedar Park Boulevard, Perrysburg, Ohio

        43551.

                And my residence -- you want my home

        residence, as well?  10220 Blue Ridge Drive

        North, Whitehouse, Ohio 43571.

MIKE KORALEWSKI

through different owners, correct?

A    Well, people changed roles and responsibilities.  The data source, you know, remains the same, STBi to field power loss correlation.

Q    That process remained constant throughout the 2008 -- 2009 to 2011 period, correct?

A    What was your beginning date, please?

Q    2009 to 2011 period.

A    The STBi-based analysis -- there may have been a few weeks at the very beginning when we were still learning about the defect, where we were looking at specific line days and things like that.

You know, there were, you know, a few claims at the very inception, but as the process moved into the maturity piece from 2009 to 2011, yes.

Q    It remained -- that process remained constant during that period, correct?

A    Correct.

Q    Who was responsible for the LPM

Page 383

MIKE KORALEWSKI

THE VIDEOGRAPHER:  Seven hours and one minute.

MR. FLUM:  Yes.  We're done.

THE VIDEOGRAPHER:  We are off the record at 6:33 p.m.

(Signature not waived.

Deposition concluded, 6:33 p.m.)


_____

MIKE KORALEWSKI


Subscribed and sworn to before me this _____ day of _____.

CERTIFICATE

I, ANNE E. VOSBURGH, Certified Shorthand Reporter,

No. 6804, Realtime Reporter, do certify that there

came before me the above-mentioned witness, who was

by me duly sworn to testify truthfully concerning

the matters in controversy in this cause; who was

thereupon examined under oath and said examination

reduced to writing by me; and that this is a true

record of the testimony given by the witness.

I further certify that I am not a relative or

employee of counsel/attorney for any of the parties,

nor a relative or employee of such parties, nor am I

financially interested in the outcome of the action.

_____

ANNE E. VOSBURGH, CSR-6804, RPR, CRR

CERTIFIED SHORTHAND REPORTER

Dated: December 19, 2014

Exhibit 41

* * *CONFIDENTIAL* * *

Page 1

THOMAS KUSTER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SMILOVITS, individually

and on behalf of all other

Persons similarly situated,

Plaintiffs,                Case No.

CV12-00555-PHX-

vs.                    DGC

FIRST SOLAR, INC.; MICHAEL J.

AHEARN; ROBERT J. GILLETTE;

MARK R. WIDMAR; JENS

MEYERHOFF; JAMES ZHU; BRUCE

SOHN; and DAVID EAGLESHAM,

Defendants.

--------------------------------------X


* * *CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF THOMAS KUSTER

New York, New York

Wednesday, February 18, 2015


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR

JOB NO. 89650

* * *CONFIDENTIAL* * *

THOMAS KUSTER

February 18, 2015

Videotaped deposition of THOMAS KUSTER held at Morrison & Foerster, 250 West 55th Street, New York, New York, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public of the State of New York.

* * *CONFIDENTIAL* * *

Page 6

THOMAS KUSTER

We're here representing defendants and the witness.

THE VIDEOGRAPHER:  Thank you.

And will the court reporter please swear in the witness.

* * *

THOMAS KUSTER, called as a

witness, having been duly sworn by a Notary

Public, was examined and testified as

follows:

EXAMINATION BY

MR. DROSMAN:

Q.    Could you please state your full name for the record.

A.    Thomas Paul Kuster.

Q.    And could you give us your current business and residence address.

A.    My business is in Bridgewater, New Jersey, at Corporate Crossing Boulevard, 400 Crossing Boulevard, Bridgewater, New Jersey, and my residence is 9 Fox Fire Lane, Clinton, New Jersey.

Q.    Now, you may have already had an opportunity to go over some of these issues with

* * *CONFIDENTIAL* * *

Page 27

THOMAS KUSTER

reassigned there.

Q.    What was your title when you began reporting to Mr. Brown?

A.    It didn't change.

Q.    And what were your duties and responsibilities?  Did those change?

A.    No, they were the same.

Q.    And what is Mr. Brown's title, or what was his title at that point?

A.    I'm not exactly sure.  He was the Head of Business Development, President of Business Development, something hike that.

Q.    What is Business Development?

A.    It's essentially the sales organization for the company.

Q.    Were you involved in sales at that point?

A.    No.

Q.    At some point you began overseeing the LPM issue; is that correct?

A.    Yes.

Q.    When was that?

A.    After T.K. left.

Q.    Did you inherit that from Mr.

* * *CONFIDENTIAL* * *

Page 28

THOMAS KUSTER

Kallenbach?

A.    I was assigned it after he left.

Q.    Had he previously overseen it?

A.    Yes.  Uh-huh.

Q.    Who assigned the LPM issue to you?

A.    I don't know who assigned it to me.  I inherited it when I got the responsibilities after T.K. left.  It was just part of the -- part of the function.

Q.    And when was that that you began to deal with the LPM issue?

A.    It was late December, early -- and into early January.

Q.    Did anybody assist you with that?

A.    Yes.

Q.    Who?

A.    Klaus-Peter Fuss.  Tony Siebers. Shellie, eventually.

Q.    What about Moritz Ilg?

A.    Moritz did as well.

Q.    Are you familiar with the acronym "GTS"?

A.    Yes.

Q.    What does that stand for?

* * *CONFIDENTIAL* * *

Page 54

THOMAS KUSTER

received from Ms. Molina or about January 29, 2011, correct?

