ROBBINS GELLER RUDMAN & DOWD LLP
Michael J. Dowd (CA SBN 135628) (Admitted *pro hac vice*)
Daniel S. Drosman (CA SBN 200643) (Admitted *pro hac vice*)
Jason A. Forge (CA SBN 181542) (Admitted *pro hac vice*)
Luke O. Brooks (CA SBN 212802) (Admitted *pro hac vice*)
Cody R. LeJeune (CA SBN 249242) (Admitted *pro hac vice*)
Darryl J. Alvarado (CA SBN 253213) (Admitted *pro hac vice*)
Christopher D. Stewart (CA SBN 270448) (Admitted *pro hac vice*)
Lonnie A. Browne (CA SBN 293171) (Admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
miked@rgrdlaw.com
dand@rgrdlaw.com
jforge@rgrdlaw.com
lukeb@rgrdlaw.com
clejeune@rgrdlaw.com
dalvarado@rgrdlaw.com
cstewart@rgrdlaw.com
lbrowne@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, Individually and on Behalf of All Others Similarly Situated,<br><br>                               Plaintiff,<br><br>     vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn and David Eaglesham,<br><br>                               Defendants. | No. 2:12-cv-00555-DGC<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>**[REDACTED VERSION]** |

1022231_1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   ARGUMENT ......................................................................................................... 3

      A.    Legal Standard............................................................................................ 3

      B.    The Individual Defendants .......................................................................... 4

      C.    Defendants Fraudulently Concealed the Existence and, Later, the
            Scope of the LPM Defect ............................................................................ 6

            1.    Defendants Concealed the Massive LPM Defect ............................. 7

            2.    Defendants Repeatedly Misrepresented the True Scope of the
                  LPM Defect .................................................................................... 14

                  a.    Defendants' Internal Definition of the LPM Defect
                        Was at Odds with Their Public Statements........................... 15

                  b.    Defendants Expected Millions of Modules to
                        Underperform by 15% or Greater ......................................... 18

                  c.    Defendants Knowingly Utilized an Overstated Module
                        Population ............................................................................. 19

                  d.    Defendants Knew that Modules Manufactured Before
                        June 2008 and After June 2009 Would Underperform
                        Warranty Levels .................................................................... 20

                  e.    ███████████████████████████████████
                        ████████████████████████ .................................................. 22

                  f.    Defendants Manipulated the "Hit Rate" to Reduce the
                        Number of Modules Needed to Remediate the LPM
                        Defect ................................................................................... 24

                  g.    Defendants Manipulated STBi Data to Minimize the
                        LPM Defect ........................................................................... 25

                  h.    Defendants Misrepresented the Status of Remediation ........ 27

            3.    Defendants' Accounting Fraud Masked the True Scope and
                  Cost of the LPM Defect .................................................................. 28

                  a.    Pre-2Q10: Defendants Actively Concealed the
                        Financial Impact of the LPM Defect .................................... 28

                  b.    2Q10 – 1Q11: Defendants' Financial Statement
                        Disclosures Were False ......................................................... 29

- i -

1022231_1

**Page**

        c.      2Q11 – 3Q11: Defendants' Financial Statement and Remediation Status Disclosures Were False.......................... 31

        d.      Defendants' Concealed Change in Warranty Methodology ..................................................................... 35

        e.      Defendants' Treatment of Refurbished Modules Violated Accounting Standards ...................................... 36

    D.     Defendants Fraudulently Concealed the Hot Climate Defect ...................... 39

        1.      Defendants Fraudulently Concealed the Hot Climate Defect for Years ................................................................................... 39

        2.      Defendants Employed Undisclosed Manipulations to Conceal the Financial Impact of the Hot Climate Defect ............................. 42

        3.      Increased Warranty Exposure from Modules Installed in Hot Climates.................................................................................... 43

        4.      Defendants Engaged in Accounting Manipulation to Conceal the Hot Climate Defect.................................................................... 44

    E.     Defendants Manipulated and Misstated Cost-per-Watt .............................. 45

        1.      First Solar Manipulated Cost-per-Watt to Deceive the Market ....... 45

        2.      First Solar's Cost-per-Watt Metric Excluded Costs Associated with First Solar Defects ................................................ 46

    F.     The Individual Defendants Engaged in Massive Insider Trading............... 47

    G.    The Company Is Liable for the Fraud .......................................................... 51

    H.    Defendants' Reliance on Auditor Defense Fails .......................................... 51

    I.     Defendants' "Process" Arguments Do Not Negate the Overwhelming Evidence of Their Scienter.................................................. 52

    J.     The Evidence of Loss Causation Presents Disputed Issues of Fact............ 53

        1.      Loss Causation Standard................................................................. 54

        2.      Defendants' Fraud Caused Plaintiffs' Economic Loss .................... 57

        3.      Steinholt Removed the Effect of Non-Fraud Related Information from the Decline in First Solar's Stock Price .............. 68

    K.    Defendants Are All Control Persons Under §20(a) ..................................... 69

III.    CONCLUSION ....................................................................................................... 70

1022231_1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Adecco, S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006)........................................................................... 34

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ....................................................................................... 55

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).......................................................................................................3

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009), *rev'd on other grounds*................................. 49

*Basic Inc. v. Levinson*,
485 U.S 224 (1988)...................................................................................................... 56

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................... 13, 14, 57

*C.E. Carlson, Inc. v. SEC*,
859 F.2d 1429 (10th Cir. 1988) ................................................................................... 52

*Carlson v. Xerox Corp.*,
392 F. Supp. 2d 267 (D. Conn. 2005)........................................................................... 36

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................................ 63

*Dirks v. SEC*,
463 U.S. 646 (1983)..................................................................................................... 47

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................ 54, 56

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................... 49, 50, 51

*Glazer Cap. Mgm't v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ....................................................................................... 51

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990) ..................................................................................... 69

1022231_1

**Page**

*Howard v. Everex Systems, Inc.*,
228 F.3d 1057 (9th Cir. 2000) ..................................................................................*passim*

*Huberman v. Tag-It Pac., Inc.*,
314 F. App'x 59 (9th Cir. 2009) .............................................................................. 55

*In re Amgen Inc. Sec. Litig.*,
No. 07-CV-2536, 2014 U.S. Dist. LEXIS 183034
(C.D. Cal. Aug. 4, 2014)................................................................................. 55, 57, 68

*In re Anadigics, Inc., Sec. Litig.*,
No. 08-5572, 2011 U.S. Dist. LEXIS 112587
(D.N.J. Sept. 30, 2011) ............................................................................................ 63

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ................................................................................... 13

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................. 13

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ..................................................................................*passim*

*In re Enron Corp. Secs.*,
MDL No. 1446, 2005 U.S. Dist. LEXIS 41240
(S.D. Tex. Dec. 22, 2005) ........................................................................................ 63

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..................................................................................*passim*

*In re Homestore.com, Inc. Sec. Litig.*,
347 F. Supp. 2d 769 (C.D. Cal. 2004) ..................................................................... 4

*In re Motorola Corp. Sec. Litig.*,
505 F. Supp. 2d 501 (N.D. Ill. 2007).............................................................. 56, 57, 69

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011)....................................................... 4, 55, 59, 69

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ................................................................................. 51

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ............................................................................. 53, 56

1022231_1

**Page**

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) .......................................................................... 53

*In re Skechers*,
    273 Fed. App'x 626 (9th Cir. 2008) ............................................................................... 50

*In re Sybase, Inc. Sec. Litig.*,
    48 F. Supp. 2d 958 (N.D. Cal. 1999) ............................................................................. 38

*In re Zynga Inc. Secs. Litig.*,
    No. C-12-4007, 2015 U.S. Dist. LEXIS 38722
    (N.D. Cal. Mar. 25, 2015) .............................................................................................. 59

*Kodimer v. County of San Diego*,
    No. 07-CV-2221, 2010 U.S. Dist. LEXIS 65090
    (S.D. Cal. June 30, 2010) ............................................................................................... 70

*Komie v. Saxton*,
    277 Fed. App'x 750 (9th Cir. 2008) ............................................................................... 57

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .......................................................................... 56, 63, 64

*Loos v. Immersion Corp.*,
    No. 12-15100, 2014 U.S. App. Lexis 17813
    (9th Cir. Sept. 11, 2014) .......................................................................................... 63, 64

*Lormond v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .......................................................................................... 57

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) .......................................................................................... 36

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) .............................................................................. 52

*Mathews v. Centex Telemgmt., Inc.*,
    No. C-92-1837-CAL, 1994 WL 269734
    (N.D. Cal. June 8, 1994) ................................................................................................ 34

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................................ *passim*

1022231_1

**Page**

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
No. CV 06-6863 DOC, 2008 U.S. Dist. LEXIS 68419
(C.D. Cal. July 10, 2008) ................................................................................ 30

*Nathanson v. Polycom, Inc.*,
No. 13-3476, 2015 U.S. Dist. LEXIS 44292
(N.D. Cal. Apr. 3, 2015) ............................................................................ 60, 63

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .................................................................. *passim*

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
54 F.3d 1424 (9th Cir. 1995) .................................................................... 51, 70

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ............................................................ 17, 53, 56

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ................................................................. *passim*

*Oregon Pub. Empls. Ret. Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) .................................................................... 63, 64

*Paracor Fin., Inc. v. GE Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) ........................................................................ 69

*Police & Fire Ret. Sys. of Detroit v. Crane*,
No. 13-CV-945, 2015 U.S. Dist. LEXIS 31989
(N.D. Cal. Mar. 13, 2015) ............................................................................ 59

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ................................................................. *passim*

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................................ 13

*Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) .................................................. 34, 48

*SEC v. Conaway*,
No. 05-40263, 2006 U.S. Dist. LEXIS 75007
(E.D. Mich. Sept. 29, 2006) .......................................................................... 36

1022231_1

**Page**

*SEC v. Lipson,*
    278 F.3d 656 (7th Cir. 2002) ...................................................................................................... 50

*SEC v. Phan,*
    500 F.3d 895 (9th Cir. 2007) ...................................................................................................... 12

*Siracusano v. Matrixx Initiatives, Inc.,*
    585 F.3d 1167 (9th Cir. 2009) .................................................................................................... 14

*Special Situations Fund III QP, L.P. v. Brar,*
    No. 14-4717, 2015 U.S. Dist. LEXIS 38825
    (N.D. Cal. Mar. 25, 2015)..................................................................................................... 57, 68

*United States v. Green,*
    523 F.2d 229 (2d Cir. 1975) ........................................................................................................ 5

*United States v. O'Hagan,*
    521 U.S. 642 (1997)....................................................................................................... 14, 47, 48

*VeriFone Holdings, Inc. Sec. Litig.,*
    704 F.3d 694 (9th Cir. Cal. 2012).................................................................................... 25, 51, 52

*Vernazza v. SEC,*
    No. 01-71857, 2003 U.S. App. LEXIS 14351
    (9th Cir. Apr. 24, 2003) .............................................................................................................. 23

*Werner v. Werner,*
    267 F.3d 288 (3d Cir. 2001) ....................................................................................................... 28

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)..................................................................................................................................... 23, 70
    §78t(a) ..................................................................................................................................... 69, 70
    §78u-4(b)(4) ................................................................................................................................. 54

Fed. R. Civ. P.
    Rule 56(a)...................................................................................................................................... 3

17 C.F.R.
    §210.4-01(a)(1) ........................................................................................................................... 30
    §229.303(c)) ................................................................................................................................ 45
    §230.405....................................................................................................................................... 70
    §240.10b-5 ................................................................................................................................... 23

1022231_1

## I.   INTRODUCTION

This case presents a straightforward securities fraud. Seizing upon the public's enthusiasm for renewable energy, defendants First Solar, Inc. ("First Solar" or the "Company"), Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham (the "Individual Defendants," collectively with First Solar, "defendants") misrepresented their solar-module technology and concealed significant defects plaguing the Company's only product. When the problems grew too big to hide, defendants lied about their size and financial impact. Defendants' scheme drove First Solar's share price to over $300 per share by the start of the Class Period (April 30, 2008 to February 28, 2012), but by the time the dust had settled on a number of partial revelations, investors had lost hundreds of millions of dollars directly attributable to the fraud. The Individual Defendants fared much better – they pocketed more than $468 million from Class Period stock sales at artificially inflated prices.

The evidence overwhelmingly supports plaintiffs' claims. There is no question that defendants concealed from the market a major manufacturing defect (low-power module, or "LPM"), and when they revealed the defect itself, they falsely downplayed its significance. Throughout the Class Period, defendants knew that a large percentage of their modules experienced premature power loss. By March 2009, customers began complaining, so defendants labeled the defect an "excursion" and downplayed the problem with customers. ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████[1] But they said nothing to investors, concealing the existence of the excursion from the market for more than a year. When they finally disclosed the excursion, defendants grossly misrepresented its scope, falsely telling the market that the excursion "affected" "less than 4%" of modules produced between June 2008 and June 2009 – or only 400,000 modules – and that remediation was

---

[1]   Unless noted otherwise, all exhibits referenced throughout are attached to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

- 1 -

1022231_1

nearly complete.  But internal documents show ███████████████████ ████████████████████████████████████████ Even by 3Q11 – more than a year later and just one quarter before the truth was revealed – ████████████ ████████████████████████ Ex. 3 at 217:13-20.  Defendants also misrepresented the financial impact of LPM, with an indefensibly low $29.5 million accrual for the supposed "full costs" of the defect.  ████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████

To hide the true extent of the defect, defendants engaged in a series of manipulations. First, defendants used several schemes to understate by millions the number of LPM. Second, defendants manipulated the true costs of the remediation to minimize their so-called special accrual.  Third, ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ – a "key metric" relied upon by investors to gauge the Company's performance – ██████████████████. Ex. 6 at 32:16-25. ██████████████████████████████████████████ ████████████████████, it was abruptly concluded with a conference call in which defendants ordered that "[n]o one should ever go to internal audit again." *Id.* at 127:9-22.

Defendants employed a similar denial-and-downplay strategy with the internal recognition that power output rapidly degraded when modules were placed in hot climates – a substantial problem for any purveyor of solar modules, but doubly so for defendants given First Solar's strategy shift to target hot climates almost exclusively.  ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ At the end of the Class Period, First Solar recorded a nearly $40 million charge to account for power loss

- 2 -

1022231_1

for modules installed in hot climates between 2009 and 2011, and restated its warranty accrual rate to accommodate for the hot climate problem going forward.

