UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, Individually and on Behalf of All Others Similarly Situated, | No. 2:12-cv-00555-DGC |
| Plaintiff, | CLASS ACTION |
| vs. | DECLARATION OF D. PAUL REGAN |
| First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn and David Eaglesham, | |
| Defendants. | |

1024394_1

## I.    INTRODUCTION

1.    I have been retained on behalf of Class Representatives in this matter by their class counsel, Robbins Geller Rudman & Dowd LLP, to provide opinions on the following:

(a)    Whether First Solar's failure to disclose the manufacturing excursion prior to 2Q10 complied with GAAP and SEC requirements.

(b)    Whether First Solar properly accounted for and disclosed the scope of the excursion and other LPM problems beginning in 2Q10 in accordance with GAAP and SEC requirements.

(c)    Whether First Solar's change in accounting for warranty-related settlements in 4Q10 were properly accounted for and disclosed in accordance with GAAP and SEC requirements.

(d)    Whether First Solar properly accounted for and disclosed the warranty accrual as of 2Q11 and 3Q11 in accordance with GAAP and SEC disclosure requirements.

(e)    Whether First Solar properly accounted for and disclosed the warranty accrual as it related to the hot climate considerations from 1Q11 to 3Q11 in accordance with GAAP and SEC disclosure requirements.

(f)    The role of First Solar's independent auditor, PwC, related to First Solar's accounting and disclosure of warranty-related obligations and contingencies.

2.    I have been asked to provide opinions on the topics identified above for purposes of plaintiffs' opposition to defendants' motion for summary judgment. I understand that expert discovery has not yet commenced and that additional information may become available. Accordingly, I reserve the right to modify or expand any opinions set forth herein, as appropriate

3.    As an expert providing consulting services, I am bound by professional standards, including the duty to act with integrity and objectivity. Consistent with those requirements, my opinions, which are expressed throughout this Declaration, are my present opinions based on the information I have considered to date. These opinions are based on

- 1 -

1024394_1

my knowledge, training, and experience, as well as various sources of evidence cited throughout this Declaration.

## II. EXPERT QUALIFICATIONS

4. My general qualifications are explained in greater detail in my resume, which is attached to this Declaration as Exhibit A.

5. I am a certified public accountant ("CPA"), licensed continuously since 1970 by the State of California in the United States. I am the Chairman of Hemming Morse, LLP, CPAs, forensic and financial consultants ("HM"). HM is an accounting firm with more than 100 employees. My work in the accounting profession includes experience as an auditor and as a forensic consultant. My expert qualifications, including my testimony in the last four years and the publications I have authored, are described in my curriculum vitae, which is attached as Exhibit A.

6. I have been a CPA for more than 40 years. During this time I have provided accounting and forensic consulting services on more than 750 complex litigation matters. Many of these have required an extensive analysis and application of relevant Generally Accepted Accounting Principles ("GAAP"). I have performed these analyses for large and small companies in the private sector, as well as for various states and federal agencies (*e.g.*, The Federal Deposit Insurance Corporation, The Resolution Trust Corporation, the U.S. Securities and Exchange Commission ("SEC"), the California Attorney General), and numerous public corporations.

7. From 1976 through today I have testified and been accepted as an expert in more than 125 trials and arbitrations and have given more than 225 depositions. These cases were generally in state and federal courts in the United States. However, I have testified in trials in Guam, Canada, Australia and Europe.

8. I have been a member of the California Society of Certified Public Accountants ("CalCPA") since 1970. I have served on its state-wide Litigation Services Steering Committee since 1990 and I was its Chair during 2002/2004. This Steering Committee provides guidance to the more than 500 members of its four Operating Sections:

- 2 -

1024394_1

(1) Business Valuation, (2) Economic Damages, (3) Fraud, and (4) Family Law.  For two and one-half years (through August of 1998), I was Chair of its 250-member Economic Damages Section.  I served as Chair of the 28,000-member CalCPA during 2004 and 2005 and in 2009 I received CalCPA's Distinguished Service Award for a career of distinguished service to the accounting profession.

9.      Since 1970, I have been a member of the American Institute of Certified Public Accountants ("AICPA").  From 1998 until July of 2001, I served as one of the nine members of the AICPA's Forensic and Litigation Services Committee ("FLSC") (formerly the Litigation and Dispute Resolution Subcommittee).  The FLSC oversaw and provided guidance to the AICPA's 340,000 members relating to litigation consulting and dispute resolution.  The FLSC also provided guidance and supervision to its subcommittees, including the subcommittee on Economic Damages, which I chaired from 1999 to July 2001.

10.     From October 2003 until October 2011, I was a member of the AICPA's governing council, and from August 2008 until October 2011, I served on the AICPA's Forensic and Valuation Services Executive Committee.  This nine-person committee is the AICPA's standard setting body for CPAs performing forensic and valuation services.  I have also been designated by the AICPA as CFF (Certified in Financial Forensics).  Since 1996 I have been a Certified Fraud Examiner ("CFE"), which is a designation granted by the Association of Certified Fraud Examiners.

11.     I was on the Board of Directors of Solar Power Inc. and Chair of its Audit Committee from 2006 to 2010.  Solar Power Inc. is a public company which provides "global turnkey developer and EPC contractor for large-scale solar energy facilities . . . designing, engineering and constructing very high-quality, efficient and sustainable photovoltaic (PV) solar systems for commercial and utility applications."[1]

---

[1]    http://en.spisolar.com/Column_Content.asp?Column_ID=29466.

- 3 -

1024394_1

**III.   FIRST SOLAR'S OBLIGATIONS TO ACCOUNT FOR AND PROVIDE DISCLOSURE REGARDING WARRANTY COSTS**

12.     GAAP for warranty obligations is addressed in ASC 450 and 460.[2] Specifically, ASC 450, *Accounting for Contingencies* ("ASC 450"), sets forth GAAP relevant to my analysis. ASC 450 addresses the establishment of reserves and the disclosures associated with loss contingencies such as an adverse outcome from warranty obligation.

13.     An accrual for a loss contingency (*i.e.*, a reserve) must be made when both of the following conditions are met:

(a)     Information available prior to issuance of the financial statements indicates that it is ***probable*** that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

(b)     The amount of loss is ***reasonably estimable***.[3]

14.     GAAP defines the term "probable" to mean "The future event or events are likely to occur."[4]

15.     The second test for the accrual of a contingent loss is met when the loss is reasonably estimable.  It is not appropriate to delay the accrual of a probable loss until only a single amount can be reasonably estimated.[5]  In some instances, a loss may be probable, but

---

[2]   ASC 460-10-25-5 states: "Because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a contingency.  Losses from warranty obligations shall be accrued when the conditions in paragraph 450-20-25-2 are met."

[3]   ASC 450-20-25-2. ASC 460-10-25-6 states: "The condition in paragraph 450-20-25-2(a) is met at the date of an entity's financial statements if, based on available information, it is probable that customers will make claims under warranties relating to goods or services that have been sold. Satisfaction of the condition in paragraph 450-20-25-2(b) will normally depend on the experience of an entity or other information.  In the case of an entity that has no experience of its own, reference to the experience of other entities in the same business may be appropriate.  Inability to make a reasonable estimate of the amount of a warranty obligation at the time of sale because of significant uncertainty about possible claims (that is, failure to satisfy condition [b] in that paragraph) precludes accrual and, if the range of possible loss is wide, may raise a question about whether a sale should be recorded before expiration of the warranty period or until sufficient experience has been gained to permit a reasonable estimate of the obligation."

[4]   ASC 450-20-20, Glossary.

[5]   ASC 450-20-25-5.

- 4 -

the range of loss may be wide. When there is an amount within the range that appears to be a better estimate, that amount shall be accrued.[6] If there is no amount that is a better estimate, than the minimum amount in the range shall be accrued.[7]

16.    GAAP also requires the nature of the accrual to be disclosed if the financial statements would be misleading absent that disclosure.[8] Alternatively, disclosure is also required when an accrual is not made, but it is at least reasonably possible that a loss (or additional loss) will be incurred.[9]

17.    The SEC has focused on registrants' accounting for loss contingencies. Specifically, the SEC has sought improved transparency regarding loss contingencies.[10]

18.    Item 303 of SEC Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), requires a discussion of liquidity, capital resources, results of operations, and other information necessary to an understanding of a registrant's financial condition, changes in financial condition, and results of operations. Item 303(a)(3) requires companies to disclose any known trends or uncertainties that had, or could reasonably be expected to have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

19.    The SEC has summarized the principal objectives of MD&A disclosure as:

---

[6]    ASC 450-20-30-1.

[7]    *Id.*

[8]    ASC 450-20-50-1.

[9]    ASC 450-20-50-3.

