UNITED STATES DISTRICT COURT

DISCTRICT OF ARIZONA

| | | |
|---|---|---|
| Mark Smilovits, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. CV-12-00555-PHX-DGC |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| First Solar, Inc., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

DECLARATION OF BJORN I. STEINHOLT, CFA

CONFIDENTIAL

April 27, 2015

**Table of Contents**

I.      INTRODUCTION AND QUALIFICATIONS ...................................................................1

II.     OVERVIEW OF ASSIGNMENT ..................................................................................2

III.    COMPANY BACKGROUND ........................................................................................4

IV.     PLAINTIFFS' ALLEGATIONS .....................................................................................5

V.      LOSS CAUSATION FRAMEWORK............................................................................9

        A.    Materiality of the Alleged Truth Concealed by the Misrepresentations................12

        B.    Price Impact from the Disclosures of the Alleged Truth .......................................14

VI.     DISCLOSURES OF THE ALLEGED TRUTH.............................................................17

        A.    July 29, 2010:  First Solar 2Q2010 Announcement...............................................17

        B.    February 24, 2011:  First Solar 4Q2010 Announcement.......................................21

        C.    May 3, 2011:  First Solar 1Q2011 Announcement................................................24

        D.    October 25, 2011:  CEO Robert Gillette Terminated ............................................26

        E.    December 14, 2011:  First Solar Updates Guidance..............................................29

        F.    February 28, 2012:  First Solar 4Q2011 Announcement.......................................30

VII.    CONCLUSION.............................................................................................................41

## I.   INTRODUCTION AND QUALIFICATIONS

1.   I am a Managing Director at Caliber Advisors, Inc. (Caliber), a full-service valuation and economic consulting firm with offices in San Diego, California; Chicago, Illinois; and Washington D.C.  Prior to Caliber, I was a founding Principal of Financial Markets Analysis (FMA), an economic consulting, valuation and litigation support firm focusing on securities litigation consulting.  Prior to FMA, I was a Vice President and then Principal at Business Valuation Services (BVS), a national full-service financial valuation firm that was part of publicly traded CBIZ, Inc. (NYSE: CBIZ).  Prior to BVS, I was a Financial Analyst, Vice President and Senior Vice President in the San Diego office of Princeton Venture Research, Inc. (PVR), a national investment banking, venture capital and litigation support firm.  Prior to PVR, I was a Graduate Fellow performing investment research at the University of San Diego.

2.   I have approximately 25 years of experience providing capital markets consulting, including analyzing and valuing investments.  Over the past 10 years, I have been retained on numerous occasions to provide expert opinions relating to market efficiency, materiality, loss causation and damages in large and complex securities class actions similar to this litigation.  In *China Intelligent Lighting and Electronics, Inc.*, No. 11-cv-02768 (C.D. Cal.), the Court entered its judgment based on my aggregate damages estimate.  In *Jaffe v. Household Intl Inc, et al.*, No. 02-cv-05893 (N.D. Ill.), the Court adopted my guidance and applied the prime rate when calculating pre-judgment interest for its final judgment.  In *Novatel Wireless Sec. Litig.*, No. 08-cv-01689 (S.D. Cal.), the Court undertook a rigorous *Daubert* analysis of every element of my comprehensive loss causation and damages methodology, concluding that all of my testimony was admissible.  Other Courts have similarly found my testimony admissible, including in *New England Health, et al v. Qwest Comm Intl Inc, et al.*, No. 01-cv-01451 (D. Col.), *Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.*, No. 99-CV-399

- 1 -

(D. Ariz.), *Nursing Home Pension Fund et al v. Oracle Corporation et al.*, No. 01-cv-00988 (N.D Cal.) and *Carson, et al v. Neopharm Inc, et al.*, No. 02-cv-02976 (N.D. Ill.).  Furthermore, several other Courts have cited my testimony in support of their own decisions, including in *Healthsouth Corp. Sec. Litig.*, No. 03-cv-01501 (N.D. Ala.), *Luman v. Anderson, et al.*, No. 08-cv-00514 (W.D. Mo.), *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 08-CV-7508 (S.D. NY) and *IBEW Local 98 Pension Fund, et al. v. Best Buy Co., Inc., et al.*, No. 11-cv-00429 (D. Minn.).  On May 3, 2013, I filed a declaration in support of Plaintiffs' Class certification motion in this case, which was considered by this Court prior to issuing its Order granting class certification on October 8, 2013 ("Class Cert. Order").

3.    I received a Master of International Business degree from the University of San Diego and a Bachelor of Science degree in Computer Science and Engineering from California State University, Long Beach.  I have also earned the professional designation Chartered Financial Analyst awarded by the CFA Institute.

4.    A summary of my background and qualifications is attached as Exhibit 1 to this declaration.

5.    The compensation for the work performed in this matter is based on the number of hours worked times each analyst's billable rate.  My billable rate is currently $475 per hour. My compensation is not contingent on the outcome of this case.

## II.    OVERVIEW OF ASSIGNMENT

6.    Plaintiffs' counsel has requested that I analyze and discuss certain economic issues relating to materiality, loss caution and damages for the common stock of First Solar, Inc. ("First Solar" or the "Company") purchased from April 30, 2008 through February 28, 2012, inclusive (the "Class Period").  Specifically, I have been asked to review Defendants' Motion

For Summary Judgment in this case, and their assertion that the evidence in this case does not support a finding of loss causation.

7.    My opinions in this matter are based on my professional experience, as well as my review of a substantial amount of information, including: (a) First Amended Complaint for Violation of the Federal Securities Laws, dated August 17, 2012 ("Complaint"); (b) Class Cert. Order; (c) Lead Plaintiffs' Response to Defendant Michael Ahearn's First Set of Interrogatories, dated March 13, 2015 ("Plaintiffs' Response"); (d) Defendants' Motion For Summary Judgment, filed on March 27, 2015 ("Defendants' Motion"); (e) Plaintiffs' Opposition To Defendants' Motion For Summary Judgment, filed on April 27, 2015 ("Plaintiffs' Opposition"); (f) Declaration of Paul A. Gompers, Ph. D., dated May 24, 2013 ("Gompers Decl."); (g) Public filings by First Solar with the United States Securities and Exchange Commission ("SEC") on Forms 10-K, 10-Q, 8-K, 4, Schedule 13G, Registration Statements and Proxy Statements during 2008, 2009, 2010, 2011 and 2012; (h) Company press releases and conference call transcripts with accompanying slide presentations; (i) Securities analyst reports regarding First Solar and its industry; (j) Contemporaneous media reports regarding First Solar and its industry; (k) Price and volume data for First Solar common stock, market and industry indices, as well as other market data from Bloomberg; (l) Internal documents referenced in Plaintiffs' Response, Plaintiffs' Opposition, as well as the internal documents referenced the text, or in footnotes to the text, of this declaration; and (m) Articles, court decisions and other relevant information cited in the text, or in footnotes to the text, of this declaration.

8.    Based on this evidence, and for the reasons explained in greater detail below, it is my opinion that Defendants' Motion ignores key evidence demonstrating that the alleged fraud did cause Class members to suffer economic losses (*i.e.*, damages).  Specifically, Plaintiffs have identified several dates in this case when the alleged truth was publicly disclosed, discussed

separately below.  My analysis demonstrates that following each of these disclosures, First Solar's stock price declined in a statistically significant manner, *i.e.*, the stock price decline was not explained by market or industry factors.  Ex. 2.  These results are corroborated by Defendants' expert's own analysis at Class certification.[1]  Also, for the reasons explained below, it is my opinion that the partial disclosures of the alleged truth: (a) explains all, or at least a substantial portion, of First Solar's July 29, 2010, February 25, 2011, February 29, 2012 and March 1, 2012, stock price declines; and (b) contributed to First Solar's May 4, 2011 and December 14, 2011, stock price declines.  In addition, it is my opinion that the unexpected termination of Defendant Robert Gillette caused First Solar's October 25, 2011 price decline, and mitigated subsequent price declines related to the alleged truth.  The above means that if the alleged truth had been disclosed earlier, then First Solar's stock price also would have declined earlier.  Consequently, Class members who overpaid for their shares during periods when the alleged truth was fraudulently concealed suffered economic losses if they continued to own the shares at the time the alleged truth eventually was disclosed, and First Solar's stock price declined as a result.

9.      This report is based on the evidence I have reviewed to date.  I understand that discovery is still ongoing and that additional information may become available.  As a result, I may modify my conclusions based on such additional evidence.

## III.    COMPANY BACKGROUND

10.      First Solar is one of the world's largest manufacturers of photovoltaic (PV) solar modules.  The Company uses an advanced cadmium telluride (CdTe) thin-film semiconductor technology that was believed to have certain cost advantages over conventional solar cells made

---

[1]      *See* Gompers Decl., Exhibit 4, attached hereto as Ex. 3.

of crystalline silicon.  On November 16, 2006, the Company went public and its shares started to trade on The Nasdaq Global Market under the ticker symbol "FSLR."

11.    The Company operates in two business segments: (a) the components segment, and (b) the systems segment.  The components segment involves the design, manufacture, and sale of the Company's solar modules to project developers, system integrators, and operators of renewable energy projects.  The components segment is highly competitive.  During 2011, there were more than 150 manufacturers of solar modules and cells.  The systems segment involves providing complete solar power system solutions using the Company's solar modules, including project development, EPC services (engineering, procurement, and construction), O&M services (operating and maintenance) when needed, and project finance if required.  During the Class Period, First Solar shifted its focus from selling modules in subsidized markets to selling utility-scale PV systems in sustainable markets around the world, generally in hot climates.  This shift is reflected in the table below.

| Net Sales (By Segment) | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| | Dec. 27, 2008 | Dec. 26, 2009 | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 |
| Components | $1,195,803 | $1,965,437 | $2,284,646 | $1,941,583 | $1,185,958 |
| Systems | $50,498 | $100,763 | $278,869 | $824,624 | $2,182,587 |
| Total | $1,246,301 | $2,066,200 | $2,563,515 | $2,766,207 | $3,368,545 |
| Components | 95.95% | 95.12% | 89.12% | 70.19% | 35.21% |
| Systems | 4.05% | 4.88% | 10.88% | 29.81% | 64.79% |

Source: First Solar Forms 10-K for fiscal years 2009, 2010, 2011 and 2012.

