James P. Bennett (*Admitted pro hac vice*)
JBennett@mofo.com
Paul Flum (*Admitted pro hac vice*)
PaulFlum@mofo.com
Jordan Eth (*Admitted pro hac vice*)
JEth@mofo.com
Judson E. Lobdell (*Admitted pro hac vice*)
JLobdell@mofo.com
Anna Erickson White (*Admitted pro hac vice*)
AWhite@mofo.com
Philip T. Besirof (*Admitted pro hac vice*)
PBesirof@mofo.com
Mark R.S. Foster (*Admitted pro hac vice*)
MFoster@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
(415) 268-7000

Maureen Beyers, Arizona Attorney No. 017134
MBeyers@omlaw.com
Joseph N. Roth, Arizona Attorney No. 025725
JRoth@omlaw.com
OSBORN MALEDON, P.A.
2929 North Central Avenue
Phoenix, Arizona 85012-2793
(602) 640-9000

Attorneys for Defendants
First Solar, Inc., Michael J. Ahearn, Robert J. Gillette,
Mark R. Widmar, Jens Meyerhoff, James Zhu,
Bruce Sohn, and David Eaglesham

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, individually and on behalf of all other persons similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham,<br><br>    Defendants. | Case No.    CV12-00555-PHX-DGC<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**REDACTED PUBLIC VERSION**<br><br>**(Oral Argument Scheduled)**<br><br>Date:    June 25, 2015<br>Time:    2:00 p.m. |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

TABLE OF ABBREVIATIONS ..................................................................................... viii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.  PLAINTIFFS MAKE NO ATTEMPT TO PRESENT EVIDENCE IN THE MANNER REQUIRED FOR ANALYSIS UNDER *CELOTEX*. ................... 2

II.  "EXPERTS WILL PLAY NO ROLE IN SUMMARY JUDGMENT." ................. 3

III.  PLAINTIFFS FAIL TO MEET THEIR BURDEN TO SHOW LOSS CAUSATION. ........................................................................................................ 4

    A.  The Alleged Corrective Disclosures Did Not Reveal Fraud. ....................... 4

        1.  Plaintiffs misstate the test:  A revelation of falsity is required. ............................................................................................ 4

        2.  Plaintiffs do not establish any corrective disclosure. ....................... 6

            a.  Plaintiffs do not link the challenged statements to the alleged corrective disclosures. ................................................. 6

            b.  Plaintiffs do not dispute that certain claims fail. ..................... 6

            c.  The six alleged corrective disclosures did not reveal falsity. ................................................................................... 7

    B.  Plaintiffs Also Cannot Prove That First Solar's Stock-Price Decline Was Substantially Caused by a Revelation of Fraud. ..................... 9

IV.  PLAINTIFFS FAIL TO MEET THEIR BURDEN WITH RESPECT TO THE REMAINING ELEMENTS OF THEIR SECTION 10(b) CLAIMS. ........... 10

    A.  Plaintiffs Fail to Overcome Shortcomings Fatal to Their Fraud Theory. ....................................................................................................... 10

        1.  Plaintiffs cannot overcome the bottom-up process by which the challenged statements were prepared. ...................................... 10

        2.  Plaintiffs' accusations that Defendants misled PwC are false and unsupported. ...................................................................... 12

        3.  Plaintiffs' theory of fraud fails to explain undisputed facts. ........... 13

    B.  Plaintiffs Have Not Met Their Burden with Respect to Statements Concerning the Excursion and the Remediation. ...................................... 14

        1.  Plaintiffs have not met their burden with respect to their accounting-fraud allegations. ........................................................ 16

            a.  Accruals ................................................................................ 17

            b.  Hindsight attacks on First Solar's accrual assumptions ......................................................................... 22

            c.  Revenue impacts .................................................................. 23

            d.  Accounting for returned modules ....................................... 23

2.   The evidence does not support Plaintiffs' remaining allegations regarding the excursion and remediation...................25

a.   Plaintiffs have not met their burden with respect to statements made before the excursion was discovered. ................................................................25

b.   Defendants did not have a duty to disclose the excursion before July 2010. .................................25

c.   "Risk factor" warnings are not actionable. .........................28

d.   General statements about module quality are not actionable. ................................................................28

e.   The evidence does not support a finding that Eaglesham's discussion of module physics is actionable. ................................................................29

f.   Statements concerning the percentage of modules affected by the excursion are not actionable. ........................29

g.   Interim status reports are not actionable. ...........................31

C.   Plaintiffs Have Not Met Their Burden with Respect to Claims Related to the Hot Climate Issue...................................................33

D.   Plaintiffs Have Not Met Their Burden with Respect to Claims Arising Out of CpW Reporting. ...................................................35

V.   THE INDIVIDUAL DEFENDANTS' STOCK TRANSACTIONS DO NOT SUPPORT AN INFERENCE OF SCIENTER. ..........................................36

VI.   PLAINTIFFS HAVE NOT SHOWN THAT FIRST SOLAR ACTED WITH SCIENTER..................................................................................38

VII.   FORWARD-LOOKING STATEMENTS ARE PROTECTED BY THE SAFE HARBOR..................................................................................39

VIII.   EACH DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 20(a) CLAIMS............................................................39

CONCLUSION ........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................................... 26, 30

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................ 5, 29

*Best W. Int'l, Inc. v. AV Inn Assocs. 1, LLC*,
   No. 08-2274,
   2010 WL 2595274 (D. Ariz. June 24, 2010) ............................................................ 3

*Brody v. Transitional Hosps. Corp*,
   280 F.3d 997 (9th Cir. 2002) ..................................................................................... 25

*Carlson v. Xerox Corp.*,
   392 F. Supp. 2d 267 (D. Conn. 2005).......................................................................... 24

*Caterpillar v. Great Am. Ins. Co.*,
   62 F.3d 955 (7th Cir. 1995) ...................................................................................... 39

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................... 2, 10, 14, 16

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ....................................................................... 8

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994)...................................................................................... 26

*Dirks v. SEC*,
   463 U.S. 646 (1983)...................................................................................... 36

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................... 5, 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) ................................................................................... 5

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976).......................................................................................... 2

*Glazer Cap. Mgmt. v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ......................................................................... 38, 39

*Howard v. Everex,*
    228 F.3d 1057 (9th Cir. 2000) ............................................................................... 37, 40

*Huberman v. Tag-It Pacific, Inc.,*
    314 Fed. Appx. 59 (9th Cir. 2009) ................................................................................. 5

*In re Amgen Inc. Sec. Litig.,*
    No. 07-2536,
    2014 U.S. Dist. LEXIS 183034 (C.D. Cal. Aug. 4, 2014) .............................................. 6

*In re Apple Inc. Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989) .................................................................................. 2, 36

*In re Convergent Tech. Sec. Litig.,*
    948 F.2d 507 (9th Cir. 1991) .......................................................................... 2, 27, 34

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................................... 28

*In re Daou Systems Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005) ..................................................................................... 5

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) .................................................................................. 5, 6

*In re Novatel Wireless Sec. Litig.,*
    830 F. Supp. 2d 996 (S.D. Cal. 2011) .................................................................. 16, 17

*In re NVIDIA Corp. Sec. Litig.,*
    768 F.3d 1046 (9th Cir. 2014) ...................................................................... 26, 27, 28

*In re Oracle Corp. Sec. Litig.,*
    627 F.3d 376 (9th Cir. 2010) ................................................... 2, 3, 4, 5, 6, 7, 9, 10

*In re PETCO Corp. Sec. Litig.,*
    No. 05-0823,
    2008 WL 8876554 (S.D. Cal. Apr. 29, 2008) .............................................................. 40

*In re REMEC Inc. Sec. Litig.,*
    702 F. Supp. 2d 1202, 1258 (S.D. Cal. 2010) .................................................. 14, 16, 28

*In re Rigel Pharms., Inc. Sec. Litig.,*
    697 F.3d 869 (9th Cir. 2012) .................................................................................. 27, 36

*In re Sofamor Danek Grp., Inc.,*
    123 F.3d 394 (6th Cir. 1997) ...................................................................................... 26

*In re Sybase, Inc. Sec. Litig.*,
    48 F. Supp. 2d 958 (N.D. Cal. 1999) ............................................................................... 34

*In re Tyson Foods, Inc. Sec. Litig.*,
    155 Fed. Appx. 53 (3d Cir. 2005) ..................................................................................... 39

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ..................................................................................... 37, 38

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................... 11, 26, 38

*In re Versant Object Tech. Corp.*,
    No. 98-0299,
    2000 WL 33960105 (N.D. Cal. May 18, 2000) ................................................................ 26

*In re Wyse Tech. Sec. Litig.*,
    No. 89-1818,
    1990 WL 169149 (N.D. Cal. Sept. 13, 1990) ................................................................... 27

*In re Yahoo! Inc. Sec. Litig.*,
    No. 11-2732,
    2012 WL 3282819 (N.D. Cal. Aug. 10, 2012) ................................................................. 26

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011) ....................................................................................................... 2

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ............................................................................................ 40

*Kodimer v. County of San Diego*,
    No. 07-2221,
    2010 U.S. Dist. LEXIS 65090 (S.D. Cal. June 30, 2010) ................................................ 40

*Komie v. Saxton*,
    277 Fed. Appx. 750 (9th Cir. 2008) .................................................................................... 5

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .......................................................................... 4, 5, 7, 8, 9

*Mathews v. Centex Telemgmt., Inc.*,
    No. 92-1837,
    1994 WL 269734 (N.D. Cal. June 8, 1994) .......................................................... 4, 16, 27

*Mauss v. NuVasive, Inc.*,
    No. 13-2005, 2014 WL 6980441 (S.D. Cal. Dec. 9, 2014) ................................................ 6

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................... 5, 7, 37, 38

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   No. 06-6863,
   2008 U.S. Dist. LEXIS 68419 (C.D. Cal. July 10, 2008) ........................................... 19

*Nathanson v. Polycom, Inc.*,
   No. 13-3476,
   2015 WL 1517777 (N.D. Cal. Apr. 3, 2015) ............................................................. 8

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ..................................................................... 36

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) ..................................................................... 38

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) ................................................................... 4, 5

*Oregon Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ................................................................... 5, 6, 9

*Paracor Fin., Inc. v. GE Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ..................................................................... 39

*Plevy v. Haggerty*,
   38 F. Supp. 2d 816 (C.D. Cal. 1998) ............................................................. 28

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................... 39

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................. 13, 28, 39

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ..................................................................... 29

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..................................................................... 36

*SEC v. Lipson*,
   278 F.3d 656 (7th Cir. 2002) ..................................................................... 36

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ................................................................... 28

*Special Situations Fund III QP, L.P. v. Brar,*
No. 14-04717,
2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ................................................................. 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ........................................................................................................ 2

*United States v. Green,*
523 F.2d 229 (2d Cir. 1975) ...................................................................................... 13, 14

*United States v. O'Hagan,*
521 U.S. 642 (1997) ................................................................................................... 26, 36

*Vernazza v. SEC,*
No. 01-71857,
2003 U.S. App. LEXIS 14351 (9th Cir. Apr. 24, 2003) ............................................... 27

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ..................................................................................... 11, 27

**STATUTES AND RULES**

Sec. Exch. Act 1934
§ 10(b) ............................................................................................. 1, 10, 25, 26
§ 20(a) ............................................................................................................ 39, 40

Fed. R. Civ. P.
Rule 44.1 ....................................................................................................................... 15

Fed. R. Evid.
Rule 1002 ...................................................................................................................... 15

Accounting Standards Codification
ASC 275-10-50-8 ........................................................................................................ 22
ASC 460-10-25-6 ........................................................................................................ 23

**TABLE OF ABBREVIATIONS**

| ABBREVIATION | DOCUMENT |
|---|---|
| Mot. | Defendants' Motion for Summary Judgment, filed March 27, 2015 (Dkt. No. 311) |
| Opp. | Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, filed April 27, 2015 (Dkt. No. 358) |
| DX | Appendix of Exhibits [1 through 90] in Support of Defendants' Motion for Summary Judgment, filed March 27, 2015 (Dkt. Nos. 327 through 340) |
| PX | Exhibits to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, filed April 27, 2015 (Dkt. Nos. 359 through 372) |
| RX | Appendix of Rebuttal Exhibits In Support of Defendants' Motion for Summary Judgment, filed May 22, 2015 |
| [Surname] Decl. | All declarations filed on March 27, 2015, and April 27, 2015, cited by reference to declarant's surname (*e.g.*, Flum Decl.) |
| [Surname] Rebuttal Decl. | All declarations filed on May 22, 2015, cited by reference to declarant's surname (*e.g.* Flum Rebuttal Decl.) |

**INTRODUCTION**

Plaintiffs' Opposition disregards controlling authority, ignores the fatal deficiencies in their case, and presents a false narrative unsupported by evidence. As to loss causation, Plaintiffs disregard the Ninth Circuit's test, which requires proving that a corrective disclosure revealed the falsity of an earlier fraudulent statement. Using the wrong test, which would turn securities fraud lawsuits into a "downside insurance policy," Plaintiffs naturally come up with the wrong result. On loss-causation grounds alone, summary judgment should be granted.

