# Exhibit 5

2.6.3.10 *Perform inquiries regarding significant and complex matters

| Workpaper |
|---|

Link to workpaper attachment: 52010-2300 *Perform inquiries regarding significant and complex matters

| General Information and Guidance | |
|---|---|
| Audit Unit: | First Solar Q3 2010 - HQ |
| Library: | 2010 US SAS 100 Interim Review |
| Ref. Number: | 52010-2300 |
| Coverage Date: | 9/24/2010 |
| Desired Evidence: | Low |
| Assertions: | C, A, R&O, P&D |
| Nature Of Test: | Other |

Confidential - Do Not Copy or Disclose

Confidential Treatment Requested                                                          PWC0062487

| General Information and Guidance | |
|---|---|
| Library Procedures: | A number of potential complex accounting/auditing matters and/or high risk areas have been identified that should be considered, whether performing a quarterly review or the year-end audit. These procedures involve inquiry of management and the performance of expanded procedures if any question is answered positively. Engagement teams should consider performing related audit procedures during the interim review if it will enhance overall engagement efficiency/effectiveness. Additionally, if any changes in accounting principles or adoption of a new accounting standard not included in the table below are identified in connection with the first quarter interim review, you should also consider completing the related auditing procedures, as appropriate. Performing such audit procedures in the quarter of the change in accounting may reduce the risk of material misstatement in interim reporting.<br><br>The following table identifies certain complex accounting/auditing matters and provides references to applicable EGAs (in the IA and Non-IA Supplements) and PwC Accounting/AuditingPractice Aids. Note: While use of these practice aids is not required, their use is encouraged when the impact to the financial statements could be material.<br><br><br><br>Significant Accounting/Auditing Issues<br><br>PwC Accounting/Auditing practice aids available in MyClient U.S. Template Manager<br><br><br>a) Have there been any issuances, modifications, or extinguishments of debt or equity securities?<br><br>Convertible Securities with Beneficial Conversion Features (BCFs) or Contingently Adjustable Conversion Ratios and Modifications of Debt and Convertible Preferred Stock Post Issuance<br><br><br><br>b) Are there any equity securities outside the scope of ASC 480?<br><br>Mandatorily Redeemable Equity Securities<br><br><br><br>c) Are there stock-based compensation awards accounted for under ASC 718, Compensation - Stock Compensation or ASC 505-50, Equity-Based Payments to Non-Employees.<br><br>Program - Accounting for Stock-Based Compensation Awards, as well as the Stock Based Compensation Audit Planning and Completion |

Confidential Treatment Requested                                PWC0062488

| General Information and Guidance | |
|---|---|
| | Guide. Consider applicable EGAs in the "Share-based compensation expense - FSLI. |
| | d) Have there been any business combinations and changes in business activities? |
| | Business Combinations |
| | Consider applicable EGAs in the "Business combinations" FSLI. |
| | e) Have there been any impairments of indefinite-lived assets or goodwill? In accordance with ASC 350, Intangibles-Goodwill and Other (ASC 350) |
| | Impairments of Goodwill and Other Intangible Assets |
| | Consider applicable EGAs in the "Goodwill and indefinite-lived intangible assets" FSLI. |
| | f) Have there been any impairments of long-lived fixed assets or intangible assets subject to amortization? |
| | Impairments of Long-Lived Assets |
| | Consider applicable EGAs in the "Property, plant & equipment process" FSLI or in the "Goodwill and intangibles process" FSLI. |
| | g) Were there any asset retirement obligations (AROs) under ASC 410, Asset Retirement and Environmental Obligations (ASC 410)? |
| | Asset Retirement Obligations |
| | Consider applicable EGAs in the "Property, plant & equipment process" FSLI. |
| | h) Were there any costs associated with exit or disposal activities under ASC 420, Exit or Disposal Cost Obligations (ASC 420)? |
| | Costs Associated with an Exit or Disposal Activity (including Certain Costs Incurred in a Restructuring) |
| | Consider applicable EGAs in the "Accruals/provisions &other liabilities" FSLI. |

Confidential - Do Not Copy or Disclose

Confidential Treatment Requested                                      PWC0062489

## General Information and Guidance

Other Significant Accounting/Auditing Matters

i) Have there been any transfers of financial assets and extinguishments of debt?

Consider applicable EGAs in the "Other assets or liabilities - financial instruments" FSLI related to Transfers and servicing of financial assets.

j) Has the entity used any derivative instruments or engaged in any hedging activities?

Consider applicable EGAs in the "Other assets or liabilities - financial instruments" FSLI related to Derivative Financial Instruments.

k) Have there been any significant revenue transactions or changes in the client's revenue recognition procedures?

Consider applicable audit procedures related to these issues (e.g., revenue, cost of sales, accounts receivable, etc.).

Refer to SAB 104 (SAB 104 required for SEC registrants and recommended for non-SEC entities).

l) Have there been any significant and unusual transactions?

Evaluate the business purpose of these transactions by gaining an understanding of its business rationale and whether that rationale (or lack thereof) suggests the transactions may have been entered into to engage in fraudulent financial reporting. Consider previously unidentified related parties or parties that do not have the substance or financial strength to support the transaction without assistance from the entity under audit.

Refer to PwC Audit 12073 and PwC Audit 3741.

In instances where we are unable to complete our review and can not obtain limited assurance for the review engagement prior to the Company's filing of the Form 10-Q, we should suggest that the Company seek a 5- day extension for the filing (pursuant to SEC Rule 12b-25) to give the Company and us more time to complete the review. In circumstances where management files the Form 10-Q without our review being completed, a statement should be included in such filing to the effect that a review of the

Confidential Treatment Requested

PWC0062490

Engagement Name: First Solar Q3 2010                  Period End Date:1/29/2015

| General Information and Guidance | |
|---|---|
| | Company's interim financial information included in the Form 10-Q filing has not been completed by the Company's independent public accountant. We should also advise our client to seek advice from their SEC legal counsel as to any reporting obligations in its Form 10-Q. Additionally, the engagement leader is required to consult with the Regional Risk Management Partner, preferably before communicating with the client. The RRMP may decide to involve the Office of the General Counsel in determining the appropriate course of action. It is very important to maintain a clear record in our working papers of all such communications with the client. |

Confidential Treatment Requested          PWC0062491

Engagement Name: First Solar Q3 2010                                    Period End Date:1/29/2015

| General Information and Guidance | |
|---|---|
| Tailored Procedures: | A number of potential complex accounting/auditing matters and/or high risk areas have been identified that should be considered, whether performing a quarterly review or the year-end audit. These procedures involve inquiry of management and the performance of expanded procedures if any question is answered positively. Engagement teams should consider performing related audit procedures during the interim review if it will enhance overall engagement efficiency/effectiveness. Additionally, if any changes in accounting principles or adoption of a new accounting standard not included in the table below are identified in connection with the first quarter interim review, you should also consider completing the related auditing procedures, as appropriate. Performing such audit procedures in the quarter of the change in accounting may reduce the risk of material misstatement in interim reporting.<br><br>The following table identifies certain complex accounting/auditing matters and provides references to applicable EGAs (in the IA and Non-IA Supplements) and PwC Accounting/AuditingPractice Aids. Note: While use of these practice aids is not required, their use is encouraged when the impact to the financial statements could be material.<br><br><br><br>Significant Accounting/Auditing Issues<br><br>PwC Accounting/Auditing practice aids available in MyClient U.S. Template Manager<br><br><br>a) Have there been any issuances, modifications or extinguishments of debt or equity securities?<br><br>Convertible Securities with Beneficial Conversion Features (BCFs) or Contingently Adjustable Conversion Ratios and Modifications of Debt and Convertible Preferred Stock Post Issuance MyClient US Template Manager<br><br><br><br>b) Are there any equity securities outside the scope of FAS 150?<br><br>Mandatorily Redeemable Equity Securities (outside the scope of FAS 150) MyClient US Template Manager<br><br><br><br>c) Are there stock-based compensation awards accounted for under FAS 123(R).<br><br>Program - Auditing Stock-Based Compensation Awards under FAS 123(R) MyClient US Template Manager |

Confidential - Do Not Copy or Disclose

Confidential Treatment Requested                                    PWC0062492

| General Information and Guidance | |
| --- | --- |
| | Consider applicable EGAs in the "Stock-based compensation - FAS 123(R)" FSLI. |
| | d) Have there been any business combinations and changes in business activities?<br><br>Business Combinations - FAS 141 MyClient US Template Manager<br><br>Consider applicable EGAs in the "Business combinations - FAS 141" FSLI. |
| | e) Have their been any impairments of indefinite-lived assets or goodwill? Has the entity adopted FAS 142 and does it have significant intangible assets and/or goodwill?<br><br>Impairments of Goodwill and Other Intangible Assets - FAS 142 MyClient US Template Manager<br><br>Consider applicable EGAs in the "Goodwill and intangibles process" FSLI. |
| | f) Have there been any impairments of long-lived fixed assets or intangible assets subject to amortization?<br><br>Impairments of Long-Lived Assets - FAS 144 MyClient US Template Manager<br><br>Consider applicable EGAs in the "Property, plant & equipment process" FSLI or in the "Goodwill and intangibles process" FSLI. |
| | g) Were their any asset retirement obligations (AROs) under FAS 143?<br><br>Asset Retirement Obligations - FAS 143 MyClient US Template Manager<br><br>Consider applicable EGAs in the "Property, plant & equipment process" FSLI. |
| | h) Were their any costs associated with exit or disposal activities under FAS 146?<br><br>Costs Associated with an Exit or Disposal Activity (including Certain Costs |

Confidential Treatment Requested                                                   PWC0062493

Engagement Name: First Solar Q3 2010                                      Period End Date:1/29/2015

| General Information and Guidance | |
|---|---|
| | Incurred in a Restructuring) - FAS 146 MyClient US Template Manager |
| | Consider applicable EGAs in the "Accruals/provisions &other liabilities" FSLI. |
| | Other Significant Accounting/Auditing Matters |
| | i) Have there been any transfers of financial assets and extinguishments of debt? |
| | Consider applicable EGAs in the "Transfers and servicing of financial assets process" FSLI. |
| | j) Has the entity used any derivative instruments or engaged in any hedging activities? |
| | Consider applicable EGAs in the "Derivative Financial Instruments" FSLI. |
| | k) Have there been any significant revenue transactions or changes in the client's revenue recognition procedures? |
| | Consider applicable audit procedures related to these issues (e.g., revenue, cost of sales, accounts receivable, etc.). |
| | Refer to SAB 104 (SAB 104 required for SEC registrants and recommended for non-SEC entities). |
| | l) Have their been any significant and unusual transactions? |
| | Evaluate the business purpose of these transactions by gaining an understanding of its business rationale and whether that rationale (or lack thereof) suggests the transactions may have been entered into to engage in fraudulent financial reporting. Consider previously unidentified related parties or parties that do not have the substance or financial strength to support the transaction without assistance from the entity under audit. |
| | Refer to PwC Audit 3741 and PwC Audit 12073. |

Confidential - Do Not Copy or Disclose                                    Page 130 of 387

Confidential Treatment Requested                                          PWC0062494

| General Information and Guidance | |
|---|---|
| | In instances where we are unable to complete our review and can not obtain limited assurance for the review engagement prior to the Company's filing of the Form 10-Q, we should suggest that the Company seek a 5- day extension for the filing (pursuant to SEC Rule 12b-25) to give the Company and us more time to complete the review. In circumstances where management files the Form 10-Q without our review being completed, a statement should be included in such filing to the effect that a review of the Company's interim financial information included in the Form 10-Q filing has not been completed by the Company's independent public accountant. We should also advise our client to seek advice from their SEC legal counsel as to any reporting obligations in its Form 10-Q. Additionally, the engagement leader is required to consult with the Regional Risk Management Partner, preferably before communicating with the client. The RRMP may decide to involve the Office of the General Counsel in determining the appropriate course of action. It is very important to maintain a clear record in our working papers of all such communications with the client. |

| Outcome | |
|---|---|
| Outcome: | No exceptions noted |
| PM Notes Identified: | 0 |

| Assess Need for Further Evidence | |
|---|---|
| Further Evidence Required: | No |
| Comments: | Not Used |

| Task Status | |
|---|---|
| Prepared By: | Karina Rivera |
| Reviewed By: | Garret Tripp |
| Status: | Reviewed-Final |

Confidential - Do Not Copy or Disclose

Confidential Treatment Requested                                    PWC0062495

| Task Details | |
|---|---|
| Priority: | Not Used |
| Due Date: | Not Used |
| Budget Hours: | Not Used |
| Expended Hours: | Not Used |
| Remaining Hours: | Not Used |

| Assignees | |
|---|---|
| Prepared By: | Karina Rivera |
| Reviewed By: | Garret Tripp |

| History |
|---|
| Reviewed by Garret Tripp on 10/27/2010 |
| Edited by Garret Tripp on 10/27/2010 |
| Prepared by Karina Rivera on 10/27/2010 |
| Edited by Karina Rivera on 10/27/2010 |
| Edited by Garret Tripp on 10/27/2010 |
| Edited by Garret Tripp on 10/22/2010 |
| Edited by Garret Tripp on 10/21/2010 |
| Edited by Garret Tripp on 10/21/2010 |
| Linked Library Document Edit by Garret Tripp on 10/21/2010 |
| Edited by Garret Tripp on 10/19/2010 |
| Edited by Garret Tripp on 10/19/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Garret Tripp on 10/18/2010 |
| Edited by Robert J Larsen on 10/18/2010 |

Confidential Treatment Requested

PWC0062496

| History |
|---|
| Edited by Garret Tripp on 10/14/2010 |
| Edited by Garret Tripp on 10/14/2010 |
| Edited by Garret Tripp on 10/14/2010 |
| Edited by Garret Tripp on 10/14/2010 |
| Edited by Garret Tripp on 10/14/2010 |
| Edited by Garret Tripp on 10/14/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/13/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Status automatically updated due to changes by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Status automatically updated due to changes by Karina Rivera on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Garret Tripp on 10/12/2010 |
| Edited by Karina Rivera on 10/11/2010 |
| Edited by Karina Rivera on 10/11/2010 |
| Edited by Karina Rivera on 10/11/2010 |
| Edited by Karina Rivera on 10/11/2010 |
| Edited by Garret Tripp on 10/5/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Garret Tripp on 9/28/2010 |
| Edited by Karina Rivera on 9/21/2010 |

Confidential Treatment Requested

PWC0062497

| History |
| --- |
| Rolled Forward By Aura on 8/31/2010 |

Confidential - Do Not Copy or Disclose

Confidential Treatment Requested

PWC0062498

Exhibit 6

| | Category | Cf | Roof System | | FF System | | |
|---|---|---|---|---|---|---|---|
| | | | <100kW | >100kW | <5MW | >5MW | |
| **1** | Average Size (KW) | | 48 | 370 | 2,000 | 9,000 | K |
| | AverageModule (75) | | 75 | 75 | 75 | 75 | L |
| | # average modules/ Site | | 640 | 4,933 | 26,667 | 120,000 | Rc |
| | Total Sites Per Segment | | 96 | 40 | 29 | 12 | K |
| | | 100% | 2.49% | 7.98% | 31.28% | 58.25% | Rc |
| | Likelihood of return | | 90% | 90% | 70% | 70% | M |
| | Total Sites affected | | 86 | 36 | 20 | 8 | Rc |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2** | Modules desired for reclamation | A  703,606 | 21,830 | 70,115 | 213,713 | 397,948 | |
| | Hit Rate | | 80% | 80% | 60% | 60% | C |
| | Modules needed to reclaimed | 1,134,367 | 27,288 | 87,643 | 356,188 | 663,247 | Rc |
| | average # modules replaced per affected site | | 316 | 2,435 | 17,546 | 78,958 | Rc |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **3** | Materail cost - clips | | 1.95 | 1.95 | 1.95 | 1.95 | H |
| | Total Material Cost | | 616 | 4747 | 34215 | 153968 | Rc |
| | h/module | | 0.9 | 0.9 | 0.9 | 0.9 | D |
| | Man hours per site | | 284 | 2191 | 15792 | 71062 | Rc |
| | €/h | | 19.50 € | 19.50 € | 19.50 € | 19.50 € | E |
| | Replacement labor per site | | 5,543 € | 42,726 € | 307,936 € | 1,385,713 € | |
| | Total Replacement Cost | 1,935,465 € | 6,159 € | 47,473 € | 342,151 € | 1,539,681 € | F |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **4** | Logistic - Cost per site | 164,160 € | 2,880 € | 5,760 € | 28,800 € | 126,720 € | imm |
| | Travel | -  1 € | -  € | -  € - | 1 € | -  € | imm |
| | Incremental Box Cost | 125,246 € | 702 € | 3,639 € | 22,377 € | 98,528 € | imm |
| | Incremental Module Testing Cost at FSLR Plant per affected site | 239,534 € | 762 € | 5,875 € | 42,345 € | 190,552 € | imm |
| | | 2,464,404 € | 10,503 € | 62,748 € | 435,673 € | 1,955,481 € | F |
| | Cost Per Module | | 33.25 € | 25.77 € | 24.83 € | 24.77 € | Rc |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **5** | Total Cost | 28,436,528 € | 907,421 € | 2,258,916 € | 8,844,152 € | 16,426,039 € | Rc |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **6** | Test hit rate | | | | 65% | 65% | N |
| | Modules measured | | | | 356,508 | 663,842 | Rc |
| | Field test cost/module | | | | 3.76 € | 3.76 € | G |
| | Identification Cost | 3,836,517 € | | | 1,340,470 € | 2,496,047 € | Rc |

| | | | |
|---|---|---|---|
| **7** | | 32,273,045 € | |

**Accural Calculations**

PWC0066917

Adjustments to total based on items covered in warranty accrual:

| | | | **F** |
|---|---|---:|---|
| 2-way freight cost | | - 1,125,770 € | |
| Packaging for shipment of replacement module (one-way) | | - 872,471 € | |
| Net total charge | | 30,274,804 € | |
| | | | **F** |
| Less prior accrual | | - 22,529,615 € | |
| Net incremental excursion cost charge | **I** | 7,745,189 € | |
| FX rate at 12/31/2010 | **B** | 1.3306 | |
| | | $10,305,748 | |
| | | | **F** |

**A**  This information comes from the Monte Carlo Model. Note that I performed a stress test to determine how a change in the number of modules would impact the total liability. Refer to the Stress Test 1 tab for more information.

**B**  materially agrees to the fx rate from oanda.com (1.3253)

**C**  agrees to the hit rate per the understanding gained in the 'Tailored' tab within this workbook.

**D**  This is the number of man hours it is estimated to take to take down and replace each module

**E**  I obtained the most recent Adler Invoices and noted a rate of 18€/h. Note that the 19.50 €/h is both reasonable and conservative, as such no further investigation is deemed necessary. Adler is the third party service provider currently removing the modules.

**F**  footed w/o/e

**G**  First Solar is being charged is 50,000€ per 1 MegaWatt of product checked. I obtained a copy of the agreement with BEC to support that. Each module in question is approximately 75Watts. There are approximately 13,333 modules in 1MW (1,000,000/75 = 13,333). Thus if you take the price per MegaWatt divided by the number of modules per MegaWatt you arrive at the cost per module (50,000€/13,333 = 3.75€). This is deemed appropriate and no further investigation is necessary.

**H**  Per our understanding of materials costs and the design and installation of modules, each clip cost slightly less than $0.50 and each module requires 4 clips for installation thus total cost per module should be about $2. This amount agrees to our understanding. Also note that no material exceptions were noted during the materials cost testing within this database. This is deemed appropriate and no further investigation is deemed necessary.

**Rc**  recalculated w/o/e

**Cf**  cross footed w/o/e

**I**  Refer to the Calculation to the right for more information

| | | |
|---:|---|---|
| 7,745,189 € | from above | |
| - 351,000 € | **imm** | |
| - 1,038,838 € | **J** | |
| 6,355,351 € | agrees to Journal Entry # 100019249 that I obtained from Todd Smith which was posted as of 12/31/10. | |

**J**  This amount relates to shipments to a customer from which the product was sent but then recalled before it was installed onsite. This occurred because after they were shipped First Solar discovered that the material was potentially defective prior to the customer installing it. The Company reclaimed the material from their warehouse, because it was substantially cheaper for them to execute than taking the material out of the field, shipping replacements and installing them on site. I obtained a copy of a memo to the customer detailing the replacement details for the potentially defective modules. This is deemed appropriate and no further investigation is deemed necessary.

**K**  I obtained the related data for the 10 largest sites that have already been remediated. Seven of these sites were above 5MW. These seven sites average a size of 13MW and 182,000 modules. Per discussion with management this average is high because it contains the single largest site (Turnow) that was being built during the LPM time frame. I noted that this site was 50MW and that the second largest site was 10MW. If I exclude this item from the average, the average becomes 7MW and 96,000 modules. Thus, I can see that it is reasonable that if the other 5 sites over 5MW had been remediated I would be able to see an average of around 9MW and 120,000 modules.

