**WO**

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

Mark Smilovits, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

First Solar, Inc.; Michael J. Ahearn; Robert J. Gillette; Mark R. Widmar; Jens Meyerhoff; James Zhu; Bruce Sohn; and David Eaglesham,

Defendants.

No. CV12-00555-PHX-DGC

**ORDER**

This securities fraud class action is set for trial in January 2020. The parties have filed nine motions to exclude expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The motions are fully briefed. No party requests oral argument or a *Daubert* hearing. This order addresses six of the motions. The Court will address the remaining motions in a separate order.

## I.    Background.

Defendant First Solar, Inc. produces photovoltaic solar panel modules. Its stock is publicly traded on the NASDAQ stock exchange. Plaintiffs purchased First Solar stock between April 30, 2008 and February 28, 2012 (the "Class Period"). *See* Doc. 171 at 22.[1]

---

[1] The parties have filed multiple motions to file documents under seal, which the Court will address in a separate order. *See* Docs. 468, 511, 551, 589, 639, 649. The parties have lodged the proposed sealed versions of the documents on the Court's electronic case

The Individual Defendants are First Solar officers and executives who purchased or sold First Solar stock during the Class Period while allegedly concealing information from the market about manufacturing and design defects causing faster power loss in certain modules.[2]

Steep declines in First Solar's stock price, beginning on July 29, 2010, followed the departure of First Solar's CEO, disappointing financial results, and the release of quarterly financial disclosures reporting the product defects. *See* Doc. 401 at 7-8. First Solar's stock fell from nearly $300 per share to less than $50 per share during the Class Period. *See id.* at 2.

Plaintiffs allege that Defendants engaged in several acts of fraud during the Class Period, including concealing the product defects, misrepresenting the cost and scope of the defects, and reporting false information on financial statements. Doc. 93 at 7-20. Plaintiffs further allege that when First Solar later disclosed the product defects and attendant financial liabilities to the market, the stock price fell, causing economic loss to Plaintiffs. *Id.* at 124-41.

Plaintiffs assert violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5. *Id.* at 135-36. Section 10(b) "makes it unlawful to 'use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 forbids, in connection with the purchase or sale of a security, "the making of

filing ("ECF") system pending rulings on the motions to seal, and have also filed redacted public versions of the documents on the ECF system. *See* LRCiv 5.6(b)-(c). Where appropriate, and as noted below, this order cites to some of the lodged documents, which will be filed on the ECF system (either under seal or in the public record) once the Court rules on the motions to seal. Citations to pages of a lodged document correspond to the same pages in the filed public copy (the documents are the same except for redactions). Citations are to page numbers added at the top of each page by the Court's electronic filing system.

[2] The modules affected by the manufacturing defect are referred to as "low power modules" or "LPM," and the design defect is termed "hot climate degradation." *See id.* at 3-6.

any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 17 C.F.R. § 240.10b-5). The scope of Rule 10b-5 is coextensive with that of § 10(b). *See Oracle*, 627 F.3d at 387; *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). To establish a violation of § 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*, 552 U.S. at 157.

Plaintiffs claim that the Individual Defendants are liable for the alleged § 10(b) and Rule 10b-5 violations as "controlling persons" under § 20(a). Doc. 93 at 136, ¶¶ 257-58. To establish a claim under § 20(a), a plaintiff must first prove a primary violation of § 10(b) or Rule 10b-5 and then show that the defendant exercised actual power over the primary violator. *See In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).[3]

## II. Rule 702 and *Daubert* Standards.

Under Rule 702, an expert may offer "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of expert testimony has the ultimate burden of showing, by a preponderance of the evidence, that the proposed testimony is admissible under Rule 702. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); Fed. R. Evid. 104(a). The trial court acts as a gatekeeper for expert testimony to assure that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see Davis*

---

[3] The Court has precluded Plaintiffs from asserting a new insider trading claim under § 10(b). Doc. 661 at 19-21. Evidence of insider trading by the Individual Defendants, however, may be relevant to the scienter element of the § 10(b) and Rule 10b-5 misrepresentation claims and perhaps for other purposes. *See id.* at 21; Doc. 401 at 7.

*v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3-4 (D. Ariz. Aug. 2, 2019).

### III.  Defendants' Motion to Exclude Davisson's Testimony (Docs. 528, 631).

Plaintiffs retained Valerie Davisson, a former securities analyst, to opine on several issues related to non-public information First Solar purportedly failed to disclose to investors and analysts. *See* Doc. 528-1 at 6. Davisson was asked to opine about: (1) the role of securities analysts with respect to publicly traded companies; (2) the state of the solar panel market and the challenges First Solar faced during the Class Period; (3) the importance of cost per watt, efficiency, product quality, product reliability, and warranty to market participants considering making an investment in First Solar; and (4) whether and how the allegedly concealed information would have materially altered analysts' ability to assess First Solar's stock value. *Id.* at 6-7. Davisson's opinions on these topics, and her qualifications and methodology, are set forth in a 75-page report. *Id.* at 2-80.

Defendants move to exclude all of Davisson's opinions. Docs. 528 (sealed lodged motion), 631 (redacted public version). Defendants argue that Davisson has no expertise in the solar industry, that she employs no reliable method in reaching her opinions, that her testimony would confuse the jury, and that she offers impermissible legal conclusions about materiality. *Id.* at 5-6. The Court will address each argument.

### A.  Davisson's Expertise.

Defendants assert that Davisson has no expertise in the solar industry. Doc. 528 at 5, 10-11. In support of this argument, Defendants purport to rely on Davisson's own testimony that stock analysts typically specialize by industry. *Id.* at 12. But Davisson testified that sell-side analysts specialize by industry, and that she was a buy-side analyst. Doc. 528-4 at 16. Defendants do not address this distinction, and do not cite any other source for their assertion that Davisson must have solar industry expertise to render her expert opinions. Doc. 528 at 12.[4]

---

[4] Defendants cite various technical statements from their expert, Dr. Varun Sivaram, but no opinion from Sivaram that market analysts cannot address the effect of alleged misrepresentations on analyst opinions without technical expertise. Doc. 528 at 12 n.6.

