ROBBINS GELLER RUDMAN & DOWD LLP
Daniel S. Drosman (CA SBN 200643) (Admitted *pro hac vice*)
Luke O. Brooks (CA SBN 212802) (Admitted *pro hac vice*)
Ellen Gusikoff Stewart (CA SBN 144892) (Admitted *pro hac vice*)
Jessica T. Shinnefield (CA SBN 234432) (Admitted *pro hac vice*)
Darryl J. Alvarado (CA SBN 253213) (Admitted *pro hac vice*)
Christopher D. Stewart (CA SBN 270448) (Admitted *pro hac vice*)
Hillary B. Stakem (CA SBN 286152) (Admitted *pro hac vice*)
J. Marco Janoski Gray (CA SBN 306547) (Admitted *pro hac vice*)
Ting H. Liu (CA SBN 307747) (Admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
lukeb@rgrdlaw.com
elleng@rgrdlaw.com
jshinnefield@rgrdlaw.com
dalvarado@rgrdlaw.com
cstewart@rgrdlaw.com
hstakem@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, Individually and on Behalf of All Others Similarly Situated, <br><br>         Plaintiff, <br><br>    vs. <br><br> First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn and David Eaglesham, <br><br>         Defendants. | No. 2:12-cv-00555-DGC <br><br> CLASS ACTION <br><br> LEAD COUNSEL'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AN AWARD OF ATTORNEYS' FEES, EXPENSES, AND AWARD TO LEAD PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) |

4832-5158-2904.v1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................... 1

II. HISTORY OF THE LITIGATION ........................................................... 3

III. THE REQUESTED FEE IS FAIR AND REASONABLE ...................................... 3

    A. The Court Should Award Attorneys' Fees Using the Percentage-of-the-Fund Method ....................................................... 3

    B. Factors Considered by Courts in the Ninth Circuit Support Approval of an 18.83% Fee in This Case .................................................... 6

        1. Lead Counsel Achieved an Excellent Result for the Class ............... 6

        2. The Litigation was Highly Risky and Complex ............................ 7

        3. The Skill Required and Quality of Work ................................... 10

        4. The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel ..................................................... 10

        5. The 18.83% Fee Award Is Well Within the Range Awarded in Similar Complex, Contingent Litigation ................................ 11

        6. The Class' Reaction to Date Supports the Fee Request ................. 12

        7. The Requested Fee Is Reasonable Under a Lodestar Cross-Check Analysis ............................................................... 13

IV. COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE APPROVED ............................................................................... 13

V. COUNSEL'S AWARDED FEES AND EXPENSES SHOULD BE PAID UPON THE COURT'S ORDER GRANTING THE AWARD ......................... 15

VI. LEAD PLAINTIFFS' REQUEST FOR AN AWARD PURSUANT TO 15 U.S.C. §78u-4(a)(4) IS REASONABLE ............................................... 16

VII. CONCLUSION ............................................................................ 17

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.,*
    572 F.3d 221 (5th Cir. 2009) ............................................................. 7

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980).......................................................................... 3

*Brown v. Hain Celestial Grp. Inc.,*
    2016 WL 631880 (N.D. Cal. Feb. 17, 2016) .................................. 15

*Cheng Jiangchen v. Rentech, Inc.,*
    2019 WL 5173771 (C.D. Cal. Oct. 10, 2019).................................. 9

*Dusek v. Mattel,*
    2003 WL 27380801 (C.D. Cal. Sept. 29, 2003) ............................ 17

*Dusek v. Mattel, Inc.,*
    2003 WL 27380800 (C.D. Cal. Sept. 29, 2003) ............................ 12

*Hatamian v. Advanced Micro Devices, Inc.,*
    2018 WL 8950656 (N.D. Cal. Mar. 2, 2018)................................... 5

*HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.,*
    2010 WL 4156342 (S.D. Cal. Oct. 15, 2010) ................................ 13

*Hefler v. Wells Fargo & Co.,*
    2018 WL 6619983 (N.D. Cal. Dec. 18, 2018),
    *aff'd,* 2020 WL 1910732 (9th Cir. Apr. 20, 2020) ....................... 6, 7, 11, 12

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)........................................................................... 6

*In re Allergan, Inc. Proxy Violation Sec. Litig.,*
    No. 8:14-cv-02004-DOC-KES, slip op. (C.D. Cal. Aug. 14, 2018)............... 12, 13, 17

*In re Amkor Tech., Inc. Sec. Litig.,*
    2009 WL 10708030 (D. Ariz. Nov. 19, 2009).......................................... 4, 9

*In re Apollo Grp. Secs. Litig.,*
    2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008)............................... 9, 12

*In re Broadcom Corp. Sec. Litig.,*
    2005 WL 8153006 (C.D. Cal. Sept. 12, 2005) ..................................... 12, 13

Page

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001) ............................................................. 5

*In re JDS Uniphase Corp. Sec. Litig.*,
    2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) ........................................ 11

*In re Korean Air Lines Co.*, *Antitrust Litig.*,
    2013 WL 7985367 (C.D. Cal. Dec. 23, 2013) ........................................ 4

*In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg.*,
*Sales Practices & Prod. Liab. Litig.*,
    952 F.3d 471 (4th Cir. 2020) ........................................................... 16

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
    768 Fed. Appx. 651 (9th Cir. 2019) ............................................ 3, 13

*In re Omnivision Tech., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................... 4, 7, 13

*In re Optical Disk Drive Prod. Antitrust Litig.*,
    2016 WL 7364803 (N.D. Cal. Dec. 19, 2016) ...................................... 15

*In re Oracle Corp. Sec. Litig.*,
    2009 WL 1709050 (N.D. Cal. June 19, 2009),
    *aff'd*, 627 F.3d 376 (9th Cir. 2010) .............................................. 11