A.    Yes.

Q.    And you understood that Ms. Molina was responding to an e-mail that you had sent on December 28, correct?

A.    Yes.

Q.    Let's take a look at the e-mail that you had sent.  You wrote, "Our man Jim Brown is asking us to arrange a meeting to reset our strategy for LPM."  Do you see that?

A.    Yes.

Q.    Why did the strategy for LPM need to be reset?

MR. FLUM:  Foundation.

A.    Well, the strategy for LPM claims processing, of course, is what we're working on, so Jim has been asking us to get the outstanding claims cleaned up because the industry is going through some levels of adjustment, you know, the access to customers.  Customers are hard to come by at this point -- by this point, and it's a strategy of ours to clean up the LPM outstanding claims so that the customers are in a better

* * *CONFIDENTIAL* * *

Page 55

THOMAS KUSTER

position to make future purchases.

Q.    What do you mean that the customers were in a better position to make future purchases?

A.    Well, customers that have outstanding claims were citing that to Jim, or what I was hearing is they were using that as an excuse with Jim to not make future purchases.

Q.    And what was your understanding with respect to why the outstanding LPM claims prevented them from making future purchases?

A.    I'm not sure I had an understanding. My gut feel would be that because they have outstanding claims, they're using future purchases as leverages to force a claim to get resolution.

Q.    Did you in fact reset the strategy for LPM?

A.    Well, from a claims processing standpoint, there were some changes to how we were trying to achieve those settlements.

Q.    So what was the prior strategy?

A.    I'm not sure I'm really an expert on the prior strategy, but the prior strategy --

Page 56

THOMAS KUSTER

earlier strategies were based thematically more on a physical exchange of product; product, solar panels, essentially, were returned and then replaced with newer versions, newer modules. The change in strategy here was to go for more commercial settlements because it was more expeditious, more cost-expeditious for the company and for the customer.

Q. And when was that strategy reset?

A. I think that strategy -- that was an evolving strategy that came from -- it started with some individual customer -- customers, and then we viewed that as preferential and then moved that in to be more of a normal part of the strategy probably across the fourth quarter of 2011.

Q. And then if you look at the third paragraph in your e-mail, you wrote, "The numbers I have seen are a bit humbling, to say the least." Do you see that?

A. Yes.

Q. And you were talking about the numbers of defective LPM modules, correct?

A. I was talking about the number of

* * *CONFIDENTIAL* * *

THOMAS KUSTER

A.    No.

Q.    You understand that Mr. Gillette left in October of 2011, correct?

A.    Yes.

Q.    Do you know why he left?

A.    No.

Q.    Did you ever hear any discussion of why Mr. Gillette left?

A.    No.

Q.    Did you ever hear any discussion of why Mr. Kallenbach left?

A.    No.

Q.    Mr. Brown was your supervisor while you oversaw LPM, correct?

A.    Yes.

Q.    And he left the company as well, correct?

A.    He left -- he has left the company, yes.

Q.    When did he leave the company?

A.    I don't know.  A year later or something like that.

Q.    Do you have any understanding as to why he left?

* * *CONFIDENTIAL* * *

Page 331

THOMAS KUSTER

A.    I don't, no.

Q.    Did you believe that Mr. Kallenbach was competent in his oversight role of LPM?

A.    Yes.

Q.    Do you have any criticism of Mr. Kallenbach's performance in the oversight role of LPM?

A.    No.

MR. DROSMAN:  I have no further questions for this witness at this time.

MR. FLUM:  I have no questions.

THE VIDEOGRAPHER:  This concludes today's deposition.  The time is 4:17 p.m. We're off the record.

oOo

_____

THOMAS KUSTER

Subscribed and sworn to
before me this     day
of        2015.

_____

* * *CONFIDENTIAL* * *

Page 332

THOMAS KUSTER

CERTIFICATE

STATE OF NEW YORK )

                    :  ss

COUNTY OF NEW YORK)

I, Kathy S. Klepfer, a Registered Merit Reporter and Notary Public within and for the State of New York, do hereby certify:

That THOMAS KUSTER, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 19th day of February 2015.

_____

KATHY S. KLEPFER, RPR, RMR, CRR, CLR

# Exhibit 42

JENS MEYERHOFF

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually        ) Case No.
and on behalf of all other     ) CV12-00555-PHX-
persons similarly situated,    ) DGC
                               )
          Plaintiffs,          )
                               )
      vs.                      )
                               )
First Solar, Michael J.        )
Ahearn, Robert J. Gillette,    )
Mark R. Widmar, Jens Meyerhoff,)
James Zhu, Bruce Sohn, and     )
David Eaglesham,               )
                               )
          Defendants.          )
_____)

VIDEOTAPED DEPOSITION OF JENS MEYERHOFF

Phoenix, Arizona
February 17, 2015
9:03 a.m.

REPORTED BY:
Janice Gonzales, RPR, CRR
JOB NO. 89591

Page 2

JENS MEYERHOFF

VIDEOTAPED DEPOSITION OF JENS MEYERHOFF commenced at 9:03 a.m. on February 17, 2015, at Osborn Maledon, 2929 North Central Avenue, Suite 2100, Phoenix, Arizona, 85012, before Janice Gonzales, RPR, CRR, Arizona Certified Court Reporter No. 50844.

                         * * *


APPEARANCES:
     For the Plaintiffs:
          ROBBINS GELLER RUDMAN & DOWD
          By: Darryl Alvarado, Esq.
              Andrew Rudolph, Esq.
          655 West Broadway
          San Diego, California 92101


     For the Defendants:
          MORRISON & FOERSTER
          By: Anna White, Esq.
              Robert Webb, Esq.
              Eric Roberts, Esq.
          425 Market Street
          San Francisco, California 94105



     Also Present:

          Ed Kishel, Videographer

JENS MEYERHOFF

the transcript.