Taking full advantage of the fraud, the Individual Defendants engaged in mammoth insider trading during the Class Period, selling millions of First Solar shares for more than $468 million. Ahearn spearheaded the bonanza. He sold 3.2 million shares (97% of his holdings), pocketing $427 million, during the Class Period, including a single sale of 1.5 million shares that occurred after he learned about the excursion, but prior to its disclosure. In addition, defendants Meyerhoff, Sohn, Eaglesham, and Zhu reaped approximately $17.9 million, $12 million, $9.5 million, and $1.1 million, respectively, from their Class Period sales. In total, the Individual Defendants combined to sell 95% of their shares during the Class Period.

The overwhelming evidence of defendants' fraud creates triable issues of fact. Rather than confront this evidence head on, defendants either ignore it or submit self-serving declarations that directly contradict the contemporaneous documents. Accordingly, defendants' motion should be denied in its entirety.

## II.    ARGUMENT

### A.    Legal Standard

Summary judgment may be granted only if the evidence, viewed in the light most favorable to the plaintiffs, shows "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(a). The party moving for summary judgment has the burden to show the absence of a genuine issue concerning any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Id.* at 255. Conflicting inferences result in a case for the jury. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000). The court must deny a defendant's motion for summary judgment on scienter "unless ***all*** reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim." *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) (emphasis in original).

- 3 -

1022231_1

"Generally, scienter should *not* be resolved by summary judgment." *Provenz,* 102 F.3d at 1489 (emphasis in original). A finding of scienter requires knowledge or recklessness. *See Howard,* 228 F.3d at 1063. A defendant is reckless if "'he had reasonable grounds to believe that material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort.'" *Id.* at 1064.[2] In denying summary judgment in a situation where the CEO signed financial statements in the face of potentially alarming financial information, the Ninth Circuit has held that such recklessness can be demonstrated by showing potential motive and opportunity to commit securities fraud. *Id*.

"'[A] private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.' . . . *But at summary judgment, the standard is less stringent* – the PSLRA requirement of pleading a 'strong' inference of scienter 'puts securities fraud claims in the interesting posture of requiring plaintiffs to plead more than they must prove at trial, *where a simple inference of scienter is sufficient to support a jury's verdict*.'" *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1017 (S.D. Cal. 2011); *see also In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 784 (C.D. Cal. 2004) ("[I]t is generally more difficult to overcome a motion to dismiss than a motion for summary judgment.").

**B.     The Individual Defendants**

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Each of the Individual Defendants also participated in and spoke on earnings conference calls during the Class Period. ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

---

[2]   Here, as elsewhere, unless noted otherwise, all emphasis is added and citations omitted.

- 4 -

08; Ex. 10 at 25; Ex. 11 at 236:13-19; Ex. 8 at 200:17-23; Ex. 12 at 51:21-52:5; Ex. 13 at 23:13-18; Ex. 14 at 335:18-336:3.

███████████████████████████████████████████████████████████████████████████████

████████████████████████████ *see, e.g.*, *Provenz*, 102 F.3d at 1491 (question of fact raised by defendant who was "personally involved in and approved each decision" to make misleading statement).[3]  The false statements and omissions for which each defendant is liable are set forth in Appendix A ("Pls. Appx.").

**Michael Ahearn**. █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

Additionally, Ahearn drafted, edited and approved press releases and earnings call scripts.

**David Eaglesham**.  Eaglesham was the Chief Technology Officer from November 2009 to May 2012. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████. *See* Ex. 15 at 183:6-184:17; *id*. at 195:22-196:10; Ex. 8 at 213:22-214:4.

**Robert Gillette**.  Gillette was CEO from October 2009 to October 2011, ████████

███████████████████████████████████████████████████████████████████████████████

---

[3]  Defendants assert that plaintiffs' fraud allegations are somehow inconceivable because some Individual Defendants joined First Solar at different times throughout the Class Period. *See* Defendants' Motion for Summary Judgment (Dkt. 311) ("Mem.") at 3; 61-68.  To the contrary, criminals enter and exit conspiracies all the time without the conspiracy missing a beat.  *See United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975).

- 5 -

1022231_1

***Jens Meyerhoff***.  Meyerhoff was CFO from the beginning of the Class Period until December 2010, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████

***Bruce Sohn***.  Sohn was First Solar's President until April 2011. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████

***Mark Widmar***.  Widmar was CFO from April 2011 through the end of the Class Period. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████

***James Zhu***.  Zhu was Vice President and Corporate Controller from 2007 through October 2009, ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████

**C.     Defendants Fraudulently Concealed the Existence and, Later, the Scope of the LPM Defect**

During the Class Period, defendants touted First Solar's technology and

- 6 -

manufacturing capabilities while concealing massive product problems. ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ In

propagating this fiction, defendants provided a public definition of the defect ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████

### 1. Defendants Concealed the Massive LPM Defect



4 Ex. 8 at 92:15-93:7; Ex. 22 at 86:9-88:13, 195:14-196:13; Ex. 3 at 253:8-14; Ex. 21 at 55:7-56:11; 66:5-67:9, 69:9-15; 117:22-25; Ex. 23 at 88; Ex. 24 at 36; Ex. 20 at 92; Ex. 25 at 87-88; Ex. 26 at 90, 99; Ex. 27 at 89-91; Ex. 28 at 241:16-22; Ex. 29 at 98, 01-02; Ex. 30 at 88; Ex. 21 at 57:2-58:22, 66:5-67:9; 111:2-25, 177:8-179:7; Ex. 27 at 89; Ex. 31 at 80-81; Ex. 32 at 94; Ex. 20 at 10; Ex. 33 at 63; Ex. 23 at 88; Ex. 22 at 220:23-221:18.

- 7 -

1022231_1

97:24-98:3.



*see Howard*, 228 F.3d at 1065 ("[W]here reports raised legitimate red flag, defendants were required to take further steps to ensure the accuracy of the disputed data to negate intent.").

- 8 -

1022231_1

Ex. 42 at 68.

1022231_1

- 10 -

1022231_1

Given the severity of the LPM defect, however, it became increasingly difficult to hide.

A week later, Polizzotto wrote to Meyerhoff:

By mid-June 2010, it became clear that First Solar could no longer

On June 22, 2010, Eaglesham, Meyerhoff, and Zhu learned that

- 11 -

1022231_1

Defendants contend that they had no obligation to disclose the latent LPM problems threatening the Company's very viability. Mem. at 45-47. But the evidence shows the For example, Sohn In April 2010, Sohn told Eaglesham: [6] The Company, however, simply ignored .[7] Further, as discussed below, defendants were required by applicable accounting standards to disclose the existence of the LPM defect and its true financial impact. *See* §II.C.3.

In addition, defendants repeatedly assured the market on earnings calls and in SEC

[6]

[7]

t, "Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement." *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).

- 12 -

1022231_1

filings that the Company's manufacturing processes were "reliable," resulting in "operational excellence" and "continued improvements" – ████████████████████████████ ████████████████ Pls. Appx., Stmt. Nos. 20 (May 1, 2009), 33 (Feb. 22, 2010), 37 (April 29, 2010). In February 2009, when an analyst specifically "want[ed] to make sure there was [sic] no manufacturing problems around," defendant Sohn responded by touting First Solar's expectations "from a quality and reliability perspective" and confirming that they were "very cautious and careful." Pls. Appx., Stmt. No. 14. Likewise, on June 24, 2009, a week *after* ████████████████████████████ Eaglesham falsely told investors ███████████████████████████ ██████████████████████████████████████ ██████ ████████████████. Having chosen to "tout" the reliability of the manufacturing process and product performance, defendants were obligated to disclose the massive product problems. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *see also Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) ("By omitting information regarding BP's detection of high corrosion levels, Johnson affirmatively created an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 n.7 (C.D. Cal. 2008) ("'[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play'" if defendants "intentionally or recklessly omit[] certain facts contradicting these representations.").[9]

Defendants also represented that problems with First Solar's manufacturing processes and product quality "may cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share." Pls. Appx., Stmt. Nos. 3

_____

[8]  Eaglesham's after-the-fact construction is irrelevant. Whether Eaglesham's statement misled the market is a jury question. *Provenz*, 102 F.3d at 1089.

[9]  Citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991), defendants contend that they were not obligated to disclose the LPM defect because companies are not forced to "bury shareholders in an avalanche of trivial in                                    here – ████████████████ ████████████████████████████████████████ – were hardly trivial.

- 13 -

(May 2, 2008), 6 (July 31, 2008), 9 (Oct. 31, 2008), 15 (Feb. 25, 2009).  These statements are false and actionable because they speak to *unrealized* risks that have *already been* realized.  *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("Similar to *Berson*, the passage in the Form 10-Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition.'"); *Provenz*, 102 F.3d at 1489 ("'There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems . . . .'").  Thus, defendants' risk warnings aggravated, rather than negated, their fraudulent concealment of the excursion.[10]

Defendants' stock sales also triggered a duty to disclose the known, material facts regarding LPM and hot climate degradation.  *See United States v. O'Hagan*, 521 U.S. 642, 652, 661 (1997) (corporate insiders in possession of material, non-public information have a "duty to disclose or to abstain from trading").  Rather than disclose, five of the defendants dumped shares while in possession of material, non-public information, abusing their superior position of knowledge to exploit the market.  *See* §II.F., *infra*.

**2.    Defendants Repeatedly Misrepresented the True Scope of the LPM Defect**

In First Solar's 2Q10 earnings conference call and Form 10-Q, defendants disclosed the LPM defect for the first time:

> During the period from *June 2008 to June 2009*, a manufacturing excursion occurred *affecting less than 4%* of the total product manufactured within the period.  The excursion *could result in possible premature power loss* in the affected modules. . . .  We have been working directly with impacted customers to replace the affected modules and these efforts are *well underway* and, in some cases, *complete*.

Ex. 69 at 38.  Defendants repeated this disclosure, virtually unchanged, until 4Q11, when they omitted it from their 2011 Form 10-K, filed on February 29, 2012.[11]  Defendants

---

[10]    Accordingly, defendants' statements are not protected by the Safe Harbor.  Nor are the vast majority of defendants' statements forward looking.  In any event, whether defendants' cautionary language was meaningful should not be resolved at summary judgment.  *See Provenz*, 102 F.3d at 1493.

[11]    *See* Ex. 71 at 19, 39; *see also* Ex. 72 at 15, 44; Ex. 73 at 45, 86; Ex. 74 at 15, 37-38; Ex.

- 14 -

1022231_1

Ahearn, Gillette, Eaglesham, Sohn, Meyerhoff and Zhu ███████████████████
███████████████████████████████████████████████████████████████

Defendants' disclosure was false and misleading for several reasons.

**a.** ████████████████████████████████████████**s**

In order to restrict the problem to "less than 4% of the total product manufactured" during that year-long period, defendants applied ████████████████████████
█████████████████████████████████████████████████████████████████████

Defendants told the market that "[t]he excursion ***could result in possible premature power loss*** in affected modules." Ex. 69 at 13. ████████████████████████████
███████████████████████████████████████████████████████████████
███████████████

During the Class Period, defendants told the market and First Solar's customers to expect ████████████████████████████████████████████████████████
██ Defendants understood, therefore, that degradation ████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████.[12] In fact, degradation █████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████ ██████████████████████████████████████████████
███████████████████████████████████████████████████████████████

---

████████████████████████
[12] ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████
[13] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████.

1022231_1

Ex. 82 at 156:20-157:7; *see also* Ex. 86 at 35

Defendants were stuck;

This ploy created

In a presentation

Koralewski, too, expressed

It was only by using these

LPM defect "affect[ed] less than 4% of the total product manufactured

[14] *See, e.g.*, Ex. 93 at 27; Ex. 91 ; Ex. 11 at 143:5-21; Ex. 3 at 90:4-19; Ex. 22 at 49:12-25; Ex. 89 at 39.

- 16 -

within the period."[15]   The impact of this manipulation

defendants ultimately informed First Solar's Board of Directors.  Ex. 26 at 95.

This conclusion was inevitable from the beginning.  In February 2010, for example, Zhu and Eaglesham

In an April 2010

In December 2010, Koralewski wrote:

Defendants did not include these

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").

---

[15]   *See* Ex. 72 at 15, 44; Ex. 73 at 45, 86; Ex. 74 at 15, 37-38; Ex. 75 at 15, 41, 43; Ex. 76 at 16, 44, 47 (providing "less than 4%" language).

1022231_1

**b.** ████████████████████████████

Even using defendants' internal definition of ████████████████████████ ████████████████████████████.[16]  In October 2010, Koralewski determined that ████████████████████████████ Ex. 94 at 96.  In December 2010, defendants ████████████████ ████████████████████████ Ex. 21 at 432:10-15; *see also id.* at 432:24-433:10; Ex. 100 at 38.  According to the Monte Carlo simulation, ████████████ ████████████████████████████████. 100 at 38-39; Ex. 21 at 433:18-21.  Other analyses far exceeded ████████████ disclosed to the market.  *See* Ex. 101 at 27 ████████████████████ ████████████████████; Ex. 102 at 47 ████████████████ ████████████████████████.[17]  After further refining the data from the Monte Carlo simulation, Koralewski wrote: "Plugging in ranges and running the Monte Carlo yield ████████████████████ Ex. 100 at 40.  Despite these quantifications, defendants repeated in 4Q10 their disclosure that ████████ ████████████████ during the LPM period ████████████████ ████████ Ex. 73 at 45, 86.

---

[16]  In addition ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ said a First Solar manager.  Ex. 104 at 81.  This admission, which directly contradicts the assertion in ████████ serving declarations that the number of LPM affected modules never ████████, creates a triable issue of material fact.

[17]  In ████████████████████████████████████
████████████████████████████████ Ex. 22 at 307:20-309:20; Ex. 102 at 47.  Even assuming the truth of ████████ description of the quantification itself: ████████████████████

1022231_1

In June 2011, Koralewski estimated that First Solar's Malaysian plant alone – ▮▮▮▮ ▮▮▮▮ ▮▮▮▮" Ex. 85 at 44.  In 2Q11, Koralewski re-ran ▮▮▮▮ ▮▮▮▮ Ex. 89 at 38; Ex. 82 at 224:24-25; Ex. 15 at 145:14-20; Ex. 105 at 61:11-25.  The calculation of LPM modules ▮▮▮▮ Ex. 106 at 75 ▮▮▮▮ In August 2011, Kallenbach summed up the status of the LPM issue: ▮▮▮▮ ▮▮▮▮ Ex. 107 at 36.  Defendants disclosed none of this to the market.  Rather, they ▮▮▮▮ ▮▮▮▮ during the LPM period, ▮▮▮▮ ▮▮▮▮ Ex. 75 at 15, 41, 43 and Ex. 76 at 16, 44, 47.