[10]    Ernst & Young, SEC Comments and Trends, September 2008: "The SEC staff has asked registrants to provide additional information and/or enhance disclosures related to contingencies that are accounted for or disclosed pursuant to FASB Statement No. 5, Accounting for Contingencies (Statement 5). In addition to broad questions regarding a registrant's consideration of Statement 5, the SEC staff also has asked registrants to provide more specific information. These comments include requests for details such as the factors considered in determining that the contingency did not meet the recognition criteria in paragraph 8 of Statement 5 and the factors that were considered in determining it was appropriate to reverse an accrual for a loss contingency. . . . [I]f it is reasonably possible that an exposure to a loss in excess of the amount accrued exists, the nature and either an estimate of the contingency or a statement that an estimate cannot be made also should be disclosed. Based on the nature of the SEC staff's comments, it is clear that the SEC staff's objective is to improve transparency in contingency disclosures."

- 5 -

The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:

- provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.[11]

## IV.   FIRST SOLAR FAILED TO DISCLOSE THE MANUFACTURING EXCURSION PRIOR TO 2Q10

20. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

21. ████████████████████████████████████████████████████████████████████████████████ This term "Excursion" was a label given by First Solar to modules experiencing premature power loss manufactured between June 2008 and June 2009.

22. First Solar's contemporaneous analyses demonstrate that the LPM issue was a significant event. In May 2009, Mike Koralewski, First Solar's VP of Global Quality, noted, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[11] Financial Reporting Release 72, December 29, 2003 ("FR 72").

[12] Ex. 287 at 08 (*First Solar – Low Power Issue*, July 26, 2010); Ex. 71 at 6. All exhibits referenced herein are attached to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to Motion for Summary Judgment filed concurrently herewith.

[13] Ex. 84 at 67; Ex. 83 at 40; Ex. 80 at 67; Ex. 26 at 86.

[14] Ex. 51 at 24 (Low Power Panels Communications Plan, updated August 14, 2009).

[15] Ex. 41.

- 6 -

1024394_1

████████████████████████████████████████████████ But at that time, First Solar characterized its external communications regarding LPM as ████████████████ ████████████████████████"[17]

23.     First Solar determined that to resolve the LPM issues, it would compensate customers by allowing the customer to return larger quantities of modules in exchange for replacement modules (the "Rip and Replace" method).[18] First Solar would test the modules and potentially redeploy any "good" modules.  This approach was a shift from past practice whereby First Solar, or the customer, would search for and replace individual modules.[19] The Rip and Replace method meant that First Solar would incur module-related costs in excess of the number of LPM modules, as well as other above-normal costs incurred during the replacement process (*e.g.* transportation, testing and labor).

24.     ████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████.[21]

25.     ████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

---

[16]  Ex. 288 at 56.

[17]  Ex. 137 at 41.

[18]  Ex. 114 (including an e-mail from Mr. Amonett (First Solar, Director of Financial Planning & Analysis) to Mr. Koralewski dated October 14, 2009).

[19]  *Id.*

[20]  Ex. 25 at 84.

[21]  *Id.*

[22]  Ex. 289 (including an e-mail from James Brown to Mr. Koralewski dated November 9, 2009).

- 7 -

1024394_1



26. ███████████████████████████████

As described below, the impact on future revenues was required to be disclosed under GAAP and SEC disclosure rules.

27. The evidence above indicates that the impact of the Excursion had become material to First Solar prior to 2Q10, both quantitatively and qualitatively. Qualitative materiality factors are set forth in GAAP.[27] These factors include whether a misstatement (or omission) concerns a portion of the entity's business that plays a significant role in the entity's profitability.[28]

---

[23] Ex. 9 at 08 (including e-mail from Mr. Koralewski to Mr. Arnaud dated January 21, 2010).

[24] Exs. 294 and 290 (for 1Q10); Ex. 287 at 10 (*First Solar – Low Power Issue*, July 26, 2010). *See also* Ex. 137 at 47

[25] Ex. 291 (e-mail dated April 13, 2010 from John Amonett to Bryan Schumaker). First Solar's Form 10-Q for this period was filed on April 29, 2010; Ex. 68.

[26] Ex. 68.

[27] ASC 250-10-S99 ("As used in the accounting literature and in this SAB, 'qualitative' materiality refers to the surrounding circumstances that inform an investor's evaluation of financial statement entries.").

[28] ASC 250-10-S99 ("Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are . . . whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.").

- 8 -

1024394_1

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

28.     In consideration of the number of modules manufactured during the Excursion that were exposed to the risk of premature power loss (*see* ¶24 *supra*), ███████████

██████████████████████████████████████████████████

████████████████████████     GAAP requires disclosure when there is information known about an estimate that could cause the estimate to change in the near term.[30]  The SEC has emphasized that it expects registrants to apply this GAAP.  Specifically, the SEC has stated that there is an increasing presumption, as time passes, that it is possible for a company to provide quantitative information regarding loss contingencies,[31] such as warranty accruals.

██████████████████████████████████████████████████

---

[29]  Ex. 254 (including e-mail from Stephan Hansen to Robert Gilette dated March 7, 2011: ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

[30]  ASC 275-10-50-8: ("Disclosure regarding an estimate shall be made when known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that both of the following criteria are met: a. It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events.  (The term reasonably possible as used in this Subtopic is consistent with its use in Subtopic 450-20 to mean that the chance of a future transaction or event occurring is more than remote but less than likely.); b. The effect of the change would be material to the financial statements.").

[31]  CAQ SEC Regulations Committee, Joint Meeting with SEC Staff, June 24, 2010 ("Mr. Carnall [Chief Accountant, SEC Division of Corporate Finance] added that he would expect that disclosures about a loss contingency would be updated as additional information becomes available. With the passage of time, there is a greater presumption that it would be possible for the company to provide quantitative information.").

- 9 -

████████████████████████████████████████████

███████████████ (*see* ¶¶15-16 *supra*, as well as ASC 275 cited in this paragraph).

29.    In addition, the Excursion was a known event as described in Item 303 of Regulation S-K above.  Further, the Excursion was expected to have a material unfavorable financial impact.  Therefore, the Excursion met the requirements for disclosure in the MD&A as described at ¶¶17 to 19.[32]  Specifically, First Solar was required to disclose that the Excursion had, or could reasonably be expected to have, a material unfavorable impact on net sales or revenues or income from continuing operations.  First Solar's disclosure also should have included information regarding management's analysis of the expected reduction in revenue caused by the consumption of otherwise saleable modules in the LPM replacement process.[33]

30.    Ultimately, prior to 2Q10, First Solar was aware that the Excursion would result in material warranty-related costs and other adverse financial impacts such as lost revenue.  Despite this awareness and related concerns, First Solar failed to provide appropriate disclosure regarding the Excursion pursuant to the requirements of GAAP and the SEC disclosure rules prior to 2Q10.

---

[32]  *See also* SEC Release Nos. 33-8350 and 34-48960; FR-72.  The SEC's requirements include: "MD&A must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance or of future financial condition," and "As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.  (In this release we sometimes use the term 'known material trends and uncertainties' to describe trends, demands, commitments, events or uncertainties as to which disclosure is required.)"

[33]  ASC 605-10-S99 ("Examples of such revenue transactions or events that the staff has asked to be disclosed and discussed in accordance with FRR 36 are . . . Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.").

- 10 -

1024394_1

## V. FIRST SOLAR FAILED TO PROPERLY ACCOUNT FOR AND DISCLOSE THE FULL SCOPE OF THE EXCURSION AND OTHER LPM PROBLEMS BEGINNING IN 2Q10

31.

32.

33. First Solar disclosed that less than 4% of modules manufactured (approximately 30MW or 400,000 modules)[40] during the Excursion were affected.[41] As described in greater detail below, during the Class Period, First Solar maintained this disclosure despite the fact that the total modules to be replaced due to the Excursion far exceeded the "affected" 400,000 modules.

---

[34] Ex. 137 at 05 (Board of Directors Meeting, February 21, 2012, LPM Process History).

[35] Ex. 287 at 08 (*First Solar – Low Power Issue*, July 26, 2010

[36] Ex. 137 at 06.

[37] Ex. 26 at 86.

[38] Ex. 96 at 42 (LPM Discussion, June 22, 2010).

[39] *Id.*

[40] Ex. 295.

[41] Ex. 96

- 11 -

1024394_1



34.

35.