## IV.    PLAINTIFFS' ALLEGATIONS

12.    For the purpose of my analysis, I have assumed that Plaintiffs will be able to prove their factual allegations.[2]   Generally, it is my understanding that Plaintiffs allege that

---

[2]    This is consistent with the traditional role of a damages expert.  *Reference Manual on Scientific Evidence: Reference Guide on Estimation of Economic Damages*, 3rd. ed. at 432.  ("In

Defendants made numerous statements that were false and misleading because they omitted to disclose certain known performance problems with the Company's solar modules. These product performance problems can largely be divided into two separate issues: (a) a "manufacturing excursion" whereby some of First Solar's modules experienced premature power loss, the so-called low power modules ("LPM"); and (b) a heat degradation issue whereby First Solar's modules were subject to greater than disclosed failure rates when installed in hot climates. Below is a more detailed summary of my understanding regarding Plaintiffs' allegations.

13.     Plaintiffs allege that, from the start of the Class Period, Defendants were aware of, but concealed, premature module degradation. According to First Solar's own public statements, by June of 2009, the Company had identified and mitigated the problem of premature power loss as a result of "manufacturing excursion" that took place from June 2008 to June 2009, *i.e.*, the LPM problem. *Infra*, ¶35. Early in the Class Period, ███████████████████████

████████████████████████████████    Ex. 4, at FSLR01112439.  ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████    Ex. 5, at FSLR00223597. According to Plaintiffs' allegations, despite being aware of the significance of the LPM problem, Defendants decided to fraudulently conceal

---

almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that it was unlawful.")

that they even had an LPM problem from investors until its first partial disclosure on July 29, 2010.[3]

14.    In July of 2010, the Company discussed internally ███████████████

████████████████████████████████████████████████████████████

█████████████    Ex. 8, at FSLR01128612.  Although the LPM issue was discussed on the July 29, 2010, conference call, Plaintiffs' allege that Defendants: (a) significantly understated total LPM related costs, "estimating" it at $27.4 million,[4] (b) falsely claimed that the LPM problem was limited to "less than 4%" of the modules produced during the period June 2008 to June 2009 – or only 400,000 modules (30MW), *Infra.* ¶35, and (c) failed to fully disclose the impact of the LPM problem on the Company's revenues resulting from the module replacement program and tarnished reputation relating to product quality.[5]    Consequently, according to Plaintiffs' allegations, First Solar's July 29, 2010, disclosure was a partial disclosure that provided a distorted portrayal of the full extent of the LPM problem.

15.    Plaintiffs also allege that First Solar fraudulently concealed that the Company had a degradation problem with their modules in hot climates.  Ex. 10, at FSLR00333208.  In order to satisfy customers, the Company frequently ████████████████████████████

---

[3]    ██████████████████████████████████████████████████    Ex. 6, at SOHN00001006; Ex. 7, at FSLR02345165.

[4]    At the end of the Class Period, the Company reported that it had "expensed $215.7 million total to-date for the estimated costs of remediating systems affected by modules manufactured during the relevant period," and that there could be "additional costs related to our voluntary remediation program of up to approximately $44 million."    First Solar 2011 Form 10-K, at 19.

[5]    First Solar did not explicitly address the number of lost sales caused by the LPM problem on the July 29, 2010 conference call.  However, internally ██████████████████ ████████████████████████████    Ex. 9, at JAM0023962.

███████████████████████████████████.[6]    There was a direct relationship between heat degradation and revenues. Ex. 12, at FSLR01140661.  The heat degradation issue impacted the Company's ability to push sales in certain hot regions, because, among other things, ██████████████████████████ Ex. 13, at FSLR01096345.  On May 3, 2011, the Company ████████████████████████████████████████████

████████████████████████████████████████████████

█████  Ex. 14, at FSLR01981995.  At the end of the Class Period, the Company discussed the heat degradation issue publicly for the first time, including the related $37.8 million in its warranty reserve, and increasing the warranty rate by 1 percent (or about $0.01 to its manufacturing cost per watt) going forward. *Infra*, ¶72.

16.    Based on my review of the Complaint and Plaintiffs' Opposition, and discussions with Plaintiffs' counsel as to what they will be able to prove at trial, it is my understanding that the alleged truth relating to the LPM and heat degradation issues was gradually disclosed on the following dates:

- July 29, 2010:  The Company disclosed that it had accrued $27.4 million in expenses associated with the LPM issue ($23.4 million in 2Q2010 alone), and that it was reducing its 2010 revenue guidance by $100 million (consistent with internal analysis showing that LPM would result in $99 million in lost sales).

- February 24, 2011: The Company disclosed $8.5 million in further costs associated with the LPM issue, and reported lower than expected sales in Q42010 as a result of the module replacement program.

- May 3, 2011:  Despite reporting 1Q2011 revenues and earnings above expectations, the Company merely maintained its 2011 revenue and earnings guidance, and reduced its 2011 guidance for operating income and operating cash flow.  The new 2011 guidance included a $0.20 per share reduction in earnings due to the heat degradation problem.  The Company also indicated that ASP

---

[6]    *See*, for example, e-mail from Samantha Sloan:  █████████████████
██████████████████████████████    Ex. 11, at FSLR01041850.

(Average Selling Prices) were coming under pressure, another issue related to the alleged product quality problems. Finally, the Company disclosed $4.5 million in further costs associated with the LPM issue.

- October 25, 2011: The Company unexpectedly terminated CEO Robert Gillette, an event that signaled to investors that there likely would be negative Company specific news to come.

- December 14, 2011: The Company reduced its 2011 guidance, partly as a result of the LPM issue, and introduced 2012 earnings guidance below expectations as a result of the heat degradation issue.

- February 28-29, 2012: The Company disclosed warranty and costs in excess of normal warranty expense for 4Q2011 of $1.67 per share, revealed possible future LPM costs of $44 million, and wrote down module inventory by $13.8 million, all related to the LPM and heat degradation issues. In addition, the Company increased the warranty accrual rate by 1 percent going forward as a result of the heat degradation issue.

17.    For an additional summary of Plaintiffs' allegations, *see* the Complaint and Plaintiffs' Opposition.

## V.    LOSS CAUSATION FRAMEWORK

18.    Loss causation relates to whether the alleged fraudulent act or omission "caused the loss for which plaintiffs seeks to recover damages."[7] In 2005, in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court considered the issue of loss causation in securities cases. The *Dura* opinion stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."[8] Instead, loss causation is established when the "relevant truth begins to leak out," and the stock price declines as a result.[9] The "relevant truth" is generally considered to be

---

[7]    Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4.

[8]    *Dura*, 544 U.S. at 342.

[9]    *Id*.

the truth allegedly omitted or concealed by the misrepresentation.  As one court explained, "to establish loss causation this disclosed information must reflect part of the 'relevant truth' – the truth obscured by the fraudulent statements."[10]  While loss causation is a legal concept, below I will discuss the framework generally used by experts to analyze loss causation from an economic point of view.

19.     In order to analyze loss causation, it is necessary to understand the various elements of the alleged fraudulent conduct.  Generally, as in this case, plaintiffs allege that defendants made certain misrepresentations that concealed an undisclosed, material truth (including the foreseeable economic consequences that flow from this material truth).  The misrepresentations are deemed to be material if they, and their concealment of the alleged or relevant truth, would have been considered important by reasonable investors making investment decisions.  Material misrepresentations artificially inflate the stock price and, thereby, cause public investors to overpay for their shares, *i.e.*, the price paid for the shares exceeds their true value.  The artificial stock price inflation is then reduced or eliminated as information reflecting the alleged truth concealed by the fraud (including the foreseeable economic consequences thereof) is revealed, thereby causing economic losses to public investors who overpaid for their shares and now are unable to recover this overpayment by selling the shares.  Importantly, the resulting economic losses are losses that would not have occurred had the alleged truth not been fraudulently concealed, as alleged by plaintiffs.[11]

---

[10]     *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, No. 07-11303 c/w 08-10071, 2009 U.S. App. LEXIS 13280, at *21 (5th Cir. June 19, 2009).

[11]     From an economic point of view, a loss caused by fraud-related factors is the difference between an investor's: (a) actual loss, less (b) loss that still would have been incurred even in the absence of the alleged fraudulent conduct.  This is the same economic principle used in event studies when calculating the abnormal returns, discussed below, to quantify the impact of an event.

20.    I will note that Defendants' Motion suggests that the decline in First Solar's stock can be explained by market and industry factors, including: (a) end of subsidized feed-in tariff markets, (b) the global financial crisis, (c) European government austerity programs, (d) the precipitous decline in the price of silicon, and (e) the massive influx of competition from China. Defendants' Motion, at 1, 38, fn 28. It is true that market and industry factors did negatively impact First Solar's stock price during the Class Period. However, these are not the price declines that Plaintiffs seek to recover damages for. First, Plaintiffs only seek to recover damages for specific price declines following disclosures of the alleged truth, thereby conservatively assuming that all other price declines are not fraud related. Second, even for each of the disclosures of the alleged truth, an event study is used to control for market and industry factors. In this case, as discussed below, each of the relevant disclosures of the alleged truth was followed by statistically significant price declines (*i.e.*, the price decline was not explained by market and industry factors), results that are confirmed by Defendants' expert's own event study submitted at Class certification. Ex. 2, Ex. 3. Of course, this evidence, by itself, does not mean that the entire Company-specific price decline following each of the disclosures of the alleged truth can necessarily be attributable to Plaintiffs' allegations, as discussed in greater detail below. However, for the reasons discussed below, a substantial portion of these price declines were caused by disclosures of the alleged truth, and not by market factors, industry factors, or other Company-specific factors unrelated to the alleged fraud.