As to the elements of falsity and scienter, Defendants showed that all challenged disclosures were prepared through a bottom-up process based on information supplied by professionals who are not Defendants. Plaintiffs do not deny that the burden shifted to them to present evidence showing that an Individual Defendant subverted the process. Their only attempts to meet this burden, however, consist of false allegations that Individual Defendants "cut short" "investigations," with citations to documents showing nothing of the kind.

Defendants cited numerous cases explaining that Plaintiffs cannot prove a Section 10(b) accounting-fraud case absent some evidence that an Individual Defendant concealed information from independent auditor PwC. Again, Plaintiffs do not deny their burden. Their only attempts to meet it, however, consist of accusations that are disproved by the very documents they cite.

Plaintiffs do not contest that they bear the burden of supporting a coherent, plausible fraud theory. Yet they never answer the basic questions asked in Defendants' opening brief: How or why did this alleged scheme get started over a year before the excursion was discovered? How or why were executives added and dropped? How has this years-long fraud been concealed—even to this day—from PwC and the Audit Committee? Plaintiffs respond with heat, rather than light: Unspecified "defendants" "schemed" to "conceal" "massive" "defects" that were "threatening the Company's very viability." The language is colorful, but the story makes no sense.

**ARGUMENT**

**I.    PLAINTIFFS MAKE NO ATTEMPT TO PRESENT EVIDENCE IN THE MANNER REQUIRED FOR ANALYSIS UNDER *CELOTEX*.**

Plaintiffs do not dispute that Defendants have met their initial burden under *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and have, thereby, shifted the burden to Plaintiffs to "come forth with evidence from which a jury could reasonably render a verdict" in their favor.  (Mot. at 29.)[1]  In a securities class action, this burden "is not a light one."  *Oracle*, 627 F.3d at 387. To defeat a motion for summary judgment, therefore, Plaintiffs must present evidence sufficient for a jury to find—separately with respect to each alleged statement and each Individual Defendant—that:  (1) the Individual Defendant "made" the statement within the meaning of *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011); (2) at the time the Individual Defendant made the statement, it was materially false or misleading to investors; and (3) at the time the Individual Defendant made the statement, he was acting with scienter—"the intent to deceive, manipulate, or defraud" investors.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *see also Convergent*, 948 F.2d at 512 (analyzing claims on a statement-by-statement basis); *Apple*, 886 F.2d 1109 (same); (Mot. at 41).  Further, with respect to each challenged statement, Plaintiffs must present evidence of loss causation.

An orderly presentation of the evidence is especially important here, where Plaintiffs have challenged 167 statements by seven "makers."  (*See* RX 1.)  Yet Plaintiffs make no effort to shoulder this burden.  For instance, rather than identify a "maker" of each statement based on evidence, as *Janus* requires, Plaintiffs submit a chart alleging that each Individual Defendant is responsible for virtually every statement made during his

---

[1] Plaintiffs say their summary judgment burden as to scienter and materiality is "less stringent" than at the pleading stage, because they must "plead more than they must prove at trial." (Opp. at 4.)  The Supreme Court disagrees:  A "plaintiff is not forced to plead more than she would be required to prove at trial" with respect to scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328-29 (2007).  Further, the same *Celotex* standard applies for all elements.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991); *In re Apple Inc. Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989).

tenure as a director or employee. (Pls.' App. A.)[2]  And Plaintiffs completely ignore entire categories of statements—for example, statements concerning revenue recognition (FAC, Dkt. No. 93 ¶¶ 163-191)—presenting no evidence on falsity, scienter, or materiality.[3]

Throughout, Plaintiffs refer indiscriminately to "defendants," "management," "executives," or "First Solar."  These vague terms overwhelmingly refer not to Individual Defendants, but rather to First Solar engineers, such as Koralewski and Kallenbach, who are **not** defendants and who did **not** make any challenged statements.

While Plaintiffs acknowledge their burden of presenting "contemporaneous" evidence of Defendants' knowledge of falsity (*e.g.*, Opp. at 2), they repeatedly cite documents out of time to support fraud-by-hindsight arguments.  For example, Plaintiffs assert that statements were fraudulent because they concealed what "the defect would ultimately cost." (Opp. at 29.)  This style of argument ignores that Defendants learned new information as the four-year Class Period progressed.

Summary judgment is appropriate where, as here, Plaintiffs have failed to meet their burden of presenting the evidence in the manner required.  *Oracle*, 627 F.3d at 385-86.  "It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles." *Id.* at 386; *see also Best W. Int'l, Inc. v. AV Inn Assocs. 1, LLC*, No. 08-2274, 2010 WL 2595274, at *5 (D. Ariz. June 24, 2010).

## II.    "EXPERTS WILL PLAY NO ROLE IN SUMMARY JUDGMENT."

More than a year and a half ago, when establishing the schedule upon which this

---

[2] Plaintiffs' vague allegations concerning the roles of the Individual Defendants fall far short of presenting admissible evidence to support each element with respect to each challenged statement and each Individual Defendant. Many are unsupported or outright fabrications. For example, Plaintiffs assert that Gillette was a member of the Disclosure Committee (Opp. at 5), but unrebutted evidence shows the opposite. (Gillette Decl. ¶ 26 ("The Disclosure Committee reported to me; I was not a member and did not attend their meetings.").) Plaintiffs claim "Ahearn drafted, edited and approved press releases and earnings call scripts" (Opp. at 5), but cite no evidence for this.

[3] As another example, Plaintiffs also present no evidence about Ahearn's statement that "we have had on occasion issues…. That has all been reflected in our financials." (Mot. at 51-52 n.38; DX 1 stmt. 166.) Thus, they concede a lack of falsity and scienter.

case would proceed, the parties agreed with the Court that "experts will play no role in summary judgment." (Dkt. No. 179 at 30:24-25, 31:4.)  Yet Plaintiffs have proffered declarations from two professional witnesses—Bjorn Steinholt and Paul Regan—and argued that summary judgment should, on this ground, be denied.  (Opp. at 28, 57.) Plaintiffs sought no leave, and gave no notice.  The improperly submitted declarations and accompanying exhibits—which amount to little more than paid speculation—should be disregarded.  In any event, as discussed below, they are no substitute for the evidence Plaintiffs lack.[4]

## III.   PLAINTIFFS FAIL TO MEET THEIR BURDEN TO SHOW LOSS CAUSATION.

### A.   The Alleged Corrective Disclosures Did Not Reveal Fraud.

#### 1.   Plaintiffs misstate the test:  A revelation of falsity is required.

Defendants cited controlling Ninth Circuit cases—*Apollo*, *Loos*, *Oracle*, *Metzler*—setting forth the test for loss causation:  Plaintiffs must show that "the market learn[ed] of a defendant's fraudulent act or practice, the market react[ed] to the fraudulent act or practice, and plaintiff suffer[ed] a loss as a result of the market's reaction."  (Mot. at 30-31.)  As Defendants showed, Plaintiffs' six alleged "corrective disclosures" do not meet this controlling test.[5]  In response, Plaintiffs argue that the Ninth Circuit does not require that corrective disclosures reveal the falsity of prior statements, and that the Ninth Circuit applies a different test, a vague "financial impact" test.  (Opp. at 56-57.)

The Ninth Circuit has *twice* rejected Plaintiffs' financial impact assertion.  (Mot. at 34.)  A corrective disclosure must reveal the falsity of a prior statement.  *Id.* (citing *Oracle*, 627 F.3d at 392; *Loos v. Immersion Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014);

---

[4] Numerous securities fraud cases affirm summary judgment where plaintiffs substitute paid speculation from experts for admissible evidence.  *See, e.g.*, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1122-23 (9th Cir. 2013); *Mathews v. Centex Telemgmt., Inc.*, No. 92-1837, 1994 WL 269734 (N.D. Cal. June 8, 1994).

[5] The dates for the six alleged corrective disclosures are: July 29, 2010; February 24, 2011; May 3, 2011; October 25, 2011; December 14, 2011; and February 28, 2012.

*Oregon Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014)); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011) (loss causation requires a "correction to a prior misleading statement" (citation omitted)).[6]

Plaintiffs' cases themselves turned on corrective disclosures that revealed the falsity of prior statements. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008) (publicly disclosed FDA warning letter contradicted the company's statements about compliance with federal law); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986-90 (9th Cir. 2008) (public statement revealed that "backlog" included contracts that had been halted by stop-work orders). As for *In re Daou Systems*, 411 F.3d 1006 (9th Cir. 2005), the Ninth Circuit has *twice* stated that loss causation was shown "because the market learned of and reacted to the alleged [accounting] fraud." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008); *Loos*, 762 F.3d at 888. The unpublished decision in *Huberman v. Tag-It Pacific, Inc.*, 314 Fed. Appx. 59 (9th Cir. 2009) has no analysis, while the unpublished decision in *Komie v. Saxton*, 277 Fed. Appx. 750, 751 (9th Cir. 2008), affirmed dismissal for defendants.

As a backup, Plaintiffs argue that the "materialization of the risk" test applies to their omissions claims. Far from ever endorsing a separate "materialization of the risk" test, the Ninth Circuit has described it as a "different" test applied by the Second Circuit. *Apollo*, 774 F.3d at 604; *Nuveen*, 730 F.3d at 1121-22 & n.5 (affirming summary judgment for defendants and discussing other circuits' tests in dicta). *Apollo*, *Loos*, *Metzler*, and *Oracle* all involve alleged omissions and all apply the "reveals-the-falsity" test.[7] "Materialization of the risk" is just an "end run" around the Ninth Circuit's rule, and

---

[6] Plaintiffs' policy argument that this rule grants defendants "a license to commit fraud" (Opp. at 57), runs smack into the rule's rationale: to prevent private securities fraud actions from becoming a "partial downside insurance policy." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005); (Mot. at 30).

[7] *Oracle*, 627 F.3d at 392 (alleged omissions about product quality and accounting fraud); *Loos*, 762 F.3d at 886-87 (alleged concealment of accounting fraud); *Apollo*, 774 F.3d at 608 (alleged concealment of enrollment fraud); *Metzler*, 540 F.3d at 1063 (same). The district court cases Plaintiffs cite found causation where falsity was revealed. *See Special Situations Fund III QP, L.P. v. Brar*, No. 14-04717, 2015 WL 1393539, at *9 (N.D. Cal. Mar. 26, 2015) (disclosed "cure notice" revealed that prior statements on project's

there is no "reason why one characterization of loss causation should produce a viable claim while another, on the same set of facts, does not." *Mauss v. NuVasive, Inc.*, No. 13-2005, 2014 WL 6980441, at *7 (S.D. Cal. Dec. 9, 2014).

Finally, Plaintiffs contend that summary judgment is foreclosed by this Court's order denying the motion to dismiss. (Opp. at 54.) Unsuccessful pleading challenges do not moot summary judgment motions. In fact, loss causation principles apply "with even greater force" at summary judgment. *Oracle*, 627 F.3d at 392; *Gilead*, 536 F.3d at 1049.

### 2.    Plaintiffs do not establish any corrective disclosure.

#### a.    Plaintiffs do not link the challenged statements to the alleged corrective disclosures.

Plaintiffs must "specify which of Defendants' statements were made untrue" or what claims by Defendants were invalidated by subsequent public disclosures. *Apollo*, 774 F.3d at 608. They have not linked any of the 167 alleged misstatements to any of the six alleged corrective disclosures.

All that Plaintiffs say is that the "evidence links each of the relevant disclosures to defendants' fraud." (Opp. at 56.) What does that mean? That all six disclosures corrected all 167 alleged misstatements? That the February 28, 2012 statement revealed the falsity of statements about "conversion efficiency" made nearly four years earlier? (DX 1 stmt. 1.) That the October 2011 statement announcing Gillette's departure revealed the falsity of the Company's reported net income for the third quarter of 2008? (*Id.* at stmt. 13.) This is Plaintiffs' burden. It is not for the Court and Defendants to connect the dots. *Oracle*, 627 F.3d at 385-86.