Note that through reviewing the 7 sites I reviewed the data for 345K of the 1.1M modules that will need to be pulled for remediation based on the calculation above. This gives me a coverage of ~30%. To further gain comfort over these amounts I performed a stress test to illustrate what impact a change in the average size, number of modules per site, and number of sites per segment has on the total liability amount. Refer to Stress test 2 - 3 for more information.

**Accural Calculations**

PWC0066917

**L**
First Solar sells 72.5W, 75W, and 77.5W rated solar panels depending on what each panel measures at once it comes off the assembly line. Based on prior audit knowledge, the average module rating is 75W.

**M**     Note that this was stress tested at the Stress Test 4 tab within this workbook

**N**     Note that this was stress tested at the Stress Test 5 tab within this workbook

Exhibit 8

## 2.14.2.30 FG Inventory Analysis

| Document |
|---|
| |

Link to document attachment: FG Inventory Analysis

| Document Properties | |
|---|---|
| Audit Unit: | First Solar Q3 2011 - HQ |
| Financial Statement Line Item: | Interim review engagement activities |
| Source: | Prepared by Bryan Schumaker, Assistant Controller |
| Category: | Prepared by Client external party |
| Comments: | |
| File Name: | FG Inventory Analysis.PDF |
| Paper File?: | No |
| Ref. Number | Not Used |
| Roll the Selected Document Forward?: | No |
| File Size (KBs): | 371 |
| Modified Date: | 11/2/2011 10:22:28 AM |
| Added By: | Karina Rivera |
| Date Added: | 11/2/2011 10:23:30 AM |

Confidential - Do Not Copy or Disclose

Confidential Treatment Requested

PWC0084480



**First Solar.**

# MEMORANDUM

350 West Washington Street
Suite 600
Tempe, AZ 85281 USA

**To:**   Financial Reporting Files

**From:**   Bryan Schumaker
Corp. Asst. Controller

**Date:** 2011 Oct. 20

**Subject:**  FG Inventory Analysis

## Overview:

As of Q3 2011, FSLR had $232M in Finished Goods inventory at 9/30/2011.

(in M's)

| | | |
|---|---:|---|
| $ | 151 | Components Business Finished Goods Inventory at Standard as of 9/30/2011 |
| $ | (2) | Standard to Actual Adjustment at 9/30/2011 |
| $ | 149 | Adjusted Compoents Business Finished Goods Inventory as of 9/30/2011 |
| $ | 83 | Systems Business Inventory at 9/30/2011 |
| $ | 232 | Total Finished Goods Inventory at 9/30/2011 |

| Series | W. Bin | Spec | Qty | Value | | CPW | MW | % |
|---|---|---|---|---|---|---|---|---|
| Series 3 | 87.5 | A | 2,900 | $ 187,582 | $ | 0.74 | 0.25 | 0.2% |
| | 85 | A | 27,800 | $ 1,752,267 | $ | 0.74 | 2.36 | 1.9% |
| | 85 | L | 4,100 | $ 265,202 | $ | 0.76 | 0.35 | 0.3% |
| | 82.5 | A | 401,800 | $ 20,931,506 | $ | 0.63 | 33.15 | 26.0% |
| | 82.5 | E | 10,000 | $ 653,859 | $ | 0.79 | 0.83 | 0.6% |
| | 82.5 | L | 4,450 | $ 257,490 | $ | 0.70 | 0.37 | 0.3% |
| | 80 | A | 607,250 | $ 31,077,039 | $ | 0.64 | 48.58 | 38.0% |
| | 80 | E | 5,500 | $ 359,623 | $ | 0.82 | 0.44 | 0.3% |
| | 80 | L | 9,350 | $ 510,791 | $ | 0.68 | 0.75 | 0.6% |
| | 77.5 | A | 517,700 | $ 27,800,233 | $ | 0.69 | 40.12 | 31.4% |
| | 77.5 | E | 50 | $ 3,269 | $ | 0.84 | 0.00 | 0.0% |
| | 77.5 | L | 6,250 | $ 345,788 | $ | 0.71 | 0.48 | 0.4% |
| >=77.5 | | | 1,597,150 | 84,144,649 | $ | 0.66 | 127.68 | 100.0% |
| | 75 | A | 161,720 | $ 8,847,533 | $ | 0.73 | 12.13 | 62.2% |
| | 75 | L | 2,250 | $ 127,301 | $ | 0.75 | 0.17 | 0.9% |
| | 72.5 | A | 74,150 | $ 3,938,755 | $ | 0.73 | 5.38 | 27.5% |
| | 72.5 | L | 350 | $ 20,191 | $ | 0.80 | 0.03 | 0.1% |
| | 70 | A | 19,250 | $ 1,032,630 | $ | 0.77 | 1.35 | 6.9% |
| | 67.5 | A | 6,950 | $ 379,149 | $ | 0.81 | 0.47 | 2.4% |
| | 0 | A | 150 | $ 8,653 | | | - | 0.0% |
| < 77.5 | | | 264,820 | 14,354,211 | $ | 0.74 | 19.52 | 100.0% |
| Total Series 3 | | | 1,861,970 | 98,498,860 | $ | 0.67 | 147.20 | |

| Series | W. Bin | Spec | Qty | Value | | CPW | MW | % |
|---|---|---|---|---|---|---|---|---|
| Series 2 | 80 | A | 36,705 | $ 1,812,800 | $ | 0.62 | 2.94 | 9.2% |
| | 80 | L | 9,800 | $ 487,103 | $ | 0.62 | 0.78 | 2.5% |
| | 77.5 | A | 205,850 | $ 10,072,138 | $ | 0.63 | 15.95 | 50.1% |
| | 77.5 | L | 17,700 | $ 902,395 | $ | 0.66 | 1.37 | 4.3% |
| | 75 | A | 49,850 | $ 2,436,260 | $ | 0.65 | 3.74 | 11.7% |
| | 75 | L | 13,300 | $ 697,644 | $ | 0.70 | 1.00 | 3.1% |
| | 72.5 | A | 58,950 | $ 2,923,049 | $ | 0.68 | 4.27 | 13.4% |
| | 72.5 | L | 3,400 | $ 190,416 | $ | 0.77 | 0.25 | 0.8% |
| | 70 | A | 13,100 | $ 701,872 | $ | 0.77 | 0.92 | 2.9% |
| | 67.5 | A | 7,850 | $ 400,893 | $ | 0.76 | 0.53 | 1.7% |
| | 65 | A | 850 | $ 45,437 | $ | 0.82 | 0.06 | 0.2% |
| | 62.5 | A | 879 | $ 56,083 | $ | 1.02 | 0.05 | 0.2% |
| | 60 | A | 30 | $ 1,914 | $ | 1.06 | 0.00 | 0.0% |
| | 57.5 | A | 50 | $ 2,311 | $ | 0.80 | 0.00 | 0.0% |
| | 55 | A | 17 | $ 1,085 | $ | 1.16 | 0.00 | 0.0% |
| | 50 | A | 100 | $ 4,621 | $ | 0.92 | 0.01 | 0.0% |
| | 0 | A | 402 | $ 23,309 | | | - | 0.0% |
| Total Series 2 | | | 418,833.00 | 20,759,330.35 | $ | 0.65 | 31.87 | 100.0% |

| Series | W. Bin | Spec | Qty | $ | | CPW | MW | % |
|---|---|---|---|---|---|---|---|---|
| Refurbished | 77.5 | R | 312 | 15,679 | $ | 0.65 | 0.02 | 0.0% |
| | 75 | R | 1,404 | 70,555 | $ | 0.67 | 0.11 | 0.2% |
| | 72.5 | R | 2,028 | 101,913 | $ | 0.69 | 0.15 | 0.3% |
| | 70 | R | 39,936 | 2,006,905 | $ | 0.72 | 2.80 | 6.2% |
| | 67.5 | R | 93,288 | 4,688,004 | $ | 0.74 | 6.30 | 14.6% |
| | 65 | R | 148,512 | 7,463,178 | $ | 0.77 | 9.65 | 23.2% |
| | 62.5 | R | 197,652 | 9,932,611 | $ | 0.80 | 12.35 | 30.8% |
| | 60 | R | 157,560 | 7,917,867 | $ | 0.84 | 9.45 | 24.6% |
| Total | | | 640,691 | 32,196,712 | $ | 0.79 | 40.83 | 100.0% |

| Series | Qty | $ | | CPW | MW | % |
|---|---|---|---|---|---|---|
| Series 3 >=77.5 | 1,597,150 | 84,144,649 | $ | 0.66 | 127.68 | 58.1% |
| Series 3 <77.5 | 264,820 | 14,354,211 | $ | 0.74 | 19.52 | 8.9% |
| Series 2 | 418,833 | 20,759,330 | $ | 0.65 | 31.87 | 14.5% |
| Refurbished | 640,691 | 32,196,712 | $ | 0.79 | 40.83 | 18.6% |
| Combined Total | 2,921,494 | $ 151,454,903 | $ | 0.69 | 219.90 | 100.0% |

Page 1 of 5

Confidential Treatment Requested

PWC0084481

**First Solar.**

**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

## Planned Disposition of Finished Good Modules in the Components Business:

| Module Type | MW's | Value | Average CPW |
|---|---|---|---|
| Series 3 ≥77.5W | 128 | $84M | $0.66 |

### Planned Disposition

To be sold through third party customers or our Systems Business Projects.

### LCM

For the three months and nine months ended September 30, 2011, the gross margin for FSI was approximately 38% and 40%, respectfully.  FSI projects to have gross margins of 38% for Q4 2011 and 26% for 2012.   As of September 30, 201 our Days of Inventory associated with finished goods modules was 27 days.  (18 for the Components business and 9 days for the Systems Business) Based on the gross margin analysis of the Company, Management does not believe any LCM issues exist with this population of modules.

| Module Type | MW's | Value | Average CPW |
|---|---|---|---|
| Series 3 <77.5W | 19.5 | $14.4M | $0.74 |

### Planned Disposition

Management has planned on installing these modules on FSLR rooftops.  Below is an analysis and an estimated schedule of when these modules will be installed by project.

| Project | Scope (MW) | Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Q311 | Q411 | Q112 | Q212 | Q312 | Q412 | Q113 | Q213 |
| PBG - Test array | 0.72 | 0.72 | | | | | | | |
| MSA - Ground Array | 1.5 | | 1.0 | 0.5 | | | | | |
| MSA - Roof Array | 3.5 | | 1.0 | 0.6 | 1.0 | 0.9 | | | |
| KLM5,6 | 4.0 | | | | | 1.0 | 3.0 | | |
| KLM1-4 | 8.0 | | | | | | 2.0 | 5.0 | 1.0 |
| **Total** | **17.72** | | 2.72 | 1.1 | 1 | 1.9 | 5 | 5 | 1 |

This 17.7 MW's will utilize $13.1M of the product and will come from the following bin classes:  FS367/367HC/370/370HC/372/372HC/375/375HC

The remaining balance of $1.3M as of September 30, 2011, will be reviewed for a solid disposition plan during Q4 2011.  If Management can't come up with a solid disposition plan by year end we will impair these modules.

In Q3 2011, Management began scrapping all Series 3 modules produced that were less than 72.5 Watts per module.  Below is the production forecast that was presented in the S&OP meeting on October 3, 2011.  Management will continue to evaluate all Series 3 modules less than 77.5 watts to ensure we have a disposition plan in-place.

Confidential Treatment Requested

PWC0084482

**First Solar.**

**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*



## Forecast by MW by Bin Class – Forecast expires Oct 3rd, 2011 – Internal only

| | 75 | 77.5 | 80 | 82.5 | 85 | 87.5 | 90 | 92.5 | 95 | 97.5 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Temperate Modules Only** | | | | | | | | | | | |
| Q4 '11 | 3,3 | 42,4 | 158,9 | | 73,9 | 25,2 | - | - | - | - | 485,4 |
| Q1 '12 | - | 1,5 | 24,6 | 125,3 | | 84,0 | 13,8 | - | - | - | 444,0 |
| Q2 '12 | - | - | 3,6 | 59,3 | | 154,0 | 38,3 | - | - | - | 454,7 |
| Q3 '12 | - | - | 1,0 | 25,9 | 146,3 | | 101,7 | - | - | - | 485,2 |
| Q4 '12 | - | - | 0,6 | 16,4 | 120,9 | | 159,1 | 25,3 | - | - | 579,0 |
| Q1 '13 | - | - | 0,2 | 8,3 | 78,2 | 191,5 | | 97,5 | 15,2 | - | 585,3 |
| Q2 '13 | - | - | - | 1,6 | 27,6 | 144,5 | | 137,4 | 18,4 | - | 581,6 |
| Q3 '13 | - | - | - | 0,3 | 9,2 | 62,9 | 132,3 | | 139,2 | 38,4 | 542,6 |
| Q4 '13 | - | - | - | 0,1 | 2,2 | 13,3 | 47,6 | 190,6 | | 67,8 | 561,0 |
| **Hot Climate Modules Only** | | | | | | | | | | | |
| Q4 '11 | 5,0 | 20,6 | 24,6 | 26,9 | 19,5 | - | - | - | - | - | 96,6 |
| Q1 '12 | - | 1,5 | 19,4 | 59,8 | 41,5 | 6,2 | - | - | - | - | 128,5 |
| Q2 '12 | - | 0,2 | 8,6 | 55,7 | 70,4 | 18,5 | - | - | - | - | 153,4 |
| Q3 '12 | - | 0,1 | 5,6 | 54,9 | 106,7 | 45,2 | - | - | - | - | 212,6 |
| Q4 '12 | - | - | 3,4 | 44,6 | 110,9 | 58,7 | - | - | - | - | 217,7 |
| Q1 '13 | - | - | 2,1 | 31,4 | 91,4 | 65,0 | 22,8 | - | - | - | 212,8 |
| Q2 '13 | - | - | 0,4 | 9,3 | 56,9 | 104,4 | 59,8 | 10,1 | - | - | 240,9 |
| Q3 '13 | - | - | 0,1 | 3,9 | 42,1 | 120,3 | 102,0 | 39,3 | - | - | 307,7 |
| Q4 '13 | - | - | - | 0,3 | 7,8 | 38,1 | 87,8 | 132,2 | 57,1 | - | 323,3 |
| **Grand Total** | 8,2 | 66,3 | 253,1 | 705,6 | 1.400,0 | 1.598,8 | 1.211,6 | 792,8 | 469,3 | 106,2 | 6.612,3 |

© Copyright 2010, First Solar, Inc          First Solar Confidential & Proprietary          32

| LCM |
|---|

Historically we have owned the arrays on our rooftop and utilized them to offset our electricity bill. Management believes that the future net benefit of these modules, when they are installed on our rooftops, will exceed the cost of the modules plus the estimated balance of system cost as of September 30, 2011.

| Module Type | MW's | Value | Average CPW |
|---|---|---|---|
| Series 2 | 32 | $20.8M | $0.65 |

| Planned Disposition |
|---|

These modules will be used to replace the estimated 93MW's of modules needed to meet our warranty obligation. The estimated obligation is made up of two components:

1. Management estimates that we will need to replace approximately 47MW's of modules under our 5 year Defects and Workmanship Warranty and 25 year Power Output Warranty. Series 2 modules where sold through 2010, so the warranty demand for these modules will continue for several years based on our current technology. (i.e. currently we can't use Series 3 modules to replace Series 2 modules)
2. In Q3 2011, Management determined that FSI will replace an additional 46MW's of modules under a Special Excursion. This replacement effort will occur over the next 12 months.

| LCM |
|---|

Series 2 modules are on our books at $49.56 per module. Since these modules will be used to meet our warranty replacement demand, we compared this value to the amount we have accrued under our warranty liability. As of September 30, 2011, FSI established a liability at the Worldwide Average cost of $64.14 a module. This includes estimates for

Page 3 of 5

Confidential Treatment Requested                    PWC0084483



**First Solar.**

**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

EOL $8.68 and two way freight of approximately $3.  When these costs are adjusted from the total warranty liability the adjusted cost is $52.46 as compared to the $49.56 noted above.  This variance between the amount we accrued for under our warranty liability and the standard cost recorded in Inventory appears reasonable. ($1.2M=419K Series 2 modules *($52.46-$49.56))

| Module Type | MW's | Value | Average CPW |
|---|---|---|---|
| Refurbished | 41 | $32.2M | $0.79 |
| **Planned Disposition** | | | |

Management believes that we will be able to utilize the Series 2 Refurbished modules in the following ways:

1. These modules can be sold through third party sales
2. Allocated to a discrete project that our Systems Business will Construct (i.e. similar to Tillbury)
3. These modules can also be used to meet our warranty obligation for Series 2 modules.  This refurbished material has gone through the stabilization period and have been de-rated, so they are ideal for warranty purposes.  European Countries that allow pre-installed modules to remediate sites by replacement, or providing additional power for a specific site are as follow:

| Country of first installation of LPMs | Country of installation of refurbished modules – eligibility to the local FIT | | | | |
|---|---|---|---|---|---|
| | Czech Republic | France | Germany | Italy | Spain |
| Czech Republic | Yes | Yes | No | Yes | Yes |
| France | Yes | Yes | No | Yes | Yes |
| Germany | Yes | Yes | No | Yes | Yes |
| Italy | Yes | Yes | No | No | Yes |
| Spain | Yes | Yes | No | Yes | Yes |

| **LCM** |
|---|

In Q3 2011, we sold 5,400 modules to Phoenix for €0.70 per watt ($0.90).  The blended CPW on these modules are $0.79 as noted above.  This excludes warranty $0.01, freight $0.03 and EOL cost $0.04 which are not capitalized into warranty.  These costs are incurred when the module is sold.  The total Cost of Sales recorded for these modules were $0.87 per watt as compared to USD adjusted sales price of $0.90 per watt.  Due to the size of this sale, this transaction may not be representative of the overall market for these modules, but does provide a good indication of the market.  Based on review of these modules sold in Q3 and the  other channels that Management  believes are available for the disposition of these modules, Management does not believe there is a LCM issue with these modules.

Page 4 of 5

Confidential Treatment Requested

PWC0084484



**First Solar.**

**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

**Conclusion**

**CONCLUSION:**
Based on review of each population of modules in our Finished Goods inventory as of September 30, 2011, Management concludes that all of this inventory is valued at the Lower of Cost or Market at the end of Q3 2011.

**Technical References:**

Reviewed by:

/s/ James Zhu

James Zhu, CAO

Date:

October 20, 2011

Q3 FG Inventory Analysis

Page 5 of 5

Confidential Treatment Requested

PWC0084485

Confidential Treatment Requested

PWC0084486

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Mark Smilovits, Individually    )
and on Behalf of All Other      )
Persons Similarly Situated,     )
                                )
                Plaintiffs,     )
                                )
            vs.                 ) Case No.
                                ) 2:12-cv-00555-DGC
First Solar, Michael J. Ahearn,)
Robert J. Gillette, Mark R.     )
Widmar, Jens Meyerhoff, James   )
Zhu, Bruce Sohn, and David      )
Eaglesham,                      )
                                )
                Defendants.     )
------------------------------)

VIDEOTAPED

DEPOSITION OF ADAM D'ANGELO

New York, New York

Friday, January 30, 2015

Reported by:

FRANCIS X. FREDERICK, CSR, RPR, RMR

JOB NO. 89592

A P P E A R A N C E S:


        ROBBINS GELLER RUDMAN & DOWD

        Attorneys for Plaintiffs

                655 West Broadway

                San Diego, California  92101

        BY:   Darryl Alvarado

                Andrew Rudolph


        MORRISON & FOERSTER

        Attorneys for Defendants

                425 Market Street

                San Francisco, California  94105

        BY:   Paul Flum

                Nicholas Napolitan


        PRICEWATERHOUSECOOPERS

        Attorneys for the Witness

                Three Embarcadero Center

                San Francisco, California  94111

        BY:   Theodore Senger


ALSO PRESENT:

        CARLOS LOPEZ, Videographer

A. D'ANGELO

PricewaterhouseCoopers representing the witness.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

* * *

A D A M   D ' A N G E L O,   called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. ALVARADO:

Q.    Good morning, Mr. D'Angelo.

A.    Good morning.

Q.    Would you please state your full name for the record.

A.    Adam D'Angelo.

Q.    Can you please provide us with your current home and business addresses.

A.    My home address is 521 Pelham Manor Road in Pelham, New York.  My business address is 300 Madison Avenue in New York.

Q.    You're currently employed by PricewaterhouseCoopers; is that right?

A.    I'm a partner at

A. D'ANGELO

services related to each module defect..."
and then there are a number of subparts.

Do you see that?

A.    Yes.

Q.    And what is your understanding of
the module defects that are at issue in this
case?

A.    Well, there was a manufacturing
excursion that was sometime -- sometimes
referred to as LPM.  Sometimes LPM brought in
some other items.  So there could refer to
stabilization modules.  It could refer to low
power modules.  It could refer to, you know,
various different types of problems.  But
generally they were modules that produced
lower than the labeled power.

Q.    Any other module defects that
you're aware of that relate to this
litigation?

A.    No.

Q.    Are you aware --

A.    I may be aware of the defect from
the hardware, but I don't know -- if you tell
me which defects you're referring to I could

A. D'ANGELO

MR. FLUM:  Objection, vague.