From this evidence, the Court cannot conclude that solar industry expertise is necessary for the opinions Davisson offers about the market effects of Defendants' alleged misrepresentations. She worked for more than ten years as a securities portfolio manager. Doc. 528-1 at 8. As a buy-side analyst, Davisson recommended the purchase of stocks for large institutional clients. *Id.* She assessed and predicted market dynamics, opined on management credibility, forecasted earnings, and valued stocks. *Id.* She interviewed more than 500 management teams, participated in thousands of earnings conference calls, and attended hundreds of investor conferences. *Id.* As a sell-side analyst, Davisson performed industry research and in-depth analysis, wrote research reports, and modeled company financials to establish a price target and allow valuation comparisons between companies. *Id.* at 9. Davisson also spent ten years at large publicly traded manufacturing companies, where her job entailed understanding quarterly earnings forecasts and performing quarterly variance analyses used by investor relations departments. *Id.* She attended St. Louis University, earning Bachelor of Science in Business Administration and Master of Accounting degrees. *Id.* She was a certified public accountant in Arizona from 1994 to 2001. *Id.*

Davisson also served as the chief financial officer of the solar company PosiGen from 2014 to 2015. Doc. 528-1 at 7-8, 528-4 at 22. As a member of PosiGen's executive team, Davisson was heavily involved in each department, including the company's technology department. Doc. 528-4 at 23. Defendants note that PosiGen is a residential solar company, but do not explain why Davisson's position at PosiGen "did not provide her with any relevant expertise" in the industry. Doc. 528 at 11.

In moving to exclude Defendants' rebuttal expert, Dr. Varun Sivaram, Plaintiffs explain that Davisson's opinions about the state of the solar panel market and the challenges First Solar faced as a public company (see Doc. 528-1 at 11-29) are based on her expertise in financial analysis, including predicting market dynamics, evaluating management credibility, forecasting earnings, and valuing stocks. Docs. 472, 488 at 14. Plaintiffs concede that Davisson is not an expert on solar technology or manufacturing and

avow that she will offer no opinions on these topics.  Id. at 6, 14; *see* Doc. 528-3 at 7-8 (Davisson explaining that she does "not offer any technical opinions in this case").[5]

Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  "As the terms of the rule state, an expert may be qualified either by 'knowledge, skill, experience, training, or education.'" *Id.*  Davisson's substantial knowledge and experience as a securities analyst, coupled with her experience in manufacturing and her exposure to the solar industry, are sufficient to qualify her to opine about the role of securities analysts and the effect the allegedly concealed information had on analysts' ability to assess the true value of First Solar stock. *See* Doc. 528-1 at 7-11 (Davisson's qualifications and summary of opinions); *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("Given Caliri's significant knowledge of and experience within the insurance industry, the district court did not abuse its discretion in concluding that he was qualified to testify as an expert witness."); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613-EJD, 2015 WL 364796, at *2 (N.D. Cal. Jan. 27, 2015) (collecting cases where "testimony grounded on the expert's personal knowledge and experience was admissible in light of his background in the area"); *Donahoe v. Arpaio*, No. CV-10-02756-PHX-NVW, 2013 WL 12419625, at *2 (D. Ariz. Sept. 20, 2013) ("Like *Hangarter*, [the expert's] opinions rest on personal experiences derived from fifty-plus years involved directly and indirectly in law enforcement and the knowledge accumulated therefrom.").

Defendants specifically challenge Davisson's opinion that analysts would have wanted to know about the "inverse relationship between STBi and module efficiencies." Doc. 528 at 12-13 (quoting Doc. 528-1 at 11).  Davisson explained in her deposition that internal First Solar documents confirm such an inverse relationship.  Doc. 528-4 at 32; *see* Doc. 528-3 at 10, 19-20.  Defendants are free to disagree with this conclusion, but such disagreements do not render Davisson unqualified to offer opinions in this case. *See Alaska*

---

[5] The Court will hold Plaintiffs to their word, and is confident Defendants will object if Davisson crosses the line into technical aspects of the solar industry.

*Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (explaining that a judge should "not exclude opinions merely because they are impeachable").

### B. Davisson's Methodology.

Defendants contend that Davisson identifies no reliable methodology in reaching her opinions. Doc. 528 at 14. The Court does not agree.

Davisson approached her analysis in this case "in the same way that [she] would have approached First Solar if it were a company [she] covered as a Wall Street analyst." Doc. 528-1 at 10. Davisson describes her methodology as follows:

> I read the Company's public filings, earnings transcripts, analyst reports about the Company, and contextual analyses and information about the solar industry and the Company's competitors. In conducting my analysis, I also reviewed numerous internal documents produced by First Solar to plaintiffs in this case.

> I then analyzed the differences between the information about First Solar and the solar industry that was publicly available and the internal information about the Company and the solar industry that was not available to investors, analysts, or anyone in the public. I also conducted my own analyses of the public and nonpublic information.

*Id.*; *see* Doc. 528-4 at 8-9 (explaining that her methodology was based in part on her "experience as an equity analyst"). Davisson's opinions about information First Solar concealed from the market and the effect of the concealment on analysts' ability to fairly assess the value of First Solar stock are based on documents she reviewed, her independent analysis, and her knowledge and experience as a securities analyst. Doc. 528-1 at 10-11.