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ............................................................. 7

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) ............................................................. 4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 7575004 (N.D. Cal. Dec. 27, 2011) ...................................... 15

*In re Verifone Holdings, Inc. Secs. Litig.*,
    2014 WL 12646027 (N.D. Cal. Feb. 18, 2014) ...................................... 15

*In re Washington Mut., Inc. Sec. Litig.*,
    2011 WL 8190466 (W.D. Wash. Nov. 4, 2011) ...................................... 12

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ........................................................... 11

4832-5158-2904.v1

Page

*In re: Whirlpool Corp. Front-loading Washer Prods. Liab. Litig.*,
   2016 WL 5338012 (N.D. Ohio Sept. 23, 2016)........................................ 16

*Knight v. Red Door Salons, Inc.*,
   2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ............................................. 14

*Mauss v. NuVasive, Inc.*,
   2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ........................................... 15

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C. D. Cal. 2004)........................................................... 12

*Pelzer v. Vassalle*,
   655 F. App'x 352 (6th Cir. 2016) ........................................................... 15

*Stanger v. China Elec. Motor, Inc.*,
   812 F.3d 734 (9th Cir. 2016) ........................................................... 4, 11

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ................................................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................. 4

*Vincent v. Hughes Air West, Inc.*,
   557 F.2d 759 (9th Cir. 1977) ................................................................... 3

*Vincent v. Reser*,
   2013 WL 621865 (N.D. Cal. Feb. 19, 2013) ........................................... 14

*Vinh Nguyen v. Radient Pharm. Corp.*,
   2014 WL 1802293 (C.D. Cal. May 6, 2014) ......................................... 5, 9

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ......................................................... *passim*

*Wing v. Asarco, Inc.*,
   114 F.3d 986 (9th Cir. 1997) ................................................................. 10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78u-4(a)(4) ..................................................................................... 16, 17
   §78u-4(a)(6) ........................................................................................... 4

- iv -

Page

Federal Rules of Civil Procedure
    Rule 23 ............................................................................................................. 16
    Rule 23(b)(3).......................................................................................................... 8

**SECONDARY AUTHORITIES**

Charles Silver,
*Due Process and the Lodestar Method: You Can't Get There*
*from Here* (June 2000)
    74 Tul. L. Rev. 1809.............................................................................................. 5

Janeen McIntosh and Svetlana Starykh,
*Recent Trends in Securities Class Action Litigation:*
*2019 Full-Year Review*
    (NERA Jan. 21, 2020) ..................................................................................... 6, 11

Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons,
*Securities Class Action Settlements – 2018 Review and Analysis*
(Cornerstone Research 2019)
    Appendix 3 ........................................................................................................... 6

Richard Posner,
*Economic Analysis of Law* (3d ed. 1986)
    §21.9.................................................................................................................. 11

## I.      INTRODUCTION

After more than seven years of hard-fought litigation, and on the eve of trial, Lead Counsel secured a cash settlement of $350,000,000 on behalf of the Class (the "Settlement"). The Settlement is the fifth largest PSLRA securities class action settlement ever obtained in the Ninth Circuit and yields an exceptional recovery of approximately 34% of the Class's maximum recoverable damages – an amount **16 times** the median ratio of recovery-to-investor losses obtained in PSLRA class action settlements in 2019.

The Settlement would not have been achieved without counsel's skill, dogged pursuit and refusal to accept a far lower settlement during this lengthy Litigation.  Counsel expended extraordinary resources – approximately $28.3 million of time and more than $5.2 million in expenses – all without any assurance that this time or money would be recovered.  Given the size of the Settlement and the percentage of recovery, and in light of the very significant risks from inception to Settlement, the result is – by any metric – extraordinary.

As compensation for their efforts in achieving this result, Lead Counsel, on behalf of all Lead Plaintiffs' Counsel, requests that the Court award a percentage fee of 18.83% of the Settlement Fund, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund.  The fee request is made pursuant to the agreement negotiated by Lead Plaintiffs Mineworkers' Pension Scheme and British Coal Staff Superannuation Scheme ("Lead Plaintiffs") with Lead Counsel Robbins Geller Rudman & Dowd LLP ("Lead Counsel" or "Robbins Geller") at the outset of the Litigation.  Under the agreement negotiated by Lead Plaintiffs, Robbins Geller was charged with advancing all fees and expenses necessary to prosecute the case, and in return is entitled to seek a fee pursuant to a tiered fee structure now that a successful outcome has been achieved.  *See* §III.A, *infra*. The tiered fee agreement was designed by Lead Plaintiffs to align the interests of counsel with those of Class Members by incentivizing Lead Counsel to maximize the net recovery for the Class.  *Id.*   As evidenced by the outstanding $350,000,000 Settlement, Lead Plaintiffs' fee structure worked.

Lead Counsel's accomplishments are particularly noteworthy considering the *ex ante*

risks of this case, and the hurdles presented throughout, which were manifold and which persisted to the day of settlement.  Defendants, represented by several of the nation's most well-respected law firms, vigorously contested liability and exhausted every litigation and appellate strategy in an effort to end this case without any recovery for Class Members – even appealing this case all the way to the United States Supreme Court.

The quality of Lead Counsel's representation, their efforts on behalf of the Class, and the high stakes of the case further support the requested fee award.  Lead Counsel investigated and pleaded a strong complaint, defeated Defendants' motion to dismiss, obtained class certification, and undertook exhaustive discovery efforts which included the collection and review of more than 3.7 million pages of documents from Defendants and third-parties.  Lead Counsel also crisscrossed the country to take and defend 37 depositions, and defeated a hotly-contested summary judgment motion.  Next, appellate specialists joined the trial team to defeat Defendants' efforts to derail the case in the Ninth Circuit and Supreme Court.  After years of appellate delay, Lead Counsel worked closely with eight expert witnesses to obtain detailed expert reports on complex subjects including, *e.g.*, market efficiency, solar technology, accounting, loss causation and damages, market analysis, and insider trading.  Lead Counsel then fended off myriad pretrial motions to exclude Plaintiffs' trial experts and evidence and was prepared to try this case when it settled just two days before trial.  These victories were obtained with diligence, hard work and skill.