MR. CORTEZ WEBB:  Robert Cortez Webb for the defendant -- all defendants.

MR. ROBERTS:  Eric Roberts, Morrison & Forrester for the defendants and the witness.

THE VIDEOGRAPHER:  Thank you.

Madam Reporter, would you please swear in the witness.

JENS MEYERHOFF, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ALVARADO:

Q.   Good morning, Mr. Meyerhoff.  Can you please state your full name for the record.

A.   Jens Meyerhoff.

Q.   Could you please provide us with your current residential and business addresses.

A.   My residential address is 14539 East Edgewater Court in Fountain Hills, Arizona, zip code 85268.

Q.   Do you have a current business address?

A.   Yes, I do have a -- I'm working part-time at a company in Orange County in Foothill Ranch and

JENS MEYERHOFF

right?

A.    That's what she is suggesting.

Q.    Ultimately that figure changed to less than 4 percent, correct?

A.    I think that figure was subject to constant analysis, yes.

Q.    And when that figure was disclosed at Q210, the figure was less than 4 percent of modules were affected, right?

A.    I believe that is correct.

Q.    Sub (d) states, "This is no 'new' news. It is fully reflected in our 2010 guidance."  Do you see that?

A.    Yes.

Q.    And in what way was the LPM excursion fully reflected in First Solar's 2010 guidance?

A.    Well, the impact as it relates to utilizing production capacity to -- to mitigate, replace panels and the actual cost to do that would have been reflected in our guidance.

Q.    After a couple responses, there's an e-mail from Mr. Polizzotto that begins on the page ending 688 and continues on to the page ending 689. He's writing to Mr. Sohn.  He writes, "We now have

Page 257

JENS MEYERHOFF

projects in and around September 2011?

A.    I elected to leave the company.  It was a successful completion of financing in the pipeline that I had helped to build and acquire.

Q.    And then following First Solar, did you immediately go work for another company or did you do something else?

A.    No, I actually took some time off and spent time with my family.

MR. ALVARADO:  Plaintiffs have no further questions at this time.

THE VIDEOGRAPHER:  This concludes today's recording of the deposition of Jens Meyerhoff.  This is the end of disk number 5 and there are a total of 5 disks in this recording.  We are now off the record.  The time is 4:53 p.m.

(The proceedings concluded at 4:53 p.m.)

Page 259

JENS MEYERHOFF

I, Jens Meyerhoff, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

_____   I have made changes to my deposition.

_____   I have NOT made any changes to my deposition.

EXECUTED this _____ day of _____, 20\_\_, at _____, _____.                      (City)

    (State)

                              _____

                              Jens Meyerhoff

Page 260

JENS MEYERHOFF

STATE OF ARIZONA        )

COUNTY OF MARICOPA      )

CERTIFICATE

I, JANICE E. GONZALES, Certified Court Reporter for the State of Arizona, certify:

That the foregoing proceeding was taken by me; that I am authorized to administer an oath; that the witness, before testifying, was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that review and signature was requested; that the foregoing pages are a full, true, and accurate transcript of all proceedings, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED this 18th day of February, 2015.


_____

Janice E. Gonzales, RPR, CRR

Certified Court Reporter No. 50844

For the State of Arizona

Exhibit 43

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Mark Smilovits, Individually and on )
behalf of all other persons         )
similarly situated,                 )
                                    )
            Plaintiff,              )
                                    )
vs.                                 ) No. CV12-00555-PHX-DGC
                                    )
First Solar, In,  Michael J. Ahearn,)
Robert J. Gillette, Mark R. Widmar, )
Jens Meyerhoff, James Zhu, Bruce    )
Sohn, and David Eaglesham,          )
                                    )
            Defendants.             )
                                    )

VIDEOTAPED DEPOSITION OF MARK WIDMAR

Phoenix, Arizona
January 21, 2015
9:10 a.m.

REPORTED BY:
Kristy A. Ceton, RPR
AZ Certified Court Reporter No. 50200
Job No. 89234

MARK WIDMAR

Eric Roberts and Dave Wiener.

THE VIDEOGRAPHER:  Thank you.

Madam reporter, would you please swear in the witness.

MARK WIDMAR,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DROSMAN:

Q.    Could you please state your full name for the record, sir?

A.    Mark Richard Widmar.

Q.    And could you give us your current business and residence address also for the record?

A.    Business is 350 West Washington Street, Tempe, Arizona.  Personal is 11728 East Dreyfus Avenue, Scottsdale, Arizona.

Q.    You may have already had an opportunity to go over some of these issues with your counsel, but let me go over some of the ground rules to make sure we're on the same page here.

Do you understand that you are giving

Page 42

MARK WIDMAR

for Subsection N?

A.    No.

Q.    Okay.  And you didn't communicate with anybody about Subsection N; is that correct?

A.    Correct.

Q.    You did nothing, other than what you've told me, to prepare for Subsection N, correct?

A.    Correct.

Q.    You mentioned that you reviewed the claim remediation status in preparation for Subsection N, correct?

A.    Again, I just reviewed the one-page slide that indicated, you know, the claims were either -- been approved and remediated or approved and not yet remediated.

Q.    Okay.  Why did you review that one-page slide in preparation for your testimony on Subsection N?

A.    I was just trying to remember the status and where the status of the claims were at that point in time, as well as to understand the population of claims which had yet not been evaluated.