### c. Defendants Knowingly Utilized an Overstated Module Population

Defendants also ▮▮▮▮ ▮▮▮▮ when asserting a ▮▮▮▮ ▮▮▮▮ of the product manufactured. On July 28, 2010, ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ Ex. 361 at 72. ▮▮▮▮ ▮▮▮▮ *Id.*  Wood wrote ▮▮▮▮ ▮▮▮▮ *Id.*

Later that day, ▮▮▮▮ ▮▮▮▮



1022231_1

. *Id.* at 71-72. Dividing ███████████████████████████████, Wood responded: ██████████████████ *Id.* at 71. When asked how the Company should handle the disclosure, ██████████████████████████████████ ████████████████████████████████ *Id.* at 70.███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██ Ex. 312. Subsequent reports confirm██████████████████████████

██████████████████████████████ For example, in a December 2010

████████████████████████████████████████████████

████████████████████████████████████████████████

. . . ." Ex. 98 at 13, 16; *see also* Ex. 109 at 64 (February 2012 analysis:██████████

████████████████████████.[18]

**d.** ██████████████████████████

██████████████████████████

Defendants repeatedly represented ████████████████████████

████████████████████████████. Appx., Stmt. Nos. 40, 42, 47, 53, 56, 60, 68, 87, 93, 95. However, defendants knew ████████████████████

████████████████████████████████████████████████

well before and after the year-long period defendants disclosed. ████████████

████████████████████████████████████████████████

████████████████████████████████" Mortiz Ilg, a member of Global Technical Services ("GTS") responsible for quantifying LPM, told a group of First Solar's senior executives. Ex. 24 at 36. Likewise, First Solar's largest customer, Juwi, recognized that

████████████████████████████████████████████████

████████████████████████████ Ex. 172; *see also* Ex. 34 at 86-87 ████████

████████████████████████ ; Ex. 57 at 55 █████████████████ me

---

[18]  Notably, PwC ██████████████████████████ *See* Ex. 110 at 47:10-48:22.

- 20 -

1022231_1

The STBi ██████████████████████████. Defendants created a chart, ██████████████████████████ identifying the substantial ████████ ████████████████████ Ex. 20 at 92-93; Ex. 82 at 134:18-21; *see also* Appendix B. Using STBi correlations, defendants determined in February 2010 ████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████ Ex. 29 at 20; Ex. 21 at 73:19-77:13; Ex. 27 at 89-91. Eaglesham and Sohn received ████████████████████ ████████████████████████ Ex. 111 at 86. The analysis ended ominously: ██████████████████████████ ██████████████████████████████████ ████████████████ *Id.* at 89; *see also* Ex. 112 at 56 ████ ██████████████████████████████████ ████████████████████ Koralewski advised Eaglesham and Sohn ██ ██████████████████████████████████ ██████████████████████████████████ ████████ Ex. 111 at 85-86; *see also* Ex. 113 at 54 ██████████ ████████████████████

In May 2010, ████████████████████████ ██████████████████████████████████ ██████████████████████ Ex. 93 at 24. Alex Panchula, the Head of Performance and Prediction Group, concluded that First Solar had produced ████ ██████████████████████████████████ ████████████ Ex. 80 at 63. ██████████████████████ ████████████████████ Ex. 3 at 283:8-284:3.

- 21 -

1022231_1

**e.** █████████████████████████████████████

█████████████████████████████████████████████

Defendants' statement ███████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████. 12 at 129:24-130:7. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 114 at 97; Ex. 105 at 135:19-136:20.  Defendants ████████████████

█████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████

Ex. 22 at 256:13-257:22; *see also id.* at 342:19-343:17.  Had defendants ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Ex. 26 at 09.

Zhu testified that the total number of reclaimed modules ███████████████ █████████ *See* Ex. 12 at 99:1-19, 129:11-17.  On June 15, 2010, defendants determined that First Solar ███████████████████████ █████ Ex. 37 at 11.  In July 2010 – ████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Ex. 115 at "July 8 2010 Model" tab; Ex. 105 at 228:14-25.  Defendants described internally ████████████████ ████████████████████████████████ Ex. 115 at "July 8, 2010 Model" tab.

Asked at his deposition what ███████████████████ means – the same language defendants used in their public disclosure – senior executive Thomas Kuster conceded that

- 22 -

1022231_1



Ex. 3 at 230:2-24. Because the number of modules needed ███████ Ex. 115 at "July 8 2010 Model" tab; *see also* Ex. 116.[19]

Despite overwhelming evidence that the ███████ was false and misleading, defendants contend they could not have ███████ Mem. at 47. Defendants are wrong. As a threshold matter, defendants' suggestion that scienter requires a specific intent to mislead is incorrect. "In this Circuit, a violation of the Exchange Act §10(b) and Rule 10b-5 may be supported by 'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'" *Vernazza v. SEC*, No. 01-71857, 2003 U.S. App. LEXIS 14351, *17 (9th Cir. Apr. 24, 2003).

In any event, none of the actions defendants say they took undermines their scienter. Defendants aggressively concealed the LPM defect for years. *See* §II.C.1. Rather than ███████ of LPM, Ahearn ███████ Ex. 48 at 72; *see also* Ex. 54. When it became clear the LPM defect was in fact ███████ Ex. 51 at 13. Defendants employed this strategy because they believed ███████ Ex. 9 at 08. Finally, when defendants did disclose, it was only because they had no choice. Analysts were catching wind of the problem, and defendants had to ███████ Ex. 64 at 12.

---

[19] Defendants erroneously contend that the LPM accrual ███████

1022231_1

Nor did defendants offer ██████████████████████████████████████ they merely ██████████████████████████████████████ Ex. 26 at 09.  Further, defendants were obligated by the EU statutory warranty to replace modules that degraded more than 5% in the first two years.  *See* §II.C.2.a.  Because First Solar █████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████ *Id.*  Likewise, defendants' claim █████████ ██████████████████████████████████████████████████████████ *See* §II.C.3.

**f.**  ████████████████████████████████ ██████████████████████████

As discussed, First Solar did not have ████████████████████████████ ████████████████████████████████ Accordingly, the Company ███████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████ Ex. 21 at 391:2-9, 411:11-412:8; Ex. 117 at 12; Ex. 21 at 414:3-415:10; Ex. 11 at 158:16-20, 146:15-17.  For example, if First Solar found one bad module for every 10 it removed, the hit rate would be 10%.  Gillette testified ███████████████████████████ associated with "pulling back the good modules" – ███ ████████████████████████ █████████████████ Ex. 11 at 146:21-147:10.  Thus, the higher the hit rate, the lower the cost.  *Id.*

Gillette exerted ████████████████████████████████ ██████████████████████████████ On June 17, 2010, Sohn ██████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ Ex. 118 at 91; Ex. 21 at 428:10-429:21.  On June 22, 2010, Koralewski ██████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 119 at 52; Ex. 11 at 159:21-160:7.  On June 28, 2010, Gillette received more bad news – ████████████████████████████████████

- 24 -

1022231_1



Ex. 120 at 61.  Prior to disclosing LPM, Gillette ▮▮▮▮▮

▮▮▮▮▮ Ex. 11 at 173:12-174:12; *see also id.* at 163:6-23.

Recognizing that they could not attain ▮▮▮▮▮

▮▮▮▮▮ On June 25, 2010, Koralewski sent Eaglesham and Sohn an ▮▮▮▮▮. Ex. 117 at 11-12. Two weeks later, on July 11, 2010, Koralewski ▮▮▮▮▮ ▮▮▮▮▮ Ex. 121 at 86.  Koralewski testified ▮▮▮▮▮ ▮▮▮▮▮ Ex. 21 at 422:14-423:8, 426:2-10.  Nonetheless, on July 8, 2010, defendants used ▮▮▮▮▮ ▮▮▮▮▮ Ex. 115 at "July 8, 2010 Model" tab.  Had defendants instead used the ▮▮▮▮▮

▮▮▮▮▮ Ex. 122.  Using ▮▮▮▮▮ ▮▮▮▮▮ *Id.*[20]  Thus, defendants' argument that ▮▮▮▮▮ ▮▮▮▮▮ *See VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704, 709-10 (9th Cir. Cal. 2012) (scienter adequately alleged where executives rejected accurate margin numbers and directed controller to "fix the problem" along with the specific numbers to use).

**g.** ▮▮▮▮▮

Defendants also manipulated ▮▮▮▮▮ ▮▮▮▮▮ Ex. 26 at 86. ▮▮▮▮▮

---

[20]  Calculated using the then-current 1.3 dollar-to-euro exchange rate.

1022231_1

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* ████████████████████

█████████████████████████████████████████████████████████████████[21]

In addition, defendants minimized ██████████████████████████████████

████████████████████████████████████ For example, Sohn instructed Koralewski ██████████

██████████████████████████████████████████████████████████████ Ex. 90 at 07.

At Sohn's direction, Koralewski's presentation stated: ██████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 476 at 12-13.█████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████ *See, e.g.*, Ex. 429 at 06. ██████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████ *See* Ex. 90 at 13.[22]

In 4Q11, defendants █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████. Ex. 86 at 36-38.  At the end of the Class Period, █████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 124 at 44; *see also* Ex. 86

[21] ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

1022231_1

at 36-38; Ex. 21 at 385:6-8. ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 26 at 88.

**h.    Defendants Misrepresented the Status of Remediation**

Defendants' disclosures also led the market to believe ████████████████

████████████████████████████████████████████████████████████

████████████████████████ Ex. 92 at 58; *see also* §II.C.3.  In July 2010, defendants ████████

████████████████████████████████████████████████████ Ex. 69 at 14, 38, 42.[23]   When they made this statement, ████████████████████████████

████████████████████████████████████████████████████ 125 at 62.

████████████████████████████████████████████████████████████

████████

Nor was the claims process complete ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Pls. Appx., Stmt. Nos. 52, 93, 95.  At the time, customers had ████████████████████████████

██████████████████████████████████████████████████████ In contrast with Zhu's assurance, ████████████████████████████████████████

████████████████████████████ *See, e.g.*, Ex. 127 at 91; Ex. 128 at 34; Ex. 129 at 18.  Ultimately, defendants ████████████████████████████████████████

████████████

Defendants suggest ████████████████████████████████████████████

████████████████████████████████████████████ Mem. at 51.  But Zhu did not ████████████████████████████████████████████ Mem. at 51) had been completed, he told the

---

[23]   Defendants repeated this statement in every quarterly SEC filing through 3Q11. *See* Pls. Appx., Stmt. Nos. 40, 42, 47, 53, 56, 60, 87, 93, 95.  By 2Q11 and 3Q11, defendants represented that the accrual covered the "total replacement cost" of remediation and that remediation was "substantially concluded."  *See* §II.C.3.c.   These representations were knowingly false and misleading.  *Id.*

- 27 -

1022231_1

market the concluded claims process resulted in a "total replacement cost estimate." Pls. Appx., Stmt. Nos. 52, 93, 95. The Company's internal strategy memorandum for the Q410 statement ███████████████████████████████████████████████████████ ███████████████████████████████████████████ *See, e.g.*, Ex. 130 at 34 ██████████ ███████████████████████████████████ Defendants' false statements worked; analysts believed that LPM "had been resolved already." Steinholt Decl., ¶70.[24]

### 3. Defendants' Accounting Fraud Masked the True Scope and Cost of the LPM Defect

As outlined below and in the expert Declaration of D. Paul Regan ("Regan Decl."), defendants violated Generally Accepted Accounting Principles ("GAAP") and SEC regulations governing the reporting of First Solar's financial and accruals results.[25] Defendants' accounting manipulations allowed them to mask the true scope of the LPM defect throughout the Class Period.

**a.** ███████████████████████████████████████ ███████████████████████████████

Beginning in 2008, defendants had data ██████████████████████████████████ ███████████████████████████████. *See generally* §II.C.2.d. Nevertheless, in 2Q09, after their manipulations, defendants █████████████████████████████████████ ██████████████████████████████████████████████████ *See* Ex. 131 at 93-94. Even that drastically understated number was too much: defendants accrued for only 75,000 modules, or $1.5 million. *See* Ex. 132 at 16. Recognizing this under-accrual, Meyerhoff warned: ████████████████████████████████████████████████████

---

[24] Defendants' citation to a screen-shot from "the way back machine" website removes all doubt that defendants knew their cost estimate was drastically understated. Mem. at 51 (citing Defs' Ex. 88). Even were it admissible, and assuming it was actually published, defendants cannot rely on a single Q&A buried in a website four days later to clarify their false statement on a conference call. *See Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) ("Under the 'buried facts' doctrine, a disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed. The doctrine applies when the fact in question is hidden in a voluminous document or is disclosed in a piecemeal fashion which prevents a reasonable shareholder from realizing the 'correlation and overall import of the various facts interspersed throughout' the document.").

[25] "As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case," *Provenz*, 102 F.3d at 1490 – certainly so here.

- 28 -

██████████████████████████████████████████████████████████████

█████████████.  ██████████████████████████████████████████████

███████  *See, e.g.*, Ex. 133.

In 3Q09, defendants' internal estimates, which were knowingly understated (*see* §II.C.2.d.), ████████████████████████████████████████████ ██████  *See* Ex. 123 at "Oct. 19, 2009 Model" tab.  Despite the rising costs, the Company continued to conceal the LPM issue.

By 4Q09 and into 1Q10, the LPM defect was spiraling out of control.  First, in connection with his 1Q10 CFO Quarter Close review, presented to E-Staff and the Board, ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████.  *Id*. at 01-02, 04; *see also* Ex. 8 at 109:14-17, 109:21-110:3.

Moreover, by April 2010 – before releasing 1Q10 financials – defendants internally ████████████████████████████████████████████████.  Ex. 68.  Internal analyses showed ████████████████████████████████████████████.  *Id.* Despite the material financial impact, defendants concealed the LPM defect.  This concealment ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████  *See* Regan Decl., ¶¶20-30.