[45]

---

42 Ex. 137 at 08.

43 *Id.*

44 Ex. 296 at 36.

45 Ex. 27 at 89

1024394_1



- 13 -

1024394_1

37. ██████████████████████████████████████████ ████████████████ ████████████████████████

38. As noted above, First Solar's financial statements did not provide disclosure about the Excursion until 2Q10. Figure 3 summarizes the key components of First Solar's 2Q10 disclosure, accompanied with my observations regarding the adequacy and appropriateness of the disclosure:[47]

Figure 3

| Disclosure | Observation |
|---|---|
| Less than 4% of modules manufactured during the period were *affected*. | This disclosure failed to identify the significantly greater number of modules needed to remediate the Excursion.██ ████████████████████████████████ |
| The Excursion "could result *in possible premature power loss* in the affected modules." | The disclosure failed to reflect the true population of modules that were expected to experience premature power loss ██████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████████████Thus, this disclosure was misleading and inconsistent with First Solar's warranty obligations. |
| Low power modules were produced between June 2008 and June 2009. | ███████████████████████████████ ███████████████████████████████ ████████████████████ |

[46] Ex. 26 at 95.

[47] Ex. 69 at 13-14:

The above-referenced $27.4 million of accrued nonrecurring expenses in excess of normal product liability as of June 26, 2010 consists of the following, each related to the manufacturing excursion described below: (i) $21.8 million in estimated expenses for certain module replacement efforts voluntarily undertaken by us beyond the normal product warranty (appearing in results of operations under "cost of sales"); and (ii) $5.6 million in estimated nonrecurring post-sale expenses (appearing in results of operations under "selling, general and administrative"). During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage.

[48] Ex. 115 at 02 (July 8, 2010 model).

- 14 -

1024394_1

| Disclosure | Observation |
|---|---|
| Efforts were well underway to resolve the Excursion, and in some cases, complete. | This disclosure provided reassurance that the financial effect of the remediation would not be significant in future periods. But, as of 2Q10, First Solar's remediation efforts were only beginning. ██████████████████████████ ██████████████████████████████ |

39. Defendants repeated this identical misleading disclosure throughout the Class Period despite the fact that the Company's estimates of LPM modules were increasing. ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████

40. First Solar also failed to properly account for the true scope of the Excursion and LPM problems by assuming its customers would not return underperforming modules. Throughout the Class Period, First Solar set its warranty reserves based, in part, on underlying assumptions regarding the likelihood of customers finding and returning underperforming modules (*i.e.*, "the customer return rate"). ██████████████ ████████████████████████████████████████████████████████████ ████████████████████

- ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████

- ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[49] Ex. 137 at 15.

[50] Ex. 102.

[51] Exs. 292 and 115 at 02 (July 8, 2010 model).

[52] Ex. 27 at 90.

- 15 -

1024394_1

███████████████████████████████████ But First Solar did not appropriately monitor whether the scenario subsequently changed.

41. First Solar's warranty assumptions regarding the likelihood of customers finding and returning underperforming modules were based on historical warranty experience and were not properly updated for the change in circumstances surrounding the Company's LPM remediation actions and communications beginning in 3Q09 (*i.e.*, First Solar characterized the Excursion as a significant non-recurring event). ██████████

---

[53] *Id.* at 91.

[54] Ex. 26 at 95.

[55] *Id.*

[56] *Id.*

[57] *Id.*

1024394_1

████████████████████████   ████████████████████████

████████████████████████████████████████████████

42.    GAAP set forth two conditions to accrue warranty costs. The first is that the incurrence of the warranty cost was probable.[60] This was clearly the case, as First Solar determined that there was essentially a 100% likelihood that customers would look for LPM modules. The second criteria was that the amount of warranty cost be estimable.[61] For the reasons described above, First Solar applied incorrect assumptions leading to understated estimates of the warranty costs associated with LPM.[62]

43.    GAAP also require disclosure if it is at least reasonably possible that a change in estimate of the liability could occur in the near term.[63] This was clearly the case regarding

---

[58]   *Id.*

[59]   *Id.*

[60]   ASC 460-10-25-6 ("The condition in paragraph 450-20-25-2(a) is met at the date of an entity's financial statements if, based on available information, it is probable that customers will make claims under warranties relating to goods or services that have been sold. Satisfaction of the condition in paragraph 450-20-25-2(b) will normally depend on the experience of an entity or other information. In the case of an entity that has no experience of its own, reference to the experience of other entities in the same business may be appropriate. Inability to make a reasonable estimate of the amount of a warranty obligation at the time of sale because of significant uncertainty about possible claims (that is, failure to satisfy condition [b] in that paragraph) precludes accrual and, if the range of possible loss is wide, may raise a question about whether a sale should be recorded before expiration of the warranty period or until sufficient experience has been gained to permit a reasonable estimate of the obligation.").

[61]   ASC 450-20-25-2. ASC 460-10-25-6 ("The condition in paragraph 450-20-25-2(a) is met at the date of an entity's financial statements if, based on available information, it is probable that customers will make claims under warranties relating to goods or services that have been sold. Satisfaction of the condition in paragraph 450-20-25-2(b) will normally depend on the experience of an entity or other information. In the case of an entity that has no experience of its own, reference to the experience of other entities in the same business may be appropriate. Inability to make a reasonable estimate of the amount of a warranty obligation at the time of sale because of significant uncertainty about possible claims (that is, failure to satisfy condition [b] in that paragraph) precludes accrual and, if the range of possible loss is wide, may raise a question about whether a sale should be recorded before expiration of the warranty period or until sufficient experience has been gained to permit a reasonable estimate of the obligation.").

[62]   *See, e.g.*, ¶¶33, 41 *supra.*

[63]   ASC 450-20-50-2 ("If the criteria in paragraph 275-10-50-8 are met, paragraph 275-10-50-9 requires disclosure of an indication that it is at least reasonably possible that a change in an entity's estimate of its probable liability could occur in the near term. Example 3 (*see* paragraph 450-20-55-36) illustrates this disclosure for an entity involved in litigation."). *See also* ASC 275-10-50-6,

- 17 -

the liability associated with the Excursion.[64]  At a minimum, First Solar was required to include disclosure in its financial statements that the total cost associated with the Excursion was uncertain and might significantly exceed then-current estimates.[65]  But First Solar failed to inform users of its financial statements regarding this material risk in 2Q10, or any other quarter during the Class Period.

44.    The limited disclosure that First Solar did offer for the first time in 2Q10 failed to provide adequate information to users of its financial statements (*see* ¶29 *supra*).



First Solar's failure to make relevant disclosure conflicted with the SEC's GAAP implementation

*Certain Significant Estimates*: "This Subtopic requires discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25), it is reasonably possible that the estimate will change in the near term and the effect of the change will be material.  The estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements shall be disclosed and the evaluation shall be based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25)."

[64]   ASC 275-10-50-8: ("Disclosure regarding an estimate shall be made when known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that both of the following criteria are met: a. It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events.  (The term reasonably possible as used in this Subtopic is consistent with its use in Subtopic 450-20 to mean that the chance of a future transaction or event occurring is more than remote but less than likely.) b. The effect of the change would be material to the financial statements.").

[65]   ASC 275-10-50-6, *Certain Significant Estimates*: "This Subtopic requires discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25), it is reasonably possible that the estimate will change in the near term and the effect of the change will be material.  The estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements shall be disclosed and the evaluation shall be based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25)."

- 18 -

1024394_1

guidance.[66]   Specifically, the SEC has advised registrants that disclosures about loss contingencies, such as warranty reserves, should be updated as more information becomes available to the registrant.[67]

45.     First Solar also failed to make appropriate MD&A disclosures concerning the risk that its LPM-related warranty estimates were likely to change.  The SEC has instructed registrants to make disclosures that address uncertainties regarding "the methods, assumptions, and estimates underlying the company's critical accounting measurements."[68] As described above, First Solar's LPM estimates were based on a series of undisclosed assumptions.

46.     First Solar's failures described in ¶¶31-44 identify materially false and/or misleading statements, as well as material omissions as to the scope and financial statement impact of its LPM modules.  These failures include, not only GAAP violations as to First Solar's financial statements, but also SEC requirements as to its MD&A disclosures.

---

[66] CAQ SEC Regulations Committee, Joint Meeting with SEC Staff, June 24, 2010 ("Mr. Carnall [Chief Accountant, SEC Division of Corporate Finance] added that he would expect that disclosures about a loss contingency would be updated as additional information becomes available. With the passage of time, there is a greater presumption that it would be possible for the company to provide quantitative information.").

[67] *Id.*

[68] SEC Release Nos. 33-8350 ("A company should address specifically why its accounting estimates or assumptions bear the risk of change.  The reason may be that there is an uncertainty attached to the estimate or assumption, or it just may be difficult to measure or value.  Equally important, companies should address the questions that arise once the critical accounting estimate or assumption has been identified, by analyzing, to the extent material, such factors as how they arrived at the estimate, how accurate the estimate/assumption has been in the past, *how much the estimate/assumption has changed in the past, and whether the estimate/assumption is reasonably likely to change in the future*.  Since critical accounting estimates and assumptions are based on matters that are highly uncertain, a company should analyze their specific sensitivity to change, based on other outcomes that are reasonably likely to occur and would have a material effect. Companies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors.") (emphasis added).