21.    Below, I will discuss two related loss causation issues: (a) materiality of the information allegedly concealed by the misrepresentations (*i.e.*, the alleged truth), which generally implies that the stock price traded at inflated prices, and (b) price impact from the disclosure of the alleged truth, which is direct evidence demonstrating loss causation.

- 11 -

A.      **Materiality of the Alleged Truth Concealed by the Misrepresentations**

22.      Material information is often defined as information that a reasonable investor would want to consider prior to making an investment decision.  In *Basic*, the Supreme Court quoted *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), which stated that a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision or if it would have "significantly altered the 'total mix' of information made available" to the shareholder.[12]  The issues that are important to investors, *i.e.*, the information that reasonable investors would want to consider prior to making an investment decision, are usually factors that impact the value of an investment.

23.      From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of such cash flows.[13]  Securities analysts typically analyze factors that impact a company's revenues and expenses to forecast that company's earnings power and cash flows.  Information that impacts a company's cash flows is sometimes called value-relevant information because it also impacts the company's value, and thereby also the value of the company's common stock which represents a residual ownership interest in the company.

24.      For technology companies, such as First Solar, product quality is of critical importance.  As noted in a February 29, 2012, Credit Suisse analyst report: ". . . product quality in our view is THE MOST SIGNIFICANT metric for a solar companies' long-term survivability."  Ex. 15.  Inferior products generally result in loss of sales to competitors or sales that occur at lower prices, both negatively impacting revenues.  The performance problems

---

[12]      *Basic*, 485 U.S. at 231-32 (quoting *TSC*, 426 U.S. at 449).

[13]      Brealy, Myers & Allen, *Principles of Corporate Finance: Chapter 4 - The Value of Common Stocks*, 11th ed., McGraw-Hill (2013).

relating to First Solar's modules resulted in reduced sales, and also increased warranty costs and other expenses. In July 2010, the Company internally ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 16, at AHRN00000036. In April 2011, the Company internally █████████████████████ ████████████████████████████████ Ex. 14, at FSLR01981995. At the time, the Company's stock traded at more than a 13 times multiple to 2011 earnings, translating the $0.20 per share impact into an implied reduction in value of █████ per share. *Infra*, ¶49, fn 24. Throughout 2011, the Company's revenues were significantly impacted by derating, which negatively impacted the Company's revenues, and allegedly caused the Company to significantly reduce its 2012 earnings guidance on December 14, 2011. In February 2012, the Company reported warranty and costs in excess of normal warranty expense (almost all related to LPM and heat degradation) of $2.13 per share, or more than 35% of First Solar's non-GAAP earnings of $6.01 per share for 2011. *Infra*, ¶62, Ex. 64. In addition, the Company disclosed that there could be $44 million additional warranty costs related to LPM in the future, that it was writing down module inventory by $13.8 million as a result of the LPM remediation, and that it was increasing the warranty accrual rate as a result of the heat degradation issue by 1 percent. *Infra*, ¶72. Based on the above, in my opinion, the information Plaintiffs allege was fraudulently concealed clearly was value-relevant, and, therefore, would be information that a reasonable investor would have wanted to consider prior to making an investment decision regarding First Solar.

25.     Another test of materiality of an alleged fraud is to perform an event study to determine whether the disclosure of the alleged truth impacted the stock price. If the information

- 13 -

impacted the stock price, then the information, by definition, was material.  Below I will discuss the event study methodology.

**B.    Price Impact from the Disclosures of the Alleged Truth**

26.    In an efficient market, securities prices quickly incorporate new, material information.[14]  Consequently, the price movement following a disclosure of new information can be analyzed to: (a) assess statistical significance; and (b) quantify the portion of the price movement not explained by market and industry factors, *i.e.*, the company-specific portion of the price movement.[15]  This analysis is generally performed using the event study methodology.  The event study methodology generally involves the following steps: define the event(s); adjust for market and/or industry factors; select control period(s); calculate predicted returns, abnormal returns and t-statistics; and interpret results.[16]

27.    Step #1: Define the Event.  The first step in the event analysis generally involves defining the event or events.  In a loss causation context, generally, the relevant events are those when the alleged truth is revealed.  Specifically, we want to test to see whether the disclosure of the alleged truth previously concealed impacted the stock price.  Plaintiffs identify six events when the alleged truth was partially revealed, causing Class members to suffer damages:

(a)    July 29, 2010: 2Q2010 Announcement (after market close);

---

[14]    For a more comprehensive discussion on market efficiency, *see* Steinholt Declaration, dated May 3, 2013.

[15]    A statistically significant price movement is one that is unlikely to have occurred simply by chance, and is therefore a price movement likely caused by the event.

[16]    For a more detailed explanation of the event study methodology, *see* John Campbell, Andrew Lo & Craig MacKinley, *The Econometrics of Financial Markets*, Chapter 4, Princeton University Press, 151 (2007); and Mark Mitchell & Jeffry Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *49 Bus. Law* 545, (Feb. 1994).

(b)    February 24, 2011: 4Q2010 Announcement (after market close);

(c)    May 3, 2011: 1Q2011 Announcement (after market close);

(d)    October 25, 2011: Termination of CEO Rob Gillette;

(e)    December 14, 2011: New 2011 and 2012 Guidance; and,

(f)    February 28, 2012 and February 29, 2012: 4Q2011 Announcement (after market close on February 28), and Form 10-K for 2011 (filed after market close on February 29).

28.    Step #2: Adjust For Market and/or Industry Factors.  The second step involves selecting market and/or industry indices used to control for market and industry factors. Consistent with the Company's public filings, I selected the S&P 500 Index as First Solar's market index and an equally weighted industry index based on the following peer group companies: Canadian Solar, Inc., Hanwha SolarOne, SunPower, Suntech Power, Trina Solar, and Yingli Green Energy.[17]  These two indices were also used by Defendants' expert at Class certification. Ex. 3.

29.    Step #3: Select a Control Period.  The third step involves selecting a control period with normal price returns unaffected by the events examined, to determine the normal historical statistical relationship between First Solar's price returns and that of the market and peer group index.  In this case, I used the 252 day (approximately one-year) period prior to each event as the control period, excluding days that potentially could have revealed the alleged fraud.[18]  Defendants' expert at Class certification also used 252 days prior to each event, but

---

[17]    First Solar 2011 Form 10-K, at 33.  SolarWorld is also listed by the Company as a peer group company, but excluded due to limited trading data.  Defendants' expert at Class certification also excluded SolarWorld from his industry index.  Ex. 3.

[18]    Analyzing the potential impact of an alleged fraud is different than analyzing the impact of new and material information (fraud-related or not) in the context of market efficiency, and requires that all fraud-related events be excluded (as best as possible) from the control period. The fraud-related price declines excluded were those impacted by the 2Q2010, 3Q2010, 4Q2010,

excluded more days than I do.  Consequently, there are some small differences between the two sets of results, but these differences are not material for the specific days I am focusing on.

30.    Step #4: Calculate Predicted Returns, Abnormal Returns and T-Statistics.  The fourth step involves using the regression equation discussed above to calculate First Solar's predicted returns for each day analyzed.  The difference between First Solar's actual return and its predicted return is the abnormal return, *i.e.*, First Solar's return net of market and industry factors.  Statistical significance was then assessed by calculating the t-statistic (abnormal return divided by the standard error during the control period).  The magnitude of the t-statistic was used to assess statistical significance, *i.e.*, the likelihood of the price return occurring simply by chance.  More specifically, the t-statistic translates into a p-value, or probability that a price movement of equal or greater magnitude would occur randomly.

31.    Step #5: Interpret Results.  Finally, the fifth step involves interpreting the regression results for the events analyzed.  The event study methodology provides an objective way to estimate the portion of a price movement not explained by market and industry factors, *i.e.*, explained by Company-specific factors, known as the abnormal return.  It also provides an objective way to assess statistical significance by comparing the abnormal return to the returns during the control period.  For example, if the abnormal return is greater than 95% of the price returns in a random sample (return during the control period), it is defined as being statistically significant at the 5% level (p-value < 5%).  While different experts may use slightly different indices and control periods, using the steps listed above generally ensures that the statistical

1Q2011, 2Q2011, 3Q2011 and 4Q2011 earnings announcements, including the more detailed SEC filings of these results on Forms 10-Q and 10-K.  In addition, I also excluded: (a) October 25, 2011, when First Solar announced the termination of Defendant Robert Gillette, and (b) December 14, 2011, when First Solar provided new 2011 and 2012 guidance.

results from different experts remain reasonably similar.  In this case, my event study results are corroborated by the analysis conducted by Defendants' expert at Class certification.

32.    Based on the event analyses described above, I found that all of the specific events analyzed were followed by statistically significant price movements at the 5% level (i.e., p-value < 5%).[19]  Ex. 2.  This is consistent with the findings of Defendants' expert at Class certification.  Ex. 3.

## VI.    DISCLOSURES OF THE ALLEGED TRUTH

33.    A key part of examining the issue of loss causation is to analyze the actual stock price reaction, if any, as a result of the disclosure of the alleged truth.  The alleged truth relates to the information plaintiffs allege defendants fraudulently concealed during the class period, including the foreseeable economic consequences thereof.  Below is my review and analysis of the key disclosures of the alleged truth.

### A.    July 29, 2010:  First Solar 2Q2010 Announcement

34.    On July 29, 2010, after the market had closed, First Solar announced 2Q2010 earnings of $1.84 per share on revenues of $588 million, beating Bloomberg consensus estimates of $1.63 per share and $546 million, respectively.[20]  Ex. 18.  The Company also reduced its

---

[19]    In this case, it does not matter if the statistical test is performed on a one-tail basis (requiring |t-statistic| ≥ 1.645) or a two-tail basis (requiring |t-statistic| ≥ 1.96).