#### b.    Plaintiffs do not dispute that certain claims fail.

Even under Plaintiffs' "impact" approach, certain alleged misstatements drop out of the case. Plaintiffs do not contest Defendants' showing that none of the 63 statements

---

progress were false); *In re Amgen Inc. Sec. Litig.*, No. 07-2536, 2014 U.S. Dist. LEXIS 183034, at *63, *70-71 (C.D. Cal. Aug. 4, 2014) (disclosed guilty plea for "off-label marketing" corrected prior statements about compliance with FDA marketing rules).

about CpW has ever been revealed to be false.  (Mot. at 37; DX 3 § 6 at 45-60.)  Nor do Plaintiffs contest Defendants' showing that no disclosure has revealed the falsity of the eight challenged statements describing the LPM excursion as affecting "less than 4%" of the modules produced by First Solar between June 2008 and June 2009.  (Mot. at 37; DX 1 stmts. 92, 97, 111, 127, 139, 148, 158, 163.)  Nor do Plaintiffs contest Defendants' showing that there has never been any correction of the 33 challenged statements relating to First Solar's recognition of revenue.  (Mot. at 36; DX 3 § 2 at 12-21.)

### c.    The six alleged corrective disclosures did not reveal falsity.

### (i)    The October 25, 2011 press release

The October 25, 2011 disclosure that Gillette was replaced as First Solar's CEO is not a corrective disclosure.  Plaintiffs say the market was "surprised," "suspicious," and "concerned" that his being replaced "presaged bad news."  (Opp. at 62, 64.)  That does not matter.  Three on-point Ninth Circuit rulings have held that "concerns" and "speculation cannot form the basis of a viable loss causation theory."  (Mot. at 32 (quoting *Loos*, 762 F.3d at 890; citing cases).)[8]

Plaintiffs try to distinguish this case on the ground that the "speculation" was later realized at the end of the Class Period.  (Opp. at 63, 64.)  But Plaintiffs present no evidence to support that false accusation.  Furthermore, a disclosure that "puts investors on notice of a *potential* future disclosure of fraudulent conduct" does not cause loss. *Loos*, 762 F.3d at 890.  Plaintiffs' argument would allow stock drops to come before corrective disclosures, violating the admonition that courts make a "careful delineation between losses caused after [a] company's conduct was revealed, and losses suffered before the revelation," which are not recoverable.  *Metzler*, 540 F.3d at 1063.

The CEO departure cases Plaintiffs cite demonstrate what is missing here.

---

[8] Plaintiffs point to "internal evidence"—emails, a draft earnings call script, a handwritten note, deposition testimony, and a couple of presentations. (Opp. at 58-59 & n.54, 61-62, 65.)  A company's internal documents are "not evidence of what the market learned of and reacted to." *Oracle*, 627 F.3d at 393-94. Plaintiffs also argue that Gillette's departure was "linked" to unspecified "performance issues." (Opp. at 63.)  They do not, however, cite any evidence linking his departure to any wrongdoing.

DEFENDANTS' REPLY BRIEF ISO MOTION FOR SUMMARY JUDGMENT                    7

*Polycom* involved allegedly misleading statements concerning the CEO's compliance with expense reimbursement policies.  The alleged corrective disclosure announced both that he had resigned and that the company had found "irregularities" in his expense reports.  *Nathanson v. Polycom, Inc.*, No. 13-3476, 2015 WL 1517777, at *3, *12 (N.D. Cal. Apr. 3, 2015).  The alleged misrepresentation in *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128 (N.D. Cal. 2013), was the CEO's compliance with an ethics code.  The alleged corrective disclosure announced both that he had resigned and that he had "irreparably comprised [sic] the board's trust by misleading directors."  *Id.* at 1134.  There is nothing like that here.

### (ii)    The December 14, 2011 press release

The December 14, 2011 press release is not a corrective disclosure.  Plaintiffs argue that First Solar's December 14, 2011 "guidance reduction resulted from the financial impact of the manufacturing excursion and heat degradation."  (Opp. at 65.)  This is just Plaintiffs' rejected "impact" theory.  Plaintiffs do not show that the "market must have learned of and reacted to the company's fraudulent practices as opposed to the financial impact of those practices."  *Loos*, 762 F.3d at 887-88; (Mot. at 33-34).

### (iii)    The four Earnings Releases

First Solar's Earnings Releases on July 29, 2010, February 24, 2011, May 3, 2011, and February 28, 2012, did not correct any earlier statements. (Mot. at 35-38.)  Plaintiffs point out that on those dates revenue targets were missed (Opp. at 59); guidance was lowered (*id.* at 58, 59, 61); losses were incurred (*id.* at 61); or sales went down (*id.* at 66).  That "impact" evidence does not meet Plaintiffs' burden.  (*See*, § III.A.1, *supra*.)

Plaintiffs also argue that the February 2012 accruals "plainly corrected" First Solar's earlier statements (Opp. at 67),[9] suggesting that increasing the amount of an accrual reveals previously concealed costs.  (*Id.* at 54.)  It does not.  Accruals are estimates of future expenses that must be updated quarterly. (Mot. at 35.)  Every time

---

[9] This is the only time Plaintiffs even argue that a First Solar announcement corrected any previous statement.

First Solar did so, including in February 2012, it revealed that it was engaged in accounting—not accounting fraud. No evidence shows a "'revelation' of a prior false statement to the market." *Loos*, 762 F.3d at 889.

Rather than identify an actual correction on February 28, 2012, Plaintiffs make one up, labeling some of the accruals a "warranty restatement." (Opp. at 64, 66.) There was no restatement. No document says there was a restatement. No testimony, even from Plaintiffs' "experts," says there was one. And it is undisputed that PwC never described First Solar's accruals as a restatement, nor called for one. (*See* Mot. at 29, 35.) As in *Oracle*, First Solar's "earnings have never been revised downward." 627 F.3d at 394.

That leaves Plaintiffs to argue that the first disclosure of the LPM excursion on July 29, 2010, was a "partial disclosure of previously concealed product problems." (Opp. at 58.) But Plaintiffs do not show what earlier "statements were made untrue" by the disclosure. *Apollo*, 774 F.3d at 608. Under Plaintiffs' logic, disclosures of all setbacks would be revelations of "fraud." The loss-causation element prevents this by requiring a corrective disclosure. *Id.*

**B.      Plaintiffs Also Cannot Prove That First Solar's Stock-Price Decline Was Substantially Caused by a Revelation of Fraud.**

A separate, independent ground for granting summary judgment is Plaintiffs' failure to establish that the purported misrepresentations were a substantial cause of the decline in First Solar's stock price. (Mot. at 38 (citing cases).) Plaintiffs' only evidence on this issue is the report of Steinholt, a purported "expert" who was supposed to play "no role" on summary judgment. He does not even purport to address whether the six disclosures are corrective, but just assumes they are, based on his "discussions with Plaintiffs' counsel." (Steinholt Decl. ¶ 16.) His opinion thus has no bearing on the dispositive arguments raised in section III.A.

In any event, Steinholt does not support Plaintiffs. He erroneously relies on the Fifth Circuit's inapposite "foreseeable economic consequences" test. (Steinholt Decl. ¶ 19.) He also does not show that it was fraud, rather than "changed economic

circumstances, changed investor expectations, or new industry-specific or firm-specific facts," that led to stock-price declines. *Dura*, 544 U.S. at 342-43.

Finally, as Plaintiffs acknowledge (Opp. at 55), a revelation of fraud must be a "substantial cause" of the stock price decline. *Oracle*, 627 F.3d at 388. Steinholt opines that three of the six alleged corrective disclosures "contributed substantially" to the ensuing stock price decline. But even Steinholt does not opine that the three other alleged corrective disclosures were a "substantial cause" of any decline, saying instead that they either "contributed" to a stock price decline (May 3, 2011, and Dec. 14, 2011) or "mitigated" a later decline (Oct. 25, 2011), a novel unsupported theory. (Steinholt Decl. ¶ 75.) For this reason as well, these three statements are not corrective disclosures.

## IV.   PLAINTIFFS FAIL TO MEET THEIR BURDEN WITH RESPECT TO THE REMAINING ELEMENTS OF THEIR SECTION 10(b) CLAIMS.

### A.   Plaintiffs Fail to Overcome Shortcomings Fatal to Their Fraud Theory.

As Defendants showed, Plaintiffs cannot prove fraud for three basic reasons: (1) no evidence shows that any Individual Defendant ever subverted the bottom-up process by which engineers and accountants prepared the challenged statements (Mot. at 12-17, 42-45, 57); (2) no evidence shows that any Individual Defendant ever withheld any information from PwC (Mot. at 58-59); and (3) basic, undisputed facts are inconsistent with the alleged fraud scheme. (Mot. at 60-61.) Plaintiffs have failed to carry their *Celotex* burden of presenting admissible evidence on any of these three points. On this ground alone, the Court should grant summary judgment.

#### 1.   Plaintiffs cannot overcome the bottom-up process by which the challenged statements were prepared.

Defendants described in detail the bottom-up process by which the warranty accrual, the LPM Remediation Accrual, and the other challenged statements were prepared and reviewed by non-defendant engineers, accountants, and auditors before being filed. (Mot. at 12-17.) Plaintiffs do not dispute what numerous on-point cases hold: they cannot meet their burden of proving scienter under such circumstances absent

evidence that the Individual Defendants subverted the process. (*Id*. at 57.)[10] Yet Plaintiffs do not identify a single such instance.

Of the thousands of sub-certifications produced during discovery, Plaintiffs identify one exception, which Sohn submitted in Q2 2009. (Opp. at 12.) But Plaintiffs do not dispute that the disclosure issue flagged by Sohn was cleared by the Disclosure Committee before any filing was made. (RX 16 at 118:4-119:21; *see also* Mot. at 15.) This action is, thus, fully consistent with the process and undermines Plaintiffs' argument that Sohn was engaged in a scheme to conceal.

Plaintiffs' other attacks on the process either miss the point ("defendants had the final say on everything" (Opp. at 52)); are impossibly vague ("The Individual Defendants were intimately involved in day-to-day operations . . ." (*id.* at 52)); or misrepresent the evidence. In this regard, Plaintiffs falsely assert that "First Solar's IA performed an analysis of the LPM defect and concluded that senior management was responsible." (*Id.* at 53.) The document Plaintiffs cite—PX 256—is an after-hours, instant message chat session between two mid-level employees, speculating about year-end bonuses.[11]

Similarly false is the accusation that Ahearn "shut down the IA investigation into LPM and cancelled the remaining investigation interviews." (Opp. at 53.) To the contrary, the head of Internal Audit testified that all relevant witnesses had been "exhaustively" interviewed. (RX 17 at 76-81.)[12] Also false is the accusation that Gillette "directed that the 'hit rate' be improperly increased to minimize the financial impact of

[10] *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (9th Cir. 2012), confirms this point. There, the defendants "direct[ed] baseless adjustments to the company's financial statements" themselves, outside of the company's normal process. *Id*. at 710. The record here is consistent with cases that *VeriFone* distinguished, which held that management's discussions and even close reviews of inventory numbers did not support an inference that the company's financial reports were being manipulated. *Id*. (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-91, 1000 (9th Cir. 2009)).

[11] The messages immediately above and below Plaintiffs' out-of-context quotation read "*j/k [just kidding]*" and "yeah - it's not IAs fault, *I'm joking*." (PX 256.)

[12] Plaintiffs rely on an out-of-context statement in an email from Ondria LaMorte for the speculative claim that Ahearn was involved. LaMorte's email states: "No investigation interviews—project cancelled (Gaffney & Ahearn work was done . . .)." (PX 255.) It does not say that Ahearn or Gaffney—*outside counsel* hired by the Audit Committee— shut down the investigation or cancelled interviews. (Opp. at 53.)

the LPM defect." (Opp. at 24, 52-53.)  The document Plaintiffs cite—PX 118—says nothing of the kind.[13]  And no evidence suggests Meyerhoff "shut down" the CpW investigation.  (Opp. at 53.)[14]

### 2.      Plaintiffs' accusations that Defendants misled PwC are false and unsupported.

As Defendants also showed, on-point cases hold that a plaintiff cannot meet its burden of proving fraud where the allegedly concealed information was made available to an outside, independent auditor like PwC.  (Mot. at 42, 59.)  Again, Plaintiffs do not disagree with this point of law.  To avoid this precedent, Plaintiffs assert that First Solar "provided PwC with inaccurate and incomplete information."  (Opp. at 51-52.)  But as this Court's review will confirm, each time Plaintiffs assert that First Solar misled PwC, either the evidence unambiguously shows that First Solar provided the supposedly concealed information to PwC[15] or the cited documents offer no support.[16]

Plaintiffs also incorrectly imply that PwC's work was somehow incomplete because PwC did not perform full audits each quarter.  (Opp. at 52.)  This does not answer the point that the Individual Defendants never concealed any information from PwC.  Also, the evidence is crystal clear that PwC performed comprehensive quarterly reviews and then, during the year-end audits, examined "the Company's previously issued

---

[13] PX 118 is an email from Sohn to Koralewski, reporting that Gillette wants the team to "exhaust all opportunities to increase the hit rate . . . ."  In response, Sohn suggests a number of new technical procedures.  (*Id.*)  Plaintiffs present no evidence that these measures were not pursued.