A.    I remember discussions I had with management about why they did not believe the additional claims would result in an accrual.

Q.    You recall discussions with management about why the remaining 2,956 claims would not result in any additional LPM accrual?

A.    I remember discussions with -- as of the second quarter that -- there was a lot of -- the data they were getting back was incomplete.  I think they set a deadline at some point.  So they were getting a lot of information that was not valid, meaning that the information was incomplete, wasn't available in a format they wanted.  They couldn't provide serial numbers so people were just giving forms in.  And they believed that those claims would ultimately not need to be honored.

Q.    Management indicated to you that the remaining --

A.    I'm sorry.  The claims would not be valid, yeah.

A. D'ANGELO

Q.   Management indicated to you that the remaining 2,956 claims would not be valid?

A.   They did not believe they would be fulfilling those claims based on the information they had at that time.  They believed it was quite poor, the documentation they were getting.

Q.   And did PwC test any of the remaining claims to determine whether any of them may be valid?

A.   We were doing the review at the time.  So the testing was much less significant than in an audit.

Q.   So was there any testing performed on the remaining 2,956?

A.   As of the --

Q.   Let me finish the question.

A.   Oh.

Q.   Was there any testing performed at 2Q '10 as part of PwC's review on the remaining 2,956 LPM claims?

MR. FLUM:  Your question referred to Q2 '10.  Is that what you intended?

Q.   Let me rephrase.

A. D'ANGELO

11.6 megawatts?

A.    Right.  So you know --

MR. FLUM:  Hold on.  Let him ask you a question.

THE WITNESS:  Oh, okay.

Q.    Well, that was my question.  Do you see that the sites identified on the hash mark comprise the 11.6 megawatts of remediation that were not LPM?

A.    Yes.

Q.    And the first one is Masdar.  It indicates Masdar potentially 3.5 megawatts non-LPM, cleaning and hot climate impact.

Do you see that?

A.    Yes.

Q.    And this indicates that 3.5 megawatts of Masdar site was remediated and the problem with that site related to the hot climate impact and cleaning, right?

A.    Yes.

Q.    And this particular site was remediated under the LPM excursion process, right?

MR. FLUM:  Objection, vague.

A. D'ANGELO

A.    It was remediated.  So they were basically -- there's some clarity in terms of what LPM is and what -- this is when you're starting to realize what -- that they were doing things that were under the bucket of LPM that were not originally part of LPM.  So the clarity of the understanding of what the issues were, of why they were coming back was becoming clear.

Q.    And did PwC have an understanding as to why at this point in time First Solar was attempting to identify remediation efforts that were LPM and non-LPM?

A.    Why they were splitting them out?  You know, the -- I believe from my discussions was that, you know, going -- when a module comes back to you and they test it, there's always a natural standard deviation.  So things could be performed below module for a number of reasons.

They started understanding those reasons better at some point in time.  And part of those reasons were, you know, open climate.  You know, cleaning, which I'm

A. D'ANGELO

assuming is simply the customer didn't clean the panel so the irradiation couldn't get through and be turned into electrons as it should have.

So they found that there were things that they were committing to and doing that went far beyond LPM.  And then as they broke it down they realized, okay, this is not just manufacturing.  We have been remediating things for other reasons.

Q.    Did you have an understanding as to why First Solar endeavored to separate out what was true LPM and what was other things such as hot climate or cleaning?

A.    I don't know if there's any reason other than engineers are trying to figure out how to stop this from happening going forward in their operations.  There was also discussions with clients, particularly with some of the issues that came up that were really -- they weren't installed according to the instructions.  And so they wanted to be able to tell their clients how to avoid it going forward.  Their customers.

A. D'ANGELO

there may be different accounting for it but I think there also may be things that then can deal with in there operational structure to make sure it doesn't happen in the future.

Q.    What other accounting treatments would apply to modules that were coming back as low power but not true LPM?

A.    Well, you can't --

MR. FLUM:  Objection.  Incomplete hypothetical.

A.    You can't accrue for something you don't have a legal obligation for.  So, remember, the LPM itself was beyond -- went beyond the normal warranty.  So they're committing to remediate sites that are not -- in a way that's not a part of the original warranty and -- for LPM.  So if it's a customer's fault in the installation or there's another reason why it's not working that's not part of their warranty, you can't accrue for that until you actually have a legal obligation.  Right?  You can maybe even intend to spend the money, but until there's a point in time that you've incurred the

A. D'ANGELO

commitment, and in theory some of these modules may not have been committed to, it's important to understand the differences.

Q.   Did First Solar ever quantify the amounts recorded in the LPM accrual that were not LPM?

MR. FLUM:  Foundation.

A.   There's certain qualifying -- they're saying certain of these items are different.  Was there an analysis of all of those items, I don't know.  I don't believe so.

Q.   And did PwC audit the special excursion accrual to determine whether there were things -- or items in the accrual that were for issues other than LPM?

A.   We didn't audit for the purposes -- we didn't perform procedures for the purposes of distinguishing between what's LPM or not LPM.  Our procedures were focused on the financial statements, material misstated overall.  So we didn't make a distinction between LPM and non-LPM.  It was always in the context of the financial

A. D'ANGELO

THE VIDEOGRAPHER:  The time is 3:29.  We're off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 3:31 p.m.  We're back on the record.

MR. FLUM:  Defendants have no questions.

MR. SENGER:  I have no questions as well, but we would request the opportunity to read and sign the transcript.

(Continued on next page to include jurat.)

Page 259

A. D'ANGELO

THE VIDEOGRAPHER:  The time is 3:31 p.m.  We're going off the record.

(Time Noted:    3:30 p.m.)

_____

ADAM D'ANGELO

Subscribed and sworn to before me

this ___ day of _____, 2015.

_____

C E R T I F I C A T E

STATE OF NEW YORK     )

                     : ss.

COUNTY OF NEW YORK    )

        I, FRANCIS X. FREDERICK, a

    Notary Public within and for the State

    of New York, do hereby certify:

        That ADAM D'ANGELO, the witness

    whose deposition is hereinbefore set

    forth, was duly sworn by me and that

    such deposition is a true record of

    the testimony given by the witness.

        I further certify that I am not

    related to any of the parties to this

    action by blood or marriage, and that

    I am in no way interested in the

    outcome of this matter.

        IN WITNESS WHEREOF, I have

    hereunto set my hand this 2nd day of

    February, 2015.


                        _____

                        FRANCIS X. FREDERICK

# Exhibit 10

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually          )

and on behalf of all other       )

persons similarly situated,      )      Case No.

       Plaintiffs,               ) 2:12-cv-00555-DGC

v.                               )

First Solar, Michael J.          )

Ahearn, Robert J. Gillette,      )

Mark R. Widmar, Jens             )

Meyerhoff, James Zhu, Bruce      )

Sohn, and David Eaglesham,       )

       Defendants.               )

_____


VIDEOTAPED DEPOSITION OF DAVID EAGLESHAM

Boston, Massachusetts

Wednesday, January 21, 2015




Reported by:  Dana Welch, CSR, RPR, CRR, CBC, CCP

Job No.  87651

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD

Attorneys for Plaintiffs

655 West Broadway

San Diego, California 92101

BY:   Luke Brooks

Andrew Rudolph

MORRISON & FOERSTER

Attorneys for Defendants

425 Market Street

San Francisco, California 94105

BY:   Anna Erickson White

Robert Cortez Webb

ALSO PRESENT:

Jody Urbati, Videographer

EAGLESHAM

MR. WEBB:  Robert Cortez Webb, Morrison and Foerster, for defendants.

THE WITNESS:  David Eaglesham.

DAVID EAGLESHAM, sworn

BY MR. BROOKS:

Q.  Could you state your full name for the record, please?

A.  David James Eaglesham.

Q.  And what's your current business address?

A.  Pellion Technologies, 625 Mount Auburn Street, Cambridge, Massachusetts.

Q.  And what's your current residential address?

A.  8 Cutler Farm Road, Lexington, Massachusetts.

Q.  You may have already had an opportunity to go over some of these issues with your counsel but I'd like to go over some of the ground rules covering the deposition here today, okay?

A.  Okay.

Q.  Do you understand that you're giving testimony here and that even though we're in an informal setting in a conference room, you're

EAGLESHAM

A.   So -- so the -- I'm not -- can you clarify the question?  I'm not sure what correlation --

Q.   Sure.  Based on the field data from First Solar's test sites, did you understand there was a strong correlation between that data and the data from the alternative life testing?

MS. WHITE:  Objection, lacks foundation, vague and ambiguous.

A.   The -- so I'm still struggling to understand the question that's under discussion.

Q.   In November of 2009, was there a strong correlation between the data from First Solar's test sites and the alt life testing data?

MS. WHITE:  Same objections.

A.   So there's a challenge with how you do that type of correlation.  Because any module that's subject to accelerated life testing in the lab has been subjected to accelerated life testing in the lab.  So it's not the same module as the module that is subject to field exposure.  So the question behind your question is how do you do such a correlation.  And that correlation is something that we really only learned how to do in the LPM exercise.

EAGLESHAM

the timing of the built with respect to the

performance to the power purchase agreement.  So

there is a financial group that I think worked for

Jens Meyerhoff, that was responsible for making

those kind of estimations, and I don't see anyone

from that functional group on this document.

Q.  So your answer is yes, it would make a

difference if someone from that cost modeling group

had been involved in the quantification?

A.  If this quantification was built by that

group, then it would make a difference, yes.

Q.  It would make it more reliable, wouldn't

it --

A.  That is --

Q.  -- in your view?

A.  So that is the appropriate group to be

doing such cost modeling, that is correct.

Q.  Why don't we turn to the page ending 409.

Do you see there's a bullet point just above these

figures that begins, "The technical team"?

A.  I do.

Q.  It reads, "The technical team authoring

this paper do believe that the data currently

available suggests that degradation rates of

EAGLESHAM

systems in hot climates are likely to be higher than we are currently guiding to, and for purposes of internal risk assessment and costing of performance guarantee and PPA products, we should consider using either a linear estimate of 1-to-1.5 percent annually, or an exponential profile of high rates in early system life to estimated system yields in hot climates."  And did you agree with that conclusion?

A.  No, I did not.  So I -- so I'm sorry.  Let me restate.  So there are two parts to this conclusion.  What it says is we should consider, and I agreed with the conclusion that we should consider that.

Q.  Did you agree that the data currently available suggests that degradation rates of systems in hot climates are likely to be higher than we are currently guiding to?

A.  I did not.

Q.  What was the basis for your disagreement?

A.  It is the fit -- the functional form of the fit.  So by forcing a linear fit to an exponential function, this particular exercise is forcing the wrong functional form to fit to the

EAGLESHAM

data.

Q.   At this point, you were seeing other indications from the field that modules in hot climates weren't performing as well as anticipated, weren't you?

MS. WHITE:  Objection, lacks foundation, vague and ambiguous.

A.   I am -- I don't -- I'm not sure of the timing, but I don't recall seeing any data set other than this one that flagged hot climates on this time frame.

Q.   What action, if any, did you take in response to this draft or the final version of this paper?

A.   So -- so this -- this paper, there's a set of requests and recommendations in this paper, and the recommendations in this paper are all focused on obtaining better data so that the data will become actionable.  So -- so there's a list of recommendations under future work that's in the back of this document.  My recollection is that all those recommendations were funded, supported, and executed on.  And so we expanded the Arizona star site.  We began an expanded sampling process.  I

EAGLESHAM

believe this is the time frame in which we began testing in Florida.  So there's a range of recommendations in here that are focused on obtaining more data and those recommendations were -- were pursued.

Q.  Did you inform Ms. Kimber that her conclusions were incorrect because of the linear fit?

MS. WHITE:  Objection, vague and ambiguous.

A.  So -- so I don't recall the discussion in detail, but I will tell you that there was a robust discussion around forcing a linear fit to what is clearly a nonlinear data set.  And so it was something that was discussed in a very, again, robust fashion, where the various people came in with opinions about whether you should or should not be forcing linear data through -- a linear functional form to a nonlinear data set.

Q.  How did the data set that was used to derive the conclusions in this paper differ from the data set that was derived -- that was used to derive the .8 that First Solar was guiding its customers with?

EAGLESHAM

MS. WHITE:  Lacks foundation, vague and ambiguous, calls for speculation.

A.  So the -- again, the primary data set that's used to obtain the long-term degradation number is the longest lived systems.  So if you have a functional form that is down and -- down and out if you like, so the initial stabilization followed by degradation, to separate those two terms, then to measure the degradation period, you have to begin measuring at a point in time after the stabilization has completed.  So you need to start measuring at year three and measure out from there.  So the data set that's used to obtain the 0.8 percent is focused on long-lived sites.  This data set takes the first three years.  So the focus here is on data that is less than three years old.  It takes the first three years and forces a straight line through them.

Q.  Within two years of this paper, was this guidance changed?  In other words --

MR. BROOKS:  Withdrawn.

Q.  Within two years of this paper, did you understand that the degradation rates in hot climates were greater than .8, based on additional

EAGLESHAM

data?

MS. WHITE:  Vague and ambiguous.

A.  So -- so, again, as I'm defining it, where I separate stabilization from degradation, the degradation view was unchanged, even later.

Q.  Just so we're clear, your separation of stabilization from degradation just ignores the first three years, correct?

A.  Um, it's a little more subtle than that but basically, yes.

Q.  So your view never changed --

A.  There's two different functional forms.

Q.  Your view never changed, is that correct, on the degradation rate in hot climates?

A.  Actually, I would say on balance with 20/20 hindsight, as we came to this in -- in two, three years later, the view on degradation was -- actually degradation was, in fact, completely independent of temperature.  And that the attempt -- or the -- the -- this difference that we had, the .5 to 0.8 was actually an artifact of the stabilization phenomenon.  So the end of the stabilization phenomenon was what made the high temperature degradation look faster.

EAGLESHAM

So with 20/20 hindsight looking back, I think there's a document somewhere where it is stated that actually degradation, the degradation piece of the curve is actually independent of temperature altogether.

Q.  And that was based on long years of data in hot climates?

A.  I think at that point, which is much later, that's based on a vastly improved model for the stabilization.

Q.  So with this vastly improved model, it was okayed to apply a linear fit to a couple of years of data to reach conclusions about degradation after stabilization?

MS. WHITE:  Objection, mischaracterizes prior testimony.

A.  That's not what I said.  So what I said is with a better model for the stabilization period, we're able to go back and basically strip out the stabilization piece from earlier data.

Q.  All from the Tucson Electric Power data?

A.  And from other sites.  So once we had better -- so in 2012, we have the first five -- all these three-year sites become five-year sites, and

EAGLESHAM

You wasted seven hours on a lot of other questions badgering the witness and so we're done.

MR. BROOKS:  I never badgered the witness once.  If you want to walk away from the deposition as it's ongoing, you'll have to live with the consequences.

MS. WHITE:  The deposition is over.  It's been seven hours.  Dave?

THE VIDEOGRAPHER:  Here ends today's deposition.  Off the record, 6:01 p.m.

(Whereupon, this deposition was concluded at 6:01 p.m.)

_____

DAVID EAGLESHAM

Subscribed and sworn to before me this _____ day of _____, 2015.

_____

CERTIFICATE

Commonwealth of Massachusetts

Suffolk, ss.

         I, Dana Welch, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that David Eaglesham, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

         I further certify that I am neither related to nor employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

         In witness whereof, I have hereunto set my hand and seal this 22nd day of January, 2015.


                    _____

                    Dana Welch

                    Notary Public

                    My commission expires:

                    October 6, 2017

Exhibit 11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually            )
and on behalf of all other         )
persons similarly situated,        )
                                   ) Case No.
            Plaintiffs,            ) CV12-00555-PHX-
                                   ) DGC
       vs.                         )
                                   )
First Solar, Michael J.            )
Ahearn, Robert J. Gillette,        )
Mark R. Widmar, Jens               )
Meyerhoff, James Zhu, Bruce        )
Sohn, and David Eaglesham,         )
                                   )
            Defendants.            )
_____)

VIDEO DEPOSITION OF

Georgette Gillen

San Diego, California

Thursday, August 7, 2014

Reported by:

LISA MOSKOWITZ, CSR 10816, RPR, CLR

JOB NO. 82792

representing the witness Georgette Gillen.

MR. ETH:  Jordan Eth representing the defendants First Solar and the individual defendants.

MR. FOSTER:  Mark Foster representing all defendants.

MR. WEBB:  Robert Webb representing all defendants.

MR. STEWART:  Chris Stewart for plaintiffs.

MR. RUDOLPH:  Andrew Rudolph for plaintiffs.

MR. FORGE:  Jason Forge for plaintiffs.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please swear in the witness.

GEORGETTE GILLEN,
        called as a witness, having been
        duly sworn, was examined and
        testified as follows:
///
///

leaving, and I worked for Jeff for -- I don't believe it to be a full year but probably close to that.  I honestly don't remember.

Q.    What was Jeff's last name?

A.    I don't recall.  Sorry.

Q.    But whoever replaced John Amonett --

A.    Yes.

Q.    -- the conversation you would have had with John would have been, what, within a month of that person taking over for him?

A.    Oh, no.  It was the day John announced that he was -- it was the day he announced that Kurt was moving, and he was getting a promotion.  And given the circumstances and the environment, I wasn't surprised actually or upset about it.  I thought it was pretty par for the course nor did I choose to --

Q.    Dwell on it?

A.    To dwell on it or to say, you know, "Hey, I was discriminated against because of this."  I mean, it was pretty clear that I was suspected of being the whistleblower,

Page 126

and I knew that and that was that.

Q.    Do you remember any sort of conference call regarding a wrap-up of First Solar's internal investigation regarding your complaint?

A.    Yes.

Q.    Were you on it?  Did you participate in the conference call regarding the resolution of that investigation?

A.    If it's the one that I'm recalling is the same one you're referring to, one led by Jens Meyerhoff --

Q.    I don't really have much.  I'll show you what I have.

A.    I dialed into a very broad wrap-up call, I believe counsel was on, I believe HR was on, all of finance was on.

Q.    This is Exhibit 11.  There's really no substance to it.  It's essentially just an invitation.

        (Exhibit No. 11 was marked for
        identification.)

BY MR. FORGE:

Q.    The subject is "Re:  Cost Per Watt Investigation Closing Report."

A.   Yeah.  I recall this.

Q.   Do you recall there being a single call concerning the wrap-up with the investigation?

A.   Yes.

Q.   Was there -- did anyone take the lead in this call?

A.   Jens took the lead on this call.

Q.   What do you recall being the substance of Jens' presentation during the call?

A.   I recall that I was on vacation at the time; so I called in from home and listened in.  And the general tone, as I recall it, was "The investigation's over.  There was no impropriety.  No one should ever go to internal audit again.  You'd better raise these kind of things up through your chain of command," which at the time, I found ironic because the first person I talked to was in my chain of command, and it was coming through my chain of command.

Q.   Did you take any notes of that call?

A.   I did not.  I was, as I said, on

vacation, and I dialed in.

Q.   Do you have any understanding as to whether anyone was tasked with taking minutes or notes of the conversation?

A.   I don't know if anyone was.  I would be surprised that they didn't record it, but I have no knowledge if they did or did not.  I was just a dialing-in listener.

Q.   Did you talk about the call with anyone else afterwards?

A.   You know, I don't recall specifically.  It wouldn't have been immediately because I was in Chicago actually when I called in to this on vacation.  I wouldn't be surprised if afterwards we didn't discuss the general tone.  I don't recall the specific conversations, but I'm sure there were probably discussions.

Q.   Who were your closest colleagues at First Solar?

A.   In terms of peers, Zac Dalton definitely and probably because we discussed most things and we sat next to each other for my entire tenure, probably with him,

probably with Julie.  I don't recall if internal audit was on this call or not.

Q.   Did anyone --

A.   I --

Q.   I'm sorry.

A.   No, I'm sorry, go ahead.

Q.   Anyone else that you were particularly close to at First Solar?

A.   There were employees who worked for me.  I'm not even sure at what point they worked for me, but Rakhi Agarwal who was one of the analysts who worked for the Perrysburg team eventually reported to me.  Tiffany.  Her last name starts with an S.  I'm sure -- at some point, I think she may have even started in internal audit.  She started in Perrysburg.  I may have spoken to her about it.  Mo Smaidi who worked for me.  I'm not even sure if he was here.  I don't believe he was here at the time that this even happened; so maybe not him.

Q.   Does Zac Dalton still work for First Solar, as far as you know?

A.   As far as I know.

Q.   How about Julie Myerholtz?

A.   As far as I know.

Q.   How about Rakhi Agarwal?

A.   I don't believe so.

Q.   Do you have any idea -- it's a she; right?

A.   It's a she.

Q.   Do you have any idea where she works?

A.   I think I got a LinkedIn notice that she works at maybe Owens-Corning or one of the Owens companies in the Toledo area. Oh, Tiffany Cross.

Q.   Do you recall anybody else speaking in that conversation other than Jens -- was it Jens?

A.   Jens.  I think HR might have said a couple of words.  I really -- my recollection and my -- what resonated with me was Jens.

MR. FORGE:  This next one is going to be Exhibit 12.