Plaintiffs have shown, by a preponderance of the evidence, that Davisson employed a reliable methodology in reaching her opinions. *See GSI Tech.*, 2015 WL 364796, at *2 ("Murphy relied on his industry experience to form an opinion. This methodology is proper, thus Murphy's opinion is admissible."); *Bixby v. KBR, Inc.*, No. 3:09-CV-632-PK, 2012 WL 12952722, at *4 (D. Or. Aug. 29, 2012) ("[W]hen experts employ established methods in their usual manner, a district court need not take issue under *Daubert*"); *Noyes v. Kelly Servs., Inc.*, No. 2:02-CV-2685-GEB-CMK, 2008 WL 782846, at *2 (E.D. Cal.

Mar. 21, 2008) ("[T]he methods described by [the expert] are sufficiently reliable to support his proffered opinions . . . and satisfy the requirement in Rule 703 that data upon which the expert relies be 'of a type reasonably relied upon by experts in the particular field.'").

Defendants assert that Davisson's opinions should be excluded because she uses no "scientific" method. Doc. 528 at 5; *see* Doc. 652 at 7 (Davisson "employs no testable or replicable methodology"). But the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to [non-scientific] testimony, whose reliability depends heavily on the knowledge and experience of the expert." *Hangarter*, 373 F.3d at 1017; *see* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Under Rule 702 and *Daubert*, expert testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted).

Defendants further assert that Davisson ignores a large amount of public information about First Solar that securities analysts would consult, selectively quotes from statements made by stock analysts, and relies on a small subset of documents produced in this litigation. Doc. 528 at 14-15. But unless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, "criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." *IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 4750129, at *9 (D. Ariz. Sept. 30, 2019). The Court finds that Davisson's opinions are based on a sufficient factual foundation to satisfy Rule 702(b). Defendants' factual arguments are appropriate subjects for cross-examination, rebuttal expert testimony, and jury argument, but they do not so undercut Davisson's opinions as to render them inadmissible under Rule 702. *See id.*; *In re Citimortgage, Inc. HAMP Litig.*, No. ML 11-2274 DSF, 2013 WL 8844095, at *3 (C.D.

Cal. Oct. 7, 2013) (expert's "failure to deal with the entire universe of documents is not a reason for exclusion").

## C. Whether Davisson's Testimony Will Confuse or Assist the Jury.

Defendants argue that Davisson's testimony will confuse the jury because a section of her report "is about 25% 'opinion' and 75% 'recitation of facts that she assumed[.]" Doc. 528 at 16 (citing Doc. 528-1 at 52-79). Defendants also cite portions of Davisson's deposition testimony for the proposition that she "has difficulty keeping 'facts' straight from the 'opinions[.]'" *Id.* at 16-17 (citing Doc. 528-4 at 13); *see* Doc. 652 at 11-12.

Davisson clearly sets forth the factual bases for her opinions in her report. *See* Doc. 528-1. The Court assumes she will do so in her testimony, and that Defendants will clarify on cross-examination any factual assumptions they believe are not actual opinions. The Court cannot conclude that the jury will be confused by Davisson's testimony.

## D. Legal Conclusions.

Defendants contend that Davisson impermissibly provides a legal conclusion by opining that the materiality test is satisfied in this case. Doc. 528 at 17. Defendants note that Davisson was asked to opine on "[w]hether and how the allegedly concealed information would have materially altered analysts' ability to assess the Company's value." *Id.* (quoting Doc. 528-1 at 7). Plaintiffs counter that Davisson offers no legal conclusions and that her opinions about the information analysts would consider informative to their valuations, and how Defendants' concealment of certain information impaired analysts' ability to fairly assess First Solar's value, are appropriate under Rule 702. Doc. 555 at 19-20.

The Ninth Circuit "has repeatedly affirmed that 'an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.'" *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (citations omitted). "This prohibition of opinion testimony on an ultimate issue of law recognizes that, 'when an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" *Id.*

(citation omitted; emphasis in original). But where "the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion." *Id.* at 1199.

Davisson offers the following opinions:

- The Company's concealment of the LPM manufacturing defect harmed analysts' ability to fairly assess the stock. Had analysts known about the LPM defect, it would have tarnished their opinion of the stock.

- The Company concealed the true scope of the LPM defect and as a result, the Company hindered analysts' ability to fairly assess the reported operational metrics, accurately forecast earnings, and assess the stock's value. Had analysts known, this information would have been negative to their views.

- The Company concealed the hot climate defect and as a result, the Company impaired analysts' ability to fairly assess operational metrics, accurately forecast earnings, and assess the stock's value. Had analysts been aware of the nature of this defect, their evaluation of the stock would have been less favorable.

- By reflecting the hot climate costs in guidance without disclosing the reason, the Company misled analysts about the risks of this new technology and prevented them from obtaining a clear picture of the Company's operational and financial results and prospects.

- Had analysts known of the inverse relationship between STBi and module efficiency, they would have been less reliant to [sic] base their ratings, estimates, and valuations on operational metrics reported by the Company.

- The change in the Company's warranty method masked module quality problems and did not allow analysts to be informed of the product's risks to First Solar.

Doc. 528-1 at 10-11.

These opinions do not attempt to instruct the jury on a legal test for materiality or apply any such test to the facts of the case. The Court cannot conclude that Davisson offers an opinion on an ultimate issue of law. *See Diaz*, 876 F.3d at 1199 (deeming expert

- 10 -

testimony admissible because it operated to assist the jury, was based on a review of relevant facts, used legal terms in their ordinary, everyday sense, and did not substitute the expert's opinion for that of the jury); *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, No. 15-CV-02383-RS, 2018 WL 5013580, at *3 (N.D. Cal. Oct. 16, 2018) (allowing the expert to testify where he "did not substitute his judgment for the jury's, but instead provide[d] his professional opinion about whether PG&E's conduct acted in conformance with its understanding of the Gas Rules"). Defendants may object at trial if they believe Davisson crosses the line into inadmissible legal conclusions.