The 18.83% fee requested falls well below the Ninth Circuit's 25% fee benchmark for common-fund litigation as well as the usual and customary range that clients pay lawyers to handle complex commercial cases in the private market.  A lodestar cross-check also confirms the reasonableness of the requested fee, as the lodestar multiplier of approximately 2.3 here falls well within the range of multipliers awarded in the Ninth Circuit, particularly in cases where the risk was substantial and the recovery was exceptional, as it was here.  The fee request is also supported by Lead Plaintiffs, a fact that should be given significant weight in the analysis of whether a requested fee is reasonable.  *See* §III.B.6, *infra*; Declaration of Paul McCormick in Support of Settlement ("McCormick Decl.").

1   Likewise, Lead Plaintiffs' Counsel's litigation costs, charges and expenses of

2   $5,263,516.69 (plus interest accrued thereon) should be awarded in full as they were

3   reasonably and necessarily incurred in the prosecution of the Litigation.  Finally, the Lead

4   Plaintiffs should also be awarded their reasonable expenses pursuant to the PSLRA, which

5   encourages institutional investors to participate in securities class actions.

6   **II.      HISTORY OF THE LITIGATION**

7   Lead Counsel invested substantial time and money in the prosecution of the Litigation,

8   including investigating background facts, interviewing witnesses, drafting the amended

9   complaint, briefing dispositive motions, briefing interlocutory appeals, conducting discovery,

10  reviewing documents, working with experts, preparing for, taking and defending fact and

11  expert depositions, and preparing for trial.  A detailed description of Lead Plaintiffs' claims

12  and Lead Counsel's prosecution of this case is set forth in Lead Plaintiffs' Memorandum of

13  Points and Authorities in Support of Motion for Final Approval of Settlement and the Plan of

14  Allocation and accompanying Declaration of Daniel S. Drosman in Support of: (1) Lead

15  Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (2) Lead

16  Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Drosman Decl.").  For

17  the sake of brevity, the Court is respectfully referred to those submissions.

18  **III.     THE REQUESTED FEE IS FAIR AND REASONABLE**

19  **A.      The Court Should Award Attorneys' Fees Using the**
    **Percentage-of-the-Fund Method**
20

21  The Supreme Court has long recognized that "a litigant or a lawyer who recovers a

22  common fund for the benefit of persons other than himself or his client is entitled to a

23  reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S.

24  472, 478 (1980).  Similarly, the Ninth Circuit holds that "a private plaintiff, or his attorney,

25  whose efforts create, discover, increase or preserve a fund to which others also have a claim

26  is entitled to recover from the fund the costs of his litigation, including attorneys' fees."

27  *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *accord In re NCAA*

28  *Grant-in-Aid Cap Antitrust Litig.*, 768 Fed. Appx. 651, 653 (9th Cir. 2019) ("*In re NCAA*").

- 3 -

1    Courts recognize that awards of fair attorneys' fees from a common fund are important to

2    incentivizing attorneys to represent class clients, who might otherwise be denied access to

3    counsel, particularly on a contingency basis. *See Stanger v. China Elec. Motor, Inc.*, 812

4    F.3d 734, 741 (9th Cir. 2016) ("*Stanger*").  An award of fair attorney fees in securities class

5    actions thus serves the public interest; as the Supreme Court has emphasized, private

6    securities actions such as this one are "an essential supplement to criminal prosecutions and

7    civil enforcement actions" brought by the U.S. Securities Exchange Commission ("SEC").

8    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

9         Although courts have discretion to employ either the percentage of recovery or

10   lodestar method, "[t]he use of the percentage-of-the-fund method in common-fund cases is

11   the prevailing practice in the Ninth Circuit for awarding attorneys' fees and permits the

12   Court to focus on a showing that a fund conferring benefits on a class was created through

13   the efforts of plaintiffs' counsel." *In re Korean Air Lines Co.*, *Antitrust Litig.*, 2013 WL

14   7985367, at *1 (C.D. Cal. Dec. 23, 2013); *see also In re Amkor Tech., Inc. Sec. Litig.*, 2009

15   WL 10708030, at *1 (D. Ariz. Nov. 19, 2009) ("*In re Amkor*") (percentage-of-recovery

16   method most appropriate to award attorneys' fees in securities class action); *In re*

17   *Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) ("*In re Omnivision*")

18   ("use of the percentage method in common fund cases appears to be dominant").  Thus, the

19   Ninth Circuit has expressly and consistently approved the use of the percentage method in

20   common fund cases.  *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-48 (9th

21   Cir. 2002) ("*Vizcaino*").

22        The PSLRA likewise contemplates that fees be awarded on a percentage basis,

23   authorizing attorneys' fees and expenses to counsel that do not exceed "a reasonable

24   percentage of the amount of any damages and prejudgment interest actually paid to the

25   class."  15 U.S.C. §78u-4(a)(6); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300

26   (3d Cir. 2005) ("[T]he percentage-of-recovery method was incorporated in the [PSLRA].").