Q.    How is that information relevant to First Solar's decision to omit the four percent figure

Page 43

MARK WIDMAR

referenced in Subsection O?

A.   The -- there -- what ended up happening in the fourth quarter, there still were a large percentage of the claims that needed to be evaluated. At the same time, we -- the market was being -- was very challenging at that point in time. Historically, First Solar had always --

THE COURT REPORTER:  Had always what?

THE WITNESS:  Sold through.

So everything we produced, we would sell. We were basically in an allocation mode.  That started to change as we exited the second quarter and got worse in the third and the fourth quarter.  We made a decision at that point in time, and as we thought through completing the remediation process in the fourth quarter, that need to be focused on resolving the issues, not having the effects of that overhanging our relationships with our customers. And we focused more on remediating the claim versus just whether or not the percent was the four percent.

It was, we have claims, we determined that they're valid claims.  It's very difficult to -- We determined in the fourth quarter, it would be very difficult to find the discrete-impacted modules.  And

Page 44

MARK WIDMAR

instead of trying to spend our focus and effort around that, we made a decision to let's find a way to get the claims resolved as quickly as possible.

And then also, in the fourth quarter, we had moved from more of a predictive modeling exercise to a discrete evaluation of the claims.

So I just wanted to remember where we were at that point in time and how many claims still were outstanding.

Q.   BY MR. DROSMAN:  Now, you said you determined in the fourth quarter it would be very difficult to find the discrete-impacted modules, correct?

A.   Yes.

Q.   Okay.  Who determined that?

A.   It was a -- a decision that was mainly made with the team that was managing the activity at that time, which included TK Kallenbach, as well as with input from the executive management team of we need to get these issues resolved and processed.

Q.   Okay. Why was it determined that it would be very difficult to find the discrete-impacted modules?

A.   As we had gotten -- as we started working

Page 56

MARK WIDMAR

down.

A.   Uh-huh.  Can I ask a question?  You said it was contained in -- whatever exhibit -- and you said statement 5.  Was -- is that this one?

Q.   Yes.  It's Plaintiff's Exhibit 164.

A.   Okay.

Q.   Do you see Plaintiff's Exhibit 164?

A.   Got it.

Q.   Do you statement 5 there?

A.   Now I do.

Q.   Statement 5 is set forth on page 18 of Plaintiff's Exhibit 166.

A.   Uh-huh.

Q.   So turn to page 18 of 166.

A.   Yes.

Q.   And do you see the fifth full paragraph down?

A.   Yes.

Q.   And the third sentence in begins, "Our assumptions."

Do you see that?

A.   Yes.

Q.   And it reads, "Our assumptions could prove to be materially different from the actual

Page 58

MARK WIDMAR

this statement.

Q.   BY MR. DROSMAN:  First Solar made this statement?

A.   Yes, it would be as a company-related statement.

Q.   The company acts through its officers or directors, correct?

MR. ETH:  Objection.  Calls for a legal conclusion.

THE WITNESS:  From my perspective, I would say yes.

Q.   BY MR. DROSMAN:  Okay.  And what individuals at the company approved the statement to be made?

A.   This would have gone through multiple layers of review.  It would have initially been drafted, coordinated with our accounting and legal team, which would have been facilitated and reviewed by the disclosure committee that we have, which would include members of myself, all of our key VPs.

So at this point in time, 2011, it would have included VP of sales, VP of manufacturing, VP of technology.  It would have included our quality team.

So all of the disclosures would go

Page 59

MARK WIDMAR

through the disclosure committee.  The disclosure committee would actually review those disclosures, comment on those disclosures, make any necessary changes to those disclosures.

It would also then be reviewed by our external auditors.  We would also review this with our external legal counsel.  It would then be reviewed through our audit committee.  Also reviewed by our CEO.  And then reviewed through the board as it relates to the approval to file the 10-K.

So there would have been multiple levels of review and discussion around this disclosure.

Q.   Okay.  And that process that you just described to me, is that the process that occurred for all of the disclosures in First Solar's 10-Qs and 10-Ks during the class period in this case?

A.   Yes.  That would be a consistent process that would have been used.

Q.   Okay.  So my question, rather than asking you about the process, was what individuals approved this statement to be made?  Can you name those individuals for me?

MR. ETH:  Objection.  Asked and answered.

THE WITNESS:  It would have been the

Page 68

MARK WIDMAR

THE WITNESS:  The statement is --

Q.   BY MR. DROSMAN:  Just answer yes or no. Do you understand that question?

MR. ETH:  Wait.  Wait.  You can't interrupt him.  Can't interrupt him.  Can't interrupt him.

THE WITNESS:  The statements that are made in the filing are statements made on behalf of the company.  Individuals within the company provide input into those disclosures to make sure that they're accurate and complete, to the best of their knowledge.

Q.   BY MR. DROSMAN:  Does anybody at the company approve the statement, sir?

A.   The filing includes comments and input from the individuals.  It ultimately would then be referred to the board for their approval to file through resolution.

MR. DROSMAN:  Move to strike as nonresponsive.

MR. ETH:  Objection.

Q.   BY MR. DROSMAN:  Does anybody at the company approve the statement, sir?

MR. ETH:  Objection.  Asked and answered.

Page 170

MARK WIDMAR

specific review as well with a controllership team,

being James Zhu and Bryan Schumaker, and engaging

with the proper associates who were analyzing the

potential exposure and the anticipated remediation,

which would have included TK Kallenbach and his team.

Q.   Okay.  And was this statement accurate

when it was made?

A.   To the best of management's information

at that point in time, it was an accurate statement.