### b.    2Q10 – 1Q11: Defendants' Financial Statement Disclosures Were False

*2Q10.*  When defendants disclosed the defect in 2Q10, they misrepresented the extent of the problem and understated the massive financial impact the defect was expected to have on the Company.  *See generally* §II.C.2.; *see also* Regan Decl., ¶¶31-44.  Defendants' ██████████████████████████████████████████████████████████████

██████████████████.  *See* Ex. 135 at 61.  Going forward, defendants ████████████████████

1022231_1

███████████████████████ Ex. 136 at 700.  Finally,█████████████████

████████████████. The LPM defect's enormous financial impact to the Company, however, was concealed from investors.  Ex. 8 at 187:22-188:17.  As a result, defendants' incomplete disclosure of the LPM defect violated GAAP and SEC reporting requirements, rendering the Company's SEC filings misleading and inaccurate.  *See, e.g.*, Regan Decl., ¶¶20-30; *see also Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863 DOC (RNBx), 2008 U.S. Dist. LEXIS 68419, at *15 (C.D. Cal. July 10, 2008) ("Financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  17 C.F.R. §210.4-01(a)(1).").[26]

*3Q10 – 1Q11*: In discussing 3Q10, Kallenbach – █████████████████████ ███████████████████████ (*see* Ex. 137 at 27) – ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████ Ex. 127.  In an August 2010 meeting, Gillette ███████████████ ████████████████████████████████████████████████████ Ex. 138 at 13; Ex. 105 at 57:2-58:15, 64:12-19.  In 3Q10, however, defendants took ██ ████████████████████████████████████████████████████ █████████████████ *See, e.g.*, Ex. 137 at 47.

By 4Q10, defendants ██████████████████████████████████ ████████████████████████████████ Ex. 139 at 54.  The number of affected modules, even using defendants' ████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████. *See* §II.C.2.b.[27]  Still, the Company did not █████████████

---

[26] █████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

1022231_1

██████████████████████████████████████████████████████████████ *See, e.g.*, Ex. 8 at 181:20-183:5. In 1Q11, defendants took ████████ ██████████████████████████████████████████████████████████ ████████ *See, e.g.*, Ex. 137 at 48.

### c.    2Q11 – 3Q11: Defendants' Financial Statement and Remediation Status Disclosures Were False

**2Q11.** Defendants repeated the false statements concerning the scope of the LPM defect and stated the excursion accrual to date "cover[ed] the replacement of the anticipated module population in the field" and reflected the Company's "best estimates of the total replacement costs" under the LPM remediation program. Ex. 75 at 41.

In reality, First Solar failed ███████████████████████████████████ ███████████████████████████████████ *See* Ex. 140 at 78. Sites committed to remediate were ███████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. 142 at 79; *see also* Ex. 82 at 292:17-293:8. In fact, the Company ███████████████ ████████████████████████████████████████████, *e.g.*, Exs. 143-150. Remediation of these committed sites ███████████████████████████████ ███████████████████████████████ *See* Ex. 140 at 78;[28] *see also* Ex. 151 ████████████████████████████████ by 2Q11); *see also* Regan Decl., ¶72. Defendants, however, █████████████████████████████████████████ ████████████████████████ *See* Ex. 152 at 486; Ex. 153; Ex. 13 at 160:14-161:2, 170:4-24.[29]    Thus, the LPM defect accrual █████████████████

---

22.

[28] ████████████████████████████████████████████████████████ ████████████

[29] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ .

- 31 -

███████████████████████████████████████████ *See also* Regan Decl., ¶¶71-81.

In addition, defendants knew that ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ *Id.* Because First Solar had ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ Ex. 155. When Zhu asked Kallenbach ████ ████████████████████████████████████████ *See* Ex. 156 at 13. Of course, ██████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 82 at 324:21-24. Days later, however, ██████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████ *See also* Regan Decl., ¶72. As Kallenbach later admitted to Widmar, ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████. Ex. 157 at 94 (capitalized emphasis in original).[30]

***3Q11.*** In 3Q11, defendants ████████████████████ ████████████████████████████████████████████████████

[30] "b███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████

1022231_1

Ex. 76 at 44, 47.

t. Ex. 158 at 08.

To the contrary,

Ex. 3 at 217:13-20.

*See* Ex. 104 at 86; Ex. 161 at 86; Ex. 159 at 08.

” Ex. 160 at 88.  Indeed, Kallenbach

” Ex. 164 at 113.[31]

Prior to the 3Q11 earnings call, Polizzotto

Ex. 165 at 54.

*Id.* at 53.  Tellingly, in early 2012, when

*Id.*

*Id.*; *see also* Ex. 166 at 24 of

[31]

- 33 -



The Company's ██████████████████████████████████████

████████████████ Ex. 13 at 318:14-23. ████████████████████

████████████████████████████████████████████████████████

██████████████ *Id.* at 318:24-319:4; Ex. 158 at 08.   Indeed, on October 18, 2011,

████████████████████████████████████████████████████████

████████████████████ Ex. 167 at 58. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████ " *Id.* at 57.  Koralewski ██████████ *Id.*  The next day,

████████████████████████████████████████████████████████

████████████████████ Ex. 169.  Nevertheless, defendants ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 137 at 48) – ██

████████████████████████████████████████████████████████ .

Defendants also repeated the false "██████████████████████

████████████████████████████████████████████████████ .   For

example, the 3Q11 ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Ex. 159 at 08.

Defendants' ████████████████████████████████████████████

████████████████████ *See* Regan Decl., ¶¶71-81.  Simply put, the Company's accruals ████

████████████████████████████████████████████████ *Alaska Elec.*

*Pension Fund v. Adecco, S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006).  A triable issue of

fact as to scienter exists where, as here, defendants "had reasonable grounds to believe

material facts existed that were misstated or omitted."  *Howard*, 228 F.3d at 1064.[32]

---

[32]    Accordingly, defendants' reliance on *Mathews v. Centex Telemgmt., Inc.*, No. C-92-1837-CAL, 1994 WL 269734, at *6 (N.D. Cal. June 8, 1994), where defendants' reserves were deemed "reasonable," is inapposite.  Defendants' reliance on *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1117 (E.D. Wash. 2013) – a motion to

- 34 -

1022231_1

**d.**

To mask the true size of the LPM defect, defendants made an undisclosed and unjustified accounting methodology change. First Solar's inventory policy in place at the outset ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* Ex. 170 at 62. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* Under this original accounting method, First Solar's reported "Settlements" – the line item in the Company's SEC filings reflecting the shipment of LPM replacement modules – ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Regan Decl., ¶50.

Analysts tracked settlements to determine the number of replacement modules shipped specifically and module quality generally. *See, e.g.*, Ex. 10 at 26. As the LPM remediation efforts ramped up and more and more replacement modules were shipped, settlements trended upward, causing analysts to question the true extent of the LPM defect. In response to the increase in settlements, Zhu, Meyerhoff, and Eaglesham learned: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 206 at 06.

In order to hide the rising replacement module shipments, defendants secretly changed the Company's accounting methodology. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Ex. 19 at 46:23-47:17. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

1022231_1

chart attached as Appendix D. ███████████████████████████████████████

███████████████████████████████████████ *See* Regan Decl., ¶¶53-59.  For example, ████████████████████████████████████████████████████████████████

██████████████████████████████████ *Id.*, ¶53.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████ *See* Regan Decl., ¶¶68-70; *see also Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 272 (D. Conn. 2005) (failure to disclose that "gains were a result of accounting changes rather than improved operational performance" was misleading). ████████████████████████████████████ As discussed, analysts closely tracked the Company's settlements figure to gauge the true extent of the LPM defect. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006); *see also SEC v. Conaway*, No. 05-40263, 2006 U.S. Dist. LEXIS 75007, at *15 (E.D. Mich. Sept. 29, 2006) (whether or not changes to accounting methodology relating to inventory and accounts payable were material and required to be disclosed "'reserved for the jury'").

### e.  Defendants' Treatment ████████████████ Violated Accounting Standards

Schumaker, the Assistant Corporate Controller responsible for calculating and booking the warranty each quarter, ███████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 19 at 48:16-23.  But the evidence demonstrates ████████████████████████ ██████████████████████████████████████████████████.

The change required a series of baseless assumptions and improper accounting practices.  ***First***, defendants improperly ████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████ *See, e.g.*, Ex. 171; Regan Decl., ¶¶54-56.  Further, there is no evidence PwC ███████████████████████████████████████████████████████████████████ *See* Ex. 110 at 193:5-196:24. ██████████████████████████████████████

1022231_1

███████████████████████████████████████████████████████

███████████████████████████████████████████. Ex. 173 at 1.

*Second*, ████████████████████████████████████████

████████████████████████████████████████████████

███████████ *See* Ex. 174 at 43. In 4Q10, defendants █████████

████████████████████████████. *See* Ex. 175 at 13-27. PwC concluded

████████████████████████████████████████████████

██████████ Ex. 284; *see also* Regan Decl., ¶60.[33]

*Third*, in setting the price used to value ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (*see* Ex. 175 at 13-27) ██████████

████████████████████ (depending on module wattage). Defendants, however, did

not include ████████████████████████████████████, as required.

Had it done so, ████████████████████████████████

████████████ *See* Regan Decl., ¶¶62, 66.

*Fourth*, defendants failed to ████████████████████████

████████████████████████████. *See, e.g.*, Ex. 176 at 28 ██████████

████████████████████████████████████████ Ex. 177 at 08

███████████████████████████████████ In fact, defendants

sold ████████████████████████████. *See* Ex. 175.[34] In contrast,

---

[33] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████
██

- 37 -

defendants sold 2 █████████████████████████████████ *Id*. Not surprisingly, when defendants finally analyzed in December 2011 whether the ████████████████████████████████████████████████████ ██████ Ex. 179 at 07.[35]  As a result, ████████████████ ████████████████████████████████████████████████████ ███████████████. Ex. 99 at 014.  Had defendants performed ███████ throughout the period, as required, this █████████████████████████. *Finally*, defendants improperly ████████████████████████ ████████████ As a result, ████████████████████████ ███████ was assigned the same value ████████████. By June 2011, there was no ████████████████████████████. *See, e.g.*, Ex. 184 at 70 █████ ████████████████████████ *see also id.* ████████ █████████████████████████ When defendants ultimately ████████████████████████████████████████████████████. Ex. 185 at 28.

Given their deliberate accounting manipulations, defendants' reliance on *Sybase* – a forecasting case – misses the point.  There, plaintiffs alleged only that defendants had "contradicting or inconsistent" forecasting reports, which the court declined to "second guess."  *In re Sybase, Inc. Sec. Litig.*, 48 F. Supp. 2d 958, 962-63 (N.D. Cal. 1999). Moreover, plaintiffs in *Sybase* lacked any evidence of "information undermining" defendants' forecasts.  *Id*.



1022231_1

**D.      Defendants Fraudulently Concealed the Hot Climate Defect**

At the end of the Class Period, defendants disclosed that First Solar's modules experienced accelerated power degradation in hot climates.  As a result, in Q411 the Company recorded a $37.8 million charge to reflect the loss in power for ███████████

████████████████████████████████████████████████████████████████████

███ Ex. 20 at 94.  The Company also restated its warranty rate from 1.82% to 2.82%.  Ex. 186 at 71; Ex. 26 at 334.  Defendants knew much earlier, but failed to disclose, that the hot climate issue would cause a huge financial impact.

**1.      Defendants Fraudulently Concealed the Hot Climate Defect for Years**

Throughout the Class Period, defendants represented First Solar's modules degraded at a rate of ████████████████████████████████████ per year for hot climates. Ex. 95 at 05.  This was not reality.  In November 2009, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 78 at 78, 84.[36] ██████ warned: ███████████████████████████████████████████████████." Ex. 187 at 44.

In early 2010, the Company received additional information that █████████ ████████████████████████████████████ Ex. 188 at 08.  The degradation ████████████████████████████████████████████ Ex. 189 at 84.  The degradation and power prediction guidance ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████. *See* Ex. 190; *see also* Ex. 8

─────────────────────

[36] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████.

at 131:4-12.

In order to protect First Solar's reputation and financial interests, however, defendants misrepresented ███████████████████████ In fact, defendants ████████ ████████████████████████████████████████████████ Ex. 191 at 21. ████████████████████████████████████ ████████████████████████████████ Ex. 192 at 167:25-168:3; *see also id.* at 100:3-8.  Another senior executive ████████████████████████ ████████████████████ Ex. 193 at 62; *see also* Ex. 194 at 31.

In March 2010, ████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████ (*id.* at 71), ████ ████████████████████████████████ (Ex. 196 at 04).  The "technical team" ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████ *id.* at 74-75); ██████████████████████ ██████████████████████████████████████████████ " (*id.* at 76).

Ultimately, the technical team concluded ██████████████ ██████████████████████████████████████████████ ████████████████████████████████ Ex. 195 at 76. ████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████ Ex. 197.[37] ████████████████ ,

---

[37] ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████

1022231_1

Alex Panchula wrote ██████████████████████████████████████

████████████████████ Ex. 198 at 86. █████████████████████████████

████████████████████████████████████████████████████████ ” *Id.*

███████████████████████████████████████████████████ *See* Regan

Decl., ¶84.

On March 17, 2011, Eaglesham ███████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████ Ex. 199 at 14; *see also* Ex. 200 at 23 ████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 200.  On March

25, 2011, Kimber ████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 95 at

96, 05.[38] ██████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████ Ex. 95 at 600.

Still, defendants ████████████████ ██████████████████████████

█████████████████████████████████████████████████████ Ex. 201

at 70; *see also* Ex. 202 at 60; Ex. 4 ████████████████ Ex. 203 ████████

████████████████████████.[39] On March 25, 2011, defendants █████████

████████████████████████████ Ex. 202 at 60. █████████████████████

█████████████████████████████████████████████████████████████

████████████████████.” Ex. 192 at 216:3-7; *see also* Ex. 15 at 236:22-237:5.

[38] ████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██ ███████████████████████████████████████████████████████
████████

- 41 -

On March 31, 2011, First Solar's Executive Staff received ███████████ █████████████████████████████████████████████████████████ ████████████████ Ex. 204 at 57-58; *see also* Ex. 15 at 228:20-231:24. Nevertheless, defendants chose non-disclosure for another year. ██████████████████████ ███████████████████████████████████████████ This decision was not surprising given defendants' only objective was to ████████████████ *Id*.