- 19 -

## VI.   FIRST SOLAR FAILED TO PROPERLY ACCOUNT FOR AND DISCLOSE THE CHANGE IN ACCOUNTING FOR WARRANTY-RELATED SETTLEMENTS IN 4Q10

47.

48.

---

[69] *Id.* The analysis here regarding First Solar's accounting treatment is set forth in numerous documents.

[70] Ex. 293 at 41

[71] *Id.* at 38.

- 20 -

1024394_1

49. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████ ███████████████████████████████████████████████████ █████████

Figure 4

| Module Condition | Accounting Outcome |
|---|---|
| ███████████████ | ██████████████████████████ |
| ███████████ | ████████████ |

50. This methodology culminated in LPM replacement modules being recorded and reflected in the "Settlement" line item within the warranty footnote in First Solar's financial statements.[76] ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████

---

[72] *Id.* ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████

[73] Ex. 170 at 62 and Ex. 297 at 37, which both state: ████████████ ███████████████████████████████████████████████████ █████████████████████████████

[74] Ex. 297 at 37.

[75] *Id.*

[76] Ex. 298 at 16 (*First Solar 2010 Year-end Warranty Analysis*, ████████ ███████████████████████████████████

[77] Ex. 10 at 25 ████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████

- 21 -

[REDACTED]

51.    In fact, First Solar's disclosures in 2Q10 and 3Q10 continued to report increased settlement activity relative to prior periods.

52.    [REDACTED]

53.    [REDACTED]

---

[78] Ex. 206 at 06 (e-mail from Larry Polizzotto dated June 21, 2010 to Mr. Eaglesham and others). *See also* Ex. 299 at 01 (e-mail from Mr. Polizzotto to Mr. Eaglesham dated June 21, 2010: [REDACTED]

[79] Ex. 299 at 01.

[80] Ex. 298 at 16.

[81] *Id.*

[82] Ex. 25 at 76 [REDACTED]

- 22 -

1024394_1

Figure 5

| | 3Q10 | 4Q10 | % Change |
|---|---|---|---|
| ██████████████ | ██████ | ███████ | ████ |
| █████████ | █████ | █████ | ████ |
| ██████ | | | |

54.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

55.    ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████     ██████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

---

[83]    Ex. 102.

[84]    Ex. 73 at 100.

[85]    Ex. 171 at 76-77 ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

[86]    *Id.*

- 23 -



56.

57.

58.

59.

1024394_1



60.

61.

---

[87] First Solar documents describe this GAAP (*see* Ex. 177 at 04).

[88] *See* Defendants' Response to Lead Plaintiff Mineworkers' Pension Scheme's Second Set of Interrogatories, No. 6 ("Rog. Resp. No. 6").

[89] Ex. 298 FSLR01077614 at 16

[90] *See* Rog. Resp. No. 6

[91] Ex. 286 at 35; Ex. 178 at 67.

[92] Ex. 180 at 37.

[93] *See* Rog. Resp. No. 6

[94] *Id.*

1024394_1



62.

---

[95] Ex. 301 at 05 (*LCM Pricing Floor Triggers*, November 2011).

[96] Ex. 177 at 05.

[97] Ex. 302

[98] Ex. 303 at 45. *See also* Rog. Resp. No. 6.

[99] Ex. 304 at 83.

[100] Calculated using defendants' Rog. Resp. No. 6.

[101] Ex. 298 at 16.

- 26 -

1024394_1



63.

64.

65.     As another example, in 4Q11, First Solar's Controller participated in the following exchange:

66.

---

[102] First Solar's financial statements state that its inventory is stated at "the lower of cost or market." Ex. 73 at 70.

[103] Ex. 176 at 32.

[104] Ex. 179 at 06-08. *See also* Ex. 304 at 84

[105] Rog. Resp. No. 6.

[106] Rog. Resp. No. 6.

- 27 -

1024394_1

67.

68.     At a minimum, GAAP required First Solar to have disclosed the fact that it had implemented a significant change in the methodology used to prepare the warranty reserve disclosure.[110]  This disclosure of the change was required so that users could discern the true number of replacement modules shipped and the fact that Settlements following 4Q10 only accounted for a portion of replacement modules shipped.[111]

---

[107] ASC 330-10-35-3 ("The rule of lower of cost or market is intended to provide a means of measuring the residual usefulness of an inventory expenditure.  The term market is therefore to be interpreted as indicating utility on the inventory date and may be thought of in terms of the equivalent expenditure which would have to be made in the ordinary course at that date to procure corresponding utility.").

[108] *See* Ex. 71.

[109] *See* Ex. 99 at 14.

[110] GAAP specifically identifies estimates regarding the valuation of inventory subject to technological obsolescence as an uncertainty relevant for disclosure. *See* ASC 275-10-50-15 ("The following are examples of assets and liabilities and related revenues and expenses, and of disclosure of gain or loss contingencies included in financial statements that, based on facts and circumstances existing at the date of the financial statements, may be based on estimates that are particularly sensitive to change in the near term. . . . a. Inventory subject to rapid technological obsolescence. b. Specialized equipment subject to technological obsolescence.").

[111] ASC 250-10-50-4 ("The effect on income from continuing operations, net income (or other appropriate captions of changes in the applicable net assets or performance indicator), and any related per-share amounts of the current period shall be disclosed for a change in estimate that affects several future periods, such as a change in service lives of depreciable assets. Disclosure of those effects is not necessary for estimates made each period in the ordinary course of accounting for items such as uncollectible accounts or inventory obsolescence; however, disclosure is required if the effect of a change in the estimate is material.  When an entity effects a change in estimate by changing an accounting principle, the disclosures required by paragraphs 250-10-50-1 through 50-3 also are required.  If a change in estimate does not have a material effect in the period of change but is reasonably certain to have a material effect in later periods, a description of that change in estimate shall be disclosed whenever the financial statements of the period of change are presented.").

- 28 -

1024394_1

69.     Beyond First Solar's failure to comply with GAAP, it also failed to comply with SEC disclosure requirements.  The SEC specifically required First Solar to provide users of the financial statements information necessary for an understanding of the issuer's financial condition.[112]   This requirement is consistent with the central objective of transparency within MD&A.  But the undisclosed change in methodology that First Solar applied in 4Q10 had the opposite effect.

70.     Cumulatively, First Solar's change in methodology to determine the warranty reserve was expected to impact several future periods. It was quantitatively as well as qualitatively material, including because it masked a change in settlement trends.[113]  And it was not made in the ordinary course of business (the LPM was repeatedly characterized by First Solar as non-recurring).[114]  These factors are the focal point in a GAAP analysis of whether disclosure is required.[115]  As such, GAAP clearly required First Solar to make appropriate disclosure regarding the change.  Finally, given that First Solar reported that its inventory was stated in accordance with GAAP, and specifically that it was stated at the lower of cost or market, a proper study of the market value of its derated inventory, which was material, should have been made, but was not.  In fact, as stated in ¶65 *supra*, there was limited demand for this inventory.  The above discussion in ¶¶47-67 identifies materially false and/or misleading statements, as well as material misstatements of First Solar's financial statements and MD&A regarding its Settlements and inventory accounting for its LPM modules.

---

[112]  SEC Release No. 33-8350 ("The purpose of MD&A is not complicated.  It is to provide readers information 'necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations.'  The MD&A requirements are intended to satisfy three principal objectives.").

[113]  ASC-250-10-S99 ("Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are whether the misstatement masks a change in earnings or other trends.").

[114]  Ex. 73 at 86

[115]  ASC 250-10-50-4.

- 29 -

1024394_1

## VII.    FIRST SOLAR FAILED TO ACCURATELY ACCOUNT FOR AND DISCLOSE THE WARRANTY ACCRUAL AS OF 2Q11 AND 3Q11

71.

72.

---

[116] Ex. 300 at 57.

[117] *Id.*; *see also* Ex. 305 at 44

[118] Ex. 300 at 59.

[119] Ex. 154 at 05; *see also* Ex. 140 at 78

[120] Ex. 154 at 05.

[121] *Id.*

[122] *Id.*

- 30 -

1024394_1



73.

74.

[123] Ex. 214 at 81.

[124] Ex. 161 at 86.

[125] Ex. 140 at 78.

[126] Ex. 128 at 34

[127] Ex. 75 at 41.

[128] Ex 161 at 86; Ex 104 at 86.