[20]    For the purpose of this declaration, I will generally use the *Bloomberg* consensus estimates as an indication of how a particular result compared to expectations.  However, there were other consensus estimates from other sources as well, and sometimes these other consensus estimates differed from the Bloomberg consensus estimate.  The difference could be a result of different methodologies of averaging analyst forecasts, or including different analysts in the calculation, or differences as a result of the inclusion or exclusion of extraordinary items.  While consensus estimates can be used as an indication of expectations, sometimes the actual expectations are different than the observable consensus estimates.  Such actual expectations are sometimes called whisper numbers, and can be more subjective and more difficult to determine than analysts' published consensus estimates.  According to an internal e-mail, ███████████
███████████████████████████████████████    Ex. 17, at FSLR01976971.

revenue guidance for FY2010 by $100 million to $2.5 billion to $2.6 billion, and increased its earnings guidance for FY2010 to $7.00-$7.40 per share from $6.80–$7.30 per share. *Id.* In addition, First Solar, for the first time, publicly discussed the LPM issue, and stated that it would record accrued expenses of $23.4 million in 2010 as a result, or approximately $0.24 per share.[21] Ex. 19, at 6.   Internally, ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 9, at JAM0023962.   In my opinion, excluding the impact of the LPM problem, First Solar's 2Q2010 results and 2010 EPS guidance met or beat analysts' expectations.

35.    On the July 29, 2010, conference call, First Solar publicly discussed the LPM issue for the first time.  Specifically, on the conference call, defendant Robert Gillette stated:

> Finally in Q2, reflected costs associated with the modular replacement program. During the period from June of 2008 to June of 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in affected modules. The root cause was identified and subsequently mitigated in June of 2009. Ongoing testing confirms the corrective actions are effective.  We have been working directly with impacted customers to replace the affected modules and these efforts are well under way, and in some cases complete. Some of these efforts go beyond our normal warranteed coverage. We accrued the estimated full cost of these additional efforts in our Q2 results and Jens will discuss the financial impact in more detail.

Ex. 19, at 3.

36.    Also, on the July 29, 2010, conference call, Defendant Jens Mayerhoff went on to state:

> During the second quarter, we accrued $17.8 million in cost of sales for expected module replacement costs and our cost of goods sold. In addition, we accrued $5.6 million of operating expenses associated with this process excursion,

---

[21]    The $23.4 million impact translates into $0.24 per share, assuming ████████. ($23.4 million * (1-13%) / 86.4 million shares = $0.24 per share).  ████████  *see* Ex. 16, at AHRN00000036.

bringing our total accrued expenses to 27.4 million at the end of the second quarter.

*Id.*, at 6.

37.    During the answer and question portion of the July 29, 2010, conference call,

Defendants made further comments about the LPM issue.

> Question: Auriga analyst Mark Bachman.
> Congratulations, everybody there, on you your results and especially improvements on the line run rate efficiency and the cost per watt. First, Jens, can you just put a dollar amount on the module replacement program to go along with the 30 megawatts or so, so we don't need to wait for the Q?
>
> Answer: Defendant Bruce Sohn.
> So the cost of the program in total is about 23.4 million; 17.8 in COGS, and 5.6 that we have reserved in this quarter. That reserve completes our current estimate of the cost of the program.
>
> Answer: Defendant Jens Meyerhoff.
> Yes, so maybe just to add real quick, so the numbers Bruce gave you, right, were what we booked in Q2.  As we publish our Q, you're going to see in our footnote A around accrued liabilities that the total accrual stands at $27.4 million.

*Id.*, at 12.

38.    On July 30, 2010, numerous analyst reports were issued discussing the strong

2Q2010 results.  For example, Ardour Capital stated: "The Company beat top- and bottom-line

expectations, despite a lack of incremental capacity and one-time charges."  Ex. 20.  Goldman

Sachs stated: "Solid 2Q results and better visibility leads to higher estimates."  Ex. 21.  Kaufman

Bros. stated: "Beat consensus on both the top and bottom lines."  Ex. 22.  Robert W. Baird

stated: "FSLR beats on all metrics."  Ex. 23.  Stifel Nicolaus stated: "Reports Strong 2Q . . .

despite a $23.4 million charge accrued in the quarter."  Ex. 24.  Wedbush stated: "Q2 Beat

Driven by Strong Demand and Lower Manufacturing Costs; Module Recall Underway;

Adjusting Estimates and Raising Target to $100."  Ex. 25.

39.    Analysts also noted the $100 million lower 2010 revenue guidance issued by the

Company.  Auriga analyst report stated: "Negative: Guidance looks like a mixed bag. . . .

Investors will likely focus on the $100mn cut to the EPC revenue forecast. . .” Ex. 26.  Cantor Fitzgerald stated: “The company is capacity constrained . . . This results in a drop in total revenue guidance, but a slight increase in earnings guidance. We expect that most investors will find this disappointing.”  Ex. 27.  Needham stated: “The company raised its full year earnings guidance, but lowered its 2010 revenue outlook, which probably disappointed the Street given the high expectations going into the report, in our view.”  Ex. 28.

40.    The key negative reported in the quarter was the LPM problem, and its impact. Credit Suisse stated: “Company is now incurring a ‘warranty charge’ of $17.9mm in COGS and $5.6mm in SG&A - 4% of the production from June-2008 to June-2009 had an excursion - 30MW of panels were affected - the issue was resolved by June 2009 - but company is now incurring a charge - bears will point out why the charge is being taken more than a year after the company knew about and resolved the issue, and question why a similar issue will not arise again.”  Ex. 29.  UBS stated: “Potentially concerning takeaways from its 2Q10 results.  First Solar reported that it found solar module quality problems affecting 4% (30MW) of its production during the time period of Jun-08 to Jun-09. First Solar has set aside a reserve fund of $27.4M in 2Q2010 for replacing these modules. We believe this could be an overhang on the stock as the modules are replaced over the next six months.”  Ex. 30.

41.    An internal e-mail



Ex. 17, at FSLR01976970-71.

42.    Following the Company's 2Q2010 announcement, First Solar's stock price declined significantly.   The announcement of First Solar's 2Q2010 financial results and conference call occurred after the market closed on July 29, 2010, so its impact on the stock price would have occurred on July 30, 2010.  On this day, First Solar's stock price declined 7.4 percent from $135.50 per share on July 29, 2010 to $125.45 per share on July 30, 2010, or $10.05 per share.  This price decline was statistically significant at the 5% level, a result that is also consistent with Defendants' expert's event study submitted at Class certification.  Ex. 2, Ex. 3.  Absent the LPM problems, First Solar would have reported an estimated 13% higher earnings for 2Q2010, and not have had to reduce its 2010 revenue guidance by $100 million.  Based on all of the above, it is my opinion that the LPM expenses and approximately $100 million lost revenues related to the LPM problem explain all, or at least a substantial portion, of the Company-specific stock price decline on July 30, 2010.

**B.    February 24, 2011:  First Solar 4Q2010 Announcement**

43.    On February 24, 2011, after the market had closed, First Solar announced 4Q2010 earnings of $1.80 per share on revenues of $610 million, beating Bloomberg consensus earnings estimates of $1.73 per share, but coming in below Bloomberg consensus revenue estimate of $647 million. Ex. 31.  The Company also slightly decreased high end of its revenue guidance for FY 2011 to $3.7-$3.8 billion from $3.7-$3.9 billion, while increasing its earnings guidance for FY 2011 to $9.25-$9.75 per share from $8.75-$9.50 per share.  *Id.*  In addition, First Solar, disclosed additional accrued expenses of $8.5 million relating to the LPM problem during

4Q2010, or approximately 9 cents per share.[22]  Ex. 32, at 7.  In other words, absent the LPM problem, First Solar would have beat 4Q2010 consensus earnings by 16 cents as opposed to 7 cents.  Furthermore, as discussed below, the 4Q2010 revenue miss is also related to the LPM problem.

44.    On the February 24, 2011, conference call, First Solar disclosed the LPM problem and its impact on First Solar's performance.  Specifically, on the conference call, defendant Robert Gillette explained that "Q4 was impacted by our decision to divert some volumes to expedite the module replacement program."  *Id.*, at 2.  Also, on the conference call, Defendant James Zhu stated:

> Also, during the fourth quarter, we reserved an additional $8.5 million for the module replacement program discussed during our second quarter 2010 earnings call. In Q4, we concluded a claims process and based our field data and execution today, we updated our total replacement cost estimate.

*Id.*, at 7.

45.    On February 25, 2011, numerous analyst reports were issued discussing First Solar's 4Q2010 results, including the 4Q2010 revenue miss.  Lazard Capital markets stated: "FSLR reported revenues of $610M and EPS of $1.80, versus LCM/consensus estimates of $645/$643M and $1.81/$1.75 respectively. Reported results also included an $8.5M or $0.09 impact from additions to a module warranty replacement reserve."  Ex. 33.  Mizuho Securities stated: "revs missed guidance somewhat . . . due largely to a decision to accelerate replacement of ~30MW of potentially faulty modules."  Ex. 34.  Ardour stated: "4Q10 revenues somewhat light, but EPS continues to outperform."  Ex. 35.  Auriga stated: "We expect bears to raise the issue of revenue falling short of the consensus in both 4Q10 and 1Q11."  Ex. 36.

---

[22]    The $8.5 million impact translates into $0.09 per share, assuming ▮▮▮▮▮▮▮. ($8.5 million * (1-13%) / 86.8 million shares = $0.09 per share).  ▮▮▮▮▮▮▮ *see* Ex. 16, at AHRN00000036.

46.    An internal e-mail

Ex. 37, at FSLR01899592-93.

47.    Following the Company's 4Q2010 announcement, First Solar's stock price declined significantly.    The announcement of First Solar's 4Q2010 financial results and conference call occurred after the market closed on February 24, 2011, so the impact on the stock price would have occurred on February 25, 2011.    On this day, First Solar's stock price declined 5.4 percent from a closing price of $164.68 per share on February 24, 2011, to a closing price of $155.72 per share on February 25, 2011, or $8.96 per share.    This price decline was statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class certification.    Ex. 2, Ex. 3.    Absent the LPM problems, First Solar would have beat Bloomberg 4Q2010 EPS consensus by 16 cents (as opposed to 7 cents) and avoided reporting a $37 million 4Q2010 revenue miss.    Based on all of the above it is my opinion that the LPM expenses and the lower than expected revenues explains all, or a substantial portion, of the Company-specific stock price decline on February 25, 2011.