[14] The statement Plaintiffs claim shut down the investigation was made a month *after* the investigation concluded.  (PX 6 at 126:18-127:22; RX 19; DX 31.)

[15] Plaintiffs say First Solar "falsely told" PwC it performed an updated LCM analysis in 2011, even though the analysis itself is documented and was transmitted to PwC.  (*See infra*, § IV.B.1.d.)  Plaintiffs say Defendants told the Board one thing about hot climate exposure and told PwC another, but the PwC workpapers contain the *very same Board presentation* the Plaintiffs say was concealed.  (*See infra*, § IV.C.)

[16] Plaintiffs label Kallenbach's statements to PwC in Q2 and Q3 2011—about his belief that claims beyond certain thresholds would be rejected—as "false," but present no evidence Kallenbach's belief was false.  (*See infra*, § IV.B.1.a.v-vi.)  Plaintiffs say that PwC believed replacement modules were recorded in inventory only after receipt and testing, but the evidence shows otherwise.  (*See infra*, § IV.B.1.d.)

quarterly financial statements" for a second time. (D'Angelo Decl. ¶¶ 5-6, 8.) During this process, PwC specifically addressed both the quarterly LPM Remediation Accrual and the separate warranty accrual. (*Id.* ¶¶ 13-15.) PwC again endorsed First Solar's accounting after reviewing the accruals for a ***third time*** during its 2012 audit. (*Id.* ¶ 16; DX 25.)

Thus, under Plaintiffs' own authority, the Court should enter summary judgment based on "*unrebutted* evidence showing that [Defendants'] accountants had full knowledge of the disputed transactions." *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir. 1996).

### 3.    Plaintiffs' theory of fraud fails to explain undisputed facts.

Also fatal to Plaintiffs' "straightforward securities fraud" case (Opp. at 1) is the fact that Plaintiffs' fraud theory is incoherent in light of facts that Defendants pointed out (Mot. at 60) and Plaintiffs have not disputed. For example, how could it be that "Defendants' scheme drove First Solar's share price to over $300 per share by the start of the Class Period"? (Opp. at 1.) The excursion did not even begin until months later and was not detected until over a year later. The hot climate issue was not recognized until 2011. Defendants asked, "What was this April 2008 conspiracy all about, and where is the evidence supporting its existence?" (Mot. at 60.) The answer, apparently, is that there is none. Plaintiffs identify no evidence to fill in the other gaps Defendants identified in the fraud theory, such as why Ahearn would turn over the reins of a massive securities fraud to Gillette, the president of Honeywell Aerospace, a person with whom he had no prior relationship. (*Id.* at 60-61.) And why, if Gillette, Widmar, and Kallenbach were executing a securities fraud scheme, would they buy—rather than sell—at the fraudulently inflated price? Rather than confront the on-point cases that grant summary judgment where fundamental questions like these are unanswered, Plaintiffs cite *United States v. Green*, 523 F.2d 229 (2d Cir. 1975), a case about fish theft and organized crime in the 1960s, which illustrates what is missing here.[17]

---

[17] In *Green*, one of the conspirators testified how the conspiracy worked: The trucking company owner demanded that drivers who were stealing frozen fish from the piers had to provide him with half their profits. *Id.* at 231-32. As new drivers started, they were told

**B.** **Plaintiffs Have Not Met Their Burden with Respect to Statements Concerning the Excursion and the Remediation.**

The shortcomings identified above—(1) failure to present the evidence in a manner that corresponds to Plaintiffs' burden of proof; (2) failure to show any corruption of the bottom-up process; (3) failure to show that any information was concealed from PwC; and (4) failure to present a coherent theory of fraud—each independently warrant entry of summary judgment. In addition, Plaintiffs have failed to meet their *Celotex* burden with respect to falsity, materiality, and scienter in connection with each category of statement for the reasons set out below.

Undermining all of Plaintiffs' arguments concerning the excursion and remediation is Plaintiffs' background narrative, which grossly distorts basic points on which the evidence leaves no genuine basis for dispute. As Plaintiffs would have it, all modules that exhibited any measurable power loss—even 5%—were "defective." This is unsupported and false. First Solar modules—like all solar modules and most things in the world— degrade over time. (Mot. at 27.) This well-known characteristic did not make them all "defective." Some modules degraded at different rates from others, which balanced out in systems consisting of up to hundreds of thousands of modules. (*See* Eaglesham Decl. ¶¶ 24-26; *see also* RX 26 at 60; Koralewski Rebuttal Decl. ¶ 5.)

Plaintiffs falsely imply that First Solar had a warranty obligation to root out and replace all so-called "defective" modules. First Solar's warranty is in evidence, and its terms are clear: First Solar was *not* obligated to find underperforming modules, or to rip and replace such modules. (Mot. at 9-10.) Rather, it was up to customers to perform these tasks and ship the modules back to First Solar (all at their own expense), which was then required to send replacements only if the modules tested at 15% power loss or

---

the rules. *Id.* The conspirator testified about multiple incidents in which truckers stole fish and split the profits. *Id.* On point is *In re REMEC Inc. Securities Litigation*, where the court explained that a change in executives "considerably weakens any inference that the two officers carried out a continuous scheme to conceal REMEC's true financial condition." 702 F. Supp. 2d 1202, 1258 (S.D. Cal. 2010), which Plaintiffs do not distinguish.

greater.  (*Id.*; DX 63.)  Plaintiffs argue that the "European Statutory Warranty" (ESW) obligated First Solar to replace all modules that experienced power loss greater than 5% "in the first 2 years."  (Opp. at 15-16.)  This argument fails for numerous reasons—such as that the ESW does not create a legal obligation and First Solar never received a claim under it—and is entirely unsupported by evidence.[18]

First Solar's warranty engineers knew, based on years of experience, that warranty claims were almost never made for two reasons:  (1) customers monitored power at the system level, where module-by-module variations evened out; and (2) it was not cost effective for customers to find, remove, test, and ship back individual modules.[19]  (DX 75 at 62-63.)  Analysis on these issues was presented in white papers supporting the warranty accruals.  (*See*, *e.g.*, *id.*)

The excursion was different.  It occurred because of a process change—FR421—that was in place from June 2008 to June 2009, and it resulted in a small percentage of modules displaying a rapid drop in power output followed by stabilization.  (Mot. at 20 n.13.)  Some customers who received a significant number of these modules noticed system-level power loss.  First Solar responded by offering to remediate the effects of the excursion—above and beyond its limited warranty obligation.  It did so by ripping and replacing modules as necessary to bring affected sites back to expected system-level power output.  (Mot. at 18.)

---

[18] The ESW argument fails on the grounds that (1) emails between engineers are not evidence of the ESW, *see* Fed. R. Civ. P. 44.1; Fed. R. Evid. 1002; (2) the ESW is only an EU guideline to member nations without legal effect (*see* RX 2 at L171/14); (3) the guideline excludes the types of sales at issue here—sales to commercial entities selling electricity to the grid (*see* RX 2 at L171/14 ("For the purposes of this Directive: *consumers* shall mean any **natural person** who, in the contracts covered by this Directive, is acting for purposes which are **not related to his trade, business or profession**.")); (4) the guideline does not require payment of rip-and-replace costs; (5) First Solar never received a claim under the ESW or any related country warranties; and (6) in any event, First Solar considered potential claims under statutory warranties when estimating its anticipated return rates.  (DX 82 at 47; RX 15 at 241:23-242:16.)

[19] Plaintiffs' claim that First Solar's warranty was triggered by 10% power loss is unsupported by admissible evidence.  Shorthand deposition explanations of the warranty are inadmissible to prove the content of the warranty under Fed. R. Evid. 1002.  The warranty itself states that modules must exhibit 15% power loss (including a 5% measurement error) within the first ten years to trigger coverage.  (DX 63.)

Plaintiffs misleadingly imply that the remediation program was much more—an undertaking to ferret out, remove, and replace *all* "low power modules."  (Opp. at 24.) They present no evidence to support this notion.  The fact that the goal of the remediation—restoration of expected *system* power levels—sometimes involved the incidental replacement of modules unaffected by the excursion does not show that First Solar was somehow required to replace all such modules.

As explained in Defendants' opening brief, First Solar estimated and accrued the rip-and-replace costs based on a defined, controlled process, whereby engineers estimated the number of modules that would be replaced and accountants projected the resulting expenses.  These rip-and-replace expenses were not required by warranty and, therefore, were accrued in a separate LPM Remediation Accrual.  (Mot. at 41-42.)

**1.    Plaintiffs have not met their burden with respect to their accounting-fraud allegations.**

Plaintiffs have failed to meet their *Celotex* burden on their accounting-fraud claims arising out of the remediation.  As Defendants showed, and as Plaintiffs' authority confirms, to prove falsity, Plaintiffs must prove that the accounting "was *wholly outside the zone of reasonable disagreement.*"  *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1013 (S.D. Cal. 2011) (emphasis added).  Thus, "the opinion of an expert that a defendant's accounting should have been different is not sufficient to defeat summary judgment."  *Id.*[20]  Instead, Plaintiffs must demonstrate that both First Solar's internal accounting team and PwC—which approved everything—were acting at all times "wholly outside the zone of reasonable disagreement."  *Id.*

As to scienter, Plaintiffs must present evidence showing that the Individual Defendants who made the challenged statements, most of whom had no accounting

---

[20] As *Novatel* explained, Plaintiffs cannot avoid summary judgment merely by submitting an expert declaration (coincidentally, the same expert used here) that is critical of the challenged accounting:  "[I]f Mr. Regan's opinion were fully supported, which it is not, at most it would establish the existence of 'two permissible judgments,' which amounts to nothing more than a difference of opinion on accounting practices and is not enough to 'create a triable issue of fact.'"  830 F. Supp. 2d at 1014-15.  Other decisions are in accord.  *See*, *e.g.*, *REMEC*, 702 F. Supp. 2d at 1215; *Mathews*, 1994 WL 269734, at *6-7.

training, "knew, or at least recklessly disregarded, that the accounting was inaccurate." *Id*. at 1013.  Plaintiffs do not attempt to dispute this test or distinguish the on-point cases Defendants cited granting summary judgment using this test.  (Mot. at 59.)

### a.    Accruals

#### (i)    Q1 2008 through Q1 2009

Plaintiffs do not dispute that First Solar established the LPM Remediation Accrual in Q2 2009, as soon as it committed to the remediation.  Nor do Plaintiffs present any evidence that this accrual should have been recorded earlier or was prepared unreasonably.  On this ground, Defendants are entitled to summary judgment with respect to Plaintiffs' accounting fraud claims for the period before Q2 2009.

#### (ii)    Q2 2009 through Q1 2010

Plaintiffs argue that First Solar fraudulently accrued for projected remediation costs from Q2 2009 through Q1 2010, but their own exhibits confirm that the accruals accurately reflect Koralewski's replacement-module estimates.[21]  Plaintiffs do not dispute that each of these accruals was approved by PwC.  (Mot. at 19-20.)  And even Regan does not contest them.

As Defendants showed, the Q2 2009 LPM Remediation Accrual of $1.8 million estimated beyond-warranty expenses to replace all 75,000 modules First Solar expected to remediate at that time.  (Mot. at 19; PX 131 at 93.)  Plaintiffs argue that "defendants" failed to account for another $6.5 million (Opp. at 28); this figure referred to estimated warranty costs, which were recorded in the warranty accrual (RX 20 at LPM War Analysis Tab; PX 131 at 94), not the LPM Remediation Accrual.  (*Compare* PX 131 at 95 *with id*. at 94.)

Plaintiffs admit that First Solar's Q3 2009 LPM Remediation Accrual reflected the Company's internal estimates, and present no evidence that anyone within First Solar

---

[21] PX 131 at 93, 95 (Q2 2009 accrual based on an "[e]stimated impact includ[ing] ~100k-160k modules . . . Replacement Cost Support to Customers . . . Applies to only 75k modules."); PX 123 at "Oct. 19, 2009 Model" tab (Q3 2009 accrual based on estimate of "[t]otal modules affected . . . 115,000 . . . Modules needed to reclaimed [sic] . . . 134,550").

believed that this accrual or the warranty accrual was understated.[22]  (Opp. at 29.)

Plaintiffs do not contest the accuracy of First Solar's accruals during Q4 2009. (Opp. at 29.)  The only evidence they cite concerns expenses accrued for in Q1 2010 (PX 134), which Plaintiffs do not contend should have been accrued for in Q4 2009.  (Opp. at 29.)  Plaintiffs also do not argue that the Q1 2010 accruals were false.  (*Id.*)[23]

On these grounds, Defendants are entitled to summary judgment with respect to accounting-fraud claims relative to Q2 2009 through Q1 2010.