(Exhibit No. 12 was marked for identification.)

BY MR. FORGE:

Q.   Take your time to look through

C E R T I F I C A T E

STATE OF CALIFORNIA:


        I, LISA MOSKOWITZ, CSR, RPR, CLR,

shorthand reporter, do hereby certify:

        That the witness whose deposition is

hereinbefore set forth was duly sworn, and

that such deposition is a true record of the

testimony given by such witness.

        I further certify that I am not related

to any of the parties to this action by

blood or marriage, and that I am in no way

interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set

my hand this 12th day of August, 2014.


        _____

        LISA MOSKOWITZ, CSR, RPR, CLR

        Shorthand Reporter

Exhibit 12

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Mark Smilovits, Individually and on )
behalf of all other persons          )
similarly situated,                  )
                                     )
            Plaintiff,               )
                                     )
vs.                                  ) No. CV12-00555-PHX-DGC
                                     )
First Solar, In,  Michael J. Ahearn,)
Robert J. Gillette, Mark R. Widmar,  )
Jens Meyerhoff, James Zhu, Bruce     )
Sohn, and David Eaglesham,           )
                                     )
            Defendants.              )
                                     )

VIDEOTAPED DEPOSITION OF TERRY LEE KALLENBACH

Phoenix, Arizona
March 2, 2015
9:18 a.m.

REPORTED BY: Kristy A. Ceton, RPR
AZ Certified Court Reporter No. 50200
Job No. 90113

TERRY LEE KALLENBACH

VIDEOTAPED DEPOSITION OF TERRY LEE KALLENBACH

commenced at 9:18 a.m., on March 2, 2015, at Osborn

Maledon, PA, 2929 North Central Avenue, Suite 2100,

Phoenix, Arizona, before Kristy A. Ceton, RPR,

Arizona Certified Court Reporter No. 50200.


                        * * *


APPEARANCES:

     For the Plaintiff:

          ROBBINS GELLER RUDMAN & DOWD
          By:  Daniel Drosman, Esq.
          655 West Broadway
          San Diego, CA 92101


     For the Defendants:

          MORRISON & FOERSTER
          By:  Paul Flum, Esq.
               David Wiener, Esq.
          425 Market Street
          San Francisco, CA 94105


     Also Present:

          Ed Kishel, the videographer

     Terry Koelbl

TERRY LEE KALLENBACH

with David Wiener of Morrison & Foerster.  We are representing defendants and the witness.

Before you get started, Mr. Drosman, I want to request an opportunity to read and sign on behalf of the witness.  And could I also -- it looks like your realtime is working and mine isn't.  Can I just swap these two out?

THE VIDEOGRAPHER:  Madam reporter, would you please swear in the witness.

TERRY LEE KALLENBACH,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DROSMAN:

Q.  Could you please state your full name for the record, sir?

A.  TL Kallenbach.

Q.  And what's your full legal name?

A.  Full legal name is Terry Lee Kallenbach.

Q.  And you go by TK; is that correct?

A.  Typically.

Q.  Could you give us your current business

Page 85

TERRY LEE KALLENBACH

A.   Yes.

Q.   Okay.  And you've seen the abbreviation while you were at First Solar "LPM," I take it, correct?

A.   Yes, I've seen that.

Q.   And is that a synonym for the manufacturing excursion?

MR. FLUM:  Objection.  Vague.  Overbroad.

THE WITNESS:  So I would say it's -- it's potentially a synonym for LPM.  But LPM could have encompassed a number of other issues that were performance-related.

Q.   BY MR. DROSMAN:  Was it used on occasion to be the -- synonymous with manufacturing excursion?

A.   Yes.

Q.   Okay.

A.   Yeah, it could be.  I would just say that it could be used in a variety of contexts.

Q.   And did you suggest to Mr. Gillette that the company publicly disclose LPM?

A.   In the second quarter of 2010, we were getting a number of questions from trade media, and so we did have discussions around a specific trade media discussion.  This was beyond the fact that the

                    TERRY LEE KALLENBACH

not considered part of the manufacturing excursion.

        Q.   BY MR. DROSMAN:  Because they weren't

more than 15 percent, right?

        A.   That's correct.

        Q.   Okay.  But you don't know whether it was

the cad-chloride process which caused this

degradation, correct?

            MR. FLUM:  Objection.  Overbroad.  Asked

and answered.  Vague.

        Q.   BY MR. DROSMAN:  Is that correct?

            MR. FLUM:  Same objections.

            THE WITNESS:  Is what correct?

        Q.   BY MR. DROSMAN:  My question, sir.  I

asked you, but you don't know, one way or the other,

whether it was the cad-chloride process which caused

this negative 10 to negative 15 percent degradation,

correct?

            MR. FLUM:  Same objections.

            THE WITNESS:  I don't.  It could be

environmental.  It could be nothing to do with First

Solar's process.  It could be that the modules were

installed in an open circuit environment and degraded

rapidly but less rapidly than the manufacturing

excursion.

TERRY LEE KALLENBACH

There were a number of causes that could be environmental and not related to First Solar process.

Q.   BY MR. DROSMAN:  Could it have been the cad-chloride process that was responsible for the manufacturing excursion that caused these modules to decline 10 percent to 15 percent in power?

MR. FLUM:  Objection.  No foundation. Calls for speculation.  Incomplete hypothetical.

THE WITNESS:  My view, my understanding of the way we looked at the program, for the modules to be included as part of the evaluation of the manufacturing excursion, they had to have a power loss of greater than 15 percent with a very rapid loss signature.

Q.   BY MR. DROSMAN:  So I guess my question was, could it have been the cad-chloride process that was responsible for the manufacturing excursion that caused at least some of the modules listed in the bucket of negative 10 to negative 15 percent to decline by that amount?

MR. FLUM:  Objection.  No foundation. Calls for speculation.  Incomplete hypothetical. Asked and answered.

TERRY LEE KALLENBACH

understood it then as being correct.  Carol is

referring -- it's the prior -- the prior statement.

"The STBi slide was put into deck to show our

associates that we did learn from it.  Our

stability" -- which would have been the STBi part of

the module stability -- "is much better now due to

this unfortunate event," which would have been the

manufacturing excursion and the subsequent

remediation.

       Q.   BY MR. DROSMAN:  And then she writes,

"That being said, it isn't entirely behind us and

until we are more comfortable that it is, we will

continue to apply the .1 discretion."

            Do you see that?

       A.   I do see that.

       Q.   Do you understand what ".1 discretion"

refers to?

            MR. FLUM:  Foundation.

            THE WITNESS:  Actually, sitting here

right now, I -- I'm not sure what she's referring to.

       Q.   BY MR. DROSMAN:  Turn, if you would, to

the first page of the exhibit, page ending 375.

       A.   Okay.

       Q.   The middle of the Exhibit 486, there's an

TERRY LEE KALLENBACH

e-mail from you, right?  And the second paragraph says, "But in five weeks or so when I have to come to the E-staff and ask for approximately 25 million to 40 million more LPM reserve, I sure would be glad I know that no one will be surprised."

MR. FLUM:  You misread that.  It says "glad to know."

Q.  BY MR. DROSMAN:  "And this would be a 'serious tone, not sarcastic,' just to avoid a miscommunication in tone."

Do you see that?

A.  Yes, I do.

Q.  And you wrote that, correct?

A.  Yes, I did.

Q.  So you -- you knew that the -- expected that the accrual would need to be increased, right?

A.  I don't know that I expected the accrual would be increased.  I wanted to get Dave's attention that we didn't think that the problem was completely behind us.  And that level of money is about the size of Dave's engineering budget, and Dave and I were not communicating on the same wavelength, and so I wanted his attention.

Q.  Well, you wrote, "In five weeks or so

                    TERRY LEE KALLENBACH

Right?

          MR. FLUM:  Object the characterization of
the document and the prior testimony.

     Q.   BY MR. DROSMAN:  Is that what it
indicates, sir?

          MR. FLUM:  Same objections.

          THE WITNESS:  Paragraph 3 states that "We
would need to get back 593,000 modules that are in
LPM status."

     Q.   BY MR. DROSMAN:  Okay.  Did you
understand that all 593,000 modules in LPM status
were expected to experience 15 percent -- greater
than 15 percent label loss?  Yes or no?

     A.   I would say that they are part of the
manufacturing excursion and there may be items in
there that are beyond the manufacturing excursion or
they could include scrap.  And so this particular
output was the output of a model which included a
slightly different definition or a different
definition than the manufacturing excursion and the
number of modules that could have been affected by
the manufacturing excursion.

     Q.   Okay.  Sir, I didn't ask you whether
those modules were beyond the manufacturing or could

TERRY LEE KALLENBACH

include scrap, right?  I just asked you a pretty

straightforward question, so listen really closely to

it.

Did you understand that all 593,000

modules in LPM status were expected to experience 15

-- greater than 15 percent label loss?  Yes or no?

MR. FLUM:  Objection.  Foundation.

THE WITNESS:  And I would say that is not

the only definitional piece of that category.

Q.   BY MR. DROSMAN:  I'm not asking you if

it's the only definitional piece.  I'm asking you

whether you understood that all 593,000 modules in

LPM status were expected to experience greater than

15 percent label loss?  Yes or no?

A.   Or they could be scrap or other things.

So I would say no.

Q.   Okay.  Some of the modules in that

category were not expected to experience greater than

15 percent label loss, correct?

A.   I didn't say that.  I said there are

different categories of items.

Q.   Well, sir, either all the modules in that

category were expected to experience greater than 15

percent label loss or not all of the modules in that

TERRY LEE KALLENBACH

category were expected to experience greater than 15 percent label loss.  You would agree with that as a statement of fact, wouldn't you, sir?

MR. FLUM:  Objection.  Objection.  No foundation.  Calls for speculation.

Q.   BY MR. DROSMAN:  Would you agree with that as a statement of fact, sir?

MR. FLUM:  Same objections.

THE WITNESS:  I would disagree with you because it could include other categories besides power loss.

Q.   BY MR. DROSMAN:  Do you have a different definition for how you define the 593,000 modules?

MR. FLUM:  Objection.  No foundation. Calls for speculation.

Q.   BY MR. DROSMAN:  How do --  Let me withdraw the question.

How do you define this population of 593,000 modules?

MR. FLUM:  No foundation.

THE WITNESS:  That population is an output from a Monte Carlo simulation which tells us approximately how many modules would be returned in a particular category.  That category could include

TERRY LEE KALLENBACH

things that have a power loss greater than 15 percent.  But there are other items within that category like breakage and scrap.

Q.   BY MR. DROSMAN:  So the Monte Carlo model tells you how many modules could be returned with breakage and scrap, correct, sir?

A.   No, it does not.  But it says that there is a distribution of -- of modules that it's different than the manufacturing excursion population.

Q.   Now, I'm just asking you how you define that 593,000 modules, sir?

MR. FLUM:  Objection.  No foundation. Asked and answered.

Q.   BY MR. DROSMAN:  Can you just define it for me?

MR. FLUM:  Asked and answered.

Q.   BY MR. DROSMAN:  What is it?

MR. FLUM:  Asked and answered.

Q.   BY MR. DROSMAN:  Did you hear my question, sir?

A.   Yes, I did hear your question.  I -- I think I've answered your question.

Q.   Could you define the 593,000 modules for

TERRY LEE KALLENBACH

me?

A.   Those would be modules that would be returned that are in a category of a certain power loss, but also may include scrap and breakage and other items which can't be characterized in terms of power loss.

Q.   And what was the root cause of the degradation of the 593- modules that are in LPM status that are the subject of Mr. Koralewski's e-mail ending on page 938?

MR. FLUM:  Objection.  No foundation.

THE WITNESS:  I'm going to read the balance of the e-mail, because I think you have to take this e-mail as the definition of what's in that population.

Q.   BY MR. DROSMAN:  Sir, I asked you a different question.  Just try really hard to listen to what I'm asking you.  I think it will help things go a little faster.

What was the root cause of the degradation of the 593,000 modules that are in LPM status that are the subject of Mr. Koralewski's e-mail ending on page 938?

MR. FLUM:  Objection.  No foundation.

TERRY LEE KALLENBACH

percentage of those would be in that category.

Q.   Did you have an understanding as to the basis for the statement by First Solar that the manufacturing excursion affected less than four percent?

A.   Yes, I did.

Q.   Okay.  And the reason that not all the 593,000 modules could be caused by the manufacturing excursion is because that would be more than four percent, right, sir?

MR. FLUM:  Objection.  Argumentative.  No foundation.  Assumes facts.

THE WITNESS:  I would say that there -- within First Solar and the manufacture of our product, there are other things besides the manufacturing excursion, which could result in modules being returned with a power loss of greater than 15 percent or be scrapped.  That's my only point.

Q.   BY MR. DROSMAN:  And you can't tell me what percentage of these modules were meant -- were caused by the manufacturing excursion, correct?

MR. FLUM:  Objection.  Vague.  Asked and answered.

Page 266

TERRY LEE KALLENBACH

MR. FLUM:  Objection.  Mischaracterizes the document.

THE WITNESS:  I would say that we were coming up with a -- a new estimate which would include both the manufacturing excursion and the remediation of the manufacturing excursion plus a much clearer detailed estimate for those items that were not part of the manufacturing excursion but were going to need to be remediated in some fashion.

Q.   BY MR. DROSMAN:  And why were you coming up with a new estimate for those items in the manufacturing excursion in July -- late July and August?

A.   What we had found as we went through the initial analysis in late July and early August of 2011, is that we had a number of sites which had been declared as part of the manufacturing excursion and which indeed were having degradation problems which were completely unrelated to the manufacturing excursion or were not primarily related to the manufacturing excursion.

Q.   And so at the time that you released Q2 earnings, this new analysis of the reserve for the LPM issue had not been completed, correct?

Page 267

TERRY LEE KALLENBACH

MR. FLUM:  Objection.  Vague.  Misstates the record.

THE WITNESS:  It would be very precise and say that the reserve that we declared for Q2 2011 was the best estimate we had for the manufacturing excursion projects at that time.

Q.   BY MR. DROSMAN:  Was it an estimate of future costs or current actual costs?

MR. FLUM:  Compound.

You can answer.

THE WITNESS:  Apologies.

It was an estimate that included both the actuals to date and the cost to complete the remediation of the manufacturing excursion population.

Q.   BY MR. DROSMAN:  Well, sir, the -- the reserve at the end of Q2 2011 couldn't have taken into the -- into account the new estimate that was completed in the late July and August, right?  You would agree with me there?

A.   Yeah, that's correct.  What I'm being very specific to say that the estimate for Q2 2011 with respect to the manufacturing excursion was our best estimate to treat the manufacturing excursion.

TERRY LEE KALLENBACH

So there were a number of other sites that had already been included in the actual cost of the accrual which we had figured out both in late July and early August that were not part of the manufacturing excursion problem.

They had other environmental issues and they had other installation issues that we began to discover throughout the summer.

So the -- we had a -- an actual accrual cost, which commingled costs from sites that were part of the excursion and sites that weren't part of the excursion.

Q.   BY MR. DROSMAN:  Did you ever tell Mr. Widmar at the end of Q2 2011 that there would be no material increase to the LPM reserve?

A.   I would have not phrased it in that fashion.  I would have said that the -- we were confident in the manufacturing excursion reserve from a Q2 estimated point of view, and that was what was reviewed in early Q3.

Q.   Why would you have not phrased it in that fashion that there was no material -- that there would be no material increase to the LPM reserve?

A.   The reason I would not have phrased it

TERRY LEE KALLENBACH

THE WITNESS:  So I would say that we would have reserved based on our Monte Carlo simulation for a very small portion of those to be remediated.  We thought the vast majority of those 2,956 claims were actually never going to be visited because they were preemptive in nature and we couldn't actually get the data to actually evaluate if we had a performance claim.

Q.   BY MR. DROSMAN:  Did you --

Sorry.  Go ahead.

A.   So I would say that most of those 2,956 claims would have expired without any remediation whatsoever.

Q.   Well, sir, you didn't have the final details on those claims yet, did you?

A.   And we never ultimately got those data. So we didn't have the data in July of 2011 and when I left First Solar, we still didn't have that data. Those claims basically were closed in the process that I mentioned earlier today where if they didn't have modules where they could validate the modules were shipped during the manufacturing excursion, we closed it.

If they didn't have performance data that

TERRY LEE KALLENBACH

we could validate they were having site underperformance, we closed those.

And so most -- and I would say on the order of 90 percent of those 3,000 claims were -- were closed in that manner.  So there was not a big unfunded reserve that we would forecast at the -- at the Q2 update.

We thought most of those claims would -- would basically be closed without any data.

Q.   Did you tell Mr. Widmar that the amount of reserve necessary for the 2,956 claims that had yet to be reviewed would be immaterial?

MR. FLUM:  Vague.

THE WITNESS:  I would probably not use the term "immaterial."  When Mark and I would talk on the specifics of the manufacturing excursion, I would say that we would discuss more on the other issues associated with non-LPM claims that were part of the manufacturing excursion process.

Q.   BY MR. DROSMAN:  Sir, you were aware at this time that there was a claims validation deadline of September 30th, 2011, correct?

A.   That's correct.

Q.   And that deadline hadn't come yet, had

TERRY LEE KALLENBACH

Do you see that?

A.    Which page are you on, sir?

Q.    The very first page of Exhibit 501 that shows what attachment was there.

Do you see that?

A.    Oh, there we go.  Yes, sir.  Okay.  Got it.

Q.    Okay.  So Plaintiff's Exhibit 501 is a true and accurate copy of the e-mail and attachment that you received from Mr. Fuss on or about 9/28/2011, correct?

A.    Yes, that's probably true.

Q.    Okay.  And he was -- Mr. Fuss was forwarding an e-mail from Moritz on to you, correct?

A.    From Moritz Ilg, yeah.  Yes.

Q.    And he said, "Please find the latest assessment based on our discussions last Friday," right?

A.    Yes, that's correct.

Q.    Okay.  And then if you look at Mr. Ilg's e-mail below on the first page of Exhibit 501, you see that in the last paragraph on the first page of Exhibit 501, second to last sentence, Mr. Ilg writes, "If adding all that up, there is an estimated demand

Page 374

TERRY LEE KALLENBACH

for additional physical product of 75 megawatts going forward to remediate sites with non-LPM technical root cause."

Do you see that? Second to last sentence on the first page of Exhibit 501. Are you with me?

A. Yes, I am.

Q. Okay. And you see what I just read to you, correct?

A. Yes, sir, I do.

Q. And you understood this as of September 28th, 2011, correct?

MR. FLUM: Foundation.

THE WITNESS: I understood that Moritz and the analysis, and we gave an estimated demand for an additional physical product for non-LPM -- for nonmanufacturing excursion, technical root cause. That's correct.

Q. BY MR. DROSMAN: Did you tell Mr. Widmar this information?

MR. FLUM: Vague. Overbroad.

THE WITNESS: I would say I cannot recall if I gave him this exact information.

Q. BY MR. DROSMAN: You may not have provided it to him. Is that accurate, sir?

TERRY LEE KALLENBACH

ostensibly started in Q2 and Q3 of 2011.

Q.   And these non-LPM issues that you read about here, were they covered by the LPM reserve?

MR. FLUM:   Objection.   Foundation.

THE WITNESS:   I would say no.   Some of these were customer-related events.   The customer had installed it improperly, not to our technical guidance, and so those would definitely not be covered by either our performance warranty nor the LPM special accrual.

MR. DROSMAN:   Move to strike as nonresponsive everything after "no."

I have no further questions at this time.

MR. FLUM:   All right.   I have no questions.

THE VIDEOGRAPHER:   This concludes today's recording of the deposition of TK Kallenbach.   This is the end of media No. 5, and there are a total of five media in this recording.   We are now off the record.   The time is 7:08 p.m.

(The proceedings concluded at 7:08 p.m.)

Page 392

TERRY LEE KALLENBACH

I, TERRY LEE KALLENBACH, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct,

EXECUTED this _____ day of _____,

20__, at _____, _____,

(City)                          (State)


_____ I have made changes to my deposition.

_____ I have NOT made changes to my deposition.


_____
TERRY LEE KALLENBACH

Page 394

TERRY LEE KALLENBACH

CERTIFICATE

I, Kristy A. Ceton, Certified Court Reporter for the State of Arizona, certify:

That the foregoing proceedings were taken by me; that I am authorized to administer an oath; that the witness, before testifying, was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that review and signature was requested; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had upon the taking of said proceedings, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED this 3rd day of March, 2015.

_____
Kristy A. Ceton
Certified Court Reporter No. 50200
For the State of Arizona

# Exhibit 13

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, individually and on behalf of all other Persons similarly situated,

                             Case No.

    Plaintiffs,            CV12-00555-PHX-DGC

  vs.

First Solar, Inc.; Michael J. Ahearn; Robert J. Gillette; Mark R. Widmar; Jens Meyerhoff; James Zhu; Bruce Sohn; and David Eaglesham,

      Defendants.

----------------------------------

VIDEOTAPED DEPOSITION OF ADRIANNE KIMBER

San Francisco, California

Tuesday, November 25, 2014

REPORTED BY:

CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

JOB NO. 86087

APPEARANCES:

On Behalf of Plaintiffs:

     ROBBINS GELLER RUDMAN & DOWD

     By:  LUKE BROOKS, ESQ.