Defendants' motion to exclude Davisson's testimony (Docs. 528, 631) is **denied**.

## IV. Plaintiffs' Motion to Exclude Dr. Marietta-Westberg's Testimony (Docs. 470, 486).

Defendants offer Dr. Jennifer Marietta-Westberg, a former SEC official and finance expert, to rebut Davisson's opinions. Plaintiffs move to exclude Marietta-Westberg's testimony about Defendants' risk warnings. Docs. 470 (lodged), 486 (public). Plaintiffs assert that she simply copied and pasted into her report various risk warnings from First Solar's 10-K forms. Doc. 470 at 2. Plaintiffs contend that this is improper because Dr. Marietta-Westberg "does not analyze the risk warnings, does not opine that they were sufficient, and does not opine that they revealed the existence of the two alleged defects that will be the subject of the trial." *Id.*

The Court does not agree that Dr. Marietta-Westberg simply parrots Defendants' risk warnings without any expert opinion. She responds to Ms. Davisson's opinions by opining that securities analysts rely on the "total mix" of information available to the market, and that the total mix in this case included information about First Solar's risks, including risks of solar technology and the performance of its products. Doc. 470-1 at 7. She opines that "Davisson fails to acknowledge the total mix of information available to the market before and during the Class Period and instead focuses on certain company information to the exclusion of other information." *Id.* at 7.

The section of her report challenged by Plaintiffs (§ VII) identifies specific risk disclosures that were part of the "total mix" of information available to analysts. *Id.* at 14-20. She sets forth those disclosures in some detail. *Id.* This evidence is fair rebuttal to Ms. Davisson's opinions about how analysts would have reacted to the information she chooses to highlight. The fact that the "existence and substance of [the] risk warnings is not in dispute" (Doc. 470 at 3) does preclude Dr. Marietta-Westberg from using them to rebut Davisson's opinion about the market effects of certain nondisclosures.

Contrary to Plaintiffs' assertion, Dr. Marietta-Westberg's discussion of the risk warnings is not impermissible "conduit testimony." *Id.* at 4-5. The cases Plaintiffs cite are inapposite. *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 547 (C.D. Cal. 2012) (an expert may not "circumvent the rules of hearsay by testifying to the opinions of other experts"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (excluding an expert because he was acting as a "conduit for the opinion of an unproduced expert").

Plaintiffs' motion to exclude Dr. Marietta-Westberg's testimony (Docs. 470, 486) is **denied**.

## V. Plaintiffs' Motion to Exclude Dr. Sivaram's Testimony (Docs. 472, 488).

Defendants retained Dr. Varun Sivaram to opine on solar technology, including the manufacturing processes and performance of thin-film solar modules, and to respond to certain issues raised in Davisson's report. Doc. 472-1 at 5. Dr. Sivaram offers three primary opinions: (1) "It would have been extremely difficult for thin-film manufacturers to have perfectly predicted how thin-film modules would perform in the field during the Class Period"; (2) "It would have been extremely difficult and costly to find deficient or nonperforming modules once they had been deployed in the field during the Class Period"; and (3) "Reliability problems have been common across module manufacturers as the solar [photovoltaic] industry has scaled up rapidly over the last two decades." *Id.* at 6.

Plaintiffs do not dispute that Dr. Sivaram's academic background and experience as a solar engineer qualify him to offer opinions on solar technology. They instead move to

exclude his opinions because they are irrelevant to any issue of disputed fact and will not assist the jury.  Docs. 472 (lodged), 488 (public).

The Court cannot conclude that Dr. Sivaram's first opinion – that it would have been extremely difficult for thin-film manufacturers to have perfectly predicted how thin film modules would perform in the field during the Class Period – is irrelevant.  Plaintiffs argue that they will rely on what Defendants actually knew as shown by Defendants' own internal documents, and that general industry knowledge is therefore irrelevant.  But Defendants assert that the picture was not as clear as Plaintiffs suggest, and that the highly technical nature of the issues must be understood to realize why Plaintiffs' narrative of what Defendants knew is inaccurate.  Defendants certainly are not required to adopt Plaintiffs' interpretation of the internal documents.  What thin-film manufacturers could have known about matters addressed in Plaintiffs' planned exhibits is relevant to the jury's assessment of what Defendants knew, should have known, and intended.

Dr. Sivaram's second opinion – that it was extremely difficult and costly for First Solar to find deficient or nonperforming modules – is relevant to when Defendants should have understood the magnitude of its module problems, a key issue in the jury's evaluation of when Defendants should have made disclosures and what they reasonably understood on the dates Plaintiffs have identified as key points of nondisclosure.  Plaintiffs allege that Defendants repeatedly misrepresented the true scope of the manufacturing defect by disclosing that less than four percent of modules were affected by the defect.  Dr. Sivaram's opinion that it was difficult to identify non-performing modules in the field is relevant to this issue.

The third opinion – that reliability problems were common in the photovoltaic solar industry – is relevant to the jury's evaluation of the alleged nondisclosures' effect on the market for First Solar stock.  The jury must decide how a reasonable investor would have responded to disclosures or nondisclosures of reliability problems, and an accurate understanding of the industry is relevant to this decision.

In short, Dr. Sivaram is qualified to opine on the solar industry issues he addresses, and the Court cannot conclude that his proposed opinions are irrelevant or unfairly prejudicial. The Court will rule on objections at trial, when the context and relevancy of evidence is better understood.