27        The rationale for compensating counsel in common fund cases on a percentage basis

28   is sound.  First, it is consistent with the practice in the private marketplace where contingent

- 4 -

1    fee attorneys are customarily compensated by a percentage of the recovery.  *See Vinh*
2    *Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *9 (C.D. Cal. May 6, 2014) ("*Vinh*
3    *Nguyen*").  Second, it more closely aligns "the lawyers' interests with achieving the highest
4    award for the class members" in the shortest amount of time.  *Id.*; *see also* Charles Silver,
5    *Due Process and the Lodestar Method: You Can't Get There from Here*, 74 Tul. L. Rev.
6    1809, 1819-20 (June 2000) ("The consensus that the contingent percentage approach creates
7    a closer harmony of interests between class counsel and absent plaintiffs than the lodestar
8    method is strikingly broad.  It includes leading academics, researchers at the RAND Institute
9    for Civil Justice, and many judges. . . .  Indeed, it is difficult to find anyone who contends
10   otherwise."); *cf. Vizcaino*, 290 F.3d at 1050 n.5 ("[I]t is widely recognized that the lodestar
11   method creates incentives for counsel to expend more hours than may be necessary on
12   litigating a case[.]").

13        Here, at the time they retained Lead Counsel, Lead Plaintiffs negotiated a fee
14   agreement carefully designed to maximize the Class' ***net*** recovery and align Lead Counsel's
15   interests with those of the Class.  *See* McCormick Decl., ¶7.  In enacting the PSLRA,
16   Congress believed that institutions with significant financial stakes in the outcome of
17   securities class actions would be well positioned to select counsel and optimize the
18   prosecution of the case and the recovery to the class.  *In re Cendant Corp. Litig.*, 264 F.3d
19   201, 220 (3d Cir. 2001).  That is precisely what happened here.  The fee structure negotiated
20   *ex ante* by Lead Plaintiffs who are large sophisticated institutions with a substantial stake in
21   the litigation achieved its objective: Lead Counsel aggressively litigated this case to the eve
22   of trial and obtained a recovery that pays the Class 34% of the maximum damages – far more
23   than the median securities class action recovery while yielding an attorneys' fee request of
24   18.83%, or approximately 25% below the benchmark in this Circuit of 25%.  *Cf Hatamian v.*
25   *Advanced Micro Devices, Inc.*, 2018 WL 8950656, at *2 (N.D. Cal. Mar. 2, 2018)
26   (approving 25% fee where request had been "reviewed and approved as fair and reasonable
27   by Class Representatives, sophisticated institutional investors that were directly involved in
28   the prosecution and resolution of the Action and who have a substantial interest in ensuring

that any fees paid to plaintiffs' counsel are duly earned and not excessive").

**B.     Factors Considered by Courts in the Ninth Circuit Support Approval of an 18.83% Fee in This Case**

"Because the [18.83] percent award requested is below the 'benchmark' percentage for a reasonable fee award in the Ninth Circuit, it is 'presumptively reasonable.'" *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018) (citation omitted), *aff'd*, 2020 WL 1910732 (9th Cir. Apr. 20, 2020).  Moreover, application of the factors that courts in this Circuit consider when determining whether a fee is fair also strongly support the reasonableness of the requested fee.  These include: (1) the results achieved; (2) the risks of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and financial burden carried by the plaintiffs; (5) awards made in similar cases; (6) the reaction of the class; and (7) a lodestar crosscheck.  *See Vizcaino*, 290 F.3d at 1048-50.

**1.     Lead Counsel Achieved an Excellent Result for the Class**

Courts have consistently recognized that the result achieved is "the most critical factor" to consider in making a fee award.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). Here, Lead Counsel unquestionably obtained an exceptional recovery for the Class, both in terms of overall amount ($350,000,000) and as a percentage of the estimated recoverable damages (34%).  Indeed, the 34% of damages recovery is more than ***15 times*** the median percentage recovery for cases settled with estimated damages of $1 billion or more in 2018, and approximately ***16 times*** the median ratio of settlements-to-investor losses in 2019.[1]  The $350,000,000 recovery places the Settlement in the Top 50 largest securities class action settlements of all time, and is the fifth largest ever obtained in the Ninth Circuit.[2]

---

[1]     *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements – 2018 Review and Analysis* at 6, Figure 5, 19, Appendix 3 (Cornerstone Research 2019) (median settlements as a percentage of estimated damages was 2% in 2018 for Rule 10b-5 cases involving over $1 billion in damages and 5.1% for cases of all sizes in the Ninth Circuit from 2009 to 2018); Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review* at 20, Figure 13 (NERA Jan. 21, 2020) ("NERA Report") (median ratio of settlements to investor losses was 2.1% in 2019).

[2]     *See* Jeffrey Lubitz, *et al.*, *The Top 100 U.S. Class Action Settlements of All-Time*, at 6-7 (ISS SCAS 2020).

## 2.     The Litigation was Highly Risky and Complex

The "complexity of the issues and the risks" of the Litigation are also important factors in determining a fee award. *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995); *see also Vizcaino*, 290 F.3d at 1048 ("Risk is a relevant circumstance."). "'[I]n general, securities actions are highly complex and . . . securities class litigation is notably difficult and notoriously uncertain.'"  *Hefler*, 2018 WL 6619983, at *13 (citation omitted). Indeed, "[t]o be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009).  For these reasons, in securities class actions, fee awards often exceed the 25% benchmark recognized in the Ninth Circuit.  *In re Omnivision*, 559 F. Supp. 2d at 1047.

This Litigation was uniquely complex and risky.  Plaintiffs' claims involved alleged misrepresentations and omissions of information concerning the performance of First Solar's technology, the impacts of that non-performance on the Company's financials, and the accounting for those impacts.  Each of these issues was highly technical, and litigating this case required Lead Counsel to develop a sophisticated understanding of the operation and commercialization of solar technology, the myriad metrics that were important to both solar engineers and the financial market concerning the performance of First Solar's solar modules; the accounting principles that should have been applied, but allegedly were not in preparing First Solar's financial statements; and the economics of the solar energy industry.