Q.   Why do you say that?

MR. ETH:  Objection.  Beyond the scope.

THE WITNESS:  My point is that any

management estimate which is in -- which is what this

represents, it's an accrual for estimated expenses in

excess of our normal product warranty.  The actual

expenses could be different over time, depending upon

the extent of the cost of the remediation.  It could

be favorable.  It could be unfavorable.

Q.   BY MR. DROSMAN:  When was this 10-Q for

the third quarter 2011 filed?

A.   It indicates November 4th, is what I show

here.

MR. DROSMAN:  I'll show you what we'll

mark as Plaintiff's Exhibit 178 for identification.

Page 171

MARK WIDMAR

(Exhibit 178 was marked for identification.)

Q.   BY MR. DROSMAN:  Plaintiff's Exhibit 178 consists of a document entitled, "Memorandum, Subject Excess Obligation of Normal Product Warranty Liability and Related Expenses," dated 2011, September 30th, and bears Bates Nos. FSLR00955706 to FSLR00955735.

Do you recognize this document?

A.   Again, yes, I am familiar with this document.

Q.   What do you recognize it to be?

A.   It's a memo that we would have created as part of our close process for the third quarter of 2011, which would have been an evaluation of the -- the accrual that would support the accrual of the 16.2 that you identified plus any additional accruals that we would identify as being excess to our normal product warranty.

Q.   Why do you recognize it?

MR. ETH:  Objection.  Vague. Argumentative.

THE WITNESS:  This is a standard --  As through today, this is a standard memo that is written and reviewed as part of our internal

Page 172

MARK WIDMAR

controls.

Q.   BY MR. DROSMAN:   Was the information contained in the memo Plaintiff's Exhibit 178 accurate?

MR. ETH:   Objection.   Beyond the scope. Compound.   Foundation.

THE WITNESS:   The information included in here would have been management's best estimate and best understanding of our potential costs associated with excess obligations outside of our standard product warranty.

Q.   BY MR. DROSMAN:   Okay.   Take a look, if you would, to page ending 714.   And I'm referring to those last three numbers, the Bates numbers on the bottom right.

A.   Uh-huh.

Q.   Do you see that page?

A.   Yes.

Q.   And do you see the chart there in the middle of the page underneath the heading "Financial Statement, Geography of Additional Reserve"?

A.   Correct.

Q.   Do you see the total there on the bottom right reads, "16.242751 million," right?

MARK WIDMAR

A.   No, I have not.

Q.   Okay.  Look at the e-mail -- second e-mail on the page down from David Eaglesham to Greg Helyer.

Do you see that?

A.   Yes.  I do.

Q.   And Mr. Eaglesham says, "Derate is directly linked to revenue."

Do you see that?

A.   Yes, I see the statement.

Q.   And that's an accurate statement, correct?

MR. ETH:  Objection.  Beyond the scope. Calls for speculation.  Foundation.

THE WITNESS:  I don't -- I would not interpret that the same way that David has written that.

Q.   BY MR. DROSMAN:  So you believe it's an inaccurate statement; is that correct?

MR. ETH:  Objection.  Beyond the scope. Vague.  Foundation.

THE WITNESS:  I believe the value of the module is driven off of the amount of energy that is produced versus the derating.

Page 178

MARK WIDMAR

Q.   BY MR. DROSMAN:   Is the derate directly linked to revenue?

A.   Energy generated is directly linked to revenue.

Q.   The derate is not directly linked to revenue; is that correct?

MR. ETH:   Objection.   Beyond the scope. Foundation.

THE WITNESS:   Again, I think it may be a different perspective of how David has described it versus how I would have described it.   My position would have been the derate is not what's directly related to revenue.   It would be the energy that is produced.

MR. DROSMAN:   I'll show you what we'll mark as Plaintiff's Exhibit 180 for identification.

(Exhibit 180 was marked for identification.)

Q.   BY MR. DROSMAN:   For the record, Plaintiff's Exhibit 180 consists of a document entitled, "Board of Directors April 27th, 2011," and bears Bates No. FSLR00200083 to 00200209.

Do you recognize this document, Mr. Widmar?

A.   Again, not having gone through everything

MARK WIDMAR

Foundation.

THE WITNESS:  The presentation would indicate that it was a doubling based off of what information was available at that point in time.

Q.   BY MR. DROSMAN:  The hot climate derate was a doubling of the standard derate, correct?

MR. ETH:  Objection.  Vague.  Beyond the scope.  Foundation.

THE WITNESS:  Based on the available information at that point in time, the presentation indicates that it would be approximately double the temperate climate derate.

Q.   BY MR. DROSMAN:  Okay.  And then there is a bullet point at the bottom which reads "Impact."

Do you see that?

A.   Yes, I do.

Q.   Okay.  And then it reads, "20 to 40 megawatts," right --

A.   Correct.

Q.   -- on the first hashmark?

A.   Correct.

Q.   "30 million to 60 million in 2011 (derating)."

Do you see that?

Page 184

MARK WIDMAR

A.   Correct.

Q.   That was the financial impact of derating, correct?

MR. ETH:  Objection.  Vague.  Foundation. Overbroad.

THE WITNESS:  That was -- that was an estimate at that point in time based off of the understandings at that point in time.  And as any presentation or any estimate, new information will become available over time.  But that was a preliminary estimate.

Q.   BY MR. DROSMAN:  Did that estimate factor into the guidance that First Solar provided?

A.   That actual impact ended up being much lower than what was represented here.  So there was -- in our guidance that was provided in the first quarter, we did include an impact.