### 2. Defendants Employed Undisclosed Manipulations to Conceal the Financial Impact of the Hot Climate Defect

Internally, senior First Solar executives calculated it would cost the Company ████ ████████████████████████████████████████ leading to ████████████████ ████████████ Ex. 5 at 17; *see also* Ex. 195 at 74 ████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████[40]

To avoid increasing their warranty rate and disclosing the hot climate problem, in 2Q11 defendants began ████████████████████████████████████████s. Ex. 21 at 257:10-258:16. ████████████████████████████████████████████████ ████████. *See* Ex. 192 at 224:20-225:5; Ex. 210; Ex. 211 at 17; Ex. 15 at 223:4-228:20; *see also* Ex. 105 at 338:20-339:15. ████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 204 at 61; *see also* Ex. 213 at 40 ████████████████████████████████ ████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 215. ████████████████████████████████████████████████████ ████ Ex. 216 at 405. ████████████████████████████ ███████████████████████████ ████████████████████████. Ex. 217; *see also* Ex. 204.[41] By March 25, 2011, ████████████

---

[40] To p ████████████████████████████████████████████████████████ 0 million████████████████████████████████████████████████████████ █ ████████████████████████████████████████████████████████████

1022231_1

█████████████████████████████████████████████████████ *See* Ex. 95 at 15, 23-24; *see also* Ex. 218 at 706.

On April 27, 2011, █████████████████████████████████████ █████████████████████████████████████████████████████ ███████████████████████████████████.” Ex. 15 at 260:4-266:19. ████ ██████████████████████████████████████████████████ Ex. 219 at 02. ██████████████████████████████████████████████ ██████████ *Id*. at 06. ████████████████████████████████████ █████████. *Id.*; *see also* Ex. 216 at 405; Ex. 220; Ex. 221 at 90. █████████ ████████████████████████████████████████.

### 3. Increased Warranty Exposure from Modules Installed in Hot Climates

██████████████████ only █████████████████████████████████ █████████. Millions of modules that were ███████████████████████, however, were ignored. Ex. 21 at 279:7-281:9. Defendants also ignored the warranty risk posed by ███ ███████████████████████████████████████████████████████ Ex. 222 at 88; *see also* Ex. 213 at 39; Ex. 84. Defendants also knew they were exposed ██████████████████████████████████████ ███████████████████████████████████████████████████ Ex. 223 at 09; *see also* Ex. 224 at 15; Ex. 208 at 98; Ex. 218 at 13; Ex. 225. ████████ █████████████████████████████████████ *See* Ex. 187 at 44.

In April 2010, First ███████████████████████████████████ ██████████████████████████████ Ex. 226 at 14. In 2Q11, the "████ ███████████████████████████████████████ Ex. 227 at 300; *see also* Ex. 228 at 171 and Ex. 229 at 72. ████████████████████████ █████████████████████████████████████████" Ex. 229 at 76. Panchula

███████████████████████████████████████████████████. 8 at 223:14-16; *see also* Ex. 192 at 198:24-199:13.

- 43 -

1022231_1

told Eaglesham in February 2012 "in hot climates, more than 50% of the modules will underperform if manufactured before the beginning of 2011." Ex. 230 at 55.

In the first half of 2011, Alex Panchula estimated that First Solar would have to replace 45 megawatts of lost power due to accelerated heat degradation. Ex. 21 at 269:25-270:21, 318:13-319:25; *see also* Ex. 80. The same number of ███████████████████ ████████████████████████████████████████████. *Id.*; *see also* Ex. 231 at 18; Ex. 20 at 94. Notably, Panchula based this analysis on data that defendants possessed contemporaneously. *See* Ex. 80.

### 4. Defendants Engaged in Accounting Manipulation to Conceal the Hot Climate Defect

From at least 4Q09 through 3Q11, the hot climate problem and its financial impact was concealed from investors. Defendants' excuse for non-disclosure is ███████████ ██████ Mem. at 27. If believed, defendants were required to disclose that First Solar███████ ████████████████████████████████████s. Regan Decl., ¶84. Certainly, by April 2011, when defendants admit they had ██████████████████████████████████ ██████████████rs, they were required to record the financial impact or, at a minimum, disclose an estimate of the possible loss, or range of loss. *See* Regan Decl., ¶89.[42]

In fact, defendants ████████████████████████████████████████████ ████████████████████████████████████████████. Regan Decl., ¶89; *see also* Ex. 20 at 94. This charge covered ████████████████████████████████████ ████████████████████████████████████████████ ████████ *See* Regan Decl., ¶84. Defendants also failed to record or disclose the material financial impact of ███████████████████████████████████

---

[42] ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

- 44 -

climate defect.  *Id.*  Disclosure of the heat degradation problem was particularly warranted given that First Solar began ███████████████████████████████████████████.”  Ex. 233 at 17.  By concealing the heat degradation problem, defendants knowingly violated GAAP, rendering their financial statements materially false and misleading.  Regan Decl., ¶89.

Further, in 3Q11, although defendants booked a ████████████████████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████. Ex. 214 at 86.  Defendants also mischaracterized the nature of the ████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ██████████” *Id.*  This disclosure was misleading and violated SEC rules requiring that First Solar's disclosures provide readers a fair understanding of the Company's financial conditions and operations.  *See* Item 303(a) of Registration S-K (17 C.F.R. §229.303(c)).

**E.      Defendants Manipulated and Misstated Cost-per-Watt**

First Solar defined Cost-per-Watt (“CpW”) as the █████████████████████ ███████████████████████████████████████████.”  Defs' Ex. 45 at 29; *see also* Ex. 6 at 62:9-20.  Indeed, the success of the Company and the performance of First Solar modules were measured – ██████████████████████████████████████. *See* Ex. 39 at 141:13-19.  The CpW metric was, without question, a “███████  upon which First Solar “███████████████.”  Ex. 6 at 33:23-34:3.

**1.      First Solar Manipulated Cost-per-Watt to Deceive the Market**

During the Class Period, First Solar ███████████████████████. *See* Ex. 6 at 54:24-55:1.  ██████████████████████████████████████████████████████████ ███████████████████████████” *Id*. at 100:2-5.  As ███████ estified: ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

*Id*. at 211:7-15; *id.* at 45:23-46:21 (FP&A bonus directly tied to CpW).

As a result of the LPM defect in 3Q09, the

Ex. 234 at 30.  In response,

[43]

**2.      First Solar's Cost-per-Watt Metric Excluded Costs Associated with First Solar Defects**

e

[43]  Defendants' argument that Gillen populated the finalized CpW figure into First Solar's SEC filings is a red herring.

- 46 -

1022231_1

███████████. *See, e.g.*, Ex. 11 at 316:6-325:10.

First Solar's policy of excluding additional warranty accruals attributable to defects from its CpW metric – while at the same time refusing to raise its warranty accrual rate – meant that numerous defects would not be reflected in First Solar's CpW. Ex. 6 at 242:7-243:3. Put differently, by simply waiting until the next quarter to recognize an LPM defect or hot climate degradation cost, defendants ensured these costs would never hit CpW.

**F.     The Individual Defendants Engaged in Massive Insider Trading**

After defendants' fraud artificially propped up First Solar's stock price – but before the truth was revealed – they unloaded nearly half a ***billion*** dollars' worth of First Solar stock. Defendants' sales, consummated when defendants had undisclosed adverse information, further support a finding of defendants' scienter. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003).

***Ahearn***. Ahearn sold 3.2 million First Solar shares for a profit of ***$427 million*** during the Class Period – unloading nearly ***97%*** of his shares. *See* Appendix E. The sheer volume alone of Ahearn's sales supports an inference of scienter. *See Am. West*, 320 F.3d at 938. Moreover, Ahearn's stock sales were improper because they were made while Ahearn possessed material, adverse and undisclosed information concerning the health of the Company. *O'Hagan*, 521 U.S. at 651-52; *see also Dirks v. SEC*, 463 U.S. 646, 654 (1983).

For example, after remarking internally that ████████████████████ ████████████████████████████████████████ ████████████████████ in February 2010, Ahearn unloaded 1.5 million shares – more than 50% of his holdings – for proceeds of more than $163 million. This sale occurred outside of a predetermined trading plan (*see* Mem. at 65 n.49) and after Ahearn was told selling 1.5 million shares "████████████████." Ex. 240 at 33. Ahearn continued his stock dump throughout the Class Period, selling nearly $119 million worth of shares in February/March 2011 – days after defendants falsely told the market that the LPM claims process was complete (Pls. Appx., Stmt. Nos. 52, 93, 95) – and nearly $70 million worth of

- 47 -

1022231_1

shares in August 2011 – days after defendants issued false 2Q11 financials and in the face of being advised that the sales ███████████████████████████████████████████████ ” (Ex. 241 at 16). *See also* Dkt. 93-1, Ex. A.

Ahearn's insider sales were also out of line with his prior trading habits. *Am. West*, 320 F.3d at 938. In the 18 months prior to the Class Period, Ahearn sold only 45% of his holdings. *See* Appendix E. In the 18-month period he sold stock during the Class Period, however, Ahearn unloaded nearly **97%** of his remaining shares. *Id.* Ahearn's Class Period selling spree – which occurred after nearly two years of trading inactivity and shortly before defendants dropped the LPM defect bombshell – strongly supports scienter. *See Am. West*, 320 F.3d at 940 ("[T]he sudden flurry of massive insider trading over this three month period of time, after an extended period of inactivity, appears unusual.").

The suspiciousness of Ahearn's sales was not lost on investors. Ex. 242 at 43 ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████ ” Ex. 244.[44]

***Eaglesham***. Eaglesham sold **94%** of his shares for more than $9.6 million in proceeds while in possession of nonpublic information concerning the LPM and hot climate defects. *See* Ex. 15 at 99:2-101:21; *see also O'Hagan*, 521 U.S. at 651-52. Eaglesham's liquidation of almost all of his holdings during the Class Period supports an inference of scienter. *See Am. West*, 320 F.3d at 938. Indeed, Eaglesham had so little faith in the success

---

[44] Defendants' reliance on *City of Roseville* for the contention defendants' sales were "wholly inconsistent with fraudulent intent" ignores the evidence. 963 F. Supp. 2d at 1141. In *City of Roseville*, for example, "neither of the Individual Defendants sold shares . . . during the Class Period." *Id.* In contrast, here, defendants made ***$468 million*** in insider sales during the Class Period. *Id.* A "holistic analysis" of the evidence, as *City of Roseville* requires, creates a triable issue of fact regarding defendants' scienter. *Id.*

- 48 -

of First Solar, ███████████████████████████████████████████████." Ex. 15 at 99:2-101:21.  Thus, the fact that Eaglesham traded shares pursuant to a 10b5-1 trading plan actually supports scienter here. *See, e.g.*, *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009)*, rev'd on other grounds* (finding that defendants "amend[ing] their 10b5-1 plans to allow more stock sales based on their inside information coupled with the unusual pattern of sales supports an inference of scienter"); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (a trading plan may support "scienter because 'a clever insider might "maximize" their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan.'").

*Gillette*.  Defendants argue that Gillette's purchase of stock during the Class Period negates scienter.  In fact, Gillette purchased a paltry 10,000 shares not because he believed in the Company, but, ████████████████████████████████████████████████████████████████████████████████." Ex. 245 at 50; *see also* Ex. 246.  Gillette's purchase of 0.003% of the number of shares sold by defendants during the Class Period, bought in an effort ██████████████████████████████████████████████████ (Ex. 245 at 50), actually supports Gillette's scienter. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Meyerhoff*.  During the Class Period, Meyerhoff sold 80% of his First Solar stock,

---

[45]  "[S]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *Am. West*, 320 F.3d at 944.  Here, Gillette did not sell stock during the Class Period because it would have been uneconomical to do so.  Under the circumstances, "the lack of stock sales by [Gillette] is not dispositive as to scienter." *Id.*

- 49 -

1022231_1

pocketing $18 million, while in possession of nonpublic information concerning the LPM and hot climate defects. *See* Appendix E. Defendants' argument that scienter is negated because Meyerhoff waited a period of months after learning of the LPM defect before selling fails. Defendants ignore that during this period, Meyerhoff knew defendants had no intention of revealing "████████████████████████████████." Ex. 2 at 54. Before they did, Meyerhoff sold $7 million worth of shares. *See* Dkt. 93-1, Ex. A. Given these facts, "common sense tells us that it is probable that his decision to sell when he did and how much he did (rather than sell later or sell less) was influenced by the information." *SEC v. Lipson*, 278 F.3d 656, 661 (7th Cir. 2002).

*Sohn*. Sohn sold 75% of his First Solar stock during the Class Period for proceeds of $12.4 million. *See* Appendix E. The amount and percentage of Sohn's sales during the Class Period gives rise to an inference of scienter. *Am. West*, 320 F.3d at 938. Further, the timing of Sohn's sales was suspicious – he sold nearly $9 million of his shares between August 2010 and February 2011, before defendants fully disclosed the costs of the LPM defect to the public. *See In re Skechers*, 273 Fed. App'x 626, 630 (9th Cir. 2008).[46]

*Widmar*. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Thus, Widmar was equally motivated to maintain the artificial inflation in First Solar's stock upon joining the Company in April 2011. The 1,000 shares – or 0.00029% of the number of shares sold by defendants during the Class Period – Widmar purchased does not negate scienter.

*Zhu*. Zhu sold over 7,800 First Solar shares during the Class Period (almost 50% of his holdings) and pocketed nearly $1.2 million in profits. *See* Appendix E. The large percentage of sales, consummated while in the possession of adverse, non-disclosed

---

[46] Sohn's improper use of a 10b5-1 trading plan does not negate on inference of scienter, it is actually evidence of scienter. *See Freudenberg*, 712 F. Supp. 2d at 200. Sohn entered into the trading plan in November 2010, at a time when he was actively concealing the hot climate defect and full scope and impact of LPM. *See* Dkt. 93-1, Ex. A; *see also supra*, §II.C.

- 50 -

information, creates a triable issue of fact as to Zhu's scienter. *See Am. West*, 320 F.3d at 938. Like the other defendants, Zhu entered his 10b5-1 trading plan in the midst of the LPM cover-up (April 2010). *See* Dkt. 93-1, Ex. A. That Zhu traded pursuant to that plan, therefore, does not negate scienter. *See Freudenberg*, 712 F. Supp. 2d at 200.