1024394_1

(a)



(b)

(c)

(d)

75.    The Company's 2Q11 and 3Q11 false and misleading disclosures violated GAAP.  For example, financial statements for both 2Q11 and 3Q11 stated that First Solar recorded an "estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost."[133]  Based upon the information discussed in ¶¶71-74, this statement was materially

---

[129] Ex 306 at 14; *see also* Ex. 275 at 67; Ex. 151 at 53.

[130] Ex. 164 at 13.

[131] Ex 307 at 03.

[132] Ex 308 at 64.

[133] Ex. 75 at 27; Ex. 76 at 30.

- 32 -

1024394_1

misleading. Similar materially misleading statements appear within First Solar's MD&A (*see, e.g.*, Ex. 177 at 42).

76.     Ultimately, in 4Q11, the Company complied with GAAP and appropriately disclosed the uncertainty surrounding its LPM remediation estimates:

> In addition to those customers with solar modules affected by the manufacturing excursion that we have already identified, we are working with other customers who have made claims and may have affected modules. We are in the process of gathering information to complete our analysis of these remaining claims. Based upon our experience to date with our remediation approach, together with the data currently available, we estimate that, if we ultimately determine that remediation of these claims under our current remediation program is probable, we could incur additional costs of up to approximately $44 million in the then-current reporting period. This includes approximately $24 million beyond our limited warranty obligations in connection with these claims, including the costs of actual remediation and the costs of additional compensation payments to customers under certain circumstances, and approximately $20 million related to additional product warranty liability.[134]

77.     Specifically, this disclosure was in conformity with GAAP because it alerted users of First Solar's financial statements to the material uncertainties present in those financial statements. But these factors were known to First Solar at least by 2Q11. ██

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

78.     As described above, ASC 450 required First Solar to accrue all probable and estimable warranty costs. ████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████ ██ ██████████████████████

---

[134] Ex. 71 at 96.

[135] Ex. 13 (Widmar Tr., February 5, 2015) at 175:7-9.

[136] Ex. 157 at 94-95 ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████

███████████████████████████████████████████████████

███████████████████████████████████ First Solar's failure to appropriately accrue for, and disclose, these contingent losses was an error as that term is defined in GAAP (*see* discussion above).[137]

79. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

80. In addition to the quantitative materiality factors set forth in the preceding factors, GAAP set forth methods for accountants to evaluate the qualitative materiality aspects as it relates to the financial statements of SEC registrants.[138] Specifically, there are several factors that support my conclusion that a reasonable estimate of the expected costs to resolve the LPM module warranty replacement obligations were material, including: (1) the significance of an item to a particular entity (for example, inventories to a manufacturing company) (*see, e.g.*, the considerations highlighted in ¶74), and (2) whether the misstatement masks a change in earnings or other trends (*see, e.g.*, ¶77).

81. Finally, First Solar also continued its pattern of failing to provide adequate MD&A-related disclosure regarding the state of its LPM.[139] At the end of 2Q11 and again at

---

[137] ASC 250-10-20, Glossary.

[138] ASC 250-10-S99.

[139] SEC Release No. 33-8350 ("A company should address specifically why its accounting estimates or assumptions bear the risk of change. The reason may be that there is an uncertainty attached to the estimate or assumption, or it just may be difficult to measure or value. Equally important, companies should address the questions that arise once the critical accounting estimate or assumption has been identified, by analyzing, to the extent material, *such factors as how they arrived at the estimate, how accurate the estimate/assumption has been in the past, how much the estimate/assumption has changed in the past, and whether the estimate/assumption is reasonably likely to change in the future*. Since critical accounting estimates and assumptions are based on matters that are highly uncertain, a company should analyze their specific sensitivity to change, based on other outcomes that are reasonably likely to occur and would have a material effect. Companies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors.") (emphasis added).

1024394_1

the end of 3Q11, First Solar reported that it had used its best estimate of LPM exposure. But the reality was that First Solar's warranty reserve analysis was incomplete and essentially certain to increase. First Solar inappropriately omitted this information from its disclosures in these periods.

## VIII.   FIRST SOLAR FAILED TO ACCURATELY ACCOUNT FOR AND DISCLOSE THE WARRANTY ACCRUAL AS IT RELATED TO HOT CLIMATE CONSIDERATIONS FROM 1Q11 TO 3Q11

82.     First Solar monitored the degradation rate of its modules, including by the type of climate in which the modules were installed. It did so for at least two reasons. First, this information was an important factor in the marketability of the product (*i.e.*, future sales volumes).[140] Second, this information was relevant to the evaluation of warranty exposure, which allowed for degradation of 10% by year 10 and 20% by year 25.

83.



[140] Ex. 190 at 79 (January 15, 2010

[141] Ex. 188 at 08

[142] Exs. 309, 310, 196 and 311.

[143] Ex. 196 at 09

1024394_1



84.

---

[144] Ex. 95 at 600.

[145] Ex. 198 at 86

[146] ASC 450 required First Solar to disclose that it lacked a basis to "make a reasonable estimate of its warranty obligation . . . because of significant uncertainty about possible [warranty] claims."

[147] Ex. 21 (Koralewski Tr., February 26, 2015) at 279:7-281:9.

[148] Ex. 105

[149] Ex. 219 at 02.

[150] Ex. 219 at 06; *see also* Ex. 95 at 11

1024394_1



85.

86.

87.

[151] Ex. 15 (Eaglesham Tr., January 21, 2015) at 231:6-24

[152] Ex. 20 at 94. *See also* Ex. 137 at 11

[153] Ex. 20 at 94; *see also* Ex. 80.

[154] Exs. 227, 229.

[155] Ex. 229 at 76.

1024394_1

88.    The evidence above indicates that the impact of the Hot Climate issue had become material to First Solar by no later than 1Q11, both quantitatively and qualitatively. For example:

-

89.    The criteria for accrual of warranty-related costs are set forth in ASC 450 and 460. As described above, First Solar had accumulated a significant amount of data regarding accelerated degradation in Hot Climate regions by 1Q11. In violation of GAAP, First Solar failed to increase its warranty or make appropriate disclosure regarding the financial impact of the Hot Climate issue at that time and continuing thereafter. Instead, First Solar delayed both the additional accrual and the disclosure until 4Q11. First Solar's $38 million retroactive charge for modules installed in Hot Climates from 3Q09 to 2Q11 is further evidence that First Solar's warranty was understated during these periods.

90.    Finally, for many of the same reasons that First Solar failed to appropriately account for and disclose the Hot Climate issues, it also failed to provide appropriate MD&A

---

[156] Ex. 209 at 33

[157] Ex. 219 at 02.

[158] *Id.*

1024394_1

disclosure. Specifically, the Hot Climate issue was a known material event that caused information reported in 1Q11 through 3Q11 to not be indicative of future operating performance or condition.[159] In the circumstances, First Solar was required to make these disclosures (see the factors set forth in ¶88).[160]

## IX.    THE ROLE OF FIRST SOLAR'S INDEPENDENT AUDITOR, PWC, RELATED TO FIRST SOLAR'S ACCOUNTING AND DISCLOSURE OF WARRANTY-RELATED OBLIGATIONS

91.    First Solar's management was responsible for the presentation of financial statements in accordance with GAAP.[161] ███████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████ ███████████████████████████████████████ █████████████████████████████████████████████████ For purposes of its annual audits, PwC's tests were designed to provide reasonable assurance that First Solar's annual financial statements were fairly presented in accordance with GAAP. This testing did not address all aspects of First Solar's financial statements. █████████ █████████████████████████████████████████████████████████████████

---

[159] SEC Release No. 33-8350 ("MD&A must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance or of future financial condition.").

[160] *Id.* ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

[161] Ex. 73 at 64 ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

[162] *Id.* ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████

1024394_1



92.    PwC's audits were not designed to obtain evidence such as e-mails among First Solar's employees.  As seen in my discussion above, that type of evidence exhibited candid contemporaneous assessments of the LPM and Hot Climate remediation process which do not appear to have been shared with PwC.

93.    These are among the reasons that PwC required First Solar to provide numerous representations regarding its financial statements, including as it related to LPM and the Hot Climate issue.

94.

[163] Ex. 110 (D'Angelo Tr., January 30, 2015) at 48:11-22

[164] *Id.* at 108:2-18

[165] *Id.* at 150:12-22                                                                identified in the memo were the specific sites subject to the hot climate accrual, right?  A. Yes.").

- 40 -

1024394_1

95.     In addition, PwC did not have responsibility for disclosures that First Solar made, or failed to make, in the MD&A section of its financial statements.[166] In fact, PwC had no obligation to audit First Solar's MD&A disclosures.[168]

96.     Finally, PwC also did not provide an opinion on First Solar's interim (quarterly) financial statements. The testing that PwC did perform on First Solar's interim financial statements was only designed to provide negative assurance on those financial statements (*i.e.*, a material misstatement had not come to PwC's attention).[169]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 27th day of April, 2015, at San Mateo, California.