C.    **May 3, 2011:  First Solar 1Q2011 Announcement**

48.    On May 3, 2011, after the market had closed, First Solar announced 1Q2011 earnings of $1.33 per share on revenues of $567.3 million, beating Bloomberg consensus estimates of $1.17 per share and $543 million, respectively.  Ex. 38.  The 1Q2011 results also included accrued expenses of $4.5 million relating to the LPM module replacement program, or approximately 5 cents per share.[23]  In addition, the Company indicated that revenues from Agua Caliente likely would be pushed out to 3Q2011 as the loan guarantee from the Department of Energy had been delayed.  Ex. 39, at 3, 8.

49.    Despite beating 1Q2011 expectations, First Solar maintained its revenue and earnings guidance for FY2011 of $3.7-$3.8 billion and $9.25-$9.75 per share, respectively, while its 2011 guidance for operating income was reduced by $10 million to $900 million, and its 2011 guidance for operating cash flow was reduced to $0.8-$1.0 billion from $1.0-$1.1 billion.  Ex. 38.  Unbeknownst to investors, ████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████    Specifically, it is my understanding that ██████

███████████████████████████████████████████████████

██████████████████████    Ex. 14, at FSLR01981995.  Given that the Company's stock traded at approximately 13 times First Solar's midpoint guidance of $9.50 per share, ████████

████████████████████████████████████████████████████

██████ .[24]

---

[23]    The $4.5 million impact translates into $0.05 per share, assuming a ████████████ .  ($4.5 million * (1-11.9%) / 87.1 million shares = $0.05 per share).  First Solar 1Q2011 Form 10-Q filed on May 4, 2011.  For 2011 marginal tax rate and diluted shares outstanding, *see* Ex. 64.

[24]    FSLR May 4, 2011 closing price of $126.31 per share divided by FSLR 2011 mid-point earnings guidance of $9.5 = 13.3.  Negative impact on implied value = $0.20 per share * 13.3 =

50.     Because the heat degradation issue was not specifically discussed, or otherwise disclosed or broken out, none of the analysts had an opportunity to comment on the issue in subsequent analyst reports.  However, there were some comments on the 2011 guidance itself,

████████████████████████████████████████████████████

████████████████████████████████████  After the market closed on May 3, 2011, a Wedbush analyst commented to Reuters that investors had hoped for a bump in the Company's 2011 earnings outlook, particularly after topping expectations in the first quarter.  Ex. 40.  On May 4, 2011, other analysts also expressed disappointment that First Solar did not raise guidance.  Citi stated: "C2011 EPS guide maintained at $9.25-9.75 - slightly disappointing as we expected a slight bump."  Ex. 41.  Credit Suisse stated: "FSLR reiterated its CY11 EPS guidance to $9.25-$9.75, . . .  We were expecting the company to raise mid-point to $9.75 . . ."  Ex. 42.  Absent the $0.05 per share expense as a result of the 1Q2011 LPM problem, and the $0.20 per share impact on 2011 earnings guidance as a result of the heat degradation problem, the Company would have raised its mid-point guidance by $0.25 per share to $9.75 per share, exactly as Credit Suisse had expected.

51.     Following the Company's 1Q2011 announcement, First Solar's stock price declined significantly.   The announcement of First Solar's 1Q2011 financial results and conference call occurred after the market closed on May 3, 2011, so the impact on the stock price would have occurred on May 4, 2011.  On this day, First Solar's stock price declined 6.2 percent from a closing price of $134.66 per share on May 3, 2011 to a closing price of $126.31 per share on May 4, 2011, or $8.35 per share.  This price decline was statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class

---

$2.66 per share.  Note that Bloomberg 2011 analyst earnings forecast was $9.92 per share, *i.e.*, slightly greater than midpoint earnings guidance.

certification.  Ex. 2, Ex. 3.  In my opinion, 1Q2011 LPM expenses and the impact of the heat degradation issue on the Company's 2011 guidance had a negative impact on First Solar's stock price, and, therefore, contributed to its May 4, 2011 stock price decline.

**D.     October 25, 2011:  CEO Robert Gillette Terminated**

52.     On October 25, 2011, First Solar suddenly disclosed that Defendant Robert Gilette had been replaced as CEO.  The press release stated:

> The Board of Directors of First Solar, Inc. (NASDAQ: FSLR) today asked its Chairman and company founder, Mike Ahearn, to serve as interim Chief Executive Officer. Ahearn has accepted. Effective immediately, Rob Gillette is no longer serving as Chief Executive Officer, and the Board of Directors thanks him for his service to the company.  The Board of Directors has formed a search committee and is initiating a search for a permanent Chief Executive Officer.

Ex. 43.

53.     CEOs of publicly traded companies routinely are replaced without the company's stock price being negatively impacted.  However, the unexpected nature of the departure of First Solar's CEO alarmed investors that there could be unpleasant news on the horizon.  Several October 25, 2011, analyst reports pointed out the unusual manner in which First Solar terminated Defendant Robert Gillette.  For example, Credit Suisse stated: "The news is clearly negative . . . the abruptness of the announcement and terse wording of the release, the fact that earnings will likely be next week and the CEO is stepping down just a week in advance, and the fact that FSLR had planned to host a reception with the CEO on Nov 15 all sound unfortunately quite concerning." Ex. 44.  Goldman Sachs stated: ". . . the terse nature of today's announcement, its timing and the lack of a permanent replacement argue that this was an unanticipated event." Ex. 45.  Deutsche Bank stated: "The press release is short on details and we believe the news (along with timing of announcement) is likely to raise a lot of investor questions about the health of overall industry as well as near/longer term profitability outlook of the company."  Ex. 46.  Cantor Fitzgerald: "Since we expect that FSLR will release earnings next week, we believe that

this does not bode well for the outlook." Ex. 47. Morgan Stanley stated: "We believe that Robert Gillette's unexpected departure is likely a troubling sign of things to come." Ex. 48. PacificCrest stated: "The rate of executive turnover this year suggests major problems at First Solar." Ex. 49. Raymond James stated : "So, what could have prompted this sudden change? . . . On the bearish side would be an accounting scandal. . . A less damaging but still negative scenario would be the board sacking Gillette ahead of a major earnings miss or guidance cut." Ex. 50. Jeffries stated: "Is there a restatement or scandal without disclosure?" Ex. 51. The commentary continued the next day when, on October 26, 2011, Auriga stated: "First Solar: CEO exit adds to skepticism." Ex. 52. Deutsche Bank stated: "Is the CEO departure related to operational, strategy or accounting issues?" Ex. 53. Wunderlich stated: "No explanation was given for the departure but we speculate that the fall in the price of the stock, the value of his options, the change in industry dynamics, and the outlook for the company's earnings had something to do with this." Ex. 54.

54.    Following the announcement of the removal of Defendant Robert Gillette as CEO, during trading hours, First Solar's stock price declined significantly. On October 25, 2011, First Solar's stock price declined more than 25 percent from a closing price of $57.95 per share on October 24, 2011, to a closing price of $43.27 per share on October 25, 2011, or $14.68 per share. This price decline was statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class certification. Ex.2, Ex. 3. The Company's press release disclosing Defendant Robert Gillette's departure clearly was the reason for the Company-specific portion of First Solar's October 25, 2011, price decline.

55.    Just one day following Defendant Robert Gilette's departure, on October 26, 2011, First Solar issued a press release with its 3Q2011 results earlier than expected, but did not hold a conference call to explain the results. The First Solar press release reported 3Q2011

earnings of $2.25 per share on revenues of $1.0 billion, compared to Bloomberg consensus estimates of $2.66 per share and $1.0 billion, respectively.  Ex. 55.  The company also substantially reduced its 2011 earnings guidance to $6.50-$7.50 per share from $9.00-$9.50 per share, and its 2011 revenue guidance to $3.0-$3.3 billion from $3.6-$3.7 billion.  *Id.*  As later revealed, the 3Q2011 earnings reported included $16.2 million in expenses relating to the Company's LPM module replacement program, or approximately $0.16 per share.[25]

56.    On October 26, 2011, numerous analyst reports discussed the fact that, even though First Solar's 3Q2011 results and guidance were below consensus forecasts, the earnings announcement was still viewed positive given the concerns reflected in the 25% price decline the prior day following the termination of Defendant Robert Gillette as CEO.  On October 26, 2011, Deutsche Bank stated: "First Solar reported Q3 results and 2011 guidance well below consensus expectations . . . Earlier than expected Q3 results remove near term operational overhang."  Ex. 53.  Canaccord stated: "[First Solar] released its Q3 financials and FY outlook today, likely to stem what appeared to be a market panic."  Ex. 56.  Cantor Fitzgerald stated: "We expect a rebound in the shares today, as bad news is still better than no news."  Ex. 57.  On October 27, 2011, Wunderlich stated: "Investors took one look at the numbers and breathed a sigh of relief that it wasn't worse, but it sure wasn't good either."  Ex. 58.

57.    Following the 3Q2011 announcement, First Solar's stock price rebounded significantly.  On October 26, 2011, First Solar's stock price increased 6.5 percent from $43.27 per share on October 25, 2011 to $46.11 per share on October 26, 2011, or $2.84 per share.  On October 27, 2011, First Solar's stock price closed up another 14.7 percent to $52.90 per share, or

---

[25]    The $16.2 million impact translates into $0.16 per share, assuming a 11.9% tax rate. ($16.2 million * (1-11.9%) / 87.1 million shares = $0.16 per share).  First Solar 3Q2011 Form 10-Q filed on November 4, 2011.  For 2011 tax rate, *see* Ex. 64.