### (iii)    Q2 and Q3 2010

Plaintiffs make two unsupported attacks on First Solar's accruals for Q2 and Q3 2010.  First, Plaintiffs argue that Gillette directed that hit rates be falsified so as to reduce First Solar's LPM Remediation Accrual.  Plaintiffs' evidence, however, shows only that the accrual properly took account of improved remediation methodologies that Koralewski projected would—and in fact did—increase hit rates for large sites.  (*See* PX 121 at 87-89 (outlining improvements).)  Plaintiffs do not dispute that these measures were successfully adopted beginning in Q3 2010.  (RX 25 at 63; 74-75.)

Second, Plaintiffs argue that "Defendants" hid the revenue impact of allocating sellable modules to the remediation.  (Opp. at 29-30.)  As discussed below, First Solar incorporated these "lost sales" into its reported revenue and its revenue guidance.  (*See,*

---

[22] Plaintiffs claim that "defendants had data [in Q2 and Q3 2009] showing that millions of First Solar modules were likely to experience premature power loss" (Opp. at 28), referencing section II.C.2.d of their opposition brief in support.  Nothing cited in that section (or anywhere else) supports this assertion.  Instead, Plaintiffs rely on hindsight. (PX 24 (Jan. 16, 2012); PX 172 (May 18, 2011); PX 57 (Apr. 13, 2010); PX 20 (Feb. 12, 2012); PX 29 (Feb. 5, 2010); PX 27 (Feb. 9, 2010); PX 111 (June 1, 2010); PX 112 (Apr. 21, 2011); PX 113 (May 16, 2010); PX 93 (May 24, 2010); PX 80 (Feb. 3, 2012).)  The only contemporaneous document Plaintiffs cite—PX 34—reports on STBi data from one plant for a six-month period predating the manufacturing excursion—well before First Solar had developed a correlation between STBi and Field Power Loss (FPL). (Koralewski Rebuttal Decl. ¶ 3.)

[23] Plaintiffs note that First Solar's total LPM expenses, including standard warranty expenses, reached $9.7 million in Q1 2010.  This figure included $4.5 million of expenses associated with the beyond-warranty remediation and $5.2 million of standard warranty expenses.  (PX 134 at 02.)  The evidence shows that these expenses were accurately incorporated into First Solar's financial statements.  (PX 134 at 693, 702, 704.)  Plaintiffs do not argue otherwise.

*infra* § IV.B.1.c.)[24]

Regan does not even mention the Q3 2010 accrual.  Nevertheless, Plaintiffs complain that Gillette was informed that the LPM remediation could "potentially" be much greater than expected, pointing to handwritten meeting notes from August 24, two months before the filing of First Solar's 10-Q.  (Opp. at 30, citing PX 138.)  Speculation that an accrual *could potentially* grow does not show it was false.[25]

On these grounds, Defendants are entitled to summary judgment with respect to accounting-fraud claims relative to Q2 2010 through Q3 2010.

### (iv)    Q4 2010 and Q1 2011

Neither Plaintiffs nor their expert challenge First Solar's LPM Remediation Accrual recorded in Q4 2010 or Q1 2011.  Regan's only complaint concerns First Solar's policy of recording refurbished modules in inventory at the lower of cost or market.  As discussed in section IV.B.1.d below, this argument is without merit.

### (v)    Q2 2011

Plaintiffs' attack on the Q2 2011 LPM Remediation Accrual is simply an attack on Kallenbach's business judgment.  Plaintiffs have presented no evidence showing that any Individual Defendant knew or "must have known" that Kallenbach's judgments were unreasonable at the time.

Plaintiffs argue that the remediation estimate Kallenbach delivered was unreasonable because some customer sites "scheduled for remediation" by a customer service team in Germany were not included.  (Opp. at 31-32.)  But Plaintiffs provide no evidence suggesting that any Individual Defendant knew that these sites were

---

[24] Plaintiffs cite a case involving options backdating, which merely confirms that claims are plausible where defendants knew that "no plausible interpretation" of GAAP permitted the accounting.  *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. 06-6863, 2008 U.S. Dist. LEXIS 68419, at *18 (C.D. Cal. July 10, 2008).

[25] Plaintiffs also claim that an email exchange between Kallenbach and Eaglesham shows that First Solar's LPM Remediation Accrual in Q3 2010 was false.  (Opp. at 30.)  Kallenbach testified that he was trying to get Eaglesham's attention in this email, and that he did not believe that the accrual needed to be increased.  (RX 12 at 187:22-188:24.)  In any event, this email exchange took place *after* First Solar released earnings and filed its Form 10-Q for Q3 2010.

"committed," much less allegedly excluded from the accrual.

Similarly, Plaintiffs' argument that Widmar and Zhu knew that the "final details" of unanalyzed claims were unresolved does not show that either man knew or must have known that the accrual was false. (Opp. at 32 n.30.) Kallenbach's judgment, based on the information available to him at the time, was that virtually all of the remaining unanalyzed claims would be rejected under the LPM remediation program. (Mot. at 23; RX 12 at 323:15-324:10; Kallenbach Decl. ¶¶ 14-18.) It is undisputed that he conveyed this judgment to First Solar's accountants who prepared the accrual. (Mot. at 23-24.)

Plaintiffs argue that Kallenbach "refused" to confirm by email to Zhu that "there would be no additional replacement costs." (*See* Opp. at 32.) But Plaintiffs admit that Zhu sent the memorandum Kallenbach prepared supporting the Q2 2011 accrual to PwC accountants (Opp. at 32 n.30; PX 154), who then discussed the accrual with Kallenbach. (PX 110 at 107:20-111:4.) Kallenbach again explained—this time to PwC—his judgment that there was no material outstanding exposure from the remaining unanalyzed claims. (*Id.*) As part of its Q2 2011 review, PwC determined that the accrual was reasonable. (DX 18.)

In any event, Kallenbach testified that he believed that the Q2 2011 accrual reflected the "best estimate we had for the manufacturing excursion projects at that time," and that there was no significant outstanding LPM remediation exposure at the end of Q2 2011. (RX 12 at 266:23-267:16, 323:15-324:10; Kallenbach Decl. ¶¶ 14-18.) Before the filing of the Q2 2011 10-Q, Kallenbach informed Widmar that he was "confident in the manufacturing excursion reserve" recorded, and that there was no basis for a further accrual. (RX 12 at 268:14-21; PX 13 at 168:11-170:24.)[26]

PwC also analyzed the Q2 2011 LPM Remediation Accrual as part of its year-end audit. After performing a detailed audit of the accrual—including evaluating remediation

---

[26] Plaintiffs state that Kallenbach "later admitted" to Widmar "months after the Company's 2Q11 disclosures" that his analysis of the remediation program was incomplete in Q2 2011. (Opp. at 32.) Needless to say, this cannot serve as evidence of Widmar's scienter at the time of the filing.

commitments made before the filing of the 10-Q—PwC advised the Audit Committee that there were no material errors. (DX 24 at 280-81, 284; *see also* DX 8.) PwC reaffirmed those conclusions again a year later. (DX 25.) Neither Plaintiffs nor Regan dispute any of this evidence.

Plaintiffs have not, therefore, shown either falsity—that no reasonable accountant would agree with First Solar's accounting (PwC did, in fact, agree); or scienter—that an Individual Defendant knew this was the case.

### (vi)   Q3 2011

For the same reasons, Plaintiffs' attack on First Solar's Q3 2011 accruals fails to establish either falsity or scienter. Plaintiffs argue that German employees in the Global Technical Services group (GTS) "estimated the total remediation volume at 206 MW in September 2011—more than 50% higher than defendants accrued at 3Q11." (Opp. at 33.) But Plaintiffs present no argument or evidence that any Individual Defendant was aware of this 206 MW estimate.[27] And GTS agreed that "it seems we will be able to meet the requirement to conclude LPM remediation within the 120MW of LPM reserve which is going to be approved." (PX 104 at 81.) It is undisputed that First Solar's Q3 2011 accrual reflected this 120 MW number. (Mot. at 24-25.) Plaintiffs fail to acknowledge that the additional remediation that GTS requested was ***unrelated*** to the excursion.[28] (RX 12 at 373:17-374:18.)[29]

Similarly, Plaintiffs argue that GTS estimated power compensation payments

[27] Plaintiffs do not even mention Ahearn in their discussions of the Q3 2011 accrual, and the undisputed evidence shows that Kallenbach told Widmar and Zhu that the 120 MW accrual was sufficient to conclude the LPM remediation. (Mot. at 24-25.)

[28] Plaintiffs assert that "***Kallenbach*** learned the LPM 'costs may continue to Rise.'" (*See* Opp. at 33.) Plaintiffs make no such claim about the Individual Defendants. PX 164 does not establish that any Individual Defendant acted with scienter. This hearsay statement, made nearly 4 months after the Q3 2011 close and after Kallenbach left the Company, does not state when or to whom this "communication" was made, and flies in the face of the contemporaneous evidence and Kallenbach's testimony. (*See* RX 24 at 58 ("I recommend to set to a reserve value [of] 120MW to conclude LPM."); Kallenbach Decl. ¶¶ 19-20.)

[29] Because First Solar did not commit to and had no obligation to perform rip-and-replace remediation for sites unaffected by the excursion, the PwC audit partner testified that accruing expenses for these sites would have been improper. (RX 9 at 135:6-136:4.)

would reach approximately $44 million, while "defendants" accrued only $8.6 million in Q3 2011. (*See* Opp. at 34.)  But Plaintiffs present no evidence either that any Individual Defendant knew of the $44 million estimate, or that the GTS estimate was not considered when the accrual was prepared.  (*See id.*)  Regan does not opine that the accrual violated GAAP.

Finally, Plaintiffs ignore the undisputed fact that during its Q3 2011 review, PwC independently analyzed and stress-tested the assumptions underlying the LPM Remediation Accrual and power compensation accrual, and approved both.  (DX 19; *see also* DX 20.)  PwC specifically evaluated the Q3 2011 accruals again as part of its year-end audit and determined that they were reasonable.  PwC found that accrual increases in Q4 2011, which form the basis for Plaintiffs' fraud-by-hindsight attack, "were not expected by Management in the third quarter nor was there a compelling basis at the time to believe that a larger accrual would be necessary based upon the information available." (DX 24 at 80-81.)

### b.    Hindsight attacks on First Solar's accrual assumptions

Plaintiffs make two additional hindsight attacks on First Solar's accruals.  First, Regan argues that, after Q2 2009, GAAP required additional disclosure that it was reasonably possible that the accruals could materially change in the near term.  (Regan Decl. ¶ 28.)  The undisputed evidence shows that Schumaker did not believe that it was reasonably possible that there would be an increase to the LPM Remediation Accrual that would be material to First Solar's financial condition.  (*See* Mot. at 42-43 n.33); *see also* ASC 275-10-50-8 (requiring materiality).  Plaintiffs present no evidence that any Defendant believed otherwise.  And Plaintiffs fail to present evidence to rebut Defendants' additional showing that First Solar's SEC filings disclosed the possibility of change. (Mot. at 42-43 n.33.)

Second, Plaintiffs imply that First Solar's warranty accrual should have reflected the costs to replace any module expected to experience any power loss.  (Opp. at 17.) This ignores that GAAP requires accrual of warranty expenses only if "it is probable that

customers will *make claims* under warranties." ASC 460-10-25-6. Plaintiffs present no evidence undermining First Solar's process for estimating costs associated with expected claims. Regan's hindsight-aided evaluation of the engineering and commercial judgments of First Solar's engineers and accountants is far beyond his expertise and is not a substitute for contemporaneous evidence of fraud. [30] (*See* Regan Decl. ¶¶ 40-41.)

### c.    Revenue impacts

Plaintiffs argue that First Solar fraudulently failed to "disclose to investors the LPM defect's massive impact on revenue." (Opp. at 31.) This argument makes no sense for two reasons. First, the undisputed evidence shows that First Solar incorporated all "lost sales" attributable to the remediation into its reported revenue and revenue guidance. (Mot. at 47 n.34; PX 8 at 134:12-21; *see also* Opp. at 59; Steinholt Decl. ¶ 42.) Second, as Plaintiffs admit, First Solar openly discussed the remediation program's impact on quarterly revenue during investor calls. For example, during the Q4 2010 earnings call, Gillette stated: "Q4 was impacted by our decision to divert some volumes to expedite the module replacement program." (Steinholt Ex. 32 at 2; *see also* Opp. at 59.)