        ANDREW RUDOLPH, CPA, CFE

     One Montgomery Street

     San Francisco, CA 94104

On Behalf of Defendants and the Deponent:

     MORRISON & FOERSTER

     BY:  PAUL FLUM, ESQ.

        NICHOLAS ALAN ROETHLISBERGER, ESQ.

     425 Market Street

     San Francisco, CA 94105

Videographer:  Sean McGrath

Page 5

MR. ROETHLISBERGER:  Nicholas Roethlisberger for defendants.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and we can proceed.

ADRIANNE KIMBER,

having first been duly sworn, testified as follows:

EXAMINATION

BY MR. BROOKS:

Q.  Good morning.

A.  Morning.

Q.  Have you ever been deposed before?

A.  No.

Q.  Okay.  Could you state your full name for the record, please?

A.  Adrianne Ryan Curtner Kimber.

Q.  And what's your current business address?

A.  663 Glenside Drive, Lafayette, California.

Q.  Is that also your home address?

A.  It is.

Q.  You may have gone over some ground rules with your counsel, but let me just go over some of these so we have a full understanding.

Page 66

A.   The current best information that I had available to me, yes.

Q.   And just so we're clear, the "current guidance on degradation" that's referred to here, is that the .8 percent or the .5 percent or both?

A.   It's not clear in this and I don't recall. I mean -- yeah, I don't recall whether I was referring to both or just one.

Q.   The main issue was the degradation in hot climates; right?

A.   I think the main issue was trying to understand degradation, period, from my perspective, not just hot climates.

Q.   Turning to the page ending 824, do you see there is a graph that's titled "Bivariate Fit of PRn by Field Age (Years)"?

A.   I do.

Q.   And underneath, "Data from internal array monitoring at Star site in Tempe, Arizona suggests exponential component to early degradation in the field."

A.   Mm-hmm.

Q.   Do you see that?

A.   I do.

Q.   What does that mean, that the data suggests

Page 67

an exponential component to early degradation?

A.   It means that the person that prepared this analysis was able to fit an exponential form of a curve to the data.

Q.   What is an "exponential form"?

A.   In this case, we are looking at an exponential decay, which is a form of a curve in which the decrease in the first part of time is -- is steeper than the decrease in the middle and the end part of the time frame.

So I mean, you're looking at the picture. I know the camera isn't looking at the picture. But it's a -- it means degradation would start out fast and slow down over time. So the modules would degrade less and less as time went on.

Q.   And what would linear degradation mean?

A.   Linear degradation means the rate at which the modules degraded would continue at the same pace over time.

Q.   So turning to the e-mail on the very front of Exhibit 26, this is an e-mail that you sent on February 9th, 2010, to Gerrit Schulz, Mike Koralewski, and others; right?

A.   That's what it says.

Q.   And in the second paragraph you wrote:

between stabilization and degradation, right, and we've said that we weren't a hundred percent clear on where you should start drawing the line between what's stabilization, what's degradation.  So...

One more time with the question.

Q.  Sure.

A.  I've got myself in a pickle again.

Q.  Was this exponential pattern of degradation that was suggested by the best data available at the time that you wrote this a positive development or a negative development?

A.  Okay.  So the word "development" -- First Solar knew that -- that the way that the performance or that the power of the module changed over time was exponential already.  That was not new information.  So it's not a development, is what I'm trying to say.

The idea that -- First Solar knew that the -- knew that the modules would -- the power of the module, its change over time, would look exponential.  They knew that.

They used the combination of the derate, which I just explained, and degradation over time to -- to ensure that -- well, as a way of modeling or -- so First Solar knew -- it wasn't a development

Page 88

about this exponential thing.  They knew about it and they had mechanisms in place already.

What we were trying -- what we were looking at doing was offering a -- a new product at the system level that was different from the existing module warranty.  And that new product we knew would be -- we were -- I think what First Solar was trying to do was offer something that was actually -- would have been more valuable to customers because it would have been, I guess, a higher bar to clear than the existing module warranty.  But in order to do that, they -- First Solar would have had to -- we were -- at least -- at the time that this paper was written, I was suggesting that in order to do -- in order to give customers a tighter tolerance, basically, on -- you know, a higher bar to clear for First Solar, First Solar may have needed to describe to customers more fully what that exponential shape looked like and that would have been a difficult educational process.

Q.  So First Solar always knew that there was this exponential shape, it just hadn't disclosed that to its customers; is that correct?

A.  First Solar knew that there was an exponential shape.  I wouldn't say that they hadn't

Page 157

Q.  Well, you just got done saying how the standard deviations were so wide --

A.  Right, very high.

Q.  -- for this commercial dataset and yet you, as a group, chose to use that data to estimate degradation rates for the first years of system life.  So why was that?

A.  Well, as it says in the next sentence, the commercial systems represent the largest sample of modules available.

So even though the confidence in the data coming in from the other sites was higher, the number of modules that were incorporated in those sites was very small compared to the number of modules that was incorporated in the commercial sites.

Q.  It also results in the lowest degradation per year as reflected in the chart on 779 for warm or hot climates, doesn't it?

A.  Well, NREL's climate is kind of on the bubble and it's got a lower number.  It does look to be -- besides the NREL --

Q.  We have AZ Star which is a warm climate?

A.  Right.

Q.  And that's 3.1 percent?

A.  Right.

Q.  And then you have the Q&R testing, which is 1.5 percent per year in warm climates; right?

A.  Right.

Q.  And then -- and that's the exponential linear.  And the exponential-exponential testing from Q&R is 12.5 percent; right?

A.  Right, but this is 32 modules -- I mean, is it the lowest rate from this chart?  No, it's not. The NREL is lower.

Q.  So the NREL in Denver is considered a hot climate under First Solar's standards?

A.  I'm not sure it would be hot.  It's not -- it's not mild, but it's -- I mean -- I don't know.

Q.  Ultimately, this number, which was 1.5 to 2 percent was changed to 1.42 percent in this draft after your conversation with Mr. Eaglesham; correct?

A.  Can I look at -- I really am just -- if that's what the document says, that's what the document says.  I don't remember enough of this.

What was the other draft exhibit?  31? March 23rd.

Q.  Right.  If you --

A.  And we're looking at Most Likely Degradation Rate, is that --

EXAMINATION

BY MR. FLUM:

Q.  Good afternoon, Ms. Kimber.  My name is Paul Flum.  I'm one of the lawyers for First Solar, and I'm also representing you today; correct?

A.  Correct.

(Deposition Exhibit 39 was marked for identification)

BY MR. FLUM:

Q.  You have in front of you what we marked as Exhibit 39.  And do you recognize this as a color copy of what Mr. Brooks had marked as Exhibit 32?

And if you need to pull Exhibit 32 out, it's in the pile in front of you.

A.  Yes.

Q.  All right.  And so you can put Exhibit 32 aside.

Just staying on Exhibit 39, is this the cover e-mail that transmitted the April 2nd, 2010 draft of what we've been calling the white paper?

A.  It is.

Q.  And does the April 2nd, 2010 draft of the white paper come to any conclusions about whether the rate of hot climate degradation was likely to exceed First Solar's performance warranty for

Page 230

modules?

A. You're talking about the module warranty?

Q. Yes.

A. Yeah. On page 281776, the figure there shows three of what the team considered to be likely degradation scenarios plotted against the module warranty. And from that graph, especially since the team felt that the exponential scenarios were more likely, we didn't feel that there was a huge risk of being in violation of the module warranty.

Q. All right. So can you just walk us through what's on that graph? So starting out with the purple line --

A. Sure.

Q. -- what does that represent?

A. Oh. That represents the percent power loss from nameplate that was allowable under First Solar's module warranty at the time.

Q. All right. And it looks like that purple line is fitted at 15 percent loss from nameplate for the first ten years and then it goes down to 25 percent for the next 15 years?

A. That's correct.

Q. All right. And why is that set at at minus 15 and minus 25 percent?

Page 231

MR. BROOKS:  Objection; lack of foundation, calls for speculation.

THE WITNESS:  It's that way because the module warranty allows for a 5 percent measurement tolerance.

BY MR. FLUM:

Q.  And what do you mean by that?

A.  When -- in the same way we were talking before about how difficult it is to measure the amount of irradiance that's on a solar panel, the measurement tolerance is included in the warranty so that when modules are measured after they've been in the field, the uncertainty associated with that measurement is assigned a value of 5 percent and the degradation of the module has to be measured to be more than 5 percent under the warranty level in order to be a claim under the warranty.

Q.  All right.  And if you just flip back to the Executive Summary in Exhibit 39.  So page 281774.

A.  Okay.

Q.  On the very first paragraph under the Executive Summary, you see that?

A.  I do.

Q.  And by the way, did you write this

Executive Summary?

A.  I believe I did.

Q.  All right.  And would you read out loud the third sentence of that first paragraph, the one that starts "First Solar's current module warranty"?

A.  (Reading):

"First Solar's current module warranty guarantees that our modules will produce at least 85 percent of their rated capacity at STC for the first 10 years of operation and at least 75 percent of their rated capacity at STC for the remaining 15 years of the warranty (including 5 percent measurement tolerance)."

Q.  And is that 5 percent measurement tolerance that you referred to in the memo, is that consistent with that 5 percent adjustment that's reflected on the chart on page 1776?

A.  Yes.

Q.  And what does "STC" stand for?

A.  It stands for standard test conditions.

Q.  So let's turn back to the chart on 1776.

A.  Okay.

Q.  So there are three other lines on this chart: a blue one, a green one and a red one.  Can

you describe what each of those represents?

A.   The red line represents a straight line degradation of 1.5 percent per year from the nameplate.  The green line represents an exponential curve that when -- if you tried to fit a straight line to that exponential curve, the -- or -- yeah, if you tried to fit a straight line to that curve, you would get a line with a slope of .77 percent. And the blue line represents an exponential curve that if you fitted a straight line to it you would get an average annual degradation rate of .47 percent.

Q.   And at the time that this draft of the white paper was circulated in April of 2010, did you have a view as to which of these three curves best represented the likely performance of First Solar's modules in hot climates?

MR. BROOKS:  Objection; vague and ambiguous.

THE WITNESS:  At the time, as I've testified previously, the amount of data that we had was pretty limited and there was a great deal of uncertainty, but one thing that did seem to be coming through at the time was that the shape of the degradation curve was exponential.  So I would have

anticipated seeing either the blue line or the green line.

BY MR. FLUM:

Q. All right. And what do the blue line and the green line show in relation to the warranty, the purple line?

A. Neither of them go under the purple line.

Q. And did you think that the red line represented the likely performance of First Solar modules in hot climates?

MR. BROOKS: Objection; vague and ambiguous.

THE WITNESS: I thought that the blue or the green line were more likely than the red line.

BY MR. FLUM:

Q. And what does the red line show in relation to the module warranty?

A. It shows that there is a chance that the modules would fall out of warranty in year 10 and that they would fall out of warranty in year 17.

Q. Now, did -- Mr. Brooks was asking you questions about your meeting with Mr. Eaglesham in I think March or early April of 2010.

Did Mr. Eaglesham direct you to change anything in the white paper during that meeting?

Page 252

THE VIDEOGRAPHER:  This marks the end of Volume I, Disc 4 and concludes the deposition of Adrianne Kimber.  The time is 6:08 p.m. and we're off the record.

(Time noted:  6:08 p.m.)

Page 253

DECLARATION UNDER PENALTY OF PERJURY

I, ADRIANNE KIMBER, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on November 25, 2014; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this _____ day of _____ 2014, at _____, California.

_____

ADRIANNE KIMBER

Page 254

STATE OF CALIFORNIA   )

            :ss

COUNTY OF SAN MATEO   )

        I, CYNTHIA MANNING, a Certified Shorthand Reporter of the State of California, do hereby certify:

        That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

        I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

        IN WITNESS WHEREOF, I have subscribed my name this 28th day of November, 2014.

_____

        CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

Exhibit 15

MICHAEL KORALEWSKI

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually        ) Case No.
and on behalf of all other     ) CV12-00555-PHX-
persons similarly situated,    ) DGC
                               )
          Plaintiffs,          )
                               )
     vs.                       )
                               )
First Solar, Michael J.        )
Ahearn, Robert J. Gillette,    )
Mark R. Widmar, Jens Meyerhoff,)
James Zhu, Bruce Sohn, and     )
David Eaglesham,               )
                               )
          Defendants.          )
_____)

VIDEOTAPED DEPOSITION OF MICHAEL S. KORALEWSKI

Phoenix, Arizona
February 26, 2015
9:15 a.m.

REPORTED BY: Janice Gonzales, RPR, CRR

AZ Certified Court - Reporter No. 50844

Job No. 89648

MICHAEL KORALEWSKI

VIDEOTAPED DEPOSITION OF MICHAEL S. KORALEWSKI
commenced at 9:15 a.m. on February 26, 2015, at
Osborn Maledon, P.A., 2929 North Central Avenue, Suite
2100, Phoenix, Arizona, 85012, before Janice
Gonzales, RPR, CRR, Arizona Certified Court Reporter
No. 50844.

                        * * *


APPEARANCES:

    For the Plaintiffs:

            ROBBINS GELLER RUDMAN & DOWD
            By: Daniel Drosman, Esq.
                Terry Koelbl, Esq.
            655 West Broadway
            San Diego, CA 92101


    For the Defendants:

            MORRISON FOERSTER
            By: Paul Flum, Esq.
                Grant Schrader, Esq.
                Jim Bennett, Esq.
            425 Market Street
            San Francisco, CA 94105


    Also Present:

            Ed Kishel, Videographer

Page 8

MICHAEL KORALEWSKI

Bennett also representing defendants and the witness.

THE VIDEOGRAPHER:  Thank you.

Madam reporter, would you please swear in the witness.

MICHAEL S. KORALEWSKI, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DROSMAN:

Q.   Could you please state your full name for the record.

A.   Michael Stephen Koralewski.

Q.   Do you understand that you are giving testimony here and that even though we're in an informal setting in a conference room, that you are testifying under oath and the testimony that you are giving is given the same weight and solemnity as if given in a court of law?

A.   I do.

Q.   Do you understand that you are to testify truthfully to the best of your ability here today?

A.   I do.

Q.   If for any reason you don't understand any of my questions, please tell me.  I'll be happy

Page 54

MICHAEL KORALEWSKI

THE WITNESS:  STBi tests occurred not just in 2007, but in -- in many years.

BY MR. DROSMAN:

Q.   Okay.  So I -- I'm just trying to make clear that it was -- the STBi test was performed on modules coming off the line in 2007, right?

MR. FLUM:  Same objections.

THE WITNESS:  Yes.

BY MR. DROSMAN:

Q.   And the STBi test was performed on modules coming off the line in 2008, correct?

A.   Yes.

Q.   And the STBi test was performed on modules coming off the line in 2009, right?

A.   Yes.

Q.   Okay.  And what was the purpose of the STBi test?

A.   The purpose of the STBi test was to ensure that the line was -- was not moving substantially different from -- from day-to-day.

Q.   What do you mean?

A.   Meaning the outputs were -- STBi is a -- a relational measure to the initial measurement efficiency.  Test is performed and then there's a

Page 55

MICHAEL KORALEWSKI

relative number to what that module drops in the test.  What you're looking at is the relative drop compared to other lines and plants and -- and -- and past modules to see how they -- how they moved with one another throughout time.

Q.   So you've described to me what the STBi test is.  Why -- what was the purpose of it?

A.   It's a -- it's a quality control function.

Q.   And how does it perform a quality control function?

A.   It provides you a piece of data that allows you to see if -- if there are potential anomalies in the -- in the process limited by its sample size and -- and methodologies of sampling.

Q.   And how does it do that?

A.   I don't under --

Q.   Let -- let me withdraw the question.

It provides you with a piece of data that allows you to see if there are potentially -- potential anomalies in the process.  How does the STBi test do that?

A.   At the -- at the end of the STBi test, you get a -- a -- a relationship number, a

Page 99

MICHAEL KORALEWSKI

page ending 296.  Do you see the date of that e-mail is August 18, 2010?

A.   Yes.

Q.   And the subject is "Re: Staff meeting," right?

A.   Yes.

Q.   Okay.  And if we turn to page ending 297, you see that at the top of the page beginning "I disagree"?

A.   Yes, sir.

Q.   Mr. Beitzel wrote to Mr. Fowler, "I disagree that we will not detect these until a year later in the field because STBi is now believed to be an indicator and is also being used in the CMS process as an equivalent metric as efficiency.  The reason 'LPM' is at the magnitude that it is, we made the wholesale change to all sites of a new process ignoring the STBi effect, then continued to ignore the STBi data until the customer complained."  Do you see that?

A.   Yes, sir.

Q.   And you understood that there was, in fact, STBi data during the LPM period that First Solar monitored, correct?

MICHAEL KORALEWSKI

A.   There was STBi data uncorrelated to the field, yes, sir.

Q.   My question was, was there STBi data period -- was there STBi data during the LPM period that First Solar received?

A.   Yes, sir.

Q.   Did you receive any STBi data during the LPM period?

A.   From June 2008 to June 2009, you're asking if I received any data on STBi?

Q.   Correct.

A.   I'm sure at some point during that -- that period I received STBi data.

Q.   And you, in fact, noticed a problem with the STBi data in the later part of 2008, correct?

MR. FLUM:  Objection.  No foundation, assumes facts.

THE WITNESS:  Are you referring to a specific e-mail that --

BY MR. DROSMAN:

Q.   I'm asking you a question.

A.   On document 459, I had forwarded data to -- to Mr. Eaglesham that we -- we just reviewed.  You know, looking at the -- the monthly and weekly

MICHAEL KORALEWSKI

name plate?

MR. FLUM:  Objection.  Vague.

THE WITNESS:  Was that premature power loss from name plate?  I don't understand the question.

BY MR. DROSMAN:

Q.   Well, sir, we're talking about percent from label.  It's under that column, right?

A.   Yes, sir.

Q.   And it says, "Negative 10 percent to negative 15 percent," right?

A.   Yes, sir.

Q.   And we know we're talking about modules that were installed in the field between June '08 and June '09, right?

A.   Yes, sir.

Q.   So my question to you is, is that premature power loss from label?

MR. FLUM:  Objection.  Vague.

THE WITNESS:  There's an expected degradation that we would expect to see in the normal distribution of the modules.  There would be some modules at the minus 10 to minus 15 percent prior to dark soak.  And, again, we're -- at this point in

MICHAEL KORALEWSKI

time in 2011, we're not sure of all the root causes that are lumped into these numbers. It's just every module that we had brought back during that time frame.

BY MR. DROSMAN:

Q. Okay. The -- the modules in the bucket, negative 15 percent to negative 20 percent, do you see that?

A. Yes, sir.

Q. And it indicates that of the return modules, 19.07 percent fell into that bucket, right?

A. Yes, sir.

Q. Were those modules affected by the excursion?

A. We determined the modules to be affected that would be those outside of the -- the typical performance and distribution, and that was around the minus 15 percent because that was clearly outside of what we would expect. So minus 15 percent being field power loss, sir.

Q. So, sir, I'm just trying to understand. I'm looking at a bucket "Percent from Label" in the first column. "Negative 15 percent to negative 20 percent," do you see that bucket?

MICHAEL KORALEWSKI

My question is, were those modules in the negative 15 to negative 20 percent bucket there the 213,904 modules?  Are you with me so far, sir?

MR. FLUM:  Objection.  Vague, argumentative.

THE WITNESS:  Yes.

MR. FLUM:  Compound.

BY MR. DROSMAN:

Q.   Were those experiencing greater than expected degradation?  Yes or no, sir?

MR. FLUM:  Objection.  Vague, asked and answered.

THE WITNESS:  The -- the minus 15 to minus 20 percent modules are actually performing at minus 10 to minus 15 percent when you adjust with a 5 percent dark soak.  We would expect a tail of the population, any population, to have normal process to be in that level.  To say whether all 213,904 modules would be expected to be in that distribution, I cannot state because I don't know what other failure modes and root causes are included in that number.

BY MR. DROSMAN:

Q.   That's -- that's fine.  So as you sit here today, you don't -- you can't tell me one way or

MICHAEL KORALEWSKI

BY MR. DROSMAN:

Q.   Okay.  Yeah, I'm not asking about a lot of different opinions, I'm asking about what the company believed.  Did the company ever change its estimate from less than 4 percent to 4 to 8 percent of product manufactured during the period June 2008 to June 2009 were affected by the manufacturing excursion?

MR. FLUM:  Objection.  Vague, overbroad, calls for a legal conclusion.

THE WITNESS:  Specific to the LPM manufacturing excursion, I believe that the consensus was 450 -- or the less than 4 percent.  At various points of time, other defects got lumped in to increase percentage range from 4 to 8 percent, but I believe the LPM consensus was less than 4 percent.

BY MR. DROSMAN:

Q.   Just so -- just so I'm clear, the company never did change its estimate.  The product manufactured during the period June 2008 to June 2009 that was affected by the manufacturing excursion from less than 4 percent; is that accurate, sir?