Plaintiffs contend that Dr. Sivaram's opinions are not based on a reliable methodology because he cites a study published two years after the Class Period. Doc. 472 at 8 (citing Doc. 472-1 at 24-25 & n.33). Defendants counter that the study at issue – a 2014 report titled "Review of Failures of Photovoltaic Modules" – relates directly to module degradation during the Class Period and analyzed more than 300 thin-film solar projects between 2006 and 2013. Doc. 621 at 11-12. Defendants also note, correctly, that Plaintiffs cite no authority requiring experts to rely only on academic literature published before or during the Class Period. The Court cannot conclude that Dr. Sivaram's reliance on the 2014 study renders his opinions unreliable.

Plaintiffs contend that Dr. Sivaram's testimony is unreliable because he "parrots" Defendants' claim that the manufacturing defect impacted approximately 450,000 modules. Doc. 472 at 9. Dr. Sivaram makes clear that the 450,000 figure represents his understanding of the facts based on information provided by Defendants. Doc. 472-1 at 31 & n.47. Rule 703 "specifically provides that '[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of[,]'" and "nothing requires that an expert conduct independent [verification] in every case." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 363 (N.D. Cal. 2018). Plaintiffs' challenges to factual information on which Dr. Sivaram relies (Doc. 472 at 9-13) do not render his opinions inadmissible under Rule 702.

Plaintiffs also contend that Dr. Sivaram exceeds the scope of proper expert testimony in opining about Defendants' "knowledge and state of mind" during the Class Period. Doc. 472 at 9. Plaintiffs challenge two statements in Dr. Sivaram's report: (1) "[t]he manufacturing excursion is a paradigmatic example of an unforeseen reliability defect that was born of the desire to increase module efficiency," and (2) "given the

scientific uncertainty regarding the annealing process, First Solar could not have known without the benefit of hindsight that a random 2% deviation in FR 421's ideal temperature profile would cause the module reliability problems associated with the LPM issue." *Id.* (quoting Doc. 472-1 at 30-31). Defendants respond that "[n]either statement constitutes commentary on Defendants' intent or state of mind." Doc. 621 at 13. Without hearing the statements in the context of Dr. Sivaram's broader testimony, the Court cannot conclude that these statements constitute impermissible "opinions on [First Solar's] intent, state of mind, or motivations[.]" *Tillman v. C. R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015). Plaintiffs may object at trial if they believe Dr. Sivaram is offering any such opinions.

Dr. Sivaram opines that "Davisson cannot and does not opine with any authority" on the "state of the solar panel market and the challenges First Solar faced during the Class Period." Doc. 472-1 at 40. Plaintiffs contend that this opinion is misplaced because Davisson is not a solar industry expert. Doc. 472 at 13. The Court will be better equipped to rule on this issue after Davisson has testified and when Sivaram appears as a rebuttal witness. Plaintiffs may object if they believe Dr. Sivaram's criticism of Davisson's opinions is not proper rebuttal testimony.

Plaintiffs claim that Dr. Sivaram's "narrative history" of the solar industry and First Solar's product development efforts is irrelevant and will waste time and confuse the jury. Doc. 472 at 16-17. These are matters that must be decided at trial. *See* Doc. 661 at 13-14.

Plaintiffs' motion to exclude Dr. Sivaram's testimony (Docs. 472, 488) is **denied**.

## VI.     Defendants' Motion to Exclude Regan's Testimony (Docs. 538, 634).

Plaintiffs retained D. Paul Regan, a certified public accountant, to opine about whether First Solar complied with Generally Accepted Accounting Principles ("GAAP"), SEC disclosure rules, and MD&A principles when accounting for and disclosing the LPM and heat degradation issues. Doc. 538-1 at 7.[6] Defendants move to exclude Regan's

---

[6] MD&A is shorthand for "[m]anagement's discussion and analysis of financial condition and results of operations." 17 C.F.R. § 229.303. An MD&A is a narrative explanation of a company's "financial condition, changes in financial condition and results

opinions about SEC disclosure rules, MD&A, and First Solar's warranty obligations. Docs. 538 (lodged), 634 (public).

**A.    SEC Disclosure Rules and MD&A.**

Defendants argue that Regan is not qualified to opine on SEC disclosure rules in general and MD&A in particular.  Doc. 538 at 6-7, 11; *see, e.g.*, Doc. 538-1 ¶¶ 27-34, 101-05, 144, 159, 181, 187, 190, 195 (various SEC disclosure rules and MD&A opinions). Defendants further argue that Regan's opinions about alleged violations of MD&A disclosure requirements are irrelevant to Plaintiff's § 10(b) and Rule 10b-5 claims, and that his MD&A opinions are unreliable because they simply mirror his conclusions about GAAP with no additional analysis.  Doc. 538 at 9-13; *see* Doc. 538-4 at 6-8 (deposition testimony discussing GAAP and MD&A analyses).

Plaintiffs' response devotes several pages to defending Regan's accounting qualification – which Defendants do not challenge – and then states: "plaintiffs do not intend to elicit testimony regarding the requirements of MD&A or whether defendants complied with those requirements from Mr. Regan at trial."  Doc. 553 at 3 n.3.  Pages of briefing and reading could have been saved if Plaintiffs had made this point clearly at the outset.  The Court will grant Defendants' motion in this regard and preclude Regan from testifying at trial about SEC disclosure rules and MD&A.[7]

**B.    First Solar's Warranty Obligations.**

Defendants seek to preclude Regan from providing two legal opinions, one on statutory warranties under the European Union and the other on implied warranties. Doc. 538 at 15.  Plaintiffs counter that Regan offers no opinion concerning the legal obligations stemming from statutory and implied warranties, but instead opines on accounting obligations resulting from First Solar's "existing practices," as required by GAAP.  Doc. 553 at 13.

---

of operations" that the SEC requires in certain public filings pursuant to Item 303 of Regulation S-K.  *Id.*

[7] Given this ruling, Defendants no longer need to call their SEC disclosure rules expert, John J. Huber.  *See id.*; Doc. 538 at 5-6.