Despite their ultimate success, Lead Counsel assumed significant risk at every procedural step of this Litigation.  Defendants argued strenuously that Plaintiffs failed to adequately plead: (i) a material fraudulent misrepresentation; (ii) scienter; (iii) loss causation or (iv) control person liability under §20(a).  ECF 102.  Plaintiffs prevailed.  Class certification presented the next major hurdle: if Lead Plaintiffs did not persuade the Court to certify the Class, Lead Plaintiffs may have elected not to continue with the case, and Lead Counsel may not have been able to recover the expenses undertaken or obtain a reasonable fee for the work it had performed.  Even if the Court did elect to certify a class, it could have

substantially narrowed the class definition, such that the maximum possible damages were significantly reduced.  Unsurprisingly, Defendants strenuously opposed class certification, hiring a prominent expert economist to dispute market efficiency and advancing several arguments as to why Plaintiffs had failed to show they were entitled to the *Basic v. Levinson* presumption of reliance and otherwise failed to establish Rule 23(b)(3)'s predominance requirement.  ECF 161.  Yet Plaintiffs prevailed again.

Plaintiffs faced even greater risk at summary judgment, where Defendants pressed every available factual and legal argument.  In particular, Defendants argued that the Ninth Circuit test for loss causation mandated the dismissal of all of Plaintiffs' claims.  While the Court ultimately agreed with Plaintiffs, the decision was exceedingly close, and the Court certified the loss causation issue for immediate appeal, recognizing that following one of the two lines of Ninth Circuit case law would result in dismissal.  *See* ECF 401 at 1.

Defendants left no stone unturned in their efforts to appeal the Court's summary judgment ruling, but Lead Counsel successfully navigated the appeal, defendants' *en banc* petition and their petition for writ of certiorari to the Supreme Court.  Defendants' petition gained enough traction that the Court issued an order calling for the views of the Solicitor General ("CVSG") – a rare event that happens on only 25 of the 7,000-8,000 petitions for certiorari per year on average, and indicated that the Supreme Court was seriously considering taking up the petition.[3]  Lead Counsel met multiple times with representatives from the SEC and the Office of the Solicitor General, ultimately obtaining a strong recommendation from both agencies that the Court deny Defendants' petition, which the Supreme Court did in June 2019.  In total, the appeals process took approximately four years, during which time Plaintiffs faced a significant risk of having their entire case disappear and Lead Counsel faced the specter of non-payment for nearly six years of work and millions of

---

[3]  *See* Ginger D. Anders, "Calls for the Views of the Solicitor General: An obscure but important part of Supreme Court practice" (American Bar Association July 1, 2017), available at  www.americanbar.org/groups/environment_energy_resources/publications/ trends/2016-2017/july-august-2017/calls-for-the-views-of-the-solicitor-general/    (last accessed April 21, 2020).

dollars of advanced expenses.

Even after navigating summary judgment and Defendants' subsequent appeals with their case mostly unscathed (the Court dismissed one category of alleged misstatements and one alleged corrective disclosure), Plaintiffs still bore the substantial risk of a month-long jury trial.  Defendants' counsel were determined to undercut Plaintiffs' case through pre-trial motions, moving to exclude each of Plaintiffs' five expert witnesses from testifying, as well as critical categories of evidence and exhibits.  *See* Drosman Decl., ¶¶87-94.

At the trial, the case would have hinged largely on expert testimony and the credibility of fact witnesses who were all represented by defense counsel.  Defendants needed only to defeat one element of Plaintiffs' claims to prevail, and there was a significant risk the jury would agree with Defendants' experts and find no liability, no damages, or award far less than Plaintiffs sought to recover.  *See, e.g.*, *Vinh Nguyen,* 2014 WL 1802293, at *2 (noting, in securities class action, that "[p]roving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law.  The outcome of that analysis is inherently difficult to predict and risky.").  Moreover, even if Plaintiffs obtained a favorable verdict, they would still face the risk of partial or complete reversal in post-trial proceedings.  *See, e.g.*, *In re Apollo Grp. Secs. Litig.*, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (court granted motion for a judgment as a matter of law, overturning $277 million verdict in favor of plaintiffs based on insufficient evidence of loss causation); *Cheng Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *9 (C.D. Cal. Oct. 10, 2019) ("The risk that further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees."); *see also In re Amkor*, 2009 WL 10708030, at *2 (that class counsel had "borne all the ensuing risk – including the risk of affirmance on Plaintiffs' appeal, surviving dispositive motions, obtaining class certification, proving liability, causation and damages, prevailing in a 'battle of the experts,' and litigating the Action through trial and possible appeals" weighed in favor of approving requested fee award).  The $350 million recovery, achieved in the face of these significant risks supports

1    the requested 18.83% fee award.

2    **3.    The Skill Required and Quality of Work**

3           The quality of Lead Counsel's representation further supports the reasonableness of

4    the requested fee.   Not only did Lead Counsel successfully litigate the case through

5    dispositive motions, prevail in the Ninth Circuit and successfully navigate the subsequent

6    cert petition and CVSG, but they brought the case to the brink of trial, forcing settlement

7    only two days before jury selection.  Moreover, Robbins Geller is a nationally recognized

8    leader in securities class actions and complex litigation.  *See* www.rgrdlaw.com.  The firm

9    has a track record of trying cases, or settling cases at a premium on the eve of trial after

10   moving teams of lawyers, forensic accountants and support personnel around the country.

11   Clients retain Robbins Geller to benefit from its experience and resources in order to obtain

12   the largest possible recovery for the Class.  Thus, the fee agreement in this case reflects the

13   concept:  you get what you pay for.  Here, Lead Counsel's skill and experience brought

14   about an exceptional result, further supporting the requested fee.

15          The quality of opposing counsel should also be considered in evaluating the work

16   performed by Lead Counsel.  *See, e.g.*, *Wing v. Asarco, Inc.*, 114 F.3d 986, 989 (9th Cir.