Q.   But it wasn't 30 to 60 million, correct?

A.   Correct.

Q.   This was the information that was presented to the board, correct?

A.   Correct.

MR. ETH:  Objection.  Vague.  Beyond the scope.

Page 185

MARK WIDMAR

Q.   BY MR. DROSMAN:   But it wasn't the information that was factored into the guidance, correct?

A.   Because new information became available to indicate that the exposure that was presented to the board was higher than our actual exposure was anticipated to be.

Q.   Okay.  Second bullet point indicates "New understanding that stabilization is climate dependent."  When did that understanding -- when did First Solar gain that understanding?

MR. ETH:  Objection.  Beyond the scope. Foundation.

THE WITNESS:  The learnings around that, at least broadly understood, would have been in the end of the first quarter, beginning of the second quarter around this time of this presentation.

Q.   BY MR. DROSMAN:  Okay.  Does First Solar still derate for hot climate?

MR. ETH:  Objection.  Way beyond the scope.  Foundation.

THE WITNESS:  Our module technology as we -- as it exists today and the variables that impact stabilization, we no longer have to differentiate

Page 189

MARK WIDMAR

motion, I have no questions right now.

MR. ETH:  So I do want to reserve the right to review the transcript.  We want to make sure we reserve that right.

Of course, we will oppose that motion. Getting 25 statements on a Thursday afternoon after close of business before a three-day weekend and asking the CFO of the company to interview dozens of people involved in hundreds of conversations over a six-year period is, on its face, contrary to what the Court had in mind, contrary to what the rules have in mind, and we will oppose any effort to further burden and overburden the company and the defendants.

MR. DROSMAN:  We don't need to litigate this on the record today.  Obviously, I disagree with your assertion, and we can raise it at the appropriate time with the Court.

MR. ETH:  I -- I fully agree with that.

THE VIDEOGRAPHER:  Okay.  Please stand by.

This concludes today's recording of the deposition of Mark Widmar, 30(b)(6).  This is the end of media unit No. 3, and there were a total of three media in this recording.  We are now off the record.

Page 190

MARK WIDMAR

The time is 2:21 p.m.

(The proceedings concluded at 2:21 p.m.)

Page 191

MARK WIDMAR

I, MARK WIDMAR, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct,

EXECUTED this _____ day of _____, 20__, at _____, _____,
                    (City)                    (State)


_____ I have made changes to my deposition.
_____ I have NOT made changes to my deposition.



                    _____

                    MARK WIDMAR

Page 193

MARK WIDMAR

CERTIFICATE

I, Kristy A. Ceton, Certified Court Reporter for the State of Arizona, certify:

That the foregoing proceedings were taken by me; that I am authorized to administer an oath; that the witness, before testifying, was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that review and signature was requested; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had upon the taking of said proceedings, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED this 22nd day of January, 2015.


_____

Kristy A. Ceton

Certified Court Reporter No. 50200

For the State of Arizona

# Exhibit 44

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, individually
and on behalf of all other
persons similarly situated,

                       Case No.
      Plaintiffs,          CV12-00555-PHX-
                       DGC

  vs.

First Solar, Inc.; Michael J.
Ahearn; Robert J. Gillette;
Mark R. Widmar; Jens
Meyerhoff; James Zhu; Bruce
Sohn; and David Eaglesham,
      Defendants.

------------------------------------

VIDEOTAPED DEPOSITION OF JAMES ZHU

San Francisco, California

Thursday, January 29, 2015

REPORTED BY:

CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

JOB NO. 87644

January 29, 2015

8:54 a.m.

Videotaped deposition of JAMES ZHU, held at Morrison & Foerster LLP, 425 Market Street, San Francisco, California, before Cynthia Manning, Certified Shorthand Reporter No. 7645, Certified LiveNote Reporter, California Certified Realtime Reporter.

Mr. Zhu.  With me, right now, is Grant -- Grant Schrader, excuse me.  Mr. Eric Roberts will be joining us.

        And while I have the floor, on behalf of Mr. Zhu, we would invoke his right under Rule 30 to read and review the transcript.

        MR. GRONBORG:  Understood.

        MR. BENNETT:  The floor is yours.

        THE VIDEOGRAPHER:  Madam Court Reporter, would you please swear in the witness.

                        JAMES ZHU,
            having first been duly sworn, testified as
            follows:


                        EXAMINATION
BY MR. GRONBORG:

    Q.  Good morning again, Mr. Zhu.

        Do you understand that you've been sworn in?

    A.  Yes.

    Q.  Okay.  And that you're here to give testimony under oath as if you were in a court of law?

    A.  Yes.

Page 71

development was material?

A.   I think that would be Q -- around Q2 2010.

Q.   So it's your understanding that before Q2 2010, the disclosure committee did not make any assessment of whether the LPM development was material?

A.   Made an assessment -- disclosure committee meeting made assessment, concluded prior to that, based on what best estimate, the information available for those preceding quarters, the disclosure committee concluded for those respective quarters they're not material and that no disclosure was made.

Q.   You said for those preceding quarters.

What quarters?

A.   For the quarter starting that we have LPM matters.

Q.   And what quarter was that?

A.   I think it's Q2 2000- -- 2009.

Q.   Is it your understanding Q2 2009 is the first time that the disclosure committee made an assessment of whether the LPM development was material?

A.   That's correct.  That's the quarter the information came to our attention.

Q.   And how did it come to the disclosure committee's attention in Q2 2009?

A.   I don't recall specifically and we -- we typically have three disclosure committee meetings: Before close, after close, before press release.  So I think the event just brought it to the E-staff's attention and disclosure committee's attention and then we did assessment.