### G. The Company Is Liable for the Fraud

The Individual Defendants' scienter confers scienter on First Solar. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("corporate scienter relies heavily on the awareness of the directors and officers, who . . . are necessarily aware of the requirements of SEC regulations and state law and of the 'danger of misleading buyers and sellers'"); *VeriFone*, 704 F.3d at 704, 709-10 (company liable for executives "recklessly turning a 'blind eye' to impropriety"). So does Kallenbach's (Executive of Marketing and Product Management, a member of E-Staff, and one of just nine "executive officers" at the Company), Koralewski's (Vice President of Global Quality), and Schumaker's (Assistant Corporate Controller responsible for warranty accruals) knowledge of the false and misleading statements and omissions. Ex. 166 at 11; *see also Nordstrom*, 54 F.3d at 1435 (corporate scienter is established where "'one or more members of top management knew of material information . . . but failed to stop the issuance of misleading statements'").[47] Questions of fact exist regarding defendants' scienter.

### H. Defendants' Reliance on Auditor Defense Fails

Reliance on an auditor is no defense where, as here, defendants knew their representations were false. As described above, ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████.

---

[47] Defendants argue *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) and *Glazer Cap. Mgm't v. Magistri*, 549 F.3d 736 (9th Cir. 2008), bear "no application to summary judgment" because both involved appeals from dismissal at the pleadings stage. Mem. at 69 n.50. Neither case, however, held the collective scienter doctrine is inapplicable at the summary judgment stage – if anything, the doctrine is *more* appropriate where, as here, discovery as to what certain "corporate officials knew" has already taken place. *Glazer*, 549 F.3d at 744.

- 51 -

1022231_1

*See* §§II.C.-D.; *see also* Regan Decl., ¶¶91-96; *Provenz,* 102 F.3d at 1491 (no defense where defendants "failed to disclose material information to their accountant"); *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1436 (10th Cir. 1988) (full disclosure to professional must be established to support reliance on experts). Even had PwC knowingly approved of defendants' improper accounting manipulations, it would "not shield [defendants] from liability for deception such methods may have caused." *Marksman Partners, L.P. v. Chantal Pharm. Corp*., 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996).

Nor is reliance on auditor a defense where, as here, the auditor did not conduct a full audit of the challenged statements. *Provenz,* 102 F.3d at 1491; *see also* Regan Decl., ¶¶91-96. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* Ex. 110 at 254:17-255:8; Ex. 232; Ex. 253. In short, defendants' reliance on PwC fails.

**I.    Defendants' "Process" Arguments Do Not Negate the Overwhelming Evidence of Their Scienter**

Defendants' suggestion that a so-called bottom-up process absolves this fraud is baseless. Mem. at 42, 57. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* §§II.C.-E.; *see also* Ex. 138 at 13; Ex. 105 at 57:2-58:15, 64:12-19; Ex. 2 at 54. The evidence shows that each of the Individual Defendants actively concealed the fraud. *See Verifone*, 704 F.3d at 710.

For example, far from passively receiving information from underlings, Sohn "████████████████████████████████████████." Ex. 254 at 95. Gillette, moreover, directed that the ██████████████████████████████████████████████████████████████████████████

- 52 -

*See* §II.C.2.f.  Further, Ahearn (and Gaffney, internal counsel) ████

████.  *See* Ex. 255.

Similarly, ████

████

████.”  Ex. 6 at 127:9-22.  Finally, each of the Individual Defendants received information

████, yet said nothing to the market.

*See* §II.D.  Defendants' intimate involvement in the fraud is clear.

In fact, ████

████

████.”  Ex. 256.  Ultimately, ████

████

████  Ex. 257 at 92, 96; *see also* Ex. 258 at 86 ████

████

████”).  Quite simply, the fraud flowed from the top down.[48]

**J.      The Evidence of Loss Causation Presents Disputed Issues of Fact**

The evidence raises a triable issue of fact that defendants' fraud caused investors to suffer economic loss.  A series of disclosures revealed the "relevant truth" concealed by defendants' fraud: (a) the existence of LPM and hot-climate related product defects, (b) reduced guidance because saleable watts were consumed by LPM replacements, derating and overbuilding, (c) unexpected financial shortfalls caused directly by the defects, (d) massive remediation costs, and (e) the restatement of First Solar's power warranty reserve.  Each disclosure caused a statistically significant decline in First Solar's stock price.  Accordingly, summary judgment should be denied.

Defendants seek summary dismissal because, they claim, none of the disclosures

[48]   Thus, *Oracle* – a case relied upon by defendants – is inapposite.  There, unlike here, low-level employees calculated sales numbers and communicated that information up the pipeline to unknowing high-level executives.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388-89 (9th Cir. 2010).  Similarly, in *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1241 (S.D. Cal. 2010), the CEO testified that he relied solely on lower level personnel, "did not make any decisions," and plaintiffs lacked any evidence to the contrary.

- 53 -

1022231_1

revealed to the public that defendants had committed fraud. Mem. at 30.[49] Although defendants lost this argument at the outset of the litigation, they ignore the Court's prior ruling and continue to overstate plaintiffs' burden. *See* Dkt. 114. But as this Court found when it denied defendants' motion to dismiss – which made the same arguments about the same disclosures – plaintiffs need not prove that the market knew it had been defrauded. *Id*.; *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119-20 (9th Cir. 2013); *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008); *In re Daou Sys.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005). Instead, plaintiffs can establish loss causation by showing that First Solar's stock price declines were "the direct result of revelations about the extent of the remediation costs Defendants had concealed for years – in other words, that Defendants' fraudulent concealment of true remediation costs ultimately caused the very losses suffered by Plaintiff and the class." Dkt. 114 at 10.

### 1. Loss Causation Standard

A plaintiff must "prove [at trial] that the defendant's misrepresentation (or other fraudulent conduct) proximately caused [its] . . . loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); 15 U.S.C. §78u-4(b)(4). Plaintiffs need only prove that a "relevant truth" that was previously concealed became "generally known" and caused the company's stock price to drop. *Dura*, 544 U.S. at 342, 344. In the Ninth Circuit, "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Nuveen*, 730 F.3d at 1119-20. Thus, "a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the ***very facts*** that were a substantial factor in causing the plaintiff's economic loss.'" *Id*. (emphasis in original). One way to do this is demonstrate that the economic impact of the practices concealed by the fraud were revealed and substantially contributed to

---

[49] Each of defendants' loss causation arguments turns on some form of this erroneous contention. *See* Mem. at 31-37 (arguing plaintiffs cannot show that the disclosures expressly "reveal[ed] fraud," "reveal[ed] that First Solar had violated GAAP," "improperly recognized revenue before it was earned," "fraudulently concealed the excursion," "misrepresented the status of the excursion," or "issued fraudulent statements and risk-factor warnings").

- 54 -

the company's stock price decline. *Gilead*, 536 F.3d at 1055; *Daou*, 411 F.3d at 1025-26 ("the price of Daou's stock fell precipitously after defendants ***began to reveal figures showing the company's true financial condition***"). Another way loss causation can be proven is by showing that "'misstatements and omissions concealed'" a risk "'that materialized and played some part in diminishing the market value' of a security." *Nuveen*, 730 F.3d at 1120. Under the materialization of the risk approach, "'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk ***concealed*** by the misrepresentations and omissions alleged by a disappointed investor.'" *Id.* (emphasis in original).[50]

At summary judgment, "[l]oss causation requires that a plaintiff present facts that demonstrate a connection between the defendant's material misrepresentation and the plaintiff's loss." *Huberman v. Tag-It Pac., Inc.*, 314 F. App'x 59, 61-62 (9th Cir. 2009) (reversing a grant of summary judgment: "The drops in stock price directly followed the press releases that disclosed for the first time the extent of Tag-It's deteriorating financial condition. A reasonable factfinder could conclude on the basis of this evidence that Tag-It's alleged fraudulent conduct was a substantial cause of [plaintiff's] loss.") (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062-65 (9th Cir. 2008)). A misrepresentation "need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *Gilead*, 536 F.3d at 1055. Thus, a motion for summary judgment must be denied "if the defendant is unable 'to establish that, as a matter of undisputed fact, the depreciation in the value of the [stock] could not have resulted from the alleged false statement or omission of the defendant.'" *Novatel*, 830 F. Supp. 2d at 1019.

The law simply does not require a "fact-for-fact" admission of the type defendants argue for here. *See, e.g.*, *Nuveen*, 730 F.3d at 1119-20; *Gilead*, 536 F.3d at 1055; *Daou*, 411 F.3d at 1025-26; *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir.

---

[50] "While the Ninth Circuit has only addressed the materialization of the risk approach in the abstract . . . numerous district courts in the Ninth Circuit . . . have expressly endorsed the approach." *In re Amgen Inc. Sec. Litig.*, No. 07-CV-2536, 2014 U.S. Dist. LEXIS 183034, at *65-*72 (C.D. Cal. Aug. 4, 2014) (collecting cases).

- 55 -

2009); *In re Motorola Corp. Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007).  The evidence cited below easily distinguishes this action from the facts of *Oracle*, 627 F.3d at 391, on which defendants rely heavily, where the market only reacted to that company's "'poor financial health generally.'"  In that case, the plaintiffs alleged that problems with one of Oracle's products were hidden from investors and when they were revealed the stock dropped.  627 F.3d at 392.  The court held the "overwhelming evidence . . . indicates the market understood Oracle's earnings miss to be a result of several deals lost in the final weeks of the quarter due to customer concern over the declining economy," not about the Oracle product in question. *Id.* at 393.  The court found plaintiffs' evidence insufficient to link the miss that caused Oracle's stock price to decline to the alleged fraud.  *Id.* at 393-94 & n.8.  Here, the evidence links each of the relevant disclosures to defendants' fraud.

*Loos*, too, is inapplicable as it addressed only the question of whether an announcement of an investigation into potentially fraudulent conduct, without more, is sufficient to allege loss causation.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 888-90 (9th Cir. 2014).  *Loos* also held that "a securities fraud plaintiff is not required to allege an outright admission of fraud to survive a motion to dismiss." *Id.* at 888-89.  Likewise, *Metzler* states that "[plaintiff] is correct to observe that neither *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled."  540 F.3d at 1064.  Further, *Metzler* acknowledges that "there is no prohibition against [plaintiff] alleging loss causation through a series of disclosures by the Defendants."  *Id.* at 1063 n.6.  *Metzler* is merely an application of those established principles to the particular facts presented.

*Oracle*, *Loos*, and *Metzler* follow the fundamental understanding articulated in *Basic Inc. v. Levinson*, 485 U.S 224, 243 (1988), that causation can be proven in "more than one way."  For example, *Metzler* rests on *Daou* where the Ninth Circuit explicitly rejected the concept that there must be a public disclosure that defendants were "engaged in improper accounting practices" in order for plaintiffs to plead loss causation.  411 F.3d at 1026.

Since *Daou*, the Ninth Circuit has repeatedly reaffirmed that loss to investors can be caused when the ***impact*** of defendants' fraud on the company's true financial condition is

- 56 -

1022231_1

revealed – even if the specific ***practices*** defendants used to accomplish their fraud remain concealed.  Thus, in *Berson*, 527 F.3d at 984, 989-90, the Ninth Circuit upheld a theory of loss causation where the only public disclosure causing loss was related to the impact of the fraudulent practices.  *See also Komie v. Saxton*, 277 Fed. App'x 750, 751 (9th Cir. 2008) (public revelation of "true financial condition" combined with allegations linking that condition to fraud are necessary to plead loss causation).  Conversely, in *Gilead*, 536 F.3d 1049, even when the fraudulent practices were made public first, the Ninth Circuit upheld a theory of loss causation based on allegations that there was no loss caused until "the third-quarter earnings release made the effect of that information inescapably clear."  *Id.* at 1054.

Defendants' proposed standard requiring public disclosure of defendants' alleged fraudulent practices as necessary to proving loss causation misstates the law, and would give defendants a license to commit fraud.  *Motorola*, 505 F. Supp. 2d at 544.

### 2.     Defendants' Fraud Caused Plaintiffs' Economic Loss

The evidence demonstrates that a "series of partial disclosures" removed the price inflation caused by defendants' earlier misstatements and omissions.[51]  Performing an event study and regression analysis, plaintiffs' loss causation expert, Bjorn I. Steinholt, has demonstrated that each of these disclosures related to plaintiffs' allegations.  Steinholt Decl., ¶75, Ex. 3.  The evidence demonstrates that on each of the relevant dates, the information disclosed by defendants is directly linked to plaintiffs' allegations, and the revelations were a substantial cause of investors' loss.  This evidence raises a disputed issue of fact.[52]

***July 29, 2010***.  After the market closed on July 29, 2010, First Solar announced its 2Q10 earnings.  Steinholt Decl., ¶¶34-36, Ex. 19.  For the first time, defendants publicly

---

[51]   Multiple revelations that remove artificial inflation from the stock price establish loss causation.  *See Lormond v. US Unwired, Inc.*, 565 F.3d 228, 260-61 (5th Cir. 2009).  Thus, plaintiffs may prove loss causation by showing that "the truth gradually emerged through a series of partial disclosures."  *Id.* at 261; *see also Metzler*, 540 F.3d at 1063 n.6; *Daou*, 411 F.3d at 1026-27.

[52]   The evidence creates a genuine issue of fact that for each price decline defendants' fraud caused plaintiffs' losses under both the "corrective disclosure" theory and the "materialization of the risk" theory.  *See Special Situations Fund III QP, L.P. v. Brar*, No. 14-4717, 2015 U.S. Dist. LEXIS 38825, at *27-*30 (N.D. Cal. Mar. 25, 2015) (materialization of the risk); *Amgen*, 2014 U.S. Dist. LEXIS 183034, at *65-*72 (same).

- 57 -

1022231_1

disclosed the manufacturing excursion. *Id.* The Company also disclosed that First Solar would record $23.4 million of accrued expenses related to the excursion in 2Q10. *Id.* In addition to announcing the excursion and associated (albeit understated) expenses, First Solar reduced its net revenue guidance by $100 million. *Id.* These disclosures caused First Solar's stock price to decline on July 30, 2010 by $10.05/share (7.4%), a statistically significant amount in relation to its peer group and the market. *Id.*, ¶42, Ex. 2. The LPM disclosures and guidance reduction both were substantial factors in First Solar's July 30, 2010 stock price decline, and both were proximately caused by defendants' fraud. Steinholt Decl., ¶¶42, 75.