_____
D. PAUL REGAN

---

[166] Ex. 252 at 40.

[167] AU §550.04, *Other Information in Documents Containing Audited Financial Statements* ("The auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document. However, he should read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements.") (http://pcaobus.org/Standards/Auditing/Pages/AU550.aspx accessed April 20, 2015).

[168] *Id.*

[169] AU §722.25, *Interim Financial Information* ("A review of interim financial information is not designed to obtain reasonable assurance that the interim financial information is free of material misstatement.") (http://pcaobus.org/Standards/Auditing/Pages/AU722.aspx accessed April 20, 2015).

- 41 -

1024394_1

# EXHIBIT A

**HEMMING MORSE, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

EXECUTIVE SUMMARY OF
CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Employment & Education *see page 1 of C.V.*

- **Chairperson**
  **Hemming Morse, LLP**
  *Certified Public Accountants
  and Forensic Consultants*

- **B.S. Accounting (Accounting Specialist), M.S. Accounting, CPA/CFF, CFE**

## Professional & Service Affiliations *see page 1 of C.V.*

- **Certified Public Accountant, State of California, since 1970**

- **American Institute of Certified Public Accountants, since 1970**
  Certified in Financial Forensics, since 2008

  AICPA Council Member, 2003-2011

  Member, Forensic & Valuation Services Executive Committee, 2008-2011

  Litigation and Dispute Resolution Services Subcommittee, 1998-2001

  Chair of National Economic Damages Committee, 1999-2001

- **Association of Certified Fraud Examiners, since 1996**

- **California Society of Certified Public Accountants**

  Distinguished Service Award, 2009

  – Board of Directors, 2001-2006
  – Council, since 2001
  – Chair, 2004-2005

  Litigation Consulting and Dispute Resolution Services Common Interest Member
  – Steering Committee, since 1990
  – Chair, 2002-2004

  State Economic Damages Section
  – Chair, 1996-1998
  – Member, since 1995

- **Town of Hillsborough**
  – Council Member, 1998-2010
  – Mayor, 2002-2004
  – Commissioner of Finance, 1998-2002; 2004-2010
  – Financial Advisory Committee, since 2011

- **Hillsborough City School District Board of Trustees**
  – Trustee, 1985-1995
  – President, 1986-87; 1993-94

- **Audit Committees**
  – Golden Gate University, Chair, 2005-2008
  – Jesuit School of Theology, Chair, 2004-2011
  – International Display Works, Inc., 2005-2006
  – Solar Power, Inc., Chair, 2006-2010
  – Catholic Charities CYO of the Archdiocese of San Francisco, since 2009

page 1 of 1

## Courses Written and Presented *see page 3 of C.V.*

## Publications *see page 5 of C.V.*

## Trials, Depositions & Arbitrations *see page 6 of C.V.*

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Employment & Education

| | |
|---|---|
| 2012 – Present | **Hemming Morse, LLP** <br> *Certified Public Accountants and Forensic Consultants* <br> Chairperson |
| 1975 – 2011 | **Hemming Morse, Inc.** <br> *Certified Public Accountants* <br> *Litigation and Forensic Consultants* <br> Chairman of the Board, 2001-2011 <br> President, 2001-2009 <br> Director-in-charge of the firm's Litigation and Forensic Consulting Practice, 1975-2006 |
| 1973 – 1975 | **Regan & Skelton, CPAs** <br> Partner |
| 1968 – 1973 | **Peat, Marwick, Mitchell & Co., CPAs** |
| 1979 | **Golden Gate University, San Francisco** <br> M.S. Accounting |
| 1968 | **University of San Francisco** <br> B.S. Accounting (Accounting Specialist) |

## Professional & Service Affiliations

- **Certified Public Accountant, State of California, since 1970**

- **American Institute of Certified Public Accountants, since 1970**
  Certified in Financial Forensics, since 2008

  AICPA Council Member, 2003-2011

  Member, Forensic & Valuation Services Executive Committee, 2008-2011

  Member, Litigation and Dispute Resolution Services Subcommittee, 1998-2001
  – Chair of National Economic Damages Committee, 1999-2001

  National Computer Audit Subcommittee of the Auditing Standards Board, past member

- **Association of Certified Fraud Examiners, since 1996**

page 1 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Professional & Service Affiliations continued

- **California Society of Certified Public Accountants**
  Distinguished Service Award, 2009

  California CPA Education Foundation,
  Board of Trustees, 1997-2003
  – President, 2001-2002
  – First Vice President, 2000-2001
  – Treasurer, 1999-2000

  California Society of Certified Public Accountants,
  Board of Directors, 2001-2006
  – Council, since 2001
  – Chair, 2004-2005
  – First Vice President, 2003-2004

  Litigation Consulting and Dispute Resolution Services
  Common Interest Member
  – Steering Committee, since 1990
  – Chair, 2002-2004
  – Vice President, 2000-2002

  State Economic Damages Section
  – Chair, 1996-1998
  – Member, since 1995

  EDP Committee, past member

  Quality Control Committee, past member

  Litigation Services Conference Chair, 1990

  Advanced Litigation Forum Planning Committee,
  1991-1993; 1995 and 1997
  – Chair in 1993 and 1997

  Computer Show and Conference Chair, 1985

  Economic Damages Conference Planning Committee,
  2000

- **American Arbitration Association's National Panel of Arbitrators, 1983-1996**

- **Western Association of Accounting Firms**
  Audit and Accounting Committee, Chairman,
  1980-1982
  Audit and Accounting Manuals, Editor, 1979-1982

- **CPA Computer Report, Editorial Board, 1984-1987**

- **Board of Trustees, Golden Gate University, 2002-2013**
  Audit Committee member, since 2005
  Audit Committee Chair, 2005-2008

- **Board of Trustees, Jesuit School of Theology at Berkeley, 2002-present**
  Audit Committee member and Chair, 2004-2011

- **International Display Works, Inc.**
  Board of Directors, 2004-2006
  Audit Committee member, 2005-2006

- **Solar Power, Inc.**
  Board of Directors, 2006-2010
  Audit Committee Chair, 2006-2010

- **Catholic Charities CYO of the Archdiocese of San Francisco**
  Board of Directors, 2009-present
  Audit Committee Chair, since 2009

- **Town of Hillsborough**
  Council Member, 1998-2010
  Mayor, 2002-2004
  Vice Mayor, 2000-2002
  Commissioner of Finance, 1998-2002; 2004-2010
  Financial Advisory Committee, since 2011

- **Hillsborough City School District Board of Trustees**
  Trustee, 1985-1995
  President, 1986-87; 1993-94

- **Hillsborough Recreation Commission, 1989-1993; 1998-2010**
  President, 1990-1993

- **Citizen of the Year, 1995**
  Town of Hillsborough, California

page 2 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, LLP**

CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Courses Written and Presented

### AICPA & California Society of CPAs:

- *"Economic Damages: Common Frameworks By Industry & Claim Type"*
  AICPA National Forensic Accounting Conference, Boston, MA, 2010

- *"Fraud Prevention and Detection"*
  California Society of CPAs, Business and Industry Conference, Los Angeles and San Francisco, CA, 2004

- *"Trigon Insurance Co. v. United States"*
  California Society of CPAs, Economic Damages Litigation Section, San Francisco, CA, 2003

- *"Issues Re: Revenue Recognition"*
  California Society of CPAs, Litigation Sections Steering Committee, Burlingame, CA, 2003

- *"Trashing Drafts - A Standard Practice or a Dangerous Proposition?"*
  California Society of CPAs, Advanced Business Litigation Institute, Palm Springs, CA, 2003

- *"Aggressive Accounting & The Games People Play"*
  AICPA Webcast, co-author, NJ, 2003

- *"Mistakes Made in the Work Product"*
  California Society of CPAs, Litigation Services Conference, Irvine, CA, 2002

- *"Complex Litigation/Accounting Malpractice"*
  AICPA National Fraud Conference, Las Vegas, NV, 2002

- *"Enron and Beyond"*
  California Society of CPAs, Financial Statements and Tax Fraud Conference, Los Angeles and San Francisco, CA, 2002

- *"Ethics, Taxes and Financial Reporting"*
  California Society of CPAs, San Francisco, CA, 2002

- *"Expert Disqualifications"*
  California Society of CPAs, Advanced Economic Damages and Business Valuation Conference, Palm Springs, CA, 2001

- *"Financial Statement Fraud"*
  California Society of CPAs, Fraud Conference, San Francisco and Los Angeles, CA, 2000

- *"Quantifying Losses"*
  AICPA National Fraud Conference, Las Vegas, NV, 2000

- *"Electronic Work Product-Discovery Issues"*
  California Society of CPAs, Economic Damages Conference for Business Trial Lawyers & Experts, Los Angeles, CA, 1999