$6.79 per share.  This price increase was statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class certification.  Ex.2, Ex. 3.  In other words, the unexpected termination of Defendant Robert Gillette reduced investors' expectations regarding the Company's 3Q2011 results.  As a result, even though 3Q2011 results and new guidance was significantly below consensus forecasts, they were actually viewed as a positive because they were not as bad as feared.

58.    On November 3, 2011, First Solar held their 3Q2011 conference call, in which Defendant Mark Widmar stated: "We have substantially concluded the remediation programs associated with this manufacturing excursion." Ex. 59, at 7.

### E.    December 14, 2011:  First Solar Updates Guidance

59.    On December 14, 2011, prior to the market opening, First Solar reduced its 2011 earnings guidance to $5.75-$6.00 per share from $6.50-$7.50 per share, and its 2011 revenue guidance to $2.8-$2.9 billion from $3.0-$3.3 billion.[26]  Ex. 62.  This was far below Bloomberg consensus forecasts of 2011 earnings of $6.85 per share on 2011 revenues of $3.2 billion.  Also, as part of the Company's effort to reduce cost and increase operating efficiency, First Solar stated that it expected to record up to $0.85 per share in restructuring charges during 4Q2011, including the reduction in head count by approximately 100 positions.  Ex. 63, at 6.  This restructuring charge was not included in the Company's 2011 EPS guidance.  Ex. 62.

60.    In addition, First Solar initiated 2012 earnings guidance of $3.75-$4.25 per share that was significantly below Bloomberg consensus of $7.29 per share, and 2012 revenue guidance of $3.7-$4.0 billion slightly below Bloomberg consensus of $4.06 billion.  *Id.*  It is my

---

[26]    Internally, there is some evidence that there might have been up to a $0.56 per share impact on 2011 guidance as a result of charges for obsolete LPM modules, but there is no mention of this charge on the conference call.  Ex. 60, at FSLR01139675, Ex. 61, at FSLR02401398.

understanding that the reason for the lower 2012 earnings guidance related to the heat degradation problem as the Company was changing its focus to larger scale projects in hotter climates.  As stated by Defendant Mike Ahearn in the December 14, 2011, press release: "Our diverse business model and robust project pipeline will help First Solar generate a significant amount of cash in 2012 while improving operational efficiencies, but we are recalibrating our business to focus on building and serving sustainable markets rather than pursuing subsidized markets, . . .  By channeling our core strength in utility-scale PV systems to markets with immediate need for mass-scale renewable energy our goal is to earn substantially all of our new revenues from sustainable markets by the end of 2014." *Id.*

61.    Following the Company's reduced 2011 and initial 2012 guidance below expectations, First Solar's stock price declined significantly.  On December 14, 2011, First Solar's stock price closed down at $33.45 per share from $42.57 per share on December 13, 2011, a stock price decline of $9.12 per share or 21.4 percent.  This price decline was statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class certification.  Ex. 2, Ex. 3.  According to Plaintiffs' allegations, a portion of the reduction in 2011 guidance and the lower than expected 2012 earnings guidance was a result of the LPM and heat degradation issues.  In my opinion, the Company's reduced 2011 guidance, and initial 2012 guidance significantly below expectations, explains the Company-specific portion of First Solar's December 14, 2011, price decline.

**F.    February 28, 2012:  First Solar 4Q2011 Announcement**

62.    On February 28, 2012, after the market had closed, First Solar announced 4Q2011 losses of $4.78 per share on revenues of $660 million.  Ex. 64.  The Company's 4Q2011 losses included: (a) a non-cash goodwill impairment charge of $3.90 per share; (b) restructuring charges of $0.43 per share (below $0.85 per share announced on December 14, 2011); and (c)

$1.67 related to warranty and cost in excess of normal warranty expense, for a total of $6.00 per share. *Id.* According to First Solar, the Company's non-GAAP 4Q2011 earnings, excluding the $6.00 per share in extraordinary charges and costs, were $1.26 per share. *Id.* For the FY2011, the Company reported non-GAAP earnings of $6.01 per share, compared to its FY2011 guidance of $5.75-$6.00 per share, and revenues of $2.8 billion at the low and of its FY2011 guidance of $2.8-$2.9 billion. *Id.*

63.     In addition, First Solar reduced its 2012 revenue guidance from $3.7-$4.0 billion to $3.5-$3.8 billion, while maintaining its 2012 earnings guidance at $3.75 to $4.25 per share. *Id.* Its 2012 guidance for operating cash flow was reduced from $0.9-$1.1 billion to $0.8-$0.9 billion, as a result of the impact of the additional LPM charges accrued at the end of 2011. Ex. 65, at 7.

64.     The Company's announcement of significant additional warranty expenses relating to the LPM issue would have been very important to investors, particularly since they had been told this issue had been "substantially concluded." [27] Ex. 59, at 7. Also, the Company announced and discussed the heat degradation issue for the very first time. On the February 28, 2012, conference call, after the market closed, Defendant Mike Ahearn stated:

> This quarter we incurred $125.8 million in additional warranty reserves to reflect an updated estimate of costs related to the manufacturing excursion that occurred between June 2008 and June 2009. As previously disclosed, a small percentage of product manufactured during that time period may experience premature power loss once in the field. First Solar identified and addressed the manufacturing excursion in June 2009 and later initiated a voluntary remediation program that goes above and beyond our standard warranty obligations. The remediation program includes module removal, testing, replacement and logistical services and additional compensation payments to customers under certain circumstances.

---

[27]     On the November 3, 2011, 3Q2011 conference call, Defendant Mark Widmar stated: "We have substantially concluded the remediation programs associated with this manufacturing excursion." *See also* Ex. 66, at FSLR01131153.

A large volume of claims made under the remediation program were processed in the fourth quarter, and we identified the significant increase in remediation costs under the terms of our voluntary program. Our estimates now benefit from having processed over 95% of the total claims submitted under the life of the program. The total cost of remediating the manufacturing excursion that occurred from June 2008 to June 2009 now stands at $215.7 million including $145.6 million above and beyond our standard warranty.

There are approximately 4% of the claims submitted for which we have not yet been able to determine if remediation is required. If it is determined that these claims should be remediated, there's at least the potential for additional costs of as much as $44 million.

Ex. 65 at 3.

65.    On the February 28, 2012, conference call, Defendant Mark Widmar went on to state:

In order to provide a comprehensive view of the manufacturing excursion and warranty charges in Q4, a breakdown is provided on slide 10. In the quarter we expensed $163.5 million. Of this amount $125.8 million was for the manufacturing excursion. As Mike mentioned previously, a large volume of claims made under manufacturing excursion program were processed in the fourth quarter, and we identified a significant increase in remediation costs under the terms of our voluntary program. The Q4 costs associated with the manufacturing excursion is composed of three items.

The first item is the cost to remove, replace and provide logistical services related to the manufacturing excursion. In the fourth quarter we expensed $23.9 million for these efforts and have expensed $99.7 million to date.

The second item is expected payment to customers under certain conditions for power loss prior to the remediation of the customer's system. In the fourth quarter we expensed $31.8 million for this compensation and have expensed $45.9 million to date.

The third item, $70.1 million, is due to an increase in the expected number of replacement modules above our standard warranty rate required for our remediation efforts.

Finally, we recognized a $37.8 million charge to increase our warranty accrual. We believe our PV modules are potentially subject to increased failure rates in hot climates. As our geographic mix of sales has shifted to hot climates we have increased our warranty accrual. Our experience has shown that our warranty rate for hot climates are slightly higher than the return rates for temperate climates. With this change, our standard warranty accrual rate has been

- 32 -

increased by one percentage point to account for potential returns going forward. We will continue to review our warranty accrual rate in the future and will adjust the rate as appropriate to reflect our actual experience.

*Id.*, at 6.

66.    During the answer and question portion of the February 28, 2012, conference call,

Defendants were asked about the LPM issue that was supposed to be in the past.

Question: Citi analyst Timothy Arcuri.
Hi. Mike, on the last conference call on the third of November, I asked you about warranty expenses and you said that it had all been taken into account in the financials. So did something change from the third of November to the end of the quarter? Was it a rush of warranty applications? Is that what the issue was? Thanks.

Answer: Defendant Mike Ahearn.
As Mark mentioned, we processed a large volume of the claims that were made over the life of the program in Q4. For the last quarter we reserved and reported based on the best available information then and we discovered in processing the claims a lot of additional exposure, which is reflected in the charges that we've taken in Q4.

*Id.*, at 10.

67.    During the February 28, 2012, conference call, Defendants were also asked about

the heat degradation issue.

Question: Miller Tabak analyst Chris Kettenmann.
Just wondering if you could tell us, you mentioned that the hot climate affected panel performance. Wondering if you could give us a quantitative idea of the level of degradation and geographically where you saw most of the warranty claims come from.

Answer: Defendant Mike Ahearn.
Well, at this time we don't have a lot of data. We have enough – we know there's a natural physical acceleration of degradation modes in hot climate. In fact our accelerated reliability test exposes them to intense temperature. So that's just the way these behave from a physics point of view, and we have enough to know – to feel that it's prudent to raise the rate until we get more data, but we're pretty early. We just started really shifting the mix into hotter climates in the last couple years. So we'll have to continue to reevaluate it as we see results, get more data, but for now we thought it was prudent to increase the rate by a point because of the mix change and what we have seen to date.

*Id.*, at 15.

68.     Out of the three extraordinary charges/expenses in 4Q2011, only the product issues relating to the modules would have been considered a material negative.  The restructuring charges of $0.43 per share were less than the $0.85 per share estimate disclosed on December 14, 2011.  Ex. 62.  The goodwill impairment charge was a non-cash charge that, in this case, did not represent any changes to future cash flows.   On the February 28, 2012, conference call, Defendant Mark Widmar explained:

> The goodwill impairment is a non-cash charge that does not affect our cash position or cash flows from operating activities. The goodwill is primarily related to the acquisition of OptiSolar in 2009 and NextLight in 2010, representing benefits from expected synergies, economies of scale and vertical integration. We allocated most of the goodwill for these acquisitions to our components business, consistent with our historical view of the systems business function as being an enabler for the components business to drive module throughput.