### d.    Accounting for returned modules

Plaintiffs accuse Defendants of changing First Solar's methodology for valuing inventory in order to "mask the true size of the LPM defect." (Opp. at 35-36.) In fact, the undisputed evidence shows that First Solar never changed its methodology of valuing inventory at the lower of cost or market price ("LCM"). (PX 81 at 68; DX 48 at 70.)

First Solar recorded returned, derated modules in its inventory. (PX 170 at 62-63.) At first, these modules were "held in inventory with zero value" on the ground that First Solar had not established a market for them. (*Id.* at 62.) In Q4 2010, First Solar "established a market precedence for 'de rated' modules based on sales to three separate customers," at which point the modules were valued at cost (which was lower than

---

[30] Based exclusively on documents from 2012, Regan concludes that "First Solar applied incorrect assumptions" when calculating its accruals in 2010 and 2011. But Regan does not opine that First Solar's accruals were false, or that they were prepared in a manner inconsistent with GAAP. (*See* Regan Decl. ¶¶ 40-42.) Regan's approach is classic fraud-by-hindsight, is improper expert testimony, and cannot form the basis of a fraud claim.

market).  (RX 4.)  PwC analyzed the market determination and agreed with First Solar's valuation decision in its 2010 audit.  (*Id*.; RX 21 at 11; *see also* DX 7; D'Angelo Rebuttal Decl. ¶ 3.)

Plaintiffs argue that PwC concluded a market had not been established in Q4 2010. (Opp. at 37.)  But they cite a workpaper from the *Q3 review*.  (PX 284; D'Angelo Rebuttal Decl. ¶ 4; RX 5.)  PwC's year-end audit workpapers confirm that the additional sales in Q4 changed this assessment.  (RX 4.)[31]

Plaintiffs also criticize First Solar for estimating the number of resellable modules "while those modules were *still in transit* . . . and, thus, not yet tested," arguing that "there is no evidence PwC knew of, much less approved," the practice.  (Opp. at 36.)  In fact, the PwC audit partner testified that PwC knew First Solar "made estimates about how many modules would be functional and did not wait to test them."  (PX 110 at 193:5-15.)  In any event, Plaintiffs and their expert cite no rule that prohibits assigning value to in-transit inventory, nor do they state that it is unreasonable to do so.[32]  Additionally, Plaintiffs offer no evidence that any Individual Defendant was involved in the valuation change. Schumaker's testimony, that it was "what the executives committed us to" (Opp. at 36), did not concern this issue.  (PX 19 at 47:18-49:11.)[33]

---

[31] Plaintiffs incorrectly assert that First Solar failed to reevaluate whether a market existed on an "ongoing" basis, and then "falsely told" PwC that they could still sell modules. (Opp. at 37-38.)  But undisputed evidence shows that First Solar sold refurbished modules in Q3 2011, performed an LCM analysis in that quarter, told PwC exactly how many returned modules were sold in 2011, and explained First Solar's conclusion that the sales were "a good indication" that a market existed.  (RX 8 at 82-85.)

[32] Plaintiffs argue that the calculation should have been based on modules that "Tilbury purchased," but these were intercompany transactions with a First Solar subsidiary.  (PX 175 at 14; Schumaker Rebuttal Decl. ¶ 4.)  As such, the Tilbury transactions did not represent market price or cost.  Plaintiffs also claim that 60-watt modules should have been valued less, but neither Plaintiffs nor their expert state that First Solar's accounting treatment violated GAAP.

[33] The case Plaintiffs cite for a duty to disclose accounting details—*Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267 (D. Conn. 2005)—does not recognize such a duty.  Instead, *Carlson* involved alleged false statements about earnings, which were inflated by 37% due to accounting changes that (as defendants were advised by their auditors) violated GAAP.  *Id.* at 284-85.  The other two out-of-circuit cases cited by Plaintiffs do not even involve accounting changes.

**2.   The evidence does not support Plaintiffs' remaining allegations regarding the excursion and remediation.**

**a.   Plaintiffs have not met their burden with respect to statements made before the excursion was discovered.**

Plaintiffs have presented no evidence that the excursion was identified to any Individual Defendant before May 29, 2009.  (*See* PX 47 at 45.)  Defendants accordingly are entitled to summary judgment with respect to all statements made before this date.

Plaintiffs cite emails between engineers concerning STBi trends before and after the excursion began.  (Opp. at 8; PX 34.)  Plaintiffs do not, however, explain what the STBi data mean.  Also, as Defendants explained, First Solar could not correlate STBi and FPL until *after* analyzing LPM return data in 2010.[34]  Plaintiffs do not dispute this point, and documents they cite confirm it.[35]  Further, Plaintiffs present no evidence that STBi concerns were shared with any Individual Defendant who made a statement during this period.

**b.   Defendants did not have a duty to disclose the excursion before July 2010.**

Plaintiffs claim that Defendants waited too long—until the July 29, 2010 Earnings Call—to disclose the excursion.  This argument fails for three independent reasons.

First, Plaintiffs cannot establish Section 10(b) liability based on "concealment" of corporate information; liability arises only from a materially false or misleading *affirmative* statement.  (Mot. at 45-47); *see also Brody v. Transitional Hosps. Corp*, 280 F.3d 997, 1006 (9th Cir. 2002).  Plaintiffs' attempts to escape this point of law all fail. Plaintiffs argue that one or more "defendants"—Plaintiffs do not reveal whom—had a duty to disclose additional facts surrounding the excursion because, like all businesses,

---

[34] *See* Mot. at 20; RX 15 at 99:23-100:3; RX 10 at 120:12-25; *see also* Koralewski Rebuttal Decl. ¶ 3.  Documents created in 2010 and 2011 are not evidence that Defendants had this knowledge in 2008 and 2009.  (*See, e.g.*, Opp. at 7 n.4; PX 23 (Apr. 25, 2010); PX 24 (Jan. 16, 2012); PX 25 (Apr. 13, 2010); PX 26 (Feb. 21, 2012).)

[35] For example, the 2012 presentation that Plaintiffs cite in an attempt to establish Koralewski's knowledge of the excursion states:  "2008 . . . According to Mike K[oralewski] Global Quality noticed a hick-up [sic] in STBi *but was not sure what it meant.*"  (PX 35 at 02.)

First Solar made statements presenting its products and services in a positive light and warned about potential risks to the business. (Opp. at 13.) Non-actionable puffery and risk-factor warnings do not give rise to a duty to disclose (*see* §§ IV.B.2.c-d, *infra*). *E.g., In re Yahoo! Inc. Sec. Litig.*, No. 11-2732, 2012 WL 3282819, at \*14, \*17 (N.D. Cal. Aug. 10, 2012) (citing cases), *aff'd*, 2015 WL 2330190 (9th Cir. May 15, 2015).

Second, Plaintiffs argue that Defendants' stock sales triggered a duty to disclose, citing a criminal insider-trading case, *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). (Opp. at 14.) The courts have rejected the argument that "insider trading create[s] a duty that is transferrable to [a] securities fraud claim." *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 403 (6th Cir. 1997); *In re Versant Object Tech. Corp.*, No. 98-0299, 2000 WL 33960105, at \*16 (N.D. Cal. May 18, 2000) ("'abstain or disclose' doctrine . . . only applies to claims of insider trading") (citation omitted).

Third, Plaintiffs cite Regan's opinion that Item 303 of SEC Regulation S-K required disclosure. "Item 303 does not create a duty to disclose for purposes of Section 10(b)." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055-56 (9th Cir. 2014); *accord VeriFone*, 11 F.3d at 870. Section 10(b) is not a mechanism to enforce compliance with the myriad SEC and accounting rules filling volumes of the Federal Register—that is the job of the SEC. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994).

Additionally, Plaintiffs cannot establish materiality during this period, because (1) the excursion was over; (2) First Solar accounted for projected remediation costs in accruals; and (3) First Solar took account of all revenue effects in the guidance it provided to investors. Even Regan does not contest the accruals before July 29, 2010, or contend that they were quantitatively material. Plaintiffs have not even tried to show "a substantial likelihood" that additional information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted). (*See* Mot. at 40.) As the Ninth Circuit has explained, so long as a company accurately reports

hard data, the securities laws do not require it to narrate the details behind it.  (Mot. at 46.)

Plaintiffs respond not with evidence, but rather with hyperbole, writing that, as of early 2010, the excursion "had ballooned into a massive problem" and was "threatening the company's very viability."  (Opp. at 12.)  This unsupported assertion makes little sense, as Plaintiffs do not dispute that the total amount accrued before the Q2 2010 disclosure was approximately 0.52% of net sales and 1.79% of net income (Mot. at 46), amounts that are immaterial as a matter of law.  *Convergent*, 948 F.2d at 511-12; *Mathews*, 1994 WL 269734, at *6-7.

Plaintiffs also point to no evidence showing that any Individual Defendant knew that not disclosing this information would materially mislead investors.[36]  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (knowledge that information was not disclosed "not sufficient" to show "defendants believed they were making false or misleading statements").

Plaintiffs devote much space to presenting evidence on an undisputed—and irrelevant—point:  that Sohn sought to limit disclosure of the excursion beyond those customers directly affected.  Sohn's decision is fully consistent with a reasonable business judgment that more-widespread disclosure could be exploited by competitors to First Solar's disadvantage.  (Sohn Decl. ¶¶ 20-22.)  The federal securities laws do not regulate such judgments; they do not "require companies to denigrate their own products, and the failure to do so does not violate Rule 10b-5."  *In re Wyse Tech. Sec. Litig.*, No. 89-1818, 1990 WL 169149, at *2 (N.D. Cal. Sept. 13, 1990); *Convergent*, 948 F.2d at 516 (company had no duty to disclose problems with engineering changes merely because its internal data was more detailed than disclosed).  (*See also* § IV.B.2.d, *infra*.)

Finally, Plaintiffs make no attempt to distinguish *NVIDIA*, in which the court

[36] Plaintiffs claim that they need not prove that Defendants made an affirmative decision to exclude reference to the excursion, because there is no "specific intent" requirement.  (Opp. at 23 (citing *Vernazza v. SEC*, No. 01-71857, 2003 U.S. App. LEXIS 14351 (9th Cir. Apr. 24, 2003)).)  This argument ignores abundant Ninth Circuit authority holding that Plaintiffs must prove "deliberate recklessness," which "we continue[] to view . . . as a form of intentional or knowing misconduct."  *Zucco Partners*, 552 F.3d at 991 (citation omitted).

rejected as "implausible" plaintiffs' allegations that the defendants acted with scienter by concealing product defects, while at the same time accounting for the financial impact of such defects. 768 F.3d at 1056-58; *see also REMEC*, 702 F. Supp. 2d at 1246-47 (financial disclosures are inconsistent with an intent to deceive).

### c.    "Risk factor" warnings are not actionable.

Plaintiffs argue that warnings found in First Solar's risk factors are "actionable" because "they speak to unrealized risks that have already been realized." (Opp. at 13-14.) As Defendants explained, numerous courts within this Circuit have rejected that argument, which, if accepted, would create a perverse incentive to provide fewer, less-specific warnings. (Mot. at 48-49.) "[T]he rule in this Circuit" is that plaintiffs cannot "complain that the risks were masked as mere contingencies." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998). Plaintiffs ignore Defendants' authority, citing instead cases addressing a different point.[37]

### d.    General statements about module quality are not actionable.

As Defendants have shown, vague statements of corporate optimism are not actionable. (Mot. at 52.) Plaintiffs make no attempt to distinguish the cases that Defendants cite. Plaintiffs' cases also recognize that optimistic statements regarding a product's "high quality" "would not be actionable in the vast majority of cases," and emphasize that such statements can only be actionable in an "extraordinary case where a company's practices so depart[] from its public statements" that to reconcile them to the alleged facts would be to render the statements without "any meaning." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008). Plaintiffs have not come anywhere close to demonstrating that First Solar's statements

---

[37] Plaintiffs' cases hold that overly generalized warnings, or unrelated warnings, do not insulate defendants from liability that would arise from other statements, not from the warnings themselves. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009); *Provenz*, 102 F.3d at 1488-89.

reached this high threshold.[38]

### e.    The evidence does not support a finding that Eaglesham's discussion of module physics is actionable.

Plaintiffs selectively quote from the only statement Eaglesham made during the Class Period in an attempt to show inconsistency with the excursion. (Opp. at 13; DX 1 stmt. 40.) The statement describes highly technical characteristics of First Solar's modules ("resistive loss" and "band gap"), and does not address the reliability of First Solar's manufacturing process, much less present it as error free. (Eaglesham Decl. ¶¶ 58-63.)[39] On this ground, Eaglesham is entitled to summary judgment.

### f.    Statements concerning the percentage of modules affected by the excursion are not actionable.

At great length, Plaintiffs argue that First Solar fraudulently underestimated (by an unspecified amount) that "less than 4%" of the modules it produced from June 2008 to June 2009 were affected by the excursion. Plaintiffs fail to cite evidence showing falsity, materiality, or scienter with respect to these statements.