MR. FLUM:  Same objections.

THE WITNESS:  To the best of my

MICHAEL KORALEWSKI

outside the scope.

THE WITNESS:  I believe at this time we're looking at how to improve our -- our warranty policies overall to go from individual module warranty to a site performance warranty system, and this appears to be a -- a step in that process to make sure that as we move to the next level of -- of warranty possibilities, that we don't miss anything correctly --

BY MR. DROSMAN:

Q.   And how --

A.   -- miss anything.

Q.   How were statutory warranty gaps relevant to that analysis?

MR. FLUM:  Same objections.

THE WITNESS:  I believe you want to make sure that you have everything covered when you write a new warranty policy, that you have all of the -- the different requirements and all the different regions covered correctly.

BY MR. DROSMAN:

Q.   And was the statutory warranty covered previously before this analysis?

MR. FLUM:  Objection.  Vague, overbroad,

MICHAEL KORALEWSKI

no foundation.

THE WITNESS:  We did not have a specific callout for a statutory warranty that I'm aware of. However, we accrued at rates which were consistent with our returns from customers over the period of time.

BY MR. DROSMAN:

Q.   Did you accrue the statutory warranty?

MR. FLUM:  Outside the scope of the designation for this witness.

THE WITNESS:  I'm not aware of a specific line item that we identified as statutory warranty; however, we accrued at rates which were in -- in line with what we were expecting from a performance initiative and workmanship claims.

BY MR. DROSMAN:

Q.   Why was there a statutory warranty gap in October of 2010?

MR. FLUM:  Objection.  No foundation, outside the scope of the designation.

THE WITNESS:  I am not sure that there was a specific gap, other than there may not have been a line item specifically called out inside of the warranty accrual that was identified as statutory

MICHAEL KORALEWSKI

I don't believe that we changed our guidance from -- from .7 at that time frame.

BY MR. DROSMAN:

Q.   Okay.  Did -- and I take it that the guidance of .7 was the degradation that First Solar expected for modules going into hot climates; is that accurate?

MR. FLUM:  Vague, overbroad, calls for a legal conclusion, outside the scope.

THE WITNESS:  So what we were -- one of the -- one of the things that we were becoming aware of at this point in time is that we wanted to ensure that we weren't -- that we were looking at the exponential piece of the degradation and not just the linear portion.

In a moderate climate, the linear portion, which again is represented by that .7 percent, is the ongoing piece of the curve.  The derate doesn't really cover the linear degradation, it covers that initial exponential dropped, and that was -- that is what the derate was -- was focused on.

So I -- I don't believe that the linear degradation changed throughout the period of time in a hot or moderate climate because the long-term

MICHAEL KORALEWSKI

linear was temperature independent and the initial exponential piece was -- was temperature dependent, which is why the derate changed.

BY MR. DROSMAN:

Q.   Did First Solar's expectations for degradation rates in hot climates ever change in 2011?

MR. FLUM:  Objection.  Calls for a legal conclusion.

THE WITNESS:  Can you repeat the question, please?

BY MR. DROSMAN:

Q.   Did First Solar's expectation for the degradation of modules being installed in hot climates ever change in 2011?

MR. FLUM:  Same objection.

THE WITNESS:  We looked at -- we were just starting to get into the desert southwest market at that point in time.  Any data that we looked at would have been just coming forward with about a year of -- of possib- -- of data.  I don't recall if we specifically changed our guidance or changed expectations at that time.  Again, we had implemented the -- the hot climate derate, and we had monitored

Page 381

MICHAEL KORALEWSKI

understood his request, didn't you?

A.    Yes.

Q.    And then he wrote, "Thanks.  If I could get it by 2:00 p.m. today would be great," right?

A.    Yes.

Q.    And then you responded to him, "Per discussion, please review and if acceptable I will remove draft and PDF for you," right?

A.    Yes.

Q.    And you also sent that to Mr. Eaglesham, right?

A.    Yes.

Q.    Okay.  And you authored this particular analysis that's attached on page 844, right?

A.    Yes.

Q.    And it's entitled "LPM Population Analysis Q4 2011," right?

A.    Yes.

Q.    And it's an accurate analysis, right?

A.    It's an accurate analysis to the request that I was given.

Q.    Okay.  And you wrote, at the last -- the last sentence of the document, the attachment, "Additionally, based on the 95 percent confidence

MICHAEL KORALEWSKI

limits of the fit, the negative 15 percent FPL could range from negative 24.1 percent to 26.5 percent STBi," comma, "therefore the best estimate of the -- LP- -- LPM population would be between 4 and 8 percent based on the STBi distribution shown below." Do you see that?

A.   Yes.

Q.   And that was an accurate statement, correct?

A.   For estimating a range, yes.  For estimating an exact population, no.  We -- the -- the LPM population throughout was tied to the minus 25 percent STBi value and the FPL of minus 15 percent and that correlated to about 450,000 modules which was a little less than 4 percent of the entire population.

Q.   You say, "The best estimate of the LPM population would be between 4 percent and 8 percent based on the STBi distribution shown below."  Is that accurate or inaccurate?

MR. FLUM:  Asked and answered.

THE WITNESS:  So the request from Mr. DeJong was to develop a relatively simple one-pager that talks to how we came to 4 to 8 percent affected

MICHAEL KORALEWSKI

population.  This document shows a method by which you could get to a 4 to 8 percent estimate.

BY MR. DROSMAN:

Q.   It's the best estimate of the LPM pop- -- population, right?

A.   The best estimate of the LPM population is the 450,000 modules that we've talked about from day one.  This is in response to a specific request. And again, I don't believe that this was either utilized in the 10-K filing.

Q.   When you wrote, "therefore the best estimate of the LPM population would be between 4 and 8 percent," was that not true, sir?

A.   The range of data is between 4 and 8 percent using the confidence intervals as shown above.  The best estimate that I had for LPM specifically was 450,000 modules, which was about 4 percent.

Q.   So I take it that when you wrote the best estimate of the L pop- -- LPM population would be between 4 and 8 percent, that was an inaccurate statement that you were passing on to Mr. Eaglesham and Mr. DeJong, correct?

MR. FLUM:  Objection.  Argumentative,

MICHAEL KORALEWSKI

statement that you wrote, "The 600,000 number comes close to the need for the current MLC at 25 percent of the total LPM population," you do not understand that statement, right?

MR. FLUM:  Asked and answered.

THE WITNESS:  I don't know what I'm referring to as a total LPM population.

BY MR. DROSMAN:

Q.   Do you know what you're referring to as the current MLC at 25 percent?

A.   No, because that would be in relation to the total LPM population.  If I knew that, I could -- I could tell you.

Q.   Fair enough.  So sitting here today, as you read this statement, "The 600,000 number comes close to the need for current MLC at 25 percent of the total LPM population," you don't know what you meant when you wrote it, right, sir?

A.   I -- I don't know what I meant today looking at this.  I know -- I would assume that I knew what I wrote on 10/10 of 2010.  I don't know exactly what I meant at that time.  The impetus of this e-mail was to get Mr. Beitzel to look at other options to ensure that we were focusing the LPM

Page 395

MICHAEL KORALEWSKI

number correctly, and we continued to develop that over time, and all of the analysis came back to the 450,000 modules for LPM.

Q.   Except for this analysis, right, sir?

MR. FLUM:  Objection.  Argumentative, misstates the record.

THE WITNESS:  No, sir.  This is -- this is a -- a -- a exercise to Mr. Beitzel to -- to look and see if there is any validity to the 600,000 which, if there was, we would have taken that number. We didn't, we took the 450,000 LPM because that had the most strength in the data sources.

BY MR. DROSMAN:

Q.   Well, it's certainly the number that you had publicly disclosed at this point, right, sir?

MR. FLUM:  Objection.  Foundation, outside the scope.

THE WITNESS:  I don't remember exactly if we disclosed a number or less than 4 percent, and I can't remember exactly what quarter we did that in. I'd have to look at the -- the filings.

BY MR. DROSMAN:

Q.   600,000 would be more than 4 percent.  We can agree there, right, sir?

Page 456

MICHAEL KORALEWSKI

A.   Yes, sir.

Q.   Okay.

MR. DROSMAN:  I have no further questions at this time barring a decision by the Court to order Mr. Koralewski to return, given his unpreparedness, which I intend to raise with the Court.

MR. FLUM:  All right.  We have no questions.  Obviously we disagree with your statements about his level of preparedness and what you're entitled to at this deposition.

THE VIDEOGRAPHER:  This concludes today's recording of the deposition of Mike Koralewski in his capacity as 30(b)(6).  This is the end of media number 7 and there are a total of 7 media units in this recording.  We are now off the record.  The time is 8:00 p.m.

(The proceedings concluded at 8:00 p.m.)


_____

Michael S. Koralewski

Subscribed and sworn to before me this _____ day of _____, 2015.

_____

NOTARY PUBLIC

Page 458

MICHAEL KORALEWSKI

I, Michael S. Koralewski, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

_____   I have made changes to my deposition.

_____   I have NOT made any changes to my deposition.

EXECUTED this _____ day of _____, 20__, at _____,
_____.                    (City)

     (State)


                    _____
                    Michael S. Koralewski

Page 459

MICHAEL KORALEWSKI

STATE OF ARIZONA      )
COUNTY OF MARICOPA     )

CERTIFICATE

I, JANICE E. GONZALES, Certified Court

Reporter for the State of Arizona, certify:

That the foregoing proceeding was taken

by me; that I am authorized to administer an oath;

that the witness, before testifying, was duly sworn

by me to testify to the whole truth; that the

questions propounded by counsel and the answers of

the witness were taken down by me in shorthand and

thereafter reduced to print by computer-aided

transcription under my direction; that review and

signature was requested; that the foregoing pages are

a full, true, and accurate transcript of all

proceedings, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way

related to nor employed by any of the parties hereto

nor am I in any way interested in the outcome hereof.

DATED this 28th day of February, 2015.


_____
Janice E. Gonzales, RPR, CRR
Certified Court Reporter No. 50844
For the State of Arizona

# Exhibit 16

CONFIDENTIAL

Page 1

BRUCE SOHN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually    ) Case No.
and on behalf of all other ) CV12-00555-PHX-
persons similarly situated, ) DGC
                           )
         Plaintiffs,        )
                           )
     vs.                    )
                           )
First Solar, Michael J.     )
Ahearn, Robert J. Gillette, )
Mark R. Widmar, Jens Meyerhoff,)
James Zhu, Bruce Sohn, and  )
David Eaglesham,            )
                           )
         Defendants.        )
_____)

*** CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF BRUCE SOHN

Phoenix, Arizona
February 6, 2015
8:59 a.m.

JOB NO: 89644
REPORTED BY:
Janice Gonzales, RPR, CRR
AZ Certified Court
Reporter No. 50844

Page 2

BRUCE SOHN

VIDEOTAPED DEPOSITION OF BRUCE SOHN commenced at 8:59 a.m. on February 6, 2015, at Osborn Maledon, 2929 North Central Avenue, Suite 2100, Phoenix, Arizona, 85012, before Janice Gonzales, RPR, CRR, Arizona Certified Court Reporter No. 50844.

                         * * *

APPEARANCES:

     For the Plaintiffs:
          ROBBINS GELLER RUDMAN & DOWD
          By: Luke Brooks, Esq.
              Andrew Rudolph, Esq.
          One Montgomery Street
          San Francisco, California 94104


     For the Defendants:
          MORRISON & FOERSTER
          By: Philip Besirof, Esq.
              Robert Cortez Webb, Esq.
          425 Market Street
          San Francisco, California 94105



     Also Present:
          Ed Kishel, Videographer

CONFIDENTIAL

Page 7

BRUCE SOHN

Morrison & Foerster for Mr. Sohn and the defendants.

THE VIDEOGRAPHER:  Thank you.

Madam Reporter, would you please swear in the witness.

BRUCE SOHN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BROOKS:

Q.    Good morning.  Could you state your full name for the record.

A.    Bruce Sohn.

Q.    And what's your residential address?

A.    8128 North 47th Street, Paradise Valley, Arizona.

Q.    Do you have a business address?

A.    17 -- QuantumScape Corporation, 1730 Technology Drive, San Jose, California.

Q.    You live here in Phoenix but work in California?

A.    I live -- yes.

Q.    You understand that you've been sworn in and that your testimony is under oath?

A.    Yes.

CONFIDENTIAL

Page 118

BRUCE SOHN

A.   I have no way of knowing one way or another.

Q.   You know that at some point you flagged this low power module issue in your sub-certifications, correct?

A.   Yes, I do.

Q.   Okay.  And that's based on the document that you reviewed when you were preparing for your deposition?  Is that what your memory's based on?

A.   No, I -- I mean, I remember at the time when we're filling out -- going through sub-certs, I wanted to be accurate, and I recall flagging it at the time.

Q.   Okay.  Based on your position on the disclosure committee, are you aware of whether the committee ever discussed whether to disclose any information about the LPM manufacturing defect?

MR. BESIROF:  Objection.  Vague.

THE WITNESS:  I'm not quite sure I follow what you're -- you're asking.

BY MR. BROOKS:

Q.   Did the disclosure committee, to your knowledge, ever consider whether or not First Solar should disclose any information about the LPM

CONFIDENTIAL

Page 119

BRUCE SOHN

manufacturing defect?

MR. BESIROF:  Objection.  Vague.

THE WITNESS:  There were discussions about a variety of topics in the -- in the disclosure committee.  I don't recall the specific situations and the topics.

BY MR. BROOKS:

Q.  You can't recall whether or not the disclosure committee ever considered disclosing the LPM manufacturing excursion; is that your testimony?

A.  I'm -- I'm sure that the topic of LPM came up in those discussions.  I don't recall the exact context or nature of that discussion.

Q.  Did the topic of LPM come up in the second quarter of 2009 when the problem was discovered?

A.  I do not recall specifically whether it came up in that meeting.  However, issues that arose out of certifications would have been addressed and closed at some point in time.

Q.  What does that mean, "addressed and closed"?

A.  Some individual would have, in this case, tried to identify what is LPM and discuss the

CONFIDENTIAL

BRUCE SOHN

to that statement, yes.

BY MR. BROOKS:

Q.   Did you do anything at all to confirm the 450,000 module enumerator in that calculation?

MR. BESIROF:  Same objections.

THE WITNESS:  Again, I don't recall other than -- I don't recall specifically following up on the numerator side.  Clearly there was some discussion of the denominator side that -- that's included here.

BY MR. BROOKS:

Q.   Kurt Wood pointed out -- and this is on the page ending 272 -- that "The numbers and the table above represent the official consolidated FSLR production for the 13 months of June 2008 through June 2009."  Do you see that?

A.   I see that statement, yes.

Q.   And that includes the total modules produced, right?

MR. BESIROF:  Objection. Calls for speculation, lacks foundation.

THE WITNESS:  Again, I can see where that number is sitting is -- is there on the page, but I also can see at the top of the page that a further

CONFIDENTIAL

Page 301

BRUCE SOHN

look into the production database found a 11.8 million number.

BY MR. BROOKS:

Q.   You wrote, "From the official production database, there were 11.8 million modules manufactured from June -- through -- through June 2009," correct?

A.   Yes, that was my e-mail.

Q.   And that should read June 2008 through June 2009, right?

A.   I would assume so, yes.

Q.   So is the official consolidated First Solar production for the first 13 months different than the official production database?

A.   I don't recall what the different -- the definition of the official consolidated -- I don't recall that particular reference, but there was a particular database that was used to track all -- track the key production metrics, and my reference here on July 28th was just going directly to that database and pulling out the number.  Apparently Kurt looked at the number as well and -- and agreed with my -- with my comment.

Q.   Why did you go to the database?

CONFIDENTIAL

Page 365

BRUCE SOHN

MR. BESIROF:  Bruce, we're all done.

BY MR. BROOKS:

Q.   -- over 11.8 million is greater than 4 percent, isn't it?

A.   (No response.)

(Whereupon, Philip Besirof, Robert Cortez Webb and Bruce Sohn exited the room.)

THE VIDEOGRAPHER:  We are now going off the record.  The time is 6:54 p.m.  This concludes today's recording of the deposition of Bruce Sohn.  This is the end of media number 6 and there are a total of six media in this recording.

(The proceedings concluded at 6:54 p.m.)

CONFIDENTIAL

Page 367

BRUCE SOHN

I, Bruce Sohn, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

_____    I have made changes to my deposition.

_____    I have NOT made any changes to my deposition.

EXECUTED this _____ day of

_____, 20\_\_, at _____,

_____.                    (City)

(State)

_____

Bruce Sohn

CONFIDENTIAL

Page 368

BRUCE SOHN

STATE OF ARIZONA        )
COUNTY OF MARICOPA       )

CERTIFICATE

I, JANICE E. GONZALES, Certified Court Reporter for the State of Arizona, certify:

That the foregoing proceeding was taken by me; that I am authorized to administer an oath; that the witness, before testifying, was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that review and signature was requested; that the foregoing pages are a full, true, and accurate transcript of all proceedings, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED this 9th day of February, 2015.

_____

Janice E. Gonzales, RPR, CRR
Certified Court Reporter No. 50844
For the State of Arizona

# Exhibit 17

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 1

ANDREY XAVIER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Smilovits, Individually      ) Case No.
and on behalf of all other   ) CV12-00555-PHX-
persons similarly situated,  ) DGC
                             )
          Plaintiffs,        )
                             )
     vs.                     )
                             )
First Solar, Michael J.      )
Ahearn, Robert J. Gillette,  )
Mark R. Widmar, Jens Meyerhoff,)
James Zhu, Bruce Sohn, and   )
David Eaglesham,             )
                             )
          Defendants.        )
_____)

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

VIDEOTAPED DEPOSITION OF ANDREY BASTOS CUNHA XAVIER

Phoenix, Arizona
February 25, 2015
10:03 a.m.

REPORTED BY: Janice Gonzales, RPR, CRR

AZ Certified Court Reporter No. 50844

Job No. 89646

TSG Reporting - Worldwide - 877-702-9580

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 2

ANDREY XAVIER

VIDEOTAPED DEPOSITION OF ANDREY BASTOS CUNHA XAVIER

commenced at 10:03 a.m. on February 25, 2015, at

Osborn Maledon, P.A., 2929 N. Central Avenue, Suite

2100, Phoenix, Arizona, 85012, before Janice

Gonzales, RPR, CRR, Arizona Certified Court Reporter

No. 50844.