Regan discusses GAAP requirements related to warranty obligations in Section II of his report. Doc. 538-1 at 10-13. He explains that First Solar was required to account for known events even if uncertainty existed about the ultimate expense needed to resolve the issue, and that GAAP defines this situation as a "loss contingency." *Id.* at 10, ¶ 20. He further explains that Accounting Standards Codification ("ASC") 450 "addresses the accounting for loss contingencies such as an adverse outcome arising from warranty obligations," and that GAAP specifies three loss contingency thresholds – remote, reasonably possible, and probable – which dictate the accounting method to be applied under GAAP. *Id.*, ¶ 21. These are appropriate accounting opinions within Regan's expertise.

Regan addresses First Solar's warranties in Section III of his report. *Id.* at 16-19. Defendants do not challenge Regan's discussion of First Solar's express warranty. *See id.*, ¶¶ 36-38 (§ III(B)). Defendants instead contend that Regan offers impermissible legal opinions in the following sections of his report:

> 39. In addition, First Solar was obligated to replace modules installed in the European Union ("EU") that degraded more than 5% from the label within 2 years. This threshold also limited First Solar's ability to re-distribute returned modules.
>
> 40. The EU statutory provision was a significant financial statement risk to First Solar since its EU volumes shipped were 542MW, 1,000MW, and 551MW (a total of 2,093MW or approximately 28,000,000 modules) for the second half of 2009, the full year of 2010 and the first half of 2011 respectively. This represented 87%, 75% and 66% of First Solar's total shipments for those time periods, respectively.
>
> 41. With respect to whether a warranty obligation is probable or reasonably possible, GAAP [is] guided by ". . . whether as a matter of contract or as a matter of existing practice . . ." product will be returned. As a consequence, even if under the terms of the contract First Solar's customer did not have the right to return the modules at issue (for example, if the modules had not yet failed under the terms of the warranty), but, given the circumstances, it was likely that First Solar would accept the return of such modules, a contingent liability under ASC 450-20-25-2(a) was in place.

42. Here, First Solar represented to customers that the degradation rate was approximately (0.5)% per year in temperate climates and (0.7)% to (0.8)% per year in hot climates. During the Class Period, customers expected performance based on First Solar's degradation guidance[.]

43. The implied warranty obligations were particularly relevant as First Solar considered remediation actions to mitigate reputation risk associated with low power modules.

*Id.* at 18-19 (footnotes omitted).

Regan clearly reaches a legal conclusion about the alleged statutory warranty: "First Solar *was obligated* to replace modules installed in the European Union ("EU") that degraded more than 5% from the label within 2 years." Doc. 538-1 at 18, ¶ 39 (emphasis added). Regan is not qualified to render this legal opinion. *See* Doc. 538-4 at 10 (Regan acknowledging that he is not a legal expert); Doc. 553 at 11 ("Regan is an accounting expert."); *see also de Fontbrune v. Wofsy*, 838 F.3d 992, 997 (9th Cir. 2016) ("[T]he testimony of foreign legal experts, together with extracts of foreign legal materials, 'has been and will likely continue to be the basic mode' of determining foreign law.") (citation omitted). Regan will be precluded from offering this legal opinion at trial.

Plaintiffs assert that Regan does not opine on the legal requirements arising from an implied warranty, but instead analyzes evidence showing that it was Defendants' practice to replace modules that did not yet breach the express warranty under what they called an "implied warranty." Doc. 553 at 12-13 (citing Doc. 538-1 at 18, ¶ 41). But Regan concludes that First Solar's practice of replacing modules that did not yet breach the express warranty created "implied warranty obligations." Doc. 538-1 at 19, ¶ 43. Because Regan is not qualified to reach a legal opinion on the existence of implied warranties, he is precluded from offering such an opinion at trial. *See In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2011 WL 5827198, at *3 (S.D. Cal. Nov. 17, 2011) ("[T]o the extent that Mr. Regan opines on the question of whether the contracts at issue allowed Defendants to ship products to customers in the manner they did, the Court finds such opinions to be improper legal conclusions[.]").

These are fine lines, and the Court wants to be clear. Regan may not testify that First Solar had a statutory warranty obligation or an implied warranty obligation. But he may testify about the GAAP implications of First Solar's express warranties (which Defendants do not challenge), its actual practice of replacing modules that did not yet breach express warranties, or its own internal conclusions about potential statutory or implied warranties if those internal conclusions are clear from documents or testimony. *See* Doc. 553 at 11-12; *see also In re Novatel*, 2011 WL 5827198, at *3. Defendants may object if they believe Regan crosses the line into impermissible legal conclusions.

Defendants' motion to exclude Regan's testimony (Docs. 538, 634) is **granted in part and denied in part** as set forth above.

**VII.    Plaintiffs' Motion to Exclude Reicher's Testimony (Docs. 471, 487).**

Defendants retained Dan Reicher, an expert in the renewable energy industry, to opine on whether and how macroeconomic and industry factors affected the solar industry during the Class Period. Doc. 471-1 at 4-5. Reicher offers five primary opinions about events during the Class Period: (1) unprecedented growth in China's solar manufacturing sector eroded the market share of its non-Chinese competitors; (2) United States solar manufacturers were negatively affected by the dumping of silicon photovoltaic modules; (3) United States solar manufacturers were negatively affected by the reduction in European feed-in tariffs and other financial subsidies for Chinese solar manufacturers; (4) United States solar manufacturers were negatively affected by tightening of credit markets that were central to the solar boom in the first decade of the 2000s; and (5) the combined effects of these macroeconomic factors created a perfect storm that significantly weakened the United States solar industry. *Id.* at 6-7. Plaintiffs move to preclude Reicher from offering these opinions and any opinions regarding First Solar and other solar companies' stock prices. Docs. 471 (lodged), 487 (public). Plaintiffs contend that Reicher's opinions are not relevant to any issue in the case, are not based on a reliable methodology, and are cumulative of other expert opinions. *Id.* at 7-19.