17   1997).  Eschewing lower-priced alternatives for this complex, high-stakes case, Defendants

18   chose nationally known and highly capable representation, including, Morrison & Foerster

19   LLP, Cravath, Swaine and Moore LLP, Osborn Maledon, P.A., and former acting U.S.

20   Solicitor General Neal Katyal of Hogan Lovells.  These firms spared no effort or expense on

21   behalf of Defendants in their zealous defense of the Litigation.  Plaintiffs' ability to obtain a

22   favorable result for the Class while litigating against these powerful defense firms and their

23   well-financed clients further evidences the quality of Lead Counsel's work and weighs in

24   favor of awarding the requested fee.

25          **4.    The Contingent Nature of the Fee and the Financial**
            **Burden Carried by Lead Counsel**
26

27          Determination of a fair attorneys' fee must include consideration of the contingent

28   nature of the fee and the difficulties that were overcome in obtaining the settlement:

                                             - 10 -
     4832-5158-2904.v1

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. *See* Richard Posner, *Economic Analysis of Law* §21.9, at 534-35 (3d ed. 1986). Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994); *see also Stanger*, 812 F.3d at 741 ("[R]isk multipliers incentivize attorneys to represent class clients, who might otherwise be denied access to counsel, on a contingency basis. This incentive is particularly important in securities cases.").

The risk of no recovery for a class and its counsel in complex cases of this type is very real. For example, in *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010), a case that Lead Counsel prosecuted, the court granted summary judgment to defendants after eight years of litigation, after plaintiff's counsel incurred over $7 million in expenses, and worked over 100,000 hours, representing a lodestar of approximately $40 million. In another Ninth Circuit PSLRA case, after a lengthy trial involving securities claims against JDS Uniphase Corporation, the jury reached a verdict in defendants' favor. *See In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007).

Because the fee in this matter was entirely contingent, the only certainty was that there would be no fee without a successful result. Nevertheless, Robbins Geller committed significant resources of both time and money to vigorously and successfully prosecute this action for the Class' benefit. *See generally* Drosman Declaration. The contingent nature of counsel's representation supports approval of the requested fee.

### 5. The 18.83% Fee Award Is Well Within the Range Awarded in Similar Complex, Contingent Litigation

The 18.83% fee requested is significantly less than the Ninth Circuit's well-established 25% "benchmark" for percentage fees in common fund cases, and also less than the 22.8% median attorneys' fee award granted from $100-500 million settlements between 2010-2019. *See, e.g.*, *Hefler*, 2018 WL 6619983, at *13; NERA Report, at 25.

1    The 18.83% fee requested by Lead Counsel is also within the range of percentage fees

2    that have been awarded in securities class actions and other complex class actions in the

3    Ninth Circuit with recoveries of comparable size.  *See, e.g.*, *In re Allergan, Inc. Proxy*

4    *Violation Sec. Litig.*, No. 8:14-cv-02004-DOC-KES, slip op. at 2 (C.D. Cal. Aug. 14, 2018),

5    ECF 637 (awarding fee of 21% of $250 million settlement); *Apollo Grp.*, 2012 WL 1378677,

6    at *8 (awarding 33% fee from $145 million settlement); *In re Broadcom Corp. Sec. Litig.*,

7    2005 WL 8153006, at *4 (C.D. Cal. Sept. 12, 2005) (applying 25% benchmark to

8    $150 million settlement); *Hefler*, 2018 WL 6619983, at *13 (granting fee award of 20% of

9    $480 million settlement); *In re Washington Mut., Inc. Sec. Litig.*, 2011 WL 8190466, at *1

10   (W.D. Wash. Nov. 4, 2011) (awarding 21% of $208.5 million total settlement); *Dusek v.*

11   *Mattel, Inc.*, 2003 WL 27380800, at *6-*7 (C.D. Cal. Sept. 29, 2003) (27% fee award from

12   $127 million settlement reasonable).

13                **6.     The Class' Reaction to Date Supports the Fee Request**

14   District courts in the Ninth Circuit also consider the reaction of the class when

15   deciding whether to award the requested fee.  *See, e.g.*, *In re Washington Mutual*, 2011 WL

16   8190466, at *2 (noting, in approving fee request, that "no substantive objections to the

17   amount of fees and expenses requested were filed").  While a certain number of objections

18   are to be expected in a large class action such as this, "the absence of a large number of

19   objections to a proposed class action settlement raises a strong presumption that the terms of

20   a proposed class action settlement are favorable to the class members."  *Nat'l Rural*

21   *Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C. D. Cal. 2004); *Hefler*, 2018

22   WL 6619983, at *15 ("As with the Settlement itself, the lack of objections from institutional

23   investors 'who presumably had the means, the motive, and the sophistication to raise

24   objections' [to the attorneys' fee] weighs in favor of approval.") (citation omitted).

25   While the June 9, 2020 deadline to object to the fee and expense application has not

26   expired, to date, only one objection has been received, and that submission contained no

27   substantive basis for the objection.  Should any further objections be received, Lead Counsel

28   will address them in its reply papers.  Finally, Lead Plaintiffs support Lead Counsel's fee and

expense request, a fact weighing in favor of approval.  McCormick Decl., ¶7.

### 7.    The Requested Fee Is Reasonable Under a Lodestar Cross-Check Analysis

Although Lead Counsel seek approval of a fee based on a percentage of the recovery, "[a]s a final check on the reasonableness of the requested fees, courts often compare the fee counsel seeks as a percentage with what their hourly bills would amount to under the lodestar analysis." *In re Omnivision*, 559 F. Supp. 2d at 1048.  The Ninth Circuit has noted that an analysis of the "lodestar method is merely a cross-check on the reasonableness of a percentage figure." *Vizcaino*, 290 F.3d at 1050 n.5; *see also HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*, 2010 WL 4156342, at *2 (S.D. Cal. Oct. 15, 2010) ("[L]odestar analysis is not necessary when the requested fee is within the accepted benchmark.").