Q.   So it's your understanding that it was brought to both the E-staff's attention and the disclosure committee's attention in Q2 2009?

A.   That's correct.

Q.   And do you recall who it is who brought it to the attention of the E-staff and/or the disclosure committee?

A.   I do not recall.

Q.   Did it come to your attention in Q2 2009?

A.   Correct.

Q.   And you said at least that quarter you believe the disclosure committee would have made a materiality assessment of the LPM development and determined that it was not material; is that right?

A.   That's correct.

Q.   Did the disclosure committee consider any qualitative factors in making that determination in

Q2 2009?

A.   Yes.

Q.   What qualitative factors did the disclosure committee consider?

A.   I just do not recall the detailed discussions.

Q.   Would they be written down anywhere?

MR. BENNETT:   Object; calls for speculation.

THE WITNESS:   Not -- not that I recall.

BY MR. GRONBORG:

Q.   You're certain, though, that they did consider qualitative factors in Q2 --

A.   Yes.

Q.   But you have no idea what any of those qualitative factors are?

A.   I just do not recall at this time.

Q.   And did the disclosure committee consider quantitative factors in Q2 2009 in assessing the materiality of the LPM development?

A.   Yes.

Q.   What quantitative factors were considered?

A.   The financial impact.

Q.   The financial impact of what?

A.   The financial impact of the accruals to

that particular quarter.

Q.   And did the disclosure committee consider any quantitative factors other than the financial impact of accruals to the quarter?

A.   I do not recall any -- what else is being discussed.

Q.   When you say I don't recall there, do you mean to say you don't recall anything else was discussed or you don't have a recollection --

A.   I don't have a recollection.

Q.   So there may have been more things discussed --

A.   That's correct.

Q.   -- you don't remember?

A.   Yes.

MR. BENNETT:   Let him complete his questions.   Help make a clear record.   You knew where he was going.

BY MR. GRONBORG:

Q.   Now, in Q3 2009, did the disclosure committee again do an assessment of the materiality of the LPM development?

A.   Q3 2009, that's your question?   Yes.

Q.   So would they have considered additional information in Q3 2009?

A.   Yes.

Q.   How would the assessment have changed from Q2 2009 to Q3 2009?

MR. BENNETT:   Object; vague and ambiguous, vague.

THE WITNESS:   Can you repeat your question?

BY MR. GRONBORG:

Q.   Is it your understanding that the disclosure committee would have reviewed updated or new quantitative and qualitative factors in Q3 2009?

A.   Correct.

Q.   And do you have a recollection of what any of those new or updated quantitative or qualitative factors were?

MR. BENNETT:   Object to the word "factors" as vague.

THE WITNESS:   In relation to what specific topic?   In general is your question?

BY MR. GRONBORG:

Q.   The LPM development.

A.   Okay.

Based on my recollection, new data came to our attention.

Q.   What new data was that?

A.   The claims.

Q. Anything else?

A. Mainly the claims.

Q. So as new data was developed with regard to the LPM development, is that -- would that generally been considered by the disclosure committee?

A. Yes.

Q. Would the disclosure committee make an effort to go and get the latest information about the LPM development in order to do the materiality assessment?

A. Generally correct, yes.

Q. And was there a particular person or persons who were responsible for providing the disclosure committee with the latest information about the LPM development?

A. Depending on which quarter that you're talking about. In that particular quarter, my recollection is Mike Koralewski.

Q. Okay. And did that change at some point?

A. Yes, later on.

Q. And who did it become later on?

A. TK.

Q. TK Kallenbach?

A. TK.

Q. And Mr. Koralewski and then later

Mr. Kallenbach, would they actually attend the disclosure committee meetings?

A.   Yes, either in person or telephonically.

Q.   And was that for purposes of providing updated information about the LPM development?

A.   Yes.

Q.   And as of Q3 2009, is it your understanding that Mr. Koralewski would have been participating in the disclosure committee meeting?

MR. BENNETT:   Object; vague, vague and ambiguous as to "participation."

THE WITNESS:   I don't know.   I don't recall and how it was participated.   So, yeah, I would expect that he was there.

BY MR. GRONBORG:

Q.   And is it your expectation that he would have provided the most up-to-date information about the LPM development?

A.   Correct.

Q.   And did it ever come to your attention that Mr. Koralewski had not provided the disclosure committee with the most updated information about the LPM development?

A.   No.

Q.   Did it ever come to your attention that

Page 78

Mr. Kallenbach had not provided the disclosure committee with the most updated information he had about the LPM development?

A.   Would you repeat the question again?

Q.   Sure.

My question was:  Did it ever come to your attention that Mr. Kallenbach had not provided the disclosure committee with the most updated information he had about the LPM development?

A.   No.

Q.   Q4 2009, did the disclosure committee again do a materiality assessment of the LPM development?

A.   Q4 2009, yes.

Q.   And, again, the disclosure committee determined that it was not material?

A.   Yes.

Q.   And what was the basis for the disclosure committee's determination in Q4 2009 that the LPM development was not material?

A.   Based on the financial impact, based on our best estimates, per information available to us, it was concluded for the -- for the quarter and for the year.

Q.   Best estimates of what?

A.   The information available to the effort to

Page 79

be taken to remediate the LPM situation.

Q.   So the best efforts of what that effort would entail?

A.   That's correct.

Q.   Financially?

A.   Correct.

MR. BENNETT:   We've been going about 90 minutes, so when it's convenient for you...