Commentators and other market participants linked the July 30, 2010 decline to investor concerns about the product problems and management's failure to disclose the manufacturing excursion for more than a year. Steinholt Decl., ¶¶38-41. Market participants were also disappointed by the $100 million revenue guidance reduction. *Id.*

Defendants' disclosure of the manufacturing excursion was plainly related to defendants' fraud – it was a partial disclosure of previously concealed product problems. Internally, First Solar ███████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████ Ex. 260 at 47. ███████████████

████████████████████████████████████████████████████████

███████ " Ex. 261 at 71 ████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ *Id.* ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ . *See* Steinholt Decl., ¶¶34, 42.[53]

---

[53] *See also* Ex. 262; Ex. 39 at 165:13-16; Ex. 263; Ex. 11 at 240:6-12; Ex. 77 at 36; Ex. 136 at 700; Ex. 39 at 165:17-166:9; *id.* at 166:19-167:2; Ex. 11 at 179:3-180:16; Ex. 12 at 165:9-24.

- 58 -

Defendants assert that the July 29, 2010 disclosure "could not have revealed the falsity of earlier statements" because "***there had been none***." Mem. at 36. But if defendants' logic were adopted, loss causation could never be proven for omissions or concealed product problems. Of course, this is not the law. Plaintiff can establish loss causation by showing that "the defendant misrepresented or ***omitted*** the very facts" – here, the existence of the low power module defect and its foreseeable impact on First Solar's future revenues – "that were a substantial factor in causing the plaintiff's economic loss."[54] *Nuveen*, 730 F. 3d at 1120; *see also Daou*, 411 F.3d 1025-26; *Gilead*, 536 F.3d at 1049; *Novatel*, 830 F. Supp. 2d 996; *Police & Fire Ret. Sys. of Detroit v. Crane*, No. 13-CV-945, 2015 U.S. Dist. LEXIS 31989, at \*27-\*28 (N.D. Cal. Mar. 13, 2015); *In re Zynga Inc. Secs. Litig.*, No. C-12-4007, 2015 U.S. Dist. LEXIS 38722, at \*23-\*25 (N.D. Cal. Mar. 25, 2015).

***February 24, 2011***. On February 24, 2011, after the market closed, First Solar announced 4Q10 earnings of $1.80 per share on revenues of $610 million, beating analyst consensus earnings estimates of $1.73 per share, but coming in below consensus revenue estimate of $647 million. Steinholt Decl., ¶43. The Company also decreased the high end of its revenue guidance for FY 2011 to $3.7-$3.8 billion from $3.7-$3.9 billion. *Id*. In addition, First Solar, disclosed additional accrued expenses of $8.5 million relating to the LPM problem. *Id.*

The 4Q10 revenue miss was caused by the LPM problem. *Id.*, ¶¶43-44. During the 4Q10 earnings call, Gillette admitted that First Solar's 4Q10 net sales were "impacted by our decision to divert some volumes to expedite the [LPM] module replacement program." *Id*, ¶43. In addition to defendants' admissions, internal documents confirm that the FY11 guidance reduction was caused by LPM expenses. Ex. 265 at 76. For the first quarter alone,

---

[54] Defendants' contention that First Solar's guidance reduction revealed nothing about the concealed LPM problem is directly contradicted by their deposition testimony. For example when asked to confirm that First Solar did not disclose "the revenue lost as a result of the LPM excursion in its financial filings" Meyerhoff responded that "if revenues were to decline as a result of that, then that would be factored into the financial guidance and ***would be disclosed***." Ex. 8 at 186:16-187:3; Ex. 14 at 341:6-15; Ex. 13 at 48:2-50:22; Ex. 264 at 131:1-133:15.

- 59 -

First Solar anticipated $46.6 million in lost sales because of the remediation, up $19.6 million from the prior guidance given in December 2010.  *Id.*; Ex. 266 at 99; Ex. 267 at 63.

Analysts expressed concern about the surprise LPM charge, the remediation's impact on First Solar's 4Q10 performance, and the guidance reduction.  Steinholt Decl., ¶¶45-46. As was the practice,



" *Id*.

Not surprisingly, First Solar's stock price declined significantly, by $8.96 per share (5.4%) on February 25, 2011, the first trading day after the announcement.  Steinholt Decl., ¶47.  The lower than expected revenues, LPM expenses and reduced guidance were a substantial cause of the decline.  *Id*.  Absent the LPM problem, First Solar would have exceeded 4Q10 EPS consensus by 16 cents (as opposed to only 7 cents), avoided reporting a $37 million 4Q10 revenue miss, and avoided lowering 2011 guidance and plaintiffs would have been spared the steep decline. *Id*.  Consequently, there is a causal relationship between the disclosure of the alleged truth and the February 25, 2011 price decline.  *Gilead*, 536 F.3d at 1055; *Daou*, 411 F.3d at 1025-26; *Nuveen*, 730 F.3d at 1119.

Defendants address none of this evidence, but argue instead that the only way an increased accrual can support loss causation is if it "reveals the prior accrual was fraudulent or prepared in violation of GAAP."  Mem. at 35.  The standard proposed by defendants – that loss causation for fraudulent accounting only follows from a restatement or other admitted GAAP violation – would create the absurd result that a defendant could avoid liability for fraud simply by refusing to ever admit it.  But Ninth Circuit law is clear that "simply because a corrective disclosure does not admit securities fraud does not mean that such a disclosure cannot form the basis of loss causation." *Nathanson v. Polycom, Inc.*, No. 13-3476, 2015 U.S. Dist. LEXIS 44292, at *41 (N.D. Cal. Apr. 3, 2015).

- 60 -

***May 3, 2011***.  On May 3, 2011, First Solar announced its 1Q11 earnings and disclosed a decline in net sales and average selling price ("ASPs").  Steinholt Decl., ¶¶48-49.  Although First Solar beat 1Q11 consensus EPS estimates by $.16 EPS ($14.3 million revenue), the Company did not increase EPS or revenue guidance for the remainder of 2011.  *Id*., ¶49.  The Company revised its 2011 operating income guidance down by $10 million and cash flow down by $100-200 million.  *Id*.  The results included $4.5 million in additional expenses for the LPM remediation, a $.05 EPS hit.  *Id.*  The Company's announcement and related market commentary caused the First Solar's stock price to decline on May 4, 2011 by $8.35/share (6.2%), a statistically significant amount.  *Id*., ¶51.

First Solar's flat guidance reduced operating income and average selling price decline, resulted from ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  *Id*., ¶¶50-51.

The reason revenue guidance was flat and operating income declined even though First Solar beat expectations in the first quarter was that the ███████████████████████████████████████████████████████████████████████████.  Ex. 219 at 02 ███████████████; Ex. 268 at 21 ██████████████"); Ex. 269 at 404 ("███████████████████████████████.  Defendants admit in their brief that First Solar's May 3 guidance included "the estimated financial impact of derating and overbuilding."  Mem. at 28.[55]

Likewise, ████████████████████████████████████████████████████████████████████████████████████████████████████

_____

[55] ████████████████████████████████████████████████████████████).

1022231_1



██████ Ex. 271 at 304. ██████

██████ *Id.*[56] ██████

██████ Ex. 273 at 26. ██████

██████ Ex. 274 at 109:9-18.[57]   Accordingly, the evidence is more than sufficient to establish that the May 4, 2011 stock price decline was directly related to plaintiffs' losses.

***October 25, 2011***.   On October 25, 2011, while the market was open, First Solar announced Gillette's departure, triggering a massive sell-off amid fear of declining fundamentals and accounting malfeasance.  Steinholt Decl., ¶¶52-56.  Securities analysts were surprised by the news and suspicious that "Robert Gillette's unexpected departure is likely a troubling sign of things to come."  *Id.*, ¶53; *see also id.* ("On the bearish side would be an accounting scandal.  This could plausibly prompt the CEO's dismissal . . . .").  The revelation and related market commentary caused First Solar's stock price to decline on October 25, 2011 by $14.68/share (25.3%), a statistically significant amount in relation to its peer group and the market.  *Id.*, ¶54.

---

[56] ██████ ; Ex. 276 at 29 ██████"); Ex. 270. ██████

[57] ██████

Ex. 151 at 53.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *See*

§§II.C.-D.

Several courts have found that the dismissal of a high-ranking executive followed by a stock price decline establishes the requisite link for loss causation. In *Nathanson*, the court held a CEO's ouster supported loss causation even in the absence of a revelation of "'the practices that the plaintiff contends are fraudulent . . . .'" 2015 U.S. Dist. LEXIS 44292, at *36-*41. Like here, analysts found the CEO's departure "'raises red flags and we believe management credibility (at all executive levels) comes into question.'" *Id.* at *38; *see also Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145-46 (N.D. Cal. 2013) (loss causation adequately alleged following executive resignation even though underlying practice was not disclosed); *In re Enron Corp. Secs.*, MDL No. 1446, 2005 U.S. Dist. LEXIS 41240, at *58-*60 (S.D. Tex. Dec. 22, 2005) ("[B]esides a formal corrective disclosure by a defendant . . . the market may learn of possible fraud a number of sources," including "***resignations of CFOs***"); *In re Anadigics, Inc., Sec. Litig.*, No. 08-5572, 2011 U.S. Dist. LEXIS 112587, at *50-*52 (D.N.J. Sept. 30, 2011) (same).

Citing *Loos*, *Metzler*, and *Apollo*, defendants contend that market participants' suspicion of fraud is not enough. Mem. at 31-34. First, this argument ignores evidence that Gillette's firing was linked to the performance issues which caused the Company's overall poor performance. Additionally, the cases defendants rely on all suffer from the same flaw – the so-called speculation was never realized. In *Loos*, for example, the court found there was no loss causation because the plaintiff had "not attempted to correlate his losses to anything other than the announcement of an internal investigation." *Loos v. Immersion Corp.*, No. 12-

- 63 -

1022231_1

15100, 2014 U.S. App. Lexis 17813, at *3 (9th Cir. Sept. 11, 2014).[58] "Most notably," the plaintiff had alleged that the "announcement of an internal investigation completed the revelation of fraud to the market and removed all inflation from the company's stock price."[59] *Id.* at *15. In *Metzler*, too, there was no ultimate disclosure of the truth concealed by defendants' fraud. 540 F.3d at 1064-65. In *Oregon Pub. Empls. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598 (9th Cir. 2014), the court held that the alleged false statements were inactionable puffery and "an expression of concern" by the Department of Education and a GAO report about the entire industry was not sufficiently tied to the alleged false statements to support loss causation. As with *Metzler* and *Loos*, and unlike this case, the false statements in *Apollo* were never corrected in the market.

Plaintiffs here do not contend Gillette's firing "completed the revelation of the fraud" and do not rely solely on this event to prove loss causation. Instead, as discussed herein, the conduct defendants' fraud concealed, and its full impact, were ultimately revealed by the end of the Class Period causing further inflation to leave the stock. Analysts understood that Gillette's firing presaged bad news: "Is there a restatement or scandal without disclosure?" *See, e.g.*, Steinholt Decl., ¶53. As it turned out, it was both. When that bad news came – in the form of disappointing 3Q11 financial results and reduced guidance announced the days after Gillette was fired, another guidance reduction on December 14, 2011, and the massive charges, warranty restatement, and disclosure of the heat defect announced on February 28, 2012 – it was undisputedly connected to the fraud. Steinholt Decl., ¶¶55-57, 61, 74. Because inflation was removed based upon speculation about declining fundamentals and

[58]   *Loos* was amended on September 14, 2014 to clarify that the court did not intend to "suggest that the announcement of an investigation can *never* form the basis of a viable loss causation theory." *Id.* at *22-*23 n.3 (emphasis in original). Instead, an announcement of an investigation "standing alone" is not enough but may be enough when combined with a subsequent disclosure of wrongdoing. *Id.*

[59]   Although the defendant in *Loos* eventually disclosed that its financial statements should not be relied upon and ultimately restated, the court expressly declined to consider those facts because plaintiff did not allege the impact of those events on Immersion's stock price in the complaint and also waived its argument that these post-class period events "'solidif[ied] the causative link'" by failing to raise it in the district court. *Id.* at *23-*24 & n.4.

- 64 -

1022231_1

accounting malfeasance when Gillette's ouster was announced, the stock did not have as far to fall when defendants revealed that First Solar's product defect problems were much greater than previously represented and their negative and material impact on the Company's declining fundamentals had been concealed by improper accounting and CpW manipulations. Accordingly, the requisite proximate connection exists between defendants' fraud and the losses plaintiffs suffered following the October 25, 2011 stock price decline. *Id*.

***December 14, 2011***. On December 14, 2011, First Solar issued a press release and held a conference call to update its 2011 financial guidance, slashing the Company's expected results for net sales, earnings per share ("EPS") and operating income, far below consensus forecasts. *See* Steinholt Decl., ¶¶59-60. Defendants also initiated disappointing 2012 earnings guidance. *Id.* These disclosures caused First Solar's stock price to drop $9.21/share ($21.4%), a statistically significant amount in relation to its peer group and the market. *Id.*, ¶61.

[60] *See* Ex. 279 at 75-76, Ex. 280 at 50 (and attachment); *see also* §II.C.3.e. (

[61] *Compare* Ex. 281 at 143 *with* Ex.

[60]   A December 21, 2011 draft script for the conference call identifies the inventory charge as $0.56/share and notes: "Not sure we want to say this, or say it in this manner." Ex. 251 at 398. Ultimately, defendants deleted all reference to the charge from their statement to investors and lowered the $0.56 impact to between $0.15 and $0.26.

[61]   Eaglesham's averment that First

. . ." Ex. 278; *see also* Ex. 15 at 265:2- 268:9

- 65 -

282 at 254 ██████████████████████████████████████████████ ██████████████████████████████).

In short, ███████████████████████████████████████████████ ████████████████████████████████████████ This led directly to First Solar's massive stock price decline and is more than sufficient to create a triable issue of fact under either the corrective disclosure or materialization of the risk theory. Dkt. 114 at 10; *Daou*, 411 F.3d 1025-26; *Nuveen*, 730 F. 3d at 1120.