- *"The CPA's Role in Construction Damages"*
  AICPA National Advanced Litigation Conference, Atlanta, GA, 1999

- *"Significant Frauds of our Time"*
  AICPA National Fraud Conference, Las Vegas, NV, 1998

- *"Daubert and the CPA Expert"*
  California Society of CPAs, Advanced Economic Damage Conference, San Francisco, CA, 1998

- *"The Accountant in Fraud Investigations"*
  California Society of CPAs, Fraud Conference, San Francisco and Los Angeles, CA, 1997

- *"Rule 26 Reports," "The Auditor and Fraud," and "Challenging Questions"*
  California Society of CPAs, Advanced Litigation Forum, Palm Springs, CA, 1996

page 3 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Courses Written and Presented continued

- *"Distinguishing Between Litigation and Attest Engagements"*
  California Society of CPAs, Advanced Litigation Forum, San Diego, CA, 1995

- *"Miniscribe Trial Binder"*
  California Society of CPAs, Advanced Litigation Forum, Monterey, CA, 1993; Litigation Consulting Services Committee, Puerto Vallarta, MX, 1993; Litigation Consulting Services Committee, San Francisco, CA, 1994

- *"Lost Profits"*
  California Society of CPAs, Litigation Services Conference, San Francisco and Los Angeles, CA, 1991

- *"Opportunities Update: "A Discussion of Disruption Claims"*
  California Society of CPAs, Litigation Consulting Conference, Los Angeles, CA, 1990

- *"Construction Damages"*
  AICPA, Second Annual Conference on CPA's Role in Litigation Services, Dallas, TX and Washington, DC, 1990

### Selected Others

- *"The Fraud Triangle - Where Were the Gatekeepers"*
  United States District Court, Northern District Historical Society, San Francisco, CA, 2012

- *"Introduction of Financial Forensic Accounting"*
  Golden Gate University, Adjunct Professor, 2009-present

- *"Reporting in Litigation Engagements"*
  *"Wage & Hour Litigation"*
  Golden Gate University, 2009

- *"Intellectual Property Damages"*
  Federal Bureau of Investigation, Quantico, VA, 2001

- *"Alternative Dispute Resolution Techniques and Strategies for the Small and Emerging Contractor"*
  American Bar Association, Fourth Annual Construction Institute, 1995

- *"Fundamentals of Forensic Accounting"*
  Georgetown University, Washington, DC, 1994

- *"Proving and Pricing Delay and Disruption Claims"*
  Andrews Conference - Fourth Annual Construction Litigation Superconference, San Francisco, CA, 1989

- *"The Auditor in Court"*
  State of California, Government Auditors, 1989

- *"Pricing Construction Claims"*
  Thelen, Marrin, Johnson & Bridges, 1988

- *"Dollars and Sense:  Building Your Damages Case & Surviving a Daubert Challenge"*
  San Francisco Trial Lawyers Association, Litigation Practice, San Francisco, CA, 2007

- *"Winning Strategies for the Financial Side of Your Damages Case"*
  Construction Infrastructure Summit, Phoeniz, AZ, 2007

page 4 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Publications

- *"Our Roots Run Deep"*
  California CPA Magazine, August 2004

- *"Expert Witnesses: Do They Have to Keep Draft Reports?"*
  California CPA Magazine, May 2004

- *"Revenue Recognition: Now, Later or Never?"*
  California CPA Magazine, September 2003

- AICPA Litigation Services and Applicable Professional Standards Consulting Services Special Report 03-1 (Contributing author)

- Litigation Services Handbook, *"The Role of the Accountant as Expert Witness,"* published by John Wiley & Sons, Chapter 16, "Litigation Consulting: Construction Claims"

- Litigation Support Report Writing, published by John Wiley & Sons, Chapter 15, "Construction Claims"

- Member of the Editorial Board and author of various articles for the California Society of CPAs' Litigation and Dispute Resolution Services Section's quarterly publication (since summer 1996)

- Outlook Magazine, Winter 1985 - Computer Show and Conference Survey

- *"California CPA Computer Show and Conference,"* CPA Computer Report, September 1985

- *"Direct and Cross Examination of Experts,"* co-author of case study presented by University of California Hastings Litigation Advocacy Program

page 5 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**H E M M I N G
M O R S E, L L P**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Testimony (presented in the last four years)

### *Trial*

- **Duryea v. Froshman Billings & Lewandowski (2014)**
  Superior Court of California, Santa Clara County
  Case No. 1-12-CV-222828

- **Paciocco & Anor v. Australia and New Zealand Banking Group Limited ("ANZ") (2013)**
  Federal Court of Australia No. VID196 of 2013

- **United States of America v. Joseph M. Elles and Joseph Pacifico (2013)**
  U.S. District Court, Northern District of Georgia
  Atlanta Division, Case No. 1:11-CR-445-JEC

- **Livent Inc. Through Its Special Receiver and Manager, Roman Doroniuk and Deloitte & Touche and Deloitte & Touche LLP (2013)**
  Ontario Superior Court of Justice, Canada
  Court File No. 02-CV-225823 CM2

- **John Garamendi, as Insurance Commissioner of the State of California and as Conservator, Rehabilitator, and Liquidator of the Estate of Executive Life Insurance Company v. Altus Finance S.A., et al. (2012)**
  U.S. District Court, Central District of California
  Case No. CV-99-02829 AHM (CWx)

- **Continuous Computing Corporation v. teleSys Software, Inc. (2012)**
  American Arbitration Association
  Case No. 72 117 00006 11 NOLG

- **Marin Healthcare District v. Sutter Health (2012)**
  JAMS, San Francisco, CA, Reference No. 1100065277

- **Plaintiffs v. Carey Limousine LA, Inc., et al. (2012)**
  JAMS, Case No. 1100059356

- **DVD Copy Control Association v. Kaleidescape, Inc. (2011)**
  Superior Court of California, Santa Clara County
  Case No. 1-04-CV-031829

- **Rambus Inc. v. Micron Technology, Inc., et al. (2011)**
  Superior Court of California, San Francisco County
  Case No. 04-431105

- **Francie E. Moeller, et al. v. Taco Bell Corporation (2011)**
  U.S. District Court, Northern District of California,
  San Francisco Division, Case No. C 02-05849 PJH JL

- **Ivana Kirola, Michael Kwok, and Elizabeth Elftman v. The City & County of San Francisco, et al. (2011)**
  U.S. District Court, Northern District of California, San Francisco/Oakland Division, Case No. C07-3685 SBA

- **Grimaud Farms of California, Inc. v. Whole Foods Market California, Inc., et al. (2011)**
  Superior Court of California, San Joaquin County
  Case No. CV030845

- **John Lonberg v. City of Riverside (2011)**
  U.S. District Court, Central District of California, Eastern Division, Case No. ED-CV-97-0237 SGL (AJWx)

page 6 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

HEMMING
MORSE, LLP

CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Testimony continued

### Deposition

- **Honora Keller, et al. v. The Board of Trustees of California State University  (2015)**
  Superior Court of California, County of San Francisco
  Case No. CGC-09-490977

- **Marlene Hopkins, et al. v. Plant Insulation Company, et al. (2014)**
  Superior Court of California, County of San Francisco
  Case No. CGC06450944

- **Brian Behaein, et al. v. Pizza Hut, Inc. (2014)**
  Superior Court of California, County of Los Angeles
  Case No. BC384563

- **Mary K. Jones v. Pfizer Inc., et al. (2014)**
  U.S. District Court, Southern District of New York
  Case No. 10-cv-03864-AKH

- **Duryea v. Froshman Billings & Lewandowski (2014)**
  Superior Court of California, Santa Clara County
  Case No. 1-12-CV-222828

- **In the Matter of LFG Liquidation Trust vs Ernst & Young LLP (2014)**

- **In Re: Lehman Brothers Securities and ERISA Litigation  (2014)**
  U.S. District Court, Southern District of New York
  Case No. 09-md-02017-LAK

- **GSI Technology, Inc. v. Cypress Semiconductor Corporation (2014)**
  U.S. District Court, Northern District of California
  San Jose Division, Case No. 5:11-cv-03613-EJD

- **Crescent Resources Litigation Trust v. Duke Energy Corporation, et al. (2013)**
  U.S. District Court, Western District of Texas
  Austin Division, Case No. A-12-CA-009-SS

- **Robert P. Mosier as Receiver for Private Equity Management Group, Inc., et al. v. Stonefield Josephson, Inc., CPAs, et al. (2013)**
  U.S. District Court, Central District of California
  Case No. 2:11-cv-02666 PSG (Ex)