> We believe that the acquisitions of OptiSolar and NextLight have provided tremendous value to First Solar far in excess of the acquisition costs including goodwill. As a result of these acquisitions, First Solar has announced the sale of and is currently constructing four of the largest solar power plants in the world. This impairment charge does not change the value of the acquired project pipeline, nor does it change the company's view of its business prospects or future results as discussed later in this call. It is primarily triggered by the fact that the market capitalization of our stock is trading below the book value as of the end of the fiscal year 2011 and the related pressures on the industry as a whole.

Ex. 65, at 6.

69.     Expectations prior to the 4Q2011 announcement were low.   As noted in a Deutsche Bank February 27, 2012, analyst report: "Expectations are low going into the earnings call . . .  Expect Cautious Tone, Possibly Some Risk to 2012 Guidance."  Ex. 67.  Similarly, a February 27, 2012, Citi analyst report stated: "All in all, the tea leaves point to a mild cut to guidance, but there are enough offsetting factors that we would not be surprised if FSLR maintains 2012 EPS guidance of $3.75-4.25."  Ex. 68.  On February 28, 2012, prior to the 4Q2011 announcement, Credit Suisse stated: "We estimate there could be an additional 25-50c risk to FSLR's $3.75-$4.25 EPS guidance for 2012."  Ex. 69.  First Solar reported very poor

4Q2011 results, particularly as a result of the unexpected warranty expenses. That said, Ardour noted: "We believe the 4Q11 miss was somewhat expected." Ex. 70. Furthermore, the Company's FY2012 earnings guidance was actually maintained. Goldman Sach stated: "First Solar reported weaker-than-expected 4Q results, though the outlook for 2012 remains largely intact." Ex. 71. Deutsche Bank stated: "Guide Better Than Feared." Ex. 72. On February 29, 2012, Morningstar also stated: "Amidst all of the noise, 2012 guidance relating to cash flows and earnings remains largely intact." Ex. 73.

70. There were significant concerns, however, regarding the LPM and heat degradation issues, and their impact both on the 4Q2011 results and future results. Below are some selected excerpts regarding the LPM and heat degradation issues from the analyst commentary.

Deutsche Bank (2/28/2012)
Concerns 1) Warranty charges and accruals likely - especially as mix of shipments to high temp regions (India/US) increase vs. shipments to Germany (where degradation is relatively lower).

Ex. 72.

UBS (2/28/2012):
First Solar took a charge of $38M in 4Q11 as it increased its warranty accruals rate for the first time. This new charge is to account for a higher number of modules being returned that are located in hot temperature climates (we believe this could be the US desert or Italy). We will need to monitor this trend closely going forward to be sure there are no new technology issues found by customers as we believe these are for its newer modules made after Jun-11.

Ex. 74.

Cantor Fitzgerald (2/29/2012):
Warranty charges were troubling as the company dramatically increased their reserves for a "manufacturing excursion" in 2008. Furthermore, the company increased its warranty reserve to account for management's belief that FSLR modules are potentially subject to increased failure rates in hot climates. We are concerned that we may not have heard the last about this.

Ex. 75.

- 35 -

DNB (2/29/2012):
First Solar has a large installed base of solar panels, in excess of 5GW.  Warranty expenses have been increasing, which could signal product weakness, although Q4 charges relate to production in 2008-2009. For 2011, First Solar booked warranty expenses of 9.2% of sales, which, in our view, is too high.  An additional USD44m in claims is possible after reviewing 95% of warranty claims, but we are concerned about mounting warranty provisions.

Ex. 76.

Stifel Nicolaus (2/29/2012)
First Solar took a number of product replacement charges on a 2008/2009 manufacturing issue that we expected had been resolved already, and increased warranty provisions on increased risks of product failure in hotter climates. . . . we see the disclosed heat-driven degradation issue as lowering the economics of expanding into new markets and potentially posing a product acceptance risk.

Ex. 77.

Wunderlich (2/29/2012):
. . . there is no 20-year to 25-year history of Cd-Tel thin-film solar panels to point to in order to say that the problem FSLR is seeing is an anomaly. We hope it is but who knows?

Ex. 78.

Credit Suisse
A quarter billion dollar warranty problem
The $253mm in cumulative warranty and related charges now raises a significant question mark on the reliability and field performance of FSLR's panels – product quality in our view is THE MOST SIGNIFICANT metric for a solar companies' long-term survivability.

Ex. 15.

Maxim (2/29/2012):
The Ghost of the "Manufacturing Excursion" Returns with $164m in Charges: Despite having denied further exposure since the first two charges totaling $36m were taken in 2010 for power loss problems associated with a portion of its production, FSLR suddenly announced an additional $164m in warranty-related charges. While FSLR claimed further exposure could amount to $44m, we note that at the end of last year it was reportedly $0m. While the level of warranty coverage is uncertain, given the 819 MW produced 3Q08-2Q09 and estimated replacement (module + labor) cost of $0.89/W, we estimate total nominal exposure remaining of $528m.

Ex. 79.

Needham (2/29/2012):
Significant warranty charges highlight increased risks. FSLR took warranty related charges totaling $253.5MM in 2011, as it received a greater than expected number of claims on the remediation program. While the company stated that it has identified the issues and majority of the claims were processed, we are concerned that additional reliability issues could surface, especially since the issue was related to its aggressive production volume ramp, typically more susceptible to defects.

Ex. 80.

Citi (2/29/2012):
. . . the company has suffered major reputational damage with the ongoing low-power module issues it has experienced. . .

Ex. 81.

ThinkEquity (2/29/2012):
The company's increased warranty expense is also a concern for ongoing profitability as the company is clearly seeing problems in the performance of its products in the field. We hope the company has included an expectation for future expenses in guidance, but believe investors should be attentive to the potential risk to earnings from these warranty issues.

Ex. 82.

J.P. Morgan
Big warranty charge during the quarter. Although First Solar had previously believed it had seen the majority of the warranty claims associated with product manf in 2008-2009, another round of replacement reared its head in C4Q 11, causing a significant charge. Management believes that the bulk of the warranty risk is now behind, but we think investors will be incrementally worried given that this was an unexpected event and that there could be additional charges in the future.

Ex. 83.

71.    On February 29, 2012, after the market had closed, First Solar filed their Form 10-K for 2011, which provided additional information regarding the LPM and heat degradation problems.  Among other things, the 2011 10-K disclosed that the Company had taken a $13.8

million module inventory write-down primarily as a result of the voluntary remediation efforts.[28]

On March 2, 2012, Credit Suisse issued an analyst report that discussed First Solar's 2011 Form 10-K titled: "10-K Review: More tidbits on warranty issues." It stated:

> **Summary:** Post a review of FSLR's 10K published on Wednesday, we note there still are more questions than answers to the warranty questions that have now become an important aspect FSLR story. Consistent communication, ideally backed by robust field performance data will help FSLR address credibility and brand concerns that now likely exist with investors and customer partners.
>
> **Timeliness and completeness of disclosures under scrutiny.** FSLR repeated its view that there main issues were due to the manufacturing excursion from June-08 to June-09 – for which FSLR believes the root cause was identified and remedied by June'09. Investors however have been disappointed that company continued to increase the estimate for the cost of the warranty reserves due to this issue. Recall that it is clear that management was aware there were issues by June'09, but the issues were first disclosed to investors only in July'10 – and at that time, the estimate for charges was only ~$20mm. Company reiterated on its 10-K that the warranty reserve estimates disclosed at each fiscal period was consistent with the best available information at each period. Disclosure timing and accuracy on an issue as critical as field performance is important not just for equity investors – it is also important for FSLR's project equity buyers and investors in FSLR's project debt to accurately assess the risk. FSLR will need to gradually re-establish confidence with its investors and customer partners that past issues are fully contained, and future projects will not have similar issues.
>
> **There could be risk of additional charges.** FSLR noted it had received over 5000 claims from customers for its replacement plans. FSLR settled ~1100 claims, rejected 4000 claims and 200 claims that remain yet to be resolved. FSLR has noted there could be an additional $44mm of charges to settle the remaining 200 claims.
>
> We find it a bit disturbing that there were 5000 separate claims, reflecting a large body of dissatisfied customer base with FSLR. Importantly, company disclosed that in addition to customers with systems with panels made in the June'08-June'09 period, the company is "working with a number of additional customers who have made claims, and "may" have affected modules". This is an important area to watch – to ensure there have not been issues with panels made after June'09.
>
> **Potential for resale of panels may be one positive.** Company noted that warranty costs were higher than expected as it was impractical to replace

---

[28]    First Solar 2011 Form 10-K, at 50.

individual modules in certain cases, and instead whole installations or an entire string of panels were replaced. As a result there may be an opportunity for FSLR to resell modules that were not affected.  However, note that FSLR has chosen not disclose the exact number of modules that were collected that has been determined as not affected by the issue.

**Hot climate issue – a new issue for investors.** FSLR noted that based on available technical literature, internal data, analysis of module returns – its panels are subject to higher failure rates in hot climates. FSLR also noted this is due to "stress corrosion cracking in glass, polymer creep and impurity diffusion". FSLR also noted that the hot climate applies to South West US where some of its projects lie, as well as several regions identified in its long term strategic plan as focal areas. This hot climate issue is a new factor for investors and possibly for FSLR customer-investor partners.
(emphasis in original)

Ex. 84.

72.    The LPM and hot climate issues impact First Solar two key ways.  First, it delayed, reduced or eliminated revenues as a result of customer dissatisfaction with the quality of First Solar's products.  Second, it added expenses as the Company had to engage in a costly module replacement program, overbuild solar plants, or simply pay customers compensation for underperforming modules.  Many of the costs were quantified by the company in its earnings release and Form 10-K, including: (a) $1.67 per share for warranty and cost in excess of normal warranty expense, (b) additional $44 million in costs related to outstanding claims, or approximately $0.45 per share,[29] and (c) $13.8 million in module inventory writedown, or $0.16 per share.[30]  In total, these costs add up to $2.26 per share.  In addition, First Solar increased the warranty rate by 1 percent, or $0.01 per watt manufactured, which translates into another implied

---

[29]    The $44 million impact translates into $0.45 per share, assuming ▉▉▉▉▉▉▉▉.  ($44 million * (1-11.9%) / 87.1 million shares = $0.45 per share).  For 2011 marginal tax rate, *see* Ex. 64.