Fatal to Plaintiffs' scienter arguments is undisputed evidence that Koralewski repeatedly told the Individual Defendants that his "less than 4%" estimate remained accurate, even specifically approving of the language in Plaintiffs' final challenged statement concerning the scope of the excursion.[40] (*See, e.g.*, DX 80; Koralewski Decl. ¶¶ 12-19; Mot. at 49-50.) Further, Koralewski submitted sub-certifications conveying his

[38] *Berson*, 527 F.3d at 989, involved misstatements about concrete facts—*e.g.*, the defendant stated it had a certain dollar value of "work it has contracted to do but hasn't yet performed," but much of this work had been cancelled. In *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014), the defendant denied it had "any warning of high corrosion before the first pipeline leak" when in fact "data showed objectively high corrosion rates and dramatically increased corrosion."

[39] Contemporaneous evidence shows that in June 2009, First Solar understood that the excursion affected approximately 75,000 modules—approximately 0.5 percent of the total deployed to customer sites. (Koralewski Decl. ¶ 9; Sohn Decl. ¶ 18.) Even if Eaglesham was "tout[ing] the reliability of the manufacturing process" (Opp. at 13), knowledge that 99.5% of modules were "delivering in the field" is consistent with this statement.

[40] Koralewski concluded that there were approximately 450,000 modules affected by the excursion—or less than 4% of the more than 11.8 million modules produced during the period. (Mot. at 20-21.)

conclusion that First Solar's descriptions of the excursion were accurate. (Koralewski Decl. ¶ 16.) Kallenbach likewise informed Gillette, Meyerhoff, Zhu, and Sohn that the disclosure language was accurate and that "the math is correct." (DX 68.)[41]

Plaintiffs make no effort to explain how any Individual Defendant would have had any foundation for questioning Koralewski's analysis at any particular point in time, much less for determining that his math was incorrect.[42]

Plaintiffs also have not presented a genuine dispute with respect to materiality. As Defendants showed, the excursion ended in 2009, and First Solar accounted for the financial impact of the remediation effort. While Plaintiffs argue (incorrectly, as discussed below) that "less than 4%" was false, they have not even staked out a position (much less supported that position with evidence) as to the right percentage—was it really 5% or 8%? Accordingly, Plaintiffs have not shown how revealing the "true" percentage would have "significantly altered the 'total mix' of information available to investors," *Basic*, 485 U.S. at 232, about First Solar at any time.

Finally, Plaintiffs have not met their burden with respect to falsity. Plaintiffs have presented no independent statistical analysis of the affected module population. Instead, they rely exclusively on the work performed by the same First Solar engineers whose ultimate conclusions they reject—Koralewski and Kallenbach. Except rather than cite to the final, verified analyses—which these engineers certified were prepared with sufficient accuracy for inclusion in the SEC filings—Plaintiffs cherry-pick from informal email exchanges and preliminary steps in the calculation, knowing that these preliminary

---

[41] Plaintiffs argue that Sohn "manipulated" the total number of modules produced during the excursion period, pointing to an email from Wood using a figure of approximately 10.9 million modules. But the official production records created in 2009—almost a year *before* this "manipulation"—contain the 11.8 million figure. (RX 23; Van Dyke Rebuttal Decl. ¶¶ 7-9.)

[42] Plaintiffs claim that Sohn pressured Koralewski to manipulate the correlation between STBi and field power loss. The evidence submitted by Plaintiffs belies this assertion. PX 111, *sent by Koralewski* three weeks *before* the "manipulation," explains ███████ ████████████████████████ PX 111 specifically notes that the STBi cor t              Appendix C "does not take into account dark soak effects of modules . . . . ████████████████████████████████████████████ (PX 111 at 87.)

opinions do **not** represent Koralewski's final conclusions and offering no scientific basis for believing that they are superior to his final conclusions. Plaintiffs cannot have it both ways—either the analysis of Koralewski was sound, in which case Plaintiffs cannot establish falsity because, in Koralewski's professional judgment, "less than 4%" is accurate (RX 14 at 303:17-25; RX 15 at 210:3-17, 381:23-383:19; Koralewski Decl. ¶ 19), or it was unsound, in which case Plaintiffs cannot rely on it to meet their burden of proving a material misrepresentation.

Plaintiffs' errors in quantifying LPMs are due to their failure to recognize or acknowledge these basic facts: (1) Not all modules produced during periods of high STBi will experience premature power loss;[43] (2) The Monte Carlo model was not intended to and did not attempt to estimate the number of modules affected by the excursion;[44] and (3) "LPM" was often used to describe modules that were not affected by the excursion.[45]

### g. Interim status reports are not actionable.

Plaintiffs argue that First Solar's July 29, 2010 statement that its remediation efforts were "well underway and, in some cases, complete" was false. But the July 2010 presentation they cite confirms that First Solar had already "replaced and measured 203,226 modules as of June 2010." (PX 125 at 62; *see also* Mot. at 50.)[46] Indeed, First Solar had completed module replacement at more than two dozen of the roughly 150 sites

[43] RX 14 at 221:15-25 ██████████████████████████████████
████████████████████████████████████████████████████████ mments
a████ everything.' You interpolate."); PX 37 at 420.003 ████████████
████████████████████████████████████████

[44] RX 14 at 302:8-303:25; RX 12 at 249:17-251:7; Koralewski Decl. ¶¶ 28-29; Kallenbach Decl. ¶¶ 12-13.

[45] RX 9 at 23:6-17 ("Sometimes LPM brought in some other items. So there could refer to stabilization modules. It could refer to low power modules. It could refer to, you know, various different types of problems."); RX 18 at 185:25-186:11 ("The LPM that's being referenced here, again, could include modules that were adversely impacted that were not directly associated with the cad-chloride excursion."); RX 12 at 85:3-19 ("LPM could have encompassed a number of other issues that were performance-related.").

[46] Without any evidentiary support, Plaintiffs claim that this was insignificant because more than 3.5 million modules had to be remediated. (Opp. at 27.) Plaintiffs argue Defendants must have known the remediation would ultimately require this number of modules. No contemporaneous evidence supports this assertion.

claimed under the remediation program at the time. (Mot. at 50.)

Next, Plaintiffs attack Zhu's February 24, 2011 statements that First Solar "concluded a claims process" and "updated [its] total replacement cost estimate." (Opp. at 27.) Both of these statements were true. (Mot. at 51.) The deadline for submitting claims for LPM Remediation had passed on November 30, 2010 (*id.*), and First Solar had updated its total replacement cost estimate, using a Monte Carlo simulation. Plaintiffs' hindsight citation to documents from 2012 does not support a conclusion that "defendants knew the remediation process was far from complete and expected huge future costs." (Opp. at 27; PX 128; PX 129.) Neither does an email from Kallenbach to Eaglesham in November 2010, before the development of the Monte Carlo model. (PX 127.)

Plaintiffs have also failed to rebut Defendants' showing that First Solar's public website stated: "November 30th 2010 marked the conclusion of the period during which customers could file extended-warranty claims related to the excursion modules. We are now in the process of validating and verifying those claims." (DX 88 at 4.) Plaintiffs have failed to present any evidence contradicting Defendants' proof that the web posting was made ***before*** Zhu's statement. (*Id.*; Mot. at 51 n.37; Sloan Decl. ¶ 10.) Plaintiffs claim this was a "buried fact," but a contemporaneous analyst report shows that the market understood that "[t]he cost of replacement modules was updated based on claims, *for which there was a November deadline. These will still need to be validated* . . . ." (RX 3 at 74.)

Finally, Plaintiffs present no contemporaneous evidence showing the falsity of Widmar's November 3, 2011 statement that First Solar had "substantially concluded the remediation programs associated with this manufacturing excursion." (Opp. at 27 n.23.) In fact, Plaintiffs acknowledge that only 528 of the 5,260 customer sites claimed under the program still needed to be analyzed. (PX 159 at 07.) In any event, Plaintiffs cannot prove scienter, because the executives in charge of the remediation program specifically

approved the language used by Widmar. (DX 80 at 22-23.)[47]

### C.    Plaintiffs Have Not Met Their Burden with Respect to Claims Related to the Hot Climate Issue.

Plaintiffs present no evidence referring to the hot climate issue from the start of the Class Period to November 2009. (*See generally* Opp. § II.D.)  As a result, Plaintiffs concede the absence of falsity and scienter related to hot climate issues during this period.

With respect to the period November 2009 to February 2011, Plaintiffs present a classic fraud-by-hindsight claim—that because First Solar adjusted its warranty rate in Q4 2011, the Individual Defendants must have known years earlier that modules would underperform. (Opp. at 3.)

Plaintiffs' argument hinges on a misstatement of First Solar's module technology reflecting unsupported assumptions that modules degrade linearly from the day of their installation. (*See* PX 78 at 78 ("***aggregate linear rate*** . . . is worse than -0.8%/yr"); PX 187 at 44 ("***Linear assumption*** on actual data").)  The uncontroverted evidence—including the documents Plaintiffs cite—shows that First Solar's modules did ***not*** degrade linearly; they experienced higher degradation during their first few years of operation, followed by slower long-term degradation. (RX 13 at 66:18-67:15, 87:8-88:20; RX 10 at 156:16-161:6; RX 15 at 260:5-261:4; Eaglesham Decl. ¶ 21.)

While Plaintiffs base their argument on a conditional statement—that First Solar's modules would be at risk of falling out of warranty "'***if*** the rate is linear'" (Opp. at 40; PX 195 at 75)—the document they rely on concluded that the rate was ***not*** linear and that non-linear degradation scenarios did not present warranty concerns. (PX 195 at 75-76; *see also* RX 13 at 229:10-234:14.)  Far from "concluding that the guidance First Solar

---

[47] Plaintiffs offer no support for their claim that Kallenbach's approval was "with a wink," nor do Plaintiffs claim that Koralewski's approval of the same language was improper. (Opp. at 33.)  Plaintiffs' citation to the deposition testimony of Tom Kuster (Opp. at 33) similarly does not allow a reasonable juror to conclude that Widmar's statement was false when made.  Kuster was not involved with the LPM remediation until "late December [2011], early—and into early January [2012]." (DX 41 at 28:11-14.)  Kuster's testimony does not show that Widmar believed his statement was false in November 2011.

provided to the market was false,"[48] the white paper's conclusion was that more study and data were needed. (RX 10 at 157:13-158:6.) The securities laws do not require disclosure of a preliminary, internally debated, highly technical topic. *Convergent*, 948 F.2d at 510-11; *In re Sybase, Inc. Sec. Litig.*, 48 F. Supp. 2d 958, 962-63 (N.D. Cal. 1999).

Plaintiffs have also failed to present evidence supporting a finding of scienter. Eaglesham was the only Individual Defendant who received analyses discussing hot climate degradation rates before 2011. He made no statement relating to the hot climate issue. Additionally, Eaglesham did not believe these analyses presented a problem, because he knew that linear degradation profiles did not accurately model long-term performance. (RX 10 at 155:23-158:20; Mot. at 27.)

Plaintiffs admit that First Solar mitigated any prospective warranty exposure from modules installed in hot climates after discovering the hot climate issue in Q1 2011. (Opp. at 43; Mot. at 28.) Plaintiffs also admit that First Solar fully incorporated the costs associated with these mitigation strategies into the Company's financial statements and earnings guidance. (*See* Opp. at 61; Mot. at 28.)

In addition, Plaintiffs do not dispute that the analyses performed by First Solar's quality and reliability teams before Q4 2011 concluded the warranty accrual was sufficient to cover all anticipated warranty claims, including those from hot climates.[49] (Koralewski Decl. ¶¶ 34-36; DX 75 at 66-68; Schumaker Decl. ¶¶ 18-19; DX 79 at 89.) Plaintiffs also do not dispute that PwC specifically reviewed First Solar's warranty accrual rate in Q1 2011 and deemed it reasonable. (D'Angelo Decl. ¶ 17.)

Plaintiffs' only response is the erroneous assertion that "defendants" hid from PwC estimates that the hot climate issue could affect up to 40 megawatts and more than three sites. (Opp. at 52.) The PwC workpapers show that PwC was fully informed; indeed,

---

[48] The guidance referred to in Kimber's white paper was module degradation guidance provided to customers, not financial guidance given to investors.