                        *  *  *


APPEARANCES:

     For the Plaintiffs:

          ROBBINS GELLER RUDMAN & DOWD
          By: Cody LeJeune, Esq.
              Christopher Stewart, Esq.
          655 West Broadway
          San Diego, CA 92101




     For the Defendants:

          MORRISON FOERSTER
          By: Mark Foster, Esq.
              Robert Webb, Esq.
          425 Market Street
          San Francisco, CA 94105




     Also Present:

          Ed Kishel, Videographer

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 5

ANDREY XAVIER

Morrison & Foerster for the defendant -- for all   10:03
defendants and the witness.   10:03

THE VIDEOGRAPHER:  Thank you.   10:03

Madam Reporter, would you please swear in   10:03
the witness.   10:03

ANDREY BASTOS CUNHA XAVIER,   10:03
called as a witness herein, having been first duly   10:03
sworn, was examined and testified as follows:   10:03

EXAMINATION   10:03

BY MR. LEJEUNE:   10:03

Q.   Sir, could you please state your full   10:03
name for the record.   10:03

A.   Andrey Bastos Cunha Xavier.   10:03

Q.   And can you give us your current business   10:03
and residence address, please.   10:03

A.   Business and residence?   10:03

Q.   Correct.   10:03

A.   350 West Washington Avenue, Tempe,   10:03
Arizona is my business address.  Home address 11660   10:03
E. Terra Drive, Arizona -- Scottsdale, Arizona.   10:03

Q.   Okay.  You may have already had an   10:03
opportunity to go over some of -- over some of these   10:04
issues with your counsel, but I'll just go over some   10:04
of the ground rules to make sure we're on the same   10:04

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 76

ANDREY XAVIER

during the interview necessarily.  As I explained,    11:43

some people have different styles.  I don't like to    11:43

take my attention away from what's being discussed to  11:43

-- to take notes.  I prefer being -- I -- and I can    11:44

rely on my memory for that to -- paying attention to   11:44

what's being tell -- told to me, ask the questions     11:44

that I think are relevant so I can understand the      11:44

full picture.                                          11:44

          Some other people may choose to take         11:44

notes, but it's not part of the way we document our    11:44

work.  And if there may be notes, yeah, some people    11:44

may have notes.  I don't have them.                    11:44

BY MR. LEJEUNE:                                        11:44

     Q.   Sir, did the -- did the board of -- of       11:44

directors request LPM special interviews in March of   11:44

2012?                                                  11:44

          MR. FOSTER:  Objection.  Foundation,         11:44

speculation.                                           11:44

          THE WITNESS:  No, not request special        11:44

interviews.  A conversation I had with the board in    11:44

February was specifically with Tom Presby.  He said,   11:44

Andrey, "I'm satisfied with the work you have done     11:44

here," but the responsible thing to ask is, Is there   11:44

anything else we must do?  Is there anything that we   11:44

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 77

ANDREY XAVIER

haven't looked at?  Any -- is there any chance that    11:44

we didn't look at something we should look at?  We    11:45

didn't analyze, we didn't talk to someone we have    11:45

talked to.    11:45

　　　　　　　And I said, "Tom, it's a fair question.    11:45

Let me go back and -- and think about that and -- and    11:45

I'll get back to you."    11:45

　　　(Exhibit 407 was marked for identification.)    11:45

BY MR. LEJEUNE:    11:45

　　　Q.　Sir, I'll show you what's been marked as    11:45

Exhibit 407.  Take a minute to review this document,    11:45

and I'll only ask you questions on the -- on the    11:45

e-mail itself.    11:45

　　　A.　Okay.    11:45

　　　Q.　And for -- for the record, Exhibit 407 is    11:45

a multiple-page e-mail with attachment bearing the    11:45

Bates range FSLR02118604 through FSLR02118607.    11:45

　　　A.　Okay.    11:46

　　　Q.　Sir, you recognize this document?    11:46

　　　A.　Yes.    11:46

　　　Q.　Okay.  And is this an e-mail that -- that    11:46

you received on March 9th, 2012, from Ondria LaMorte?    11:46

　　　A.　Yes.    11:46

　　　Q.　Okay.  And did you receive this e-mail    11:46

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 78

ANDREY XAVIER

during the ordinary course of your duties at First   11:46
Solar?   11:46

A.   Yes.   11:46

Q.   Okay.  And is this e-mail and attachment   11:46
a true and accurate -- is this document a true and   11:46
accurate copy of the e-mail and attachment that you   11:46
received on March 9th, 2012?   11:46

A.   Yes, assuming it has -- it has not been   11:46
changed, yes.   11:47

Q.   And you can see the -- the subject of --   11:47
of this e-mail is "LPM Initiatives - Board Requested   11:47
LPM Special Interviews."  Right?   11:47

A.   Uh-huh.   11:47

Q.   Okay.  And did these LPM special   11:47
interviews take place?   11:47

A.   No.  So I'll --   11:47

Q.   Why not?   11:47

A.   -- give you a little bit of background on   11:47
this.  So I had that conversation with -- with Tom,   11:47
and he didn't specifically determine to me what   11:47
should I do.  So -- I brought that discussion back to   11:47
my team, said, "Hey, Tom was asking, is there   11:47
anything else we could have done here to feel   11:47
comfortable?"  I mean, it's a significant   11:47

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 79

ANDREY XAVIER

transaction.  It's a complicated topic.                         11:47

And the team said, "Well, maybe we could                        11:47
interview the key people that have any input on it              11:47
that we may have missed."  I said, "That's a good               11:47
idea.  Why don't you get the list of people that --             11:47
that you can think of that could have an input."                11:47

And I think the team went to the chief                          11:47
compliance officer at the time and say, "Hey, give me           11:47
a list of anyone that is" -- I think in the hold                11:47
notice, or something like that, and give me the list,           11:48
and that's what I think this list is.  And they                 11:48
brought it back to me and when I looked at the names            11:48
and said, "Hey, look, really, the people that are               11:48
really relevant for the topics that we're concerned             11:48
with, we -- we interviewed them exhaustively," and I            11:48
was there, right?                                               11:48

And -- and I think an important point                           11:48
that is maybe difficult for people that are not there           11:48
at the time is that it was a very open environment.             11:48
There was -- there was really a thirst in the                   11:48
organization to try to understand the new information           11:48
that was received in Q4, the -- the history of -- of            11:48
the issue and the details.  And so I was there and I            11:48
was participating in those interviews and I was very           11:48

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 80

ANDREY XAVIER

comfortable with the tone, the way the questions were   11:48
asked, the number of people that came in to be   11:48
interviewed.   11:48

When I look at this and I said, "We   11:48
already talked to the people that are really relevant   11:48
to the case here" --   11:48

Q.   As part of -- sorry.  Go ahead.   11:48

A.   -- "it's -- it's a waste of time to go   11:48
ask the same people the same questions again."  So I   11:49
just think that was unnecessary.   11:49

Q.   So what you're saying is these -- these   11:49
interviews, essentially, were already conducted in --   11:49
in January of 2012?   11:49

A.   No --   11:49

MR. FOSTER:  Objection.  Misstates prior   11:49
testimony.   11:49

THE WITNESS:  -- that's not what I'm   11:49
saying.  What I said is that the key people that is   11:49
in this list here that I would think that would be   11:49
relevant for the case were already interviewed.  And   11:49
it's not that we got the information secondhand, I   11:49
was there.  I heard what they had to say, I heard the   11:49
questions they were asked, I heard the tone.  Right?   11:49
They were not being put under any pressure, they were   11:49

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 81

ANDREY XAVIER

just like really trying to understand all the    11:49

information.    11:49

And then I said, going into this -- this    11:49

exercise will be a replication of what has already    11:49

been done.  So it's not going to add any value, and    11:49

that's what I communicated back to Tom, say, "Look,    11:49

Tom, I think we've done everything you could have    11:49

done.  I talked to everyone that I could have talked.    11:49

I -- I'm very confident of the work that was done    11:49

here."    11:49

BY MR. LEJEUNE:    11:49

Q.   And the -- the 20- -- the January 2012    11:49

interviews, what -- what documents were created as --    11:49

as a result of those interviews?    11:50

MR. FOSTER:  Objection.  Assumes facts,    11:50

foundation, speculation, overbroad.    11:50

THE WITNESS:  The documents that my    11:50

organization created are the reports and the work    11:50

papers.    11:50

BY MR. LEJEUNE:    11:50

Q.   Okay.  And the reports and the work    11:50

papers, were these reports and work papers -- have we    11:50

looked at these reports and work papers today?    11:50

A.   You showed me a version of one of them --    11:50

TSG Reporting - Worldwide - 877-702-9580

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 84

ANDREY XAVIER

recording of the deposition of Andrey Xavier.  This    11:56

is the end of media number 2 and there are a total of  11:56

two media in this recording.  We are now going off     11:57

the record.  The time is 11:57 a.m.                    11:57

(The proceedings concluded at 11:57 a.m.)              11:57

_____

Andrey Bastos Cunha Xavier

Subscribed and sworn to before me

this _____ day of _____, 2015.

_____

NOTARY PUBLIC

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 86

ANDREY XAVIER

I, Andrey Bastos Cunha Xavier, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

_____   I have made changes to my deposition.

_____   I have NOT made any changes to my deposition.

EXECUTED this _____ day of

_____, 20\_\_, at _____,

_____.              (City)

    (State)

                        _____

                        Andrey Bastos Cunha Xavier

*** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

Page 87

ANDREY XAVIER

STATE OF ARIZONA        )
COUNTY OF MARICOPA       )

                    CERTIFICATE

          I, JANICE E. GONZALES, Certified Court

Reporter for the State of Arizona, certify:

          That the foregoing proceeding was taken

by me; that I am authorized to administer an oath;

that the witness, before testifying, was duly sworn

by me to testify to the whole truth; that the

questions propounded by counsel and the answers of

the witness were taken down by me in shorthand and

thereafter reduced to print by computer-aided

transcription under my direction; that review and

signature was requested; that the foregoing pages are

a full, true, and accurate transcript of all

proceedings, all to the best of my skill and ability.

          I FURTHER CERTIFY that I am in no way

related to nor employed by any of the parties hereto

nor am I in any way interested in the outcome hereof.

          DATED this 26th day of February, 2015.


          _____
          Janice E. Gonzales, RPR, CRR
          Certified Court Reporter No. 50844
          For the State of Arizona


TSG Reporting - Worldwide - 877-702-9580

Exhibit 18

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Mark Smilovits, Individually and on )
behalf of all other persons             )
similarly situated,                     )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     ) No. CV12-00555-PHX-DGC
                                        )
First Solar, In,  Michael J. Ahearn,)
Robert J. Gillette, Mark R. Widmar,  )
Jens Meyerhoff, James Zhu, Bruce     )
Sohn, and David Eaglesham,           )
                                        )
            Defendants.                 )
                                        )

VIDEOTAPED DEPOSITION OF MARK WIDMAR

Phoenix, Arizona
February 5, 2015
9:04 a.m.

REPORTED BY:
Kristy A. Ceton, RPR
AZ Certified Court Reporter No. 50200
Job No. 89643

Page 2

MARK WIDMAR

VIDEOTAPED DEPOSITION OF MARK WIDMAR commenced at 9:04 a.m., on February 5, 2015, at Osborn Maledon, PA, 2929 North Central Avenue, Suite 2100, Phoenix, Arizona, before Kristy A. Ceton, RPR, Arizona Certified Court Reporter No. 50200.

* * *

APPEARANCES:

    For the Plaintiff:

        ROBBINS GELLER RUDMAN & DOWD

        By:  Darryl Alvarado, Esq.

        655 West Broadway

        San Diego, California 92101

    For the Defendants:

        MORRISON & FOERSTER

        By:  Jordan Eth, Esq.

        425 Market Street

        San Francisco, California 94105

    Also Present:

        Ed Kishel, the videographer

        Terry Koelbl

        Eric Roberts

Page 6

MARK WIDMAR

Foerster, for defendants and the witness.

MR. ROBERTS:  Eric Roberts, Morrison & Foerster, for the defendants and the witness.

THE VIDEOGRAPHER:  Thank you.

Madam Reporter, would you please swear in the witness.

MARK WIDMAR,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. ETH:  Counsel, as I mentioned off the record, I want to make sure we reserve the right to review and sign the transcript and to designate it as confidential, including the transcript from the last deposition, the 30(b)(6) deposition of Mr. Widmar.

EXAMINATION

BY MR. ALVARADO:

Q.   Good morning, Mr. Widmar.

A.   Good morning.

Q.   You testified as a designee on behalf of First Solar on January 21st, 2015, correct?

A.   Correct.

Page 149

MARK WIDMAR

that it could exhibit a lost power module type of

condition.

(Exhibit 277 was marked for identification.)

Q.   BY MR. ALVARADO:  I've handed you Exhibit

277, which is an e-mail you received on July 25th,

2011.  It bears Bates No. FSLR01340256 through

01340257.

A.   Okay.

Q.   You received this e-mail on July 25th,

2011, from Mr. Kallenbach; is that right?

A.   It appears so.

Q.   You received the e-mail in the ordinary

course of your duties at First Solar; is that right?

A.   I believe so.

Q.   This appears to be a true and accurate

copy of the e-mail you received on July 25th, 2011,

correct?

A.   I believe so.

Q.   The e-mail originates with an e-mail from

you to Mr. Kallenbach on July 24th, and the subject

is "LPM."

Do you see that?

A.   Yes.

Q.   And you write, "Are you -- are you sure

MARK WIDMAR

A.    And which -- I thought you said second paragraph.

Q.    First paragraph.

A.    First paragraph.  And what sentence?

Q.    It begins "Based."  It's about halfway through.

A.    I got it.

Q.    "Based on review of the data during Q3 2011, management determined that it will need a total of 120 megawatts to remediate the approximately 600,000 LPM modules that are either at customer locations or installed at a site."

Do you see that?

A.    I see that.

Q.    As of Q3 2011, First Solar understood that approximately 600,000 modules were LPM modules, correct?

MR. ETH:  Objection.  Vague.  Foundation.

THE WITNESS:  First, this, to me, would, again, represent that we believe that there were approximately 600,000 modules that could exhibit low power output based on the criteria that was determined for low power modules.

Q.    BY MR. ALVARADO:  With regard to the

MARK WIDMAR

600,000 modules, these are modules that were affected by the LPM excursion, correct?

MR. ETH:  Objection.  Foundation.  Vague.

THE WITNESS:  Again, trying to get clarity around definition.  The manufacturing excursion was the cad-chloride oven event.  We didn't have an LPM excursion discreetly.  The LPM that's being referenced here, again, could include modules that were adversely impacted that were not directly associated with the cad-chloride excursion.

Q.   BY MR. ALVARADO:  Well, let's take a look at the memo.  If you continue --  Well, before I -- before we review the memo.

Earlier, when we were discussing the document that indicated 594,000 true LPM modules, you indicated that that may have included modules that were exhibiting 15 percent or more power loss for reasons other than being part of the manufacturing excursion, correct?

A.   Correct.

Q.   And one of the things that you identified as being possibly a cause of that degradation was -- were modules that were left in open circuit, correct?

A.   That was one of the examples that I

MARK WIDMAR

remediation programs associated with the manufacturing excursion, correct?

        A.   Yes, that's correct.

            MR. ALVARADO:  Plaintiffs have no further questions at this time.

            MR. ETH:  I have no questions at this time.  Thank you very much.

            THE VIDEOGRAPHER:  This concludes today's recording of the deposition of Mark Widmar.  This is the end of media No. 6, and there are a total of six media units in this recording.  We are now off the record.  The time is 6:08 p.m.

        (The proceedings concluded at 6:08 p.m.)

Page 320

MARK WIDMAR

I, MARK WIDMAR, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct,

EXECUTED this _____ day of _____,

20__, at _____, _____,

(City)                    (State)

_____ I have made changes to my deposition.

_____ I have NOT made changes to my deposition.

_____

MARK WIDMAR

Page 322

MARK WIDMAR

CERTIFICATE

I, Kristy A. Ceton, Certified Court Reporter for the State of Arizona, certify:

That the foregoing proceedings were taken by me; that I am authorized to administer an oath; that the witness, before testifying, was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness were taken down by me in shorthand and thereafter reduced to print by computer-aided transcription under my direction; that review and signature was requested; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had upon the taking of said proceedings, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto nor am I in any way interested in the outcome hereof.

DATED this 6th day of February, 2015.

_____

Kristy A. Ceton

Certified Court Reporter No. 50200

For the State of Arizona

# Exhibit 19

**To:**       Ora Crossley[OCrossley@FIRSTSOLAR.COM]; Jens Meyerhoff[JMeyerhoff@FIRSTSOLAR.COM]; Melanie Ball[MBall@FIRSTSOLAR.COM]; April Brady[ABrady@FIRSTSOLAR.COM]; Richard Thompson[RThompson@FIRSTSOLAR.COM]; James Zhu[jzhu@FIRSTSOLAR.COM]; Bryan Schumaker[BSchumaker@FIRSTSOLAR.COM]; Craig Fotheringham[CFotheringham@FIRSTSOLAR.COM]; Robert Knox[rknox@FIRSTSOLAR.COM]; Richard Mittermaier[RMittermaier@FIRSTSOLAR.COM]; Scott Green[SGreen@FIRSTSOLAR.COM]; Todd Smith[todd.smith@FIRSTSOLAR.COM]; Todd Magyar[tmagyar@FIRSTSOLAR.COM]; Ondria Follett[ofollett@FIRSTSOLAR.COM]; Tyler Hillstead[THillstead@FIRSTSOLAR.COM]; Herbert Kemp[HKemp@FIRSTSOLAR.COM]; Tiffany Cross[TCross@FIRSTSOLAR.COM]; Melissa Boyers[mboyers@FIRSTSOLAR.COM]; Michael Lindsey[mlindsey@FIRSTSOLAR.COM]; Mark Villani[mvillani@FIRSTSOLAR.COM]; Rakhi Agarwal[RAgarwal@FIRSTSOLAR.COM]; Stacy Pearcy[spearcy@FIRSTSOLAR.COM]; Sara Frank[SFrank@FIRSTSOLAR.COM]; Darcy Kantner[DKantner@FIRSTSOLAR.COM]; Barbara Bristley[bbristley@FIRSTSOLAR.COM]; Ryan Ferguson[rferguson@FIRSTSOLAR.COM]; Chris Wolf[CWolf@FIRSTSOLAR.COM]; Kurt Wood[kwood@FIRSTSOLAR.COM]; Teresa Gullatte[tgullatte@FIRSTSOLAR.COM]; Steven Ryan[sryan@FIRSTSOLAR.COM]; Zachary Dalton[ZDalton@FIRSTSOLAR.COM]; Kevin Willis[kwillis@FIRSTSOLAR.COM]; Georgette Gillen[GGillen@FIRSTSOLAR.COM]; Jeff Van Dyke[JVandyke@FIRSTSOLAR.COM]; Kevin Tawes[KTawes@FIRSTSOLAR.COM]; John Amonett[jamonett@firstsolar.com]; Fadel Shukry[fshukry@FIRSTSOLAR.COM]; Rich Innes[RInnes@FIRSTSOLAR.COM]; Jennifer Nicomedes[JNicomedes@FIRSTSOLAR.COM]; Scott Erickson[SErickson@FIRSTSOLAR.COM]; Larry Polizzotto[LPolizzotto@FIRSTSOLAR.COM]; Daniel Nelson[DNelson@FIRSTSOLAR.COM]; David Brady[dbrady@FIRSTSOLAR.COM]; Julie Myerholtz[JMyerholtz@FIRSTSOLAR.COM]; Brian Castro Vidot[BCastroVidot@FIRSTSOLAR.COM]; Christian Youngston[CYoungston@FIRSTSOLAR.COM]; Carol Campbell[ccampbell@FIRSTSOLAR.COM]; Mary Beth Gustafsson[MGustafsson@FIRSTSOLAR.COM]
**From:**     Ora Crossley
**Sent:**     Fri 12/18/2009 3:25:42 PM
**Importance:**       Normal
**Subject:**   RE: Cost Per Watt Investigation – Closing Report
**MAIL_RECEIVED:**    Fri 12/18/2009 3:25:43 PM

Team... additional call in numbers just in case...

**Dial in numbers***:

| Country | Toll Numbers | Toll Free Number |
|---|---|---|
| ARGENTINA | | 0800-777-0477 |
| AUSTRALIA | | 1-800-993-915 |
| AUSTRIA | | 0800-005-024 |
| BELGIUM | | 0800-4-9531 |
| BRAZIL | | 0800-7610691 |
| CHILE | | 1230-020-2391 |
| CHINA | | |

Exhibit 11
Gillen
8/7/14
Lisa Moskowitz
CSR 10816, RPR, CLR

CONFIDENTIAL

FSLR02096725

| | | |
|---|---|---|
| CHINA | | 10-800-120-1667 |
| COLOMBIA | | 01800-9-156492 |
| CZECH REPUBLIC | | 800-700-223 |
| DENMARK | | 8088-8311 |
| ESTONIA | | 800-011-1097 |
| FINLAND | | 0-800-9-14609 |
| FRANCE | | 080-563-6106 |
| GERMANY | | 0800-000-3334 |
| GREECE | | 00800-12-7313 |
| HONG KONG | | 800-930-435 |
| HUNGARY | | 06-800-12792 |
| INDIA | | 000-800-852-1261 |
| INDIA | | 000-800-001-6217 |
| INDONESIA | | 001-803-011-3782 |
| IRELAND | | 1800-992-932 |
| ISRAEL | | 1-80-9216167 |
| ITALY | | 800-986-966 |
| JAPAN | | 0066-33-132432 |
| LATVIA | | 8000-2926 |
| MALAYSIA | | 1-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 |
| MEXICO | | 001-866-839-3359 |
| NETHERLANDS | | 0800-020-1432 |
| NEW ZEALAND | | 0800-446-385 |
| NORWAY | | |

CONFIDENTIAL

FSLR02096726

| | | |
|---|---|---|
| PANAMA | | 011-001-800-5072118 |
| PERU | | 0800-53759 |
| POLAND | | 00-800-1212564 |
| PORTUGAL | | 8008-14064 |
| RUSSIA | | 8-10-8002-9803011 |
| SINGAPORE | | 800-120-4674 |
| SOUTH AFRICA | | 080-09-80419 |
| SOUTH KOREA | | 00798-14800-6853 |
| SPAIN | | 800-098-589 |
| SWEDEN | | 0200-884-628 |
| SWITZERLAND | | 0800-001-117 |
| TAIWAN | | 00801-137-798 |
| THAILAND | | 001-800-1206-65649 |
| UNITED KINGDOM | | 0808-238-6016 |
| URUGUAY | | 000-413-598-3419 |
| USA | 1-203-418-3123 | 866-692-3158 |
| VENEZUELA | | 0800-1-00-3207 |

-----Original Appointment-----
**From:** Ora Crossley
**Sent:** Wednesday, December 16, 2009 4:07 PM
**To:** Jens Meyerhoff; Melanie Ball; April Brady; Richard Thompson; James Zhu; Bryan Schumaker; Craig Fotheringham; Robert Knox; Richard Mittermaier; Scott Green; Todd Smith; Todd Magyar; Ondria Follett; Tyler Hillstead; Herbert Kemp; Tiffany Cross; Melissa Boyers; Michael Lindsey; Mark Villani; Rakhi Agarwal; Stacy Pearcy; Sara Frank; Darcy Kantner; Barbara Bristley; Ryan Ferguson; Chris Wolf; Kurt Wood; Teresa Gullatte; Steven Ryan; Zachary Dalton; Kevin Willis; Georgette Gillen; Jeff Van Dyke; Kevin Tawes; John Amonett; Fadel Shukry; Rich Innes; Jennifer Nicomedes; Scott Erickson; Larry Polizzotto; Daniel Nelson; David Brady; Julie Myerholtz; Brian Castro Vidot; Christian Youngston; Carol Campbell; Mary Beth Gustafsson

**CONFIDENTIAL**

**FSLR02096727**

**Subject:** Cost Per Watt Investigation - Closing Report
**When:** Friday, December 18, 2009 9:00 AM-10:00 AM (GMT-07:00) Arizona.
**Where:** PHX - Grand Canyon (Call in: 866-692-3158; Part (5771842)

All Arizona team members should join the discussion in person. Location Grand Canyon CR

Please note: Only 20 lines have been reserved for this call.  Site specific groups should gather in a common conference room to minimize the number of lines in use.