Plaintiffs assert that Reicher's opinions are not relevant to any issue with "the possible exception being the element of loss causation." *Id.* at 8; *see id.* at 11-13. The Court denied Plaintiffs' motion in limine to preclude Defendants from offering evidence, argument, or opinions related to China's participation in the solar energy industry because "[t]he effect of Chinese competition on First Solar's business, market share, and stock price is relevant to loss causation – whether the stock price drops identified by Plaintiffs were due to Defendants' fraud or other market forces." Doc. 661 at 8. This reasoning applies to Reicher's primary opinions because each addresses whether, and how, macroeconomic and industry factors affected the solar industry during the Class Period. *See* Docs. 471-1 at 4-5, 620 at 13. Loss causation is a "'context-dependent' inquiry," and Reicher's primary opinions provide relevant context for the jury to consider in deciding what caused Plaintiffs' identified drops in First Solar stock. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) ("Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.") (citation omitted). The Court will not exclude Reicher's five primary opinions on relevancy grounds.

Plaintiffs contend that Reicher's opinions should be excluded because he employed no reliable method in forming them. Doc. 471 at 8-14. This argument is unfounded to the extent Reichert relied on his unique knowledge of and experience in the solar industry to formulate his five primary opinions about macroeconomic forces during the Class Period. *See Hangarter*, 373 F.3d at 1016-17; *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1075 (D. Or. 2013) ("Assessing the reliability of expert testimony based on specialized knowledge, unlike scientific or technical expert testimony, is not contingent upon a particular methodology or technical framework."); *Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 WL 8742757, at *4-5 (N.D. Cal. Dec. 21, 2010) (finding opinions about the video game industry admissible because they had "a reliable basis in the expert's knowledge and experience of the relevant field").

Plaintiffs have a point, however, with respect to any opinions Reicher might offer on variations in First Solar stock prices. Reicher analyzed no First Solar documents or data, including information about First Solar's financial condition or stock price variations. *See* Doc. 471-2 at 42 ("analyzing the economics of First Solar specifically was outside of the scope of my work"); *id*. at 44 ("The scope of my work did not include . . . First Solar's economic and financial situation."). And he did not examine the extent to which market forces affected any particular company's stock price, or whether market forces affected the stock price of First Solar during the Class Period. *Id.* at 14. Defendants explain that Reicher "did not analyze specific First Solar facts because that is not the purpose of his testimony; that material would not inform his analysis." Doc. 620 at 16.

Defendants also suggest, however, that Reicher will testify about movements in First Solar stock prices "in the context of the impacts on the industry overall." *Id.* at 16-17 n.6; *see id.* at 13. Reicher may testify, as stated in his deposition, "that the stock price[s] of solar companies are one of the manifestations of a declining market, the declining value of the stock." Doc. 471-2 at 14. This opinion is reasonably based on his knowledge and experience in the solar industry. But Defendants have not shown by a preponderance of the evidence that Reicher opinions on specific variations in First Solar stock prices would be based on sufficient facts and data when he made no First-Solar-specific study. As a result, Reicher may testify about his five primary opinions with respect to the solar industry, and may opine generally about the effects market forces had on solar companies and the value of their stock, but he may not offer opinions about movements in First Solar stock prices.

Plaintiffs seek to preclude Reicher and two other defense experts, Dr. Sivaram and Allan Kleidon, from presenting cumulative testimony. Doc. 471 at 17-18. The Court's Scheduling Order states: "Each side shall be limited to one retained or specially employed expert witness per issue." Doc. 438 at 1 n.1. The Court will not permit overlapping and duplicative expert testimony at trial. The Court cannot conclude at this time, however, that any particular testimony should be excluded. Defendants assert that the three experts have

different expertise and will testify on separate topics. Doc. 620 at 20-21. This issue may be addressed, if necessary, when the experts testify at trial.

Plaintiffs also seek to preclude Reicher from providing a narrative of events before and after the Class Period. Doc. 471 at 19. No expert will be permitted to engage in lengthy factual narratives that are not necessary to the jury's understanding of their opinions. The Court will seek to strike the proper balance at trial between allowing experts to provide some background information and reasonably explain their opinions in a manner helpful to the jury, and avoiding unnecessary factual narratives. More detailed rulings are not possible at this time. *See* Doc. 661 at 9; *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6554163, at *3 (D. Ariz. Dec. 22, 2017).

Plaintiffs' motion to exclude Reicher's testimony (Docs. 471, 487) is **granted in part and denied in part** as set forth above.

**VIII. Defendants' Motion to Exclude Dr. Branz's Testimony (Docs. 524, 630).**

Plaintiffs retained Dr. Howard Branz, a solar technology expert, to rebut opinions offered by Dr. William Holder, Defendants' accounting expert. Doc. 524-1. Defendants argue that this testimony should be excluded because it is improper rebuttal evidence. They assert that the focus of Dr. Branz's testimony is on fundamental engineering issues that should have been addressed in an initial expert report, that the testimony does not relate to the same subject matter as Dr. Holder's testimony and therefore is not proper rebuttal evidence under Federal Rule of Evidence 26(a)(2)(D)(ii), and that permitting Dr. Branz to provide his late-disclosed engineering opinions would prejudice Defendants and deprive them of a fair opportunity to provide rebuttal evidence. Docs. 524 (lodged), 630 (public).[8]

The Court must resolve this issue at trial. Whether Dr. Branz's testimony constitutes proper rebuttal of Dr. Holder's testimony depends on what Dr. Holder says at trial. Until that testimony is given, the Court cannot determine whether the Dr. Branz's testimony is

---

[8] Dr. Branz also provides rebuttal opinions in response to the testimony of Dr. Sivaram, but Defendants do not challenge those opinions. *See id.* at 4.

proper rebuttal. The Court therefore will deny Defendants' motion and resolve this issue at trial, but with the following observations and conclusions.