Here, Lead Counsel spent more than 41,700 hours of attorney and paraprofessional time prosecuting this action on the Class' behalf.  Declaration of Luke O. Brooks Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Brooks Decl."), ¶4.   The resulting lodestar is $28,307,662.00, representing a modest multiplier of 2.3, which is well within the range of multipliers deemed reasonable in the Ninth Circuit.  *See Vizcaino*, 290 F.3d at 1047-51 (approving 3.64 multiplier and noting that multipliers from 1 to 4 are commonly approved in common fund cases); *In re NCAA*, 768 Fed. Appx. at 654 (district court did not abuse discretion by finding lodestar multiplier of 3.66 multiplier in "mega-fund" case to be reasonable).

## IV.    COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE APPROVED

Attorneys who create a common fund are entitled to an award of their expenses incurred in creating the fund so long as the submitted expenses are reasonable and directly related to the prosecution of the action.  *See In re Omnivision*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."); *Broadcom*, 2005 WL 8153006, at *8 (awarding $3.7 million in expenses accrued during four-year litigation); *Allergan*, No. 8:14-cv-02004-

- 13 -

1   DOC-KES, ECF 637 at 2 (awarding $6.2 million in litigation costs).  Here, Lead Plaintiffs'

2   Counsel requests an award of its litigation expenses in the amount of $5,263,516.69 incurred

3   in prosecuting and resolving the action on behalf of the Class.

4          From the outset, Lead Counsel knew that it might not recover any of its expenses or,

5   at the very least, would not recover them until the action was successfully resolved.  Even if

6   the case was ultimately successful, payment of Lead Counsel's expenses would not

7   compensate it for the lost use of funds advanced to prosecute the action.  Thus, Lead Counsel

8   was motivated to, and did, take significant steps to minimize expenses wherever practicable

9   without jeopardizing the vigorous and efficient prosecution of the action.

10          Lead Counsel's litigation expenses are identified and detailed in the accompanying

11   Brooks Declaration setting forth the specific categories of expenses incurred and the

12   amounts.  These expenses are the type of expenses routinely charged to clients billed by the

13   hour.  These include expenses associated with, among other things, experts and consultants,

14   service of process, online legal and factual research, travel and mediation.  *See, e.g.*, *Vincent*

15   *v. Reser*, 2013 WL 621865, at *5 (N.D. Cal. Feb. 19, 2013) (granting award of costs and

16   expenses for "'three experts and the mediator, photocopying and mailing expenses, travel

17   expenses, and other reasonable litigation related expenses'") (citation omitted); *Knight v. Red*

18   *Door Salons, Inc.*, 2009 WL 248367, at *7 (N.D. Cal. Feb. 2, 2009) (granting award of costs

19   because "[a]ttorneys routinely bill clients for all of these expenses").

20          A large component of Lead Counsel's expenses is for the costs of experts and

21   consultants, all of whom were qualified and necessary to litigate this action.  The Brooks

22   Declaration, ¶6(g)-(h), explains each expert's qualifications and role in the Litigation.

23          The Notice informed Class Members that Lead Plaintiffs' Counsel would apply for

24   payment of litigation expenses in an amount not to exceed $6 million.  *See* Declaration of

25   Ross D. Murray Regarding Notice Dissemination, Publication, and Distribution of the Net

26   Settlement Fund, dated April 23, 2020 ("Murray Decl."), Ex. A.  The amount of expenses for

27   which payment is now sought, $5,263,516.69, is less than the amount published in the

28   Notice, to which no Class Member has substantively objected.

- 14 -

**V.   COUNSEL'S AWARDED FEES AND EXPENSES SHOULD BE PAID UPON THE COURT'S ORDER GRANTING THE AWARD**

Lead Plaintiffs request that Lead Counsel's awarded fees and expenses be paid upon the Court's order granting such award, as provided in the Stipulation. *See* Stipulation, ¶6.2. ECF 701. Federal courts regularly approve such payment provisions in complex class action settlements across the country. *See, e.g.*, *In re Optical Disk Drive Prod. Antitrust Litig.*, 2016 WL 7364803, at \*13 (N.D. Cal. Dec. 19, 2016) ("Quick pay provisions are common practice in the Ninth Circuit."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575004, at \*1 (N.D. Cal. Dec. 27, 2011) ("Federal courts, including this Court and others in this District, routinely approve settlements that provide for payment of attorneys' fees prior to final disposition in complex class actions.") (collecting cases); *In re Verifone Holdings, Inc. Secs. Litig.*, 2014 WL 12646027, at \*2 (N.D. Cal. Feb. 18, 2014) (PSLRA case finding that the "'quick pay' nature of the attorneys' fee provision does not pose a problem"); *Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at \*13 (S.D. Cal. Dec. 6, 2018) (approving request for payment of fee award in PSLRA case within 10 days of judgment).