MR. GRONBORG:   Sure.

BY MR. GRONBORG:

Q.   And do you have a specific recollection of whether or not the disclosure committee considered any qualitative factors in assessing the materiality of the LPM development in Q4 2009?

A.   Yes.

Q.   What qualitative factors do you understand the disclosure committee considered?

A.   I think mainly is understanding the scope of the issue, the nature of the issue.

Q.   What do you mean by that?

A.   Qualitatively try to understand, you know, this is confined, retain the issue or is this an open-ended issue, so how well understood we are in terms of this particular operational issue.

Q.   Sort of whether you're at the beginning of

Page 80

the problem or the end of the problem?

A.   That's correct.

Q.   Did the --

MR. BENNETT:   I'm just going to object to that as vague, "the problem."

BY MR. GRONBORG:

Q.   Did the disclosure committee consider the reputational impact of the LPM development on First Solar?

A.   What do you mean by repetition -- repetition impact?

Q.   Reputational.

A.   Reputational impact?

I do not recall the specific discussions.

Q.   At any point in time, did the disclosure committee consider what the impact would be on First Solar's reputation if the LPM development was publicly disclosed?

A.   I do not recall all those.  I know that a discussion took place regarding customer satisfaction.

Q.   That's something you thought took place during Q4 2009?

A.   Not necessarily.  Could be other quarters, too.

Q.   Before Q4 2009?

A.   I do not recall when it took place specifically.

Q.   And what do you understand was the nature of the conversations regarding customer satisfaction?

A.   It's so -- so long ago, I just could not recall the details.

Q.   Was that a quantitative factor or qualitative factor?

A.   Qualitative -- qualitative factor, yeah.

Q.   So it wasn't just the number of modules that would have to be shipped for customer satisfaction, it was something else?

A.   We had a good understanding at the time, based on information available, how many modules were required to be shipped.  So the focus is really the qualitative discussion.

Q.   When you say "at the time," what are you referring to?

A.   For the quarters, each quarter end.

Q.   So in Q3 2009, you thought you had a good understanding of the number of modules that would be shipped as a result of the LPM development?

A.   Correct.

Q.   And Q4 2009, you thought you had a good understanding of the number of modules that would ultimately have to be shipped as a result of the LPM development?

A.   Correct, based on additional information available at the time.

Q.   Okay.  And did that number change between, say, Q3 2009 and Q2 2010?

A.   In terms of what number now?

Q.   The number of modules that would have to be shipped to rectify the LPM development?

A.   Yes.

Q.   Was there any point in time when you realized that the number that the disclosure committee had considered in an earlier quarter was no longer accurate?

MR. BENNETT:  Object.  Object to the form; ambiguous and argumentative.

THE WITNESS:  We determined it's necessary to revise the estimate based on the information available.  So for each quarter, those are the best estimates based on the information available for the respective quarters.

BY MR. GRONBORG:

Q.   When you say "we determined," who is we?

A.  The disclosure committee.

Q.  So the disclosure committee made the determination that it would be necessary to revise the estimate of the number of modules that would be -- have to be shipped as a result of the LPM development?

A.  Disclosure committee does not make a decision for the number of modules to be shipped. Rather, it is the technical group, engineering group, they determine.  So disclosure committee is a recipient of the information.

Q.  Okay.  So I guess when you say "we determined it was necessary to revise the estimate," you're referring to someone within First Solar made that determination?

A.  That's correct.

Q.  And the disclosure committee would get the updated information?

A.  Correct.

MR. GRONBORG:  Okay.  Why don't we go ahead and take a break.

MR. BENNETT:  Thanks.

THE VIDEOGRAPHER:  This marks the end of Disc Number 1 in the video deposition of James Zhu. The time is 10:30 a.m.  We're going off the record.

randomly asking, understanding that 2012 is year-end, is a big number.

Q.  How about following the year-end?

A.  No.

Q.  You don't recall having discussions with anyone following the year-end about the LPM issue?

A.  No.

MR. GRONBORG:  You want to give me more time?

MR. BENNETT:  No.

MR. GRONBORG:  Okay.  Worth asking.

MR. BENNETT:  You don't deserve it.  You're not going to get it.

MR. GRONBORG:  Ask the witness.  Mr. Zhu --

MR. BENNETT:  It's not personal.  I didn't write the rules.  No.  Thank you.

MR. GRONBORG:  Do you have any questions?

MR. BENNETT:  Not at this time.

MR. GRONBORG:  Mr. Zhu, we'll reserve our right to recall you.  Your counsel will reserve the right to challenge that.

THE WITNESS:  Understood.

MR. GRONBORG:  Otherwise, thank you.

MR. BENNETT:  Thank you.

THE WITNESS:  Thank you.

Page 311

THE VIDEOGRAPHER:  This concludes today's video deposition of James Zhu.  Master discs of today's deposition will be held in the custody of TSG Reporting.  The time is 5:36 p.m.  We're off the record.

(Time noted:  5:36 p.m.)

Page 312

DECLARATION UNDER PENALTY OF PERJURY

I, JAMES ZHU, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on January 29, 2015; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this            day of
2015, at                              , California.


_____

JAMES ZHU

Page 313

STATE OF CALIFORNIA  )

        :ss

COUNTY OF SAN MATEO  )

        I, CYNTHIA MANNING, a Certified Shorthand Reporter of the State of California, do hereby certify:

        That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

        I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

        IN WITNESS WHEREOF, I have subscribed my name this 30th day of January 2015.

        _____

        CYNTHIA MANNING, CSR No. 7645, CCRR, CLR