***February 28, 2012***. On February 28, 2012, after the market closed, First Solar announced 4Q11 losses of $4.78 per share on revenues of $660 million. The Company's 4Q11 losses included: (a) a non-cash goodwill impairment charge of $3.90 per share; (b) restructuring charges of $0.43 per share (below $0.85 per share announced on December 14, 2011); and (c) $1.67 related to warranty and cost in excess of normal warranty expense, for a total of $6.00 per share. Steinholt Decl., ¶62.

Defendants also announced massive additional warranty expenses relating to the LPM issue – an issue investors had been told in November was "substantially concluded" – and disclosed the heat degradation defect for the first time. *Id.*, ¶64. The Q4 costs associated with the manufacturing excursion were composed of three items: (1) $23.9 million to remove, replace and provide logistical services related to the manufacturing excursion, bringing that total cost to $99.7 million, (2) $31.8 million for payments to customers for power loss prior to the remediation of the customer's system, bringing the total to $45.9 million, and (3) $70.1 million for additional replacement modules. *Id.*, ¶¶64-65.

First Solar also announced a $37.8 million charge to increase its warranty accrual, because of "increased failure rates in hot climates." *Id*. The Company not only restated its previous loss accrual rate for hot climate modules out in the field but also disclosed that the heat defect could cost First Solar 1% on event modules sold in the future, as it increased the accrual "to account for potential returns going forward." *Id*.

_____

████████████████████████████████████████████████████ *id* at 257:8-259:10 (same).

1022231_1

Although expectations prior to the 4Q11 announcement were low, in light of the prior partial disclosures in 2011, and although the Company's FY2012 earnings guidance was maintained, the stock price declined by $4.10/share (11.26%), a statistically significant amount. *Id*., ¶74. After the market closed on February 29, 2012, defendants filed their 10-K, which included additional new information concerning the LPM and heat defects. *Id*., ¶71. On March 1, 2012, First Solar's stock dropped another 5.8%. *Id*., ¶74. This drop, too, was statistically significant. *Id*. The product issues and related charges caused both price declines. *Id*., ¶¶64-74.

Analysts were concerned about the LPM and heat degradation issues, and their impact both on the 4Q11 results and on expectations for 2012. Steinholt Decl., ¶¶69-71. Defendants' disclosures plainly corrected their prior false statements understating the scope of First Solar's LPM defect, the status of the remediation, and defendants' under-accrual of related expenses. Based on defendants' prior false statements and omissions, analysts were surprised by the new LPM charges – both because of the scope of the problem and because defendants had previously represented that the problem already had been solved. *Id*. (Citi: "[O]n the last conference call on the third of November, I asked you about warranty expenses and *you said that it had all been taken into account in the financials*."); *id*. (Stifel Nicolaus: "*we expected [this] had been resolved already*"); *id*. (Maxim: "The Ghost of the 'Manufacturing Excursion' Returns with $164m in Charges: Despite having denied further exposure since the first two charges totaling $36m were taken in 2010 for power loss problems associated with a portion of its production, FSLR suddenly announced an additional $164m in warranty-related charges. While FSLR claimed further exposure could amount to $44m, we note that at the end of last year it was reportedly $0m.").

Analysts were also surprised and concerned about the new disclosure that First Solar's panels did not perform well in the sun and its implications on First Solar's "long term survivability." Steinholt Decl., ¶70; *see also id*. (Credit Suisse: "A quarter billion dollar warranty problem. The $253mm in cumulative warranty and related charges now raises a significant question mark on the reliability and field performance of FSLR's panels –

- 67 -

1022231_1

product quality in our view is THE MOST SIGNIFICANT metric for a solar companies' long-term survivability."); *id*. (Stifel Nicolaus: "we see the disclosed heat-driven degradation issue as lowering the economics of expanding into new markets and potentially posing a product acceptance risk").

Accordingly, the losses plaintiffs suffered following defendants' February 29, 2012 disclosure were plainly "related to the economic loss [the plaintiff] suffered." *Nuveen*, 730 F.3d at 1120.  The entire stock price decline was caused by revelations correcting defendants' prior false statements. *Id*., ¶¶72-74.  Because the massive charges and business-threatening reputational harm that First Solar incurred were foreseeable risks, the evidence is also sufficient to create a genuine issue of material fact under the "risk materialization" theory.[62]  *Id.*; *see also Special Situations*, 2015 U.S. Dist. LEXIS 38825, at *27-*30; *Amgen*, 2014 U.S. Dist. LEXIS 183034, at *65-*72.

### 3.    Steinholt Removed the Effect of Non-Fraud Related Information from the Decline in First Solar's Stock Price

Defendants claim that plaintiffs cannot show First Solar's stock price declines were not due to "changing market conditions." Mem. at 38.  But Steinholt's event study *expressly removed* the effect of non-fraudulent information from the decline in First Solar's stock price on each of the fraud related days.  Steinholt Decl., ¶20.  In his event study (the results of which are corroborated by defendants' class certification expert), Steinholt reviewed the public mix of information, identified the fraud related firm-specific information that caused the firm-specific price decline, and explained the relationship between this fraud related *firm-specific information* and plaintiffs' allegations.  *Id*.  Steinholt also reviewed the information defendants claim was unrelated to the fraud (Mem. at 38 n.28), and explained why the impact of this information was accounted for in his analysis.  *Id*.

Steinholt's analysis is more than sufficient under Ninth Circuit law.  In the Ninth

---

[62]  A February 10, 2012 Instant Message exchange between First Solar employees summed up the state of affairs: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 283 at 42.

1022231_1

Circuit, it is not necessary to apportion and quantify the losses attributable to defendants' fraud and those attributable to other factors for loss causation. *See Daou*, 411 F.3d at 1025 "'[A]s long as the misrepresentation is *one substantial cause of the investment's decline in value*, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'"). Instead, it is *defendants' burden* at summary judgment to establish beyond a disputable fact that the alleged fraud *did not* cause plaintiffs' loss. *Novatel*, 830 F. Supp. 2d at 1019; *Motorola*, 505 F. Supp. 2d at 548-51. Plaintiffs need only "present sufficient evidence from which a reasonable jury could conclude that those price declines indeed resulted from such a disclosure." *Motorola*, 505 F. Supp. 2d at 551. And when they do so, "'the trier of fact can determine the damages attributable to the fraudulent conduct.'" *Id.* As defendants' motion utterly fails to even address the evidence demonstrating that each of the disclosures was a substantial cause of plaintiffs' loss, it should be denied. In addition, defendants should be barred from introducing evidence or arguing that non-fraud factors contributed to First Solar's stock price declines. Plaintiffs sought defendants' factual basis for this assertion, and defendants were ordered to provide their basis in interrogatory responses, but they did not comply. *See* Dkt. 310.

### K.    Defendants Are All Control Persons Under §20(a)

Defendants are all control persons under §20(a). 15 U.S.C. §78t(a). Whether a defendant is a controlling person "'is an *intensely factual question*.'" *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). "[I]t is *not* necessary to show actual participation or the exercise of power" to be held liable under §20(a), *America West*, 320 F.3d at 945, *or* "establish[] that person's scienter distinct from the controlled corporation's scienter.'" *Howard*, 228 F.3d at 1065-66 (evidence the CEO participated in the release of, and signed, false financials sufficient under §20(a)); *see also Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (§20(a) "was enacted to expand rather than restrict the scope of liability").

Defendants contend not one of them is a control person. This is plainly wrong. First,

- 69 -

defendants' argument that there is no "underlying Section 10(b) violation" fails. Mem. at 69; *see* §§II.C.-E.   Second, defendants ***overwhelmingly*** had control over First Solar's disclosures.  Each defendant had "direct or indirect . . . power to direct or cause the direction of the management and policies" at First Solar.  17 C.F.R. §230.405.  Indeed, each defendant made misstatements and omissions during earnings calls, in press releases, and in SEC filings (*see* §II.B.), and ███████████████████████████████████ ███████████████████████████████ (*see, e.g.*, Ex. 53 at 47-48; *see* Ex. 204; Ex. 18 at 34; Ex. 208 at 96-97).[63]

Finally, the contemporaneous evidence belies defendants' "good faith" defense. Mem. at 70.  Defendants' self-serving declarations are wholly insufficient to excuse their clear intent to mislead the market.  *See Kodimer v. County of San Diego*, No. 07-CV-2221, 2010 U.S. Dist. LEXIS 65090, at *8 (S.D. Cal. June 30, 2010) ("Summary judgment . . . unwarranted if based simply on Defendants' declarations as to their own state of mind.").[64]

## III.   CONCLUSION

For the foregoing reasons, defendants' motion should be denied.

DATED:  April 27, 2015

Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
Daniel S. Drosman

s/ Daniel S. Drosman
DANIEL S. DROSMAN

---

[63]   Whether the Board purportedly "retained final authority over the issuance of the challenged statements" is irrelevant to the fact defendants "directly or indirectly, control[ed]" First Solar or any other defendant.  *See* 15 U.S.C. §78t(a); Mem. at 70.  *See Howard*, 228 F.3d at 1065 (§20(a) does not require that "defendant was a culpable participant in the violation"); *Howard*, 228 F.3d at 1065 ("***day-to-day oversight of company operations and involvement in the financial statements at issue were sufficient to presume control***").

[64]   Neither *Howard* nor *Kaplan v. Rose* supports this defense.  *Howard*, 228 F.3d at 1066 ("good faith 'defense is unavailable ***even when*** the defendants who induced the fraud believed in good faith that they were not perpetrating a fraud'").  *Id.* at 1066 n.11 ("In *Kaplan* [*v. Rose*] we stated that absence of scienter precludes a finding of § 20(a) liability . . . .  If that statement were a holding, it would contradict the wording of the statute and our subsequent holding in *Nordstrom*.").

Michael J. Dowd
Jason A. Forge
Luke O. Brooks
Cody R. LeJeune
Darryl J. Alvarado
Christopher D. Stewart
Lonnie A. Browne
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT, P.C.
Andrew S. Friedman (AZ005425)
Kevin Hanger (AZ027346)
2325 E. Camelback Road, Suite 300
Phoenix, AZ  85016
Telephone:  602/274-1100
602/274-1199 (fax)

Liaison Counsel for Plaintiffs

- 71 -

1022231_1

CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 27, 2015.

s/ Daniel S. Drosman
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dand@rgrdlaw.com

1022231_1

# Mailing Information for a Case 2:12-cv-00555-DGC Smilovits v. First Solar Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George C Aguilar**
  gaguilar@robbinsarroyo.com,notice@robbinsarroyo.com

- **Kathryn B Allen**
  kallen@kmllp.com

- **Darryl J Alvarado**
  Dalvarado@rgrdlaw.com

- **Stephen Richard Basser**
  sbasser@barrack.com

- **James P Bennett**
  JBennett@mofo.com,KMarttila@mofo.com

- **Philip T Besirof**
  pbesirof@mofo.com,mblackmer@mofo.com,rbarajas@mofo.com

- **Maureen Beyers**
  mbeyers@omlaw.com,ppalmer@omlaw.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com

- **Luke Brooks**
  lukeb@rgrdlaw.com

- **Lonnie A Browne**
  LBrowne@rgrdlaw.com

- **Jennifer N Caringal**
  Jcaringal@rgrdlaw.com

- **Keith Michael Cochran**
  kcochran@cfsblaw.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com,mzehel@pomlaw.com

- **Jonathan Adam Dessaules**
  jdessaules@dessauleslaw.com,hpeters@dessauleslaw.com,jpitchel@dessauleslaw.com

- **Michael J Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel S Drosman**
  dand@rgrdlaw.com,karenc@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Jordan Eth**
  jeth@mofo.com,adavis@mofo.com,jrahman@mofo.com

- **Paul Flum**
  PaulFlum@mofo.com,TLee@mofo.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark Ryan Scott Foster**
  mfoster@mofo.com,lroiz@mofo.com

- **Andrew S Friedman**
  afriedman@bffb.com,paquilino@bffb.com,rcreech@bffb.com

- **Jeffrey Dale Gardner**
  jgardner@jsslaw.com,eblackmountain@jsslaw.com

- **Richard W Gonnello**
  rgonnello@faruqilaw.com,msullivan@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Bryan Jens Gottfredson**
  Bryan.Gottfredson@sackstierney.com

- **Salvatore Jo Graziano**
  salvatore@blbglaw.com,errol.hall@blbglaw.com

- **Tor Gronborg**
  Torg@rgrdlaw.com

- **Joseph P Guglielmo**
  jguglielmo@scott-scott.com

- **Kevin Richard Hanger**
  khanger@bffb.com,tdinardo@bffb.com,rcreech@bffb.com

- **Eugene G Illovsky**
  eillovsky@mofo.com

- **Craig Kennedy**
  mbeyers@omlaw.com

- **Jennifer Lynn Kroll**
  jkroll@martinbonnett.com

- **Cody R LeJeune**
  clejeune@rgrdlaw.com

- **Jeffrey S Leonard**
  jeffrey.leonard@sackstierney.com,kelly.sharpe@sackstierney.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Peter S Linden**
  plinden@kmllp.com

- **Judson E Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Susan Joan Martin**
  smartin@martinbonnett.com,tmahabir@martinbonnett.com,mblawfirm@aol.com

- **Michael Craig McKay**
  mmckay@schneiderwallace.com,efilings@schneiderwallace.com

- **Danielle S Myers**
  danim@rgrdlaw.com

- **Patrick Powers**
  patrick@powerstaylor.com,sarah@powerstaylor.com

- **Ira Michael Press**
  ipress@kmllp.com

- **Jay N Razzouk**
  jrazzouk@robbinsarroyo.com,notice@robbinsarroyo.com

- **Brian J Robbins**
  brobbins@robbinsarroyo.com,rsalazar@robbinsarroyo.com,notice@robbinsarroyo.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Hart Lawrence Robinovitch**
  AZDocketing@zimmreed.com,stacy.bethea@zimmreed.com,Hart.Robinovitch@zimmreed.com

- **Joseph Nathaniel Roth**
  jroth@omlaw.com,bwendt@omlaw.com

- **David R Scott**
  drscott@scott-scott.com,efile@scott-scott.com

- **Mark Solomon**
  marks@rgrdlaw.com

- **Christopher Dennis Stewart**
  CStewart@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Edward M Varga , III**
  evarga@kmllp.com

- **Samuel M Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Anna Erickson White**
  awhite@mofo.com,rwebb@mofo.com,avickery@mofo.com

- **Garrett Webster Wotkyns**
  gwotkyns@schneiderwallace.com,efilings@schneiderwallace.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)