- **Gigoptix, Inc. v. Optomai, Inc., et al.  (2013)**
  Superior Court of California, Santa Clara County
  Case No. 1-11-CV-199643

- **United States of America v. Joseph M. Elles and Joseph Pacifico (2013)**
  U.S. District Court, Northern District of Georgia
  Atlanta Division, Case No. 1:11-CR-445-JEC

- **Michael Karas v. George S. Karas (2013)**
  American Arbitration Association

- **Sarkissian Mason, Inc. and Automatic, LLC v. Enterprise Holdings, Inc. (2013)**
  U.S. District Court, Southern District of New York
  Case No. 11-CV-09472-PAC

- **In re: Heller Ehrman LLP (2012)**
  U. S. Bankruptcy Court, Northern District of California
  Case No. 08-32514 DM

- **In re: CityCenter Construction and Lien Master Litigation (2012)**
  District Court, Clark County, Nevada
  Case No. A605103

page 7 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**HEMMING MORSE, LLP**
CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Testimony continued

### *Deposition* continued

- **Life Technologies Corporation and Applied Biosystems, LLC v. Biosearch Technologies, Inc. (2012)**
  U.S. District Court, Eastern Division of Texas
  Marshall Division, Case No. 3:12-CV-00852-WHA

- **Ramon Gomez v. Pizza Hut of Southeast Kansas, Inc. (2012)**
  Superior Court of California, County of San Bernardino
  Case No. CIVVS900679

- **Securities and Exchange Commission v. Peter R. Morales, Betsy D. Scolnik, and Adriana J. Kampfner (2012)**
  U.S. District Court, Southern District of New York
  Case No. 06 CIV 2435 (RJH)

- **Ron Block, et al. v. Daniel Helix, et al. (2012)**
  Superior Court of California, County of Contra Costa
  Case No. CIV MSC 05-01725

- **Chinatown Community Development Center v. Tower Hotel Partners, Ltd, et al. (2012)**
  Superior Court of California, City & County of San Francisco, Case No. CGC-10-501798

- **SIPCO, LLC v. ADT Security Services, Inc. (2011)**
  U.S. District Court, Southern District of Florida, West Palm Beach Division, Case No. 11-cv-80521-DMM

- **DVD Copy Control Association v. Kaleidescape, Inc. (2011)**
  Superior Court of California, Santa Clara County
  Case No. 1-04-CV-031829

- **Constar International Inc. Securities Litigation (2011)**
  U.S. District Court, Eastern Division of Pennsylvania
  Case No. 03CV05020

- **Philip F. Otto v. Schilling Robotics, Inc. (2011)**
  JAMS, San Francisco, Case No. 1100065090

- **Wilfredo Aguilar, et al. v. Carey Limousine LA, Inc., et al. (2011)**
  JAMS, Los Angeles Superior Court
  Case No. 1100059356

- **Brian Gilmer, et al. v. Alameda-Contra Costa Transit District (2011)**
  U.S. District Court, Northern District of California
  Case No. C 08-05186 CW

- **Novatel Wireless Securities Litigation (2011)**
  U.S. District Court, Southern District of California
  Case No. 08-CV-01689-H (RBB)

- **Grimaud Farms of California, Inc. v. Whole Foods Market California, Inc., et al. (2011)**
  Superior Court of California, San Joaquin County
  Case No. CV030845

- **Silverman v. Motorola, Inc., et al. (2011)**
  U.S. District Court, Northern District of Illinois
  Eastern Division, Case No. 1:07-cv-04507

page 8 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

**H E M M I N G**
**M O R S E, L L P**

CERTIFIED PUBLIC ACCOUNTANTS
AND FORENSIC CONSULTANTS

CURRICULUM VITAE

www.hemming.com

# D. Paul Regan, CPA/CFF, CFE

## Testimony continued

### Arbitration

- In the Matter of LFG Liquidation Trust v. Ernst & Young LLP (2014)

- Eastham Capital Appreciation Fund LP, et al. v. KPMG LLP et al. (2013)
  Confidential Pursuant to CPR Arbitration Rule 18

- In the matter of SB Liquidation Trust v. Ernst & Young LLP (2012)

- Philip F. Otto v. Schilling Robotics, Inc. (2011)
  JAMS, San Francisco, Case No. 1100065090

page 9 of 9

**San Mateo Office**
155 Bovet Road
Suite 600
San Mateo, CA 94402
Tel: 415.836.4000
Fax: 415.777.2062

CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 27, 2015.

s/ DANIEL S. DROSMAN
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dand@rgrdlaw.com

1024407_1

# Mailing Information for a Case 2:12-cv-00555-DGC Smilovits v. First Solar Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George C Aguilar**
  gaguilar@robbinsarroyo.com,notice@robbinsarroyo.com

- **Kathryn B Allen**
  kallen@kmllp.com

- **Darryl J Alvarado**
  Dalvarado@rgrdlaw.com

- **Stephen Richard Basser**
  sbasser@barrack.com

- **James P Bennett**
  JBennett@mofo.com,KMarttila@mofo.com

- **Philip T Besirof**
  pbesirof@mofo.com,mblackmer@mofo.com,rbarajas@mofo.com

- **Maureen Beyers**
  mbeyers@omlaw.com,ppalmer@omlaw.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com

- **Luke Brooks**
  lukeb@rgrdlaw.com

- **Lonnie A Browne**
  LBrowne@rgrdlaw.com

- **Jennifer N Caringal**
  Jcaringal@rgrdlaw.com

- **Keith Michael Cochran**
  kcochran@cfsblaw.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com,mzehel@pomlaw.com

- **Jonathan Adam Dessaules**
  jdessaules@dessauleslaw.com,hpeters@dessauleslaw.com,jpitchel@dessauleslaw.com

- **Michael J Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel S Drosman**
  dand@rgrdlaw.com,karenc@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Jordan Eth**
  jeth@mofo.com,adavis@mofo.com,jrahman@mofo.com

- **Paul Flum**
  PaulFlum@mofo.com,TLee@mofo.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark Ryan Scott Foster**
  mfoster@mofo.com,lroiz@mofo.com

- **Andrew S Friedman**
  afriedman@bffb.com,paquilino@bffb.com,rcreech@bffb.com

- **Jeffrey Dale Gardner**
  jgardner@jsslaw.com,eblackmountain@jsslaw.com

- **Richard W Gonnello**
  rgonnello@faruqilaw.com,msullivan@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Bryan Jens Gottfredson**
  Bryan.Gottfredson@sackstierney.com

- **Salvatore Jo Graziano**
  salvatore@blbglaw.com,errol.hall@blbglaw.com

- **Tor Gronborg**
  Torg@rgrdlaw.com

- **Joseph P Guglielmo**
  jguglielmo@scott-scott.com

- **Kevin Richard Hanger**
  khanger@bffb.com,tdinardo@bffb.com,rcreech@bffb.com

- **Eugene G Illovsky**
  eillovsky@mofo.com

- **Craig Kennedy**
  mbeyers@omlaw.com

- **Jennifer Lynn Kroll**
  jkroll@martinbonnett.com

- **Cody R LeJeune**
  clejeune@rgrdlaw.com

- **Jeffrey S Leonard**
  jeffrey.leonard@sackstierney.com,kelly.sharpe@sackstierney.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Peter S Linden**
  plinden@kmllp.com

- **Judson E Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Susan Joan Martin**
  smartin@martinbonnett.com,tmahabir@martinbonnett.com,mblawfirm@aol.com

- **Michael Craig McKay**
  mmckay@schneiderwallace.com,efilings@schneiderwallace.com

- **Danielle S Myers**
  danim@rgrdlaw.com

- **Patrick Powers**
  patrick@powerstaylor.com,sarah@powerstaylor.com

- **Ira Michael Press**
  ipress@kmllp.com

- **Jay N Razzouk**
  jrazzouk@robbinsarroyo.com,notice@robbinsarroyo.com

- **Brian J Robbins**
  brobbins@robbinsarroyo.com,rsalazar@robbinsarroyo.com,notice@robbinsarroyo.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Hart Lawrence Robinovitch**
  AZDocketing@zimmreed.com,stacy.bethea@zimmreed.com,Hart.Robinovitch@zimmreed.com

- **Joseph Nathaniel Roth**
  jroth@omlaw.com,bwendt@omlaw.com

- **David R Scott**
  drscott@scott-scott.com,efile@scott-scott.com

- **Mark Solomon**
  marks@rgrdlaw.com

- **Christopher Dennis Stewart**
  CStewart@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Edward M Varga , III**
  evarga@kmllp.com

- **Samuel M Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Anna Erickson White**
  awhite@mofo.com,rwebb@mofo.com,avickery@mofo.com

- **Garrett Webster Wotkyns**
  gwotkyns@schneiderwallace.com,efilings@schneiderwallace.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)