[30]    The $13.8 million impact translates into $0.14 per share, assuming a ▉▉▉▉▉▉▉▉. ($13.8 million * (1-11.9%) / 87.1 million shares = $0.14 per share).  For 2011 marginal tax rate, *see* Ex. 64.

impact on the Company's stock price of approximately $1.29.[31]  Taken together, these identified costs relating to the LPM and heat degradation problem add up to $3.55 per share.  This does not include impact on sales.

73.     With respect to the impact of the LPM and heat degradation issues on First Solar's future sales, in light of the Company's tarnished reputation, this impact can be difficult to quantify precisely.  That said, the following comments on CNBC by Gordon Johnson of Axiom that took place shortly after the results were first released on February 28, 2012, reflect the views of the more bearish investors:

> Their stuff is not working in the field.  That's effectively what's happening.
> Forget about the fact that they massively missed earnings.  This is a huge red flag.
> It brings into question whether they will be able to do projects here in the U.S.
> This is a game changer.

                                    *   *   *

> We heard from our checks in Germany that this is not a one-time issue.  And the
> fact that banks are becoming cautious on lending to First Solar projects suggests
> that there is a fundamental problem with their modules. . . .  This is new.  This is
> huge, and it is potentially going to be a game ender.

                                    *   *   *

> This has been a problem that First Solar has had in the past, and as was asked on
> the call by one of our competitors, they told us that this problem was, you know,
> was fixed.  And it is not fixed.  So, we need to look into this further.  The

---

[31]     According to the Company's 2012 guidance, it expected to reduce its manufacturing to about 1.5GW and 1.8GW, or 1.65 at the mid-point.  Ex. 65, at 4.  Furthermore, the Company estimated future increased warranty costs of $0.01 per watt produced  Ex. 65, at 5.  At $0.01 per watt, the increase in warranty cost is $16.5 million, or $0.16 per share assuming a 13% tax rate and 87.1 million shares.  $16.5 million * (1-13%) / 87.1 million = $0.16 per share.  On March 1, 2012, First Solar traded at 7.84 times the Bloomberg consensus.  $30.42 per share / $3.88 Bloomberg 2012 EPS consensus estimate = 7.84.  This translates into an impact on the Company's value of $1.29 per share.  $0.17 * 7.84 = $1.29 per share.  Actual impact on manufacturing cost might have been slightly less than $0.01 per watt, but this would be partly offset by other costs, including shipping.

company will not talk to us.  So, we definitely need to do some more checks to see that we are accurate.  But at first glance, this is quite negative.[32]

74.    Following the Company's 4Q2011 announcement, First Solar's stock price declined significantly.  The press release announcing First Solar's 4Q2011 financial results and conference call occurred after the market closed on February 28, 2012, while the Company's Form 10-K providing detailed financials and explanations was filed after the market closed on February 29, 2012.  As a result, the Company's stock price reaction on both February 29, 2012 and March 1, 2012, is of interest.  On February 29, 2012, First Solar's stock price declined 11.26 percent from a closing price of $36.40 per share on February 28, 2012 to a closing price of $32.30 per share on February 29, 2012, or $4.10 per share.  This price decline was statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class certification.  Ex. 2, Ex. 3.  On March 1, 2012, First Solar declined an additional 5.8 percent to $30.42 per share.  This price decline was also statistically significant at the 5% level, a result that is consistent with Defendants' expert's event study submitted at Class certification.  Ex. 2, Ex. 3.  For all the reasons discussed above, it is my opinion that the disclosures relating to the LPM and heat degradation issues explains all, or at least a substantial portion, of the Company-specific stock price declines on February 29, 2012 and March 1, 2012.

## VII.    CONCLUSION

75.    Based on the above, it is my opinion that Defendants' Motion ignores key evidence demonstrating that the alleged fraud did cause Class members to suffer economic losses (*i.e.*, damages).  Specifically, Plaintiffs have identified several dates in this case when the alleged truth was publicly disclosed, discussed separately above.  My analysis demonstrates that following each of these disclosures, First Solar's stock price declined in a statistically significant

---

[32]    http://video.cnbc.com/gallery/?video=3000075657.

manner, *i.e.*, the stock price decline was not explained by market or industry factors. Ex. 2. These results are corroborated by Defendants' expert's own event analyses at Class certification. Ex. 3. Also, for the reasons explained above, it is my opinion that the partial disclosures of the alleged truth: (a) explains all, or at least a substantial portion, of First Solar's July 29, 2010, February 25, 2011, February 29, 2012 and March 1, 2012, stock price declines; and (b) contributed to First Solar's May 4, 2011 and December 14, 2011, stock price declines. In addition, it is my opinion that the unexpected termination of Defendant Robert Gillette caused First Solar's market adjusted October 25, 2011 price decline, and mitigated subsequent price declines related to the alleged truth. The above means that if the alleged truth had been disclosed earlier, then First Solar's stock price would also have declined earlier. Consequently, Class members who overpaid for their shares during periods when the alleged truth was fraudulently concealed suffered economic losses if they continued to own the shares at the time the alleged truth eventually was disclosed and First Solar's stock price declined as a result.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 27th day of April 2015, in San Diego, California.

Respectfully submitted,

BJORN I. STEINHOLT

CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 27, 2015.

s/ DANIEL S. DROSMAN
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dand@rgrdlaw.com

1024407_1

# Mailing Information for a Case 2:12-cv-00555-DGC Smilovits v. First Solar Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George C Aguilar**
  gaguilar@robbinsarroyo.com,notice@robbinsarroyo.com

- **Kathryn B Allen**
  kallen@kmllp.com

- **Darryl J Alvarado**
  Dalvarado@rgrdlaw.com

- **Stephen Richard Basser**
  sbasser@barrack.com

- **James P Bennett**
  JBennett@mofo.com,KMarttila@mofo.com

- **Philip T Besirof**
  pbesirof@mofo.com,mblackmer@mofo.com,rbarajas@mofo.com

- **Maureen Beyers**
  mbeyers@omlaw.com,ppalmer@omlaw.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com

- **Luke Brooks**
  lukeb@rgrdlaw.com

- **Lonnie A Browne**
  LBrowne@rgrdlaw.com

- **Jennifer N Caringal**
  Jcaringal@rgrdlaw.com

- **Keith Michael Cochran**
  kcochran@cfsblaw.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com,mzehel@pomlaw.com

- **Jonathan Adam Dessaules**
  jdessaules@dessauleslaw.com,hpeters@dessauleslaw.com,jpitchel@dessauleslaw.com

- **Michael J Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel S Drosman**
  dand@rgrdlaw.com,karenc@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Jordan Eth**
  jeth@mofo.com,adavis@mofo.com,jrahman@mofo.com

- **Paul Flum**
  PaulFlum@mofo.com,TLee@mofo.com

- **Jason A Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark Ryan Scott Foster**
  mfoster@mofo.com,lroiz@mofo.com

- **Andrew S Friedman**
  afriedman@bffb.com,paquilino@bffb.com,rcreech@bffb.com

- **Jeffrey Dale Gardner**
  jgardner@jsslaw.com,eblackmountain@jsslaw.com

- **Richard W Gonnello**
  rgonnello@faruqilaw.com,msullivan@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Bryan Jens Gottfredson**
  Bryan.Gottfredson@sackstierney.com

- **Salvatore Jo Graziano**
  salvatore@blbglaw.com,errol.hall@blbglaw.com

- **Tor Gronborg**
  Torg@rgrdlaw.com

- **Joseph P Guglielmo**
  jguglielmo@scott-scott.com

- **Kevin Richard Hanger**
  khanger@bffb.com,tdinardo@bffb.com,rcreech@bffb.com

- **Eugene G Illovsky**
  eillovsky@mofo.com

- **Craig Kennedy**
  mbeyers@omlaw.com

- **Jennifer Lynn Kroll**
  jkroll@martinbonnett.com

- **Cody R LeJeune**
  clejeune@rgrdlaw.com

- **Jeffrey S Leonard**
  jeffrey.leonard@sackstierney.com,kelly.sharpe@sackstierney.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Peter S Linden**
  plinden@kmllp.com

- **Judson E Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Susan Joan Martin**
  smartin@martinbonnett.com,tmahabir@martinbonnett.com,mblawfirm@aol.com

- **Michael Craig McKay**
  mmckay@schneiderwallace.com,efilings@schneiderwallace.com

- **Danielle S Myers**
  danim@rgrdlaw.com

- **Patrick Powers**
  patrick@powerstaylor.com,sarah@powerstaylor.com

- **Ira Michael Press**
  ipress@kmllp.com

- **Jay N Razzouk**
  jrazzouk@robbinsarroyo.com,notice@robbinsarroyo.com

- **Brian J Robbins**
  brobbins@robbinsarroyo.com,rsalazar@robbinsarroyo.com,notice@robbinsarroyo.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Hart Lawrence Robinovitch**
  AZDocketing@zimmreed.com,stacy.bethea@zimmreed.com,Hart.Robinovitch@zimmreed.com

- **Joseph Nathaniel Roth**
  jroth@omlaw.com,bwendt@omlaw.com

- **David R Scott**
  drscott@scott-scott.com,efile@scott-scott.com

- **Mark Solomon**
  marks@rgrdlaw.com

- **Christopher Dennis Stewart**
  CStewart@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Edward M Varga , III**
  evarga@kmllp.com

- **Samuel M Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Anna Erickson White**
  awhite@mofo.com,rwebb@mofo.com,avickery@mofo.com

- **Garrett Webster Wotkyns**
  gwotkyns@schneiderwallace.com,efilings@schneiderwallace.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)