[49] Plaintiffs do not claim that Panchula's estimate of hot climate warranty exposure was sent to any Individual Defendant before 2012. (Opp. at 44.) And Plaintiffs present no evidence to rebut Defendants' showing that factors that first became known to Defendants in Q4 2011 drove First Solar's warranty rate increase in that quarter. (Mot. at 29.)

they contain a copy of the same presentation that Plaintiffs contend shows that "defendants knew that the problem affected between 20-40 megawatts." (*Compare* PX 219 at 02 *with* RX 7 at 84; *see* D'Angelo Rebuttal Decl. ¶ 6.)  Similarly, PwC's workpapers reflect, and D'Angelo's testimony confirmed, that PwC was aware that First Solar used derating and overbuilding strategies to address the hot climate issue for future module and system sales.  (PX 110 at 255:9-18; PX 232 at 11-12; PX 253; RX 7.)

**D.      Plaintiffs Have Not Met Their Burden with Respect to Claims Arising Out of CpW Reporting.**

Plaintiffs do not dispute decisive points Defendants made concerning CpW: Gillen's allegations were directed at Kurt Wood, who is not a Defendant.  The evidence shows that Gillen's complaint was investigated by Internal Audit, which concluded that all of the questioned entries were reasonable, the CpW calculation was appropriate, and no employee manipulated the number.  (DX 30.)  Plaintiffs also do not dispute that the results of the investigation were shared with PwC, which concurred with management's conclusions.  (DX 31 at .002.)  Plaintiffs' response to this is to assert without support that "the legal department commandeered Internal Audit's investigation." (Opp. at 2.) Innuendo unadorned with evidence does not meet Plaintiffs' burden.[50]

Furthermore, allegations that Defendants manipulated CpW by one penny—from $0.86 to $0.85—in the process of reporting Q3 2009 results as part of a stock-manipulation scheme make no sense in light of the fact that First Solar's CpW steadily declined from $1.14 at the start of the Class Period to $0.75 at the end.  (Mot. at 11 n.5.) Plaintiffs have not explained how a one-penny difference in one quarter of a four-year Class Period supports their fraud theory.

Plaintiffs' admission that First Solar's reported CpW was a contemporaneous measure of *current* manufacturing costs is fatal to their allegation that First Solar systematically "artificially lowered" CpW by delaying accrual for the expected costs of

---

[50] No evidence shows that Meyerhoff "shut down" the investigation.  (*See* § IV.A.1, *supra*.)

the remediation.  (Opp. at 46-47; Mot. at 11.)  Plaintiffs also ignore that First Solar explicitly advised investors in Q2 2010 that CpW "[e]xcludes estimate[s] of nonrecurring module replacement program described in second quarter 2010 10-Q."  (Mot. at 56.)[51]

## V.    THE INDIVIDUAL DEFENDANTS' STOCK TRANSACTIONS DO NOT SUPPORT AN INFERENCE OF SCIENTER.

Plaintiffs' arguments about stock sales are based on nothing more than false comparisons and innuendo.  Ignoring the six Ninth Circuit decisions Defendants cited, Plaintiffs rely almost exclusively on *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003).  But the facts of *America West* demonstrate the fundamental deficiencies in Plaintiffs' claims.  In that case, all nine defendants sold nearly all their shares in a "sudden flurry of massive insider trading," mostly during a two-week period at the stock's peak, just before the release of alleged corrective disclosures; no defendant had sold stock for twenty months before the class period.  *Id*. at 928, 939-40.[52]

Here, the facts are just the opposite:  the Individual Defendants' Class-Period sales were in line with their pre-class trading; the sales span a three-and-a-half-year period; the CEO (Gillette) and CFO (Widmar) *bought* rather than sold stock; and the sales occurred long before any alleged corrective disclosures.

Plaintiffs fail to identify a single suspicious stock sale, or to show that Defendants' sales were "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information."  *Apple*, 886 F.2d at 1117-18.  Plaintiffs do not contend that any sale occurred at a "peak" in First Solar's price, or closely preceded a steep decline.  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).  And Plaintiffs also "fail[] to connect [the] sales with any particular allegedly

---

[51] *In re Rigel Pharmaceuticals Inc. Securities Litigation*, 697 F.3d 869, 878-79 (9th Cir. 2012), is on point.  Plaintiffs' argument that *Rigel* does not apply where there is evidence that defendants misrepresented their methodology fails, as there is no such evidence here.

[52] Plaintiffs also cite irrelevant SEC and DOJ enforcement actions.  (Opp. at 47-48, 50 (citing *O'Hagan*, 521 U.S. 642; *Dirks v. SEC*, 463 U.S. 646 (1983); *SEC v. Lipson*, 278 F.3d 656 (7th Cir. 2002)).)

misleading statements." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002).

**Ahearn:**  Ignoring Ahearn's pre-Class Period sales, Plaintiffs argue that Ahearn sold "97% of his remaining shares" in the Class Period.  (Opp. at 48.)  But the Ninth Circuit rejected this same math trick in *Howard v. Everex*, ruling that percentages like these are "immaterial given that the only reason for this was that [his] overall holdings were decreasing due to his continued selling of shares."  228 F.3d 1057, 1066 n.12 (9th Cir. 2000).[53]

Significantly, although Plaintiffs attempt to portray Ahearn as the leader of an alleged scheme, they present only a handful of documents that even refer to him. Plaintiffs make no effort to connect Ahearn to any accounting judgment, and do not even mention him in connection with any challenged statement made after Q2 2010.

*February 2010 sales:*  Plaintiffs claim these sales were "suspicious" based on a single email stating, "We'll have to keep our fingers crossed" that a particular site does not exhibit detectable power loss.  (PX 48.)  There is nothing suspicious about that.  In any event, Ahearn did not sell stock for *more than seven months* after this exchange. (Opp. at 47.)

*February–March 2011 sales:*  Plaintiffs call these sales a "stock dump . . . days after defendants falsely told the market that the LPM claims process was complete." (Opp. at 47.)  But the statement was not false, and First Solar made concurrent in-depth disclosures to the market about its claims process.  (Mot. at 51.)  Regardless, Ahearn had entered into a plan to sell these shares *three months before* this statement (Ahearn Decl. ¶¶ 73-74), and there is no evidence that he was involved in making the statement.

*August 2011 sales:*  Plaintiffs attack these sales solely on the basis that Ahearn was warned they would create concerns for investors.  (Opp. at 47-48.)  Plaintiffs cite no

---

[53] That Ahearn finished selling his shares during the long Class Period is not proof of scienter.  In *Metzler*, the Ninth Circuit rejected an argument that defendant Beal's sales were suspicious because he sold 100% of his stock during the class period, since "Beal sold in a manner consistent with [his] pre-Class Period sales."  540 F.3d at 1067.

authority, and offer no explanation, for why these warnings show culpability.

**Eaglesham, Meyerhoff, Sohn, and Zhu:**  Plaintiffs cite one email from October 2009 in an attempt to show that Meyerhoff was aware of the excursion—but they do not dispute that Meyerhoff made no sales *for six months* after the email, and they admit that he sold a lower percentage of his shares during the Class Period than before.  (Meyerhoff Decl. ¶ 83; Opp. App. E.)  Plaintiffs also spin Eaglesham's regular practice of selling his shares as soon as they vested, claiming it shows a lack of confidence.  (Opp. at 48.)  This argument fails because selling upon vesting does not show scienter, *Metzler*, 540 F.3d at 1067; and because Eaglesham started this practice long before the Class Period began (Eaglesham Decl. ¶¶ 66, 70-77).  Contrary to Plaintiffs' argument that Sohn fraudulently concealed the excursion, Plaintiffs concede that Sohn sold no stock between May 2009— when he learned of the excursion—and July 2010—when the excursion was publicly disclosed.  (Mot. at 67.)

Plaintiffs' arguments as to Eaglesham, Meyerhoff, Sohn, and Zhu boil down to the bare fact that they sold stock during the nearly three-year period between when the excursion became known, and when the final accruals were booked.  That sales occurred during such a long period does not show that "particular statements were uttered with" scienter.  *Vantive*, 283 F.3d at 1092-93 (rejecting scienter based on sales over fifteen months).

## VI.    PLAINTIFFS HAVE NOT SHOWN THAT FIRST SOLAR ACTED WITH SCIENTER.

As Defendants showed, corporate scienter is derived from the state of mind of those who "make" the challenged statements.  (Mot. at 68-69 (citing *NVIDIA*, 768 F.3d at 1063; *Glazer Cap. Mgmt. v. Magistri*, 549 F.3d 736, 743-44 (9th Cir. 2008)).)  The cases Plaintiffs cite are in accord.[54]

---

[54] *VeriFone* denied a motion to dismiss based on allegations that the speakers possessed scienter, "and by extension VeriFone."  704 F.3d at 710.  In *Nordstrom, Inc. v. Chubb & Son, Inc.*, the court held there was no way to show that "the corporation, but not any individual defendants, had the requisite intent to defraud."  54 F.3d 1424, 1436 (9th Cir. 1995).

Plaintiffs ask the Court to impute the intent of Kallenbach, Koralewski, or Schumaker to First Solar by adopting a "collective scienter" doctrine that looks past the individuals who made the allegedly false statements.[55] (Opp. at 51 n.47.)  The Ninth Circuit has consistently refused such invitations.  *Glazer* addresses only whether pleading facts showing a falsehood "so dramatic" that the person who *"approved"* the statement would "know that the announcement was false" would survive a motion to dismiss.  *Glazer*, 549 F.3d at 743 (citation omitted).  Nothing in that case suggests that a plaintiff could meet its burden of proving corporate scienter without proving that any officer who approved the statement acted with scienter.  Plaintiffs' eleventh-hour finger-pointing at Koralewski, Kallenbach, and Schumaker also fails because there is no evidence that these employees had any intent to deceive investors, and unrebutted evidence shows their good faith.  (Kallenbach Decl. ¶¶ 9-24; Koralewski Decl. ¶¶ 7, 14-19, 32; Schumaker Decl. ¶¶ 15, 20-50, 75.)

## VII.    FORWARD-LOOKING STATEMENTS ARE PROTECTED BY THE SAFE HARBOR.

Defendants showed that they are entitled to summary judgment with respect to fifteen of the challenged statements on the ground that they are protected by the PSLRA's Safe Harbor.  (Mot. at 53.)  Plaintiffs do not dispute that the Ninth Circuit has held that statements with similar language fall within the Safe Harbor.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014).[56]

## VIII.   EACH DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 20(a) CLAIMS.

Plaintiffs' Section 20(a) claims fail for three reasons.  First, Plaintiffs have not shown a primary violation.  *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163-

---

[55] Other circuits have rejected this approach. *In re Tyson Foods, Inc. Sec. Litig.*, 155 Fed. Appx. 53 (3d Cir. 2005); *Caterpillar v. Great Am. Ins. Co.*, 62 F.3d 955 (7th Cir. 1995).

[56] Plaintiffs' reliance on *Provenz* is misplaced. (Opp. at 14 n.10.) *Provenz* affirmed summary judgment on one of the two challenged statements, as it "was cautionary and could not be said to have misled the market." 102 F.3d at 1493.

64 (9th Cir. 1996).  Second, Plaintiffs present no evidence disputing that, unlike *Howard*, 228 F.3d at 1066, First Solar's Board ultimately retained the authority over challenged statements.  (Meyerhoff Decl. ¶ 31; Widmar Decl. ¶ 26; Mot. at 12-17.)  Third, each Individual Defendant's "uncontroverted statement[s] that he never directed anyone to make statements that he knew to be misleading, and that to his knowledge all the information made public was true, [are] enough to shield him from secondary liability." *Kaplan v. Rose*, 49 F.3d 1363, 1383 (9th Cir. 1994) (affirming summary judgment as to defendant who established good-faith defense); *In re PETCO Corp. Sec. Litig.*, No. 05-0823, 2008 WL 8876554, at *6 (S.D. Cal. Apr. 29, 2008).[57]  Plaintiffs make no attempt to specifically address any Individual Defendant's Declaration.  Each Individual Defendant is, therefore, entitled to summary judgment on Plaintiffs' Section 20(a) claims.

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment for Defendants and/or grant all other relief requested in Defendants' Motion for Summary Judgment.

Dated:  May 22, 2015

By: s/ *Judson Lobdell*
Judson Lobdell
MORRISON & FOERSTER LLP

OSBORN MALEDON, P.A.
Maureen Beyers

*Attorneys for Defendants*

---

[57] Plaintiffs cite *Kodimer v. County of San Diego*, No. 07-2221, 2010 U.S. Dist. LEXIS 65090 (S.D. Cal. June 30, 2010), for the proposition that Defendants' declarations are insufficient.  (Opp. at 70.)  But *Kodimer* involved the question of whether a jail's medical staff exhibited deliberate indifference when treating a patient—a scenario far afield from the circumstances present here.

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ *Rosemary Barajas*
**Rosemary Barajas**

sf-3537845

DEFENDANTS' REPLY BRIEF ISO MOTION FOR SUMMARY JUDGMENT