**CONFIDENTIAL**

**FSLR02096728**

Exhibit 20

**To:**          (firstsolaraudit@us.pwc.com)[firstsolaraudit@us.pwc.com]
**From:**        Bryan Schumaker
**Sent:**        Mon 7/20/2009 10:55:44 PM
**Importance:**          Normal
**Subject:**     Warranty Summary PWC.xls
**MAIL_RECEIVED:**    Mon 7/20/2009 10:55:00 PM
Warranty Summary PWC.xls


Other tab added for your review.



Thanks,

Bryan

**CONFIDENTIAL & ATTORNEY'S EYES ONLY**                                                   **FSLR00276776**

| Warranty Reserve Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Total Module Warranty** | | **FSE** | **Elimination** | **Total FSLR Warranty** | |
| | | **USD** | | **USD** | **USD** | **USD** | |
| Warranty ST | A | $ 5,987,194 | $ | 529,415 | $ (20,655) | $ | 6,495,954 |
| Warranty LT | B | $ 10,896,478 | $ | - | $ | | 10,896,478 |
| **Total Warranty Per GL at 6/27/09** | A+B=C | $ 16,883,672 | $ | 529,415 | $ (20,655) | $ | 17,392,432 |
| | | | | | | | |
| **Warranty Roll forward Per GL at 6/27/09** | | | | | | | |
| Total Modules Shipped to Date | D | 17,205,474 | | | | | |
| Total Rate of Return | E | 1.82% | | | | | |
| Total Cumulative Est. Modules to be returned | D*E=F | 313,140 | | | | | |
| Total Cost Per Module | G | $ 66 | | | | | |
| Total Cum. Warranty Reserve Rec. to Date | F*G=H | $ 20,640,055 | | | | | |
| Reserve Released to Date | C-H=I | $ (4,524,868) | | | | | |
| ILS Specific Accrual | W | $ 768,485 | | | | | |
| **Total Warranty Per GL at 6/27/09** | H+I+W=J | 16,883,672 | | | | | |
| | | | | | | | |
| **Warranty for LPM** | | | | | | | |
| Est. Quantity of Modules to be Returned | K | 98,850 | | | | | |
| Cost Per Module | G | $ 66 | | | | | |
| **Warranty Cost Associated with LPM** | K*G=L | $ 6,515,526 | | | | | |
| | | | | | | | |
| **Warranty for Power Years 5-25** | | | | | | | |
| Yearly Estimated Reserve Release for Power | M | 0.020% | | | | | |
| Years Remaining | N | 20 | | | | | |
| Total % Remaining for Power Reserve | M*N=O | 0.400% | | | | | |
| **Warranty Required for Power Reserve Yr. 5-25** | (D*O)*G=P | 4,536,276 | | | | | |
| | | | | | | | |
| **Warranty for Defects and Power yr. 1-5** | | | | | | | |
| Q2'09 Modules Shipped under Warranty | Q | 4,820 | | | | | |
| Cost Per Module | G | $ 66 | | | | | |
| Quarterly Warranty Cost | Q*G=R | $ 317,702 | | | | | |
| | | | | | | | |
| Quarters Remaining for Defect and Power 1-5 | S | 20 | | | | | |
| **Worst Case Scenario based on current info.** | (R*S)=T | $ 6,354,038.75 | | | | | |
| | | | | | | | |
| **Total Est. Warranty Required at 6/27/09** | L+P+T=U | $ 17,405,840.86 | | | | | |
| | | | | | | | |
| **Total Over or (Under) Accrued at 6/27/09** | J-U=V | $ (522,169) | | | | | |

| Period | Replacement Modules Shipped | Modules Outstanding Under Defect Warranty | Modules Shipped as a % of Mod. OS under Def. War. |
|---|---|---|---|
| Q2 09 | 4,820 | 17,205,171 | 0.028% |
| Q1 09 | 1,256 | 13,908,187 | 0.009% |
| Q4 08 | 5,220 | 11,081,226 | 0.047% |
| 2007 | 3,212 | 4,227,471 | 0.076% |
| 2006 | 2,072 | 1,354,553 | 0.153% |
| 2005 | 2,024 | 467,316 | 0.433% |
| 2004 | 1,196 | 133,702 | 0.894% |
| **Total** | **19,800** | 17,205,171 | 0.115% |

**LPM War. Analysis**

**FSLR00276777**

# Exhibit 21

**To:**         garret.tripp@us.pwc.com[garret.tripp@us.pwc.com]
**From:**       Bryan Schumaker
**Sent:**       Wed 2/23/2011 11:20:11 PM
**Importance:**         Normal
**Subject:**    Justification of Warrantyt 2.23.11.docx
**MAIL_RECEIVED:**      Wed 2/23/2011 11:20:00 PM
Justification of Warrantyt 2.23.11.docx


This is the Draft version.  Please let me know if you have further questions.



Thanks,
Bryan

**CONFIDENTIAL**                                                                                                    **FSLR01072708**



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

**To:**    Financial Reporting Files                          **Date:** 2011 Feb. 15

**From:**    Bryan Schumaker
Corp. Asst. Controller

**Subject:** 2010 Year-end Warranty Analysis

## BACKGROUND:

FSLR Components business provides a limited warranty for defects in materials and workmanship under normal use and service conditions for five years following delivery to the owner of our solar modules. We also warrant to the owner of our solar modules that solar modules installed in accordance with agreed-upon specifications will produce at least 90% of their initial power output rating during the first 10 years following their installation and at least 80% of their initial power output rating during the following15 years. Our warranties are automatically transferred from the original purchaser of our solar modules to a subsequent purchaser. We accrue warranty costs when we recognize sales, using amounts estimated based on our historical experience with warranty claims, our monitoring of field installation sites, in-house testing and our estimated per-module replacement cost at 50% overhead.

FSLR Systems business will typically provide a limited warranty against defects in workmanship, engineering design, and installation services under normal use and service conditions for a period of one year following the substantial completion of a solar power plant or an energized section of a solar power plant.  This warranty does not cover the module warranty.  The module warranty is covered within the Components business warranty.  In resolving claims under both the workmanship and design warranties, we have the option of either remedying the defect to the warranted level through repair, refurbishment, or replacement.

## OVERVIEW:

The table below represents the year-end roll forward of the 2010 warranty liability by Segment:

| (In K's) | December 31, 2010 | | | |
|---|---|---|---|---|
| | Components Business | Systems Business | Total | |
| Product warranty, beginning of period | $ 21,919 | $ 664 | $ 22,583 | |
| Accruals | $ 17,524 | $ 785 | $ 18,309 | Δ |
| Settlements | $ (24,245) | $ (371) | $ (24,616) | Δ |
| Change in estimate of warranty liability | $ 11,238 | $ 380 | $ 11,618 | Δ |
| Product warranty, end of period | $ 26,436 | $ 1,458 | $ 27,894 | |
| Current portion of warranty liability | $ 9,823 | $ 1,403 | $ 11,226 | |
| Noncurrent portion of warranty liability | $ 16,613 | $ 55 | $ 16,668 | |

Δ Discussed in further detail below

Page { PAGE  \* MERGEFORMAT } of { NUMPAGES }

**CONFIDENTIAL**                                                                                    **FSLR01072709**



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

**_Accruals:_**
*Components Business:*
This balance represents the estimated accrual for new module sales that occurred during 2010. The accrual for the Components business is calculated as follows:

> (Total Sales for the Year)
> \* (Warranty Rate) ~
> \* (Module Standard Cost by Region @ 50% Overhead)
> Total Accrual for New Sales (Components Business)

*~ Warranty Rate is provided by the VP of Quality Global. For 2010 the rate used was 1.82% (1.32% Defects and Workmanship; .5% Power). Please refer to the December 2010 "Warranty Performance Analysis Memo" for additional quantitative and qualitative analysis on the 5 year workmanship warranty and the "Performance Warranty Analysis Memo" for the 25 year Limited Power Output Warranty.*

*System Business:*
This balance represents the accrual for our one year Workmanship Warranty for the construction of new projects sold. The accrual rate is estimated based on information provided by the Systems business. The current accrual rate is $.40 per kW DC for each month during the warranty period. An example of this is illustrated below using Sarnia 60 as an example. Sarnia 60 is a 70,590 kW DC project. The calculation is as follows:

$$\$.40 \times 70{,}590 \times 12 \text{ months} = \$338{,}832$$

There is also a Design warranty within our contracts, which the Systems business has determined that none of our projects have an estimated warranty cost associated with potential design defects.

The 2010 calculation for the Accrual for new sales for the Component and Systems Business is as follows: *(In K's except where noted)*

|  | NA Sales | EU Sales | Elim. | Total Sales |
|---|---|---|---|---|
| PBG Modules Sold | 1,577 | 1,136 |  | 2,713 |
| FFO Modules Sold | - | 3,161 |  | 3,161 |
| KLM Modules Sold | 1,476 | 10,591 |  | 12,067 |
| Total Modules Sold | 3,053 | 14,888 |  | 17,941 |
| Warranty Rate | 1.82% | 1.82% |  | 1.82% |
| Total Est. Modules to be replaced | 55.56 | 271 |  | 327 |
| Cost Per Module (Actual) | $ 57.59 | € 41.53 |  |  |
| Accrual for New Sales | $ 3,200 | € 11,253 |  |  |
| YTD Wtd. Avg. FX Rate |  | 1.31 |  |  |
| Total Components Accrual for New Sales | $ 3,200 | $ 14,769 | $ (446) | $ 17,523 |
| Total Systems Accrual for New Sales | 786 |  |  | 786 |
| Total | $ 3,986 | $ 14,769 | $ (446) | $ 18,309 |

Page { PAGE \\* MERGEFORMAT } of { NUMPAGES }

CONFIDENTIAL

FSLR01072710



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

### Settlements:

*Components Business:*
This balance represents the net settlement cost of modules for warranty replacements (including Low Power Modules "LPM") that were shipped during 2010.

Net Settlements from Q1 2010 through Q3 2010 represents total module cost for warranty replacements shipped less "at label" modules that were returned back to First Solar as part of the LPM exchange process. Management determined that there was a market for these used, but fully functioning modules.

During Q4 2010, FSLR established a market precedence for "de rated" modules based on sales to three separate customers. The LPM modules were sold at a rate of €1.10 per watt to the three third parties. Due to the establishment of a market for these modules in Q4 2010, net settlements in Q4 represent shipments of warranty modules to customers less "at label" and "de rated" modules that were returned back to First Solar as part of the LPM exchange process. The modules that were part of the nonmonetary exchange were placed into inventory at December 31, 2010 at the site manufactured specific current standard cost at December 21, 2010. This value approximates the original cost to produce the module during the LPM excursion period less a decrease in value due to the normal usage. Please see analysis below:

| Finished Goods (value per module) | Q208 Actual | Q308 Actual | Q408 Actual | Q109 Actual | Q209 Actual | Q309 Actual | Q409 Actual | Avg. Cost of producing module during LPM excursion period | Std. Cost/Value of LPM Modules in inv. at 12/31/2010 | Change in Value | Change in Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PBG | $ 81 | $ 82 | $ 81 | $ 82 | $ 78 | $ 81 | $ 79 | $ 81 | $ 64 | $ (17) | -21% |
| FFO | $ 72 | $ 65 | $ 62 | $ 55 | $ 61 | $ 65 | $ 67 | $ 64 | $ 55 | $ (9) | -14% |
| KLM | $ 68 | $ 50 | $ 70 | $ 54 | $ 51 | $ 51 | $ 51 | $ 57 | $ 47 | $ (9) | -16% |
| WW avg | $ 72 | $ 57 | $ 70 | $ 60 | $ 58 | $ 58 | $ 59 | $ 67 | | | |

These modules were determined to be valued at the Lower of Cost or Market.

*Systems Business:*
This balance represents settlements related to warranty work performed. Most projects we have Operating and Maintenance ("O&M") agreements and therefore, our O&M staff or the customer will make a warranty claim. The cost of this claim, which includes internal labor, time and expense, and external services materials, will be included in this line.

The 2010 calculation for the Settlement line for the Component and Systems Business is as follows: *(In K's except where noted)*

| | |
|---|---|
| 391 | KLM Warranty Shipments |
| 61 | PBG Warranty Shipments |
| 124 | FFO Warranty Shipments |
| 576 | Total Warranty Shipments |
| (73) | Total At Label Modules |
| (58) | Q4 De Rated Modules (ex. Scrap) |
| 445 | Total Settlement Modules |
| $ 54.50 | Total Blended Settlement Per Module (Actual) |
| $ 24,245 | Total Settlements (Components Business) |
| $ 371 | Total Settlement (Systems Business) |
| $ 24,616 | Total Settlements for 2010 |

CONFIDENTIAL                                                                FSLR01072711



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

### *Change in estimate of warranty liability:*
*Components Business:*
This balance represents various changes that impact the estimated warranty liability.

The following represents the key drivers:

- Changes due to the difference between estimated settlement date and actual settlement date (including the impact of the Special Excursion)
- Change in foreign exchange rate ("FX")
- Change in module standard cost

*Systems Business:*
This balance represents any changes in estimate to the warranty liability.  This business is in its infancy state and we continue to learn how projects will function within the first 12 months of operations.  Any changes to the original estimate will be recorded to this line item in the roll forward.

The 2010 calculation for the Change is estimate of warranty liability for 2010 for the Components and Systems Business is as follows: (In K's)

| | | |
|---|---:|---|
| Increase in Reserve due to Special Excursion | $  12,793 | Δ |
| Change due to FX | (1,574) | |
| Change due to Module Cost/Other | 19 | |
| Change in Estimate (Components Business) | $  11,238 | |
| Change in Estimate (Systems Business) | $      380 | |
| Total Change in Estimate | $  11,618 | |

*Δ  During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective.  We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete.  At the end of 2009, management estimated that the exposure to LPM modules caused by this Special Excursion was 114K modules, but during 2010 our exposure grew to an estimated 521K LPM modules.  In 2010 it was determined that in order to locate the 521K LPM modules, we will need to pull out 1.1M modules.  Our exposure grew in 2010 based on additional testing, and analysis performed by operations along with feedback from our customers.  Our customers had until the end of Q4 2010 to report any sites that may be impacted by this Special Excursion.*

*This Special Excursion has caused a significant amount of modules to be pulled from the field that historically would not have been either covered under warranty or would not have been sent back to FSLR for warranty replacement.  See table below:*

**CONFIDENTIAL**

**FSLR01072712**



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

| % from label | Description of Modules | Note |
|---|---|---|
| +5% to -5% | At label modules | Able to resale-always excluded from Settlements |
| -5% to -10% | Customer satisfaction | Would not have been accepted under warranty if the Special Excursion did not occur. Beginning in Q4; excluded from Settlements due to market precedence established for the resale of these modules |
| -10% to -15% | Warranty Modules | Under normal circumstances the majority of these modules would not have been returned to FSLR, due to customers not wanting to experience down time of the Power Plant to test and rip out individual modules |
| -15% to -20% | LPM Modules able to resale | Beginning in Q4; excluded from settlements due to market precedence established for the resale of these modules |
| > -20% | LPM Modules Scrap | Scrap 100% of these modules |

*Overview of Modules Extracted from the field due to the Special Excursion*

Based on the change in estimate noted above, Management analyzed the impact assuming we had accrued this change in estimate as of the prior year-end to ensure it aligned with the VP of Quality Global's semiannual review of the warranty rate.   This was analyzed by taking the prior year-end balance of $22M and adding the $13M change in estimate that occurred in 2010 that was caused by the increase in reserve due to the Special Excursion.  Based on the change in estimate the total accrual for sales prior to Dec. 26, 2009 would have been $35M as of the prior year-end. During 2010, $24M of the reserve was settled.  The release of approximately 69% of the reserve appears reasonable and aligns with the VP of Quality Global's semiannual memo. Please refer to Figure 1 of the Warranty Performance Analysis December 2010 for further analysis.

**CONCLUSION:**

Based on the analysis performed above Management has determined that the activity noted in 2010 due to the Special Excursion was a Change in Accounting Estimate under the guidance of ASC 250.  In addition, Management believes that the 1.82% return rate used at the end of 2010 to record the warranty accrual for all module sales is reasonable based on representation from the VP of Quality Global.

**Technical References:**

Financial Accounting Standards Board. *FASB Accounting Standards Codification.* [ASC]
- ASC 250-10, *Changes in Accounting Estimates*
- ASC 460-10-25-6, Guarantees
- ASC 845-10-30-16, Nonmonetary Transactions

Reviewed by:

CONFIDENTIAL

FSLR01072713



**MEMORANDUM**

*350 West Washington Street*
*Suite 600*
*Tempe, AZ 85281 USA*

/s/ James Zhu
James Zhu, CAO

Date:

2011 Feb. 15

Year-end Warranty Accrual Analysis



Page { PAGE  \* MERGEFORMAT } of { NUMPAGES }

**CONFIDENTIAL**

Exhibit 24

**To:**     Mark Widmar[Mark.Widmar@FIRSTSOLAR.COM]; James Zhu[jzhu@FIRSTSOLAR.COM]; Bryan Schumaker[BSchumaker@FIRSTSOLAR.COM]
**Cc:**     Moritz Ilg[milg@FIRSTSOLAR.COM]; Mike Koralewski[mkoralewski@FIRSTSOLAR.COM]; Klaus-Peter Fuss[KFuss@FIRSTSOLAR.COM]; Ryan Ferguson[rferguson@FIRSTSOLAR.COM]
**From:**   T K Kallenbach
**Sent:**   Wed 9/7/2011 8:02:40 PM
**Importance:**     High
**Subject:** LPM replacement volume
**MAIL_RECEIVED:**   Wed 9/7/2011 8:02:43 PM

I think we have reached the "law of diminishing returns" on LPM reserve estimating… Mike, Dan, Klaus-Peter, Moritz, Timo have ground through this over the last 6 weeks.

We have attempted to clarify the specific needs for the LPM manufacturing excursion form June 2008-June 2009.

The estimates for the number of modules manufactured with the signature issue remains essentially unchanged.  However, we have determined several sites remediated under the heading of "LPM" actually had different root cause issues.  Further, as we constructed the go forward estimate, we are attempting to correctly classify what is LPM and what has other causes for performance shortfall.

Proceeding from a baseline of 85MW LPM reserve + 6.2MW shipped in q3 to date (total of 91.2MW expended to date)

1)     Expended within the reserve status of 91.2MW is 11.6MW of remediation that was NOT due to the LPM manufacture (various reasons)

a.     Masdar potentially 3.5MW non LPM (Cleaning and Hot Climate Impact)

b.     El Dorado potentially 0.9MW non LPM (Hot Climate)

c.     Repperndorf potentially 0.225MW non LPM (PADCON Inverter)

d.     Out of LPM timeframe 2.02MW

e.     Allmanshofen approximately 5MW outside of high probability timeframe

2)     We have a detailed estimate of 52MW of reserve needed including the Commerzreal sites, After scrubbing this estimate we have made the following adjustments…

a.     3.8MW is from Huescar which is not LPM and should be treated separately (not LPM, but will be remediated out of warranty)

**CONFIDENTIAL**                                                                                    **FSLR01391657**

b.    2.0MW is from Escusar which is more than ½ not from LPM timeframe and hot climate (a portion is not LPM, and will be remediated out of warranty)

c.    1.5MW is from Repperndorf which can now be removed (out of the total estimate; no remediation required)

d.    Additional 5MW from Gottmansdorf reduction (out of the total estimate; no remediation required)

e.    Total to be removed from 52MW is 12.3MW (5.8MW will be remediated from warranty; 6.5MW is removed completely from the forward LPM forecast.

3)    When we net this out, the change to the LPM reserve should be 28.4MW… or to a total of 91.2 + 28.4MW = 119.6MW which I recommend to set to a reserve value 120MW to conclude LPM

Further, as you can see we have a couple of compounding issues beyond LPM, most notably

• STBi-tail post LPM window (while improving from the LPM window, it still has a longer tail than desirable),

• Hot climate stabilization (which we continue to assess the impact), and

• an additional escape from PBG post LPM timeframe (Nov/Dec 2009 and January 2010)

Obviously, we will continue to work to minimize the total LPM remediation… I will begin authorizing projects

*...tk kallenbach*

**President, Component Business Group | First Solar, Inc.**

**tk@firstsolar.com**

T 1.602.414.9373 | F 1.602.414.9473 | 350 West Washington, Suite 600, Tempe, AZ 85281

Please consider the environment before printing this e-mail.

**CONFIDENTIAL**                                                                                          **FSLR01391658**