First, "challenging the assumptions of an expert witness' report is a permissible topic of rebuttal testimony." *Pinterest, Inc. v. Pintrips, Inc.*, No. 13-CV-04608-HSG, 2015 WL 2268498, at *1 (N.D. Cal. May 14, 2015); *see Space Data Corp. v. Alphabet Inc.*, No. 16-CV-03260-BLF, 2019 WL 2603285, at *3 (N.D. Cal. June 25, 2019) (same). "Rebuttal experts are not required to generate independent conclusions, based on data, which arrive at a different outcome than the experts they are rebutting. Instead, 'questioning methodology, and opining on methods and facts [the initial] experts did not consider are precisely the type of rebuttal testimony [that] court[s] would expect.'" *Sinclair Wyo. Ref. Co. v. Infrassure Ltd*, No. 15-CV-194-F, 2017 WL 11094221, at *3 (D. Wyo. May 19, 2017) (quoting *Laflamme v. Safeway, Inc.*, No. 3:09-CV-00514, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010)); *Space Data*, 2019 WL 2603285, at *3 ("Dr. Hansman's rebuttal report that addresses specific assertions and assumptions in Dr. Meyer's report . . . is permissible."); *Sinclair*, 2017 WL 11094221, at *3 (expert offered proper rebuttal testimony where he took "known information about the technique [the initial expert] relied on and highlight[ed] how the methodology is susceptible to inaccuracy or manipulation based on choices about what data to input into the model"); *Laflamme*, 2010 WL 3522378, at *3 (an expert who "evaluated the loss calculations provided by plaintiffs' expert economist . . . by questioning [his] assumed wage growth rates and his discount rate" could testify as a rebuttal expert without providing an independent loss calculation); *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 CV 1851(NGG), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) (the expert offered "archetypal rebuttal testimony [because he] identifie[d] a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise"); *Armstrong v. I-Behavior Inc.*, No. 11-CV-03340-WJM-BNB, 2013 WL 2419794, at *4 (D. Colo. June 3, 2013) ("[T]he Court does not cabin the meaning of the 'same subject matter' to mean that a rebuttal witness must meet an affirmative expert report with the same methodology.").

Second, a party cannot make an end-run around expert disclosure obligations by withholding initial expert opinions until rebuttal disclosures. The Court's Scheduling Order stated that "[r]ebuttal reports shall be limited to responding to opinions stated by initial experts." Doc. 438, ¶ 5. And Rule 26 identifies rebuttal expert testimony as evidence "intended *solely* to contradict or rebut evidence on the same subject matter identified by another party[.]" Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). If the Court concludes that Dr. Branz's opinions actually are directed at the analysis and conclusions of Defendants during key periods in this case, rather than Dr. Holder's opinions, the evidence will be excluded if Defendants make a timely objection.[9]

Third, Dr. Branz will not be excluded because he is not an accountant. "There is no requirement that a rebuttal witness's area of expertise match the area of expertise of the opposing party's initial expert." *Northrup v. Werner Enter., Inc.*, No. 8:14-CV-1627-T-27JSS, 2015 WL 4756947, at *3 (M.D. Fla. Aug. 11, 2015). "[N]othing in the Rules or case law prohibits" a party from "strategically decid[ing] to rebut economic and accounting expert testimony with practical expertise in engineering." *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 178 (N.D.N.Y. 2002).

Fourth, Defendants claim that the vast majority of Dr. Branz's report is unnecessary because Plaintiffs already have an accounting expert, Dr. Regan, to rebut Dr. Holder. Doc. 524 at 15. But Dr. Regan addresses Dr. Holder's accounting opinions, while Dr. Branz explains why the scientific evidence on which Dr. Holder relies and the technical conclusions he draws are not reliable. Doc. 554 at 22. The Court will not exclude Dr. Branz because he addresses the same expert testimony as Dr. Regan, but the Court will not permit duplicate expert testimony. Doc. 438 at 1 n.1 (limiting each side to one expert "per issue").

---

[9] The Court cannot accept Defendants' suggestion that Plaintiffs failed to file a *Daubert* motion on technical and engineering opinions in Dr. Holder's testimony and therefore are somehow limited in objecting to or rebutting such opinions. Plaintiffs may still object at trial if they believe Dr. Holder's opinions exceed his area of expertise. And if Defendants choose to elicit such technical or engineering opinions from Dr. Holder and they are not objected to, or are admitted over an objection, the opinions will have been presented to the jury and Plaintiffs can seek to rebut them through Dr. Branz.

Finally, Defendants assert that Plaintiffs' intend to call Dr. Branz in their case in chief. Doc. 524 at 5, 12-13. This would not be proper. *See Bernal v. Daewoo Motor Am., Inc.*, No. CV09-1502-PHX-DGC, 2011 WL 13183093, at *2 (D. Ariz. Aug. 31, 2011); *Alsadi v. Intel Corp.*, No. CV-16-03738-PHX-DGC, 2019 WL 4849482, at *12 (D. Ariz. Sept. 30, 2019). Plaintiffs may call Dr. Branz after Dr. Holder has testified. This will be consistent with his disclosure as a rebuttal expert, and will enable the Court to rule on whether any of his testimony is improper rebuttal testimony.

Defendants' motion to exclude Dr. Branz's testimony (Docs. 524, 630) is **denied** with the clarifying conclusions set forth above.

Dated this 17th day of December, 2019.

David G. Campbell
Senior United States District Judge