Payment of Lead Counsel's fee and expenses upon final approval will protect Lead Counsel while imposing no burden on the Class. First, because this is not a "claims-made" settlement, and the Net Settlement Fund will be paid out to eligible claimants in full by the Claims Administrator as expeditiously as possible regardless of when Lead Counsel is paid or how many Class Members submit claims, delaying payment of Lead Counsel's fee and expenses will not benefit Class Members; it will only penalize Lead Counsel. *See* Murray Decl.; *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) (a payment provision providing for payment upon issuance of an order of final approval "does not harm the class members in any discernible way, as the size of the settlement fund available to the class will be the same regardless of when the attorneys get paid."). And in the event that any portion of the Settlement or attorneys' fee and expense award is successfully appealed, Lead Counsel will refund that portion within 10 days of such order. Stipulation, ¶6.3. *See also Brown v. Hain Celestial Grp. Inc.*, 2016 WL 631880, at \*10 (N.D. Cal. Feb. 17, 2016) (approving

- 15 -

4832-5158-2904.v1

payment provision because while "the plaintiffs' counsel has the option of being paid fees before resolution of any appeal; they also must return them immediately if the settlement is overturned on appeal"); *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Practices & Prod. Liab. Litig.*, 952 F.3d 471, 487 (4th Cir. 2020) ("And, in any event, when the lawyers get paid matters little when, as here . . . Class Counsel have promised to refund (with interest) the fees awarded pursuant to the quick-pay provision if the Attorney's Fees Order is vacated.").

Although the notes to Rule 23 suggest that it may be appropriate to defer fees in cases where the settlement "may not result in significant actual payments to class members" or in "[s]ettlements involving nonmonetary provisions," this is not that case. Because this is not a claims-made settlement and there is no reversion, the amount "actually paid" to the Class will be 100 percent of the Net Settlement Fund. Following disbursement, the Settlement Account will be at or near zero, and even if checks go uncashed and a second distribution is economically feasible, that money will go to Class Members. *See* Murray Decl., ¶24.

Finally, quick-pay provisions serve the socially beneficial goal of deterring professional objectors to class action settlements, whose baseless objections are often filed simply to coerce Counsel into paying the objector and his counsel more money. *See In re: Whirlpool Corp. Front-loading Washer Prods. Liab. Litig.*, 2016 WL 5338012, at *21 (N.D. Ohio Sept. 23, 2016) (the virtue of such a payment provision "'is that objectors who bring meritless appeals can no longer delay the point at which class counsel receive their fees'" and therefore "reduce the 'holdout tax' that blackmail[ing] objectors can extract in class action litigation.") (citation omitted). Lead Plaintiffs thus respectfully submit that immediate payment of Lead Counsel's fee and expenses is appropriate in this long-litigated case.

## VI.    LEAD PLAINTIFFS' REQUEST FOR AN AWARD PURSUANT TO 15 U.S.C. §78u-4(a)(4) IS REASONABLE

Lead Plaintiffs seek an award of $42,591.42, collectively, pursuant to 15 U.S.C. §78u-4(a)(4) in connection with their representation of the Class, as detailed in the accompanying McCormick Declaration. Under the PSLRA, a class representative may seek an award of

1   reasonable costs and expenses directly relating to the representation of the class.  *See* 15

2   U.S.C. §78u-4(a)(4); *see also Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003)

3   (holding that named plaintiffs are eligible for "reasonable" payments as part of a class action

4   settlement).

5          When evaluating the reasonableness of a lead plaintiff award, courts may consider

6   factors such as "'the actions the plaintiff has taken to protect the interests of the class, the

7   degree to which the class has benefitted from those actions, . . . the amount of time and effort

8   the plaintiff expended in pursuing the litigation'" among others.  *Staton*, 327 F.3d at 977

9   (citation omitted).  As detailed in the McCormick Declaration, Lead Plaintiffs devoted

10  extensive time and effort monitoring the Litigation and directing Lead Counsel, including

11  reviewing and commenting on case filings, providing input on discovery strategy, sitting for

12  deposition, and providing input on the parties' mediation.  Indeed, Lead Plaintiffs attended

13  the very first hearing in this case, intend to participate in the final approval hearing and

14  actively litigated this case every step of the way.  Courts have approved as reasonable awards

15  for class representatives that are within this range.  *See, e.g.*, *Dusek v. Mattel*, 2003 WL

16  27380801, at *1 (C.D. Cal. Sept. 29, 2003) (awarding $117,246 to the lead plaintiffs); *In re*

17  *Allergan*, No. 8:14-cv-02004-DOC-KES, slip op. at 2, ECF 637 at 6 (granting lead plaintiff

18  award of approximately $75,000).

19  **VII.   CONCLUSION**

20         Based on the foregoing and the entire record, Lead Plaintiffs and Lead Plaintiffs'

21  Counsel respectfully request that the Court: (i) award Lead Counsel attorneys' fees of

22  18.83% of the Settlement Fund and payment of $5,263,516.69 in litigation expenses, plus

23  interest on both amounts at the same rate as earned by the Settlement Fund, and (ii) an award

24  of $42,591.42 to Lead Plaintiffs, as allowed by the PSLRA.

25  DATED:  April 24, 2020                    Respectfully submitted,

26                                           s/ Luke O. Brooks
                                       _____
27                                           Luke O. Brooks

28

4832-5158-2904.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
Daniel S. Drosman
Luke O. Brooks
Ellen Gusikoff Stewart
Jessica T. Shinnefield
Darryl J. Alvarado
Christopher D. Stewart
Hillary B. Stakem
J. Marco Janoski Gray
Ting H. Liu
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT, P.C.
Andrew S. Friedman (AZ005425)
Kevin Hanger (AZ027346)
2325 E. Camelback Road, Suite 300
Phoenix, AZ  85016
Telephone:  602/274-1100
602/274-1199 (fax)

Liaison Counsel for Plaintiffs

- 18 -

1

## CERTIFICATE OF SERVICE

2      I hereby certify under penalty of perjury that on April 24, 2020, I authorized the

3 electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system

4 which will send notification of such filing to all counsel of record.

5
                                        s/ Luke O. Brooks
6                                      LUKE O. BROOKS

7                                      ROBBINS GELLER RUDMAN
                                         & DOWD LLP
8                                      655 West Broadway, Suite 1900
                                       San Diego, CA  92101-8498
9                                      Telephone:  619/231-1058
                                       619/231-7423 (fax)
10
                                       E-mail:  lukeb@rgrdlaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28